# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-1338

JAZMINE BJELLAND, DEREK BURANEN, GARETH
DOSKEY,  LAUREN FOLKERTS, JOSEPH
GALLEGOS, JACK GIRARD, ROBERT GREER, ZURI
HOSKIN, HUITZILOXOCHITL ("LALA")
JARAMILLO, VIRYA KELSANG, KEVIN KREEGER,
SEBASTIAN MCCANTS, CHRISTIAN MCDONNELL,
and DOUGLAS MUNN,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, ADAM BOLTON,
JOHN AND JANE DOES 1–100, and JOHN AND JANE
BOES 1–50,

      Defendants.

---

## COMPLAINT

---

Plaintiffs Jazmine Bjelland, Derek Buranen, Gareth Doskey,  Lauren Folkerts, Jack Girard, Joseph Gallegos, Robert Greer, Zuri Hoskin, Huitziloxochitl ("Lala") Jaramillo, Virya Kelsang, Kevin Kreeger, Sebastian McCants, Christian McDonnell, and Douglas Munn, ("Plaintiffs") submit this Complaint against Defendants the City and County of Denver ("Denver"), Adam Bolton ("Bolton"), John and Jane Does 1–100, and John and Jane Boes 1–50 and allege as follows:

## INTRODUCTION

1.      Plaintiffs seek to hold the City of Denver and certain individual officers accountable for repeated violations of constitutional rights during mass protests in late May and early June 2020 and to force the City of Denver to abandon its policy, practice, or custom of allowing police officers to use so-called "less-lethal" weapons and tactics to suppress, deter, or injure individuals and organizations that exercise their First Amendment rights.  Denver's actions, while unconstitutional in any context, are even more pernicious here because the use of excessive force has specifically targeted peaceful demonstrators who assembled to protest police violence and brutality, including in particular police brutality that disproportionately targets African Americans.  Plaintiffs demand that Denver and its police department accept and act in accordance with the principle that Black lives matter equally in our society and stop using indiscriminate or unlawfully targeted force against peaceful protesters exercising their First Amendment rights to assemble, speak, and petition their government for a redress of grievances.

2.      Just after 8:00 PM on May 25, 2020, George Floyd, a 46-year-old Black man, was accused of a non-violent offense and arrested by officers of the Minneapolis Police Department.  During the course of his arrest, Mr. Floyd was handcuffed and fell to the pavement.  Less than ten minutes after the police arrived, one of the four police officers who arrested Mr. Floyd placed his knee and the weight of his body on Mr. Floyd's neck as Mr. Floyd lay on the ground.  For eight minutes and forty-six seconds, the officer held his knee on Mr. Floyd's neck.  As Mr. Floyd pleaded for his life, three more officers either held his legs or stood by and watched while he died.  Among Mr. Floyd's final words were "please, please, please, I can't breathe."

3.      Breonna Taylor, a Black woman, was shot eight times and killed on March 13, 2020, by three plainclothes officers in Louisville, Kentucky, who entered her home in the middle of the night to execute a no-knock warrant.

4.      Tragically, Mr. Floyd and Ms. Taylor are far from the only Black men, women, and children who have unjustifiably been killed by law enforcement officers in recent years. This is true in Denver and across the country.

5.      Elijah McClain, twenty-three, was killed by Aurora police officers in August 2019 after walking down a street unarmed.  De'Von Bailey, nineteen, was shot in the back and killed by Colorado Springs police as he ran from them in August 2019.  David Baker, a thirty-two year old Navy veteran, was killed by Aurora police in December 2018 after officers discharged a Taser on him 11 times and held him face down for 90 seconds.  Michael Marshall was killed by Denver sheriff deputies after asphyxiating on his own vomit while being restrained for 11 minutes.  Marvin Booker was killed in 2010 by Denver sheriff deputies who shocked him with a Taser, put him in a sleeper hold and hit him with nunchucks as they pinned him to the floor.[1]

6.      Mr. Floyd's death, captured on video and seen by millions around the world, sparked many to take to the streets and to demand change, justice, and a collective determination that Black lives do matter.  Notwithstanding the ongoing threat posed by the global pandemic of COVID-19, groups of demonstrators throughout the United States and the world, including in

---

[1]  Noelle Phillips, *Say their names: A look at controversial police killings in Colorado*, Denver Post, June 6, 2020, https://www.denverpost.com/2020/06/06/controversial-police-deaths-in-colorado/.

Denver, Colorado, gathered to protest the brutality and systemic injustices perpetrated by law enforcement officers against Black people and people of color.

7.     Law enforcement officers, including the Denver Police Department ("DPD"), Denver Sheriff's Department, those from other jurisdictions who assisted the Denver police, as well as the Colorado State Patrol ("CSP") (collectively, "Officers in Denver"), responded repeatedly with an overwhelming and unconstitutional use of force.  This excessive use of force injured many protesters and discouraged others from exercising their constitutional rights, suppressed the protesters' speech, and infringed on the rights of legal observers, journalists, and medical personnel attempting to perform their duties at protest sites.

8.     DPD invited and/or allowed neighboring jurisdictions to send their law enforcement officers to Denver to participate in and assist the DPD in responding to protesters' speech and activities.  DPD expressly authorized the neighboring jurisdictions to follow their own policies, practices, and/or customs regarding the use of less lethal force during the protests. DPD also failed to conduct any joint training exercises with neighboring jurisdictions.  As such, Denver is responsible for the actions of the law enforcement officers from other jurisdictions who participated in the DPD's actions.

9.     Specifically, every day from Thursday, May 28, 2020 through at least Tuesday, June 2, 2020, Officers in Denver used methods of "less-lethal" force to discourage and suppress peaceful protest in public spaces throughout the City of Denver.  These methods of "less-lethal" force included the use of tear gas and chemical irritants, kinetic impact projectiles of various kinds, grenades, pepper spray, and weapons intended to stun with light and sound.  The use of these "less-lethal" methods constituted excessive force.

10.     The purpose and effect of this excessive force by Officers in Denver has restricted, frustrated, and deterred protesters from exercising their rights under the First Amendment to peacefully assemble, petition for redress of grievances, and exercise freedom of speech.  It has also infringed on protesters' rights under the Fourth and/or Fourteenth Amendments to be free from unreasonable seizures and excessive use of force.

11.     As a result of the excessive force perpetrated by Officers in Denver, Plaintiffs have suffered a variety of physical injuries, including but not limited to: bruises on their backs, torso, limbs and face; burning of their legs; burning in and on the eyes, throat, and face; difficulty breathing; and lost vision.  Plaintiffs have also suffered disorientation; sleeplessness; symptoms of post-traumatic stress disorder; and extended and continuing periods of fearfulness and anxiety.

12.     Plaintiffs have been—and still want to be—part of the movement to protect Black lives.  They want to participate in demonstrations against police brutality in the City without fear that law enforcement agents working on behalf of the City will endanger their physical safety and freedom of expression with the unjustified and indiscriminate use of "less-lethal" weapons. Plaintiffs bring this action to seek accountability, to vindicate their constitutional rights, and to restrain local law enforcement from continuing to respond to peaceful protest with unconstitutional and indiscriminate force.  In addition to injunctive and declaratory relief, Plaintiffs also seek damages for the physical and emotional injuries they have suffered because of the policies and/or customs of the City of Denver and at the hands of law enforcement officers that attacked the demonstrators.

## PARTIES

13.     Plaintiff Jazmine Bjelland is a resident of Colorado who participated in demonstrations on May 29, May 30 and May 31, 2020.

14.     Plaintiff Derek Buranen is a resident of Colorado who participated in demonstrations in Denver on May 30 and May 31, 2020.

15.     Plaintiff Gareth Doskey is a resident of Colorado who participated in demonstrations in Denver on May 30 and May 31, 2020.

16.     Plaintiff Lauren Folkerts  is a resident of Colorado who participated in demonstrations in Denver on May 30, 2020.

17.     Plaintiff Jack Girard is a resident of Colorado who participated in demonstrations in Denver on May 28 and May 30, 2020.

18.     Plaintiff Joseph Gallegos is a resident of Colorado who participated in demonstrations on May 30, 2020.

19.     Plaintiff Robert Greer is a resident of Colorado who participated in demonstrations on May 30, 2020.

20.     Plaintiff Zuri Hoskin is a resident of Colorado who participated in demonstrations in Denver on May 29, 2020.

21.     Plaintiff Huitziloxochitl ("Lala") Jaramillo is a resident of Colorado who participated in demonstrations on May 30, 2020

22.     Plaintiff Virya Kelsang is a resident of Colorado who participated in demonstrations on May 29, 29, 30, and 31, 2020, among other days.

23.    Plaintiff Kevin Kreeger is a resident of Colorado who participated in demonstrations on May 30, 2020.

24.    Plaintiff Sebastian McCants is a resident of Colorado who participated in demonstrations on May 30, 2022.

25.    Plaintiff Christian McDonnell is a resident of Colorado who participated in demonstrations on May 30, 2020, among other dates.

26.    Plaintiff Douglas Munn is a resident of Colorado who participated in demonstrations on May 29, May 30, and May 31, 2020.

27.    Defendant City and County of Denver is a home-rule municipality incorporated in the State of Colorado.

28.    Defendants John and Jane Does 1–100 are officers of the DPD, Denver Sheriff's Department, or officers of other jurisdictions who were acting with the tacit or express authorization of the DPD, who gave orders for and/or participated in the attacks on peaceful protesters, including on Plaintiffs, in Denver beginning on Thursday, May 28, 2020.  They are sued in their individual capacities.

29.    Defendants John and Jane Boes 1–50 are officers of the Colorado State Patrol (CSP) who gave orders for and/or participated in the attacks on peaceful protesters, including on Plaintiffs, in Denver beginning on Thursday, May 28, 2020.  They are sued in their individual capacities.

30.    At all times relevant to this Complaint, all Defendants were acting under color of state law.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions and seeks to redress the deprivation of rights under the U.S. Constitution.

32.     Venue is proper in this District under 28 U.S.C. 1391(e)(1) because the events giving rise to the claims took place in the District of Colorado.

## FACTUAL BACKGROUND

33.     Beginning on Thursday, May 28, 2020, demonstrators gathered at the Colorado State Capitol building to protest police brutality against Black people in the United States.  The protests were a response specifically to the recent murders of George Floyd, a Black man who was killed by police officers in Minnesota on May 25, 2020, and of Breonna Taylor, a Black woman who was killed by police officers in Kentucky on March 13, 2020.

34.     The protests continued day after day.  Though protesters often assembled at or near the Capitol building, protesters also marched down major city streets and gathered in other parts of the city.  Throughout the course of the protests, Denver employed violent law enforcement tactics to corral, intimidate, and silence protesters.  Law enforcement dressed in riot gear, carried riot shields, released tear gas, unleashed flash bombs and grenades, and shot rubber, foam batons, and pepper bullets directly at protesters.  Officers used these tactics on protesters who were demonstrating peacefully, without first issuing warnings or giving them adequate time

to disperse according to their illegal orders.  In doing so, officers repeatedly violated not only the Constitution but also the official Operations Manual of the DPD.[2]

**Weapons Used**

35.     Beginning on Thursday, May 28, 2020, Officers in Denver used at least the following on peaceful protesters:  tear gas and smoke cannisters; kinetic impact projectiles (KIPs) including rubber bullets, foam bullets, and pepperballs; grenades including flash bangs and rubber-pellet grenades (and some that also released tear gas and pepper spray); and pepper spray.[3]  APD officers used "less lethal shotguns" including so-called "sock rounds" or "bean bag rounds."

36.     One person photographed and posted online the below collection of weapons that were used at the protests.[4]

---

[2] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf.
[3] Conor McCormick-Cavanagh, *All the "Less-Lethal" Munitions Used by Law Enforcement at Protests*, Westword, June 11, 2020, https://www.westword.com/news/denver-protests-the-list-of-less-lethal-munitions-used-by-law-enforcement-11724452.
[4] "A collection of flash bang hand grenades, 40mm foam rounds, rubber bullets tear gas canisters and pepper balls all fired at the crowd last night 5/30," https://www.reddit.com/r/DenverProtests/comments/gu6zlm/a_collection_of_flash_bang_hand_grenades_40mm/.



37.     First, Officers in Denver used tear gas.  Tear gas is an umbrella term for

aerosolized chemical agents.[5]  The two most common types of tear gas are CS and OC.[6]  CS gas

(o-chlorobenzylidene malononitrile) is a chlorinated, organic chemical and OC is Oleoresin

Capsicum, which is derived from chiles, and is the active ingredient in pepper spray.[7]

---

[5] Operations Manual, Denver Police Department,
https://www.denvergov.org/content/dam/denvergov/Portals/720
/documents/OperationsManual/OMSBook/OM_Book.pdf; Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020,
https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[6] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[7] *Id.*

38.     Tear gas can be deployed in a grenade or cannister that produces a cloud of chemicals.[8]  It is indiscriminate in nature.[9]  Photos of OC and CS tear gas cannisters and grenades used during the protests, and an area filled with tear gas in Denver, are below.[10]

  

 

A tear gas canister left after Denver Police officers filled the entire block with the gas to disperse protesters. May 29, 2020. (Kevin J. Beaty/Denverite)     A woman holding a sign outside of Denver Police District Six headquarters on Washington Street disappears into a cloud of tear gas. May 30, 2020. (Kevin J. Beaty/Denverite)

---

[8] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.
[9] *Id.*
[10] Francie Swidler & Jim Hill, *What 4 Days Of Protest Over George Floyd's Death Looked Like in Denver*, CPR News, June 1, 2020, https://www.cpr.org/2020/06/01/photos-denver-protests-george-floyd-death/.

39.     Tear gas can cause severe coughing, crying, mucus production, and can make it difficult to breathe.[11]  It can also cause vision to become blurry, and eyes to tear up, become inflamed, and feel like they are burning.[12]  It can cause skin to turn red, become blistery, develop a rash or chemical burn.[13]  It also causes disorientation.[14]

40.     Tear gas can also cause respiratory arrest, vomiting and allergic reactions, and it can permanently damage the eyes, cause asthma symptoms, and cause traumatic brain injury.[15] It can also have adverse effects on pregnant people and fetuses.[16]

41.     Tear gas chemicals are banned in warfare.[17]

42.     Tear gas can cause people to cough and spread infectious droplets, putting people at higher risk of symptomatic or severe COVID-19.[18]

---

[11] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[12] *Id.*
[13] *Id.*
[14] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.
[15] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[16] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.
[17] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.
[18] *Id.*

43.     Like tear gas, smoke cannisters contain slow burning and high volume amounts of smoke and discharge grey-white smoke, making it difficult to see and breathe.[19]  Here is a picture of a smoke cannister that a protester in Denver collected on Friday night, May 29, 2020:



44.     Next, officers shot kinetic impact projectiles.  Photos of officers shooting projectiles out of  "less-lethal" weapons are below.[20]



Denver police fire projectiles across Colfax Avenue into a crowd on the west lawn of the state Capitol. Denver protesters angry about the death of African American George Floyd at the hands of a white Minneapolis police officer took the streets for a second day Friday, May 29, 2020 (Hart Van Denburg/CPR News)



A state trooper aims a weapon at protesters from a Capitol balcony. May 29, 2020. (Kevin J. Beaty/Denverite)

---

[19] Maximum Smoke HC Military-Style Canister, Defense Technology™, https://www.defense-technology.com/products/chemical-agent-devices/chemical-grenades/maximum-smoke-hc-military-style-canister-1011576.html#start=7.

[20] Francie Swidler & Jim Hill, *What 4 Days Of Protest Over George Floyd's Death Looked Like in Denver*, CPR News, June 1, 2020, https://www.cpr.org/2020/06/01/photos-denver-protests-george-floyd-death/.



A protester kneels and puts his hands in the air as Denver police officers start firing pepper ball into a crowd of protesters gathered near Colfax Ave and Broadway on the third day of George Floyd protests in Denver May 30, 2020. Protesters are outraged over the death of George Floyd, a 46-year-old black man who was killed by a Minnesota police officer who pinned him to the ground with his knee on his neck.

45.     Kinetic impact projectiles have a larger surface area than other ammunition, and thus they take unpredictable flight paths and reduced accuracy is inevitable.[21]

46.     It is extremely common for kinetic impact projectiles to cause contusions, abrasions, and hematomas.[22]  Additionally, blunt impact may cause internal injuries.[23]

47.     Fatalities may occur when impact is at the head, neck, or precordium (the region of the chest immediately in front of the heart).[24]

48.     Officers in Denver injured protesters with inappropriate shot placement.

49.     A Lakewood man was struck with a projectile Saturday, May 30, 2020, during the protest and his eye has to be surgically removed.[25]

---

[21] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; Kinetic Impact Projectiles, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.

[22] W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.

[23] *Id.*

[24] *Id.*

[25] Amber Fisher, *Denver Protests Day 7: Marches, Sit-Ins, Injured Rally-Goers*, Patch, June 3, 2020, https://patch.com/colorado/denver/denver-protests-day-7-marches-sit-ins-injured-rally-goers.

50.     In Denver, a 21-year-old delivery driver who was not protesting, but walking

from a friend's apartment to his car, was hit in the eye with a projectile and blinded in one eye.[26]

Additionally, a 22-year old woman was shot in the face with a foam projectile on Friday

afternoon, May 29, 2020, and was treated for a large laceration on the scene.[27]  A man was also

shot in his torso with a projectile at a 15-foot range on Saturday, May 30, 2020 in Denver.[28]

Hyoung Chang, a staff photographer for the Denver Post was hit in the chest with projectiles on

Thursday, May 28, 2020 during protests at the state Capitol.[29]

51.     According to a systematic review of available literature, three percent of those

injured by kinetic impact projectiles died from their injuries.[30]  Fifteen percent of 1,984 people

studied were permanently injured by them.[31]

52.     DPD uses 40 mm launchers to shoot projectiles.  40 mm launchers are firearms

that shoot "40 mm specialty impact munitions" at a speed of 90 to 100 miles per hour.[32]

---

[26] Elise Schmelzer, *Denver protest bystander blind in one eye after being hit by police with "less lethal" projectile*, Denver Post, June 9, 2020, https://www.denverpost.com/2020/06/09/denver-protest-bystander-blinded/.

[27] Lori Jane Gliha, *Police projectile fractures Denver protester's face; she says it was unprovoked*, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked.

[28] Danielle Chavira, *Colorado Man Describes Injury From Police Confrontation*, CBS 4 Denver, June 2, 2020, https://denver.cbslocal.com/2020/06/02/colorado-man-injury-police-confrontation/?utm_campaign=true_anthem&utm_medium=facebook&utm_source=social.

[29] Marc Tracy & Rachel Abrams, *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. Times, June 1, 2020, https://www.nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html.

[30] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.

[31] *Id.*

[32] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf; https://www.youtube.com/watch?v=ZUx8CkKOjH0.

53.     Officers in Denver used 40 mm launchers to launch foam batons, sometimes referred to as rubber bullets—are solid, spherical or cylindrical projectiles typically used to incapacitate a person and are known to leave bruising and welts—at protesters at speeds of over 200 miles per hour. [33]  The manufacturer of these launchers warns that their improper use can result in serious injury and death.  Officers in Denver also used 40 mm launchers to shoot grenades, projectiles containing Oleoresin Capsicum (OC) powder, and gas and smoke canisters at protesters.

  

54.     Smaller rubber bullets were also shot by Officers in Denver at the protests.



55.      Additionally, pepperballs, including those that DPD officers shot during the protests, came from air-powered launch devices that deploy plastic sphere projectiles filled a synthetic pelargonic acid, sometimes referred to as PAVA powder or OC powder.[34]  The plastic spheres are used as a kinetic impact projectile, and additionally explode a form of powdered acid on impact, causing victims who come in contact with that powder to struggle to breathe, suffer chemical burns or skin irritation, and ultimately incapacitate them..  The images below show both the PepperBall projectiles and the devices used to deploy them.[35]






---

[34] Operations Manual, Denver Police Department,
https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf.
[35] https://www.youtube.com/watch?v=ZUx8CkKOjH0.

56.     Pepperballs have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.[36]

57.     In addition to the burning effect of the chemical weapon contained in the pepper bullets, the bullets themselves can cause serious injury—even death—because of the high velocity at which they are shot.  The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second or more than 238 miles per hour.[37]

58.     The Boston Police Department suspended use of pepperballs in 2004 after a college student was killed as a result of a pepperball striking her in the eye.[38]

59.     In 2004, University of California, Davis police shot a pepperball at an unarmed student while trying to break up a block party, striking that student in the eye, and causing permanent damage.[39]

60.     Denver Police themselves have been called on and conducted an internal investigation on whether to end the use of pepperballs after they were used in response to Occupy demonstrations on October 29, 2011.

61.     The pictures below show a parking lot near the Capitol after many pepper bullets were shot, and some pepperball bullets found at the protest sites.

---

[36] Florida Gulf Coast University, Weapons & Equipment Research Institute, *Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis* (2008).
[37] 2019 Product Catalog, PepperBall, https://www.pepperball.com/wp-content/uploads/2019/01/PepperBall-2019-product-catalog.pdf.
[38] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, Wash. Post, Oct. 24, 2004, https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5.
[39] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. Times, July 12, 2012, https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.




62.    Officers in Denver also shot grenades at protesters, including flash bang grenades and rubber-pellet grenades, some of which also released tear gas and pepper spray.

63.    Flash bangs are explosives that make a loud noise and/or flash of light, and are made to temporarily blind and/or deafen people and to disorient people.[40]  Flash bangs emit a blinding light, and temperatures up to 4,900 degrees, which is hot enough to melt steel.  They also emit a concussive force strong enough to knock people out. In rare circumstances, the explosives within flash bangs can blow off fingers or hands, spray  shrapnel indiscriminately, and cause fires.[41]

---

[40] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents; "Flash Bang" Distraction Grenade, NonLethal Technologies, http://www.nonlethaltechnologies.com/DD-FB.htm.

[41] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

 

64.     Rubber pellet grenades are grenades that detonate, cause a loud sound and bright flash of light, and cause small rubber bullets to explode out of the grenade.[42]  These are sometimes called "stinger" grenades, for the pain they inflict on victims.

65.     Some of the rubber pellet grenades used against protesters not only included rubber pellets, but also detonated with clouds of  tear gas and/or pepper spray.[43]

---

[42] Stinger 32-Caliber Rubber Balls w/ Safety Clip, Defense Technology, https://www.defense-technology.com/products/tactical-devices/stinger-32-caliber-rubber-balls-w-safety-clip-1152928.html#q=stinger&start=16&sz=12.
[43] Conor McCormick-Cavanagh, *All the "Less-Lethal" Munitions Used by Law Enforcement at Protests*, Westword, June 11, 2020, https://www.westword.com/news/denver-protests-the-list-of-less-lethal-munitions-used-by-law-enforcement-11724452.

 

66.     Officers in Denver also used pepper spray, spraying it directly at protesters (in addition to releasing pepper spray in projectiles, grenades, and tear gas).  The pictures below show pepper foam found at the protest site and an officer shooting pepper spray at a person.[44]



---

[44] Jesse Paul, *Federal judge orders police not to use chemical weapons, projectiles against peaceful Denver protesters*, Colo. Sun, June 5, 2020, https://coloradosun.com/2020/06/05/denver-george-floyd-protests-federal-order/.



67.     The active ingredient in pepper spray is Oleoresin Capsicum, which is a chemical

weapon derived from the active chemical in chili peppers.[45]

68.     When aerosolized streams of irritants are sprayed directly, higher doses of the

chemical agent directly strike the person.[46]

69.     Pepper spray can cause vision to become blurry, and eyes to tear up, become

inflamed, and feel like they are burning.[47]  It can cause skin to turn red, blister, and develop a

rash or chemical burn.[48]

---

[45] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

[46] Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.

[47] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

[48] *Id.*.

70.     During the protests following the murder of George Floyd, at least 60 protesters nationwide have sustained serious injuries from the use of "less-lethal" weapons by law enforcement, including "a broken jaw, traumatic brain injuries, and blindness."[49]

**Timeline of Law Enforcement Response to Protests in Denver**

71.     Beginning at about 5 PM on Thursday, May 28, 2020, protesters gathered on the steps of the state Capitol building in Denver, Colorado.  To protest police treatment of Black individuals, demonstrators carried signs, knelt, and chanted.

72.     Shortly after the rally at the Capitol building started, law enforcement officers launched tear gas indiscriminately into the gathered crowd and then drove away in police vehicles.  Officers did not issue the crowd a warning before launching the gas canisters.  At least one canister hit a protester in the crowd.

73.     Some protesters left the Capitol building area and began marching downtown and toward I-25, a major highway in the Denver area.  As one group of peaceful protesters gathered near a pedestrian bridge by I-25, officers, without warning, again fired tear gas into the crowd, and at least one officer fired a 40 mm launcher into the crowd, hitting one protester in the eye with a foam bullet and causing his eye to bleed and for him to need emergency medical attention.

74.     At approximately the same time, as protests continued near the Capitol, an individual driving a vehicle attempted to hit protesters by turning the vehicle suddenly into the crowd.  In contrast to the violence they used to suppress protesters by the Capitol and throughout

---

[49] Kaiser Health News, *Fractured skulls, lost eyes: Police often break own rules using "rubber bullets"*, Denver Post, June 23, 2020, https://www.denverpost.com/2020/06/23/george-floyd-protests-rubber-bullet-injuries/

the City, on-duty officers who observed the car attempt to strike protesters did not respond to the assault.[50]

75.     For the next several hours, Officers in Denver shot both tear gas and projectiles at groups of largely peaceful protesters near the Capitol and in various parts of the City.  Officers aimed the tear gas and rubber and foam projectiles, as well as pepperballs, at crowds of protesters indiscriminately, even at times when the crowd was doing nothing more than standing and observing the officers.  Multiple protesters were hit with the projectiles, and many protesters suffered pain and burning in their eyes and faces from the tear gas and pepperballs that officers shot.

76.     Peaceful protesters gathered again on Friday, May 29, 2020.  Officers near the protest site at the Capitol were clothed in riot gear.  Protesters began chanting, "Why are you in riot gear, I don't see no riot here."  Without provocation or warning, officers fired rubber and foam bullets and pepperballs into the crowd of protesters.  Throughout the hours that followed, officers continued to engage in other violent and intimidating tactics.  They also used flash bang devices.  One officer sprayed pepper spray into an open car sunroof while the car was stopped next to the Capitol with passengers inside.[51]  Other officers in police vehicles released tear gas and shot pepperballs at a group of protesters who were kneeling and chanting "Hands up! Don't Shoot!"

77.     Not all victims of these violent and intimidating tactics were protesters.  Multiple members of the press were hit by tear gas and pepperballs, suffering physical injury as well as

---

[50] Associated Press, *Shots Fired During Denver's Protest over George's Floyd's Death*, KTLA 5, https://ktla.com/news/nationworld/shots-fired-during-denver-protest-over-george-floyds-death/.
[51] https://twitter.com/Dizzle14Double/status/1266615473816260609.

damage to their recording equipment.[52]  Other individuals who attended the protests in the

capacity of medics, including Plaintiffs Bjelland, Doskey, Folkerts and Buranen, were hit by tear

gas and pepperballs without warning or justification.

78.     Starting in the early afternoon on Saturday, May 30, 2020, peaceful protests

resumed in broad daylight.  In response and over the next several hours, Officers in Denver

continued to intimidate protesters with chemical-irritant sprays and projectiles, and flash bangs.

Some officers fired projectiles and sprayed pepper spray directly at protesters' faces.  Other

officers fired at protesters from the back of moving police vehicles.  And again, as a group of

protesters knelt on the ground chanting "Hands up! Don't Shoot!," officers began shooting

pepper bullets, tear gas, and rubber bullets at the crowd.

79.     That night, Denver declared a city-wide curfew, which required residents—with

the exception of essential personnel—to be off the streets by 8 PM.  The blanket city-wide

curfew provided no exception for peaceful First Amendment activity.  Some protesters chose to

remain out past curfew, in part to peacefully protest the curfew itself.  After 8 PM, officers began

using grenades against protesters, in addition to the tear gas, rubber bullets, pepper bullets, and

pepper spray already in use.  Officers also physically assaulted and verbally intimidated

protesters by threatening to shoot them with pepper spray, even when they were on their own

property.  They also shot multiple rounds of pepper bullets at people who were complying with

the curfew order by remaining at their homes, on their own property.

---

[52] https://twitter.com/AdiGTV/status/1266554320717099008; Colorado Freedom of Information
Coalition, *CFOIC, journalism groups decry law enforcement targeting of reporters and photographers
during George Floyd protests*, Colo. Independent,
https://www.coloradoindependent.com/2020/06/01/denver-floyd-protests-law-enforcement-targeting-
reporters-photographers/.

80.     Officers even shot pepperballs at bystanders stopped in traffic.  One driver, out of concern for his pregnant girlfriend—his passenger—got out of his car and demanded that officers in riot gear stop shooting pepperballs at the car, explaining that his pregnant girlfriend was in the car.  Officers continued to shoot the car with the pepperballs, causing the pregnant passenger to suffer a fractured hand after attempting to cover her face.[53]

81.     Members of the press were again targets of the Officers in Denver.  One journalist with local station 9 News was hit with a projectile shot by a CSP officer after the journalist was identified to the officer as a member of the media.[54]  Another journalist, a photographer, was thrown by police to the ground immediately next to a live fire.[55]

82.     On Sunday, May 31, 2020, as protests continued, Officers in Denver continued their use of chemical irritants, flash-bang devices, and projectiles against protesters.  Officers shot protesters with projectiles at close ranges without warnings, knocking unconscious and severely injuring at least one protester.

83.     Officers in Denver also employed the "kettle" tactic to control the protesting crowd, by blocking the crowd on the east and west sides with SWAT trucks and/or police lines and firing tear gas into the trapped crowd with no warning.

84.     Officers in Denver continued to use these same tactics on Monday, June 1 and Tuesday, June 2.

---

[53] Jeremy Jojola, *Man and pregnant fiancée sprayed by pepper balls want police held accountable*, 9 NEWS, https://www.9news.com/article/news/local/man-and-pregnant-fiancee-sprayed-by-pepper-balls-want-police-held-accountable/73-9fd11168-c1f3-4c65-967b-171c767583f1.
[54] https://twitter.com/jeremyjojola/status/1267536778577100800.
[55] https://twitter.com/tessrmalle/status/1266945413258653696.

85.     On Thursday June 4, four persons who participated in the Denver protests between May 28 and Monday, June 1, sued the City, alleging that officers' use of "less-lethal" weapons violated the First and Fourth Amendments.  On Friday, June 5, 2020, United States District Court Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order restricting DPD and jurisdictions invited by DPD from using "less-lethal" projectiles and chemical agents on peaceful protesters.

### Defendants' Illegal Actions Caused Injuries to Plaintiffs

<u>Plaintiff Jazmine Bjelland</u>

86.     Jazmine Bjelland is a resident of Colorado.

87.     Ms. Bjelland attended the protests on May 30, May 31, June 1, and June 2, 2020.

88.     Ms. Bjelland protested, and additionally acted as a medic to render aid and care to injured protesters.

89.     Ms. Bjelland demarcated her role as a medic by taping a red cross on her body.

90.     On May 30th, Ms. Bjelland arrived at the protest near Colfax and Broadway.

91.     When Ms. Bjelland arrived at the protest that day, she saw a group of protesters kneeling, chanting "hands up, don't shoot."  Every protester she saw was peaceful. Ms. Bjelland also saw a line of police officers in riot gear.

92.     Without cause or warning, Ms. Bjelland observed the police officers shoot tear gas cannisters at her, into the group of kneeling protesters.

93.     Ms. Bjelland was struck in her leg by a tear gas canister, which burned her.

94.     The CS gas from the tear gas canister blinded Ms. Bjelland, hurting her, making her cough, restricting her air supply, and preventing her from seeing.

95.     Ms. Bjelland groped blindly for her friends, afraid for both herself and others that they would be trampled by fleeing protesters in the chaos caused by the Denver Police.

96.     When Ms. Bjelland eventually found her friends, they retreated to the Capitol in fear. Once they had regrouped, one of Ms. Bjelland's friends decided that the Denver Police's attack was too much for them, and that they had better stop protesting against their will.  That day was that friend's first protest.

97.     This tear gas attack caused Ms. Bjelland to stop her protesting activities for that day to recover, and instead focus on rendering aid to other protesters hurt by the Denver Police's violent aggression.

98.     Beyond their protest activities, Ms. Bjelland and several friends set up a first aid center for injured protesters in the courtyard of a hotel building in the Capitol Hill neighborhood.

99.     The center served as a hub for Ms. Bjelland and other volunteer street medics— including an Army Medic, nurses, and EMTs who volunteered their services—where injured protesters could recover, rest, and have their wounds treated.

100.     On the subsequent days of the protest, Ms. Bjelland would protest, and, in her capacity as a medic, would look for injured protesters to bring back to the first aid center.

101.     Ms.  Bjelland rendered aid to many injured protesters.  For example, one protester—a woman who was chased by the Denver Police, and while she was fleeing, fell onto a sharp metal object—had approached Ms. Bjelland, saying "I can't feel my wrist."  On examination, the woman's wrist was slashed so deep, her tendons were exposed. Ms. Bjelland and other medics stabilized that woman, and called an ambulance for emergency attention.

102.     Ms. Bjelland had a difficult time getting ambulances to come to the first aid center.  Ms. Bjelland heard from ambulance dispatchers that the Denver Police were actively trying to keep ambulances out of the area of the first aid center.

103.     Ms. Bjelland and other medics were also actively targeted by the Denver Police.

104.     On multiple other occasions, Ms. Bjelland was shot at by the Denver Police for simply standing near other protesters, and raising her voice in protest against the Denver Police's violence.

105.     In the event that protesters needed to recover overnight, Ms. Bjelland facilitated finding shelter for those protesters.  One such shelter was a house in the Capitol Hill neighborhood that a neighbor volunteered to serve as a place of overnight refuge and recovery for injured protesters.

106.     In the early morning hours of May 31, Ms. Bjelland was in the Capitol Hill neighborhood to check on injured protesters at the shelter.

107.     When Ms. Bjelland was nearly at the front door of the shelter, she observed a Denver Police Remote Deployment Vehicle driving towards the shelter down Colfax.

108.     As the DPD vehicle drove by the shelter, Police Officers carried by that vehicle shot at her and the shelter with pepperballs.  Some of the pepperballs entered the house.  The Denver Police also threw a grenade into the front lawn of the property, where that grenade exploded with a loud bang and a blinding flash.

109.     Consequently, Ms. Bjelland ran from the shelter back towards the first aid center.  When the driver of the DPD vehicle saw her running from the shelter, the vehicle did a U-turn, and fired additional shots at Ms. Bjelland as she was running away.

110.    It was Ms. Bjelland's impression that the police were having fun while they were drive-by pepperballing her and grenading her.

111.    Ms. Bjelland subsequently made a complaint to the Office of the Independent Monitor regarding the drive-by pepperballing in the early hours of May 31.

112.    The Office of the Independent Monitor referred Ms. Bjelland's file to the Denver Police Departments' Internal Affairs department.

113.    An Internal Affairs investigator subsequently called Ms. Bjelland to investigate her allegations.

114.    The Internal Affairs investigator did not make a meaningful effort to discover the identity of the Police Officers who conducted the drive-by shooting in the Capitol Hill neighborhood on the night of the 30th. In fact, it seemed as if the Internal Affairs investigator's motive was to poke holes in Ms. Bjelland's story, and use that as an excuse to end the investigation.

115.    The Denver Police Department also ended Ms. Bjelland's investigation because of her "inability to identify [the] officers" who were drive-by pepperballing her at night, from their vehicle, while she was running away.

116.    The Denver Police Department made no effort to cross-reference the facts of this complaint with any other Internal Affairs investigative complaint. If they had, they would have easily discovered another Internal Affairs file showing that Lt. Ken Chavez had directed officers in the Capitol Hill neighborhood on the night of May 30th to do drive-by shootings of pepperballs at people who posed no threat. Additionally, in that other Internal Affairs file, they would have

noticed the testimony of several officers under Lt. Chavez's command, some of whom saw Lt.

Chavez throw a grenade into a front yard in the Capitol Hill neighborhood that night.

117.    At no point during any part of these protests did Ms. Bjelland act violently,

displayed defensive resistance, or otherwise disobeyed the Denver Police's orders.

118.    Yet, by virtue of her protesting and rendering medical aid to other protesters, she

was targeted by the Denver Police, fired at, and injured.

119.    As a result of the Denver Police's attacks on Ms. Bjelland, Ms. Bjelland has

sustained physical and emotional injury, pain, and suffering.

<u>Plaintiffs Derek Buranen, Gareth Doskey, and Lauren Folkerts</u>

120.    Plaintiffs Gareth Doskey, Derek Buranen and Lauren Folkerts are residents of

Colorado.

121.    Mr. Doskey, Mr. Buranen and Ms. Folkerts participated in the protests as medics,

with the intent to render aid to any protesters suffering from injuries.

122.    Plaintiffs Doskey, Buranen and Folkerts demarcated their status by taping a red

cross on their backpacks, shirts and hats so that they were recognizable from both front and back.

123.    On May 30, Plaintiffs Doskey, Buranen and Folkerts arrived to the protest

together at around Noon.

124.    Mr. Doskey, Mr. Buranen and Ms. Folkerts participated in the protest for hours,

marching with other protesters in loops around the Capitol Hill Neighborhood, providing snacks

and water to fellow protesters.

125.    In the early afternoon, Mr. Doskey, Mr. Buranen and Ms. Folkerts had marched

with other protesters to the corner of Colfax and Washington.

126.     There, Mr. Doskey witnessed that Denver Police had barricaded the street with vehicles, and had formed a skirmish line with batons, other weapons, and gas masks.

127.     Upon seeing the DPD's weapons and gas masks, Mr. Doskey, Mr. Buranen, and Ms. Folkerts donned respirators, helmets and goggles as a precaution.

128.     Without warning, the Denver Police began shooting PepperBalls into the crowd of protesters and against the sides of adjacent buildings.

129.     Several of these PepperBalls hit Mr. Doskey and Mr. Buranen in their backs and legs.

130.     The protesters began to flee away from the Denver Police, into the street.

131.     As the protesters were fleeing, the Denver Police threw tear gas cannisters and grenades into the crowd.

132.     The tear gas was so strong that it pervaded Mr. Doskey's, Mr. Buranen's and Ms. Folkert's respirators and goggles, causing them pain, making it difficult for them to see or breathe.

133.     Mr. Doskey and Mr. Buranen witnessed a grenade explode right next to the head of a protester.  They immediately rendered aid to that protester, who was so disturbed by the explosion that he repeatedly asked Mr. Doskey if he was dead.

134.     Mr. Doskey, Mr. Buranen and Ms. Folkerts followed the remaining crowd towards the transit station next to the Capitol, rendering aid to protesters along the way.

135.     When they arrived at the transit station, Mr. Doskey, Mr. Buranen and Ms. Folkerts joined a crowd of protesters who were chanting, kneeling and protesting peacefully on Lincoln street near the bus station.

136.     Shortly after joining this crowd, Mr. Doskey, Mr. Buranen and Ms. Folkerts saw the police line advance on the crowd.  They did not hear a warning by the police, who began firing pepperballs, pepperspray and tear gas into the peaceful protesters.  The police continued deploying these weapons on protesters as they were fleeing towards and into active traffic across Colfax avenue.  Mr. Buranen was hit with a tear gas cannister, and Ms. Folkerts was struck by a projectile in her leg, causing severe pain and a large bruise.

137.     Mr. Doskey, Mr. Buranen and Ms. Folkerts fled to the Capitol Grounds near Lincoln and Colfax.  There, they attempted to render aid to a man with apparent mental illness.

138.     As they were attempting to render aid, the Denver Police raised their weapons at Mr. Doskey, Mr. Buranen and Ms. Folkerts, aimed, and tracked Mr. Doskey's movements.

139.     Over the next several hours, Mr. Doskey, Mr. Buranen and Ms. Folkerts were repeatedly tear gassed and shot at with PepperBalls, forcing them to take cover behind the Capitol Ground's trees.  The police would regularly discharge less lethal munitions, including tear gas, pepperballs, pepper spray and grenades, into the crowd of peaceful protesters in the vicinity of Lincoln & Colfax.  Mr. Doskey and Mr. Buranen were struck multiple times with pepperballs during these attacks by the police.

140.     As the curfew approached, Mr. Doskey, Mr. Buranen, and Ms. Folkerts were worried that the Denver Police were going to enforce the curfew with even greater violence. As a consequence, they left the protest for the night.

141.     At no point during the events of May 30 did Mr. Doskey, Mr. Buranen or Ms. Folkerts attack, defensively resist, or otherwise display hostility or noncompliance to the Denver Police.

142.     Despite the repeated attacks on their constitutional rights, Mr. Doskey and Mr. Buranen returned to the protest on May 31, 2020.

143.     When Mr. Doskey and Mr. Buranen arrived at the protest on May 31, they observed peaceful conduct from protesters, including speeches and marching.

144.     In the evening, where Mr. Doskey and Mr. Buranen were present, the Denver Police shot tear gas, pepperballs and other less lethal munitions into a crowd near the District 6 police station without warning or justfication.

145.     Mr. Doskey and Mr. Buranen were consequently tear gassed several times, again inflicting pain, and hindering his ability to breathe.

146.     Nevertheless, Mr. Doskey and Mr. Buranen rendered medical aid to many protesters who had been hurt by the Denver Police's wanton attacks.

147.     Among these protesters, Mr. Doskey and Mr. Buranen rendered aid to a protester with a severe head injury in the Natural Grocers parking lot, who had lost a concerning amount of blood, and was slipping in and out of consciousness.

148.     Despite resistance from the police, Mr. Doskey and Mr. Buranen managed to facilitate an ambulance to help the protester with the severe head injury.

149.     After that point, Mr. Doskey and Mr. Buranen followed other protesters back to the Capitol.

150.     As the night continued, and curfew was imposed, Mr. Doskey and Mr. Buranen joined a march heading west on Colfax.

151.     The Denver police, without warning, responded to that march with violence by firing weapons at the crowd, and tear gassing the crowd.

152.    Mr. Doskey and Mr. Buranen were tear gassed, were nearly struck with the kinetic projectiles fired by the Denver Police in their direction, and had to duck into an alley to protect themselves.

153.    In that alley, Mr. Doskey and Mr. Buranen rendered aid to a protester who had been badly burned by a tear gas cannister thrown by the Denver Police.

154.    As a direct result of the Denver Police's attacks, Mr. Doskey and Mr. Buranen were forced to flee the area for their safety.

155.    For the remainder of the night, Mr. Doskey and Mr. Buranen rendered medical aid to many protesters who were attacked by the Denver Police.

Plaintiff Joseph Gallegos

156.    Joseph Gallegos is a resident of Colorado.

157.    He attended the protests on May 30, 2020 with two of his friends.

158.    They walked along 14th Street, and then turned north on Lincoln Street at approximately 7:45 PM to join a peaceful crowd on the Southeast corner of Lincoln and East Colfax Avenue.

159.    When he arrived at the Southeast corner of Colfax and Lincoln, Mr. Gallegos encountered a line of Denver Police officers in riot gear.

160.    Minutes after arriving at that corner, at approximately 7:50 PM, the officers began deploying pepperball, tear gas and other munitions into the largely peaceful crowd.  Mr. Gallegos did not hear a warning.

161.    Mr. Gallegos looked towards the officers and one of the officers launched what appeared to be tear gas out of some type of weapon or launcher directly towards Mr. Gallegos.

162.    The object launched by the officer flew so fast that it hit Mr. Gallegos in his face, at the bridge of his nose, between his eyes before he was able to avoid it.

163.    The impact left broke his nose and left a laceration, hindered his breathing and also left him unable to see as the gas in the canister sprayed into his face and eyes.

164.    Mr. Gallegos fell to the ground.  A still image from DPD body worn camera footage of Mr. Gallegos on his hands and knees after being struck is below:



165.    He was terrified because he could not see what was going on around him, but continued to hear munitions being fired.  Mr. Gallegos' friends grabbed his arms, helped him up

and brought him to a medic station in the Capitol Hill neighborhood at which volunteers were providing aid to injured protesters.

166.    Below are photos of the volunteers helping Mr. Gallegos and pouring milk and saline solution into his eyes to help relieve the pain and burning caused by the tear gas.  The liquids did not help to alleviate the excruciating pain and terror he felt.





167.    After receiving this aid, Mr. Gallegos' friends assisted him in getting home.

168.     Upon returning home, Mr. Gallegos was still unable to see, was sweating, had snot draining out of his nose, and his whole body was burning.  He was escorted into the shower, where he attempted to rinse off all of the gas and/or powder that was on his body for at least an hour.  When he realized the shower would not alleviate his pain, his friends assisted him in laying down on his bed.

169.     Mr. Gallegos fell asleep at around 10 PM, but awoke after an hour in a confused and depressed state.  He was barely able to sleep the rest of the night, but was still barely able to open his eyes, which continued to burn.  With what little he could see, he noticed a layer of powder or tear gas underneath his lower eyelids.  When he tried to remove the substance, he eyes immediately began to burn and become blinded again.

170.     Mr. Gallegos was unable to see for approximately eight hours after being hit with the tear gas canister.  His nose and eyes were also swollen and bruised for at least several days afterwards.

171.     For the entire next day, May 31, 2020, Mr. Gallegos was in bed and did not leave his room due to the trauma he had suffered.

172.     Since getting hit in the nose on May 30, 2020, Mr. Gallegos has had trouble breathing, particularly while sleeping and working, and has been diagnosed with a broken nose and deviated septum that will require surgery to fix.

173.     The actions by Denver police against him on May 30, 2020 have had an emotional impact as well.  For at least the following six months, Mr. Gallegos remained depressed and confused as a result of his experience, and was extremely anxious and jumpy around noise, especially loud bangs.  He continues to suffer from nightmares and anxiety.

<u>Plaintiff Jack Girard</u>

174.    Plaintiff Jack Girard is a resident of Colorado.

175.    On May 28, 2020, Mr. Girard arrived at the protest in Downtown Denver on his bicycle around 10 PM.

176.    Mr. Girard was peacefully protesting near the Denver Post Building at Colfax and Broadway when he observed Denver Police Officers throw teargas from a Rapid Deployment Vehicle.  He subsequently breathed in and experienced the effects of the teargas.

177.    Later at the same location, and while still peacefully protesting and filming on his phone, Mr. Girard observed a second RDV stop in the street. Denver Police Officers exited the vehicle and began deploying pepperball into the crowd.  Mr. Girard was hit with one pepperball near his collarbone.

178.    He recorded this incident on video.

179.    The impact of the pepperball caused Mr. Girard physical pain and left a mark on his skin, pictured below:



180.     Mr. Girard wanted to return to the protests the next day, but stayed home because he and his friends and family were concerned for his well-being.

181.     Mr. Girard then returned to the protest on his bicycle on May 30, 2020.

182.     Around 7:40 PM, Mr. Girard rode north on Broadway on his bicycle while using his phone to film the Denver Police officers lined up across Colfax.  The image below shows Mr. Girard captured by on one of the City's HALO cameras as he was riding by and filming:



183.     As Mr. Girard approached the Northwest corner of Colfax and Broadway, several Denver Police officers ordered him to turn around.  When Mr. Girard questioned why he could not continue on the street, one Denver Police officer held up a cannister of OC spray:



184.    Mr. Girard continued to insist that he should be able to proceed on the public right of way in order to join a group of protesters who were assembled on the other side of where the officers were located.  The officer continued to threaten Mr. Girard with pepper spray and told Mr. Girard he could not join the other protesters and needed to turn around.  Mr. Girard felt threatened by the officer's show of force and left the protest shortly after.

185.    Mr. Girard remains fearful of exercising his right to protest. Additionally, his experiences at the hands of the Denver Police have caused him to fear any interaction with police officers.

<u>Plaintiff Robert Greer</u>

186.    Robert Greer is a resident of Colorado.

187.    At the time of the protests, Mr. Greer lived relatively close to the Capitol building.

188.     He rode his bike towards the Capitol to attend the protests on May 30, 2020 at around 6:45 PM and joined a peaceful crowd at the intersection of Colfax and Lincoln.

189.     When he arrived at the Southeast corner of Colfax and Lincoln, Mr. Greer encountered a line of Denver Police officers in riot gear.

190.     On multiple occasions between 6:45 and 7:15 PM, when Mr. Greer was standing at or around that corner, the officers began deploying pepperball, pepper spray, tear gas and other munitions into the largely peaceful crowd.  Mr. Greer did not hear a warning on any of these occasions.

191.     At approximately 7:10, twenty to twenty five minutes after arriving at the protest, officers were shooting munitions into the crowd.  Mr. Greer retreated from the corner to escape the tear gas and other munitions.

192.     As he was retreating from police munitions, one or more pepperballs hit Mr. Greer directly in the back of his head.  At the time, he did not know what type of munition had hit him in the head.  He also experienced the tear gas that officers were launching into the crowd.

193.     At that time, his nose was burning, his eyes were tearing, and he was having difficulty breathing because his airways felt like they were closing.

194.     After being hit in the head with a pepperball and being tear gassed, Mr. Greer returned home.

195.     Upon returning home, he realized that the object that had hit him in the back of the head was a pepperball because he found white powder and pieces of pepperball stuck in his hair.  The images below show the residue of the  powder from the pepperball in Mr. Greer's hair, and the piece of pepperall that had been lodged in his hair:

196.   When Mr. Greer removed the pepperball pieces and powder from his hair, he got chemical residue on his hands, which then blinded him temporarily when he rubbed his eyes that were tearing from the effects of tear gas and the powder inside the pepperball.  He also experienced a burning sensation on his skin.

197.   The actions by Denver police against him on May 30, 2020 impacted him emotionally as well, and have made him fearful of the police and what they are capable of.

<u>Plaintiff Zuri Hoskin</u>

198.   Zuri Hoskin is a resident of Colorado.

199.   At the time of the protests, Mr. Hoskin was working as a photographer with a media group based in Aurora, CO.  He attended the protests with the intent take photographs and document the scene.

200.   He attended the protest on May 29, 2020 around 9 PM and joined a peaceful crowd near the Capitol.

201.   Mr. Hoskin then encountered a line of Denver Police officers at the intersection of 14th and Broadway lined up across Broadway.

202.   As the crowd approached the intersection, the officers began deploying pepperball into the crowd.  Mr. Hoskin did not hear a warning.

203.   Pepperballs hit Mr. Hoskin in the legs and chest.  Shortly after, Mr. Hoskin was hit directly in the head.  The image below shows the impact of the pepperball on Mr. Hoskin's forehead:



204.    The impact caused Mr. Hoskin to fall to the ground and become disoriented.  He moved away from the line of officers and left the area with several other protesters.

205.    Mr. Hoskin still experiences occasional pain in his head from the impact.

206.    Later in the night of May 29, Mr. Hoskin joined another group of protesters near 12th and Broadway

207.     The group peacefully protested for a time before Denver Police officers began to push the protesters back.

208.    Mr. Hoskin was a few feet away from the line of Denver Police officers when one officer sprayed him directly with pepper spray.  Mr. Hoskin did not hear a warning before the officer deployed the pepper spray.

209.    The pepper spray made it difficult for Mr. Hoskin to breathe, and disoriented and temporarily blinded him.

210.    Mr. Hoskin was rendered aid by another protester.  He left the protest shortly after.

211.    As a result of his experiences on May 29, 2020, Mr. Hoskin remains fearful of exercising his right to protest.

### Plaintiff Huitziloxochitl ("Lala") Jaramillo

212.    Plaintiff Lala Jaramillo attended three consecutive days of protests, which she believes to have been May 29, 30, and 31, 2020.

213.    During the protests, without warning or adequate justification, Ms. Jaramillo was exposed to chemical munitions believed to have been deployed by DPD officers.

214.    On the evening of May 31, she was with a small group of protesters leaving the protest area.

215.    While the group was in the 1300 block of Pennsylvania, without warning or adequate justification she was taken to the ground by one or more DPD officers, fracturing her wrist.  An officer then put his knee in her back, causing the respirator she was wearing to choke her.

216.    Police officers then cut off her mask and backpack and arrested her for a misdemeanor curfew violation.  During the arrest officers repeatedly called her a "piece of shit" and asked  if she "liked hurting cops."

217.    Upon information and belief, the DPD officer who caused Ms. Jaramillo's wrist injury and put his knee in her back was defendant Bolton, who the day before had assaulted Plaintiff Christian McDonnell without warning or adequate justification and then called him a "fucking faggot."

<u>Plaintiff Virya Kelsang</u>

218.    Virya Kelsang is a resident of Colorado.

219.    At the time of the protests, Ms. Kelsang lived near the Capitol building and peacefully protested outside of her house on multiple nights.

220.    On May 28th, 2020, around 8:30 PM, Ms. Kelsang joined a protest at the District 6 Police Station, near Colfax and Washington.  She moved to the front of the crowd on Washington in front of a line of Denver Police officers.

221.    The officers deployed teargas and pepperball. Ms. Kelsang was struck in the torso by a pepperball and felt the effects of the teargas.

222.    On May 30, 2020, Ms. Kelsang was peacefully protesting near the Civic Center bus station and Lincoln Memorial Park.

223.    Around 5:40 PM, officers began to deploy teargas and pepperball to push the crowd back into the park.  Ms. Kelsang experienced the effects of the teargas.

224.    Ms. Kelsang continued to peacefully protest in Lincoln Memorial Park.  She was once again at the front of the crowd of protesters.

225.    She was struck by pepperballs several times throughout the evening.

226.    On multiple other occasions while peacefully protesting, Ms. Kelsang was teargassed, struck by pepperballs, and had grenades thrown near her by Denver officers.

227.    Also on multiple occasions while peacefully protesting, Ms. Kelsang's movement was blocked by officers deploying teargas or projectiles.  When she and other protesters would attempt to move to another area, officers would continue to block streets and deploy less lethal weapons at peaceful protesters.

228.     On one occasion, during the first weekend of the protests, Ms. Kelsang and her friend were standing peacefully on the corner of Colfax and Logan, with a heavy police presence lined up across the street.  There was no crowd around them.  The officers would not allow Ms. Kelsang and her friend to move from the corner.  Instead, the officers blocked their movement and shot pepperballs at them, effectively pinning them to the corner.  Ms. Kelsang was struck by at least one pepperball.

<u>Plaintiff Kevin Kreeger</u>

229.     On May 30, 2020, plaintiff Kevin Kreeger joined a group of peaceful protesters near the Colorado Capitol.

230.     The group eventually made its way peacefully to the area adjacent to the District 6 Police Station, which is located near the corner of Colfax and Washington Streets in Denver, about 6 blocks east of the State Capitol building.  There, the group protested peacefully, engaging DPD officers with words and chanting slogans.

231.     Without adequate cause or any warning, DPD officers began deploying chemical munitions against Mr. Kreeger and other peaceful protesters.  Mr. Kreeger was heavily exposed to chemical munitions, which forced him to disburse and left him unable to breathe or see.  His skin also burned for several days afterwards.

232.      DPD's unjustified deployment of chemical weapons against Mr. Kreeger and other peaceful protesters interfered with Mr. Kreeger's right to peaceably assemble and protest, and caused Mr. Kreeger damages in an amount to be proven at trial.

<u>Plaintiff Sebastian McCants</u>

233.    On May 31, 2020, plaintiff Sebastian McCants joined a group of peaceful
protesters near the Colorado Capitol.

234.    He eventually joined a group of protesters who walked east on Colfax towards the
District 6 DPD station.  At around 8:30 that evening, the group Mr. McCants had joined reached
the intersection of Colfax and Clarkson.  A police line had formed across  Clarkson
approximately one-half block north of Colfax, facing protesters who had gathered at the
intersection of Colfax and Clarkson.

235.    Protesters engaged the officers with words and chants.

236.    Without adequate cause or any warning, DPD officers began deploying chemical
munitions against Mr. McCants and other peaceful protesters.

237.    Soon thereafter Mr. McCants was struck at least once in the chest by a less lethal
projectile fired from the police line, which Mr. McCants believes to have been a 40 MM baton
round.  He was also exposed to chemical munitions including, upon information and belief, both
chemical gas and pepperballs.

238.    DPD's unjustified deployment of chemical weapons against Mr. McCants and
other peaceful protesters interfered with Mr. McCants's right to peaceably assemble and protest,
and caused Mr. McCants's damages in an amount to be proven at trial.

<u>Plaintiff Christian McDonnell</u>

239.    On May 30, 2020, plaintiff Christian McDonnell joined a group of peaceful
protesters near the Colorado Capitol.

240.     At about 5:50 that afternoon, Mr. McDonnell was walking in the area near the RTD station north situated just north of Colfax, between Lincoln and Broadway.  Mr. McDonnell was taking photographs and protesting the deployment of potentially lethal weapons against protesters.  While doing so, Mr. McDonnell was assaulted and called a "fucking faggot" by DPD Gang Unit officer Adam Bolton.

241.     Shortly thereafter, Mr. McDonnell was struck without warning or adequate justification in the shoulder and back by kinetic projectiles fired by police, which he believes to have been pepperballs.  A pepperball also struck his camera as he was taking photographs.

242.     DPD's unjustified deployment of chemical weapons against McDonnell and other peaceful protesters interfered with Mr. McDonnell's right to peaceably assemble and protest, and caused McDonnell injuries in an amount to be proven at trial.

243.     Upon information and belief, DPD officers targeted and shot Mr. McDonnell because he was photographing events during the protests, in conformity with his First Amendment rights.

244.     DPD's unjustified deployment of chemical weapons against Mr. McDonnell and other peaceful protesters interfered with Mr. McDonnell's right to peaceably assemble and protest, and caused McDonnell damages in an amount to be proven at trial.

<u>Plaintiff Douglas Munn</u>

245.     Douglas Munn is a resident of Colorado.

246.     He attended the protests on May 29, May 30, and May 31, 2020.

247.     On May 29, 2020, Mr. Munn drove his car to downtown Denver around 6:30 PM with his then-girlfriend to join the protests.

248.    When they arrived, they observed barriers erected and a line of Denver Police officers near Colfax and Broadway.

249.    They peacefully protested near Colfax and Broadway for a few minutes, then moved to the Northeast corner of Lincoln Memorial Park.

250.    While they were in this area of the park, officers began shooting projectiles at nearby protesters.  As a result, they moved further into the park, towards 14th and Lincoln.

251.    While peacefully protesting in the park near Lincoln, Mr. Munn observed Denver police officers begin to push the crowd down the street.  He observed several officers chasing an individual across the street towards Mr. Munn's area of the park.  The officers then stopped and began firing pepperballs into the park.  Mr. Munn felt the impact of a pepperball, and turned to run out of the area; as he was running, he was struck by more pepperballs.

252.    Pepperballs struck Mr. Munn in the legs and torso:







253.    Mr. Munn and his then-girlfriend returned to the protests the next day on May 30,

2020 around 7:30 PM.

254.    They joined a group of peaceful protesters in Civic Center Park, near the

intersection of Colfax and Broadway.

255.    While in the park, Mr. Munn observed Denver police officers moving down

Colfax and attempting to move the crowd back into the park.

256.    As Mr. Munn was looking West into the park, standing with his back to Broadway, he was struck by several projectiles in the back.

257.    After being hit with the projectiles, Mr. Munn was pushed by officers further into the park.  The officers were deploying OC as they advanced on the crowd.

258.    Mr. Munn felt the effects of the OC.  He could not see or breathe easily.  He fell to the ground and attempted to use the grass to get the chemical off of his face and out of his eyes.

259.    Other protesters helped Mr. Munn from the ground.  He returned home shortly after.

260.    Mr. Munn was hesitant to return to the protests the next day due to his experiences getting shot and gassed.  However, he wanted to help make a difference by using his right to protest.

261.    Mr. Munn returned to the protests on the afternoon of Sunday, May 30 with his then-girlfriend and her teenage sister.

262.    They joined a group of peaceful protesters near Colfax and Lincoln, and joined them in marching down Colfax.

263.    Near the intersection of Colfax and Clarkson, Mr. Munn and his friends joined protesters in kneeling and chanting in front if a line of Denver Police officers.  Mr. Munn captured some of the scene on video:



264.     The officers then dispersed the crowd by deploying gas:



265.     Mr. Munn and his friends attempted to leave the protest, but encountered more teargas and lines of officers.  They were therefore blocked from being able to get to their car in order to go home.

266.     The officers continued gassing the crowds of dispersing protesters.  Mr. Munn experienced the effects of the teargas as he attempted to get to his car.

54

267.    A grenade also went off a few feet away from Mr. Munn.

268.    Eventually, Mr. Munn and his friends reached their car and left the protest.

269.    Mr. Munn was distressed that he had not been allowed to move freely and had been met with teargas when he had not done anything except peacefully protest and was attempting to get home.

270.    As a result of his experiences on May 29, 30, 31, 2020, Mr. Munn remains fearful of exercising his right to protest.

### Denver's Policies, Practices, and/or Customs

271.    The violations of Plaintiffs' constitutional rights are a direct result of and caused by Denver's policy, practice, and/or custom of authorizing Officers in Denver to use "less-lethal" weapons without warning or justification to control and suppress protests.

272.    Denver has a custom and practice of violating their own written policies regarding the use of less "lethal-force" and crowd dispersal.

273.    Notwithstanding any of DPD's written policies regarding the use of force, Officers used less-lethal weapons inappropriately and indiscriminately throughout the protests. The inappropriate use of less-lethal force during the protests was "extremely troubling," and included unjustified shootings; deploying projectiles at prohibited areas of the body, including the head, face, and groin areas; unjustified acts of violence and aggression; and the indiscriminate use of pepper spray, gas, and grenades.  Officers' inappropriate use of less-lethal force was so widespread that it was manifestly the actual policy and practice of DPD during the protests to use less-lethal force without warning, absent any threat to the safety of officers or others, and in circumstances that could not be justified under DPD's written policies. DPD also

failed to implement a coherent policy regarding the use of body-worn camera during the protests. This failure is evidence of a policy or practice of unlawful conduct and an attempt to avoid accountability.  DPD knew prior to the protests that body-worn cameras serve an important role in providing accountability for officer use of force.  Yet, during the protests, DPD officers were given the discretion to turn their body-worn cameras on or off as they saw fit.  This predictably has led to an inability to hold individual officers responsible for their use of less lethal weapons during the protests.

274.    DPD's policy during the George Floyd Protests was that officers would not need to document their individual uses of less-lethal force during the protests.  This failure is further evidence of a policy or practice of unlawful conduct and an attempt to avoid accountability. DPD understood before the protests that use of force reports serve an important role in ensuring accountability for officers' use of force.  Indeed, DPD's written policies require officers to prepare a use of force report in the ordinary course of their duties for precisely this reason.  Yet, despite knowing that the consequence of not requiring use of force reports would lead to a lack of accountability and transparency in the use of force, DPD's policy during the protests was that Officers would not need to prepare them.

275.    The violations of Plaintiffs' constitutional rights are also a direct result of Denver's utilization of the services of law enforcement officers from other jurisdictions who were authorized to use "less-lethal" weapons to control and suppress protests.

276.    In utilizing the services of law enforcement officers from other jurisdictions, Denver was required to ensure that all officers complied with both protesters' constitutional rights and Denver's written use-of-force policies.

277.     DPD's policy and practice during the protests of authorizing neighboring jurisdictions to use its policies, practices, and/or customs with respect to inappropriate and indiscriminate uses of less-lethal force, as well as Denver's failure to conduct any joint training exercises with them, caused  the unlawful and unconstitutional actions of any non-DPD officers whose services were utilized during the period in which protests were ongoing.

### Denver's Failure to Adequately Train or Supervise its Employees

278.     The violations of Plaintiffs' constitutional rights are also a direct result of and caused by Denver's failing to properly train, supervise, and discipline DPD officers regarding the appropriate use of force against protesters.

279.     The prevailing attitude under DPD's current Chief of Police, Paul Pazen, is that "training is not important."  There is no mandate from the top that police training classes be filled, so training classes do not get filled.  For example, in 2016, DPD commanders said they would no longer send officers to a three-day class on field force operations because the training was "too time intensive."

280.     Of hundreds of supervisors within DPD, only seven attended crowd control training in 2019, the year before the protests.

281.     DPD failed to train its officers regarding crowd management and crowd control techniques in a manner that does not violate citizens' constitutional rights.  DPD's training is not consistent with or up to date with its written policies regarding crowd management and crowd control techniques.  DPD's repeated failure to train its officers presented an obvious potential for excessive uses of force and violations of protesters' rights.

282.     DPD's response to the protests was a total "leadership failure," with officers on the ground merely reacting to what they saw without any sort of leadership, supervision, or proper instruction.

283.     DPD also failed to train its officers on a coherent policy regarding the use of body-worn camera during the protests.  DPD knew prior to the protests that body-worn cameras serve an important role in providing accountability for officer use of force.  Yet, during the protests, DPD officers were given the discretion to turn their body-worn cameras on or off as they saw fit.

284.     Denver's failure to conduct any joint training exercises with neighboring jurisdictions caused  the unlawful and unconstitutional actions of any non-DPD officers whose services were utilized during the period in which protests were ongoing, including those of the APD officers.  By utilizing those services, Denver was required to ensure that all officers complied with both protesters' constitutional rights and Denver's written use-of-force policies

285.     Denver adopted its policy of deficient training with deliberate indifference to the rights of others.  Denver's policymakers had actual or constructive notice that the deficiencies in training or supervision resulted in a constitutional violations, but chose to disregard the risk of harm.

**Denver's Policymaking Officials Ratified Officer Actions**

286.     The violations of Plaintiffs' constitutional rights are also a direct result of and caused by Denver's final policymaking officials ratifying the acts of officers who deprived the plaintiffs of their constitutional rights.

287.     Denver policymakers and DPD knew its officers were using extensive amounts of less-lethal force during the first few days of the protests.  DPD's use of less lethal force was so extensive and widespread that DPD ran out of less-lethal munitions almost immediately.  DPD was also receiving many complaints about the inappropriate use of force during the first few days of the protests.  Yet Denver policy makers and DPD did nothing to curb the use of less-lethal force and was deliberately indifference to its officers' unconstitutional use of force, and instead made multiple special trips to acquire more munitions to deploy.

288.     Denver policymaking officials and DPD leadership ratified the Officers' extensive and inappropriate uses of less-lethal force for crowd control at the protests.  At a press conference on May 29, 2020, Denver Mayor Michael Hancock and DPD Chief Pazen praised Officers for their "tremendous restraint" during the first night of the protests.[56]  These statements are a ratification by policymakers of the unconstitutional actions by the police that had occurred prior to that time, and statement of policy as to what was acceptable conduct by the City after that time.  Incident Commander Patrick Phelan also personally authorized the use of less-lethal munitions in ways that violated the constitutional rights of the Plaintiffs.

289.     Denver decision makers received ample notice that Officers in Denver were using "less-lethal" force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period,[57]

---

[56] Ana Campbell, *Denver law enforcement agencies have a long history of violence. A use-of-force policy is supposed to help*, Denverite,  https://denverite.com/2020/05/29/denver-law-enforcements-long-sordid-history-of-violence/; Ryan Osborne, *Denver mayor, police chief say officers showed "restraint" during George Floyd protest*, Denver Channel, May 29, 2020, https://www.thedenverchannel.com/news/local-news/denver-mayor-police-chief-say-officers-showed-restraint-during-george-floyd-protest.
[57] Jesse Paul, *Complaints about police response to Denver's George Floyd protests under investigation as demonstrations hit day 6*, Colo. Sun, June 2, 2020, https://coloradosun.com/2020/06/02/denver-police-response-protests-under-investigation/

condemnation from City Council members,[58] and widely publicized videos and firsthand accounts circulated through the local, state, and international press.[59]

     290.    Denver decision makers also received notice that the actions of the Officers in Denver against protesters violated the policies and procedures for the use of force outlined in the DPD's own Operations Manual.[60, 61]

     291.    The DPD's policy permitted officers to use their discretion in deciding when, where, and how to use less lethal weapons, so long as the officer could articulate a reason for using that less lethal weapon.

[58] Conrad Swanson, *Denver City Council members call for investigation into police use of force during George Floyd protests*, Denver Post, June 2, 2020, https://www.denverpost.com/2020/06/02/denver-city-council-investigate-police-force-protest/; Letter, Denver City Council, June 5, 2020, https://denver.cbslocal.com/wp-content/uploads/sites/15909806/2020/06/Denver-city-council-calls-for-review-of-DPD-use-of-force-policy.pdf.

[59] Lori Jane Gliha, Police projectile fractures Denver protester's face; she says it was unprovoked, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked; Alex Rose, Local man needs eye removed after projectile hits his face during afternoon protest in Denver, KDVR, June 3, 2020, https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA; https://twitter.com/DoughertyKMGH/status/1266181364396761089; https://twitter.com/AdiGTV/status/1266554320717099008; https://twitter.com/Dizzle14Double/status/1266615473816260609; https://twitter.com/heyydnae/status/1267139396278661121; https://twitter.com/jeremyjojola/status/1267536778577100800; https://twitter.com/tessrmalle/status/1266945413258653696; https://twitter.com/Mr_Blue_sky_II/status/1266631773191942145; https://twitter.com/Tipton007/status/1267331062314627072; https://twitter.com/SchwabStrong/status/1267340233781080065.

[60] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf.

[61] Noelle Phillips, *Denver declares its new police use-of-force police to be innovative and progressive*, Denver Post, Aug 9, 2018, https://www.denverpost.com/2018/08/09/denver-police-use-of-force-policy-announcement.

292.     The DPD policy is that if an officer was not disciplined for their use of force, that use of force is considered to be an appropriate use of force pursuant to DPD's policy.

293.     Despite the many complaints DPD received regarding the use of less-lethal weapons during the protests, and to date, upon information and belief, only three officers have been disciplined for such conduct.  The discipline those officers received ranged from a "stern talking to" to a ten day suspension.  No officer was fired.  That almost no officers were disciplined in any way by DPD for the widespread inappropriate, excessive and unjustified uses of force during the protests demonstrates that those uses of force have been ratified by the City.

294.     Denver policy makers acted with deliberate indifference to the constitutional rights of protesters and would-be protesters by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protesters who do not pose any safety threat and by failing to rectify the unconstitutional custom of DPD officers of using "less-lethal" force to control and suppress demonstrations.

295.     For example, on the evening of May 30, 2020, Lt. Kenneth Chavez of the Denver Police Department ordered a caravan of Denver Police Officers to follow him through the Capitol Hill neighborhood, and ordered those officers to shoot pepperballs from moving vehicles at peaceful protesters in a drive-by fashion.  Lt. Chavez also confronted several groups of protesters on their own private property, threatening them with pepper spray, and throwing a grenade onto the property of one group of protesters.  Several of the officers in the caravan became uncomfortable with Lt. Chavez's orders and behavior.  One of them, a DPD sergeant, reported Lt. Chavez's inappropriate actions to his immediate supervisor, DPD Lieutenant Kim Bowser.

296.    Lt. Bowser immediately reported these serious allegations by the DPD sergeant up the DPD command structure.  She called Commander Aaron Sanchez (now a DPD Division Chief), who was the Operations Chief for the entire protest response under Commander Phelan and also Lt. Chavez's direct supervisor in District 6.  Division Chief Sanchez found the allegations to be so outlandish that he did not believe them, and did nothing to attempt to corroborate or further investigate the allegations, other than to notify Division Chief Ron Thomas.  Division Chief Thomas also took no action to corroborate or investigate these serious allegations.  Instead, two days later, Division Chief Sanchez and Thomas put Lt. Chavez in charge of the entirety of District 6, and also acting Operations Chief for the entire protest response, during the two weeks when then Commander Sanchez was on vacation.

297.    Several weeks later, an Internal Affairs investigation was initiated against Lt. Chavez, which verified the serious allegations by the DPD sergeant through the testimony of additional officers who were part of the drive-by shooting caravan on May 30.  Lt. Chavez retired from the DPD before the Internal Affairs investigation was completed, and the closure of the investigation before completion resulted in no disciplinary proceedings against Lt. Chavez.

## CLAIMS FOR RELIEF

### CLAIM 1:

### Violation of Plaintiffs' First Amendment Rights by Denver, Bolton, John and Jane Does 1-100, Jon and Jane Boes 1-100

298.    Denver's policy, practice, and/or custom of using "less-lethal" weapons to control and suppress demonstrations have deprived and caused Plaintiffs to be deprived of their rights

under the First Amendment to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

299.    Defendant Bolton violated Plaintiffs Jaramillo and McDonnell's rights by engaging on the individual unconstitutional acts enumerated above.

300.    Defendants John and Jane Does 1–100 and John and Jane Boes 1–50 violated Plaintiffs' rights by engaging in the individual unconstitutional acts enumerated above.  The actions will be further specified when the officers in question are identified and Plaintiffs are able to attribute specific acts to specific officers.

301.    The actions of Defendant Bolton can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

302.    The actions of Defendants John and Jane Does 1–100 and John and Jane Boes 1–50—namely, the use of excessive force against peaceful protesters—can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

303.    The actions of Defendant Bolton had the purpose and effect of suppressing the protest activity of Plaintiffs Jaramillo and McDonnell.

304.    The actions of Defendants John and Jane Does 1–100 and John and Jane Boes 1–50 has had the purpose and effect of suppressing large, continuous protests.

305.    Individual Defendant Bolton acted with reckless or callous indifference to the First Amendment rights of Plaintiffs Jaramillo and McDonnell and therefore is liable for punitive damages.

306.    Denver deliberately violated well-established limitations on the permissible interference by the government in the exercise of speech and assembly in public places.

307.     Denver's authorization of the use of "less-lethal" force against protesters was motivated by the viewpoint being expressed by the demonstrators.

308.     Denver's policy, practice, and/or custom of using "less-lethal" weapons to control and suppress demonstrations is not a reasonable regulation of the time, place, or manner of Plaintiff's First Amendment protected activity.

**CLAIM 2:**
**Violation of Plaintiffs' Fourth Amendment Rights by Denver, Bolton,**
**John and Jane Does 1-100, Jon and Jane Boes 1-100**

309.     The actions of Defendant Bolton —namely, the use of physical force without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated the rights of Plaintiffs Jaramillo and McDonnell under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures and excessive use of force.

310.     The actions of Defendants John and Jane Does 1–100 and John and Jane Boes 1–50—namely, the use of physical force, including but not limited to chemical agents, "less-lethal" projectiles, frightening loud munitions, and batons and shields, without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated the rights of Plaintiffs under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures and excessive use of force.

311.     The actions of Denver—namely, its implementation of the policy, custom and/or practice of using less-lethal physical force without a warrant or probable cause to arrest, and absent an immediate threat to the safety of the public—violated and caused the violation of the rights of Plaintiffs under the Fourth Amendment to the United States Constitution to be free from

unreasonable seizures and excessive use of force.  The excessive use of force by DPD Officers in Denver was intentionally applied, objectively unreasonable, and shocks the conscience.

312.	Individual Defendant Bolton acted with reckless or callous indifference to the federally protected rights of Plaintiffs Jaramillo and McDonnell and therefore is liable for punitive damages.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully pray that the Court:

313.	Issue a judgment declaring that the acts of Defendants described herein violated the U.S. Constitution;

314.	Issue an injunction ordering Defendants Denver and their agents to cease engaging in the unlawful acts described herein;

315.	Award compensatory damages to Plaintiffs according to proof at trial, including damages for pain and suffering;

316.	Award punitive damages to Plaintiffs Jaramillo and McDonnell based on the actions of individual Defendant Adam Bolton

317.	Award punitive damages to Plaintiffs based on the actions of individual Defendants John and Jane Does 1–100 and John and Jane Boes 1–50;

318.	Award costs of suit and attorney's fees; and

319.	Provide such other and further relief as the Court may deem just, proper, and appropriate.

**JURY DEMAND**

320.    Plaintiffs request a trial by jury on any and all issues raised by this Complaint which are triable by right of a jury.


Dated: May 27, 2022                                Respectfully submitted,

                                                   By: /s/ Timothy R. Macdonald
                                                       Timothy R. Macdonald
                                                       Matthew J. Douglas
                                                       Ed Aro
                                                       ARNOLD & PORTER KAYE
                                                          SCHOLER LLP
                                                       1144 Fifteenth Street, Ste. 3100
                                                       Denver, Colorado 80202
                                                       Telephone: (303) 863-1000
                                                       Facsimile: (303) 863-2301
                                                       Timothy.Macdonald@arnoldporter.com
                                                       Matthew.Douglas@arnoldporter.com
                                                       Ed.Aro@arnoldporter.com

                                                       Mindy A. Gorin
                                                       ARNOLD & PORTER KAYE
                                                          SCHOLER LLP
                                                       250 West 55th Street
                                                       New York, NY 10019-9710
                                                       Telephone: (212) 836-7832
                                                       Facsimile: (212) 836-8689
                                                       Mindy.Gorin@arnoldporter.com

                                                       Andreas E. Moffett
                                                       ARNOLD & PORTER KAYE
                                                          SCHOLER LLP
                                                       601 Massachusetts Ave., NW
                                                       Washington, DC  20001-3743
                                                       Telephone: (202) 942-5000
                                                       Facsimile: (202) 942-5555
                                                       Andreas.Moffett@arnoldporter.com

                                                       *Counsel for Plaintiffs*