## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22–cv–01338–RMR–NRN

JAZMINE BJELLAND, *et al.*

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

Defendants.

---

## PLAINTIFFS' OPPOSITION TO DEFENDANTS CITY AND COUNTY OF DENVER AND ADAM BOLTON'S MOTION FOR SUMMARY JUDGMENT

---

### Introduction

### Response to Statement of Undisputed Facts ("RSUF")

Without conceding materiality, Plaintiffs do not dispute the facts stated in ¶¶ 1–3, 7–8, 10–11, 13–14, 21–25, 33–40, 43–44, 46–48, 50–59, 62, 64–65, 67–70, 72–76, 79 82, 84–85, 87, 90–92, 94–96, 98–99, 101, 103–107.

4.     Disputed. Unsupported by citation. Protesters did not attempt to "overtake" I–25. *See* Ex. 1 (Sannier Dep.) at 34–44; Ex. 2 (Fitouri Dep.) at 41–43; Ex. 2 (Parkins Dep.) at 56–59.

5.     Disputed. Unsupported by citation.

6.     Disputed. Police used indiscriminate force on peaceful protesters, irrespective of whether items were thrown or individuals engaged in any violence or destruction. *See, e.g.*, Ex. 81 (Plaintiff's Objections and Responses to Defendants' First Set of Combined Discovery Requests) at 6–22, 65–70. No Plaintiff was engaged in violence or destruction of property at the time during or leading up to the uses of force against them. *Id.*

1

9.       Disputed. Cited documents do not support that the individuals causing injury were "with the protesters," or that Plaintiffs caused any injuries. Furthermore, many officer injuries were self–inflicted. Ex. 4 (Parsons Dep.) at 40–54, 63–65, 73–80; Ex. 5 (*Epps* Trial Tr., Parsons Test.) at 2673:3–5; 2675:23–2676:19.

12.      Disputed. The operations plans used throughout the protests were vague and nearly identical. Ex. 6 (Wyckoff OIM Memo) at 011777.

15.      Disputed. Less lethal munitions can and did cause serious bodily injury to protesters, including Plaintiffs. *See, e.g.,* RSUF ¶ 93.

16.      Disputed. DPD had inadequate training on 40mm launchers and repeatedly used them against peaceful protesters, which was consistent with Denver's policy of providing unlimited discretion to officers. Ex. 7 (Expert Report of Norman Stamper) ¶¶ 79(e), 80(g); Ex. 8 (Expert Report of Dr. Ed Maguire) ¶¶ 26, 97, 99; Ex. 9 (O'Donnell 10/15/21 Dep.) at 16–30, 40, 49–50, 55–56; Ex. 10 (Pazen Dep.) at 92–94, 129–33, 146–53.

17.      Disputed. DPD had inadequate training on pepperballs, repeatedly used them against peaceful protesters, and afforded officers nearly unfettered discretion to use less lethal weapons under DPD policies, as promulgated by Commander Phelan. Ex. 11 (Coppedge OIM Memo) at 011716; Ex. 7 ¶¶ 79(c), 80(f), 81–86; Ex. 8 ¶¶ 26–39, 97, 99; Ex. 12 (Grothe Dep.) at 38–39; Ex. 9 at 43; Ex. 13 (Eberharter Dep.) at 107–09; Ex. 14 (Knutson OIM Memo) at 011728–29. Ex. 67 (Supplemental Expert Report of Dr. Ed Maguire) ¶ 10(a)–(e).

18.      Disputed. Chemical agents were routinely used against peaceful protesters, including Plaintiffs, without warning or apparent justification, notwithstanding any contrary policy; DPD provided inadequate training on the use of CS gas and OC spray, including the need for warning or a dispersal order before deploying CS gas. Ex. 7 ¶¶ 19, 60–80; Ex. 8 ¶¶ 51, 74, 86, 121; Ex.

15 (Martinez Dep.) at 86–87; Ex. 16 (Knutson Dep.) at 48–51, 53–54; Ex. 12 at 59–62, 67–68;

Ex. 67 ¶ 10(a)–(e).

19.    Disputed. *See* RSUF ¶ 18, *supra*.

20.    Disputed. Commander Phelan directed officers to gas protesters and his authorization was

generally required. Phelan made final decisions in managing the protest. Ex. 10 at 16–18, 22; Ex.

17 (Phelan Dep.) at 26–29, 32–39, 67, 91, 153–65; Ex. 7 ¶¶ 9, 11; Ex. 19 (Porter Dep.) at 30–35;

Ex. 20 (Pine Dep.) at 85; Ex. 15 at 92–93; Ex. 21 (Abeyta Dep.) at 45–46; Ex. 18 (*Epps* Trial Tr.,

Phelan Test.) at 1186:12–25.

26.    Undisputed that some officers were injured; dispute the rest; the  documents contain no

information as to who caused the injuries, and unsupported that any Plaintiff caused injuries.

27.    Disputed. Unsupported by documents, which contain no information as to who caused the

injuries, and unsupported that any Plaintiff caused injuries.

28.    Undisputed that there was some property damage; disputed that it was entirely caused by

protesters. The cited documents do not show who caused the damage and do not support that any

Plaintiff caused damage.

29.    Undisputed that there was some property damage; disputed that it was entirely caused by

protesters. Also not supported by cited documents, which do not show who caused the damage

and do not support that any Plaintiff caused the cited damage.

30.    Undisputed that there was some property damage; disputed that it was entirely caused by

protesters. Also not supported by cited documents, which do not show who caused the damage

and do not support that any Plaintiff caused the cited damage.

31.    Undisputed that there was some property damage; dispute the rest. *See* RSUF ¶ 29.

32.     Undisputed that Denver initiated the Denver Capital Complex Vandalism Repair Project. Disputed that the cost consisted entirely of damage caused by individuals during the protests.

41.     Disputed that Ms. Bjelland was just "hanging out in the yard, . . . getting some fresh air." Ms. Bjelland was checking on the "safe house," where she would send injured protesters after she had treated them, to see if the protesters there needed aid. Ex. 23 at 97:17–22, 98:8–11, 99:2–6. She testified that "there [was] at lease one person that was staying in the house that night, *just kind of hanging out in the yard, too, getting some fresh air*"—not that she was doing so. *Id.* at 99:10–16.

42.     Undisputed, but Ms. Bjelland also told people in the street to come into the house because she "worried what the police might do." *Id.* at 105:4–11.

45.     Disputed that Ms. Bjelland was not "otherwise affected" by the pepperball; it did not affect her *breathing*, *id.* 115:6–11, but she was affected by having to flee the pepperballs. While fleeing, she had to "jump over" a person in the street who had tripped. *Id.* at 112: 22–25

49.     Undisputed, but Mr. Buranen was also at the protests to "[be] in solidarity with the message," and to protest "killing of people by police." Ex. 24 (Buranen Dep.) at 26:23, 32:1.

60.     Undisputed, but Mr. Doskey was also motivated to attend the protests by reports of police violence and to "be a force for good." Ex. 25 (Doskey Dep.) at 16:18–24, 17:12–17.

61.     Undisputed, but Ms. Folkerts was also motivated to attend the protests because she believed attention should be brought to police reform. Ex. 26 (Folkerts Dep.) at 37:16–38:2.

63.     Disputed. Mr. Gallegos attended the protest specifically to show his support for the Black Lives Matter movement. Ex 27 (Gallegos Dep.) at 16:25–17:12. On May 30, he joined the peaceful crowd that was there to protest police brutality in the wake of the murder of George Floyd. *Id.* at 17:13–19; Ex. 28 (*Bjelland* Amended Compl.) ¶ 158.

66.    Disputed. Mr. Gallegos knew that what hit him was "[a]bsolutley [a] chemical substance" that was launched from an officer's gun and that caused an intense, painful physical reaction Ex. 27 at 39:19–21, 41:6–21.  Immediately before he was struck, he "could see the line of cops pointing the guns in [his] direction," and then he saw a "puff of smoke." *Id.* at 39:22–40:2. When he was lying on the ground in pain, "[t]here was a clear line of sight between [him] and the police officers." *Id.* 43:16–44:2. There were not "scattered people in between" him and the officers. *Id.* at 43:20–25.

71.    Disputed. Mr. Girard asserts one officer held up OC spray and ordered him to turn around; however, there were many more officers in the area. Ex. 29 (Girard Dep.) at 101:10–15

77.    Undisputed; however, Mr. Hoskin also produced an unedited video that included depictions of these incidents, among other produced items. *See* Ex. 30 (BJELLAND_0000610).

78.    Undisputed; however, Ms. Jaramillo's charges were for misdemeanor violations.  *See* Ex. 31 (PROTEST–JARAMILLO–000023); *see also, e.g.*, Ex. 32 (Bolton 4/27/2023 Dep.) at 43:21–25 (stating that a stand–alone curfew violation is not a severe crime).

80.    Undisputed; however, Ms. Jaramillo has also put forth evidence to show that she suffered a broken wrist when Officer Bolton took her to the ground during the arrest and put his knee in her back. *See, e.g.*, Ex. 33 (BJELLAND_0000395–397); Ex. 78 (Jaramillo Dep.) at 69:12–19. 70:17–21, 71:19–22.

81.    Undisputed; however, several extrinsic reports identify Officer Bolton as the arresting officer; he himself admitted to being the arresting officer; he admitted he did not feel that he was in danger from Ms. Jaramillo during the arrest; and Defendants have put forth no evidence that she was resisting arrest. *See, e.g.*, 34 (DEN031641–642); Ex. 32 at 44:6–8, 48:16–49:2.

83.     Undisputed that Ms. Kelsang moved to the front of the crowd to "see what was going on" and if she "could be of assistance." However, she moved to the front of the crowed where "there was an energy of confrontation" in hopes that her presence would deter officers from firing their weapons and that "nobody was getting hurt." Ex. 35 (Kelsang Dep.) at 52:3–53:15.

86.     Disputed. Ms. Kelsang testified that she recalled being struck by at least one pepperball during the incident at Lincoln and Colfax. *Id.* at 82:22–83:6; 110:4–111:12.

88.     Disputed. Mr. Kreeger was not there to merely mill about. He decided to protest because he "wanted to lend [his] voice to the other voices that were demanding an end to certain types of injustice." Ex. 36 (Kreeger Dep.) at 16:7–11. He marched with chanting protesters. *Id.* at 22:16–23.

89.     Disputed. While Mr. Kreeger was not directly hit by a physical projectile object, he was hit "with the chemical gas itself" when the police deployed tear gas on the protesters. *Id.* at 63:1–8. Mr. Kreeger stated that "there was tear gas in the air, so [he] could not breathe." *Id.* at 23:4–5. Being hit by this gas made his voice "extremely hoarse for days," in addition to making his throat and eyes hurt and burning his skin, which lasted for about three days. *Id.* at 29:6–10.

93.     Undisputed, except that Mr. McCants' sternum was not just "injured," but "cracked, " and there is now a "noticeable bone growth over where the injury was sustained." Ex. 37 (McCants Dep.) at 28:2–29:8; *see also*, *e.g.*, Ex. 38 (Bjelland_0000362, Bjelland_0000378, Bjelland_0000381, Bjelland_0000386, Bjelland_0000390). Mr. McCants has also experienced "significant mental trauma" from the injury that has affected his employment. Ex. 37 at 10:8–11:15.

97.     Undisputed that Mr. McDonnell questioned Officer Bolton. Disputed that Mr. McDonnell did not move; he testified that as the line of officers moved the crowd, he was "pushed across

Colfax. . . . in between Lincoln and Broadway." Ex. 39 (McDonnell Dep.) at 18:15–20. His encounter with Officer Bolton occurred during this push of protesters. *See* Ex. 40 (9news footage) at 57:30–59:30.

99.     Disputed that Officer Bolton pushed Mr. McDonnell away from the police line. *See* Ex. 40 at 59:15–59:30; Ex. 41 (Bolton BWC) at 00:30–00:56.

100.     Undisputed that Mr. McDonnell returned to the protests. Disputed that he continued to protest on May 30. After getting shot he had to "stumble home" due to the effects of the pepperball, then he went back outside for about 45 minutes. Ex. 39 at 15:14–16:14.

102.     Disputed. Mr. Munn did not testify that he wasn't protesting, but rather that while "words weren't coming out of [his] mouth," he was "there at the protests and [his] intentions were to assemble and express an opinion." Ex. 42 (Munn Dep.) at 76:5–77:2; *Id.* 78:6–8. Additionally, Mr. Munn's testimony cited by Defendants was stated in response to being asked whether he continued to protest after being struck by pepperballs on May 29th. *Id.* at 75:4–76:4.

### Plaintiffs' Statement of Additional Material Facts ("SAMF")[1]

### Plaintiffs Were Shot and Gassed While Peacefully Exercising Their Rights

1.     Police repeatedly used force on protesters without any apparent provocation and without giving any direction or warning, including launching tear gas into crowds and shooting pepperballs indiscriminately. *See, e.g.*, SAMF ¶¶ 4, 11, 18, 21–23; Ex. 7 ¶¶ 68, 81–86, 93–121; Ex. 8 ¶¶ 41. On May 28, 2020, only DPD officers policed the protests. Ex. 17 at 41. Only Denver officers had pepperball guns. Only Metro/SWAT had flashbangs. Ex. 43 (Shaker 3/12/2021 Dep.) at 18–20, 125–26; Ex. 44 (Redfearn Dep.) at 38–40, 93–94; Ex. 13 at 115–16.

---

[1] Plaintiffs add facts as to certain Plaintiffs material to the current motion, and not others whose events Defendants' MSJ has already sufficiently detailed for purposes of the current motion. Plaintiffs in no way concede that Defendants are entitled to summary judgment for any claims by a Plaintiff not mentioned in this section.

2.      Plaintiffs Derek Buranen, Lauren Folkerts, and Gareth Doskey were motivated in part to attend the protests to support George Floyd protesters who might require medical aid. Ex. 24 at 46:4–9; Ex. 25 at 27:7–9: Ex. 26 at 45:17–19. During their time at the protests, they were a part of crowds of protesters and marched with those crowds. *See, e.g.*, Ex. 24 at 73:3–6, 84:19–21; Ex. 25 at 20:4–16, 69:6–19; Ex. 26 at 47:23–24, 48:23–24, 52:23–53:7.

3.      Plaintiff Jack Girard was motivated to attend the protests due to the injustice that led to the death of George Floyd. Ex. 29 at 62:13–16.

4.      On May 28th, Mr. Girard joined a group near Colfax and Broadway who were all there for the same reason—to protest. *Id.* at 77:12–19. While protesting and filming, Mr. Girard observed officers throwing tear gas from RDVs. *Id.* at 78:24–79:16. He experienced burning, difficulty breathing, coughing, choking, and difficulty seeing as a result of being exposed to the tear gas. Very soon after, officers began shooting pepperball into the crowd. A pepperball struck Mr. Girard on the collarbone, which left a bruise that lasted for several weeks. *Id.* at 85:10–13; 86:3–15. Mr. Girard left the protest after experiencing tear gas and getting struck with a pepperball. *Id.* at 87:2–7.

5.      On May 30th, while Mr. Girard was filming on his bike, officers blocked his movement. *Id.* at 117:22–118:2. He feared he would be shot or gassed as a result of an officer raising an OC cannister and telling him to turn around. As a result, he left the protest. *Id.* at 157:14–158:4.

6.      At the time Plaintiff Robert Greer was struck by a pepperball in the back of the head, he was fleeing "the cloud of chemical weapons" released by the police on the corner on which he had been standing and strategically positioning himself in the crowd to remain closer to his own home in the event that things turned more dangerous, as his seven–and–a–half–month–pregnant wife was waiting there for him to return. Ex. 45 (Greer Dep.) at 74:06–75:13.

7.      After being hit in the head with a pepperball, Mr. Greer looked back and saw officers appear to take credit for the shot and make fun of him. Ex. 46 (Plaintiffs' Fourth Supplemental Discovery Responses) at 12; Ex. 45 at 75:09–76:10; 77:1–16.

8.      While on the corner of Colfax and Lincoln, Mr. Greer witnessed police deploy multiple rounds of less lethal munitions at protesters. Ex. 45 at 73:25–74:18; Ex. 46 at 12.

9.      After returning home, Mr. Greer noticed that half of the projectile that hit him was still lodged in his hair in the back of his head. When he dislodged the projectile from his head, the pepperball's contents were further dispersed, exposing both Plaintiff and his pregnant wife to the chemicals. Ex. 46 at 12–13; Ex. 45 at 82:15–85:05.

10.     Plaintiff Virya Kelsang was motivated to attend the protests after watching the video of George Floyd's murder. Ex. 35 at 41:4–7.

11.     On May 28, Ms. Kelsang was at the front of a group of protesters near Colfax & Washington. She was struck by pepperballs on her legs and torso and experienced the effects of tear gas. *Id.* at 48:3–14; 54:16–54:7. Ms. Kelsang experienced pain and bruising from being struck. *Id.* at 54:8–55:9. She experienced violent coughing and difficulty breathing from the tear gas. *Id.* at 55:12–25. She left the protest because she was "very affected" by the tear gas. *Id.* at 56:14–22.

12.     On May 30th, Ms. Kelsang was protesting in Lincoln Memorial Park when she was struck by projectiles approximately ten times, including while she was attempting to run away. *Id.* at 64:10–65:8; 65:19–66:3; 67:25–68:6. She experienced bruising and pain from the projectiles. Grenades also exploded nearby. *Id.* at 66:4–15. Ex. 46 at 15.

13.     Officers fired less lethal weapons toward Ms. Kelsang on other occasions on May 30th in the area of Lincoln Memorial Park. Ex. 35 at 71:9–16; Ex. 46 at 15.

14.      Late in the night on May 30th into the early morning of May 31st, Ms. Kelsang was with a group of protesters near the intersection of Colfax and Logan when officers fired less lethal. Ex. 35 at 74:14–20; 77:1–13; Ex. 46 at 15–16. When she attempted to walk elsewhere, she was fired at and forced to hide behind a pillar; she believed she could not move or she would be shot. Ex. 35 at 78:2–12; 79:2–5. She was struck by at least one pepperball, which left a bruise. *Id.* at 111:19–112:10.

15.      Ms. Kelsang was exposed to tear gas on numerous other occasions during the protests, and was also exposed to tear gas on multiple occasions outside of her home. *Id.* at 81:22–82:10.

16.      Plaintiff Christian McDonnell attended the protests on May 30 because he wanted to support the Black Lives Matter movement and wanted to experience the protests. Ex. at 39 13:14–21.

17.      Mr. McDonnell was in a crowd of protesters at the RTD bus station when a line of officers began moving the crowd south. Mr. McDonnell observed Officer Bolton pointing a "very large gun" directly at protesters. When Officer Bolton told him to leave, Mr. McDonnell asked why. Officer Bolton then shoved Mr. McDonnell and called him a slur. *Id.* at 15:4–19; 19:9–25; Ex. 41.

18.      Mr. McDonnell was then shot four times with pepperball as he turned away, which caused him to fall to the ground. A pepperball struck his camera. Ex. 39 at 15:21–24; 19:25–1; 35:10–36:11. The impact of the pepperballs caused Mr. McDonnell a lot of pain, and he experienced "excruciating" effects of the pepper, which affected "every inch of [his] body" and affected his vision. *Id.* at 35:10–36:11;41:9–18. After he was shot, Mr. McDonnell had to be assisted by other protesters and had to "stumble back home." *Id.* at 15:21–16:8; *see* 41:9–18. Mr. McDonnell testified that he would not go to another protest even though he is "a pretty strong–willed person," due to the "terrifying experience" of the protests. *Id.* at 38:8–18.

19.     Mr. McDonnell returned to the protests on June 1 in response to his friend having been shot and seriously injured by officers the night before. Mr. McDonnell had brought his injured friend to the hospital and observed the extent of his injuries. *Id.* at 38:19–24; 29:5–31:4.

20.     Plaintiff Douglas Munn was motivated to attend the protests out of sadness for the murder of George Floyd and a desire to "make a difference by assembling [and] protesting." Ex. 42 at 48:25–49:11. He hoped that his presence at the protests would make a difference. *Id.* at 50:13–17.

21.     On May 29th, Mr. Munn was struck by less lethal munitions, including after he had turned to run away from officers with raised guns. *Id.* at 63:6–23; 65:10–18. The impact caused pain, itching, stinging, and burning as well as an open wound on his leg. *Id.* at 73:20–75:3. Mr. Munn ran away from the area after being hit with pepperballs. *Id.* at 78:17–23; *see id.* at 79:24–80:4.

22.     On May 30th, Mr. Munn protested in Civic Center Park and chanted with other protesters. *Id.* at 89:2–10; 92:14–22. He was struck in the back with at least one pepperball while his back was turned to officers. *Id.* at 97:8–98:23. He also inhaled tear gas, which affected his ability to breathe, caused burning in his lungs and eyes, and caused coughing for days afterward. *Id.* at 105:10–106:4. The immediate effects of the gas caused him to collapse to the ground, and he was helped by other protesters. *Id.* at 111:15–112:7; 114:17–25. The effects to his vision also caused him to stumble across the street and risk being hit by traffic. *Id.* at 115:1–6.

23.     On May 31st, Mr. Munn marched with other protesters and participated in chants. *Id.* 131:3–3–9; *see* 132:13–19. Officers deployed tear gas without warning. *Id.* at 134:25–135:7. Mr. Munn felt the effects of the gas. *Id.* at 140:6–21. He also experienced explosives going off in the area, including one "dangerously, insanely close" that gave off a flash and overwhelming sound. *Id.* at 140:22–143:1. While attempting to leave, Mr. Munn encountered tear gas and officers shooting other less lethal weapons. To avoid the officers and the weapons, he was forced to take a

circuitous route to his car, and at one point ran into a visible cloud of gas. *Id.* at 143:25–145:6; 145:17–146:6. He experienced burning in his lungs and coughing as a result of the gas. *Id.* 146:10–22.

## Denver's Official Policy, Widespread Practice or Custom, and Failure to Train

24.    Officers were provided inadequate field force training and were not trained on how to handle protests where some individuals are throwing objects, which caused protester (and officer) injuries. *See* Ex. 47 (Sich OIM Memo) at 011772–74; Ex. 14 at 011726–29; Ex. 11 at 011714–17; Ex. 8 ¶¶ 11–39; Ex. 48 (Stadler OIM Memo) at 011770. Under Chief Pazen, "the prevailing attitude is that training is not important." Ex. 11 at 011715. Denver provides no training on the contents of the DPD Crowd Management Manual. Ex. 16 at 51–53; Ex. 59 (*Epps* Trial Tr., Knutson Test.) at 2411:22–2412:6. These training failures caused the uses of force on Plaintiffs. Ex. 8 ¶ 39.

25.    Denver engaged in widespread inappropriate use of grenades and provided no training or policies on the use of those or other explosive devices and reporting thereon, which caused the violation of Plaintiffs' rights. Ex. 7 ¶¶ 84(c), 113; Ex. 8 ¶ 25, 98, 104; Ex. 12 at 17–21, 47; Ex. 49 (Levens 11/5/2021 Dep.) at 61–64; Ex. 15 at 21, 24; Ex. 13 at 116–17, 141–42.

26.    Although CS gas was normally authorized by the Incident Commander (IC), officers were trained that they have discretion to use CS without IC approval. Ex. 12 at 36; Ex. 50 (O'Donnell OIM Memo) at 011740. The use of CS gas was authorized by Denver policy. Ex. 7 ¶ 84(f).

27.    At the time of the protests, Denver policies expressly permitted encircling or kettling protesters to attempt arrest, a dangerous practice that is contrary to generally accepted police practices and violated Plaintiffs' rights. Ex. 7 ¶¶ 89, 153(c); Ex. 8 ¶ 166; Ex. 17 at 76; Ex. 51 (DEN3873) at 9:36–9:45 p.m.; Ex. 49 at 95–99.

28.     In 2011, after DPD had injured several people through use of pepperballs and other less lethal weapons to clear a protest, OIM recommended a comprehensive tactics review "to determine whether different methods could prevent similar confrontations in the future." Ex. 52 (OIM 2012 Report) at 15. Denver declined OIM's recommendations, which the OIM called a "missed opportunity" at "improving outcomes at future demonstrations." *Id.* at 15–16.

29.     Despite recognizing that use–of–force reporting is essential for officer accountability and transparency, longstanding DPD policy was that officers need not complete reports for protests. Ex. 7 ¶¶ 122–134; Ex. 17 at 102; Ex. 19 at 43–47, 51, 60–62; Ex. 10 at 62–64; Ex. 49 at 60; Ex. 22 (Williams Dep.) at 15, 18–20. This had a serious adverse effect on protecting constitutional rights, because *during the protest*, officers believed that they need not document their uses of force. Ex. 7 ¶¶ 80(e), 122–134, 152(l), 153(e); Ex. 8 ¶¶ 139–40, 160; Ex. 22 at 15; Ex. 13 at 48– 53, 82–83.

30.     Aside from training officers how to operate their cameras, Denver provided no training or policy to officers on the proper use of BWC or when they are required to activate it during a protest. Ex. 7 ¶¶ 135–147; Ex. 16 at 22–28, 69–70. Denver's policy and training is that Metro/SWAT officers are not required to wear BWC when using their weapons, or even when arresting people, which is contrary to generally accepted police practices. Ex.16 at 71, 77; Ex.7 ¶¶ 145(c), 146(b).; Ex. 13 at 55–62, 74–82; Ex. 15 at 43, 49, 53–54. Other units of DPD also believed BWC was unnecessary in a protest, even when using less–lethal weapons. Ex. 22 at 90–91.

31.     This is Denver's policy even though, in 2014 and 2017, the OIM criticized DPD for not requiring that Metro/SWAT use BWC. Ex. 53 (OIM 2014 Report) at 25, 34–35; Ex. 54 (OIM 2015 Policy Highlight); Ex. 55 (OIM 2017 Report) at 36, 45. Denver knew BWC is essential to

accountability and preventing violations. Ex. 10 at 39–41; Ex. 7 ¶¶ 141–47; Ex. 13 at 59–61.

32.     Failing to require officers to account for their uses of force on protesters contributed to

inappropriate and unreasonable uses of force.  Ex. 7 ¶ 146(b). DPD requires the use of BWC for

patrol functions. *Id.* ¶¶ 146(a)–(c); *see* Ex.8 ¶ 132; *see* Ex. 13 at 49–51.

33.     DPD did not require officers to complete use–of–force statements until the day after the

court in *Abay, et al. v. City and County of Denver*, No. 20–cv–1616–RBJ, F. Supp. 3d 1286 (D.

Colo. 2020), issued a temporary restraining order ("TRO").[2]  DPD leadership sought to ensure

that the after–the–fact reports avoided inconsistencies and problematic language and wanted the

reports prepared to protect officers from lawsuits. Ex. 82 (DPD emails, DEN011380) at 11380,

11383; Ex. 19 at 48–49, 52–57; Ex. 17 at 103–04, 106. DPD wanted to protect itself and cover

up any problematic uses of force rather than protect the constitutional rights of Denver's citizens.

Ex. 7 ¶¶ 132, 134; Ex. 8 ¶¶ 125–167.

34.     Because officers did not write their statements until several weeks afterward, it was

difficult for officers to recall what force they used, where, and on whom. Ex. 19 at 62–64; Ex.

22 at 29; Ex. 7 ¶ 133; Ex. 57 (Beall Dep.) at 95–101, 105–15, 122–23; *compare* Ex. 58

(DEN5085) *with* Ex. 51 (DEN3873) at 9:36–9:45 p.m. Their reports were vague and generically

stated that their uses of force were consistent with DPD policy and training. Ex. 7 ¶¶ 126, 133;

Ex. 61 (Officer Statements).

35.     Denver's use–of–force reporting and BWC policies led directly to officers acting with

impunity to violate Plaintiffs' civil rights, as well as the inability to identify officers who used

force, failure to discipline, and ratification of the officers' conduct. Ex. 49 at 54–55; Ex. 7 ¶

---

[2] The TRO enjoined the DPD and mutual aid agencies from employing chemical weapons or projectiles of any kind
against peaceful protesters, ordered that an on–scene supervisor must authorize the use of chemical weapons or
projectiles in response to specific acts of violence or destruction, and set further parameters for the use of less lethal
weapons. *See Abay v. City of Denver*, 445 F. Supp.3d 1286, 1294–95 (D. Colo. 2020).

152(k); *see* Ex. 10 (Pazen Dep.) at 67–68.

36.     Denver was responsible for the excessive use of force by mutual–aid agencies, including use of less–lethal shotguns approved by Pazen or Phelan. Ex. 10 at 31–32; Ex. 17 at 42, 93–95; Ex. 18 at 1191:21–1194:22. Denver provided rules of engagement to mutual–aid agencies and its policy was to allow them to use their own policies. Ex. 60 (DPD emails, DEN006501) . A DPD supervisor was embedded with every mutual– aid unit during the protest. Ex. 10 (Pazen Dep.) at 27–31; Ex. 62 (9News video, 6/1/2020) at 3:00–3:45. Denver also failed to conduct joint training with outside agencies. Ex. 7 ¶¶ 154–58; Ex. 11 at 011717.

37.     Because Denver knew that crowd control and use of force during a protest are recurring situations that its officers would have to face, it was foreseeable that, without adequate policies and training, officers are likely to violate citizens' constitutional rights. Ex. 7 ¶ 164; Ex. 8 ¶¶ 170–72; Ex. 10 (Pazen Dep.) at 121–25.

38.     Commander Phelan authorized the use of CS gas on May 28, 2020, at 14th and Sherman, Colfax and Washington, and Colfax and Lincoln. Denver did not give dispersal orders or warnings at any location before less–lethal weapons were used, except for 14th and Sherman on May 28, and even then, officers knew that the announcement could not be heard. RSUF ¶ 20; Ex. 7 ¶¶ 24–25, 36; Ex. 63 (DEN4021) at 7:29–9:45; Ex. 57 at 51–60.

39.     Commander Phelan also authorized the use of CS gas and other less–lethal weapons, including pepperballs, at the intersection of Lincoln and Colfax on May 30, 2020. That use, and the actions of the DPD gang unit and Metro/SWAT unit members during this incident, were consistent with DPD training and policy. Ex. 64 (IAB Letters); Ex. 15 at 92–93, 102–10; Ex.22 at 59, 64–70; Ex. 65 (Carroll Dep.) at 26–27; Ex. 20 at 13–15.

40.     On May 31, 2020, Phelan authorized teams of officers to kettle a group of mostly peaceful

protesters (including Plaintiffs) into a confined space in front of a cathedral, where they were gassed and shot with less–lethal weapons between 9:36–9:42 p.m. Ex. 7 ¶¶ 87–92; Ex. 66 (DEN3874); Ex. 67 (DEN3873); Ex. 68 (Fitouri 288) at 25:00–28:24; Ex. 17 at 75; Ex. 22 at 77–88. This "encircling" was expressly permitted by DPD policy. Ex. 7 ¶ 89; Ex. 69 (DPD Crowd Management Manual) at 9; *see also* Ex. 17 at 76; Ex. 22 at 84–85.

41.    Denver received complaints of officers suppressing First Amendment rights of protesters at the beginning of the protest. Ex. 70 (Thomas 10/13/21 Dep.) at 30–31. The Mayor and Chief Pazen responded during a press conference on May 29, 2020, that officers acted with "extreme restraint," performed in an "exemplary manner," and showed "tremendous discipline." *Id.* at 34–35; Ex. 71 (9News video, 5/29/2020) at 12:20, 37:15–37:52; *see* Ex. 17 at 23–25. The Mayor and Chief told them to continue doing what they were doing. This caused the violation of Plaintiffs' rights on subsequent days of the protests. Ex. 7 ¶¶ 159–163.

42.    If DPD has not disciplined an officer for their conduct, then their actions were deemed within DPD policy. Numerous incidents of use of force, including ones at which Plaintiffs were present, were deemed consistent with DPD training and policy. Ex. 7 ¶¶ 77, 80(c), 80(e), 80(g)–(h), 99, 152(o)–(r); Ex. 9 at 15, 41; Ex. 17 at 20–26; Ex. 19 at 82–83; Ex. 22 at 37–39.

43.    There were 128 complaints alleging officer misconduct at the protests. Ex. 72 (Levens 7/27/2023 Dep.) at 13. Of these, one probationary officer was fired, four officers were disciplined for inappropriate or excessive use of force, one was disciplined and one received an oral reprimand for failing to activate BWC[3], and one Sergeant received an informal finding related to a statement that he made. Ex. 49 at 39–47; Ex. 72 at 15–39. None of these involved Plaintiffs' incidents. Ex. 72 at 43–44. No one has been disciplined for failure to appropriately

---

[3] The officer in this instance was likely not made aware of this finding due to retirement. Ex. 72 at 39.

document use of force, and instances of failure to activate BWC were not investigated or

disciplined. Ex. 49 at 50–59, 63–64; Ex. 7 ¶¶ 138–144, 152(g)–(j). Other instances of

inappropriate uses of force detailed in the *Epps* trial did not lead to discipline. Ex. 56 (Thomas

5/26/2023 Dep.) at 48:4–20.

44.    The small number of officers disciplined for their actions at the protest is "extremely

disturbing." Ex. 7 ¶ 153(a)–(c), 153(e). This failure to discipline amounts to an approval of the

officers' conduct and allowed officers to escape accountability. *Id.* ¶¶ 148–53.

45.    On June 6, 2020, Executive Director of the Department of Public Safety, Murphy

Robinson, sent an email to the entire DPD about this Court's TRO in *Abay*. He thanked the officers

for their service and approved of their conduct during the protest. Ex. 73 (DEN7004) at

DEN7004–05; Ex. 17 at 174–81. Robinson is above Chief Pazen in the chain of command. Ex.

17 at 32–33.

## Argument

## I.    The Verdict in *Epps* Precludes Summary Judgment in This Case

Denver's single paragraph discussing the verdict in *Epps*[4] argues only that the Court's

legal rulings in that case are not binding, and the verdict has no "preclusive impact" in this case.

Defendants' argument misses the point entirely and fails to recognize the salience of the *Epps*

verdict to the current Motion for Summary Judgment ("MSJ")—a reasonable jury has already

found against the City and County of Denver in *Epps*, on the same evidence included in the

---

[4] *Epps* (consolidated with *Fitouri, et al. v. City and County of Denver*) was the first case involving the 2020 protests in Denver to be tried in this district. A jury trial on 12 plaintiffs' claims of First and Fourth Amendment violations was held in March 2022. The jury found Denver liable. Ex. 79 (*Epps* Verdict). The plaintiffs presented several theories on how Denver caused the violation of their rights through Denver's official policies, widespread practices and customs, failure to train, and ratification of officers' actions. *Id.*; see Ex. 74 (*Epps* Pls.' Opp. Br.) at 15–21; Ex. 75 (*Epps* Jury Instructions). Denver's motion for a new trial was denied. Ex. 76 (*Epps* Post–Trial Order).

present case. Not only was the *Epps* Defendants' summary judgment motion, based on the same evidence, denied, but a jury found for the *Epps* Plaintiffs on every single *Monell* theory presented against the City and County of Denver. The Defendants here cannot credibly argue that a reasonable jury could not view the evidence and decide in Plaintiffs' favor on those theories, as one unequivocally already has. Moreover, the individual *Bjelland* Plaintiffs bring claims similar to the *Epps* Plaintiffs', with some arising from the *same* events of police misconduct that were at issue in *Epps*. To the extent an individual Plaintiff's claims factually differ, whether that Plaintiff's Constitutional rights were violated is a highly factual inquiry, and summary judgment is precluded where, as here, there exist questions of material fact appropriately left for a jury to decide. The *Epps* verdict, while not legally binding, presents compelling evidence that there is a genuine dispute of material fact that precludes summary judgment.

## II.    Factual Disputes Preclude Summary Judgment on First Amendment Claims

Plaintiffs' First Amendment claim requires proof of three elements: (1) protected activity, (2) government conduct that chills the protected activity, and (3) motive. *Worrell v. Henry*, 219 F.3d 1197, 1206 (10th Cir. 2000). Denver fails to establish a basis for summary judgment as to any of these factors, and its arguments also turn entirely on hotly contested facts.

First, a reasonable jury could conclude that each Plaintiff was engaged in protest activity. Defendants' attempts to characterize several Plaintiffs as not exercising their First Amendment free speech rights do not withstand scrutiny in the context of Plaintiffs' full testimony. Defendants also do not contend that the Plaintiffs were not exercising their First Amendment right to assemble. These arguments only highlight the genuine questions of material fact regarding the Plaintiffs' protest activities.

18

Second, a reasonable jury could find that Defendants engaged in conduct that would chill a person of ordinary firmness from engaging in protected activity. Denver officers (and mutual aid agencies under Denver's direction) used less lethal munitions against and/or physically assaulted the Plaintiffs. *See* Ex. 28 at 27–55; SAMF ¶¶ 36; *Irizarry v. Yehia*, 38 F.4th 1282, 1292 (10th Cir. 2022) ("[p]hysical and verbal intimidation can chill speech."). Defendants briefly reference but make no argument about the second element, and instead collapse it into the first. MSJ at 19–20. Such undeveloped arguments are forfeited or waived. *U.S. v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008).

Third, motivation is a highly factual inquiry that "may be met with either direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial." *Index Newspapers LLC v. USMS*, 977 F.3d 817, 827 (9th Cir. 2020). Motive "is not easily ascertained and requires inferences drawn from the [defendant's] behavior" such that "summary judgment may be precluded." *Seamons v. Snow*, 206 F.3d 1021, 1027–28 (10th Cir. 2000).[5]

## A.    Plaintiffs Were Engaged in Protected Speech When Force Was Used

### 1.    Plaintiffs Were Engaged in Speech Protected by the First Amendment

The First Amendment provides that all citizens have a right to hold and express their personal political beliefs. *See Cohen v. California*, 403 U.S. 15, 24, 91 S. Ct. 1780, 29 L.Ed.2d 284 (1971). It "safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Com'n*, 572 U.S. 185, 203, 134 S. Ct. 1434, 188 L.Ed.2d 468 (2014). Organized political protest is a quintessential

---

[5] Defendants also misstate the third element, claiming that retaliation must have been "substantially motivated" by Plaintiffs' protected activity. MSJ at 21. *See Worrell*, 219 F.3d at 1206 (protected activity must be "a substantial or motivating factor") (quoting *Gardetto v. Mason,* 100 F.3d 803, 811 (10th Cir.1996)).

form of "classically political speech." *Boos v. Barry*, 485 U.S. 312, 318, 108 S. Ct. 1157, 99

L.Ed.2d 333 (1988). Each Plaintiff was exercising this right.

By cherry–picking testimony, Defendants argue that some Plaintiffs were not actually

engaged in expressive activity when officers used force against them. *See* MSJ at 18–19.

Defendants isolate statements by Plaintiffs Gallegos, Kelsang, Kreeger, and Munn to

characterize their actions as not expressive speech; however, each of these plaintiffs was

motivated by a desire to protest and convey a particularized message in response to the murder of

George Floyd and engaged in protest, whether by joining in chanting, marching, and/or adding

their bodies to the protest. *See* RSUF ¶¶ 63, 83, 88; SAMF ¶¶ 16, 22–23; *see Texas v. Johnson,*

491 U.S. 397, 406 (1989). That Plaintiffs may have also been curious about the protest

environment, watching other protesters, or refraining from literally raising their voices does not

negate their First Amendment protections while participating in a protest. *See* RSUF ¶¶ 63, 83,

88; SAMF ¶¶ 16, 22–23; *see* MSJ at 18–19. Even if the Defendants' characterization of these

Plaintiffs' activities were accurate—and it is not—Plaintiffs still would have been engaged in

protected activity. As the Supreme Court has repeatedly stated, the First Amendment right to

protest is "not confined to verbal expression" and "certainly include[s] the right in a peaceable

and orderly manner to protest by silent and reproachful presence." *Brown v. Lousiana.*, 383 U.S.

131, 142 (1966).

Defendants then argue that Plaintiffs Buranen, Doskey, and Folkerts providing water,

snacks and medical attention to other protesters and Plaintiff Bjelland's "work at a first aid

station removed from the protests" at the time they were injured bars those Plaintiffs' First

Amendment claims. MSJ at 18. However, individuals who are "peaceful demonstrators,

journalists, and medics" can be "engaged in constitutionally protected activity through organized

20

political protest." *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020). The

Plaintiffs' rendering aid to other protesters does not separate them from the protest itself; each

Plaintiff, once again, was motivated to attend the protests to convey a particularized message in

response to the death of George Floyd, and engaged in protest activities, whether by chanting,

marching, or adding their presence to the protests. *See* SAMF ¶¶ 2; Ex. 23 at 69:5–9; MSJ at 8–

9; *see Brown*, 383 U.S. at 142. Even if they had not, their presence as peaceful demonstrators and

medics as part of a political protest is enough to constitute constitutionally protected activity,

which was disrupted and chilled by the Defendants.[6] *See Abay*, 445 F. Supp. 3d. at 1292.

Finally, Defendants argue that Ms. Bjelland's "'hanging out' in the yard of a house away

from the protests and walking back to the aid station," MSJ at 9, 18, and Ms. Jaramillo's "sitting

by a wall, away from any protest activity, then walking to her car," *id.* at 18, do not constitute

protected speech. Once again, Defendants omit key parts of Plaintiffs' testimony, and a

reasonable jury could find that Ms. Bjelland and Ms. Jaramillo were engaged in protected

activity. *See* RSUF ¶¶ 41 (Ms. Bjelland was not "just 'hanging out'" but serving as a medic). A

reasonable jury could find that Ms. Bjelland was engaged in protected activity because, even if

she was away from larger protest crowds at the time she was shot at, she was still engaging in

protest activity as a medic. *See Abay*, 445 F. Supp. at 1292. Likewise, Ms. Jaramillo was not

simply sitting by a wall, but rather regrouping with others with whom she was protesting that

evening. Ex. 78 (Jaramillo Dep.) at 66:10–67:7. As the protesters attempted to leave, Officer

Bolton tackled her to the ground, breaking her wrist. *Id.* 69:12–19, 70:17–21, 71:19–22; Ex. 46

---

[6] Defendants also lean on a case that is wholly inapposite. *Molina v. City of St. Louis, Missouri*'s holding that
wearing hats labeled "legal observer" did not constitute symbolic speech is not applicable to any Plaintiff's actions
here. *See* 59 F.4th 334, 341–42 (8th Cir. 2023). No Plaintiff argues that solely their clothing expressed symbolic
speech. Moreover, in *Molina* the plaintiff testified that "their goal was to protect the right to protest, not participate
in one." *Id.* at 337 (internal quotations omitted). Here, each Plaintiff expressed their desire to participate in the
protests, and engaged in protest activity. *See* SAMF ¶¶ 2; Ex. 23 at 69:5–9; MSJ at 8–9.

at 14. During her arrest, officers repeatedly called Ms. Jaramillo a "piece of shit" and asked if she "liked hurting cops." *Id.* at 74:3–13; Ex. 46 at 14. A reasonable jury could find that the officers' actions were, therefore, in response to Ms. Jaramillo's presence at the protests.

**2.    Plaintiffs' Activity Was Protected by the Freedom of Assembly**

The Plaintiffs' protest activity was also protected by the First Amendment freedom of assembly. It is well–settled that the First Amendment protects citizens' freedom to assemble in protest. *See Edwards v. South Carolina*, 372 U.S. 229, 242 (1963); *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). Indeed, the Supreme Court has stated that assembly and protest are "basic constitutional rights in their most pristine and classic form." *Edwards*, 372 U.S. at 235. Therefore, the freedom of assembly provides an independent basis to support Plaintiff's First Amendment claims. Even if, as Defendants mistakenly contend, Plaintiffs were not engaged in protected "speech," their First Amendment argument still fails because Plaintiffs were assembled in peaceful protest.

Courts have routinely held that one's mere presence at a protest falls within the scope of the First Amendment's right to assemble. Indeed, a court in this District found just that. *See Sexton v. Hickenlooper*, No. 13–cv–01008–MSK–KMT, 2014 WL 1091936, at *11 (D. Colo. Mar. 19, 2014). In *Sexton*, the court found that the plaintiff could properly assert a § 1983 claim against a police officer because the plaintiff was exercising his right to peaceably assemble at an Occupy Wall Street protest. *See id*. Similarly, the Fourth Circuit affirmed a district court's conclusion that a group of plaintiffs were engaged in protected First Amendment activity by their mere presence at a protest on the state legislature's grounds. *See Occupy Columbia v. Haley*, 738 F.3d 107, 122 (4th Cir. 2013). And on facts nearly identical to the present case, a court recently held that the Constitution affords peaceful protesters "the freedom of assembly without fear of

22

retaliation or disruption by … police officers' use of tear gas, pepper spray, flash bang devices, or foam–tip bullets." *Black Lives Matter Seattle – King Cnty v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1211 (W.D. Wash. 2020). Even if Defendants' argument that the Plaintiffs were not engaged in protected *speech* could succeed (it cannot), Defendants still have not demonstrated that summary judgment is appropriate.

### 3.    A Curfew Does Not Negate First Amendment Protections

Defendants further assert that peaceful protest activity that occurs after a curfew is in effect is not protected by the First Amendment. MSJ at 19. This cannot be, and is not, so. "A curfew alone does not erase an individual's rights to freedom of speech and to be free from use of excessive force." *Dayton v. City & Cnty. of Denver,* No. 22–cv–00841–CMA–MEH, 2023 WL 112491, at *4 n. 1 (D. Colo. Jan. 5, 2023); *see also Gregory v. City of Chicago*, 394 U.S. 111, 112 (1969) (finding a march "falls well within the sphere of conduct protected by the First Amendment" despite a curfew). Though the First Amendment is not an unqualified right, the logic urged by Defendants would give a carte blanche to a government intent on suppressing expressive speech. This is exactly what the First Amendment protects against. The fact that several Plaintiffs' events occurred after a curfew was in effect has no bearing on the protected status of the speech at issue.[7]

### B.    Causation

A factual dispute exists as to whether Plaintiffs' protected activity was a motivating factor of the officers' actions. The nature, timing, and targeting of force on peaceful protesters buttress

---

[7] The City of Denver's curfew was challenged as unconstitutional and unconstitutionally applied to protesters, in a class action bifurcated from the *Epps* trial and that is pending settlement. *See Elisabeth Epps, et al. v. City of Denver*, *et al.*, No. 120–cv–01878–RBJ, Min. Order, ECF No. 496, Sept. 6, 2023 (Minute Order in supplement to Order preliminarily approving the Class Action Settlement Agreement and proposed notice). The existence of the curfew does not affect the protected status of Plaintiffs' speech regardless of whether or not it was constitutional.

the reasonable inference that Plaintiffs' protected activity was a substantial or motivating factor for Defendant's actions. *Black Lives Matter Seattle–King Cnty.*, 466 F. Supp. 3d at 1214. The requisite motive is supported by a wide swath of evidence, including the fact that officers used unwarned force against Plaintiffs while they were engaged in peaceful protest activity—and specifically, protest activity against the police and police violence. *See, e.g.,* Ex. 28 at 2–4; RSUF ¶ 63; SAMF ¶¶ 2, 3, 10, 20. There was no justification for the use of less lethal munitions against Plaintiffs, other than their participation in protests against police use of force—which was met by widespread and inappropriate uses of force.  Officers repeatedly shot, gassed, or threw explosives at Plaintiffs without warning while they were engaged in peaceful protest activity, such as chanting, marching, kneeling, or assembling with other protesters. *See, e.g.*, Ex. 28 at 27–55. Defendants seemingly attempt to get around this by stating, without factual basis, that "along with the protesters, there were others in attendance at the protests engaged in violence attempting to injure police officers or engaged in destruction of property." MSJ at 21. However, they do not—and cannot—make any argument that the actions of *other* individuals justify the use of force against Plaintiffs as they peacefully protested. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886,  908, 933 (1982) ("one of the foundations of our society is the right of individuals to combine with other person in s pursuit of a common goal by lawful means," and "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated for doctrine that itself is not protected."

In addition, DPD's communications—at the highest levels—reinforce this dispute. Then–Division Chief Thomas relayed a message from the Chief and Deputy Chief that the "curfew ordinance is to be used only for enforcing *protest–related* behavior" and not to allow officers to cite individuals for curfew violations "*[u]nless they are actively engaged in protest activity*." Ex.

24

77 (curfew texts) at 13053 (emphasis added). A reasonable jury could determine that officers were instructed to target protesters, and that Defendants' actions were motivated by Plaintiffs' protest activity. The evidence therefore raises a genuine dispute regarding officers' motives that precludes summary judgment. *See Anti Police–Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155–56 (D. Or. 2020).

## III.    Factual Disputes Preclude Summary Judgment on 4th Amendment Claims

To prevail on a claim of excessive force under the Fourth Amendment, a plaintiff must show a seizure occurred and that it was unreasonable. *Bella v. Chamberlain*, 24 F. 3d 1251, 1255 (10th Cir. 1994); *see Graham v. Connor*, 490 U.S. 386, 395–96 (1989). Seizure includes both the use of "physical force" or a "show of authority" that "in some way restrain[s] the liberty" of the person. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (citation and internal quotation marks omitted). In *Torres*, the Supreme Court overruled the test for seizure ("intentional acquisition of physical control") cited by Denver, *see* MSJ at 21, calling it "inconsistent with the history of the Fourth Amendment and our cases." 141 S. Ct. at 999, 1001. *Torres* clarified that "[t]he application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Id.* at 994. The reasonableness of a seizure is a question for the jury. *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1253 (10th Cir. 2013)

A reasonable jury could find that each Plaintiff was subjected to a seizure, as one did on similar facts in *Epps*. Each Plaintiff was hit by a projectile, subjected to other less lethal munitions, and/or assaulted by an officer. Moreover, the use of gas to disperse or restrain Plaintiffs constitutes seizure, as it restricted Plaintiffs' freedom of movement. *See Alsaada v. City*

*of Columbus*, 536 F. Supp. 3d 216, 261–63 (S.D. Ohio 2021); *Jennings v. City of Miami*, 2009
WL 413110, at *8 (S.D. Fla. Jan. 27. 2009); *Downes–Covington v. LVMPD*, 2020 WL 7408725,
at *10 (D. Nev. Dec. 17, 2020). "[T]he appropriate inquiry is whether the challenged conduct
*objectively* manifests an intent to restrain." *Torres*, 141 S. Ct. at 998 (emphasis in original). The
intentionality requirement is satisfied when "the termination of freedom of movement [occurs]
*through means intentionally applied*." *Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012)
(emphasis in original); Ex. 80 (*Epps* Order on Summary Judgment) at 11–13. Plaintiffs' freedom
of movement was restricted through means intentionally applied when they were gassed, shot at
with projectiles, had explosive devices thrown near them, and/or were physically accosted by an
officer. *See Dayton v. City & Cnty. of Denver*, 2023 WL 112491, at *6 (D. Colo. Jan. 5, 2023)
(shooting into a crowd and striking a protester undisputedly "objectively manifested an intent" to
restrain and incapacitate him); *see also Nelson*, 685 F.3d at 875–76 (concluding that when an
individual was "hit in the eye by a projectile filled with pepper spray," he was "unquestionably
seized under the Fourth Amendment."); *Lemery v. Beckner*, 323 F. App'x 644, 649 (10th Cir.
2009) (an individual who was hit by a pepperball while in his driveway was seized, even though
he was able to run inside immediately after being hit, because he was "momentarily stopped" by
the impact). A reasonable jury, therefore, could find that each Plaintiff was subjected to a seizure,
and that those seizures were unreasonable in the face of Plaintiffs' nonviolent, protected First
Amendment activity.

## IV.    Factual Disputes Preclude Summary Judgment on the *Monell* Claims

Genuine factual disputes preclude summary judgment. Plaintiffs' § 1983 claims against
Denver require proof of (1) a city policy or custom and (2) a causal link "between the policy or
custom and the injury alleged." *Waller v. Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019). In

their MSJ, Defendants recycle the same unsuccessful arguments that they made in *Epps*. Not only

did the court reject those arguments on summary judgment, but a jury could and did find Denver

liable on each of the *Monell* theories, which are identical to Plaintiffs' here. *See* Ex 79; Ex. 80. A

reasonable jury's verdict on the same evidence in *Epps* precludes a finding of summary judgment

in this case.

### A.    Denver's Policies, Practices, and Customs

A policy or custom can be established in numerous ways, including by formal

pronouncement, informal custom that amounts to a widespread practice, decisions of final

policymakers, ratification by final policymakers of the decisions of subordinates, or a failure to

adequately train employees with deliberate indifference to the attendant effects. *Hinkle v.*

*Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239–40 (10th Cir. 2020). Here, to prove

their claim based on policy, practice, or custom, Plaintiffs do *not* need to show that there was a

history of problems relating to use of force reporting, BWC use, or any of the official policies.[8]

When it comes to "acts 'of the municipality'—that is, acts which the municipality has officially

sanctioned or ordered," it  does not matter whether there is a pattern of prior acts; "where action

is directed by those who establish governmental policy, the municipality is equally responsible

---

[8] Nor do they need to show that the policies, practices, or customs apart from inadequate training were carried out
with deliberate indifference. The deliberate–indifference requirement applies only to a *Monell* theory based on
failure to train or inadequate hiring. The two other *Monell* theories alleged by Plaintiffs lack that scienter
requirement. *See Waller*, 932 F.3d at 1283–84 (using "deliberate indifference" element only with respect to claims
for failure to train or supervise); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir.
2013) ("A challenged practice may be deemed an official policy or custom for § 1983 municipal–liability purposes
if it is a formally promulgated policy, a well–settled custom or practice, a final decision by a municipal policymaker,
*or deliberately indifferent training or supervision*.") (emphasis added); *Bryson v. City of Oklahoma City*, 627 F.3d
784, 788 (10th Cir. 2010); *Trujillo v. City & Cnty. of Denver*, 2017 WL 1364691, at *4 (D. Colo. Apr. 14, 2017).
This is because an official policy, practice or custom already requires a showing of deliberate action by
policymakers or that the practice or custom is "standard operating procedure." See *Pembaur v. City of Cincinnati*,
475 U.S. 469, 479–80 (1986); see also *id*. at 485 (White, J., concurring); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S.
701, 737 (1989). Because the municipality is accountable only for its own actions, no showing of deliberate
indifference is required where officially sanctioned action is involved. *Pembaur* at 478 n.6.

whether that action is to be taken *only once* or to be taken repeatedly." *Pembaur*, 475 U.S at 480–81 (emphasis added). Even if establishing a historical pattern *were* a requirement, Plaintiffs have put forth evidence that Denver was aware *for years* of problems with inappropriate use of less lethal weapons on protesters, BWC use, and use of force reporting, and did nothing to fix these problems. SAMF ¶¶ 38–42. Therefore, Plaintiffs' claims are not based, as Defendants contend, "solely and exclusively on the response to the protests in May and June of 2020." MSJ at 26.

In any event, there remains a genuine dispute as to Denver's actual policies, practices, and customs. The expert reports of Norman Stamper and Dr. Edward Maguire provide extensive evidentiary support for the following non–exhaustive list of DPD policies or practices that underlie Plaintiffs' claims: failure to give orders before the use of force, indiscriminate and inappropriate use of munitions and pepperballs, and inadequate training thereon; failure to require officers to complete timely use–of–force reports, which negatively impacted officer accountability; a policy of not requiring BWC activation during protests and failure to train thereon; failure to discipline officers for the excessive use of force; and indiscriminate use of tear gas ordered by an undisputed final policymaker, Commander Phelan. RSUF ¶¶ 16–20; SAMF ¶¶ 24–45.[9] A reasonable jury could determine (and has previously determined) that Plaintiffs have established the requisite policy, practice, or custom by Denver.

**B.      The Facts Show That Denver's Policies or Customs Caused Plaintiffs' Injuries**

---

[9] A policy need not be unconstitutional to be actionable. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). A plaintiff need only show that the policy was the moving force behind the constitutional violation. *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994); *Monistere v. City of Memphis*, 115 F. App'x 845, 850 (6th Cir. 2004) ("[A] municipality may be liable if an employee's application of an otherwise constitutional policy leads to an unconstitutional result.").

Causation is a question of fact for the jury. *Lance v. Morris*, 985 F.3d 787, 803–04 (10th Cir. 2021). Plaintiffs establish causation if they can show that a challenged custom or policy is "closely related to the violation" of their constitutional rights. *Hinkle*, 962 F.3d at 1241. DPD officers and supervisors have repeatedly testified that the conduct that caused Plaintiffs' injuries was consistent with DPD policy and training, including a policy of "nearly unlimited discretion to use their less–lethal weapons as they see fit." Ex.7 ¶ 80(b); *id*. ¶ 79(h) (citing 30(b)(6) O'Donnell Dep. at 41). Additionally, if an officer was not disciplined, that officer's actions were deemed within DPD policy. SAMF ¶¶ 42–45. DPD's Internal Affairs Bureau broadly declined to condemn officers' use of force on protesters because their actions were consistent with DPD training and use of force policy. SAMF ¶¶ 41–45. If the use of force imposed upon Plaintiffs was pursuant to DPD policy or training, then *a fortiori*, those policies or training directly caused Plaintiffs' injuries. Each Plaintiff's injury can be traced directly to a Denver policy (including actions by Commander Phelan), custom, or failure to train. SAMF ¶ 1–32, 35, 42–45. Each Plaintiff was shot or targeted repeatedly with less lethal weapons, subjected to excessive force without warning and/or opportunity to disperse, and targeted in retaliation for their exercise of protected First Amendment activity. SAMF ¶¶ 1–23. Each instance of excessive use of force was made more likely to occur by DPD's policies and practices that eschewed officer accountability, including foregoing use–of–force reporting and BWC activation. SAMF ¶¶ 29–35, 43–44. There is also substantial evidence that Commander Phelan, as final policymaker, directly participated in and caused the injuries to Plaintiffs, including his authorization of the use of less lethal munitions on numerous occasions. *See* RSUF ¶ 20; SAMF ¶¶ 38–40. A reasonable jury could conclude that his, and Denver's, actions caused the injuries

to Plaintiffs, just as one found that those actions caused the *Epps* plaintiffs' injuries. *See* SAMF ¶¶ 1–45.

Denver ignores the overwhelming evidence that its policies and customs caused Plaintiffs' injuries, and instead focuses on Plaintiffs' inability to identify specific officers—which in turn was exacerbated by Defendants' policies. For example, Denver's policy of not requiring timely use–of–force reports or activation of BWC, which officers understood before and during the protests, minimized the likelihood that officers would be held accountable for their use of force (or even identified as having used force). *See* SAMF ¶¶ 30–37. Such policies resulted in a lack of accountability that led to excessive force and Plaintiffs' injuries, as well as the difficulty of identifying particular officers who injured Plaintiffs. Plaintiffs should not be punished by the obfuscation of the identities of particular officers resultant from Denver's policies. To support their *Monell* claims, the issue is not whether Plaintiffs can identify individual officers who violated their rights, but rather whether they have put forth evidence that their rights were violated as a result of officers acting under Denver's policies, practices, and customs. They have. *See* SAMF ¶¶ 30–37.

### C.    Denver Was Deliberately Indifferent to the Effects of Its Failure to Train and/or Discipline

Because a *Monell* failure–to–train theory is based on municipal *inaction*, plaintiffs must show that a failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388. Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted). It can be established by proving (1) that "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately

chooses to disregard the risk of harm," *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998), or (2) "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction," *Waller*, 932 F.3d at 1284 (citation omitted).

Defendants' only defense is that the protests were purportedly "unprecedented." MSJ at 29. They argue that Denver could not have anticipated the circumstances its officers would confront, and thus was not deliberately indifferent when failing to adequately train officers on how to manage the protests without violating constitutional rights. *Id.* at 28–29. That is a quintessential fact question, and a highly disputed one. DPD had confronted large–scale protests in the recent past, including the 2008 DNC; cities nationwide were experiencing mass protests before the protests began in Denver; protests often include both violent and non–violent participants; training was deemphasized in the years leading up to the protests; and Denver understood that its failure to train officers could result in depriving protesters of their constitutional rights. *See generally* Ex. 7; Ex. 8; Ex. 67; SAMF ¶¶ 24–27; Ex. 11  at 011715 (stating that under Chief Pazen, "the prevailing attitude is that training is not important"); Ex. 14 at 011726–27  (stating that a three–day field force training ended in 2016 due to time and manpower issues; only seven supervisors then attended a one–day field force leadership course); Ex. 59 at 2367:19–2370:5, 2413:11–2418:3 (stating that the three–day training was a training in the area of crowd management, was not offered again after 2016, and was replaced with less fulsome trainings). A reasonable jury could conclude that the decision to deemphasize training reflects deliberate indifference, as one did in *Epps*, and that the evidence shows that the failure to train led directly to the violation of Plaintiffs' rights. SAMF ¶¶ 24–26, 30, 36.

There is also a genuine dispute of fact with respect to failure to discipline and ratification. When officers confronted protesters, they did so knowing that *existing* DPD policy

or custom was not to punish officers for constitutional violations. Denver's failure to discipline officers also constitutes ratification of their conduct, which is another way to establish policy. SAMF ¶¶ 35, 42–45; *see Valdez v. Macdonald*, No.15–00109 RPM, 2019 WL 1651857, at *4–5 (D. Colo. Apr. 17, 2019). The ratification theory does not require proof of a pattern or custom. Ratification of a single violative act can suffice for municipal liability to attach. *Pembaur*, 475 U.S. at 480. DPD's policy of impunity was a direct cause of Plaintiffs' injuries. Final policymakers praised officers' use of force, which led officers to continue using excessive force. SAMF ¶ 45. A reasonable jury could find in Plaintiffs' favor on their ratification theory; the jury in *Epps* already did on the exact same evidence. *See* Ex. 79.

## V.    Officer Bolton is Not Entitled to Qualified Immunity

Officer Bolton is not entitled to qualified immunity because the evidence is sufficient to show that he violated Ms. Jaramillo and Mr. McDonnell's clearly established constitutional rights. This is especially so at this stage of proceedings, where the Court must make any reasonable inferences from the evidence in the light most favorable to the Plaintiffs. *See White v. Martin*, 425 Fed. Appx. 736, 741 (10th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)).

A police officer is not entitled to qualified immunity where, as here, a plaintiff shows (1) the officer's actions violated the plaintiff's federal rights, and (2) the federal rights at issue were clearly established at the time of the conduct. *Jordan v. Jenkins*, 73 F.4th 1162, 1167–68 (10th Cir. 2023). A right may be clearly established by Supreme Court precedent, Tenth Circuit precedent, or the weight of authority from other courts. *Id.* at 1168. In "the rare and obvious case, . . . the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1053 (10th Cir. 2018) (quoting *D.C. v. Wesby*, 583 U.S. 48, 64 (2018)); *see also Reyes v. Fowlks*, No. 22–4028,

2023 WL 4486155, at *3 (10th Cir. July 12, 2023) (considering the "obvious clarity" or "flagrantly unlawful conduct" of the officer). Whether the force an officer used to effect a seizure is "reasonable" under the Fourth Amendment, and thus protected by qualified immunity, "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Myers v. Brewer*, 773 F. App'x 1032, 1037 (10th Cir. 2019) (citation omitted).

Ms. Jaramillo has put forth sufficient facts to show that Officer Bolton violated her First and Fourth Amendment protections against excessive uses of force by fracturing her wrist during a routine arrest for a misdemeanor curfew violation and failure to obey a lawful order, in an effort to chill Ms. Jaramillo's First Amendment right to peacefully assemble and protest. *See* RSUF ¶ 80; *see, e.g.¸* Ex. 34; *see also, e.g.,* Ex. 78 71:17–22, Ex. 31, Ex. 33. The force Officer Bolton used was unreasonable under the circumstances. First, Ms. Jaramillo was arrested for a curfew violation—a misdemeanor that does not justify the use of force, even on a fleeing suspect. *See Perea v. Baca*, 817 F.3d 1198, 1202–3 (10th Cir. 2016); *see also, e.g.*, RSUF ¶ 78. Second, Ms. Jaramillo has put forth evidence to show that she posed no immediate threat to Officer Bolton, as she wielded no weapons during the arrest and made no aggressive gestures. *See, e.g.*, Ex. 32 at 44:6–8. Third, she was not actively resisting arrest. *See, e.g.*, *id.* 48:16–49:2; Ex. 34.

It was clearly established as of May 2020 that it is unlawful for a police officer to forcibly apprehend and thereby injure a non–violent, non–threatening citizen in making an arrest for a misdemeanor curfew violation, especially in an effort to chill First Amendment activity. *See, e.g.*, *Davis v. Clifford*, 825 F.3d 1131, 1135–36 (10th Cir. 2016) (officer was not entitled to qualified immunity where he shattered a non–violent misdemeanant arrestee's car window and pulled the

arrestee through the window by her arms and hair); *see also, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1160–1 (10th Cir. 2008) (clearly established that use of force against a protester who committed a petty misdemeanor, who posed no threat to others, and who did not resist arrest, was unlawful); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289–92 (10th Cir. 2008) (same regarding 1st and 4th Amendment claims). Ms. Jaramillo was the victim of an unlawful use of force that resulted in her wrist being broken during an arrest for a misdemeanor curfew violation, in which she posed no threat; Officer Bolton could not justify his use of force at the time, and he cannot justify it now. *See* Ex. 32 at 44:6–8. He does not meet the standard for qualified immunity, and his motion should be denied on that basis.

Officer Bolton also violated Mr. McDonnell's First and Fourth Amendment rights. Mr. McDonnell has set forth sufficient evidence to show that while he was exercising his First Amendment rights, Officer Bolton physically assaulted him and called him a "fucking faggot" in an effort to chill his speech and in derogation of his rights to be free from unlawful uses or shows of force. Ex. 32 63:6–19 (Officer Bolton acknowledged that he observed Mr. McDonnell with a camera and that he was not doing anything that Officer Bolton would characterize as threatening); *id.* at 65:12–16 (Officer Bolton acknowledged that he "put [his] hands on Mr. McDonnell after "closing the distance" between them); *id.* at 68:14–23; Ex. 39 19:11–20:1. Nor were Officer Bolton's shows and uses of force reasonable under the circumstances. First, Mr. McDonnell was committing no arrestable offense at the time of the assault, but instead was exercising his right to film officers. Second, Officer Bolton himself admits that Mr. McDonnell posed no threat. Ex. 32 63:6–19. Third, Officer Bolton has acknowledged that *he* approached Mr. McDonnell while Mr. McDonnell was stationary, and so there can be no credible argument that Mr. McDonnell was trying to flee or resist arrest. *Id.* at 65:12–16. Yet after closing the distance between them and

despite Mr. McDonnell posing no threat, Officer Bolton nevertheless used actual force, and restrained Mr. McDonnell's movement, by pushing him without adequate justification under the circumstances, and further made a show of force by using abusive, discriminatory language while wielding a weapon. *See Lemery*, 323 F. App'x at 645.

Finally, Officer Bolton cannot escape the reality that as of May 2020, it was clearly established that it was unlawful for him to assault a peaceful protester and use verbal harassment to restrain First Amendment Activity. "A prior case need not have identical facts. Rather, the pertinent question is whether it would have been clear to a reasonable officer that his or her conduct was unlawful in the situation." *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (citation omitted). Here, it would have been clear to Officer Bolton that shoving a nonviolent, non–threatening, non–resisting protester in retaliation for his protest activity was unlawful. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that. . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions. . . . for speaking out."); *Fogarty*, 523 F.3d at 1160–61; *Buck*, 549 F.3d at 1289–92; *Osterhout v. Morgan*, 763 Fed. Appx 757, 763 (10th Cir. 2019) (it would have been obvious to officer that it was unconstitutional for him to use violent force on plaintiff when plaintiff was not resisting, not attempting to flee, and there was no objective reason to believe that he posed an immediate threat to the officers or the public).

Ms. Jaramillo and Mr. McDonnell's claims against Officer Bolton in his individual capacity are firmly rooted in fact and law and must be put to trial.

Dated: October 10, 2023                          Respectfully submitted,

                                                 By: */s/ Matthew J. Douglas*
                                                     Matthew J. Douglas
                                                     Edwin P. Aro
                                                     David Jelsma

35

Arnold & Porter Kaye Scholer, LLP
1144 Fifteenth Street, Suite 3100
Denver, Colorado 80202
Matthew.Douglas@arnoldporter.com
Ed.Aro@arnoldporter.com
David.Jelsma@arnoldporter.com

Mindy A. Gorin
Michael Krouse
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, NY 10019–9710
Mindy.Gorin@arnoldporter.com
Michael.Krouse@arnoldporter.com

Angelique A. Ciliberti
Andreas E. Moffett
Erica McCabe
Leah Motzkin
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave, NW.
Washington, DC 20001
Angelique.Ciliberti@arnoldporter.com
Andreas.Moffett@arnoldporter.com
Erica.McCabe@arnoldporter.com
Leah.Motzkin@arnoldporter.com

Mohamed Al–Hendy
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street
Houston, TX 77002
Mohamed.Al–Hendy@arnoldporter.com

Angel Tang Nakamura
Arnold & Porter Kaye Scholer LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA  90017–5844
Angel.Nakamura@arnoldporter.com

*Attorneys for Plaintiffs*

36

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2023, I served via CM/ECF the foregoing Motion on all counsel of record.

*/s/ Tanya D. Huffaker*