# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT COURT OF COLORADO

Civil Action No. 22-cv-1338

JAZMINE BJELLAND, et al.,

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, et al.,

Defendants

---

## EXPERT REPORT OF NORMAN STAMPER

### Experience and Qualifications

1.      I have been actively involved in police policies and practices, and law enforcement research and education since 1966.  I have held numerous leadership roles in two police organizations, including the following:

  a. From 1969 to 1982, I served as sergeant, lieutenant, and captain, as well as organizational ombudsman and special advisor to the police chief within the San Diego Police Department.

  b. From 1983 to 1986, I was Deputy Chief of Police in charge of the Office of Field Operations in San Diego.

  c. From 1986 to 1988, I was Deputy Chief of Police in charge of the Office of Personnel Services in San Diego.

  d. In 1988, I served as Deputy Chief of Police in charge of the Office of Special Operations (Investigations Bureau).

  e. From 1989 to 1994, I was the Executive Assistant Chief of the San Diego Police Department. As second-in-command to the Chief of Police, I was responsible for all day- to-day operations of the 2,834-member agency in the nation's then-sixth largest city.

  f. From 1994 to 2000, I was Chief of Police of the City of Seattle. I was responsible for the executive leadership of the 1,800-member organization and in charge of all policies and practices of the agency.

2.    I have extensive experience in developing policies and procedures and providing training to police agencies. As Chief of Police of the City of Seattle, I oversaw the police response to about two dozen protests and demonstrations. This included the World Trade Organization protests in November-December 1999, which involved approximately 40,000- 60,000 protesters. During my tenure in San Diego, I served as incident or field commander in approximately two dozen protests and demonstrations.

3.    My experience, training, and background is more fully described in my C.V., attached as Exhibit A. This also includes testimony that I have given in the last four years at trial or deposition. I also testified at the trial in *Epps, et al. v. City and County of Denver, et al.*, No. 20-cv-1878-RBJ, in March 2022. A list of materials I was provided for review is attached as Exhibit B.

4.    My opinions are based upon the totality of my specialized knowledge, experience, and training in the field of police practices, in addition to the materials identified in Exhibit B and mentioned specifically below. My expertise has been developed during my decades of experience in law enforcement and my continued experience as a trainer and consultant.

5.    There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the United States should follow and apply to their operations. Standards of training and practice may include case law; federal, state, and municipal statutes; departmental policies and procedures; applicable statewide police training programs; model policies, training and research from such organizations as the International Association of Chiefs of Police (IACP), Police Executive Research Forum (PERF), and the Police Foundation.

**Relevant Background Facts**

6.    On May 25, 2020, Minneapolis police officers arrested George Floyd after receiving a complaint that he had attempted to pass a counterfeit twenty-dollar bill. While restrained by other officers, Officer Derek Chauvin knelt on Mr. Floyd's neck until he died. Afterwards, the officers involved were criminally charged. In April 2021, Officer Chauvin was found guilty of murder and manslaughter charges. Trials for the other officers are pending.

7.    The death of Mr. Floyd, a Black man, at the hands of police, was only one of many similar deaths in the months preceding May 2020. In the aftermath of Mr. Floyd's death, protests erupted throughout the country, first in Minneapolis but quickly spreading to other cities across the United States. Beginning on May 28, 2020, protests (referred to herein as GFP, for George Floyd Protests) began in Denver, lasting for weeks. The first several days of protests were largely peaceful, but there were also incidents of property destruction and violence.

8.    On May 28, protesters began to gather at the Colorado State Capitol at about 5:00 p.m. (Office of Independent ("OIM") Report, p. 2.) The Denver Police Department ("DPD") established a Command Post, and appointed as the Incident Commander Patrick Phelan, who assumed primary command responsibility. (OIM Report, p. 2.) Commander Phelan was the Incident Commander for the majority of the protests (with the exception of one day, June 2, 2020,

on which Lt. Matthew Canino was the Incident Commander).  (Phelan Deposition, p. 26; Canino Deposition, pp. 45, 83.)

9.     The DPD uses the Incident Command System ("ICS"), which is a standardized approach to the command and control of an emergency response that provides a common hierarchy for first responders, including police.  (OIM Report, p. 49.)  Commander Phelan was responsible for the overall management of the GFP.  (Phelan Deposition, pp. 26-29.)  This is the role of an Incident Commander under the ICS and also part of Phelan's responsibilities as Commander of the Special Operations Division.  (Phelan Deposition, pp. 26-29; OIM Report, pp. 49-50.)  Phelan made final decisions regarding the police response to the protesters, including coordinating officers in the field, developing an operations plan and a deployment plan for personnel and materiel based on information the DPD knew about the protests.  It was Commander Phelan's responsibility to authorize the use of chemical munitions to disperse protesters.  (Phelan Deposition, pp. 26-29.)  Although Chief of Police Paul Pazen was advised of the plans developed by Commander Phelan, Phelan was in charge of managing the police response to the protests, including the response of outside law enforcement agencies that provided assistance to the DPD during the GFP.  (Phelan Deposition, pp. 26-29, 32-33, 41-44.)  Commander Phelan gave the same direction, guidance, and rules of engagement to the officers from the outside agencies as to his own officers in the DPD.  (Phelan Deposition, pp. 43-44.)  As Commander Phelan explained at his deposition, it is especially important for officers to follow the chain of command during protests so that there is an organized and coordinated police response that does not cause confusion.  (Phelan Deposition, pp. 40-41.)  The DPD Crowd Management Manual states: "In all situations it is critical that command officers and supervisors lead, direct and control the police response. Strong command and control elements are essential to maintaining a unified, measured and effective police response. A team-based response with strong leadership is the key to maintaining control and safety. Impulsive actions by involved officers must be managed."  (DPD Crowd Management Manual, p. 7, DEN 74.)

10.     As Incident Commander, Phelan was stationed in the Command Post.  (Phelan Deposition, pp. 42-43.)  While in the Command Post, he received information from his officers through radio communications, Air One (the police helicopter), observation of HALO camera and traffic camera footage, and information from social media.  (Phelan Deposition, pp. 55-58.)  On the first day of the protests (May 28), DPD had three radio channels but then switched to a single radio channel for communication of information to and from the Command Post and officers in the field.  (Phelan Deposition, p. 56.)  However, the single radio channel became overcrowded and officers frequently experienced "bonking," or a tone on the channel indicated that it was already occupied.  (Phelan Deposition, p. 56; OIM Report, p. 50.)

11.     During the protests, the use of chemical munitions (such as tear gas) had to be authorized by command staff.  (*See, e.g.*, Phelan Deposition, pp. 35-37; Canino Deposition, pp. 29-30; Abeyta Deposition, p. 46.)  During many of the major teargassing incidents in which protesters were involved during the GFP, Commander Phelan himself authorized the use of chemical munitions on protesters.  This includes the incident in front of the Capitol in the early morning hours of June 2, 2020 .  (*See* Phelan Deposition, pp. 34, 67, 161, 165; Pine Deposition, p. 85.)  As Commander Phelan explained it, DPD policy requires command authorization of chemical munitions use because command staff "have a view of what the situation is.  They have a bigger picture of what the situation is.  They make the determination based on their training, based on their experience that chemical agent needs to be used."  (Phelan Deposition, pp. 38-39.)  According

to Sergeant Abeyta, command authorization was required for tear gas deployment because tear gas is a "serious level of use of force." (Abeyta Deposition, p. 46.)  DPD officers consistently testified that tear gas is an indiscriminate weapon which is used to disperse everyone in the area, whether they are peaceful or non-peaceful. (*See* Canino Deposition, pp. 122-23; Williams Deposition, p. 61.)

12.    In this section, I will highlight some of the major events during the GFP. Additional specific events will be described below.

13.    As noted earlier, the protests began on May 28.  They continued on May 29, 2020.  At between 8:00-9:30 p.m., there was a large number of protesters in the park south of Colfax between Lincoln and Broadway, across from the State Capitol.  There were also many protesters on the Capitol lawn.  Body-Worn Camera ("BWC") video shows DPD officers, including Metro/SWAT officers, in the parking lots north of Colfax on either side of Lincoln. Some objects were thrown at the police.  However, the police deployed large amounts of chemical munitions, including tear gas and PepperBalls at protesters across the street (south of Colfax).



14.    On May 30, 2020, Mayor Hancock announced a citywide curfew in effect from 8:00 p.m. to 5:00 a.m.  (Emergency Curfew Order, DEN 011302-011303.)  According to text messages received by Lt. Porter, per Division Chief Thomas, the curfew was only to be used for "enforcing protest-related behavior."  Lt. Williams testified that the purpose of the emergency curfew to begin with was to enforce it against protesters.  (Williams Deposition, pp. 135-36; Text messages to Lt. Porter, DEN 13035, 13053; Porter Deposition, pp. 91-97.)  On May 30 and 31, the curfew began at 8:00 p.m.  The curfew was extended through June 5, 2020.  It began at 9:00 p.m. on those days.  (Extended Emergency Curfew Order, DEN 114-16.)

15.    According to the Office of Independent Monitor, there were "compounding munitions shortages," which resulted in the Colorado State Patrol flying to Wyoming to purchase

less-lethal munitions from a manufacturer, including some munitions that had been ordered by
DPD. (OIM Report, pp. 4-5.) That the DPD ran out of chemical munitions within the first couple
days of the protests is troubling. It suggests that there were not enough munitions on hand or that
there was a misuse of available munitions. A combination of those two factors is also possible.
Based on the amount of chemical munitions I saw deployed on the evening of May 28 alone, I
believe it was likely a product of the excessive use of chemical munitions. Relatedly, DPD did
not track its munitions used during the GFP. (OIM Report, p. 53.) The OIM recommended that
DPD amend its manuals to require the creation of a log or tracking system for the distribution and
deployment of all less-lethal munitions during crowd control events. (Mitchell Deposition, pp. 64-
65.) Former Independent Monitor Nicholas Mitchell testified at his deposition:

> [P]olice management with an effective log or tracking system in
> place, managers of the police department who are overseeing the
> response would have a better sense of … which officers or which
> teams were utilizing which kinds of munitions and at what rates. It
> would facilitate an investigation into any allegations of
> inappropriate force that might be raised. It would allow for
> supervisory intervention if one team in particular, for example, is
> using particular kinds of munitions at disproportionate rates.
>
> So developing a log or tracking system would enable, you know,
> more proactive management to make sure that less-lethal munitions
> are being used in conformity with the policies of the Denver Police
> Department. (Mitchell Deposition, p. 66.)

I agree. In addition, it is my opinion that the DPD should have had a tracking system in place
before the GFP, and the failure to do so was contrary to generally accepted police practices prior
to May 2020. (OIM Report, p. 19 (citing Police Foundation, Managing Large-Scale Security
Events: A Planning Primer for Local Law Enforcement Agencies, p. 30 (2018).)

    16.    By May 30, a large number of officers from outside law enforcement agencies were
providing assistance to the DPD. (OIM Report, pp. 4-5.)

    17.    According to the OIM, an estimated 150-200 officers worked the GFP on the first
day, 100-150 on May 29, 450-500 DPD and mutual aid agency officers on May 30, and 450-500
DPD and mutual aid agency officers on May 31. (OIM Report, pp. 2-5.) The DPD did not create
rosters for most protest days and nights during the first five days of the GFP. (OIM Report, pp.
12, 20; Mitchell Deposition pp. 66-67.) The OIM concluded that the creation of such rosters would
"permit the incident commander and others to determine where they have enough resources and
where they may be deficient in resources. It would … be very helpful for investigations into
individual incidents to have information about officer assignments and who was assigned to do
what where, given the challenges that we experienced in identifying officers…in investigations
into allegations of excessive force." (Mitchell Deposition, p. 68.) I agree. Creation of such rosters
is a very basic task and function of police management and administration. It is my opinion that
the failure to do so prior to the GFP was contrary to generally accepted police practices. (OIM
Report, p. 20 (citing IACP Law Enforcement Policy Center, Incident Command System Model
Policy, p. 3 (2009) (recommending the creation of a 'master record of all personnel and

components involved in the response to a critical incident,' including, among other items, personnel rosters).) For example, in both Seattle and San Diego, we used a scribe in the Command Post. This position is referred to by the IACP as a recorder. The responsibilities of the scribe included documenting everything that was done during the protests—all munitions deployed were to be tracked, all personnel deployed were to be tracked, and so on. This was essential to any kind of after-action report and for officer accountability. It is my opinion that the DPD's failure to have rosters contributed to its failure to hold accountable officers who used excessive force or violated the constitutional rights of protesters.

<strong>Patterns in the Use of Force during the GFP</strong>

18.     In my opinion, there were several disturbing patterns in DPD's use of force during the GFP, which was contrary to generally accepted police practices, standards, and training.

**A.     DPD exhibited a widespread practice and custom of failing to give dispersal orders or audible dispersal orders prior to use of force**

19.     It is generally accepted police practice to provide dispersal orders, warnings, or announcements before use of chemical munitions or other less-lethal weapons on individuals. (*See* OIM Report, p. 25 (citing IACP Law Enforcement Policy Center, *Crowd Management Model Policy*, § IV.F.3).) As explained further below, the evidence shows that such orders, warnings, or announcements were rarely provided. Of the numerous videos that have been provided for my review, very few contain any evidence of announcements or dispersal orders given by DPD prior to use of less-lethal weapons on protesters. I am very familiar with the capabilities of body-worn cameras, and, as explained further below, I believe that if warnings were given when the DPD says they were given, the microphones on the cameras would have picked it up. That no warnings are audible reveals that no warnings were given or that only inaudible warnings were given. My review of declarations and depositions submitted by the other protesters in the *Epps* and *Cruz* cases shows that they consistently stated that orders, warnings, and announcements were not given. There was also little documentation of dispersal orders given prior to use of less-lethal weapons.[1] The failure to give audible dispersal orders, warnings, and/or announcements prior to the use of less-lethal weapons on protesters is contrary to generally accepted police practices, standards, and training. It is also contrary to the DPD Crowd Management Manual. Protesters must be provided an opportunity to comply with police orders or police direction *before* force is used on them. This is especially true for the use of chemical munitions such as tear gas, which affects peaceful and non-peaceful protesters alike.

20.     Lt. Canino, Lt. Williams, and other DPD officers uniformly testified that their actions during the GFP were consistent with DPD policy, training, and instructions from the Command Post. None of the DPD leaders or officers observed any use of force by officers that

---

[1] The DPD produced a document referred to as the Chemical Agent Timeline (DEN 2763-76, 5735-53, 5646-64, 6042-60), but it does not appear to be a complete list of all uses of chemical agents or other less-lethal weapons during the GFP, and it does not appear that dispersal orders were given even for the events listed on the timeline.

was inappropriate or inconsistent with department policy or training, and none of them took any actions that they believed were inappropriate or inconsistent with department policy or training.

21.    Based on this testimony and video recordings from the GWP, it is my opinion that the *written* policies of the DPD (including provisions of the Crowd Management Manual) are not the *actual* policies of the DPD as understood and practiced by the officers (including command-level officers).  The actual policies of the DPD in practice are what is seen on the BWC and other video from the GFP, as well as what Denver's Rule 30(b)(6) witnesses and numerous DPD officers—from command staff to officers—testified to at their depositions.  That is, the unwritten policy or practice of the DPD was to use force (such as tear gas) indiscriminately on crowds of protesters without giving appropriate dispersal orders or providing protestors an opportunity to comply with police orders or police direction *before* force was used on them, and without regard to whether the First Amendment rights of peaceful protesters were affected.  This policy and practice caused in significant part the violations of the constitutional rights of Plaintiffs.

22.    A few specific examples of this conduct are discussed below:

23.    **May 28, 2020, 8:30 p.m., Colfax and Washington:** At approximately 8:30 p.m. on May 28, 2020, a group of protesters marched toward and gathered at the District 6 police station at Colfax and Washington. (DEN 3850.)  By 8:29 p.m., the bulk of the crowd was on the south side of the Colfax and Washington intersection.  The crowd appears to be impeding traffic flow, but otherwise appears mostly peaceful.





AirOne video May 28 (DEN 3840) at 8:29 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:29 p.m. MT (annotated)

24.     At about this time, Commander Phelan (radio call sign "Adam 9") explained to his team that he wants to use "less-lethal PepperBall" or "launch some gas" to move the protesters away from the intersection.   (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.28.18_Ch33, 2020-05-28_20.28.49_Ch33; AirOne video May 28 (DEN 3840) at 8:28:18 p.m. and 8:28:52 p.m. MT).  There is no discussion on the radio of a plan for providing warnings

to the crowd before deployment of gas. I have seen no other evidence of any announcements or dispersal orders given before the deployment of less-lethal munitions. And, an unlawful assembly was not declared before protesters were dispersed through use of force. (Canino Deposition, pp. 37-38.) Officers deployed gas and PepperBalls at protesters.

25. At 8:33 p.m., DPD formed a skirmish line just north of the intersection and began deploying large amounts of PepperBall into the intersection, and they advanced the skirmish line south to the intersection. At this time on the radio, you can hear Commander Phelan tell his team that he wants to move the protesters southbound on Washington and "just disrupt them there." (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.34.12_Ch33; AirOne video May 28 (DEN 3840) at 8:34:18 p.m. MT).



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:33:48 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:34:34 p.m. MT (annotated)

26.     At about 8:36 p.m., DPD officers on the ground advanced a skirmish line south through the intersection, deploying PepperBall along the way, as seen in Colfax & Washington HALO 05.28.2020 (DEN 3850).  Most of the protesters retreated further south.  Officers reported over the radio that they were getting rocks thrown at them.  (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.36.34_Ch33 AirOne video May 28 (DEN 3840).)  At 8:36:37 p.m. Commander Phelan directed his personnel to deploy gas and instructed them to don their gas masks.  (AirOne video May 28 (DEN 3840) at 8:36:44-8:38:13 p.m. MT.)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:35:18 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:36:06 p.m. MT (annotated)

27.    At 8:38 p.m., officers began deploying canisters of smoke and gas into the intersection. (Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:38:52 p.m.) There is no evidence that any warnings or announcements were given prior to the deployment of gas. For example, no warnings are audible in the body-worn camera videos from officers at this time and location. (E.g., DEN 4045.)





DEN 4045 at 8:39:09 p.m. MT

28.      In my opinion, the DPD's use of less-lethal weapons at this location and time was contrary to generally accepted police practices, standards, and training because there were no warnings given, no attempt to isolate non-peaceful from peaceful protesters, and there was an excessive amount of gas used. Officers also appeared to deploy gas into an active traffic intersection, an extremely dangerous tactic.

29.      Commander Phelan testified at his deposition that DPD's approach is to be "low profile, low visibility," to avoid "confrontation," and to "let protestors take the street." (Phelan Deposition, p. 51.)  However, his actions were inconsistent with this.  It is significant to me that Commander Phelan stated, over the radio, that he wanted to utilize tear gas merely for the purpose of moving protesters out of the intersection.  In my experience, that is not a generally accepted use of tear gas.

30.      **May 28, 2020, 9:10 p.m., 14th and Sherman:** In the rare instance in which dispersal orders were apparently given, the evidence shows that they were inaudible to most or all protesters in the area.  (*E.g.,* Beall Deposition, p. 54; DEN 4021 and other DPD BWC from 5/28 at 14th & Sherman such as DEN 4023; DEN 4025; DEN 4027; DEN 4030; Taylor Declaration, ¶ 6; Sanchez Declaration, ¶ 16.).

31.      At approximately 8:26 p.m., DPD officers arrived at the intersection of 14th and Sherman.  They formed a north-south line facing east down 14th Avenue.  The officers were led by Lt. Williams and Lt. Pine.  14th and Sherman is on the south side of the State Capitol.





CSP video 05282020 v.63 at 8:27:51 p.m. MT (annotated)

32.    By about 8:35 p.m., a crowd of protesters formed facing the officers.  I did not see evidence in the video that anyone was throwing objects at the officers at that time.



CSP video 05282020 v.63 at 8:36:17 p.m. MT (annotated)

33.     On the radio at around 8:48 p.m., Commander Phelan communicated with "Metro 2" (Lt. Pine), who was at 14th and Sherman.  Phelan asked if the officers at that location are OK and if they need to "deploy."  (AirOne video 5/28 (DEN 3840) at 8:47:57 p.m. MT.)  Lt. Pine responds, saying, no, they are ok, and that they are getting their gas masks on before they make that call.  (AirOne video, 5/28.)



AirOne video 5/28 (DEN 3840) at 8:48:02 p.m. MT (annotated)

34.    On the radio at 8:59 p.m., Lt. Pine said that they are making "announcements" and that they are going to move protesters out of the street.  Commander Phelan responded, "all right." (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.58.54_Ch33, 2020-05-28_20.59.02_Ch33; AirOne video 5/28 (DEN 3840) at 8:58:58 p.m.-8:59:04 p.m. MT.)

35.    The video produced in this case for this time and location, including the body- worn camera from DPD officers at the scene at the time shows that, to the extent any announcements were made, they were barely audible, if at all, to the officers standing on the line, and likely inaudible to everyone else standing at the intersection.  (DEN 4021; DEN 15718.)  In at least one BWC video, a protester asks Sgt. Beall what is being said on the PA.  (DEN 4021.)  Sgt. Beall tells that protester that the officers are about to deploy gas.  (Beall Deposition, pp. 54-59.)  However, Sgt. Beall does not take this information—that protesters apparently cannot hear the announcement—to any supervisor or anyone in the chain of command to alert them to the problem so that it can be fixed.  Sgt. Beall could not provide any explanation for why he did not do anything to resolve this problem.  (Beall Deposition, p. 59.)  Likewise, Lt. Williams, who was the one making the announcements during this incident, did not do anything to ensure that the announcements could be heard.  (Williams Deposition, pp. 107-09.)



CSP video 05282020 v.63 at 8:58:24 p.m. MT

36.     On the radio at 9:02 p.m., Lt. Pine reported that they are giving a second set of announcements and that there is no need for a medic.  DPD Tac 6 Dispatch Audio Files (DEN 5143 at 2020-05-28_21.02.22_Ch33; AirOne video May 28 (DEN 3840) at 9:02:13-9:02:42. MT.)

37.     By around 9:04 p.m., the crowd of protesters had increased to about 200-300.  I would consider this to be a small group.  Video evidence does not show any protesters acting aggressively towards the officers. (*See, e.g.*, CSP video, 052820 v63.ave; DEN 4023; DEN 4025; DEN 4027; DEN 4030.)



CSP 05282020 v.63 at 9:04:34 p.m. MT

38.     At 9:07 p.m., what appears to be a water bottle is thrown from the crowd at the officers.  (DEN 4035 at 9:07:57 p.m. MT; DEN 4038 at 9:07:57 p.m. MT; CSP video 05282020 v.63 at 9:07:17 p.m. MT.)



DEN 4035 at 9:07:57 p.m. MT

39.    At 9:10:43 p.m., Commander Phelan told the officers at 14th and Sherman to deploy gas on the protesters.   On the radio, Commander Phelan told the team at 14th and Sherman, "You're taking rocks and bottles, let's deploy some chemical agent at them please.  Dump some gas on 'em."  (AirOne video 5/28 (DEN 3840) at 9:10:33-9:10:43 p.m. MT.)  Multiple videos show DPD deploying canisters of gas and PepperBalls on the protesters.  (*See, e.g.*, CSP video 05282020 v63 at 9:10:19 p.m. MT; CSP video 05282020 v.29; 9News Video 5-28-2020 1; DEN 4029; DEN 4030.)



CSP video 050282020 v63 at 9:10:19 p.m. MT

40.    According to Lt. Williams, he and Lt. Pine made the decision to declare an unlawful assembly.  (Williams Deposition, pp. 99-100.)  They decided to declare an unlawful assembly because individuals in the crowd were throwing objects.  However, this testimony does not square with what is in the radio communications and video evidence—which indicate that a decision was made to disperse the crowd before any objects were thrown (as noted above, the first object that can be seen being thrown appears to be a water bottle at 9:07 p.m., a few minutes after announcements were purportedly provided).  Also, according to Lt. Williams's report, the dispersal order he read using the PA system on a Metro RDV was that the protesters were "in violation of obstructing the roadway and needed to move."  (DEN 3019, Lt. Williams Statement.)  It appears from the video evidence that the vast majority of the protesters were peaceful.

41.    As noted above, the BWC video indicates that the protesters were chanting and noisy and that it was difficult to hear the announcements.  (DEN 4021.)  Lt. Williams did nothing to ensure that the protesters could actually hear the announcements, and according to declarations from and depositions of protesters who were present, they did not hear any announcements.

42.     These actions were contrary to generally accepted police practices, standards, and training.  The IACP provides, "A warning should be issued loudly and often enough to be heard by the entire crowd … To ensure the warnings have been heard throughout the crowd, it is recommended that at least two officers go to the rear of the crowd to verify the warnings are audible."  (*Crowd Management: Concepts & Issues Paper*, Fitouri 18374.)

43.     Significantly, when asked, Lt. Williams testified that he could not think of anything that he could have done to ensure that the announcements were heard by everyone in the crowd. (Williams Deposition, pp. 108-09.)  He stated that it would not have been wise to send an officer to the back of the crowd to see if the announcements could be heard from there. (Williams Deposition, p. 109.)

44.     All of this is contrary not only to DPD's own written policies, but also to generally accepted practices, standards, and training.  The crowd at the intersection of 14th & Sherman was small.  During the 1999 WTO protests in Seattle, my Incident Commander in consultation with his Field Commander made a decision to declare an unlawful assembly at a completely clogged intersection.  The Field Commander used a bullhorn to make the announcement multiple times during a thirty-minute period.  I personally walked to the back of the crowd to see if I could hear the announcement— listening for both clarity and volume—in order to ensure that we complied with policy and with the law.  I was not wearing a helmet, face shield or other riot gear.  The crowd's more or less nonstop chanting was quite loud yet the announcement was both clear and audible from the farthest edge of the crowd.

45.     In my opinion, the DPD's use of less-lethal weapons at this location and time was contrary to generally accepted police practices, standards, and training because there were no audible warnings given and there was no attempt to isolate non-peaceful from peaceful protesters. Further, the IACP *Concepts and Issues Paper on Crowd Management* provides that, "The crowd should be warned prior to CS deployment and provided with avenues of egress." (Fitouri 18374.)

46.     **May 28, 2020, 9:30-10:00 p.m., Lincoln and Colfax:** On May 28, 2020, between approximately 9:30 and 10:00 p.m., a crowd of protesters had gathered in the area of the intersection of Lincoln and Colfax on the west side of the Capitol.  DPD officers had formed an east-west line facing north on Lincoln.  HALO Video 1450 Lincoln (DEN 3846).





HALO Video 1450 Lincoln (DEN 3846) at 9:46:01 p.m. (annotated)

47.    The video evidence does not show any objects being thrown at the officers.  The crowd appears generally peaceful.  (DEN 4089; DEN 4090; DEN 4092; DEN 4091.)  There is live traffic on Colfax behind the protesters.

48.    On the radio, at around 9:47 p.m., Commander Phelan can be heard on the radio instructing officers "As soon as you get there, launch" and "Actually, throw a smoke first then some chemical right after."  (DEN 4092 (radio chatter audible in the BWC); DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_21.47.14_Ch33; 2020-05-28_21.47.20_Ch33.)  At 9:48 p.m., an officer responds on the radio saying, "We are code six with 'em and we're putting some gas in the crowd."  (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_21.48.13_Ch33.) At 9:48 p.m., several DPD officers in green fatigues exit a vehicle behind the line of DPD officers

and deploy 7-8 canisters of what appears to be tear gas into the crowd of protesters, causing them to retreat north into the live traffic on Colfax.



HALO Video 1450 Lincoln (DEN 3846) at 9:48:19 p.m. MT (annotated)

49.     In my opinion, the DPD's use of less-lethal weapons at this location and time was contrary to generally accepted police practices, standards, and training because there were no audible warnings given and no attempt to isolate non-peaceful from peaceful protesters.  (DEN 4089; DEN 4090; DEN 4092; DEN 4091.)  For example, the IACP *Concepts and Issues Paper on Crowd Management* provides, "The crowd should be warned prior to CS deployment and provided with avenues of egress."  (Fitouri 18374.)  It was also an egregious disregard for the safety of the protesters to push them into live traffic on Colfax using tear gas.  (CSP video, 05282020 v88 at 9:47:46 p.m. MT.)



CSP video 05282020 v88 at 9:47:46 p.m. MT

50. **May 29, 2020, 9:19 p.m., Lincoln and 13th:** On May 29, 2020, at 9:19 p.m., DPD BWC shows officers casually throwing a tear gas canister at a motorist and yelling "woohoo" afterward.



DEN004220 at 9:19:43 p.m.

51.   **May 30, 2020, 5:30-8:00 p.m., Lincoln and Colfax:** On May 30, 2020, between approximately 5:30-6:00 p.m., there was a large number of protesters at Civic Center station, at the intersection of Broadway and Colfax.  (*E.g.*, 9News video, 5-30-2020 7 at 40:58; AirOne video at 5:46 p.m., DEN 3842.)



AirOne video 5/30 (DEN 3842) at 5:38:20 p.m. MT

52.   At about 5:43 p.m., a BWC shows that DPD attempted to make announcements. (DEN 5008.)  In Officer Carmody's BWC (DEN 5008) at 5:44:46 p.m. MT, an officer tells Officer Carmody that "announcements" will be made and then they were going to throw gas. Moments after that, I could vaguely hear an announcement "get out of the street," and "go back to the park," "or you will be arrested," but the scene is very loud with the protesters chanting, and I see no evidence that the officers made any attempt to make sure the protesters could hear the announcements.

53.   At approximately 5:45-5:47 p.m., protesters were pushed south of the intersection by DPD officers using less-lethal and chemical munitions.  (*E.g.*, DEN 5008; DEN 4995; 9News video, 5-30-2020 7 at 1:00:48; Williams Deposition, p. 47.)  It is my opinion that this use of force was completely inappropriate and contrary to generally accepted police practices. It is fundamental that if officers are going to use force to disperse protesters, they need to provide warning of such. They did not.  Not only were the announcements apparently inaudible to the protesters, but protesters were not warned that chemical agents would be used.  Moreover, and even more egregious, DPD was pushing protesters into a busy street (Colfax) without doing anything to ensure the safety of the protesters (or the drivers).  And, there did not appear to be adequate reason in the first place for dispersing the protesters.  For instance, the video does not show anyone throwing anything at the officers before less-lethal munitions were used on the protesters.  And, protesters have a First Amendment right to demonstrate on the streets, sidewalks, and public parks.





AirOne video 5/30 (DEN 3842) at 5:47:29 p.m. MT (annotated)



DEN 5008 at 5:46:54 p.m. MT (annotated)

54.    According to Lt. Williams, the objective at that time was to prevent protesters from accessing a rock pile in the parking lot bordering Broadway and Colfax.  (Williams Deposition, p. 45.)  Lt. Williams ordered officers to form a skirmish line across Colfax, stretching from Lincoln to Broadway.  He received this direction from Commander Phelan.  (Williams Deposition, pp. 50-51.)



AirOne video 5/30 (DEN 3842) at 6:02:59 p.m. MT (annotated)

55.    From about 6:00 to 8:00 p.m., hundreds of protesters gathered in the park across from the Capitol.  Many were crowded in the area of the intersection of Lincoln and Colfax. (9 News video, 5-30-2020 7 at 1:01:38-2:14:10 min.)  DPD officers (primarily from the gang unit) and Aurora police officers were in the skirmish line at the intersection of Lincoln and Colfax. (Sampson Deposition, pp. 82-85; Cunningham Deposition, pp. 83-86.)  DPD Metro/SWAT officers were also present.  (*See* DPD and APD BWC video, 5/30.)  BWC and Colorado State Patrol video shows that during this time period, protesters stood facing the line of officers, chanting, protesting, and holding signs.  Some protesters knelt or stood with their hands up. There was an occasional water bottle thrown by someone in the crowd towards the officers. (DEN 4988 at 6:56:19 p.m. MT.)  Although there were some references in some of the officers' depositions to Molotov cocktails, I did not see any video evidence of such items being thrown during this time period and at this location.



9 News video, 5-30-2020 7 (annotated)



CSP video 05302020 v217 at 6:54:25 p.m. MT

56.     Throughout this time period, BWC and CSP video shows officers deploying PepperBall, tear gas, pepper spray, and flash bangs at protesters.  On a few occasions, the use of force appeared to be in response to a water bottle or other items thrown by someone in the crowd.

27

On other occasions, there was no apparent reason for the use of force. Occasionally, protesters threw items in response to officers using force. Generally, the use of force by law enforcement personnel appeared to be indiscriminate. (*See, e.g.*, COABLM 238; COABLM 294; COABLM 297; COABLM 317; COABLM 330; DEN 4976; DEN 4988; DEN 4993; DEN 5017; CSP video 05302020 v88.ave; CSP video 05302020 v211.ave; CSP video 05302020 v217.ave.)



DEN 4988 at 6:56 p.m. MT

57.      As discussed below, chemical munitions are, by their very nature, indiscriminate weapons. When officers deployed chemical munitions, protesters scattered but then regrouped. In my experience this phenomenon is predictable to a high degree in protest behavior. The skirmish line stayed where it was, on Colfax, north of Lincoln.

58.      When asked about what the police objective was during this two-hour time period before curfew, Lt. Williams could not say, other than "Under directions of the command post, that's what we were doing." (Williams Deposition, p. 65.) No unlawful assembly or riot was declared. (Williams Deposition, pp. 57, 65-66.) Lt. Williams agreed that there were "many, many people that were present, that were not engaged in assaultive behavior." (Williams Deposition, p. 67.) Yet, peaceful individuals were affected by the use of chemical munitions. The police line did not move forward to disperse the crowd until after curfew. There were announcements about curfew, which began at about 7:45 p.m. However, I did not see any video evidence of any other announcements, dispersal orders, or warnings about the use of force at the intersection of Lincoln and Colfax during this time period.

59.      In my opinion, the DPD's use of less-lethal weapons at this location and time was inconsistent with generally accepted police practices, standards, and training because there were no audible warnings given and no attempt to isolate non-peaceful from peaceful protesters. The failure of command to provide audible and adequate warnings, dispersal orders, or announcements

prior to the use of less-lethal weapons on protesters was a failure of supervision and leadership. There was also no strategy for the deployment of tear gas, discussed in further detail below.

**B.      Indiscriminate and inappropriate use of chemical munitions such as tear gas**

60.      Chemical munitions such as tear gas are indiscriminate weapons which affect peaceful and non-peaceful protesters alike.  This—in addition to the fact that tear gas is a serious level of force—is one of the reasons that its use must be authorized by command staff (and during the GFP, it was frequently authorized by Commander Phelan himself).

61.      It is my opinion that in each of the specific incidents discussed above, and the ones described below (May 31 kettling incident at the Basilica, and the June 2 incident in front of the Capitol), DPD indiscriminately and inappropriately used chemical munitions such as tear gas. There was no attempt to isolate non-peaceful from peaceful protesters.  Tear gas was also frequently thrown into the middle of a crowd, which made it difficult for protesters to determine where to go, especially if they were faced with a line of officers on one side and tear gas on the other side.  The appropriate use of tear gas is to disperse a crowd in a specific direction. DPD's use of tear gas was contrary to generally accepted police practices, standards, and training.  The DPD's failure to provide adequate training, and its widespread custom and practice of indiscriminate and inappropriate use of chemical munitions, caused in significant part the violation of the constitutional rights of Plaintiffs.

62.      DPD's use of tear gas was also not consistent with the DPD Crowd Management Manual.  The DPD Crowd Management Manual states:

> The policy of the Denver Police Department is to appropriately direct and control public gatherings so as to protect life and property, maintain public peace and order, ensure compliance with the law and respect all constitutional rights including those of free speech and assembly. *Efforts will be made to isolate and arrest violators from a crowd before declaring an assembly as unlawful*. (Emphasis added.) (DPD Crowd Management Manual, p. 4, DEN 71.)

The Manual also states: "If identifiable participants engage in disorderly conduct or violence and if circumstances allow, the Denver Police Department must respond by dispersing, controlling, or arresting the specific persons engaging in the conduct; *not* by issuing a general order to disperse."  (Emphasis added.) (DPD Crowd Management Manual, p. 8, DEN 75.)

63.      The Manual also provides that general dispersal orders will not be given unless a "'significant number or percentage' of participants fail to adhere to time, place and manner restrictions *and* voluntary compliance, targeted citation and/or targeted arrest actions have not resulted or are not 'reasonably likely' to result in 'substantial compliance,' or a "'significant number or percentage of participants are engaging in, or are about to engage in, tumultuous and violent conduct which creates a grave danger of damage or injury to property or person….'" (Emphasis added.) (DPD Crowd Management Manual, p. 9, DEN 76.)

64.     The Manual emphasizes the importance of protecting the rights of individuals peacefully exercising their rights:

When deciding to address law violations during crowd control situations, officers must consider the totality of the circumstances to include factors such as:

- The nature of the violation.
- The urgency of the crime (property crime or a crime against a person).
- The risk to officers and the public.
- The extent of property damaged or endangered.
- The importance of removing violators who may be impacting the rights of those involved in a lawful assembly and expressive activity in order to maintain control of the crowd and provide free expression opportunities to non-violators. (DPD Crowd Management Manual, p. 11, DEN 78.)

Thus, the DPD recognizes that it is important to protect the free speech rights of peaceful individuals or non-violators by attempting to remove violators or aggressors, *not* by issuing general orders to disperse or using chemical munitions to disperse everyone.

65.     Despite this knowledge and recognition, command-level DPD officers could not identify any specific instance during the GFP in which actions were taken to isolate aggressors within a crowd.  Instead, DPD routinely dispersed protesters through the use of chemical munitions, including deployment of tear gas canisters and area saturation with PepperBalls, regardless of whether the protesters were largely peaceful.  This occurred on numerous occasions, including at 14th & Sherman on May 28, at Washington and Colfax on May 28, at 16th Street and Welton on May 30, and at Lincoln and Colfax on May 30.

66.     It is fundamental that officers may not use force against individuals (including protesters) unless there is an objectively reasonable basis for the use of force against that particular individual.  All persons are not subject to indiscriminate police force by simply being present at the scene, particularly at a scene where First Amendment rights are being exercised.  For example, the IACP *Concepts and Issues Paper on Crowd Management* provides, "The fact that some individuals in a crowd have engaged in unlawful conduct does not normally provide blanket grounds for use-of-force countermeasures, crowd dispersal, or declaration of an unlawful assembly."  (Fitouri 18372.)

67.     Lt. Williams testified that while there were some occasions on which officers targeted aggressive individuals within a crowd with 40 mm launchers or PepperBalls, there was no instance in which officers entered a crowd to attempt to physically isolate or arrest an individual engaged in assaultive behavior.  (Williams Deposition, pp. 63-64.)  I have not seen any evidence of any officers attempting to isolate violators within a crowd in order to protect the rights of free expression of peaceful protesters in the crowd.  Instead, command staff did what was expedient, which was to use chemical munitions to disperse entire crowds, regardless of whether the crowd was mostly peaceful with only a few aggressors.  Such use of indiscriminate force is contrary to generally accepted and proper police training and practices.

68.    There were several occasions, such as on May 28, when Commander Phelan himself authorized the use of tear gas to disperse crowds, without any assessment of whether the crowd was mostly peaceful with a few aggressors and without any attempt to isolate the aggressors. As Lt. Canino admitted when asked about Colfax and Washington on May 28, the crowd of protesters was not declared an unlawful assembly because "[s]ome of the people that were there were not throwing rocks, a good majority of them, actually were not throwing rocks." (Canino Deposition, p. 38.)  Even though the majority of the crowd was peaceful and no unlawful assembly was declared, command staff nevertheless authorized the use of tear gas on the entire crowd.  The same occurred at the intersection of Lincoln and Colfax on May 30 between 6:00- 8:00 p.m.  No unlawful assembly was declared, and yet, officers repeatedly used chemical munitions to disperse the protesters, even though the majority of them were peaceful. (Williams Deposition, pp. 65-70.)

69.    In about the half-hour before midnight on from June 1 to June 2, 2020, there was a relatively small number of protesters gathered in front of the State Capitol.  The CSP (Colorado State Patrol) video shows perhaps about a hundred or two hundred protesters standing and occasionally sitting or lying down in front of the Capitol, on Lincoln.  (CSP videos 06012020 v211, 06012020 v225, 06012020 v63, 06012020v64.)  In some of the video, the protesters (or many of them) even appear bored.  (E.g., CSP video 06012020 v.211 at 11:48-11:49.)  At one point, protesters are standing with their arms linked in the middle of the street.  (CSP video 06012020 v64 11:57:32.)  During this time (approximately 11:30-midnight), no police officers can be seen in the area.  However, shortly after midnight, a large number of officers march forward from the shadows in front of the Capitol and push south on Lincoln.  The officers are accompanied by many police vehicles, including RDVs and what appear to be armored vehicles.  (CSP video 06012020 v64 12:03-12:05.)  The officers deploy a large amount of tear gas.  This push of the protesters using tear gas was coordinated and directed by Commander Phelan, as apparent from the radio communications.  (DEN 5147.)  Even though the crowd appeared peaceful and no unlawful assembly was declared, Commander Phelan nevertheless authorized the use of tear gas on the entire crowd.

70.    As I previously noted, Lt. Canino, Lt. Williams, and other DPD officers uniformly testified that their actions during the GFP were consistent with DPD policy, training, and instructions from the Command Post.  None of the DPD leaders or officers observed any use of force by officers that was inappropriate or inconsistent with department policy or training, and none of them took any actions that they believed were inappropriate or inconsistent with department policy or training.

71.    Despite DPD's written policies (including provisions of the Crowd Management Manual), the *actual*, unwritten policy and practice of the DPD was to use force (such as tear gas) indiscriminately on crowds of protesters without regard to the proportion of individuals in the crowd who were peaceful versus non-peaceful, and without regard to whether the First Amendment rights of peaceful protesters were affected.

72.    DPD officers uniformly testified that they used less-lethal weapons to disperse crowds whenever objects were thrown at them.  Rocks and water bottles are annoying and can be dangerous. But they are objects that can be dealt with, especially when officers are wearing helmets, face shields, and other protective gear.  In order to protect the constitutional rights of the majority of protesters, DPD should have made attempts to isolate the individuals throwing objects

from the crowd.  Lt. Williams testified that it was too dangerous to send officers, though teamed up and protected from head to foot by "hard gear," into a crowd to isolate and apprehend aggressors.

73.    Not only was there a general failure to give dispersal orders or warnings before the use of less-lethal weapons on protesters during the GFP, but there was a failure to ensure that dispersal of crowds using less-lethal weapons was in compliance with the Crowd Management Manual.

74.    A written policy is only effective if it is followed.  There is little to no evidence that the written crowd management policies of the DPD were consistently adhered to—by Commander Phelan, and his lieutenants, sergeants, and officers throughout the GFP.

75.    Commander Michael O'Donnell provided testimony on behalf of Denver regarding any systemic or programmatic efforts by the City of Denver to prevent and identify officer misconduct during the George Floyd Protests (GFP).  Of particular concern were officers' suppression of the First Amendment rights of protestors, and their use of excessive force on protestors, as well as Denver's written and unwritten policies and practices, in effect from May 2015 through June 2020 relating to crowd management, crowd control, and field force tactics, including the management of protests.  (O'Donnell Deposition, pp. 9, 11-12.)

76.    Denver has no apparent systemic or programmatic efforts to prevent or identify officer misconduct, other than the training that it provides.  (O'Donnell Deposition, pp. 15-16.) Commander O'Donnell referenced discipline, but he agreed that discipline is something that occurs after a complaint is made and investigated.  (O'Donnell Deposition, p. 13.)  He also agreed that discipline is only a preventative measure to the extent that holding an officer to account may serve to prevent future misconduct from that officer, and to set an example for other officers. (O'Donnell Deposition, p. 14.)

77.    If a DPD officer uses force outside of policy he or she would, in theory, be disciplined.  If a DPD officer does not use force outside of policy, there would be no discipline. (O'Donnell Deposition, p. 15.)    Thus, the fact that DPD has not, to my knowledge, disciplined any of the officers accused of misconduct by plaintiffs in other cases I have evaluated (*e.g.*, *Cruz* and *Epps*), nor have I seen any information indicating discipline against any of the officers accused of misconduct alleged by Plaintiffs in this case, means that none of their actions were deemed outside of DPD policy.

78.    Commander O'Donnell confirmed that Denver's only policies regarding crowd control, crowd management, field force tactics, and management of protests are the DPD Crowd Management Manual and the use of force policy in the DPD Operations manual. (O'Donnell Deposition, p. 16.)

79.    Commander O'Donnell explained several aspects of Denver's policies regarding crowd management and use of less-lethal weapons during the protests, including:

  a. The Incident Commander has the authority and the responsibility to issue a general dispersal order to a crowd of protestors yet supervisors on the scene—and even the

highest-ranking officer at the scene—also have the authority to issue a general dispersal order.  (O'Donnell Deposition, pp. 17-19.)

b.   The DPD Crowd Management Manual states:

A general dispersal order will only be given under the following circumstances:

1.   A "significant number or percentage" of participants fail to adhere to time, place and manner restrictions ***and*** voluntary compliance, targeted citation and/or targeted arrest actions have not resulted in or are not "reasonably likely" to result in "substantial compliance"; or

2.   A "significant number or percentage" of participants are engaging in, or are about to engage in, tumultuous and violent conduct which creates grave danger of damage or injury to property or person or substantially obstructs the performance of any governmental function.

(DPD Crowd Management Manual, p. 9.)  Denver's policy is that this is "flexible" and "just a guide." (O'Donnell Deposition, pp. 19-20.)  Denver's policy is that it is up to the officers at the scene to evaluate the situation and determine if they can give a general dispersal order, and the policy leaves it to the officer's discretion to decide when a general dispersal order can be given.  (O'Donnell Deposition, p. 20.)  Furthermore, the policy does not provide any specific guidance on what "significant number or percentage" means.  (O'Donnell Deposition, pp. 21-23.)  Denver's policy is that it is up to the discretion of the officers or supervisors to make a determination as to when this "requirement" of the DPD Crowd Management Manual is satisfied before a general dispersal order is given.  (O'Donnell Deposition, p. 23.)

c.   The DPD Crowd Management Manual states that PepperBalls may be used in crowd control situations under five specific circumstances, and that they "will not" be deployed "without the approval of the Division or Unit supervisor."  In addition, it states that the "Pepper Ball system will not be used against a group or crowd without prior authorization from the Incident Commander.  (DPD Crowd Management Manual, pp. 19; O'Donnell Deposition, p. 39.)  However, as Commander O'Donnell testified on behalf of Denver, Denver's policy is that what is written in the Crowd Management Manual is merely "a guide," and that use of PepperBall does not always require prior authorization from a supervisor. (O'Donnell Deposition, p. 24-26.)  As Commander O'Donnell explained on behalf of Denver, Denver's policy is that officers have discretion to decide when they need to get authorization from a supervisor or not (O'Donnell Deposition, p. 26.), so long as the officer can articulate a reason.  (O'Donnell Deposition, p. 40.) Denver's policy on PepperBall use also does not require officers to give warning prior to deploying PepperBall.  (O'Donnell Deposition, pp. 27-28.)

d.   For example, Denver's policy authorizes the use of PepperBall on a crowd in the form of "area denial" if there is a large group of peaceful protestors and a small

number of individuals who are throwing water bottles at the officers. (O'Donnell Deposition, pp. 29-30, discussing example with 100 peaceful protestors and 3 individuals throwing water bottles.)

e.  The DPD Crowd Management Manual provides five specific circumstances under which the 40mm launcher may be used. (DPD Crowd Management Manual, p. 20.) However, Denver policy concerning the circumstances under which the 40mm launcher can be used against a person has exceptions. If an officer can provide an "articulation," of his or her reasons for using the 40mm launcher, even if it is outside of what is written in the Manual, it can be within policy. (O'Donnell Deposition, pp. 49-50.) Denver's policy is that officers can use the 40mm launcher in any situation where the officer can clearly articulate the need for deployment. (O'Donnell Deposition, p. 56.)

f.  The DPD Crowd Management Manual provides a list of circumstances under which chemical agents may be used. (DPD Crowd Management Manual, p. 23.) Denver policy is that officers can use chemical agents (such as OC spray) in any situation where the officer can clearly articulate the need for deployment. (O'Donnell Deposition, p. 55.) If the use of bean-bag shotguns and other less-lethal weapons by mutual aid agencies was approved by Chief Pazen or the Incident Commander, then their use at the GFP was within policy. (O'Donnell Deposition, pp. 60-61.)

g.  Commander O'Donnell also explained that, as a lieutenant in the gang unit during the GFP, he did not see any officers under his purview act in a manner contrary to Denver policy. All of the officers acted within policy. (O'Donnell Deposition, p. 38.) Given that Commander O'Donnell is one of Denver's witnesses testifying in an official, representative capacity on behalf of Denver about what Denver's policies were, this is significant evidence that the actions of the gang unit officers were consistent with and fell within Denver's policies, procedures, and customs.

h.  If officers have provided a written officer statement of why and when they used less-lethal weapons during the GFP, and the officers have not been disciplined or held to account for their actions in any way, this means that their use of force was deemed by Denver to be appropriate and consistent with policy. (O'Donnell Deposition, p. 41.)

80.  From Commander O'Donnell's testimony on behalf of Denver, I conclude the following:

a.  The DPD Crowd Management Manual is merely a "guide" that does not set any firm limits on officer discretion in their use of less-lethal weapons in a crowd control or crowd management situation. The written policy is merely paper and inconsistent with the *actual* policy of the DPD.

b.  Denver policy gives officers nearly unlimited discretion to use their less-lethal weapons as they see fit.

c.      I have not seen any indication that any of the officers involved in the incidents of use of force alleged by Plaintiffs in this case  (or the *Epps* plaintiffs) were disciplined.  As such, Denver has sanctioned these uses of force and deemed it appropriate pursuant to policy.

d.      For instance, Denver policy may allow an officer to fire a "less-lethal" weapon at a person who is standing still with their hands up, even if no orders to move back have been given. (O'Donnell Deposition, p. 43.) This is exactly what happened to protester Stanford Smith when he was sprayed in the face with OC without any warning or orders, and while he was protesting peacefully. (See Smith Deposition, pp. 105-106.) This is also what happened to protester Youssef Amghar, when he was standing on the sidewalk at the corner of Lincoln and Colfax on May 30, 2020 at 7:09 p.m. and shot multiple times with PepperBalls. This use of force was authorized and caused by Denver's policies, procedures, and customs.  (See also Eberharter Deposition, pp. 108-09.)

e.      Given that no officers were disciplined for inadequate "articulation" of their use of force on civilians during the GFP, Denver has sanctioned the use of force and deemed it as appropriate pursuant to policy.  I have been provided no evidence that any officer was disciplined for inadequate articulation of use of force in their officer statements relating to the GFP. Nor have any officers been disciplined for failing to write officer statements (or use of force reports) for specific days that they were on duty during the GFP. Denver has sanctioned this conduct.

f.      In light of Commander O'Donnell's testimony on behalf of Denver, the actual use of PepperBall during the GFP was entirely *consistent with DPD policy*, because DPD policy provided officers nearly unfettered discretion to deploy PepperBall (and other less-lethal weapons) as they saw fit.

g.      In light of Commander O'Donnell's testimony on behalf of Denver, the shooting of protester Jonathen Duran with a foam baton to the groin (on May 31, 2020 at approximately 9:30 p.m. at Colfax and Pearl) was consistent with DPD policy, because DPD policy provides that officers may use the 40mm even in situations not listed in the Manual.  And, as I previously opined in the *Epps* case, the fact that Duran's complaint to Internal Affairs was "declined" for investigation shows that Denver did not find that the officer's conduct was inconsistent with its policies or subject to discipline.

h.   Likewise, Commander O'Donnell's testimony supports my opinion that the less-lethal shooting of protesters Joe Deras and Zach Packard on May 31, 2020, was consistent with Denver policies, procedures, and customs.

C.      **Indiscriminate and inappropriate use of PepperBalls and inadequate training**

81.     According to the DPD Crowd Management Manual, PepperBall use is allowed only against targeted individuals whose conduct rises to the level of "Defensive Resistance." (DPD Crowd Management Manual, p. 19, DEN 86.)  "Defensive resistance" is defined in the DPD Operations Manual as "Physical actions that attempt to prevent an officer's control, including flight or attempt to flee but do not involve attempts to harm the officer …."  (DPD Operations Manual, § 105.01(3)(d).)  According to Commander Phelan, Lt. Williams, and other DPD officers, "defensive resistance" included failure to obey orders to disperse.  (Williams Deposition, pp. 122-23; Phelan Deposition, p. 78.)

82.     The actual use of PepperBall during the GFP was entirely *consistent with DPD policy*, because DPD policy provided officers nearly unfettered discretion to deploy PepperBall (and other less-lethal weapons) as they saw fit.  The evidence (including video footage) shows a practice of deploying DPD officers deploying PepperBall guns on protesters even though they were not engaged in "physical actions that attempt to prevent an officer's control."  The video also shows many officers deploying PepperBalls in an indiscriminate fashion without regard to whether they were aiming at a person or at the ground or an object near a person.  A few examples include:

a.      A BWC video from May 28, 2020, at 8:30 p.m. at Colfax and Washington shows officers shooting PepperBalls at individuals who did not appear to be engaged in any "physical action" that "attempt[ed] to prevent an officer's control." (DPD BWC videos, including DEN 4043; DEN 4044; DEN 4050.)

b.      On May 30, 2020, at approximately 5:50 p.m. in the vicinity of the intersection at Lincoln and Colfax, the BWC produced as DEN 5055 shows an individual asking a group of officers, "do you guys enjoy being tyrants?" The officer tells him to "get back" and fires PepperBalls at him. The individual was almost run over twice by cars as he was walking away and being shot in the back with PepperBalls. This same incident can be seen in the BWC video produced as DEN 5008.





DEN 5008 at 5:50:13 p.m. MT



DEN 5008 at 5:50:14 p.m. MT



DEN 5008 at 5:50:15 p.m. MT



DEN 5008 at 5:50:17 p.m. MT

    c.      On May 30, 2020, at 7:09 p.m., at the intersection of Lincoln and Colfax, protester Youssef Amghar was shot with PepperBalls while standing on a sidewalk with their hands up. (Amghar Declaration; DEN 5017; DEN 5047.) Video does not show Amghar engage in any "physical action" that "attempts to prevent an officer's control." Nor are any warnings or dispersal orders heard on the videos. There does not appear to be any reason that warranted shooting Amghar with PepperBalls at this time and location.

39





d.    On May 30, 3030 at 7:17 p.m., at the intersection of Lincoln and Colfax,
Elisabeth Epps was struck in the face with a PepperBall while filming with
her cell phone.  BLM_00001021 (at about 52:50-53:27).  Officer Valentine
was firing several rounds from his PepperBall gun in Epps' direction at the

time that Epps was struck in the face, as Epps was standing behind a different individual that threw an object in the direction of Officer Valentine.  (DEN 5028; 2021 Valentine Deposition, pp. 84-86, 92, 100-101.)



DEN 5028 at 7:17:00 p.m.



BLM_00001021 (Video taken by Epps) (53:58)

e.   On May 30, 2020, between 6:00-8:00 p.m., officers in the skirmish line at the intersection of Lincoln and Colfax repeatedly shot PepperBalls at protesters who did not appear to be engaged in any "physical action" that "attempt[ed] to prevent an officer's control." (*See* BWC videos from DPD and APD officers.)

f.   According to the declarations and depositions of several *Epps* plaintiffs and other witnesses, there were numerous occasions on which police shot PepperBalls at protesters without warning and not in response to any "physical action" by protesters that "attempt[ed] to prevent an officer's control." (Sannier Declaration, ¶¶ 8, 10, 13; Duran Declaration, ¶¶ 6-10, 14-16; Fitouri Declaration, ¶¶ 5, 7-11; Parkins Declaration, ¶¶ 5-12; Taylor Declaration, ¶¶ 9-13; Amghar Declaration; Deras Declaration, ¶¶ 5-6; Blades Declaration, ¶¶ 11, 17; Helmick Declaration, ¶ 18; Sanchez Declaration, ¶¶ 31-32, 35, 39-40; Stebleton Declaration, ¶¶ 6, 11, 16; Kelly Declaration, ¶¶ 4, 7, 19, 22.)

g.   In some instances, officers shot individuals who were dispersing. (E.g., DEN 5109 at 9:44:57 p.m. MT; Sanchez Declaration, ¶ 31; Helmick Declaration, ¶ 18.)

h.   Officers shot credentialed members of the press. (Duran Declaration, ¶ 7.)

83.   As discussed above, DPD witnesses, including command-level officers, uniformly testified that their actions and the actions of other officers during the GFP were consistent with DPD policy, training, and instructions from the Command Post. In addition, the DPD Crowd

Management Manual provides that, during crowd control situations, "[t]he Pepper Ball projectile will not be deployed against a <u>specific individual</u> in a crowd without the approval of the Division or Unit supervisor.  Additionally, the Pepper Ball system will not be used against a group or crowd without prior authorization from the Incident Commander."  (DPD Crowd Management Manual, p. 19, DEN 86.)

84.    Technician Ryan Grothe oversees the DPD's less-lethal weapons program and training.  He provided testimony on behalf of Denver.  He explained:

a.    The written policies of Denver on the use of less-lethal weapons and nonlethal force are contained in the Operations Manual and the DPD Crowd Management Manual. (Grothe Deposition, 46.)  There are no other policies.

b.    The only courses provided to DPD officers on 40mm use, PepperBall use, and OC spray use are reflected in the PowerPoint presentations of those courses.  (Grothe Deposition, p. 16.)

c.    Denver does not provide any training on the use of Noise Flash Diversionary Devices (NFDDs also known as flashbangs) or Stinger grenades.  (Grothe Deposition, pp. 17-20.)  Technician Grothe testified that NFDDs and Stinger grenades are used by Metro/SWAT officers, but he could not describe what training they had in their use, if any.  (Grothe Deposition, pp. 17-20.) Metro/SWAT Corporal Richard Eberharter testified at his deposition that he did not receive any training on how to use flashbangs or Stinger grenades in a crowd control or protest situation. (Eberharter Deposition, pp. 116-17, 141-42.)

d.    Denver's policies do not reference NFDDs or Stinger grenades.  (Grothe Deposition, pp. 20-21, 47.)

e.    At the time of the GFP, Denver policy was that physical actions by members of a crowd that has been declared an unlawful assembly or any disruption to pedestrian or traffic flow was considered "defensive resistance" within the meaning of Denver's written policies on use of force.  (Grothe Deposition, pp. 28, 76-77.)  Thus, Denver policy authorized the use of less-lethal weapons (such as PepperBall) on anyone disrupting traffic.

f.    Although CS gas deployment must normally be authorized by the Incident Commander, officers are trained that they have the discretion to decide if an emergency circumstance exists that warrants deployment of CS gas without Incident Commander approval.  (Grothe Deposition, p. 36.)  Thus, whether deployment of CS gas at the GFP was authorized by the Incident Commander or deployed because an individual officer, in his or herdiscretion, decided that a situation was an "emergency," the CS gas deployment was consistent with and authorized by Denver policy.

g.    Likewise, officers are instructed to use their discretion in deciding whether they need to get authorization from a supervisor to deploy PepperBall or

43

whether a given situation qualifies an "emergency" that does not require supervisor authorization. (Grothe Deposition, p. 40, 58.)

h.  Denver does not provide any specific training to officers on how to use their PepperBall guns when there is a single person in a crowd throwing water bottles. (Grothe Deposition, p. 38.)

i.  Grothe, testifying on behalf of Denver, could not provide any description of what training was provided to officers on the use of OC spray, other than what is in the PowerPoint course on OC spray.  (Grothe Deposition, pp. 59-62.)  Denver is also not aware of any training on the use of the Triple Chaser other than what is in the PowerPoint slide (DEN 334).  (Grothe Deposition, pp. 67-68.)

j.  Grothe was not aware of any discipline of DPD officers from misuse of less-lethal weapons at the GFP.  (Grothe Deposition, pp. 75-76.)

85.  From Technician Grothe's testimony on behalf of Denver, I conclude:

a.  Denver policy and training on use of NFDDs and Stinger grenades was at the time of the GFP non-existent.  (This was also corroborated by Corporal Eberharter's testimony.)   This complete failure to establish policies and to train in the use of these dangerous weapons is contrary to generally accepted police practices.

b.  Denver policy and training grants officers nearly unlimited discretion to use their less-lethal weapons as they see fit, and to declare "emergencies" that allow them to use their weapons without supervisor authorization.

c.  Denver policy, training, and accepted practice authorized the use of PepperBall against Plaintiffs in the way they described in the complaint.

d.  Denver's policy and training failures caused the alleged use of force on Plaintiffs.

86.  Overall, I conclude that (1) use of PepperBalls as a crowd control or crowd dispersal measure was authorized by the Incident Commander; (2) use of PepperBalls on specific individuals was approved by DPD supervisors; and (3) DPD policy, training, and instructions from the Command Post (i.e., the Incident Commander) resulted in the indiscriminate use of PepperBalls during the GFP, which affected the rights of peaceful and non-peaceful protesters alike. Furthermore, in my opinion, the video and other evidence show that DPD officers were not appropriately or adequately trained in the use of PepperBalls. Indeed, appropriately or adequately trained officers acting in a reasonable manner would not have deployed their PepperBall guns as described in the above-listed examples. The widespread nature of these examples—and the lack of discipline of DPD officers who engaged in this conduct—shows that the actual practice of DPD officers is quite different than what the DPD's policy is in writing (which is that PepperBall will be used in response to a "physical action" by a protester that "attempts to prevent an officer's control.")

D.  **Dangerous Kettling Incident on May 31, 2020**

87.     On May 31, 2020, between approximately 9:36-9:42 p.m., hundreds of protesters gathered in front of Cathedral Basilica of the Immaculate Conception, on Colfax between Logan and Pennsylvania.  (DEN 3874 - HALO; DEN 3873 - HALO; Fitouri 228 at 25:00-28:24 min.) The video shot by Jonathen De La Vaca Duran (Fitouri 228) shows that he and protesters were pushed west on Colfax by officers using less-lethal weapons.  BWC produced by APD shows that Aurora officers were originally at the District 6 station at Colfax and Washington.  On the radio (which can be heard on the BWC of APD Officer Alcorta, COABLM 345), Commander Phelan communicates with Captain Redfearn and Lt. Williams. Lt. Williams and his teams (Sgts. Beall and Abeyta and their officers) were on Colfax, coming in from the west.  (COABLM 345; Redfearn Deposition, pp. 34, 98-110; Phelan Deposition, p. 75)  Commander Phelan instructs Aurora to push from the east and the team headed by Lt. Williams to push from the west. At 9:39 p.m., Lt. Williams (radio call sign 100) says that they are at Colfax and Grant, and "we're going to be pushing into each other."  At 9:40 p.m., Commander Phelan tells Lt. Williams, "we'll push 'em there, we will get 'em and make some arrests."  (COABLM 345.)



88.     The HALO video (DEN 3874) and video shot by Johnathen Duran (Fitouri 228) shows that protesters were pushed west on Colfax by Aurora officers (who were also with Jefferson County SWAT officers).  Then, another large group of protesters marching east on Colfax end up

45

in front of the Basilica on Colfax between Logan and Pennsylvania. (Fitouri 228 at 25:00-28:24 min.) Aurora BWC and the HALO (DEN 3874) shows that APD officers stopped at Pennsylvania. APD officers appear to be deploying less-lethal weapons, including large amounts of tear gas, into the crowd of protesters in front of the Basilica. (DEN 3874 at 9:34 p.m. MT; COABLM 371; COABLM 375; COABLM 398.) At the same time, Lt. Williams and his team are moving in from the east on Colfax. Clouds of gas are visible at the intersection of Logan and Colfax in the HALO video from that intersection (DEN 3873). DPD officers move into the middle of the block. Large numbers of protesters are hemmed in by the metal fence around the Basilica on the north, large buildings on the south, and officers firing tear gas from the east and west. Many protesters appear able to escape down the alley to the south, between the buildings, or around the corner, north, on Pennsylvania and Logan. (DEN 3873; COABLM 398; Fitouri 228 at 28:00-28:24 min.)

89.    The practice of encircling or surrounding a group of protesters in order to arrest them (or use force on them) is often referred to as "kettling." The DPD Crowd Management Manual does not prohibit kettling. In fact, it states:

> A police line will not be used to encircle or "substantially encircle" any part of an assembly *unless the following three circumstances exist*:
>
> 1. To provide safety for the demonstrators or when there is probable cause to believe that a significant number or percentage of the persons to be encircled have committed unlawful acts (other than failure to have a permit); and
>
> 2. The police have the ability to identify those individual violators; and
>
> 3. The police have decided to arrest the violators. (DPD Crowd Management Manual, p. 9, DEN 76) (Emphasis added).

Thus, the written policy of the DPD *expressly permits the encircling of protesters* under the circumstances listed above. In this case, Commander Phelan had decided to "arrest the violators" (presumably for violation of the emergency curfew). He expressly directed the two teams of officers, headed by Lt. Williams and Capt. Redfearn, to push toward each other so that the protesters could be arrested in one location. And when asked about whether the use of force as depicted in the HALO camera at Logan and Colfax (DEN 3873), was consistent with DPD policy, although Commander Phelan initially said that he did not have enough information, he then answered, "I'm sure it was." (Phelan Deposition, p. 76.)

90.    It is my opinion that DPD policy and the actions of the DPD during this kettling incident were contrary to generally accepted police practices and standards. Kettling, also described as "encirclement," "corralling," or "containment," is a dangerous practice that indiscriminately subjects everyone to the same, often violent, treatment regardless of individual conduct.

91.    Assuming that the emergency curfew could be validly enforced (and validly enforced only against protesters), that was not a reason to kettle protesters in order to arrest them

for violation of the curfew, or to use less-lethal weapons on them in an enclosed space for violation of the curfew.[2]

92.     A law enforcement agency may use only that amount force necessary to accomplish a legal purpose.  As documented throughout the materials I reviewed, there is evidence that DPD personnel are well aware of this policy.  They are also aware that DPD requires specific dispersal orders and up to three warnings, where possible, in order to give protesters the opportunity to disperse.  This did not appear to happen in front of the Basilica before protesters were hit with heavy clouds of tear gas.  Aurora Sergeant Brukbacher can be heard saying on his BWC at 9:43:17 p.m. MT (after the use of force had already begun), "everybody hold your fire for a minute, they're going to give dispersal orders."  (COABLM 371.)  Yet, no such orders can be heard on the video. (COABLM 371.)  And, according to the declarations of protesters who were present during this incident, because no dispersal orders were heard, the protesters felt trapped and scared.  (Sannier Declaration, ¶¶ 15-27; Fitouri Declaration, ¶¶ 21-36; Parkins Declaration, ¶¶ 21-36; Duran Declaration, ¶¶ 27-35; Cousik Declaration, ¶¶ 14-30; Smedberg Declaration, ¶¶ 7-23; Zinman Declaration, ¶¶ 26-43.)  These protesters were able to run away from the tear gas, but only after having to choose between running toward officers firing less-lethal weapons, climb a metal fence, or run down a narrow alleyway with hundreds of other protesters.

## E.     Inappropriate use of 40mm launchers and other projectiles and inadequate training

93.     An appropriately-trained police officer acting in a reasonable manner would not indiscriminately fire a potentially lethal projectile into a crowd, or toward persons who are not engaged in conduct that could be construed as posing a danger to the officer, others, or themselves. During the GFP, there were many press reports of individuals who were seriously injured by inappropriate use of 40mm launchers and other projectiles.  Even innocuous-sounding "foam batons" fired from a 40mm launcher can cause loss of vision, broken bones, brain damage, even death.  The DPD's inadequate training and widespread practice of inappropriate use of 40mm launchers caused in significant part the violation of the constitutional rights of protesters.

94.     **May 31, 2020 shooting of Jonathen Duran:** According to Duran's declaration, he was documenting the GFP as a credentialed member of the press on the evening of May 31, 2020. He alleges that he was wearing a white helmet with "MEDIA" visibly written on it on all sides. (Duran Declaration, ¶ 19.)  While he was standing at the intersection of Colfax and Pearl Street, at approximately 9:30 p.m., he was shot in the groin with a foam baton.  (Duran Declaration, ¶ 24.) This appears to be corroborated by his video.  (Fitouri 228 at 21:24 (moment of shooting), 22:43 (projectile shown to the camera).)  Although there appear to have been individuals in the street around him moving a dumpster and some fencing just before he was shot, that would not have justified the shooting of Duran.

95.     According to the DPD Crowd Management Manual, "The 40mm launcher will not be used against a <u>specific individual in a crowd</u> without the approval of the Division or Unit

---

[2] It is important to note that there were certain exceptions to the curfew, such as for "credentialed members of the news media."  (Emergency Curfew Order, DEN011302-11303.)  According to his declaration, Duran was a credentialed member of the news media; if that is true, there would have been no basis to enforce the curfew (or use force) against him whatsoever.

supervisor.  Additionally, the 40mm system will not be used against a group or crowd without prior authorization from the Incident Commander."  (DPD Crowd Management Manual, p. 20, DEN 87.)  Assuming this provision was followed during the GFP, each use of the 40mm launcher on Johnathen Duran was approved by a DPD supervisor or the Incident Commander.  Certainly Chief Pazen believes the policy was followed, as he explained in an interview with Channel 9 News.  In fact, the chief reported that every unit from an outside law enforcement agency which provided mutual aid to DPD was accompanied by a DPD supervisor, and each was provided the rules of engagement.  (Pazen Deposition, pp. 29-30; 9News video, 6-1-2020 4.)

96.    The Manual further provides that use of the 40mm launcher in crowd control situations may be appropriate under the following circumstances:

- Against violent individuals within a crowd.

- Against subjects who are actively throwing objects at police officers.

- Against subjects who are at risk of causing imminent bodily injury to other persons.

- To mark individuals for future identification and arrest for illegal acts that include active aggression.

- To provide cover while Arrest Teams penetrate a crowd, or against individuals who attack the Arrest Team or who violently interfere with the movement of the team or arrest process. (DPD Crowd Management Manual, p. 20, DEN 87.)

97.    None of these circumstances appear to have been satisfied during the incident in which Duran was shot in the groin.  (Fitouri 228 at 21:24.)  According to the testimony of numerous DPD officers, 40mm launchers may only be used against individuals engaging in "active aggression."  According to the DPD Operations Manual, that means "An overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely."  (DPD Operations Manual, § 105.01(3)(e).)  The Manual also provides that officers cannot intentionally target an individual's groin.

98.    It is my opinion that the shooting of Duran with a foam baton to the groin was contrary to generally accepted police practices, standards, and training.  It was also inconsistent with the DPD Crowd Management Manual.  The video (Fitouri 228) shows that Duran was not violent, throwing anything, at risk of causing imminent bodily injury to other persons, or attacking an arrest teams or subject to arrest.

99.    Duran submitted a complaint to Internal Affairs.  No one was disciplined as a result. In the "decline" letter sent to Duran by Commander Magen Dodge of the Internal Affairs Bureau, she appears to cast doubt on the veracity of his allegation (despite his production of video evidence), by pointing to the fact that he could not identify the officers (who were wearing riot gear) and stating that his video showed that he was walking backwards when struck and that he was able to walk without assistance after being struck.  (DEN 8076.)  This letter (and the other "decline" letters, discussed in more detail below) do not show any serious attempt by the DPD to investigate citizen complaints of use of force during the GFP.

100.    **May 31, 2020 shooting of Joe Deras:** According to Deras's declaration, he was marching with other protesters near the intersection of Colfax and Washington at approximately 8:30 p.m. on May 31, 2020, when he was struck with what he believed were three tear gas canisters. (Deras Declaration, ¶¶ 10-17.)  The HALO camera video from this intersection at this time (DEN 3871) shows protesters marching east on Colfax.  The camera is facing west and the intersection cannot be seen in the minutes before 8:30 p.m.  At about 8:29 p.m., protesters can be seen stopping and backing up, away from the intersection.  The camera shifts direction and faces north, in the intersection.  A line of police officers can be seen behind large clouds of gas, standing just north of Colfax on Washington.  (DEN 3871 at 8:29-8:30 p.m. MT.)  It appears from the HALO camera footage that Deras (wearing a white helmet), may have run into the middle of the intersection to kick an object.  (DEN 3871 at 8:30:43 p.m. MT.)  He was a good distance away from the officers in the skirmish line.  Even if Deras was kicking an object in the intersection, it would have been contrary to generally accepted police practices for officers to shoot him three times with projectiles, hitting him in the head, back and hand. Also, according to Deras, the force used was without warning.  (Deras Declaration.)





DEN 3871 at 8:30:37 p.m.

101.    **May 31, 2020 shooting of Zach Packard:**  At approximately 9:12 p.m. in the vicinity of the intersection of Colfax and Washington, Zach Packard was shot in the head with a projectile by an officer shortly after he kicked a gas or smoke canister off the curb on the south side of Colfax.  The incident is depicted in photographs produced at BLM_00000040-42. There are numerous BWC videos produced by DPD and the APD that show officers firing smoke or gas canisters, as well as less-lethal munitions rounds from shotguns, into the intersection of Colfax & Washington at this time.  (COABLM 508; COABLM 450; DEN 5087; DEN 5110; DEN 5114.) The BWC produced at COABLM 508 shows that at approximately 9:12, the officers were told something to the effect that if individuals kicked the tear gas canisters, "go ahead and hit 'em." or "go ahead and see if you can hit 'em." (COABLM 508.) This use of force was contrary to generally accepted police practices.

With respect to both Deras and Packard, it was not appropriate to directly fire a projectile—whether it be a bean bag or sock round, a foam baton, or a tear gas canister—at their heads or bodies.  As noted, such use of force is potentially lethal or can cause serious bodily injury, and is only warranted when officers are confronted with force from an aggressive or violent individual posing a threat that is potentially lethal or can cause serious bodily injury to the officer or others. Even if they were kicking tear gas canisters, neither Deras nor Packard appeared to be posing such a threat.





BLM_00001771 (left), BLM_0000042 (right)



BLM_00001769

### F.    Inappropriate use of pepper spray and inadequate training

102.    Under the DPD Crowd Management Manual, pepper spray is considered a chemical munition. (DPD Crowd Management Manual, p. 22, DEN 89.)  The Manual states, "The use of a chemical agent for crowd control or riot control must be authorized by the Division or Unit Supervisor, except in the event of an emergency…."  (DPD Crowd Management Manual, p. 23, DEN 90.)  The Manual further states that chemical agent use may be appropriate in the following circumstances:

- To prevent an injury to an officer or a third person.

- To subdue a person who is threatening or attempting physical harm to himself or another.

- Against subjects resisting arrest.

- To quell rioting.

- Against subjects interfering with an arrest.

- Any situation with the officer can clearly articulate the need for deployment.

103.    There are numerous examples of DPD's inappropriate use of pepper spray during the GFP.  The widespread nature of these examples—and the lack of discipline of DPD officers who engaged in this conduct—shows that the actual practice of DPD officers is quite different than what the DPD's policy is in writing.  It also shows that DPD officers were inappropriately and inadequately trained in the use of pepper spray.  For example:

104.    On May 30, 2020, at 7:35 p.m., Defendant Officer Jossi pepper sprayed a protester who was holding a cell phone filming her and the other officers.  (DEN 5036.)  She did not recall giving him a warning, and none is heard on her BWC video. (DEN 5036). (Jossi Deposition, p. 157.  Defendant Officer Jossi testified at her deposition that this was consistent with DPD policy. (Jossi Deposition, pp. 156-58.)  A bit later, at 8:17 p.m., Defendant Officer Jossi appears to spray a protester in front of her with his hands behind his head.  (DEN 5036, 8:17 p.m.)

105.    On May 28, 2020, at approximately 9:35 p.m. in the vicinity of the intersection of 14th and Lincoln, the BWC produced at DEN 4021 shows an officer deploying pepper spray on individuals who were simply standing in the intersection when the officers decided it was time for them to move.  These individuals posed no threat to the officers and they were given no warnings prior to being pepper sprayed. (DEN 4021.)



DEN 4021 at 9:35:33 p.m.

106.    On May 29, 2020, at approximately 9:56 p.m. on the Capitol lawn just east of Lincoln Street, an officer deployed pepper spray on an individual pushing him into live traffic on Lincoln Street.  (DEN 4228.)  The officer provided no warning that he was going to deploy pepper spray on the individual.



DEN4228 at 9:56:34 p.m.

107.    On May 30, 2020, at approximately 5:46 p.m. in the vicinity of the intersection of Colfax and Lincoln, as the officers started to move protesters south of Colfax, the BWC produced at DEN 5008 shows police officers deploying pepper spray on an individual even though he was not acting aggressively. (DEN 5008.)



DEN 5008 at 5:46:54 p.m. MT (annotated)

108.    On May 30, 2020, at approximately 6:54 p.m. at the intersection of Colfax and Lincoln, BWC produced at DEN 4988 shows an officer deploying pepper spray on an individual without warning.  The individual was slowly approaching the officers asking, "which one of y'all shot me?"  The officer told this individual to back up, and when he did not immediately comply, the officer deployed a significant amount of pepper spray directly into his face without warning. (DEN 4988.)  There was no attempt to de-escalate.  This incident is also visible in the videos produced at DEN 4976; CSP video 05302020 v217 at 06:54 p.m. MT; Channel 9 News video 5-30-2020 7 at 02:05:30-02:06:02 min.



DEN 4988 at 6:54:31 p.m.

109.    On May 30, 2020, at approximately 6:56 p.m., while a group of people were tending to the man who had just been pepper sprayed at the intersection of Colfax and Lincoln in the incident described in the preceding photograph, an individual standing on the corner threw a water bottle at the group of officers standing there. In response, the officers showered everyone on the corner in pepper spray, PepperBall, and various other less-lethal munitions.

55



DEN 4988 at 6:56:22 p.m. MT (annotated)



DEN 4988 at 6:56:25 p.m. MT

110.    On May 30, 2020, at approximately 7:34 p.m. in the vicinity of the intersection of Colfax and Broadway, Stanford Smith was pepper sprayed in the face while he was walking peacefully in front of a line of officers with his hands raised in the air.  The BWC produced at DEN 5044 shows this incident, as does the video produced by the Colorado State Patrol at 05302020 v88 at 07:32:30-07:34:16 p.m. MT.



DEN5044 at 7:34:14 p.m. (annotated)

111.    On May 30, 2020, at approximately 8:20 p.m. in the vicinity of 14th and Broadway, police officers were marching in a line and moving protesters as they moved, and deploying pepper spray on individuals without warning when they were not moving fast enough. The BWC produced at DEN 5034, for example, shows an officer telling a woman to "move out," and "you're making no point, just go," "just keep going," and "it's not worth it."  When the woman did not back up fast enough, an officer pepper sprayed her without warning.  (DEN  5034.)



DEN5034 at 8:20:38 p.m.

112.    I have not seen evidence that any of the officers involved in these incidents were disciplined, or that these incidents were even investigated.  The DPD's policy and widespread practice caused in significant part the violation of the constitutional rights of protesters.

### G.    Inappropriate use of flash bangs Stinger grenades, or other explosives and failure to train

113.    According to Fitouri, Parkins, Deras, and Sannier, flash bangs—also known as noise-flash diversionary devices (NFDD)—were used by DPD on numerous occasions, including on May 29, 2020 at the intersection of Colfax and Broadway, on May 30, 2020 at the intersection of Lincoln and Colfax, and on May 31, 2020 at the intersection of Colfax and Washington. (Fitouri, Parkins, Deras, and Sannier Declarations.)  Fitouri states that, at the intersection of Colfax and Lincoln on May 30, 2020, police threw a flash bang which landed at her foot and exploded, causing minor burns and her foot to go numb.  (Fitouri Declaration, ¶ 12.)  Deras states that a flash bang exploded near his face, injuring his eardrum and causing him sharp pain in his ear for several days afterwards.  (Deras Declaration, ¶ 6.)  Sannier states that a flashbang went off near her head, causing disorientation and ringing in her ears. (Sannier Declaration, ¶ 14.)

114.    Aurora officers did not have flash bangs or PepperBall guns.  (Shaker Deposition, pp. 19-20.)  However, DPD Metro/SWAT had flash bangs.  (Bolton Deposition, p. 39.)

115.    Assuming that a jury credits the testimony of the protesters, the DPD's use of flash bangs under the described circumstances was contrary to generally accepted police practices, standards, and training.  Notably, the DPD Crowd Management Manual does not contain any discussion of use of flash bangs, Stinger grenades or other explosive devices.  There is no policy on NFDDs or other explosives or their use.  These devices are hand-thrown explosive devices that emit a bright flash and loud noise.  They are designed to disorient and can cause temporary blindness and deafness.  (OIM Report, p. 15.)  They can cause serious injuries, including fires and severe burns.  They are "'not intended for the direct application of force against a person and should not be thrown directly at a person.'"  (OIM Report, p. 15.)  Only officers who are specially trained in their use should use them.  In 2014, a police flash bang, common on virtually all early morning drug raids, landed in the crib of a baby in Georgia.  Injuries to the child were devastating. (Salon, June 24, 2014.)  Use of these devices has also become increasingly common during street protests (Seattle Times, June 2020), resulting in several people being wounded and maimed, including a Seattle police officer.

116.    However, there is no evidence that DPD officers were provided any training whatsoever on the use of flash bangs, Stinger grenades or other explosive devices.  None of the training materials produced by the City in this case contained any discussion of flash bangs.  And, as the OIM noted, "Neither the DPD Use of Force Policy nor its Crowd Management Manual include any discussion of the appropriate use of NFDDs."  (OIM Report, pp. 15-16; DPD Crowd Management Manual; DPD Operations Manual, § 105.00.)

117.    It is my opinion that the DPD's failure to create any policy on the use of NFDDs, Stinger grenades, or other explosive devices or provide any training to its officers on their proper use is contrary to generally accepted police practices and standards.  DPD failed to provide any policy or training whatsoever, even though Metro/SWAT officers were armed with them and

apparently used them.  Given how dangerous NFDDs can be, the need for training and policy is obvious.  No police department should give its officers dangerous weapons and allow them to use them without any policy governing their use or any training in their application and use.  The DPD's failure to create any policy or provide any training on use of flash bangs while simultaneously providing officers access to these devices caused in significant part the violation of the constitutional rights of protesters.

118.    The BWC produced at DEN 4086 shows that on May 28, 2020, at approximately 9:50 p.m., officers threw a flash bang grenade at protesters standing at the intersection of Lincoln and Colfax.  (DEN 4086.)  This incident can also be seen in the BWC produced at DEN 4089.  (DEN 4089.)



DEN 4086 at 9:49:48 p.m. MT

119.    The BWC produced at DEN 5095 shows that on May 31, 2020, at approximately 9:18 p.m. in the vicinity of the intersection at Colfax and Emerson, officers deployed multiple flash bang or other explosive grenades (at least two) on a group of protesters without warning.  (DEN 5095.)  This incident can also be seen in the videos produced at DEN 5113, Fitouri 228, and DEN 3878 (HALO), and the 9News Video 5-31-20 4.



DEN 5095 at 9:18:20 p.m. MT (first flash bang or explosive)



DEN 3878 at 9:18:21 p.m. MT (first flash bang or explosive)



DEN 3878 at 9:18:36 p.m. MT (second flash bang or explosive)



Fitouri 228 (first flash bang or explosive)



9News Video 5-31-20 4 (first flash bang or explosive)



9News Video 5-31-20 4 (second flash bang or explosive)

120.    The BWC produced at DEN 5110 shows that on May 31, 2020, at approximately
9:10 p.m. in the vicinity of Colfax and Washington, and officer threw a rubber ball blast grenade

without providing any warning.  (DEN 5110.)  The DPD officers on the line in front of this officer
turn around and yell "woohoo" after he threw the grenade.


DEN 5110 at 9:09:33 p.m. MT


DEN 5110 at 9:09:35 p.m. MT



DEN 5110 at 9:09:44 p.m. MT

121.    I have not seen any evidence that the officers involved in these incidents were disciplined, or that these incidents were even investigated.  Instead, the available video footage seems to indicate that the widespread use of these devices was sanctioned (and at times encouraged) by supervising officers.  The DPD's policy and widespread practice caused in significant part the violation of the constitutional rights of protesters.

### Additional Opinions on DPD's Policies, Practices, and Customs

**A.    DPD policy did not require timely use of force reports and the effect on officer accountability**

122.    As the OIM recognized in its report on the GFP:

> National standards emphasize the importance of documenting uses of force during large protests to enhance accountability. … The IACP recommends that all uses of force during crowd control be reported consistent with agencies' normal force reporting policies. All use of force reports should be as comprehensive as practicable and provide the degree of specificity necessary to fully document and evaluate the force.  Incomplete, vague, or boilerplate language in use of force reports could allow violations to go unchecked and cripple investigations, so this type of language should not be permitted.  (OIM Report, p. 23; IACP *Crowd Management Model*

*Policy*, § IV.E.3.j, Apr. 2019; IACP *Reporting of Use of Force Concepts and Issues Paper*, p. 4, Mar. 2017.)

123.    I completely agree.  Timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility.  The IACP provides, "Use-of-force reporting requirements apply equally to policing demonstrations and civil disturbances.  It is very important for law enforcement agencies to document and investigate uses of force during these events, not only for managerial and accountability reasons, but also to respond effectively to potential complaints alleging excessive force following an event." (*Crowd Management: Concepts & Issues Paper*, Fitouri 18375.)

124.    The DPD itself recognizes this, given that the Operations Manual sets forth detailed use-of-force reporting requirements, as well as a process for supervisors to review uses of force to determine whether additional investigation is necessary.  (*See* DPD Operations Manual, §§ 105.03(1)(a)(2), 105.03(2), 105.03(3).)  This section of the DPD Operations Manual requires Use of Force Reports if an officer applies force through the use of several types of weapons, regardless of whether an arrest is made, the individual dies, is injured, or complains of an injury: 40 mm launcher; any tool, object, or device used as an impact weapon; chemical agents and munitions; PepperBall system).  Even accidental discharges of PepperBall, chemical agent or munition, or 40 mm launcher must be reported, and officers are required to "immediately report" these uses of force on a Use of Force Report.  DPD Operations Manual, § 105.03(1)(a).  As the OIM described it, "During day-to-day policework, uses of force are reviewed by a supervisor in the officer's chain of command." (OIM Report, p. 24.)

125.    Despite the DPD's recognition of the importance of detailed and timely use-of-force reporting, the DPD had a different policy when it came to uses of force during protests.  As the OIM observed, "the DPD Crowd Management Manual is silent on use of force reporting requirements specific to crowd control situations." (OIM Report, p. 24.)  And as Lt. Williams, Lt. Porter, and other DPD witnesses testified at their depositions, DPD policy and practice is that use-of-force reporting is *not* required for uses of force at protests or demonstrations, including the GFP (unless an arrest is made and force was used during an arrest).  (Williams Deposition, pp. 15, 18-20; Porter Deposition, pp. 43-44.)  DPD policy for protests is that officers who use force are supposed to inform their supervisors, who in turn, provide that information to the Command Post so that a single "after action" report can be completed regarding all uses of force during the protests.  (Williams Deposition, pp. 15, 19; Porter Deposition, p. 44-45.)

126.    However, the After Action reports for the GFP are woefully inadequate and vague.  They do not include all of the uses of force by officers during the GFP, and they explicitly state that they are not even attempting to do so.  For instance, the After Action reports written by Captain Sylvia Sich state: "This After Action Report addresses the use of chemical agents during this event … This is an attempt to capture when and where chemical agents may have been used and is not at all inclusive. … In order to get a broader picture of the use of chemical agents; officer statements, After Action Report and *Use of Force Reports* must be reviewed." (DPD  After Action Reports, DEN 1938, 1941, 1943, 1945.) (Emphasis added.)

127.    The adverse effect of the DPD's policy and practice of not requiring timely and detailed use of force reports for protests on officer accountability cannot be understated.  During

the protests, officers believed that they would not be required to document their use of force on protesters, whether that use of force was use of PepperBalls, tear gas, 40 mm launchers, or any other kind of less-lethal weapon. (*See* for example, Williams Deposition, p. 15.) This fact, combined with the fact that officers were not required to follow the written BWC policy in recording their uses of force on protesters, meant that officers could escape accountability for uses of force during the GFP.

128. On June 4, 2020, the first lawsuit was filed against the City and County of Denver seeking injunctive relief against the DPD's use of force on protesters. On June 5, 2020, the federal court issued a temporary restraining order in that case (*Abay, et al. v. City of Denver*). (*See* Temporary Restraining Order issued in *Abay*.) The next day, June 6, 2020, Lt. Robert Wyckoff wrote in an email "Chief Archer and Chief Thomas have tasked Paul Berdahl and I with gathering loads of data for an overall AAR/UOF report." (DEN 11383.) Lt. Wyckoff's email details the information that Deputy Chief Archer and Division Chief Thomas wanted in the officer statements/use of force reports for the GFP. On June 9, 2020, Lt. Berdahl, an aide to Division Chief of Patrol Ron Thomas, wrote an email to all District Commanders and Administrative Lieutenants forwarding the email from Lt. Wyckoff. The email requests all District Commanders and Administrative Lieutenants to have their officers, sergeants, and lieutenants complete Use of Force Reports for each date from May 28 to May 31, and it requires them to "cover each and every Less Lethal deployment that occurred" during an officer's shift. (DEN 11383.)

129. Significantly, Lt. Berdahl's email states: "It will be critical for all completing statements to review our Use of Force policy and training materials for Less Lethal deployments. I want to ensure that the officers are using correct terms to avoid inconsistency and problematic language." (DEN 11383.) This email is forwarded amongst other supervisors, culminating in an email from District 6 Commander Aaron Sanchez, who says that this documentation "is of utmost importance to protect you and your troops." (DEN 11380.)

130. As OIM put it:

> In response to a lawsuit that was filed on June 4, DPD personnel attempted to review when and where DPD officers had deployed chemical munitions against protesters. This proved problematic because Use of Force Reports had not been routinely prepared. Starting on June 6, command staff asked officers to go back and document their uses of force from the beginning of the GFP. Many officers attempted to comply by providing a description of the force they used in an Officer Statement … rather than completing the standard Use of Force Report. Many of these … Statements were prepared 12 or more days after the use of force incidents they documented. (OIM Report, p. 24.)

The OIM observed that the Officer Statements were problematic because they contained only vague and short descriptions of the circumstances of use of force; some officers repeated their narrative for each day; and some officers could not adequately document what they did because they were completing the statements too long after the incidents at issue. Thus, "[t]hese issues

seriously limited the utility of these statements in evaluating individual uses of force to determine whether or not they were compliant with DPD policy." (OIM Report, p. 24.) I agree. The Officer Statements are, by and large, vague and provide little detail about where officers were on specific days, what kind of force they used, and on whom. In that sense they were essentially worthless—busy work that more likely than not engendered cynicism among the officers about a critically important police function.

131.    In addition, the emails of Berdahl and other command-level staff discussed above are very troubling. What they show is that, after the *Abay* lawsuit was filed, the DPD—at the highest levels—failed to show interest in whether officers actually violated policy, or behaved accountably. What the DPD wanted was for their officers to review DPD policy and training materials before writing their reports so that they could "us[e] correct terms to avoid inconsistency" with policy "and problematic language." (DEN 11383.) DPD officers, including Commander Phelan, agreed that this was the message from command-level staff. (Phelan Deposition, pp. 103-04.)

132.    In other words, DPD brass, at least as translated by Lt. Berdahl in his June 9 email, was putting words into the mouths of the officers and telling them what to write. Commander Sanchez's email—that writing officer statements so that they are consistent with DPD policy "is of utmost importance to protect you and your troops" meant to protect the officers against lawsuits or accusations. (Phelan Deposition, p. 106.) In my opinion, given my experience in police management and as a former chief of police, these emails show that DPD was interested in protecting itself and its officers, not in finding out the truth. DPD was "circling the wagons."

133.    The effect of these command-level instructions to officers is evident in the Officer Statements themselves, a few examples of which follow:

- "Myself and my team have been properly trained on the deployment and use of less lethal systems. At no point during the 8 days of protest assignment did I observe any team member deploy less lethal out of policy or during any peaceful protest. … my team showed great professionalism and restraint …." (DEN 2797, 2799, Sgt. Beall Statement.)

- "Throughout this Protest event, I did not witness any officer act in an inappropriate way, and observed my fellow team member act with great professionalism and restraint when confronted with verbal and physical abuse by violent protestors." (DEN 2940, Ofc. McDermott Statement.) (Notably, this is the same Officer McDermott whose BWC captures an officer yelling "Motherfucker! That's what you get. Fuck you!" at a protester who was shot in the face with a 40 mm launcher. DEN 4136 at 7:23 p.m. MT)

- "During this event I authorized the use of Pepper Ball, 40 mm launchers and chemical munitions. Each authorization I made was done in accordance with Department policy. Furthermore, all force that I observed officers use was reasonable and appropriate and consistent with Department policy." (DEN 3018, Lt. Williams Statement.)

- "I at no time observed any Impact officer utilize less lethal implements in an improper manner or against policy." (DEN 2781, Sgt. Abeyta Statement.)

- "We were briefed by Lieutenant Williams that less lethal munitions and other force situations is authorized as long as used within policy. I did not observe any of my 180 team utilize any unauthorized force with less lethal munitions or otherwise. … During all of these incidents that I am able to recall, I did not observe any unauthorized use of force by any Denver police officer." (DEN 2782, Sgt. Abeyta Statement.)

- "All deployment of Pepper Ball was reasonable, appropriate and consistent with Department policy. I did not personally observe any force used by officers or directed by myself that was inappropriate in response to crowd member actions." (DEN 2840, Lt. Cervera Statement.)

- "As Sergeant of the RDV, specific instructions were given to officer that they had authority to protect themselves and if they observed an assailant throwing rocks, bottles or other objects towards the RDV … they were authorized toe deploy LL; consistent with the Operations Manual that authorizes the use of these LL devices with Active Aggression." (DEN 3354, Sgt. Hyatt Statement.)

- "Each team member was instructed to use less lethal PepperBall and/or chemical weapons only if we were to come under attack and only at the order of a sergeant or above." (DEN 3374, Lucero Statement.)

- "Consistent with the Denver Police Department use of Force manual and Denver Police Department Crowd Management Manual,

    o  To support the skirmish line

    o  Against subjects within a crowd who are actively throwing objects at police Officers, I began to deploy and target subjects with pepper ball who were throwing objects." (DEN 2913, Ofc. Leon Statement.)

- Some officers included very detailed information verbatim from the DPD Crowd Management Manual. (*See* DEN 3438-39, Sgt. Simmons Statement.)

134.    Clearly, the District Commanders and Administrative Lieutenants to whom Lt. Berdahl directed his email communicated this information down through the ranks. The result was Officer Statements generated weeks after the GFP that were essentially a cover-up, not a serious attempt to document uses of force on civilians and hold officers and their superiors accountable for improper or excessive uses of force.

## B.    DPD policy gap in BWC activation during crowd control situations, failure to train, and effect on officer accountability

135.    According to the OIM, "Best practices emphasize the important role of BWCs during police crowd control and recommend that all uniformed officers use BWCs during such operations."  (OIM Report, p. 20 (citing Police Foundation, *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, pp. 30, 39 (Apr. 2018).) However, "[g]aps in the DPD's policies and practices … resulted in a substantial number of DPD officers recording no BWC footage during their assignments at the GFP." (OIM Report, p. 20.) Moreover, "[u]tilization of BWCs improves transparency and accountability by providing video evidence that allows police agencies to exonerate officers who are falsely accused or to identify officers engaging in misconduct and take corrective action when force is used inappropriately." (OIM Report, p. 21 (citing PERF, *Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned*, US Department of Justice Office of Community Oriented Policing Services, pp. 5-7 (2014); Mitchell Deposition, p. 70.)  I completely agree. In addition, officers know that the purpose of BWC is to provide objective evidence of officer- citizen interactions.  It is as much for the officer's protection as for the citizen's protection.

136.    DPD has had BWC since 2015.  The Operations Manual states that the BWC is "an 'on-the-body' audio and video recording system assigned to an officer as an additional means of documenting specific incidents in the field." (DPD Operations Manual, § 119.04.) The Operations Manual contains a policy regarding when BWCs must be activated and how officers are required to use them. (DPD Operations Manual, § 119.04.) In relevant part, BWC is required to be activated "prior to any officer initiated contacts involving actual or potential violations of the law including: … Pedestrian, citizen, and/or vehicle contacts … Any encounter that becomes adversarial… All arrests and/or citations…" and "Any situation that the officer believes the use of the BWC would be appropriate or would provide valuable documentation if not already activated per policy." (DPD Operations Manual, § 119.04(3)(a)(1)(b), (g), (k), (m).)

137.    There is no written policy that specifically governs the use of BWC during protests. BWC activation should have been required under any of the subsections referenced above.  Indeed, DPD officers generally agreed that their BWC should have been activated during use of force events on protesters during the GFP.

138.    According to OIM, there was a footage gap in BWC for the GFP. (OIM Report, p. 22.)  My review of the video evidence and deposition testimony also reveals a troubling gap.  For instance, Officer Bolton could not explain why there were gaps in his BWC video.  On May 30, 2020, he turned off his BWC when he and his fellow officers were about to use force on protesters in order to push them south of Colfax at approximately 5:45-5:46 p.m. (Bolton Deposition, pp. 80-87; DEN 4996; DEN 4995.)  There was a gap in his footage from 5:36 p.m. and 5:47 p.m., and when the footage begins in the second video (DEN 4995; Bolton Deposition, p. 89), it is apparent that officers have already pushed the protesters south of Colfax, away from the bus station, using tear gas and other less-lethal weapons.  (DEN 4995.)

139.    Similarly, there is a very troubling gap in BWC footage for the Basilica kettling incident which occurred on May 31, 2020 at approximately 9:36-9:42 p.m.  Sgt. Beall and his team members were present for this incident. They were with Lt. Williams, pushing protesters east on Colfax from the west.  (Beall Deposition, p. 97.)  However, there is no footage from Beall or any member of his team during the kettling incident.  Instead, Beall's BWC footage for May 31 begins at 9:50 p.m. MT, minutes *after* the extensive police use of force on protesters depicted in the HALO

69

camera footage.  (DEN 3873; DEN 3874.)  Beall was present for this incident.  But he could not explain why he did not turn on his camera until after the use of force on protesters.  (Beall Deposition, pp. 95-101.)  Although a few other members of this team recorded BWC, all of it begins *after* the kettling incident.  (DEN 5104, Connors BWC; DEN 5109, Hoffecker BWC.)  It only takes a second or less to press the button to turn on a BWC.  Kettling is, at a minimum, a controversial tactic.  For the uninitiated, particularly, it is a form of police force that can be extremely disconcerting, terrifying, and dangerous.  As with all provisions of DPD's crowd control policy, compliance with its own BWC policy in this instance should have been  autonomic and consistent.

140.    OIM believed that there "may be several reasons" for the footage gaps, including "there was no specific guidance about BWC usage during crowd control situations in DPD policy and no discussion of BWC activation in the Crowd Management Manual.  This may have created confusion for officers about whether to activate their BWCs during the chaos of the protests and, if so, when."  (OIM Report, p. 23.)  I agree, to a point. But I do believe if DPD had developed a clear, supervised policy direction on BWCs—a default position, as it were—any confusion would more likely than not have been resolved in favor of compliance.

141.    It is my opinion that the DPD's failure to provide specific guidance about BWC usage during crowd control situations in DPD policy and failure to discuss BWC activation in  the Crowd Management Manual was contrary to generally accepted police practices and standards.  Even  command-level officers demonstrated confusion. For example, the two Metro/SWAT lieutenants had different understandings of when BWC activation was required for their teams.  Lt. Canino testified that he understood that his officers should have worn their BWCs and had them turned on.  (Canino Deposition, p. 58.)  Lt. Pine, however, testified that he believed the protests were a "tactical operation," and that his officers did not need to wear and activate their BWCs.  (Pine Deposition, pp. 44-45.)  Lt. Williams also testified that BWC activation was not required in crowd control situations.  (Williams Deposition, pp. 90-91.)

142.    It is indefensible that, five years after body-worn cameras were introduced, there is still confusion about when their activation is required and that there is no policy, guidance or training on the activation of BWC during crowd control situations or protests. BWCs should be activated when an officer is involved in any kind of action with a civilian—especially a use of force.

143.    Chief Pazen's claim that the footage gap was due to officers being unable to attach the BWC to their uniforms is not supported by the evidence.  (*See* Bolton Deposition, pp. 16, 53, 81-98, 101; Beall Deposition, pp. 46-49, 51-53, 74-77, 88-10, 114-120.)  And even if that were true, the DPD could and should have resolved any such issues years ago—they have had years to work with the technology and resolve any issues concerning attachment to uniforms, regardless of which uniform is worn on a given occasion.

144.    Given that there is no policy governing BWC activation during protest events, it is no surprise that DPD provides no training to its officers on protest-related BWC use and activation.  These failures had an adverse impact on officer accountability.  Without BWC, officers could not recall what they did at specific times and locations.  (*See, e.g.*, Beall Deposition, pp. 105, 114, 117-18; Williams Deposition, p. 88.)

145.    Sergeant Eric Knutson testified on behalf of Denver regarding training on crowd control, crowd management, field force tactics, management of protests, documentation of uses of force, and the proper utilization of BWCs.  (Knutson Deposition, p. 11.)  He testified:

a.    The only training Denver provides to its officers on the proper use of BWC is the information in the Operations Manual and information on how to operate the camera.  (Knutson Deposition, pp. 22-28, 69-70.)  Sgt. Knutson testified that there is a PowerPoint presentation on this topic, but this was not in any of the materials produced by Denver.

b.    There is no specific training provided to officers on when they are required to turn on their BWC at protests.  (Knutson Deposition, p. 70.)

c.    Denver's policy and training is that Metro/SWAT officers are not required to turn on their BWC when they are utilizing specific tactics and devices, such as flashbangs or Stinger grenades.  (Knutson Deposition, pp. 71, 77.)  Furthermore, Corporal Eberharter testified that because every Metro/SWAT deployment is necessarily "tactical" in nature, Metro/SWAT is never required to use or turn on their BWC, even when they use any kind of less-lethal weapon or make an arrest. (Eberharter Deposition, pp. 56-62, 76-79.)

d.    Denver does not provide any training to its officers or supervisors that a warning or dispersal order must be given to a crowd before CS gas is used, even though CS munitions are indiscriminate in their effects.  (Knutson Deposition, pp. 48-51.)

e.    Denver does not provide any training to its officers or supervisors on the contents of the DPD Crowd Management Manual.  (Knutson Deposition, pp. 51, 53.) Denver simply provides a copy of the manual to its officers.  The Crowd Management Manual is not discussed during the training of either recruits or department leaders. (Knutson Deposition, p. 52.)

f.    The DPD Operations Manual has a general section on use of force reporting but says nothing specific about how to report use of force in a protest, crowd control or crowd management situation.  (Knutson Deposition, p. 62.)

g.    Denver trains its officers that, in a protest situation, they have to remember each less-lethal round they fire and report it up the chain of command so that it may be documented on a blanket report per squad or in a single after-action report. Officers are not trained that when they use their 40mm launcher or PepperBall gun they are required to write their own use of force statement.  (Knutson Deposition, p. 65-67.)

146.    From Sgt. Knutson's testimony on behalf of Denver, I conclude:

a.    Denver failed to train its officers in the proper use of BWC and had inadequate policies on the proper use of BWC. This failure to train described by Sgt. Knutson was corroborated by Metro/SWAT Corporal Eberharter, who testified that DPD policy did not require him to activate his BWC at all, during any deployment, because every Metro/SWAT

deployment is necessarily "tactical" in nature. (The written policy on BWC in the Operations Manual states that Metro/SWAT officers must activate BWC only when performing patrol functions and not tactical functions.)

b.      Denver's policy that Metro/SWAT officers' use of specialized weapons, including NFDDs and Stinger grenades, was tactical in nature and did not require BWC use, is contrary to generally accepted police practices. This policy clearly contributed to the inappropriate and unreasonable use of force by Metro/SWAT officers during the GFP, including on protesters. And, it had an adverse effect on officer accountability.

c.      DPD policy that did not require timely submission of force reports had an adverse effect on officer accountability. Sgt. Knutson's testimony on behalf of Denver merely strengthens this opinion.

d.      Not only did DPD exhibit a widespread practice and custom of failing to give dispersal or audible dispersal orders prior to the use of force, this was apparently how DPD officers were trained as well, as confirmed by Sgt. Knutson. This failure to train contributed to the uses of force and alleged constitutional violations experienced by Plaintiffs.

* * *

147.    It is my opinion that the City's policy and training failures demonstrate willful ignorance. If the City had an interest in actually holding officers accountable for their uses of force during the protests, they would have kept officer rosters, required timely use of force reports, required BWC activation during the protests, and trained on these policies and procedures. None of these issues is new. As several personnel testified, the City of Denver has been host to numerous protests over the years, especially in District 6.

## C.      Failure to discipline

148.    Of the hundreds of DPD officers who policed the GFP and the numerous citizen complaints about officer use of force, only three officers have been disciplined for their actions during the GFP (Officers Streeter, Archuleta, and McClay). (Streeter and Archuleta IA files, DEN 12010-12073; Pazen Deposition, pp. 13-14.)

149.    Many citizens filed complaints about officers' conduct during the GFP. Most were complaints about uses of force. I reviewed the "decline" letters, and they indicate that the City did not appear to take the complaints seriously. The tone of the letters (*see* letter to Johnathen Duran, discussed above) was largely to cast doubt on the veracity of the allegations made by the complainant. The City also suffered from a problem of its own making, namely, as cited previously, the difficulty in identifying officers alleged to have committed misconduct.

150.    In addition, a review of citizen complaint data from prior protests reveals that no DPD officer has been disciplined for any allegations of use of excessive force at those protests.[3] This, combined with the widespread inappropriate uses of force at the GFP—including those authorized by command staff—show that the City has a custom and practice of failing to discipline officers who use excessive force against protesters. This contributed to the violation of the constitutional rights of the Plaintiffs.  Based on the DPD's practices, DPD officers had little or no reason to believe that they would be disciplined for excessive force against, or for violation of the First Amendment rights of, protesters at the GFP.

151.    Moreover, it has taken an exceptionally long time for the DPD to investigate complaints of alleged police misconduct during the GFP.  Long delays in internal investigations affect the quality of those investigations and undermine organizational credibility; witnesses disappear, or their memories fade; complainants and officers alike are kept in limbo; officers guilty of misconduct, or worse, are (too often) kept on the job, their conduct ultimately excused; the "code of silence" is strengthened; public and internal cynicism flourishes. At his deposition, Chief Pazen testified that there are currently 20-30 open investigations of citizen complaints stemming from the GFP.  (Pazen Deposition, pp. 13-14.)  I believe, based on my experience, it is more likely than not that this extraordinary delay is attributable to: inadequate staffing and/or supervision of Internal Affairs and/or inadequate management controls and/or a low priority assigned by the City and DPD to the essential function of accurate, thorough, and timely internal investigations of citizen complaints.  In my professional experience, these internal investigations should have been completed long ago.  In both San Diego and Seattle, from receipt of a complaint, Internal Affairs investigators have 180 days to complete the investigation. If that benchmark cannot be met (exceptions are granted, but only if justified for cause), it would point to one or more of these systemic failures.  In any case, DPD's handling of these complaints is contrary to generally accepted police practices and standards.

152.    Commander Hans Levens testified on behalf of Denver on Denver's discipline of its officers, IA investigations arising from the GFP, and whether certain incidents of use of force alleged by Plaintiffs or other protesters were consistent with DPD policy, procedures, or customs. In addition, I reviewed documents from IA investigation files that were opened and closed relating to the GFP.  This information reveals:

   a. IA investigations can be initiated in several ways. (Levens Deposition, pp. 16-21.) There is no apparent consistency in the manner in which certain citizen complaints are referred for investigation.  For example, some state law notices of tort claims are referred by the City Attorney's Office to DPD's Internal Affairs Bureau (IAB) for investigation, but others are not.  (Levens Deposition, pp. 18-21, 25.)  IAB Commander Dodge decides what to investigate, and nothing circumscribes her discretion in this area.  (Levens Deposition, p. 30.)

---

[3] Excerpts from past complaint protest files, P2015-0288, P2015-0318, P2015-0339, P2015-0408, P2015-0361 (DEN 12174-79, 12447-51, 12681-86, 12699-706, 12771-73, 12811-14, 12831, 12854, 12867-72, 12855-59.)

b. There is no policy that describes how IAB investigators go about investigating citizen complaints. (Levens Deposition, p. 31.)

c. There were 123 complaints filed by citizens or initiated internally that alleged officer misconduct at the GFP. (Levens Deposition, p. 34.)

d. As of November 4, 2021 (the day before Levens's deposition), there were 12 cases still open. (Levens Deposition, pp. 34-35.)

e. Levens could not say how long those have been pending but his best estimate was that, on average, complaints from the GFP took 7 months to complete. (Levens Deposition, pp. 35-36.)

f. Of all the complaints from the GFP, two officers (Streeter and Archuleta) were disciplined for inappropriate use of force, one sergeant (O'Neill) was disciplined for failure to activate his BWC, and one probationary officer (McClay) was fired. (Levens Deposition, pp. 39- 47.)

g. Although a single officer (Sgt. Ed O'Neill) was, according to Levens, disciplined for failure to activate his BWC, there were other instances of inexplicable or apparent failure to activate BWCs during the GFP that were not investigated.

h. For instance, one complainant, Huitziloxochitl Jaramillo (IAB case number P2020-0174), alleged that during the course of her arrest for violating the emergency curfew, the arresting officer tackled her to the ground, fracturing her wrist. She was also called "a piece of sh*t" several times. (DEN031610.) The IAB identified the arresting officer as Officer Adam Bolton. When asked during his interview whether he activated his BWC for the incident, Bolton stated, "I thought I did activate my BWC but could not find the BWC video after the notice of complaint." (DEN031642.) When asked if he used force on the complainant, he said, "I don't recall…." (DEN031642.) When Officer Bolton's sergeant, Sgt. Vince Lombardi, was interviewed, he stated, "I did not witness the arrest" but "Officer Bolton was extremely professional." (DEN031647.) IAB credited Bolton and Lombardi's statements, even though it is incredible for Sgt. Lombardi to say both that he did not witness the arrest *and* that Officer Bolton was "extremely professional" during that arrest. Even Commander Levens agreed that he "has questions" about how Sgt. Lombardi could say both. (Levens Deposition, pp. 50-51.) The letter written by Lt. Addison on behalf of the IAB declining Ms. Jaramillo's complaint for further review credited the statements of Officer Bolton and Sgt. Lombardi. (DEN031598.) It concluded, "there is no evidence found to support your allegations against the officer. Further, there is no reason to suspect that the officer violated any department policy or acted in such a manner that would be considered inconsistent with their training." (DEN031598.) Officer Bolton was not disciplined either for the alleged use of force or his failure to activate his BWC. (Levens Deposition, p. 52.)

74

i.  Levens agreed that, if Officer Bolton's BWC had been activated during the arrest, then there would be some evidence either corroborating or disproving or discrediting Ms. Jaramillo's allegations.  (Levens Deposition, p. 54.)

j.  Officer Bolton did not complete a use of force report for his arrest of Ms. Jaramillo. This was within Denver policy because that policy requires the completion of a use of force report only if an officer uses force. And because Bolton said he did not use force, he did not have to complete a report, pursuant to policy. (Levens Deposition, pp. 57-58.)  Levens testified that if an officer *believed* he had not used force to effectuate an arrest, then Denver policy did not require him to complete a use of force statement.  (Levens Deposition, p. 58.) Bolton did not violate the use of force reporting policy, the BWC policy, or any other policy of Denver.  (Levens Deposition, pp. 58-59.)

k.  Numerous "decline" letters were written to citizens who complained about officers' use of force and misconduct arising from the GFP.  (*See* IA files.)  Levens agreed that many of these letters were issued on the basis that no officer could be identified. Because no officer could be identified, no specific disciplinary action against any particular officer could be pursued.  (Levens Deposition, p. 54.)  Levens also agreed that two of the major methods for identifying officers is through a use of force report (or any other statement that documents exactly what they did) or, if they had their BWC activated, video evidence of what they did.  (Levens Deposition, pp. 54-55.)

l.  Levens testified that, pursuant to Denver policy, individual officers working the protests were not required to complete individual use of force reports for their use of force, including the deployment of any chemical munitions or less-lethal weapons.  (Levens Deposition, p. 60.)

m.  Denver had no policies regarding use of NFDDs or Stinger grenades or reporting or documenting the use of NFDDs or Stinger grenades.  (Levens Deposition, pp. 61-62.)  Nor is there a policy, other than that contained in the department's general use of force policy, on how to document the use of 40 mm during the protests. (Levens Deposition, pp. 63-64.)

n.  No one has been disciplined for the failure to appropriately document their use of force during the protests.  (Levens Deposition, pp. 63-64.)

o.  Denver reviewed the incident of Officer Bishop pepper spraying an individual in the face at the intersection of Lincoln and Colfax on May 30, 2020 and concluded that Bishop's actions were within policy and training. Bishop was "exonerated." (Levens Deposition, pp. 67.) My opinion of this incident is that the use of pepper spray was inconsistent with generally accepted police practices.  (*see* 7/29/21 Report, Paragraph 95.)  Further, DPD made no attempt to deescalate the situation.

p.  Many of the letters issued by the IAB in the IA files concluded that the actions of DPD officers during the GFP were consistent with the department's training and

use of force policy. (*See* IA files.) The IAB reached these conclusions by viewing HALO and/or BWC video. There were no interviews conducted for many of the IA files. Nor, apparently, did investigators visit the various locations for witness canvassing and or potential evidence gathering.

q. For instance, IAB case number SVC2020-0030 contains a collection of numerous citizen complaints. Most of them appear to concern DPD's use of force on protestors on May 30, 2020 at Lincoln and Colfax, between approximately 5:00-8:00 p.m. (*See* complaints in IA file SVC2020-0030.) The letters written by IAB to the complainants contain materially similar language, and all or nearly all of them conclude that, based upon IAB's review of HALO and BWC footage, "…these evidentiary facts, the deployment of crowd control munitions, including chemical munitions, were consistent with the Denver Police Department's training and use of force policy." (DEN031834-38, DEN031840-41, DEN031843-45, DEN031847, DEN031849, DEN031851-54, DEN031857-58, DEN031860-61, DEN031863, DEN031865, DEN031867, DEN031870-71, DEN031873-76, DEN031878-79.)

r. Notably, when reviewing video concerning the Basilica kettling incident which occurred on May 31, 2020, Commander Levens did not see anything that caused him concern (relating to officer conduct) except for one video where an officer shot with PepperBall a bicyclist as he was fleeing. (Levens Deposition, pp. 95-99.)

153. From the IA investigation files and Commander Levens's testimony, I conclude the following:

a. In my professional opinion, the fact that Denver has disciplined only two officers for use of force, one officer for failure to activate BWC, and no officers for failure to report or document their use of force is, frankly, extremely disturbing. The videos and testimony I reviewed show that DPD and its mutual-aid officers regularly used inappropriate and unreasonable force during the GFP.

b. Denver's failure to discipline officers amounts to an approval of the officers' conduct.

c. Denver, per its witness Commander Levens, did not see anything wrong with what occurred during the Basilica kettling incident other than a specific interaction between one police officer and a bicyclist. The officers' actions during that incident were entirely inconsistent with generally accepted police practices. The fact that no officer (or supervisor) was disciplined for that incident alone indicates that Denver approved of its officers' conduct.

d. Denver's failure to have any policy on the use of force reporting for Stinger grenades or NFDDs or other explosive devices is inconsistent with generally accepted police practices.

e.  The fact that Denver did not require its officers to complete timely use of force reports and did not discipline any officer for failure to complete timely use of force reports allowed officers to escape accountability.

f.  The fact that Denver did not require its Metro/SWAT officers to wear or activate their BWCs during the protests and did not discipline any of them for failure to do so allowed officers to escape accountability.

g.  The length of time that DPD took to investigate citizen complaints arising from the GFP (on average, seven months) was far too long. DPD's handling of these complaints is contrary to generally accepted police practices and standards.

**D.  DPD was responsible for excessive use of force by mutual aid agencies; failure to train**

154.  DPD requested the assistance of numerous outside law enforcement agencies during the GFP, understandable given the size and scope of the national protest. Inexplicable, however, was DPD's policy to allow outside agencies to follow their own use of force policies during the protests.  (Phelan Deposition, pp. 94-95; Pazen Deposition, pp. 32-33, 38.) However, according to Chief Pazen, there was a DPD supervisor embedded with every unit from an outside agency, and there were "rules of engagement" provided by DPD to the outside agencies. (Pazen Deposition, pp. 29-30, 34.)  These two positions appear to be contradictory, and throughout the record, there is evidence of the confusion caused by the contradiction.

As police chief during the World Trade Organization protests in Seattle, my staff and I reached out to all our "mutual aid" partners. Our message was clear: when you are on our streets, you are under the command of the Seattle Police Department (SPD).  We received signed agreements from each agency and the pact worked flawlessly through an otherwise fraught week during the "Battle in Seattle."  Notably, the agreement was tested twice, with acts of misconduct committed by officers from outside agencies.  In the first, an officer shot a beanbag round into a retreating, nonviolent protester then kicked him in the groin.  In the second, a deputy ordered two young women to roll down the window of the car in which they were seated as they filmed some of the action. When the driver complied, the deputy filled the vehicle with pepper spray.  Both officers were immediately removed from the streets and sent home.  One lost his SWAT job and was suspended from his department, the other was fired.  In sum, simply because mutual aid personnel work for other agencies does not mean they get a "free pass."  As the requesting agency, DPD was ultimately responsible for the actions of officers from other agencies who were in the City of Denver to help police its streets.  The Incident Command System must memorialize this reality, and all member agencies must be thoroughly familiar with operational provisions of the agreement.

155.  Video and reports of members of the outside agencies confirm that they were aware of their status in the city.  A few examples include:

- COABLM 231 at 19:19:49: APD Sgt. Brukbacher takes direction from Lt. Williams

- COABLM 330 at 19:07:39: DPD Metro/SWAT Corporal hands APD Ofc. Spano a tear gas canister and tells him to throw it

- COABLM 317 at 18:01:20: APD Sgt. McClelland and Sgt. Brukbacher discuss what the objective or plan is, and Brukbacher says, "It's Denver's call."

- JSCO 14: A Jefferson County SWAT officer wrote in his report, "A Denver Police Lieutenant requested handheld gas to be deployed to disperse the crowd."

- JSCO 16: A DPD liaison directed Jefferson County SWAT where to go

- JCSO After Action Review at p. 4: Capt. Williams verified that Jefferson County use of force policies were "in line" with DPD's use of force policy

- Fitouri 12550-52: Adams County after action memo from Commander Robert Nanney stated that they were assigned DPD liaisons "to give us direction on deployment and maintaining the integrity of the DPD Use of Force directives.  It was clarified that they would be directing the response of our team on site for any incident we responded to."  (Fitouri 12550.)

156.    It is my opinion, based on my experience, especially as a former chief of police, that a law enforcement agency cannot request aid from outside agencies, invite them into one's jurisdiction to police one's citizens, and then not be held responsible for the outside agencies' uses of force on one's own citizens.  DPD was responsible, not merely because it requested the assistance of outside agencies, but also because it (1) made the decision to allow outside agencies to use their own use of force policies, which was, in itself, a policy decision; (2) embedded a DPD supervisor with every unit; and (3) provided rules of engagement for the outside agencies  to follow.

157.    DPD also failed to conduct joint training exercises with their mutual aid partners.  I saw no evidence of any such training exercises in the months and several years leading up to the GFP. Such training is essential, and recommended by ICS experts (IACP, *Crowd Management: Concepts & Issues Paper*, Fitouri 18375: "Training considerations should include the following … Joint training exercises with other agencies that will likely work together during major events…."). In Seattle, we conducted joint training, including simulations and table-top exercises, with our mutual aid partners, and this training was invaluable.  Of course, we had 11 months to plan for WTO. Still, given intense and growing "anti-police" sentiment throughout the country, and periodic large-scale protests (post-Ferguson, especially), the failure of DPD to conduct joint training exercises with mutual aid partners was contrary to generally accepted policies and practices.

158.    According to the OIM, officers they interviewed "often brought up their desire to receive additional crowd control and field force operations training. … training records produced by the DPD's Training Academy … revealed that there has been a decline in the volume and frequency of crowd control and field force training in recent years."  (OIM Report, p. 51.)  The training provided to DPD officers was inadequate, including for the reasons discussed above.

**E.      Leadership approval of officers' use of force**

159.     In my experience, law enforcement officers are keenly interested in what their leaders tell them—whether they agree or disagree with what they hear.  During the GFP the most prominent, conspicuous leaders of the DPD were the police chief and the mayor.  They set the tone.

160.     On May 29, 2020, the second day of the protests, Mayor Hancock and Chief Pazen gave a press conference in the early afternoon.  They were asked questions about the DPD's use of force on protesters the day before. Chief Pazen commended members of the DPD, saying they demonstrated "extreme restraint" and performed in an "exemplary manner."  (9News video, 5-30-2020 12 at 12:20 min.)  When a reporter asked whether officers followed the use of force policy regarding use of tear gas and PepperBalls, Pazen replied that they did, and that officers were under attack.  (9News video, 5-30-2020 12 at 19:10-21:11 min.)  When asked by a reporter if he was satisfied with how the officers handled the protests the day before and how he would suggest that they handle it today, the Mayor replied that he had watched the "video feed" of the protests, saw how the officers responded, and thought that they showed "tremendous restraint and discipline." (9News video, 5-30-2020 12 at 37:15-37:52 min.)

161.     In my experience, officers follow the lead of the Chief of Police. If the Chief says that officers are doing a great job, the officers will keep doing what they have been doing.  The effect of the Mayor and Chief's comments at the May 29, 2020 press conference would have been exactly that. Officers were praised for their performance on May 28—which, as discussed above, included indiscriminate and inappropriate use of chemical munitions on protesters.  They were expressly told by the Mayor to keep doing what they were doing. This caused in significant part the violation of the constitutional rights of the Plaintiffs, whose incident occurred on June 2, 2020.

162.     Division Chief Thomas testified on behalf of Denver on the City's knowledge and internal discussions regarding officers' conduct, including use of force, suppression of First Amendment rights of protestors, documentation of or failure to document uses of force, and use of or failure to use BWC.

> a.     According to Division Chief Thomas, the first recorded message going out to all the district commanders and administrative lieutenants telling them that officers were required to complete use of force statements was on June 9, 2020.  This was over a week after the protests began, even though problems with this came to Denver's attention within the first couple of days.  (Thomas Deposition, pp. 16-22.)

> b.     According to Division Chief Thomas, there was also discussion during operational briefings that officers needed to have their BWC engaged.  (Thomas Deposition, p. 24.)   However, Thomas does not recall specifically discussing Metro/SWAT officers.  (Thomas Deposition, p. 25.)

> c.     Denver received complaints that officers were allegedly suppressing First Amendment rights of protestors within the first couple days of the protests. (Thomas Deposition, pp. 30-31.)

    d.    However, Thomas agreed that the message communicated to the public and the officers by the Chief of Police and the Mayor at their press conference on the afternoon of May 29, 2020 was that the officers were acting with extreme restraint. Indeed, along with the Mayor and the Chief, Thomas believed that officers were in fact acting with extreme restraint. (Thomas Deposition, p. 34-35.)

    e.    Denver never communicated to its officers that they were using inappropriate or too much force, because it did not believe its officers were, in fact, engaging in such misconduct, despite the evidence, including complaints. (Thomas Deposition, pp. 32-33.)

    163.    Division Chief Thomas's testimony only reaffirms my opinion that DPD leadership and policymakers (such as the Mayor and the Chief) approved of officers' use of force.

**F.    Failure to prepare for GFP**

    164.    Several DPD officers testified at their depositions that they had never seen protests in Denver as disruptive or violent as the GFP. The implication is that the DPD was unprepared for protests of this scale, and nature. It is my opinion that this represents a failure of imagination and of preparation. Mr. Floyd's death was only one in a long line of recent, highly publicized deaths of Black people at the hands of (mostly) white police officers. The DPD should have been much better prepared for a protest like the GFP—a protest directed not at pro- or anti- immigration forces, Covid-19 policies, labor issues, or political campaigns but at police conduct itself. The less often protests of this nature and scale happen, the greater the consequences of failure to plan, and of omissions and miscalculations in the plan. It is inherent in the mission of emergency services, police work in this instance, to be adequately prepared for big, infrequent events. It is my opinion that the city and its police department should not have been surprised by the scope and nature of GFP, that it should have been prepared for what it faced. The failure to adequately prepare caused in significant part the violation of the constitutional rights of the Plaintiffs.

    165.    Having adequate policies and training in crowd control and crowd management is fundamental to the work of police departments. Even if protests as large as the GFP are not an everyday occurrence, they are not rare—in Denver, or any other major city. It is foreseeable that, without adequate policies and training in the use of less-lethal weapons and field force tactics, officers will more likely than not continue to violate the constitutional rights of citizens—even as they undermine their own mission to protect life and property.

**G.    Inappropriate delegation of weapon assignment to officer discretion; failure of supervision**

    166.    During the GFP, officers were allowed to choose which weapons (such as PepperBall or 40mm launcher) they wanted to use. Officer Bolton testified that officers were initially assigned a specific weapon, but that they could change out as they wished throughout the day. (Bolton Deposition, p. 40.) In my opinion, this was an inappropriate delegation of weapon assignment to officers. Supervisors should have been assigning the specific less-lethal weapons to officers, based on their determination of need and whether specific officers were more competent

with specific weapons. This DPD practice of allowing officers to choose their own weapons indicates that supervisors were not appropriately supervising their officers and making decisions based on needs of the protest, as determined by the Incident Commander and command-level supervisors.

**H.    OIM Interviews with DPD Personnel after the GFP Further Support My Opinions**

167.    During the *Epps* litigation, I also reviewed less redacted versions of memos written by the OIM of their interviews with DPD personnel. (DEN ICR 11695-11787.) The information contained in the additional materials further support my opinions.

168.    Of particular note are the observations of Captain Sylvia Sich, who stated that "policing fails in three areas: supervision, leadership, and training" and that "those are the areas that are always to blame for bad policing." (DEN ICR 011772.) I agree. She described the command staff in the Command Post as "'paralyzed'" in decisionmaking, and that "criticism of officers on the ground was 'non-stop.'" (DEN ICR 011773.) She wondered why police lines were not moving, why officers were not disciplined, and "she kept thinking, 'what are they supposed to do without training or supervision?'" She also stated that they "saw so many officers taking rocks and bottles and she knew that this was not what was trained in Field Force." (DEN ICR 011773.) She also observed that "a lot of officers and protestors may have been injured due to a lack of supervision and command." (DEN ICR 011773.) This supports the opinions I have previously expressed. Training is especially important when there are difficult, on-the-scene, judgment calls that officers must make in using force, and especially when they have to respect the rights of peaceful protesters and balance that with targeting only individuals who are actually jeopardizing the safety of officers or others.

169.    Lt. Coppedge, who is a DPD Training Academy lieutenant, described a change in emphasis in training from the prior chief of police to the current Chief (Pazen). According to Coppedge, "[u]nder the current Chief of Police, the prevailing attitude is that training is not important." (DEN ICR 011715.) He described how this de-emphasis on training contributed to the DPD's response to the protests, which as I have previously described, was inconsistent with generally accepted police practices, and caused the constitutional violations against Plaintiffs.

170.    Similarly, Sgt. Knutson described seeing "officers moving a crowd with pepperball only," and that "there was an absence of 'command and control,' and too much reliance on pepperball." (DEN ICR 011728.) This is what I saw in the videos (and testimony) as well, and it is contrary to generally accepted police practices. This is not a proper way to move a crowd. As Captain Sich pointed out, the proper, disciplined way to move protesters is supposed to be taught in Field Force training, which is supposed to train on "how to move forward in a disciplined line, using batons and command presence to successfully move protestors without using force." (DEN ICR 011772.)

171.    Officer Stadler's and Lt. Coppedge's observations also support my opinion that there was a failure of training, leadership, and supervision. Coppedge "saw the DPD's response to the GFP as a total 'leadership failure.'" (DEN ICR 011714.) Stadler observed that "especially on the first night of the protests, there was a lack of communication and strategy regarding less lethal deployment" and "people were not getting clear instructions and that teams were pushing

people out of the park and throwing gas just to deploy gas instead of making tactical decisions."
(DEN ICR 011770.)  These are consistent with my observations of the video and testimonial
evidence in this case.

172.    The additional material also supports my opinion that DPD failed to adequately
prepare for the protests.  For example, Sgt. O'Neill compared the George Floyd Protests to other
events:  "When asked whether he felt like there was more coordination by the DPD for previous
protests, Sergeant O'Neill said he agreed to a certain extent and described months of preparation
prior to Y2K that helped them handle the Broncos and Avalanche 'riots.'"  (DEN ICR 0011745.)
There is no legitimate excuse for DPD not to have expected widespread, mass protests after the
death of George Floyd on May 25.  Protests exploded in major cities around the country.  It would
have been reasonable for DPD to assume that mass protests would occur in Denver and to quickly
put together at least a rudimentary contingency plan, even if they had no backup plans that they
had already prepared in case of such an event.

173.    This additional material, containing observations of individuals within the DPD,
support my opinions that the policies, procedures, and customs of the City were inconsistent with
generally accepted police practices, and that they were the cause of the constitutional violations
alleged by Plaintiffs.

* * *

174.    It is my opinion that the duty and responsibility of police officers is to protect the
rights and safety of its citizens, including business owners, shoppers, residents, visitors, and
protesters.  Police officers should serve as a model of lawful and constitutional behavior; not the
opposite.  Unfortunately, the material I have reviewed in this case offers strong evidence that the
DPD did not live up to its obligations to protect the constitutional rights of its citizens, or even to
follow the most basic and generally accepted police policies, practices, standards, and training.  As
discussed in more detail above, the DPD's policies, practices, and training failures caused in
significant part the violation of the constitutional rights of the Plaintiffs and protesters at the GFP.

175.    My opinions also include my testimony from the trial in *Epps, et al. v. City and
County of Denver*, No. 20-cv-1878-RBJ, a copy of which is attached hereto as Exhibit C.

176.    My rate of compensation for review is rate of $450/hour.  I am aware that
discovery is ongoing in this case.  My opinions may be added to, or amended, upon review of
any additional information that becomes available.

Respectfully submitted,

Norman Stamper

Dated: March 3, 2023

# EXHIBIT A

**Norman H. Stamper, Ph.D.**
**Chief of Police (Ret.)**
**City of Seattle**
**March 28, 2021**

P.O. Box 1052
Eastsound, WA 98245

**PROFESSIONAL EXPERIENCE**

*2000 – Present:  Writer, Speaker, Script Consultant, Trainer, Expert Witness*

**1994 – 2000:  Chief of Police, City of Seattle.**  Responsible for executive leadership of the 1,800-member organization, and all policies and practices of the agency.

**Significant accomplishments**

- Led a process of major organizational restructuring, eliminating one rank and creating new bureaus of Professional Responsibility, Community Policing, and Family and Youth Protection;

- Created a comprehensive Domestic Violence program;

- Decentralized community policing;

- Developed 11 community advisory councils, a citizens' academy, and numerous other community outreach initiatives;

- Established new programs and measures of organizational accountability, including standards of performance and conduct for all employees of the department.

**1989 – 1994:  Executive Assistant Chief, San Diego Police Department.**  Second-in-command, responsible for all day-to-day operations of the 2,834-member agency in the nation's then sixth largest city.

**Significant accomplishments**

- Took lead in rapidly expanding Neighborhood Policing to all seven divisions within the department, empowering captains and helping to win enthusiastic grassroots support for the philosophy of community-government/problem-solving partnerships.  Led monthly Problem Analysis Advisory Committee meetings for 21 months, generating both traditional and creative solutions to drug, gangs, and other neighborhood problems;

- Formally mentored nine individuals, eight of whom were promoted, two of them twice (to the level of assistant chief);

- Led effort to reconstitute and strengthen the San Diego Metropolitan Homicide Task Force which investigated the deaths or disappearance of 44 sex industry workers;

- Recommended and led implementation of a new model of police administration that eliminated two ranks, created a flexible "matrix" management system, empowered supervisors and managers at lower levels, saved a significant amount of money, and introduced major changes in leadership practices at all levels of the organization;

- Spoke throughout the community and within city departments as a member of the City of San Diego Diversity Speakers Bureau (1992-1994);

- Chaired citywide effort to identify and analyze demographic trends and patterns in the region's labor force. Authored report for city manager.

**1988:  Deputy Chief of Police, Office of Special Operations (Investigations)**

**Significant Accomplishments**

- Redefined roles and responsibilities, in collaboration with those affected, of all centralized detective managers and supervisors;

- Established concrete expectations of, and enforced compliance with, fiscal accountability within the Office of Special Operations;

- Conducted team building workshops that significantly enhanced communication and trust among detective executives and managers.

**1986 – 1988:  Deputy Chief of Police, Office of Personnel Services**

**Significant Accomplishments**

- Created new performance evaluation system for department's executives and managers;

- Championed the cause of physical fitness and emotional wellness, and led development of a health management program for all ranks of San Diego police officers;

- Researched and successfully argued for creation of a nonsworn Human Resources Director position;
- Inspired and coordinated development of the department's mission, vision, and

core values;

- Served as member of the city manager's Management Academy development committee.

**1983 – 1986:  Deputy Chief of Police, Office of Field Operations**

**Significant Accomplishments**

- Established practice of personally walking stretches of the city in uniform to sense community perceptions and expectations and collect feedback on police performance and conduct;

- Rode regularly with patrol officers and supervisors, soliciting their views on policies, procedures, and practices;

- Worked collaboratively to redefine roles and responsibilities of executives, managers, and supervisors in Field Operations in order to reinforce concepts of community policing and to delegate greater authority and responsibility;

- Drafted, communicated, and successfully defended in EEO and Civil Service Commission hearings a set of non-negotiable standards of leadership performance and conduct for all supervisors and managers, and their subordinates;

- Initiated division field studies by captains which were then used to assess and address problems in patrol officer performance and conduct;

- Created and managed a complete overhaul of the department's internal discipline system, producing distinct paths for performance problems vs. willful misconduct;

- Directed 85-member Officer Safety Task Force which resulted in adoption of 98 recommendations for improving the personal safety of our officers;

- Successfully promoted development of an automated internal information system (IBM 8100) linking work stations throughout the department.

**1982 – 1983:  Director (Civilian), Office of Management Services**

**Significant Accomplishments**

- Inspired and facilitated development of crime fighting and other performance objectives for the department;

- Conducted and participated in several successful workshops designed to improve conditions for nonsworn (civilian) personnel;

- Pioneered the department's work on "Future Issues in Policing," bringing together experts from the fields of technology, demography, political science, sociology, business, the military, education, and community-based organizations to forecast trends and help the department prepare for the future.

## 1977 – 1982:  Civilian Ombudsman/Special Advisor to the Chief of Police

**Significant Accomplishments**

- Facilitated over sixty team building and other organization development (OD) interventions, helping personnel clarify roles, improve interpersonal communication, and resolve conflict throughout the department;

- Conducted over 480 one-on-one employee counseling sessions with personnel of all ranks;

- Advised the Chief of Police and his top staff on matters of policy; wrote numerous position papers and speeches for the Chief;

- Convened and facilitated the work of the "Management Resource Team," formed in the wake of sustained allegations of racism and discriminatory police practices in African American and Latino communities, resulting in major department reforms;

- Developed the original plan ("Area Management") that led to the decentralization of police services in San Diego;

- Worked with community groups and police officers to resolve community-police conflicts and tensions.

## 1979 – 1981:  Executive Director of Mayor Pete Wilson's Crime Control Commission

**Significant Accomplishments**

- Splitting time between the police department and city hall, supervised a staff of four administrative analysts and an assistant in support of the commission's quest for solutions to San Diego's burgeoning street-crime problems;

- Oversaw and personally wrote sections of the final report, "Crime and Justice in San Diego:  Report of the Mayor's Crime Control Commission," the most exhaustive examination of crime in the city's history.

## 1978 - 1979:  Vice Chair, City Council's Ad Hoc Task Force on Police Practices

**Significant Accomplishments**

- Splitting time between the police department and city hall, assisted the city manager, city council, and a citizen-activists' task force looking into allegations surrounding the controversial police shooting of a young, unarmed African American;

- Worked with a diverse, fragmented, and emotionally intense group, ultimately building a strong team that reached consensus on each of its 19 recommendations for improving community-police relations, and police accountability.

**1966 – 1977:  Police Officer-through-Captain**

**Significant Accomplishments**

- As patrol captain, walked streets of the city, listening and responding to citizen feedback on police performance and conduct (1976-77);

- Developed questions, conducted officer interviews, and wrote final report of the most comprehensive internal examination of police-race relations anywhere in the nation;

- Directed the establishment of across-the-board performance objectives for police academy recruits (1976);

- Developed the concept, wrote and presented to the Police Foundation in Washington, D.C. a grant proposal for the country's first program of community policing, and directed the pilot project (1972-74);

- Developed San Diego's landmark Field Interrogation Project, also sponsored by the Police Foundation (1972);

- Created the department's first Patrol Planning Unit (1971);

- Received numerous formal and informal commendations for work as a patrol officer and undercover detective (1966-69).

## EDUCATION

Ph.D. in Leadership and Human Behavior, United States International University (now Alliant International University).  Dissertation:  "Executive Leadership and Executive Management in Big-City Police Departments:  the Professed Values vs. the Observed Behavior of American Police Chiefs" (1989); Master of Science (1976) and Bachelor of Science (1974) in Criminal Justice Administration, San Diego State University. Senior thesis: "The Community as DMZ: Breaking Down the Police Paramilitary Bureaucracy"; Associate of Science in Police Science, Southwestern Community College (1968);

Graduate of the National Executive Institute (NEI), sponsored by the FBI (1999);

Numerous other courses, workshops, and seminars in business practices, criminal justice, organizational leadership, and management (1966-present).

## EXPERT WITNESS

- Pro bono consultation with Rachel Lederman, Attorney at Law, et al stemming from police actions in George Floyd protests in San Jose. 2022.

- Elizabeth Epps, et al vs City and County of Denver (excessive force, other cival rights violations against Geprge Floyd protesters). 2022. Jury trial in federal court, verdict for the plaintiffs. $14 million award.

- Jana L. Worthington v. Washington State Department of Corrections and King County Sheriff (negligence). 2021. Settled.

- Kristi Croskey v. City of Tacoma, WA (negligence). 2021. Settled.

- Gavin v. City of Boston, MA (gender discrimination). 2020. Jury trial, verdict for the plaintiff. $2 million award.

- Gentry Estate v. City of Forks, WA (civil rights, wrongful shooting death, negligence, negligent retention). 2020. Settled.

- Murray v. Spokane County (excessive force, wrongful shooting death). 2020. Active.

- Strickland v. City of Auburn (excessive force, wrongful shooting death). 2019. Active.

- Robinson v. City of Arlington (excessive force, shooting). 2019. Settled.

- Gatewood v. City of Renton (negligent death scene investigation), 2017. Case dismissed, June 1, 2018.

- Mancini v. City of Tacoma (high-risk warrant service, wrong-door case), 2013. Dismissed; successfully appealed to the Washington State Supreme Court. Verdict for the plaintiff, August 2017.

  Appealed to Court of Appeals which reversed the jury verdict.
  Appealed to Supreme Court which reversed the Court of Appeals, January 2021.

- Bennett v. City of Lynnwood (high-speed pursuit, wrongful death), 2015. Awaiting filing.

- Hillstrom v. Pierce County (excessive force, wrongful death), 2015. Settled.

- Alexanderson v. Officer Scott Langton and City of Blaine (excessive force), 2014. Settled.

- Hostetter v. City of Lakewood (high-speed pursuit collision), 2014. Settled.

- Chen vs. City of Medina, et al (wrongful termination), 2013. Verdict for the plaintiff; subsequently overturned.

- Randall v. City of Bonney Lake (false arrest, excessive force), 2012. Settled.

- Earls v. City of Forks (sexual assault of a child), 2012. Settled.

- Roznowski v. City of Federal Way (domestic violence homicide), 2010. Verdict for the plaintiffs.

- Caldwell v. City of Bellingham (child custodial interference), 2010. Dismissed.

- Hafner-Cottrell v. City of Stanwood, et al (domestic violence homicide), 2007. Settled.

- LaBox, et al v. City of Eugene (former Eugene police officer, sexual assault cases), 2006. Settled.

- Lisa Dunn v. Roger Eugene Magana and City of Eugene (former Eugene police officer, sexual assault cases), 2005-06. Settled.

- CMJ v. Kitsap County (former Kitsap County, WA. sheriff's deputy, sexual assault of a child case), 2006. Settled.

- Sitton, et al v. Idland (former Washington State Patrol trooper, sexual assault cases), 2005-06. Settled.

- Sandahl v. Klickitat County (domestic violence homicide), 2003-04. Settled.

- Ramon Ayala and Kyle W. Davis, Plaintiffs v. City of Chicago, a municipal corporation, and Phil Cline, Superintendent of the Chicago Police Department (mistreatment of witnesses), 2005-06. Settled, with court monitoring.
- Reynolds v. City of Chicago (police affirmative action), 1996-98. Upheld by 7th Circuit.

- Petit v. City of Chicago (police affirmative action), 1996-98. Upheld by 7th Circuit.

## CONSULTING AND TRAINING

- Conducted more than 65 team building and other Organization Development interventions for SDPD; other city departments (Fire, City Attorney, Organizational Effectiveness); police agencies across the country; San Diego law firms; California's Commission on Peace Officer Standards and Training (POST), including team building for the executive director and his top staff, plus four statewide symposia for chiefs and sheriffs; Los Angeles District Attorney's Office; California State Bar Association;

- Adjunct professor at San Diego State University: 19 semesters (1976-1989), teaching both upper division and graduate courses in Criminal Justice Administration, Juvenile Justice Administration, and Negotiation and Bargaining in the Public Sector;

- Adjunct professor at University of California, San Diego: Law and Society class, 1972;

- Adjunct professor at University of Washington: five quarters (1996-2000), teaching Police in Urban Society;

- Instructor in POST-sponsored courses throughout California and at other local institutions, including 11 years as instructor of highest-rated POST management class in the state;

- Technical advisor to the 1992 edition of the International City Managers Association's *Municipal Police Administration*;

- Author of the textbook *Removing Managerial Barriers to Effective Police Leadership*, Police Executive Research Forum, Washington D.C., 1992;

- Member of the U.S. Justice Department's National Advisory Panel on Excessive Force by Police (1992-1995);

- Consultant to the Portland-Multnomah County Police Consolidation Project; identified as one of eight national experts on police personnel systems (1976).

## COMMUNITY INVOLVEMENT AND PROFESSIONAL ASSOCIATIONS

**Current Member of:** Local Initiatives Support Corporation's Community Safety Initiative (Advisory Board); Law Enforcement Action Partnership (Advisory Board); National Organization for the Reform of Marijuana Laws (Advisory Board); Drug Policy

Alliance; Death Penalty Focus; and Woman in the Woods Productions (first President of Board of Directors).

**Past Member of:**  National Advisory Council of the Violence Against Women Act (founding member); San Juan County's nonprofit Domestic Violence and Sexual Assault Services Board of Directors (president emeritus); Police Executive Research Forum; International Association of Chiefs of Police; Major Cities Chiefs; President and Board Chair of Seattle's Leadership Tomorrow; Co-Chair of the Seattle Domestic Violence Council; Steering Committee member of the state's Equal Justice Coalition; Co-Chair of Alliance for Education's Urban Scholars; Governing Board of the Boys and Girls Clubs of King County; Board of Directors of National Conference of Christians and Jews; Corporate Board of Directors, San Diego Hospice; San Diego Coalition for Equality; Western Society of Criminology; Urban League of San Diego; Neighborhood House Association; Californians Against Violence; San Ysidro Family Survivors Fund; Vice President and Curriculum Chair, LEAD San Diego; Caucus Chair, LEAD San Diego.

## AWARDS AND OTHER HONORS

As Seattle's Police Chief:  **King County Bar Association's** "Distinguished Service, Friend of the Legal Profession" (1999); **Leadership Tomorrow Award** for "Outstanding Service in the Development of Civic Leadership" (1999); **Donald F. Leiffen Outstanding Alumni Award** for "Distinguished Service in the Field of Public Administration and Criminal Justice:" from SDSU (1998); **Washington Coalition of Hispanic Law Enforcement Officers** for "Outstanding Career Achievement" (1997); **City Attorney's Award** for "Exceptional and Outstanding Service in the Area of Domestic Violence" (1997); **Hannah G. Solomon Award** from the National Council of Jewish Women for "Outstanding Leadership in Improving the Quality of Life for All People and Motivating Others to Fight for Positive Change" (1996); **Katharine M. Bullitt Award** for "Outstanding Contributions to Public Education" (1996); **Isabel Colman Pierce Award** for "Excellence in Community Service" (1995); **Major Romero Yumul Award** for "Leadership, Innovation, and Diversity" from the Filipino American City Employees Association (1995); and induction into the national **Boys and Girls Clubs of America Hall of Fame** (1995).

In San Diego:  **Police Chief's Exceptional Performance Citation**, citing the District Attorney's assessment:  "Thanks to Assistant Chief Norm Stamper the [Metropolitan Homicide Task Force] will go down as the most successful serial murder task force in this country's history" (1993);  **Police Chief's Exceptional Performance Citation,** citing work that "aligned the Chief's vision with the reality of street work in a way that produced widespread support throughout the Department" (1992); **Diogenes Award** for "Honesty, Integrity, Accessibility, and Accountability" presented by the Public Relations Society of America, bestowed because "Norm Stamper was the first—and most visible—public figure to call that verdict [from the Rodney King beating trial in Simi Valley] an outrage and to say, publicly and clearly, that San Diego's police operate in a different world, with a different system and with far different standards…He's the man who makes neighborhood policing a reality" (1992); **Chief's Exceptional Performance Citation** for

"Innovation, Leadership, and Diplomacy" in directing the Mayor's Crime Control Commission (1982); **Chief's Exceptional Performance Citation** for "Creativity, Innovation, and Leadership" in designing and conducting the country's first experiment in community policing (1974); numerous **Department, Commanding Officer, and Supervisor Commendations** for a variety of accomplishments including performance on a year-long deep-cover undercover assignment (1969), the arrest of 56 sex offenders during a special detail in Balboa Park (1968), the apprehension of two serial burglary suspects (1967), and the apprehension of two armed robbery suspects (1967).

## PUBLICATIONS AND PUBLIC APPEARANCES

**Books**

*To Protect and Serve: How to Fix America's Police.* 2016. New York. Nation Books

*Breaking Rank: A Top Cop's Exposé of the Dark Side of American Policing.* 2005. New York. Nation Books

*Removing Managerial Barriers to Effective Police Leadership.* 1992. Washington, D.C. Police Executive Leadership Forum

**Other publications, interviews, speeches**

- "Policing Mass Protests," Zoom testimony before Oregon State Legislature, July 10 and July 17, 2020

- "To Protect and Serve," Zoom presentation to the Columbia Basin Badger Club, July 16, 2020

- "20th Anniversary of WTO," presentation to Crosscut/KUOW, November 19, 2019

- "The 'Battle of Seattle': We Got This," presentation to international gathering of *The Performance Theatre*, June 13, 2019

- "I-940 is a win for communities and police," *Kitsap Sun*, October 19, 2018

- "Search for Meaning Festival," Seattle University, "Policing in the Age of Trump," February 24, 2018;

- "Public Safety and the Constitution," Seattle Rotary, February 7, 2018

- Crosscut Festival, "We're the police, and you're not," February 3, 2018

- "California must change its rules on police deadly force," *Sacramento Bee*, August 14, 2018;

- "San Juaquin shows the way to end sheriff-coroner system," with Tori Verber Salazar and Miriam Aroni Krinsky, *Sacramento Bee,* June 13, 2018;

- Louisville, KY: Several speeches and TV and radio appearances on "Community-police relations and organizational reform," week of July 7, 2017;

- Blogger for *Huffington Post,* 2009 – Present;

- "How to Prevent Violence in Cleveland," *New York Times*, July 15, 2016;

- "Fix the Police: From Ferguson to Freddie Gray—What the hell happened to America's cops?" *Playboy.* July/August 2016;

- "From Warrior Cops to Community Police: A Former Chief on How We Can Turn Back the Tide of Militarization," *YES! Magazine*, February 9, 2015;

- "Militarizing Ferguson Cops With Riot Gear Is a Huge Mistake," *Time Magazine,* August 18, 2014;

- "Nothing Works in Ferguson," *The Guardian*, August 19, 2014;

- "Our Neighborhoods, Our Police, *TEDx Seattle*, January 2014;

- "Prohibition:  A Parallel to Modern War on drugs," for *Perspectives on Modern World History*, Fall, 2012;

- "Ending the Culture of Dishonesty in Law Enforcement," Institute for Law Enforcement Administration, The Center for American and International Law, Ethics Roll Call, 2011;

- *Marijuana is Safer: So Why Are We Driving People to Drink?* (Foreword), by Steve Fox, Paul Armentano, and Mason Tvert.  Chelsea Green Publishing, 2009; updated for new edition: 2013;

- Op-eds and articles for *The New Yorker; New York Times*; *ACLU Blog; Wall Street Journal; Los Angeles Times*; *Time Magazine; The Guardian, UK and US; Seattle Times*; *San Francisco Chronicle; Seattle Post-Intelligencer.com*; *The Nation; AlterNet*; *Mother Jones*; *The Economist.com*; *Opposing Views*; *Real Change*; *Alcohol and Other Drugs Council of Australia*; *Australian Drug Law Reform Foundation*; *Appeal Democrat; Firedoglake.com; CNBC; USA Today; SalemNews.com; The Weekend Australian*; *The Hill's Congressional Blog; San Jose Mercury News; San Diego Union-Tribune; Penthouse; Seattle Weekly*; *The Islands' Sounder; The Union.Com; American Police Beat Magazine; BullWings – Orcas Issues, News & Views; Los Angeles Daily News*; *Democrat Harold; Montana Law Review; American Bar Association, Human Rights*; *Playboy.*

- Appearances, often multiple, on "The Colbert Report" with Stephen Colbert; "In the Money" with Jack Cafferty; Chelsea Handler, Netflix; "The O'Reilly Factor" with Bill O'Reilly; "The Tavis Smiley Show" with Tavis Smiley; "Democracy NOW!" with Amy Goodman; "The Dylan Ratigan Show" with Dylan Ratigan; "The Mike Huckabee Show" with Mike Huckabee, "Keeping It Real" with Rev. Al Sharpton; "The Situation" with Tucker Carlson; "Talk of the Nation" with Neal Conan; "To the Point" with Warren Olny; "Al Jazeera" News; "Volkstrant News," The Netherlands; "Book TV" on C-SPAN; national, international, and local newscasts on ABC, CBS, NBC, MSNBC, CNN, PBS, NPR, FOX, Sirius Satellite Radio, BBC London, other television and radio stations throughout the U.S., Canada, Brazil, Portugal, The Netherlands, and Australia; talks at bookstores, service clubs, churches, temples, law schools, other colleges and universities, and corporations and public organizations throughout North America and Australia. (Please see www.normstamper.com, "Events," for a complete listing since 2005.)

Last updated: September 2022

- End –

# EXHIBIT B

| | A | B |
|---|---|---|
| 1 | **Materials Provided for Review** | |
| 2 | | |
| 3 | **Bates Number (if applicable)** | **File Name/Description** |
| 4 | BLM_00000001 - BLM_00000061 | photos |
| 5 | BLM_00000062 - BLM_00000131 | Videos |
| 6 | BLM_00000132 - BLM_00000166 | photos |
| 7 | BLM_00000266 | photo |
| 8 | BLM_00000974 - BLM_00001004 | photos |
| 9 | BLM_00001005 - BLM_00001069 | photos, videos |
| 10 | BLM_00001072 - BLM_00001077 | photos |
| 11 | BLM_00001106 - BLM_00001538 | photos |
| 12 | BLM_00001539 - BLM_00001643 | Videos & photos |
| 13 | BLM_00001644 - BLM_00001657 | photos |
| 14 | BLM_00001674 - BLM_00001767 | Denver Office of the Independent Monitor Report |
| 15 | BPD2 - BPD43 | Documents |
| 16 | COABLM 231-232 | Aurora PD BWC footage |
| 17 | COABLM 237-238 | Aurora PD BWC footage |
| 18 | COABLM 247 | Aurora PD BWC footage |
| 19 | COABLM 253 | Aurora PD BWC footage |
| 20 | COABLM 256 | Aurora PD BWC footage |
| 21 | COABLM 267 | Aurora PD BWC footage |
| 22 | COABLM 275-276 | Aurora PD BWC footage |
| 23 | COABLM 281-282 | Aurora PD BWC footage |
| 24 | COABLM 28-230 | Aurora PD General Offense Reports |
| 25 | COABLM 290 | Aurora PD BWC footage |
| 26 | COABLM 294 | Aurora PD BWC footage |
| 27 | COABLM 296-297 | Aurora PD BWC footage |
| 28 | COABLM 299-301 | Aurora PD BWC footage |
| 29 | COABLM 305 | Aurora PD BWC footage |
| 30 | COABLM 310, 312 | Aurora PD BWC footage |
| 31 | COABLM 317 | Aurora PD BWC footage |
| 32 | COABLM 323 | Aurora PD BWC footage |
| 33 | COABLM 325 | Aurora PD BWC footage |
| 34 | COABLM 329-330 | Aurora PD BWC footage |
| 35 | COABLM 340 | Aurora PD BWC footage |
| 36 | COABLM 345-556, 577 | Aurora PD BWC footage |
| 37 | CSP1 - CSP12 | BLM Protest 5.29.20 Operations Plan Capitol - Redacted |
| 38 | DEN000001 - DEN000017 | CAD Report 05.28.20 |
| 39 | DEN000018 - DEN000035 | CAD Report 05.29.20 |
| 40 | DEN000036 - DEN000058 | CAD Report 05.30.20 |
| 41 | DEN000059 - DEN000067 | CAD Report 05.31.20 |
| 42 | DEN000068 - DEN000111 | DPD Crowd Management_Redacted |

EXHIBIT B

|  | A | B |
|---|---|---|
| 43 | DEN000114 - DEN000116 | Extended Emergency Curfew_2020.06.01 |
| 44 | DEN000117 | STG.ICP.2.3.CHEM.INTRO |
| 45 | DEN000149 | STG.ICP.2.3.CHEM.2 |
| 46 | DEN000172 | STG.ICP.2.3.CHEM.3 |
| 47 | DEN000192 | STG.ICP.2.3.CHEM.4 |
| 48 | DEN000206 | STG.ICP.2.3.CHEM.5 |
| 49 | DEN000231 - DEN000234 | Videos - Chemical Agents |
| 50 | DEN000235 - DEN000316 | Crowd Mgmt for Supervisors - Sgt. School_Redacted |
| 51 | DEN000317 - DEN000335 | OC Course |
| 52 | DEN000336 - DEN000413 | 40mm Operator Course_Version 11.19 |
| 53 | DEN000414 - DEN000415 | DPD 40mm Operator Course Outlin |
| 54 | DEN000416 - DEN000417 | DPD 40mm Operator Practical Qualification_Version 11.19 |
| 55 | DEN000418 - DEN000421 | DPD 40mm Operator Written Exam_Version 11.19 |
| 56 | DEN000422 - DEN000425 | DPD 40mm Operator Written Exam_Version 11.19 |
| 57 | DEN000426 | 40mm Direct Impact Round |
| 58 | DEN000426 | 40mm Direct Impact Round |
| 59 | DEN000427 | 40mm eXact iMpact Sponge Round 6325 |
| 60 | DEN000428 | 40mm_250_Shot_Training_Kit_6530 |
| 61 | DEN000429 | Penn Arms 40mm multi pump |
| 62 | DEN000430 | Penn Arms 40mm single |
| 63 | DEN000431.0001 | 1 - Contempt of Cop.mp4 |
| 64 | DEN000431.0002 | 4 - Long Distance walk with gun and takes Hostage.mp4 |
| 65 | DEN000431.0003 | 4 - Safety Priorities LAPD Shoots Hostage Deescalation.mp4 |
| 66 | DEN000431.0004 | 4b - Guy Jogging with Knife.mp4 |
| 67 | DEN000431.0005 | 5 - Single Officer Suicide with Knife.mp4 |
| 68 | DEN000431.0006 | 7 - Haase SAGE 16-17382_FC297-1.mp4 |
| 69 | DEN000431.0007 | 10 - Breach gas robot taser tackle.wmv |
| 70 | DEN000431.0008 | 10 - FCPS and CSUPD.mp4 |
| 71 | DEN000431.0009 | 11 - Officer or Citizen Carry.mp4 |
| 72 | DEN000431.0010 | 12 - Suicidal man in car death blamed on Chief.mp4 |
| 73 | DEN000431.0011 | 15 - Robbery Suspect.wmv |
| 74 | DEN000431.0012 | 17 - Contact Team FCPD N College shooting.mp4 |
| 75 | DEN000431.0013 | 17 - Police Use Pepper Balls To Arrest Suspect.mp4 |
| 76 | DEN000431.0014 | 18 - Pitts stab in neck.mp4 |
| 77 | DEN000431.0015 | 18 - Yellow Shirt with Knife press Taser.mp4 |
| 78 | DEN000431.0016 | 19 - Americas Best Video OIS.mp4 |
| 79 | DEN000431.0017 | Inmate in hall.MPG |

| | A | B |
|---|---|---|
| 80 | DEN000431.0018 | LA.MPG |
| 81 | DEN000431.0019 | LAPD B Bag.mpg |
| 82 | DEN000431.0020 | MIAMI.MPG |
| 83 | DEN000431.0021 | Phil PA knife.MPG |
| 84 | DEN000431.0022 | Show Boat Car Thief.AVI |
| 85 | DEN000432 | 8 hour schedule - redacted_Redacted |
| 86 | DEN000433 - DEN000579 | DPD Crowd Control Field Force Trng redacted |
| 87 | DEN000580 - DEN000581 | Practice- Handout_Redacted |
| 88 | DEN000582.0001 | Hong Kong protestors |
| 89 | DEN000582.0002 | Mass arrest video |
| 90 | DEN000583 | DPD Crowd Control - Online Refresher Training_Redacted.mp4 |
| 91 | DEN000584 - DEN000671 | Pepperball Operator Course_Version 4.20 |
| 92 | DEN000672 - DEN000673 | PepperBall Operator Practical Qualification_Version 4.20 |
| 93 | DEN000674 | PepperBall Operator Written Exam_Version 4.20 |
| 94 | DEN000675 - DEN000677 | PepperBall Operator Written Exam_Version 4.20 |
| 95 | DEN000678 - DEN000681 | PepperBall Operator Written Exam_Version 4.20 |
| 96 | DEN000682 - DEN000690 | FTC-manual-9-1-17 |
| 97 | DEN000691 | spec_FTC |
| 98 | DEN000692 | spec_PepperBall-Accessories-13_cu_HPA |
| 99 | DEN000693 | spec_PepperBall-Accessories-SCUBA |
| 100 | DEN000694 | spec_PepperBall-Projectile-Round-Live-X |
| 101 | DEN000695 | spec-round-inert-19141 |
| 102 | DEN000696 - DEN000822 | DPD Crowd Control 5 Hr Recruit Field Force Trng 3Hr Plan Instr Redacted |
| 103 | DEN000696.0001 | Air Fill Procedure |
| 104 | DEN000696.0002 | Baltimore.mp4 |
| 105 | DEN000696.0003 | Border Security.mpg |
| 106 | DEN000696.0004 | Denver PD 2.mp4 |
| 107 | DEN000696.0005 | Denver PD.mp4 |
| 108 | DEN000696.0006 | Drunk Groin.mp4 |
| 109 | DEN000696.0007 | Field Searches.mpg |
| 110 | DEN000696.0008 | Final Warning Riots.wmv |
| 111 | DEN000696.0009 | Keene State Riot 1.mp4 |
| 112 | DEN000696.0010 | Murrieta 1a.wmv |
| 113 | DEN000696.0011 | PB Effects.wmv |
| 114 | DEN000696.0012 | SDPD Car_WMV V9.wmv |
| 115 | DEN000823 - DEN000948 | DPD Crowd Control 5 Hr Recruit Field Force Trng 3 Hr PPT_Redacted |
| 116 | DEN000949 | Hong Kong protestors.mp4 |
| 117 | DEN000950 - DEN001754 | 05-20 Book - Operations Manual |

|     | A | B |
|-----|---|---|
| 118 | DEN001755 - DEN001798 | Crowd Management Manual - Redacted v.2 |
| 119 | DEN001909 - DEN001911 | Crowd Mgmt for Supervisors - Sgt. School_Redacted |
| 120 | DEN001912 - DEN001915 | Training Bulletin 8.16.18 1st Amend |
| 121 | DEN001916 - DEN001918 | AAR 05.28.2020 |
| 122 | DEN001919 - DEN001922 | AAR_05.29.2020_Redacted |
| 123 | DEN001923 - DEN001926 | AAR_05.31.2020_Redacted |
| 124 | DEN001927 - DEN001929 | AAR_5.30.2020 |
| 125 | DEN001930 - DEN001933 | AAR_06.01.2020 |
| 126 | DEN001934 - DEN001936 | AAR_06.02.2020 |
| 127 | DEN001937 - DEN001939 | AAR_05.28.2020_Chemical Agents (Sich) |
| 128 | DEN001940 - DEN001941 | AAR_05.29.2020_Chemical Agents (Sich) |
| 129 | DEN001942 - DEN001943 | AAR_05.30.2020_Chemical Agents (Sich) |
| 130 | DEN001944 - DEN001945 | AAR_05.31.2020_Chemical Agents (Sich) |
| 131 | DEN001946 - DEN001957 | OPS PLAN_05.28.2020_Justice for George Floyd_Redacted |
| 132 | DEN001958 - DEN001969 | OPS PLAN_05.29.2020_Justice for George Floyd (Wyckoff)_Redacted |
| 133 | DEN001970 - DEN001982 | OPS PLAN_05.30.2020_Justice for George Floyd_Redacted |
| 134 | DEN001983 - DEN001995 | OPS PLAN_05.31.2020_Justice for George Floyd_Redacted |
| 135 | DEN001996 - DEN002011 | OPS PLAN_06.01.2020 - March in Honor of George Floyd_Redacted |
| 136 | DEN002012 - DEN002027 | OPS PLAN_06.02.2020 - 06.05.2020 - George Floyd Protest_Redacted |
| 137 | DEN002028 - DEN002063 | 20-0330514 CAD 5.28 |
| 138 | DEN002064 - DEN002077 | 20-0336556 CAD 5.31 |
| 139 | DEN002078 - DEN002092 | 20-340681 CAD  06.02.2020_Redacted |
| 140 | DEN002093 - DEN002105 | CAD_06.01.2020 (20-0338873)_Redacted |
| 141 | DEN002177 - DEN002184 | U2020-0364_Redacted |
| 142 | DEN002185 - DEN002200 | U2020-0365 |
| 143 | DEN002201 - DEN002204 | U2020-0368 |
| 144 | DEN002205 - DEN002230 | U2020-0369_Redacted |
| 145 | DEN002231 - DEN002238 | U2020-0370 |
| 146 | DEN002239 - DEN002246 | U2020-0372 |
| 147 | DEN002247 - DEN002265 | U2020-0374_Redacted |
| 148 | DEN002266 - DEN002275 | U2020-0375 |
| 149 | DEN002276 - DEN002329 | U2020-0378 |
| 150 | DEN002330 - DEN002339 | U2020-0385 |
| 151 | DEN002340 - DEN002348 | U2020-0387 |
| 152 | DEN002349 - DEN002362 | U2020-0388_Redacted |
| 153 | DEN002363 - DEN002376 | U2020-0394 |
| 154 | DEN002377 - DEN002442 | U2020-0400_Redacted |
| 155 | DEN002443 - DEN002461 | U2020-0410_Redacted |
| 156 | DEN002462 - DEN002762 | Telestaff 5.28-6.2 |

|     | A | B |
| --- | --- | --- |
| 157 | DEN002763 - DEN002776 | Chemical Agent Timeline |
| 158 | DEN002777 - DEN003839 | OFFICER STATEMENTS |
| 159 | DEN003840 | AirOne Video - 5-28-2020 |
| 160 | DEN003841 | AirOne Video - 5-29-2020 |
| 161 | DEN003842 | AirOne Video - 5-30-2020 |
| 162 | DEN003843 | AirOne Video - 5-31-2020 |
| 163 | DEN003844 - DEN003885 | HALO Videos |
| 164 | DEN003886 - DEN003892 | Denver PD BWC footage |
| 165 | DEN003912 - DEN003918 | AirOne Video - 6-1-2020 |
| 166 | DEN003919 - DEN003924 | AirOne Video - 6-2-2020 |
| 167 | DEN003925 - DEN004018 | Office of Independent Monitor Report |
| 168 | DEN004021 - DEN004045 | Denver PD BWC footage |
| 169 | DEN004047 | Denver PD BWC footage |
| 170 | DEN004049 - DEN004052 | Denver PD BWC footage |
| 171 | DEN004059 | Denver PD BWC footage |
| 172 | DEN004071 - DEN004072 | Denver PD BWC footage |
| 173 | DEN004075 | Denver PD BWC footage |
| 174 | DEN004078 | Denver PD BWC footage |
| 175 | DEN004086 - DEN004092 | Denver PD BWC footage |
| 176 | DEN004136 | Denver PD BWC footage |
| 177 | DEN004154 - DEN004241 | Denver PD BWC footage |
| 178 | DEN004243 | Decline Letter |
| 179 | DEN004244 | EDOS_Response_Letter_Protests_IAB |
| 180 | DEN004245 | Grothe Email |
| 181 | DEN004249 | Klukas Email |
| 182 | DEN004253 | OIM Complaint 1 |
| 183 | DEN004254 | Denver PD video - METRO SWAT pepper ball |
| 184 | DEN004255 - DEN004258 | DFD 20-52470 |
| 185 | DEN004259 - DEN004262 | DFD 20-52500 |
| 186 | DEN004263 - DEN004266 | DFD 20-52514 |
| 187 | DEN004267 - DEN004270 | DFD 20-52800 |
| 188 | DEN004271 - DEN004275 | DFD 20-52860 |
| 189 | DEN004276 - DEN004279 | DFD 20-52903 |
| 190 | DEN004280 | DFD Protest Incidents |
| 191 | DEN004281 | Email Chain Kniech Chief Commander |
| 192 | DEN004284 | Decline  Letter for Record Only |
| 193 | DEN004285 | Tent fire |
| 194 | DEN004286 | Video |
| 195 | DEN004370 | Aboellail - OIM Intake Form |
| 196 | DEN004373 | Allred's Notification of IAB Complaint |
| 197 | DEN004374 | Beidscheid - OIM Intake Form |
| 198 | DEN004379 | Case Disposition Notice |
| 199 | DEN004380 | Decline Letter |
| 200 | DEN004380 | Decline Letter |

| | A | B |
|---|---|---|
| 201 | DEN004381 | EDOS_Response_Letter_Protests_IAB |
| 202 | DEN004382 | Email from Beidscheid - Badge number and Location |
| 203 | DEN004384 | Email from Beidscheid 06-19-2020 |
| 204 | DEN004385 | Email response from Biedscheid 06-19-2020 |
| 205 | DEN004389 | Email to Aboellail - requesting contact phone number |
| 206 | DEN004390 | Email to Beidscheid asking for more info 06-18-2020 |
| 207 | DEN004393 | Ofc Schultz Garrity Advisement |
| 208 | DEN004395 | Pic of Officers  1 |
| 209 | DEN004396 | Pic of Officers - IDed by Officers - Close up |
| 210 | DEN004397 | Pic of Officers - IDed by Officers |
| 211 | DEN004398 | Pics of Officers |
| 212 | DEN004399 - DEN004402 | Denver PD videos |
| 213 | DEN004403 - DEN004575 | P2020-0125_Redacted |
| 214 | DEN004688 - DEN004690 | AAR 05.28.2020 |
| 215 | DEN004691 - DEN004694 | AAR_05.29.2020_Redacted |
| 216 | DEN004695 - DEN004698 | AAR_05.31.2020_Redacted |
| 217 | DEN004699 - DEN004702 | AAR_06.01.2020 |
| 218 | DEN004716 | Jacquelyn Parkins Decline Letter |
| 219 | DEN004724 | EDOS_Response_Letter_Protests_IAB |
| 220 | DEN004725 | Givens' Decline Letter |
| 221 | DEN004726 | Photo CONFIDENTIAL 20200724_191024 |
| 222 | DEN004728 | Photo CONFIDENTIAL 20200724_191052 |
| 223 | DEN004729 - DEN004730 | Denver PD videos |
| 224 | DEN004731 | Case Disposition Notificaion |
| 225 | DEN004732 | Decline Letter |
| 226 | DEN004733 | Garrity and Statement - Barnes |
| 227 | DEN004736 | Mediation Form |
| 228 | DEN004738 | Ofc Notice of Complaint |
| 229 | DEN004740 | Scalise-Barnes Mediation close letter |
| 230 | DEN004741 - DEN004743 | Denver PD videos |
| 231 | DEN004744 | P2020-0131_Redacted |
| 232 | DEN004793 | Rock |
| 233 | DEN004906 - DEN004909 | Denver PD audio files |
| 234 | DEN004943 | Hickman -Resolution Decline Letter |
| 235 | DEN004960 | Complaint from Harms |
| 236 | DEN004962 | Abby Harms -Decline Status Letter |
| 237 | DEN004963 | EDOS_Response_Letter_Protests_IAB |
| 238 | DEN004964 | Denver PD audio file |
| 239 | DEN004965 | Decline Letter - Kylie Kline |
| 240 | DEN004975 - DEN005125 | Denver PD BWC footage |
| 241 | | DPD radio communications excerpts, 5/28 & 5/31 |

|    | A | B |
|----|----|----|
| 242 | DEN005187 | Rich Branden Decline Letter |
| 243 | DEN005190 | ATC Bjelland via email in regards to complaint |
| 244 | DEN005191 | ATC Bjelland via email-2 |
| 245 | DEN005192 - DEN0005913 | Citizen Decline Letter |
| 246 | DEN005194 | Complaint via the OIM |
| 247 | DEN005197 | EDOS Letter |
| 248 | DEN005198 | Flyer from location at 1416 Penn St |
| 249 | DEN005199 - DEN005204 | HALO Videos |
| 250 | DEN005205 | 575A AVL |
| 251 | DEN005206 | 2020 Protest Glass-Body Repair Vehicle Costs DPD |
| 252 | DEN005215 | AVL Data Explanation |
| 253 | DEN005216 | AVL575A |
| 254 | DEN005220 | CAD 20-330514_Redacted |
| 255 | DEN005255 - DEN0005256 | Citizen decline with a debrief |
| 256 | DEN005257 | DPD Complaint & follow-up email Jade Keena |
| 257 | DEN005261 | EDOS_Response_Letter_Protests_IAB |
| 258 | DEN005262 | Email with Jade Keena  Re FW DPD Complaint |
| 259 | DEN005266 | Fleet ID two Silver Yukons |
| 260 | DEN005271 | FW Fleet |
| 261 | DEN005274 | Garage Email Damage T9312 |
| 262 | DEN005276 | Log 575A Montanez_Redacted |
| 263 | DEN005280 | Notice of Complaint |
| 264 | DEN005281 | Ofc Montanez Notice of Complaint |
| 265 | DEN005282 | Ofc Montanez Statement |
| 266 | DEN005286 | OIM DPD Complaint  Jade Keena |
| 267 | DEN005289 | Photo Siver Yukon |
| 268 | DEN005290 | Silver Yukon Blk wheels Red and Blue Lights Fleet |
| 269 | DEN005293 | T9312 Vehicle Damage from Protest |
| 270 | DEN005294 | Tucker Email License Plate DPD Complaint Jade Keena |
| 271 | DEN005297 - DEN005301 | HALO Videos |
| 272 | DEN005302 | Daily Detail Report_Redacted.pdf |
| 273 | DEN005306 | Citizen Complaint |
| 274 | DEN005311 | DPD 200 Investigation summary |
| 275 | DEN005312 | Journal Entry |
| 276 | DEN005313 | Officer Statement and Garrity |
| 277 | DEN005316 | Short video |
| 278 | DEN005317 | Sustained Journal Entry Letter Short |
| 279 | DEN005318 - DEN005319 | Denver PD Audio and video files |
| 280 | DEN005320 - DEN005324 | HALO Videos |
| 281 | DEN005325 | Denver PD audio file |
| 282 | DEN005326 - DEN005329 | AAR_05.31.2020_Redacted |

| | A | B |
|---|---|---|
| 283 | DEN005335 - DEN005344 | 5_31 CAD Report |
| 284 | DEN005345 | Complaint from BaileyYntema@gmail |
| 285 | DEN005348 | Altman Statement |
| 286 | DEN005349 | DEN5349 Aurora Reports_Redacted |
| 287 | DEN005459 - DEN005467 | Officer Statements |
| 288 | DEN005468 | DEN5468 Citizen Yntema Decline Letter |
| 289 | DEN005469 - DEN005471 | Officer Statements |
| 290 | DEN005472 | Commerce City_Brighton After Action Report |
| 291 | DEN005482 | Commerce City_Brighton use of force reports |
| 292 | DEN005571 - DEN005572 | Cunningham Statement |
| 293 | DEN005573 | Curfew was made effective for the Dates and hours |
| 294 | DEN005574 | Douglas County Sheriff Report |
| 295 | DEN005579 | EDOS_Response_Letter_Protests_IAB |
| 296 | DEN005580 | Emergency Curfew |
| 297 | DEN005582 | Evidence Map - Evidencecom P2020-0173 |
| 298 | DEN005584 - DEN005586 | Officer Statements |
| 299 | DEN005587 | Jefferson County Report_Redacted |
| 300 | DEN005590 - DEN005604 | Officer Statements |
| 301 | DEN005605 | Email_RE_ _EXTERNAL_ Re_ Follow up on online report sent to PocketGov |
| 302 | DEN005607 - DEN005625 | Officer Statements |
| 303 | DEN005626 | Email_Fey photos |
| 304 | DEN005627 | Email_Re_ OIM Complaint #13066271 |
| 305 | DEN005628 | 5_29 Protest CAD |
| 306 | DEN005636 | AAR_05.29.2020_Redacted |
| 307 | DEN005640 - DEN005645 | Officer Statements |
| 308 | DEN005646 - DEN 005664 | Chemical Agent Timeline By Date- George Floyd Protest |
| 309 | DEN005665 | Citizen Fey Decline Letter |
| 310 | DEN005666 - DEN005667 | Drew statement |
| 311 | DEN005668 | EDOS_Response_Letter_Protests_IAB |
| 312 | DEN005669 | Evidence Map - Evidencecom P2020-0175 |
| 313 | DEN005671 | FW_DPD Complaint _ Geoffry Fey |
| 314 | DEN005674 - DEN005675 | Gunsauls statement |
| 315 | DEN005676 | IMG_20200529_231255716 taken by the complainant |
| 316 | DEN005677 | IMG_20200529_231259983 taken by the complainant |
| 317 | DEN005678 - DEN005689 | Officer Statements |
| 318 | DEN005690 | OIM Complaint #13066271 |
| 319 | DEN005691 | Email_RE_ [EXTERNAL] Fey phots |
| 320 | DEN005692 - DEN005697 | Officer Statements |
| 321 | DEN005698 - DEN005701 | HALO Videos |
| 322 | DEN005702 - DEN005704 | Denver PD audio files |

| | A | B |
|---|---|---|
| 323 | DEN005705 | Denver PD BWC footage |
| 324 | DEN005710 | Decline Letter |
| 325 | DEN005715 | 5_30 After Action Report |
| 326 | DEN005718 | 5_30 CAD report_Redacted |
| 327 | DEN005730 | A City and County of Denver curfew |
| 328 | DEN005731 - DEN005734 | Officer Statements |
| 329 | DEN005735 - DEN 005753 | Chemical Agent Timeline By Date- George Floyd Protest |
| 330 | DEN005754 | Citizen Helmick Decline Letter |
| 331 | DEN005755 | Commerce City_Brighton After Action Report |
| 332 | DEN005765 | Commerce City_Brighton use of force reports |
| 333 | DEN005854 - DEN005855 | DEN5854 Cunningham statement |
| 334 | DEN005856 | Douglas County Sheriff Report |
| 335 | DEN005861 | EDOS_Response_Letter_Protests_IAB |
| 336 | DEN005862 | Emergency Curfew |
| 337 | DEN005864 | Evidence Map - Evidencecom |
| 338 | DEN005867 | Email_FW_ Denver Police Internal Affairs Complaint #P2020-0177 |
| 339 | DEN005869 | Email_FW_ DPD Complaint _ Robert Helmick (Complainant Struck with Pepper Balls) |
| 340 | DEN005872 - DEN005879 | Officer Statements |
| 341 | DEN005880 | Still of party wearing helmet, possibly the complainant.pdf |
| 342 | DEN005881 - DEN005884 | Officer Statements |
| 343 | DEN005885 - DEN005889 | HALO Videos |
| 344 | DEN005900 | Denver PD audio file - TAC6 radio |
| 345 | DEN005901 | Denver PD BWC footage |
| 346 | DEN005902 | EDOS_Response_Letter_Protests_IAB |
| 347 | DEN005903 | Wilson e-mail complaint instuctions |
| 348 | DEN005904 | Wilson-Decline letter |
| 349 | DEN005904 | Wilson-Decline letter |
| 350 | DEN005905 | Wilson-Follow-up email |
| 351 | DEN005906 | Wilson-OIM Intake |
| 352 | DEN005909 | 5_31 Arrest log_Redacted |
| 353 | DEN005915 | 5_31 CAD Report |
| 354 | DEN005925 | A City and County of Denver curfew |
| 355 | DEN005926 | AAR_05.31.2020_Redacted |
| 356 | DEN005930 | Allred statement |
| 357 | DEN005931 | Aurora Reports_Redactions_Redacted |
| 358 | DEN006041 | Bishop statement |
| 359 | DEN006042 - DEN 006060 | Chemical Agent Timeline By Date- George Floyd Protest |
| 360 | DEN006061 | Christian statement |
| 361 | DEN006062 - DEN006063 | Citizen Jebsen Decline Letter |
| 362 | DEN006064 | Commerce City_Brighton After Action Report |

| | A | B |
|---|---|---|
| 363 | DEN006074 | Commerce City_Brighton use of force reports |
| 364 | DEN006163 - DEN006164 | Cordova statement |
| 365 | DEN006165 | EDOS_Response_Letter_Protests_IAB |
| 366 | DEN006166 | Emergency Curfew |
| 367 | DEN006168 | Evidence Map - Evidencecom P2020-0181 |
| 368 | DEN006170 - DEN006176 | Officer Statements |
| 369 | DEN006177 | Jefferson County Report_Redacted |
| 370 | DEN006180 - DEN006190 | Officer Statements |
| 371 | DEN006191 | OIM Complaint #13062558 |
| 372 | DEN006192 - DEN006195 | Officer Statements |
| 373 | DEN006196 | RE_ DPD Complaint _ Jens Jebsen_Redacted |
| 374 | DEN006199 - DEN006209 | Officer Statements |
| 375 | DEN006210 | Still of Aurora PD black armored vehicle on colfax |
| 376 | DEN006211 | Still of Black MRAP vehicle on colfax |
| 377 | DEN006212 | Still of small black armored police vehicle on colfax |
| 378 | DEN006213 - DEN006214 | Vento statement_Redacted |
| 379 | DEN006215 - DEN006219 | HALO Videos |
| 380 | DEN006220 - DEN006223 | Denver PD audio files |
| 381 | DEN006224 | Decline Letter Humphries |
| 382 | DEN006227 | Decline Letter |
| 383 | DEN006234 DEN006235 | Denver PD audio files |
| 384 | DEN006236 | Decline Letter Gardner |
| 385 | DEN006237 | EDOS_Response_Letter_Protests_IAB |
| 386 | DEN006238 | Email sent to complainant |
| 387 | DEN006239 | Decline Letter Berry |
| 388 | DEN006240 | EDOS_Response_Letter_Protests_IAB |
| 389 | DEN006241 | Email sent to complainant |
| 390 | DEN006242 - DEN006245 | Denver PD audio files |
| 391 | DEN006246 | 05-31-2020 mass  Arrest Log_Complainant no. 101_Redacted |
| 392 | DEN006258 | Email sent to complainant |
| 393 | DEN006259 | Decline Letter |
| 394 | DEN006264 | P2020-0197_Redacted |
| 395 | DEN006264 - DEN006342 | P2020-0197_Redacted |
| 396 | DEN006267 - DEN006268 | Decline letter P2020-0197 |
| 397 | DEN006343 - DEN006346 | HALO Videos |
| 398 | DEN006347 | Denver PD BWC footage |
| 399 | DEN006348 - DEN006350 | Denver PD audio files |
| 400 | DEN006351 - DEN006353 | P2020-0198_Redacted |
| 401 | DEN006354 - DEN006362 | P2020-0200_Redactions |
| 402 | DEN006363 - DEN006366 | HALO Videos |
| 403 | DEN006378 - DEN006379 | Decline letter_P2020-0205 |

|     | A | B |
| --- | --- | --- |
| 404 | DEN006383 - DEN006385 | Decline letter_P2020-0206 |
| 405 | DEN006386 - DEN006387 | Denver PD audio files |
| 406 | DEN006388 - DEN006390 | Decline letter_P2020-0216 |
| 407 | DEN006391 | Denver PD audio file |
| 408 | DEN006392 - DEN006400 | P2020-0258_Redacted |
| 409 | DEN006401 - DEN006403 | Denver PD BWC footage |
| 410 | DEN006404 | Denver PD audio file |
| 411 | DEN006501 - DEN006503 | Commander Phelan Correspondence re Outside Agencies |
| 412 | DEN006534 - DEN006537 | DPD emails |
| 413 | DEN006549 - DEN006550 | DPD emails |
| 414 | DEN006553 - DEN006556 | DPD emails |
| 415 | DEN006561 - DEN006562 | DPD emails |
| 416 | DEN006616 - DEN006618 | DPD emails |
| 417 | DEN006738 - DEN006741 | DPD emails |
| 418 | DEN006745 - DEN006748 | DPD emails |
| 419 | DEN006768 - DEN006771 | DPD emails |
| 420 | DEN006785 - DEN006788 | DPD emails |
| 421 | DEN006802 - DEN006804 | DPD emails |
| 422 | DEN006818 - DEN006821 | DPD emails |
| 423 | DEN006836 - DEN006839 | DPD emails |
| 424 | DEN006840 - DEN006842 | DPD emails |
| 425 | DEN006869 - DEN006872 | DPD emails |
| 426 | DEN006890 - DEN006892 | DPD emails |
| 427 | DEN006894 - DEN006896 | DPD emails |
| 428 | DEN006897 - DEN006898 | DPD emails |
| 429 | DEN006899 - DEN006902 | DPD emails |
| 430 | DEN006903 - DEN006905 | DPD emails |
| 431 | DEN006906 - DEN006909 | DPD emails |
| 432 | DEN006910 - DEN006913 | DPD emails |
| 433 | DEN006914 - DEN006917 | DPD emails |
| 434 | DEN007004 - DEN007005 | robinson email re TRO |
| 435 | DEN007047 - DEN007045 | Robinson to media re concerns |
| 436 | DEN007220 - DEN007223 | DPD emails |
| 437 | DEN008076 - DEN008077 | Decline letter P2020-0158 |
| 438 | DEN008177 - DEN008183 | Acker - McDermott Statements |
| 439 | DEN009873 | Robinson email to Pazen LL force memo |
| 440 | DEN009874 | Robinson memo LL force |
| 441 | DEN009881 - DEN009883 | Dodge email re complaints |
| 442 | DEN009884 - DEN010188 | DPD Officers' training histories |
| 443 | DEN010264 - DEN010271 | Decline letters SVC2020-0028 |
| 444 | DEN010422 - DEN010431 | Decline letters SVC2020-0029 |
| 445 | DEN010573 - DEN010577 | Decline letter SVC2020-0031 |
| 446 | DEN010846 - DEN010847 | Decline letters SVC2020-0032 |

|   | A | B |
|---|---|---|
| 447 | DEN010974 - DEN010975 | Decline letter IC2020-0055 |
| 448 | DEN011000 - DEN011003 | Decline letter P2020-0133 |
| 449 | DEN011022 - DEN011024 | Decline letter P2020-0144 |
| 450 | DEN011033 - DEN011037 | Decline letter P2020-0151 |
| 451 | DEN011076 | Decline letter_Hall |
| 452 | DEN011157 - DEN011160 | Decline letter SVC2020-0163 |
| 453 | DEN011182 - DEN011184 | Decline letter_SVC2020-0167 |
| 454 | DEN011380 - DEN011384 | Sanchez email protect troops |
| 455 | DEN011855 - DEN011920 | DPD Officers' training histories |
| 456 | DEN011921 - DEN011931, DEN011934 | List of Videos - 2016 thru present |
| 457 | DEN011935 - DEN012009 | DPD Officers' training histories |
| 458 | DEN012010 - DEN012064 | IC2020-0051 Archuleta |
| 459 | DEN012069 - DEN012169 | IC2020-0074-Streeter_Redacted |
| 460 | DEN012174 - DEN012179 | Past complaint protest_P2015-0288_pp1-6 |
| 461 | DEN012447 - DEN012451, DEN012681 - DEN012686 | Past complaint protest_P2015-0318_excerpts |
| 462 | DEN012699 - DEN012706 | Past complaint protest_P2015-0339_excerpts |
| 463 | DEN012771-012773, 012811-012814 | Past complaint protest_P2015-0408_excerpts |
| 464 | DEN012831, 012854, 012867-012872, 012855-012859 | Past complaint protest_P2016-0361_excerpts |
| 465 | DEN013035-013037, 013053-013054 | Text msgs re curfew enforcement on protestors |
| 466 | DEN013089 - DEN014761 | Officer Statements_redacted |
| 467 | DEN015718 | Denver PD BWC footage |
| 468 | Fitouri 000002-000007 | Plaintiff's videos |
| 469 | Fitouri 000101-000105 | Plaintiff's videos |
| 470 | Fitouri 000114-000123 | Plaintiff's videos |
| 471 | Fitouri 000193-000229 | Plaintiff's videos |
| 472 | Fitouri 000241-000248 | Plaintiff's videos |
| 473 | Fitouri 000256 | curfew announcement video using LRAD |
| 474 | Fitouri 010938-010940 | Plaintiff's videos |
| 475 | Fitouri 010966-010968 | Plaintiff's videos |
| 476 | Fitouri 011072 | Plaintiff's video |
| 477 | Fitouri 011078 | Plaintiff's video |
| 478 | Fitouri 011148-011151 | Plaintiff's videos |
| 479 | Fitouri 011175-011176 | Plaintiff's videos |
| 480 | Fitorui 011237 | Plaintiff's video |
| 481 | Fitouri 011239 | Plaintiff's video |
| 482 | Fitouri 011241-011243 | Plaintiff's videos |
| 483 | Fitorui 011302-011303 | Emergency Curfew Order |
| 484 | Fitorui 011304-011305 | Emergency Declaration |
| 485 | Fitouri 012178-012189 | Video from CO Education Association |
| 486 | Fitouri 012550-012552 | DPD AAR from Adams County |
| 487 | Fitouri 012554-012555 | Unified Command AAR |

| | A | B |
|---|---|---|
| 488 | Fitouri 016836 | Plaintiff's video |
| 489 | Fitouri 017058 | Plaintiff's video |
| 490 | Fitouri 017197 | Plaintiff's video |
| 491 | Fitouri 017242 | Plaintiff's video |
| 492 | Fitouri 017273 | Plaintiff's audio file |
| 493 | Fitouri 017643-017650 | Plaintiff's audio files |
| 494 | Fitouri 017707-017712 | Plaintiff's videos |
| 495 | Fitouri 017715-017717 | Plaintiff's videos |
| 496 | Fitouri 017721 | Plaintiff's video |
| 497 | Fitouri 017726 | Plaintiff's videos |
| 498 | Fitouri 017744-0177749 | Plaintiff's videos |
| 499 | Fitouri 017753 | Plaintiff's video |
| 500 | Fitouri 017755-017763 | Plaintiff's videos |
| 501 | Fitouri 017765 | Plaintiff's video |
| 502 | Fitouri 017768 | Plaintiff's video |
| 503 | Fitouri 017867-017908 | Plaintiff's videos |
| 504 | Fitouri 017928 | Plaintiff's video |
| 505 | Fitouri 017930 | Plaintiff's video |
| 506 | Fitouri 017939 | CCPD BWC footage |
| 507 | Fitouri 017941 | CCPD BWC footage |
| 508 | Fitouri 017948 | CCPD BWC footage |
| 509 | Fitouri 018079 | CCPD BWC footage |
| 510 | Fitouri 018342-018366 | IACP Crowd Management Model Policy |
| 511 | Fitouri 018367-018376 | IACP Crowd Management Concepts and Issues Paper |
| 512 | JCSO13 - JCSO47 | JCSO 20-10539 w Supps - clean |
| 513 | various file names | All video from Colorado State Patrol (5-28-2020 thru 6-2-2020) |
| 514 | N/A | Tak, Sergeant Anthony 021921 Condensed |
| 515 | N/A | Deposition Transcript of Aurora Police Sgt. Patrick Shaker |
| 516 | N/A | Deposition Transcript of Aurora Police Capt. Stephen Redfearn |
| 517 | N/A | Deposition Transcript of DPD Sergeant Rick Beall |
| 518 | N/A | Deposition Transcript of DPD Officer Adam Bolton |
| 519 | N/A | Deposition Transcript of Matthew Canino (METRO SWAT DENVER) |
| 520 | N/A | 2020-06-25 (1) Complaint |
| 521 | N/A | 2020-07-01 Fitouri Plaintiff Complaint |
| 522 | N/A | 2020-07-23 Fitouri Plaintiff First Amended Complaint |
| 523 | N/A | (91-3) Exhibit 2 - Declaration of Claire Sannier |
| 524 | N/A | (91-4) Exhibit 3 - Declaration of Sara Fitouri |

| | A | B |
|---|---|---|
| 525 | N/A | (91-5) Exhibit 4 - Declaration of Jacquelyn Parkins |
| 526 | N/A | (91-6) Exhibit 5 - Declaration of Johnathen D. Duran |
| 527 | N/A | (91-7) Exhibit 6 - Declaration of Kelsey Taylor |
| 528 | N/A | (91-8) Exhibit 7 - Declaration of Youssef Amghar, with photos |
| 529 | N/A | (91-9) Exhibit 8 - Declaration of Joe Deras |
| 530 | N/A | (91-100) Exhibit 88 - Declaration of Shavonne Blades |
| 531 | N/A | (91-101) Exhibit 89 - Declaration of Robert Helmick |
| 532 | N/A | (91-102) Exhibit 90 - Declaration of Tejas Cousik |
| 533 | N/A | (91-103) Exhibit 91 - Declaration of Emma Smedberg |
| 534 | N/A | (91-104) Exhibit 92 - Declaration of Abby Zinman |
| 535 | N/A | (91-105) Exhibit 93 - Declaration of Brianne Sanchez, with photos |
| 536 | N/A | (91-106) Exhibit 94 - Declaration of Bennett Stebleton |
| 537 | N/A | (91-107) Exhibit 95 - Declaration of Jesse Newman |
| 538 | N/A | (91-108) Exhibit 96 - Declaration of Hayley Banyai-Becker |
| 539 | N/A | (91-110) Exhibit 98 - Declaration of Madeleine Kelly |
| 540 | N/A | (91-115) Exhibit 107 - Declaration of Ruby Tedeschi |
| 541 | N/A | SECURED Jefferson County Regional SWAT After Action Review |
| 542 | N/A | 2021-03-30 BLM Plaintiffs' First Set of Interrogatories to City and County of Denver (NOS. 1-3) |
| 543 | N/A | 2021-04-20 - BLM 5280 Plaintiffs' Second Set of Interrogatories to City and County of Denver (Nos 4-15) |
| 544 | N/A | 2021-04-28 - Defs' Response to BLM 5280 Pltfs' First Set of Roggs (Nos. 1-3) FINAL |
| 545 | N/A | 2021-05-20 Defs' Response to BLM Pltfs' Second Set of Roggs (Nos. 4-15) FINAL |
| 546 | N/A | 2020-09-21 (46) Joint Scheduling Order |
| 547 | N/A | Olsen v Owners Insurance Company |
| 548 | N/A | Fox v Gates Corp |
| 549 | N/A | Case - Cisneros v Town of Center |
| 550 | N/A | Case - Connick v Thompson |
| 551 | N/A | Case - Grynberg v Total SA |

| | A | B |
|---|---|---|
| 552 | N/A | Case - Hilt v SFC Inc |
| 553 | N/A | Case - In re The City of New York |
| 554 | N/A | Case - Trujillo v Campbell |
| 555 | N/A | Case - Watson v City of Kansas City Kansas |
| 556 | N/A | 2020-09-22 Defs' First Combined Discovery Requests to Pltfs |
| 557 | N/A | 2020-10-22 Fitouri Response to City's INT1_Amghar.Verification |
| 558 | N/A | 2020-10-22 Fitouri Response to City's INT1_Deras.Verification |
| 559 | N/A | 2020-10-22 Fitouri Response to City's INT1_Taylor.Verification |
| 560 | N/A | 2020-10-23 Fitouri Response to City's INT1_De La vaca Duran.Verification |
| 561 | N/A | 2020-10-26 Fitouri Response to City's INT1_Amghar.FINAL |
| 562 | N/A | 2020-10-26 Fitouri Ps Responses to City's 1st Int. |
| 563 | N/A | 2020-10-26 Fitouri Response to City's INT1_De La vaca Duran.FINAL |
| 564 | N/A | 2020-10-26 Fitouri Response to City's INT1_Deras.FINAL |
| 565 | N/A | 2020-10-26 Fitouri Response to City's INT1_Fitouri.FINAL |
| 566 | N/A | 2020-10-26 Fitouri Response to City's INT1_Sannier.FINAL |
| 567 | N/A | 2020-10-26 Fitouri Response to City's INT1_Fitouri.Verification |
| 568 | N/A | 2020-10-26 Fitouri Response to City's INT1_Parkins.FINAL |
| 569 | N/A | 2020-10-26 Fitouri Response to City's INT1_Taylor.FINAL |
| 570 | N/A | 2020-10-26 Fitouri Response to City's INT1_Sannier.Verification |
| 571 | N/A | 2020-10-28 Fitouri Response to City's INT1_Parkins.Verification |
| 572 | N/A | 2020-10-30 Fitouri Response to City's INT1_Fitouri.FINAL.v2 |
| 573 | N/A | 2020-10-30 Fitouri Response to City's INT1_Taylor.Amd.FINAL |
| 574 | N/A | 2020-10-30 Fitouri Response to City's INT1_Taylor.Amd.Verification |
| 575 | N/A | 2020-11-05 BLM 5280 Plaintffs' Objs. and Resp. to Defs' Discovery Requests |
| 576 | N/A | 2020-11-22 Fitouri Amended Response to City's INT 1-3.Sannier.FINAL |
| 577 | N/A | 2021-04-05 BLM 5280 Plaintff Epps's First Supplemental Response to Defendants' First Set of Discovery Requests |

| | A | B |
|---|---|---|
| 578 | N/A | 2021-04-05 BLM 5280 Plaintiff Lyman's First Supplemental Response to Defendants' First Set of Discovery Requests |
| 579 | N/A | 2021-04-09 BLM 5280 Plaintiffs' Supp Objs & Resp to Defs' Rog 4, RFP 2 |
| 580 | N/A | 2021-04-09 - Defs' Second Combined Discovery Requests to Pltfs |
| 581 | N/A | 2014AnnualReport_OIM_re BWC SWAT |
| 582 | N/A | 2014AnnualReportPolicyHighlight_OIM_re BWC SWAT |
| 583 | N/A | 2015AnnualReport_OIM_BWC |
| 584 | N/A | 2017SemiannualReport_OIM_see fn56 |
| 585 | N/A | Deposition Transcript of Patrick Phelan |
| 586 | N/A | Deposition Transcript of Sgt. David Abeyta |
| 587 | N/A | Deposition Transcript of John Sampson |
| 588 | N/A | Deposition Transcript of Tana Cunningham |
| 589 | N/A | Deposition Transcript of Nicholas Mitchell |
| 590 | N/A | Deposition Transcript of DPD Officer Keith Vaentine |
| 591 | N/A | Deposition Transcript of Lt. J.D. Williams |
| 592 | N/A | Deposition Transcript of Lt. Thomas Pine |
| 593 | N/A | Deposition Transcript of Lt. Vincent Porter |
| 594 | N/A | Deposition Transcript of Chief Paul Pazen |
| 595 | N/A | [16] Order Granting in Part TRO (Abay) |
| 596 | N/A | Defendant City and County of Denver's Responses to Fitouri Plaintiffs' First Set of Requests for Admission |
| 597 | N/A | Defendant City and County of Denver's Objections and Responses to Black Lives Matter 5280 Plaintiffs' Third Set of Interrogatories (NO.16) |
| 598 | N/A | Defendant City and County of Denver's Supplemental Responses to Fitouri Plaintiffs' Interrogatories |
| 599 | N/A | Deposition Transcript of Johnathan Christian |
| 600 | N/A | List of relevant videos and notes |
| 601 | 4569683_07E48613175E4C5D94A80F37102C409D_200528_4569683_Police_Accountability_Protests_Turn_Violent_In_D_4000.mp4 | |
| 602 | 4570369_327C29C2F6C44F8C88A6A46A82A6577F_200529_4570369_Chaos_At_The_Capitol__People_Protesting_Death_Of_4000.mp4 | |
| 603 | 4570373_BBC25FD2B9B3416CA77C29149900AAE3_200529_4570373_George_Floyd_Death__Peaceful_Protest_In_Denver_T_4000.mp4 | |
| 604 | 4570514_CB3787BE398E4E62BC9BDE5EBFFD262A_200529_4570514_Denver_Mayor__Violence_During_George_Floyd_Prote_4000.mp4 | |

| | A | B |
|---|---|---|
| 605 | 4570857_45917ACF8CC34C539720CA3AAFDE 96DA_200529_4570857_A_Few_Agitators_With in_The_Group_Of_Protesters_L_4000.mp4 | |
| 606 | 5-28-2020 1.mp4 | 9 News video |
| 607 | 5-28-2020 2.mp4 | 9 News video |
| 608 | 5-28-2020 4.mp4 | 9 News video |
| 609 | 5-30-2020 2.mp4 | 9 News video |
| 610 | 5-30-2020 4.mp4 | 9 News video |
| 611 | 5-30-2020 7.mp4 | 9 News video |
| 612 | 5-30-2020 12.mp4 | 9 News video |
| 613 | 5-31-2020 4.mp4 | 9 News video |
| 614 | Live coverage 5-30-2020.mp4 | 9 News video |
| 615 | 6-1-2020 4.mp4 | 9 News video |

# EXHIBIT C

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO

2

Civil Action No. 20-cv-01878-RBJ

3

ELISABETH EPPS,
4   AMANDA BLASINGAME,
    ASHLEE WEDGEWORTH,
5   MAYA ROTHLEIN,
    ZACH PACKARD,
6   HOLLIS LYMAN,
    CIDNEY FISK,
7   STANFORD SMITH,
    SARA FITOURI,
8   JACQUELYN PARKINS,
    KELSEY TAYLOR,
9   JOE DERAS, and
    CLAIRE SANNIER,

10

11      Plaintiffs,

12  vs.

13  CITY AND COUNTY OF DENVER, and
    JONATHAN CHRISTIAN,

14      Defendants.

15  _____

16                  **REPORTER'S TRANSCRIPT**
                TRIAL TO JURY - DAY THREE
17

18  _____

19      Proceedings before the HONORABLE R. BROOKE JACKSON,

20  Senior Judge, United States District Court for the District of

21  Colorado, continuing at 9:03 a.m., on the 9th day of March,

22  2022, in Courtroom A902, United States Courthouse, Denver,

23  Colorado.

24              THERESE LINDBLOM, Official Reporter
              901 19th Street, Denver, Colorado 80294
25       Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

Norman Stamper – Direct

1    individual has to be justified by the specific situation and

2    actions of the person against whom it is deployed?

3    A.  Yes, sir.

4            MR. DOUGLAS:  Thank you.

5            THE COURT:  Follow up from the defendants' side?

6            MS. HOFFMAN:  Nothing further.

7            THE COURT:  Okay.  Thank you, Chief.

8            THE WITNESS:  Thank you.

9            THE COURT:  You're excused.  Free to go.

10           THE WITNESS:  Thank you.

11           THE COURT:  You're welcome to stay and watch if you

12   want.

13           THE WITNESS:  No, sir.  But thank you.

14           THE COURT:  I always get that response.

15           Okay.  Next.

16           MR. ARO:  Good morning, Your Honor.  Ed Aro of

17   Arnold & Porter for the Epps plaintiffs.  The plaintiffs now

18   call Captain Norman Stamper.

19               (**NORMAN STAMPER, PLAINTIFFS' WITNESS, SWORN**)

20           THE COURT:  Have a seat.

21           THE WITNESS:  Thank you.

22                          **DIRECT EXAMINATION**

23   BY MR. ARO:

24   Q.  Good morning.

25   A.  Good morning.

Norman Stamper - Direct

1    *Q.*  I already demoted you.  I meant to say Chief.

2          Would you say your name for the record, please.

3    *A.*  Yes.  My name is Norman Stamper, S-T-A-M-P-E-R.

4    *Q.*  Where do you live?

5    *A.*  I live in Orcas Island off the state of Washington.

6    *Q.*  Is it fair to describe you as a career police officer and

7    commander?

8    *A.*  Yes.

9    *Q.*  You're here today to talk about police practices and proper

10   crowd control techniques?

11   *A.*  Yes.

12   *Q.*  Did you help us put together a PowerPoint deck to contain

13   the video and the other materials that we're here to talk

14   about?

15   *A.*  I did.

16         *MR. ARO:*  May I publish that, Your Honor?

17         *THE COURT:*  I don't know what it is you're publishing.

18         *MR. RINGEL:*  I've never seen it.

19         *MR. ARO:*  So there -- there are two things.  There is

20   a deck that has sort of chapter headings that we're going to

21   talk about to help the jury follow how things relate, and a

22   brief summary of his background.  And then we put the videos

23   and the documents into it in a form that we've already

24   discussed with counsel.  And the -- all of the materials were

25   stipulated or was contained in his reports.  It's all fully

Norman Stamper - Direct

1    disclosed, and -- except for a couple of the exhibits that

2    Mr. Ringel was talking about earlier, which I will pause before

3    we play so that he can make his record.  That's what we have in

4    mind.

5         THE COURT:  To begin with, you have to put an exhibit

6    number on it.

7         MR. ARO:  There are exhibit numbers on everything;

8    there are times on everything.  Because he saw so many videos

9    and because he has so many videos to talk about, nearly 50, we

10   put them into a PowerPoint deck so that we could do it quickly,

11   as opposed to having to bring them up one by one.

12        THE COURT:  Okay.  So what's the exhibit number of the

13   PowerPoint deck?

14        MR. ARO:  I'd be happy to put an exhibit number on it.

15        1242, Your Honor.

16        MR. RINGEL:  I don't have an objection to the deck and

17   the usage of that for video; but to the -- you know, I haven't

18   seen any text or anything like that, so I can't stipulate now

19   to any other information other than the videos at that point.

20        THE COURT:  Okay.  Well, let's get started.  I'll

21   conditionally admit it.

22        But, Mr. Ringel, you may object to any portion of it

23   you want as we go forward.

24        MR. ARO:  I appreciate that, Your Honor.  Thank you.

25        MR. RINGEL:  Thank you, Your Honor.  I don't even know

Norman Stamper - Direct

1    if I'll have an objection.  It's not just something I've ever

2    seen.

3              *THE COURT:*  I know.  I get it.

4    *BY MR. ARO:*

5    *Q.*  I'd like to start before we get into your opinions with a

6    brief description of your background, starting when you first

7    entered the police profession.  How old were you when you first

8    joined the police force?

9    *A.*  Twenty-one.

10   *Q.*  And what year was that?

11   *A.*  1966.

12   *Q.*  Where did you join the police force at that time?

13   *A.*  San Diego.

14   *Q.*  And how long were you an officer and commander in

15   San Diego?

16   *A.*  Twenty-eight years there.

17   *Q.*  Without going through every single assignment you had,

18   would you describe for us the arc of your time with the

19   San Diego PD.

20   *A.*  Yes.  I was a police patrol officer, I did a couple of

21   undercover stints during that tenure, was promoted to sergeant,

22   formed a patrol planning unit, then promoted to lieutenant,

23   during which time I wrote a grant proposal for, actually, the

24   country's first community policing program.  I served in that

25   capacity as a lieutenant for four years, promoted to captain,

Norman Stamper - Direct

1    served in that capacity for eight months, at which time I

2    basically approached the chief and told him that I was going to

3    be resigning.  He then spoke to the city manager, and the two

4    offered me a job that was attractive to me, which I took.  And

5    that was --

6    Q.  Why were you thinking about resigning at that point?

7    A.  I had developed a real passion for police reform and

8    believed that -- on a national scale and believed that I could

9    do more and better work as a consultant, as a professor, and,

10   in fact, was talked out of that by the city manager and the

11   police chief.

12   Q.  What was the job that they offered you that enticed you to

13   rejoin the force?

14   A.  Organizational ombudsman.

15   Q.  And what did that role consist of?

16   A.  It involved participating in forming conflict management

17   mechanisms in the community and within the police department.

18   I studied at that time organization development and learned

19   what I could, forming a body of knowledge about what works and

20   what doesn't work in organizational change.

21   Q.  How long did you have that role?

22   A.  Six years.

23   Q.  And what was your next job with the San Diego PD?

24   A.  The next job was as an assistant chief.

25   Q.  How long did you hold the role of assistant chief?

Norman Stamper - Direct

1    A.  I held that role for approximately six or eight years, as I

2    recall.  I served in each of the bureaus of the department --

3    investigations, patrol, human resources or personnel services,

4    and the like.

5    Q.  What was your next job after that?

6    A.  The next job was as the number two officer in the

7    department, the assistant chief of police.

8    Q.  And roughly how many officers did the San Diego PD have at

9    the time that you became the number two?

10   A.  At that time, it was approximately 1,800, as well as 3 or

11   400 civilian personnel.

12   Q.  How long did you hold the job as the assistant chief?

13   A.  As the executive assistant chief, that was five years.

14   Q.  Okay.  And what was your next job?

15   A.  Seattle's police chief.

16   Q.  How was it that you became Seattle's police chief?

17   A.  I was recruited by an executive search firm and was

18   selected by the mayor of the City of Seattle.

19   Q.  I'll let you fill your cup.

20   A.  Thank you.

21   Q.  When did you become the chief of police in Seattle?

22   A.  That was 1994.

23   Q.  How long did you hold that role?

24   A.  Six years.

25   Q.  How big was the Seattle PD when you were chief?  How many

Norman Stamper - Direct

1    civilians and how many officers?

2    A.   There were about 1,300 sworn police officers and several

3    hundred, 4 to 500 civilian personnel.

4    Q.   Okay.  During the time that you were the chief of police in

5    Seattle, did you have any exposure to crowd control and crowd

6    management situations?

7    A.   I did.

8    Q.   Had you previously dealt with crowd control and crowd

9    management when you were working in San Diego?

10   A.   Yes.  At all levels.

11   Q.   How many times during your time in San Diego, the 28 years

12   you spent there, were you involved directly as an officer or a

13   commander in a crowd control situation in the nature of a

14   protest?

15   A.   Several dozen.  This was the '60s, so we were looking at

16   everything from campus unrest, to antiwar demonstrations, to

17   assorted labor actions, as well.

18   Q.   And during any of those protests were you a -- for lack of

19   a better word -- street cop in the front lines?

20   A.   The each of the levels.  I started as a patrol officer; in

21   control of the squad of officers during protests, as a

22   sergeant; as a field commander, lieutenant, responsible for the

23   police department reaction to protests.

24   Q.   And in any of those protest situations that you were

25   involved in in San Diego, was there violence on the part of

Norman Stamper - Direct

1   some of the people in the crowd?

2   A.   Yes.

3   Q.   People yelling, people throwing things, vandalism, that

4   kind of thing?

5   A.   That and other activities, like arson fires and the like.

6   Q.   Okay.  During the time that you were in Seattle, you also

7   had some involvement in crowd management in the nature of

8   public protest?

9   A.   That's correct.

10  Q.   Was there a particular public protest that you had

11  responsibility for during your time as the Seattle PD chief?

12  A.   Well, certainly the one that is -- was most significant

13  during my tenure was the so-called Battle of -- or in --

14  Seattle, which was the World Trade Organization

15  anti-globalization riots.

16  Q.   When did those happen?

17  A.   Late November, early December 1, 1999.

18  Q.   So this is the year before you left the department?

19  A.   Correct.

20  Q.   Are you aware of roughly how many protesters were involved

21  in the WTO protests, the event you just described?

22  A.   Sure.  Depending on day of week or time of day, the number

23  ranged from 40,000 to 60,000.

24  Q.   And was there violence among some of the people who were

25  protesting?

Norman Stamper - Direct

1   A.   There -- I'm sorry.  Yes, there was.

2   Q.   What kind of violence?

3   A.   The dumpster kind of action that was described earlier

4   today, we saw a fair amount of that; we saw arson fires; we saw

5   rocks and bottles thrown at police officers and at our horses;

6   we saw police cars torched; and a significant amount of

7   violence over the course of that week.

8        MR. ARO:  Your Honor --

9   BY MR. ARO:

10  Q.   Actually, two more questions.  Give me a brief thumbnail of

11  your education since high school.

12  A.   Since high school, an associate of arts -- associate of

13  science -- I'm sorry -- in what was then called police science,

14  and then criminal justice degrees at the baccalaureate and

15  master's level at San Diego State University, and then a Ph.D.

16  in leadership and human behavior from United States

17  International University, which is now known as Alliant

18  International University.  It merged with a school of

19  professional psychology.

20  Q.   What was your dissertation about?

21  A.   It was on the professed values versus the observed behavior

22  of American big city police chiefs.

23       MR. ARO:  At this time plaintiffs would tender Chief

24  Stamper to give expert testimony under Rule 702 concerning

25  police and crowd management practices.

1          *MR. RINGEL:*  No objections with that limited

2     designation.

3          *THE COURT:*  Okay.  Onward.

4          *MR. ARO:*  He also, Your Honor, will be tendered to

5     provide rebuttal testimony potentially at a later point in the

6     case.  I just wanted to make that clear.

7     *BY MR. ARO:*

8     *Q.*  What did you review to learn about what happened in Denver

9     and come to an understanding of the police practices that

10    you're here to testify about today?

11    *A.*  A very large number of depositions and declarations and

12    videotape.

13    *Q.*  How much videotape?

14    *A.*  I would have to say dozens and dozens of videos.

15    *Q.*  Okay.  And during the course of your evaluation of police

16    practices, did you receive everything that you feel like you

17    need to support the opinions that you're here to testify to

18    today?

19    *A.*  Yes, I do.

20    *Q.*  Okay.  And you wrote several extensive reports detailing

21    your conclusions that were provided to counsel for the City?

22    *A.*  Three reports.  Yes.

23          *MR. ARO:*  I'd like to review --

24          Your Honor, this is for purposes of transparency here.

25    The opinions that I'm going to put up in the PowerPoint all are

Norman Stamper - Direct

1    headlines from the reports that he wrote that were fully

2    disclosed before.  I'm just doing it so we can organize the

3    testimony.

4    *BY MR. ARO:*

5    *Q.*  I'd like to go through the things that you talked about

6    during the course of your evaluation, starting with an opinion

7    concerning the use of force by the DPD against protesters.  Is

8    that an issue that you evaluated?

9    *A.*  Yes.

10   *Q.*  And what was your conclusion with respect to that issue?

11   *A.*  My conclusion, as written here, is that the Denver Police

12   Department had a policy, practice, or custom of

13   indiscriminately and improperly using force against protesters.

14   *Q.*  So when we talk about indiscriminate in the context of the

15   use of force against people in a group, demonstration, or

16   protest, what does the word "indiscriminate" mean?

17   *A.*  I think the easiest way for me to explain that is to give

18   you an example.  Let's assume for a moment that there are 100

19   protesters, of which three or five may be throwing rocks,

20   bottles, or otherwise engaged in criminal behavior as the

21   others are peacefully protesting.  When less-lethal weapons,

22   munitions, tear gas, other chemical agents are used, I would

23   define that as indiscriminate.

24   *Q.*  When they're used against the people throwing rocks and

25   bottles?

Norman Stamper - Direct

1   A.  Well, indiscriminately.  If the agent, for example -- a

2   chemical agent is sprayed on everyone who is involved in that

3   crowd, with only a small handful engaged in the criminal

4   behavior, I would describe that as indiscriminate.

5   Q.  Did you also look at the question of the dispersal orders

6   that were given to or not given to protesters by DPD officers

7   involved in the George Floyd protests?

8   A.  Yes, I did.

9   Q.  And what was your opinion on that subject?

10  A.  My observation was that such dispersal orders were rarely

11  if ever given.  I had to actually hear someone say, no, there

12  is a case in which somebody can be heard saying to a group of

13  people, Disperse, disperse, or what have you.

14  Q.  Okay.

15  A.  I did not hear that one, and I don't have any evidence of

16  any other official announcements or dispersal orders.

17  Q.  Okay.  Did you also look at the extent of the discretion

18  that the DPD gave its officers with respect to the kind of

19  weapons that they would use against protesters and when to use

20  those weapons?

21  A.  I did.

22  Q.  What's your opinion on that subject?

23  A.  Again, my observation, accompanied by my opinion, is that

24  it appeared that the officers -- the line officers themselves

25  were essentially allowed to pick whatever weapon or tool they

Norman Stamper - Direct

1   chose and, in fact, to employ that against the protesters.

2   Q.  Okay.  Did you also look at the question of training and

3   the evidence of training that you see in the conduct of

4   officers who were involved in the George Floyd protests?

5   A.  Yes.

6   Q.  And what's your opinion on that topic?

7   A.  Based on what I observed of the performance and conduct of

8   the officers, I concluded that there was woefully inadequate

9   training of those officers.  I saw them as, essentially,

10  undisciplined and using techniques and methods that I know of

11  no other police department would permit.

12  Q.  Okay.  Did you also look at the question of DPD's efforts

13  to or not to hold officers accountable for improper conduct,

14  violations of policy, excessive use of force against

15  protesters?

16  A.  Yes.

17  Q.  And what's your opinion on that subject?

18  A.  There was, essentially, no discipline.  I have since

19  learned from the submission of my reports that there were one

20  or two, perhaps three officers who received some form of

21  discipline.  But in general, after looking at what I consider

22  to be acts of misconduct on the part of the officers, I was

23  asked repeatedly, do you -- was there any discipline

24  administered here or there?  And my response was, no.

25  Q.  Okay.  And did you also look at the question of

Norman Stamper - Direct

1    preparations by DPD both before George Floyd's murder and then

2    between the murder and the first day of protests in Denver --

3    preparations for potential demonstrations in Denver?

4    *A.*  I did.

5    *Q.*  And what is your opinion on that subject?

6    *A.*  My opinion on that is that from the time of the Derek

7    Chauvin murder of George Floyd, protests erupted globally, that

8    there were George Floyd protests in a thousand cities in the

9    United States, on all seven continents, now looking globally,

10   that there was a huge response on the part of people throughout

11   the world to what they had seen on May 25 of 2020 in

12   Minneapolis, and protests did in fact erupt everywhere.

13   *Q.*  What is your opinion about the efforts of the DPD, given

14   the circumstances you just described, to prepare for the

15   potential for those demonstrations to spread to Denver?

16   *A.*  Yes.  I apologize.  I -- I was describing I think what had

17   happened in the immediate wake of what the world saw on that

18   day and the time and opportunity for police agencies to come

19   together, to plan, to prepare for what I knew to be the

20   inevitable.  And I was told that Denver police officers

21   essentially said, this took us by surprise.  It was bigger than

22   anything we had ever seen.  We didn't have time to do the kind

23   of planning, preparation, and training that we would have liked

24   to have done.

25   *Q.*  And, lastly, in terms of the headlines, before we get into

Norman Stamper - Direct

1   the details, did you look at all the evidence that you saw and

2   try to identify a root cause for the errors and the improper

3   conduct of the officers that you saw on the video?

4   *A.*  Yes.

5   *Q.*  And what is your opinion on that subject?

6   *A.*  I saw what I would describe as a sweeping failure of

7   leadership, from the executive level to first-line supervision.

8   I saw a lack of training, education, a lack of accountability,

9   particularly in the form of discipline against individual

10  officers who had engaged in what was to me conspicuously

11  misconduct.

12          *MR. ARO:*  Your Honor, I know that we just took a

13  break; but we're about at noon.  I'm going to change subjects.

14  Is this a good time to break for lunch?

15          *THE COURT:*  I think that makes sense.

16          *MR. ARO:*  Okay.  Thank you.

17          *THE COURT:*  How much time for lunch today, folks?  Are

18  you going to say two hours again?  Are you going to say all

19  day?

20          *JUROR:*  Hour 15.

21          *THE COURT:*  Got it.

22          (Recess at 11:58 a.m.)

23          (In open court at 1:19 p.m.)

24          *THE COURT:*  Okay.

25          *MR. ARO:*  Okay to proceed, Your Honor?

1          THE COURT:  Yes.

2    BY MR. ARO:

3    Q.  Chief Stamper, I'd like to now get into the details behind

4    the opinions that you summarized for us before lunch, starting

5    with and really going in the order that you went through those

6    summary opinions, starting with the use of force against

7    protesters and the question of whether the DPD took steps to

8    isolate people who were violent or engaged in unlawful conduct

9    from people who were protesting peacefully.

10          And to get into that, I want to start with, what's the

11   idea -- when we're talking about isolating violent protesters

12   or people who commit acts of violence, who aren't protesting

13   anything, they're just taking advantage of the situation, what

14   is the idea of isolating those people from the group of

15   protesters who are protesting lawfully?

16   A.  Well, by definition, those who are protesting lawfully have

17   not committed any offenses.  Those who are committing criminal

18   offenses within the context of a protest should -- and any

19   number of authorities cite this -- be isolated and taken into

20   custody.

21   Q.  So you mentioned any number of authorities recognize that

22   idea.  Is there a sort of clearinghouse of good policy and

23   practice for police departments?

24   A.  Yes.  As a matter of fact, there is a model crowd control

25   policy promulgated by the International Association of Chiefs

Norman Stamper - Direct

1   of Police, also known as IACP.

2   Q.  So before we get to the policy, what is the IACP?

3   A.  It is an international association of police chiefs.

4   Q.  What kind of functions does it perform?

5   A.  It provides education and training; it drafts, circulates,

6   and alternately approves model policies for a variety of police

7   functions.

8   Q.  Is IACP a recognized body among police departments like

9   Seattle or Denver, San Diego, as a source of good ideas about

10  how to do policing?

11  A.  Yes.  In the company of the Police Executive Research

12  Forum, the Police Foundation, IACP is probably seen as the

13  premier organization for those kinds of proposed policies to be

14  adopted by local jurisdictions.

15  Q.  Do you know anything about whether the Denver Police

16  Department has taken guidance from or accepts guidance from

17  IACP in the development of policies?

18  A.  Yes.

19  Q.  What do you know about that?

20  A.  That they do, in fact, recognize IACP and embrace,

21  certainly, many of their model policies.

22      MR. ARO:  Okay.  Would you please put up Exhibit 1016.

23  Actually -- put it up on the screen there.

24  BY MR. ARO:

25  Q.  Do you recognize Exhibit 1016?

Norman Stamper – Direct

1    *A.*  I do.

2    *Q.*  What is it?

3    *A.*  It is the concepts and issues paper, Crowd Management

4    Proposed Policy, from IACP.

5              *MR. ARO:*  Any objection?

6              We'd like to offer 1016 without objection.

7              *MR. RINGEL:*  No objection.

8              *THE COURT:*  Admitted.

9              (Exhibit 1016 admitted.)

10             *MR. ARO:*  Does the jury have access to that now?

11   *BY MR. ARO:*

12   *Q.*  So this is an excerpt from this concepts and issues paper

13   from the IACP that talks about crowd management.  And I want to

14   walk through it quickly with a focus on this question of

15   isolating people who are violent from people who are exercising

16   their rights properly.

17             The statement starts out, "Prior to deployment, all

18   personnel engaged in crowd management or control should be made

19   aware of the ground rules for the use of force as part of their

20   briefing and any terms that may have been negotiated between

21   law enforcement and demonstration organizers."

22             Is it customary or done in police circles that before

23   a protest or even during a protest, communication is had

24   between the police and protesters to try to figure out rules of

25   engagement to reduce the risk of violence?

Norman Stamper - Direct

1   A.   Yes.

2   Q.   How does that happen?

3   A.   There is an initiative by either side, or perhaps even

4   both, to come to the table and discuss rules of engagement, or

5   the policies, procedures, and practices that would be employed

6   by local law enforcement in policing that protest.

7   Q.   "Officers providing support" -- and I'm again reading from

8   the policy.  "Officers providing support from other agencies

9   should always be briefed on policies related to the use of

10  force and crowd control."

11       Are we talking there about the idea of mutual aid

12  agencies, where Denver brings in Aurora or some other

13  jurisdiction's police to help with the demonstration?

14  A.   Yes.

15  Q.   And why is it important for there to be really good

16  coordination between different agencies who are working

17  together to respond to a particular situation?

18  A.   Well, it's understood that if a demonstration or a protest

19  is taking place in the city of Denver, that the Denver Police

20  Department and the city of Denver would essentially be

21  establishing the rules of engagement.

22  Q.   And making sure that these other agencies follow them?

23  A.   Absolutely.

24  Q.   The next line is -- says -- it's the one that is

25  highlighted on the screen -- "The fact that some individuals in

Norman Stamper - Direct

1    a crowd have engaged in unlawful conduct does not normally

2    provide blanket grounds for use-of-force countermeasures, crowd

3    dispersal, or declaration of an unlawful assembly."

4           Is it out of the ordinary for a few folks to show up

5    at a protest and use that as an opportunity to commit acts of

6    violence?

7    A.  Not at all.

8    Q.  Does it happen in lots of protests?

9    A.  I've seen it in virtually every protest I've witnessed over

10   the years.

11   Q.  So even if there are rules of engagement that speak to the

12   issue of peaceful protest and cooperation between a police

13   agency and the protesters, is it fair for police agencies to

14   anticipate some kind of violence?

15   A.  Yes.

16   Q.  In planning for that sort of a scenario, where you've got a

17   large group of people -- maybe very large -- anticipation of

18   violence, and the need to address that violence, what is the

19   proper police approach to isolating people who may take

20   advantage of the situation to just create mayhem?

21   A.  It's typically accomplished through arrest teams.  You have

22   a certain number of officers designated as an arrest team.

23   They are physically situated to one side or the other or

24   behind, for example, a skirmish line.  And their job is, in

25   fact, to conduct sort of a surgical operation, go into the

Norman Stamper - Direct

1    crowd and arrest those who are in fact engaged in unlawful

2    behavior.

3    Q.   You used the word "skirmish line."

4    A.   Yes.

5    Q.   And we will see some examples of this.  Is it fair to say a

6    skirmish line is a line of police officers shoulder to shoulder

7    who are standing in place to keep the crowd from moving where

8    they are?

9    A.   True.  Yes.

10   Q.   And it's not uncommon for officers in a skirmish line to be

11   wearing protective equipment?

12   A.   Often called hard gear.  Yes.

13   Q.   Helmets and chest protectors and other sorts of gear that

14   we'll see pictures of later?

15   A.   Helmets, chest protectors, face masks.  In the case of male

16   officers, groin cups.  In some instances, shin guards, as you

17   would see at Coors Field, for example.

18   Q.   Okay.  And when you said that an arrest team would be

19   situated either behind the skirmish line or off to the side,

20   what did those arrest team members -- first off, how many would

21   there be?  In a protest where there is, let's say, 1,000 people

22   collected in a public place, how many arrest teams and how many

23   members of each team would there typically be?

24   A.   It varies widely, given the nature of the demonstration or

25   the protest, as well as local resources.

Norman Stamper – Direct

1    Q.   Okay.  In the situation that I'm talking about, would you

2    have maybe one or two arrest teams, or would you have ten

3    arrest teams?

4    A.   I would add one more qualifier.  That is, given the nature

5    of the unlawful behavior, you may have as few as three or four

6    officers, you may have as many as 20 or 30.

7    Q.   Okay.  And would those officers typically be wearing

8    protective hard gear like you described?

9    A.   They'd be wearing their normal uniforms, which would in

10   almost all jurisdictions include a so-called bulletproof or a

11   ballistic vest.

12   Q.   Would they be wearing helmets, typically?

13   A.   In most cases they would be.

14   Q.   And describe the function in a scenario where you've got a

15   group of protesters, somebody throws a bottle, one person, what

16   would an arrest team in that scenario who had been staged and

17   trained properly do?

18   A.   They would go into the crowd and make that arrest.

19   Q.   What about the danger of them being struck by projectiles

20   that might be thrown by other protesters?

21   A.   That is the reason that they would be typically equipped

22   with a helmet.  And it's also understood that your arrest team

23   members are among the most physically fit, agile, and competent

24   police officers, known for their patience and for their

25   discipline.

Norman Stamper - Direct

1    Q.  Okay.  And would there typically be communication between

2    the officers in the skirmish line or their command and the

3    protesters announcing the presence of an arrest team?

4    A.  Yes.  Typically there would be.

5    Q.  How would that happen?

6    A.  The incident commander -- the field commander in a given

7    situation would be communicating with the lead of the arrest

8    team.  And if, as is always suggested, there is communication

9    between police leadership, field leadership, and protesters,

10   that all would be involved in that conversation.

11   Q.  Okay.  And would it -- tell me what the purpose of making

12   the arrest right after the offense -- the throwing of a

13   bottle -- what are we trying to accomplish as an arrest team at

14   that point?

15   A.  The sooner and the more effectively that is accomplished,

16   it sends a message to other protesters that you are permitted

17   to gather, to assemble, to express yourselves peacefully, not

18   violently; and if you engage in this violent unlawful behavior,

19   this will happen to you, as well.

20   Q.  Arresting these folks also removes them from the mix and

21   prevents them from throwing another rock or bottle?

22   A.  It does.

23   Q.  Okay.  Now I want to take a look at a particular scenario

24   where we see very clearly a protester throw a rock.

25              I'm going to offer first a still from and then a

Norman Stamper - Direct

1    video, Exhibit 644, Your Honor.  And it's being offered without

2    objection.

3            THE COURT:  All right.  Admitted.

4            (Exhibit 644 admitted.)

5            MR. ARO:  So do you see everybody on their screens a

6    picture with a circle on it?  All right.

7    BY MR. ARO:

8    Q.  So Chief Stamper, would you tell us what we're looking at

9    here, when and where and what?

10   A.  We are looking at a collection of protesters on the street

11   corner outside the capitol.  And circled is a woman who will

12   throw an object --

13   Q.  Okay.

14   A.  -- at the police.

15           MR. ARO:  All right.  So let's take a look at the

16   video itself.  For the record, it's 6:56 p.m. on day three,

17   which was May 30, Saturday afternoon.

18           (Video played.)

19   BY MR. ARO:

20   Q.  So first off, in this scenario that we just looked at, are

21   you aware of whether Denver had -- the Denver Police Department

22   had deployed an arrest team of the sort you talked about at

23   this location?

24   A.  There was no indication that an arrest team was used at all

25   during that week of demonstrations.

Norman Stamper - Direct

1   Q.  Okay.  And we see very clearly in the video the woman throw

2   the bottle at the officers.

3   A.  Yes.

4   Q.  And we have no idea whether it was liquid water or frozen

5   water; correct?

6   A.  I certainly don't.

7   Q.  And we agree that it's at least conceivable that a bottle

8   or a rock can hurt an officer, even if they have hard gear;

9   true?

10  A.  Yes.

11  Q.  So from the standpoint of what would have happened if there

12  had been an arrest team assigned to this location, what would

13  you have expected to see on this body-worn camera staring right

14  up those stairs?

15  A.  I would have expected to see not the use of a chemical

16  agent but, rather, the use of an arrest team.  Clearly, as soon

17  as she threw it, she ran.  But if you've got a physically fit,

18  agile arrest team, they would go after her, place her in flex

19  cuffs, and take her to the police facility.

20  Q.  Flex cuffs are sort of plastic, temporary handcuffs that

21  are used in crowd control situations?

22  A.  Yes.

23  Q.  Okay.  Are you aware of whether that individual was ever

24  arrested?

25  A.  I am not.

Norman Stamper - Direct

1    *Q.* Do you have any idea whether that person was present at

2    later events where objects might have been thrown at the

3    police?

4    *A.* I don't know.

5    *Q.* Okay. When you look at this video that we just showed from

6    a police standpoint and thinking about the idea of isolating

7    lawful protesters from people engaged in unlawful conduct, what

8    do you see here?

9    *A.* What I saw was a police officer aim and fire his pepper

10   spray at a person who could be described as violent, having

11   committed a violent act. But that spray hits not only her, by

12   apparent design; but as you can see from the video, the person

13   operating that particular weapon moves it about from one

14   direction to another and encompasses many others who have

15   nothing to do whatsoever with the throwing of that bottle.

16   *Q.* Now, in your experience, having been at all sorts of levels

17   policing in demonstration situations over almost 40 years, what

18   happens to a crowd when people who are doing nothing but

19   protesting lawfully are subjected to less-lethal weapons, like

20   we just saw?

21   *A.* What I have seen repeatedly is that when that happens, it

22   invites a growth in the number of people who are protesting, a

23   shift in emphasis from maybe a generalized protest agenda to a

24   specific one directed at the local police department.

25   *Q.* And what effect does the application of chemical weapons

Norman Stamper - Direct

1    against people who did not engage in unlawful conduct have on

2    the violence that that crowd as a whole might direct towards

3    the officers?

4    A.   It has been my experience over the years that it will

5    invite additional levels and greater intensity in the violence

6    of attacks on officers.

7    Q.   So you mentioned earlier that when you were in Seattle, you

8    oversaw the Seattle police response to the WTO protests?

9    A.   Yes.

10   Q.   And how long after -- actually, let me ask this question

11   first:  Is it fair to say that the Seattle PD generally and you

12   in particular were roundly criticized for the initial police

13   response to those protests?

14   A.   It is.

15   Q.   How long after those protests ended did you leave the

16   Seattle Police Department?

17   A.   I essentially announced my resignation at the end of that

18   week.

19   Q.   And why did you announce your resignation at the end of

20   that week?

21   A.   Because I believe I had failed my officers and the

22   community.

23   Q.   And when you say that you failed your officers and your

24   community, was there a particular mistake that you think you

25   made in directing the police response to those protests?

Norman Stamper - Direct

1   *A.*   Yes.

2   *Q.*   What was that?

3   *A.*   Several hundred, perhaps 3 to 400 protesters on the very

4   first actual day of the WTO conference had assembled in an

5   intersection just outside the Sheraton Hotel downtown.  They

6   took a seat, they linked arms, in a couple of cases there were

7   sleeves attached between two and in some cases even more

8   protesters.  So the idea, essentially, was to engage in an act

9   of civil disobedience.

10          We had in advance of that moment agreed to make a

11   symbolic number of arrests, which would allow these

12   anti-globalization protesters to make a point, to be arrested,

13   to be escorted to a prisoner transport vehicle, and to be taken

14   from that intersection on Sixth Avenue outside the Sheraton.

15   *Q.*   And what happened next?

16   *A.*   We announced to them that because of the size of the

17   crowd -- I should point out, we expected many, many thousands

18   of protesters to be coming from around the world.  We also knew

19   that the President would be in town, that the Secretary of

20   State, that the chief trade negotiator for the United States,

21   and many other dignitaries would be present.  We knew that

22   there would be in addition to thousands of WTO ministers, many

23   tens of thousands of anti-globalization protesters, as well; so

24   we knew that it was going to be very, very large.  And we were

25   surprised by how many were present on that first day.  In

Norman Stamper - Direct

1    addition to those 3 or 400, we had additional contingents

2    converging on that very location from three or four or five

3    different cites surrounding the downtown area.

4    Q.  So you have got this group of folks who are blocking

5    traffic, sitting down locking their arms at an important

6    intersection in Seattle?

7    A.  Correct.

8    Q.  And the symbolic arrests take place?

9    A.  Yes.

10   Q.  And --

11   A.  Excuse me.  That was the plan.

12   Q.  Okay.  What decision did you make that you in retrospect

13   recognize as a mistake?

14   A.  Well, I think it's useful to point out that we, like many

15   other agencies, had both an incident commander in a command

16   post and a field commander, who is running operations on the

17   streets.  The two of them were in constant contact, mostly by

18   police radio.  I was also present at the scene.  I was

19   monitoring the back and forth between those two members of my

20   command staff.  And they had early on decided there were

21   altogether too many people for us to honor our pre-conference

22   commitment that we would make these symbolic

23   media-attention-grabbing arrests.  So we -- we conferred with

24   protest leaders; and we told them, all bets are off.  We cannot

25   do that.

Norman Stamper - Direct

1    *Q.*  And what decision was made that you later regretted?

2    *A.*  The decision was made to warn those who are on a sit-in

3    demonstration, basically, that they had to move; that if they

4    failed to move, they would be subjected to chemical weapons.

5    In this case, to CS gas.

6    *Q.*  CS gas is also sometimes called --

7    *A.*  Tear gas.

8    *Q.*  And what ended up happening?

9    *A.*  What ended up happening is that the field commander gave a

10   command through the bullhorn that he repeated I'm guessing

11   twelve, fifteen times over the course of a half an hour,

12   explaining, essentially, that we could not make, given the

13   sheer numbers of people we were looking at, physical custody

14   arrests, that we regretted not being able to do what we had

15   agreed to do, but that if they didn't get up and move, we would

16   use chemical agents to move them.

17   *Q.*  And they didn't move?

18   *A.*  They did not.

19   *Q.*  And what happened next?

20   *A.*  The warning was repeated, as I mentioned, many times over

21   the course of a half an hour in time.  I went to the far side

22   of that crowd to see whether or not I could hear clearly and

23   audibly the order that was being given by the police captain

24   who was at the scene.

25   *Q.*  And was gas ultimately deployed?

Norman Stamper - Direct

1   *A.*  It was.

2   *Q.*  And did it disperse the crowd?

3   *A.*  It was, as it, frankly, always does.  Gas works.

4   *Q.*  And you believe to this day that deploying gas was a

5   serious error; true?

6   *A.*  It took me five years, frankly, to come to that conclusion.

7   I announced my resignation on Saturday of that week, stuck

8   around for purposes of transition issues and so forth for --

9   actually, for two months.  I then entered retirement.  I was --

10  shortly thereafter, published a book, was on book tour,

11  listening to a lot of people who had come to Seattle for the

12  WTO conference protests.

13  *Q.*  And what did you ultimately conclude about the deployment

14  of gas on the first night of the WTO protests in Seattle and

15  why it was a mistake?

16  *A.*  That it was a huge mistake to use chemical agents against

17  those who were nonviolent and, indeed, nonthreatening.

18  *Q.*  And that act resulted in what outcome in the protest in

19  Seattle?

20  *A.*  In the protest, it cleared the intersection.  I mentioned

21  earlier, it's a rare occasion -- I don't know of any -- in

22  which tear gas does not accomplish the purpose that is

23  formulated at the time that you decide to use it.

24  *Q.*  So it works in the short term.  What does it do in the long

25  term?

Norman Stamper - Direct

1   *A.*  It works very well in the short term; it works very badly

2   in the long term.  If you are punishing -- and tear gas is

3   punishing to human beings.  It produces tears; it produces a

4   runny nose; it produces much more serious problems for those

5   with any kind of a pre-existing medical condition.  I think it

6   can be seen as cruel, and especially if there is no good

7   justification for its use, excessive.  It is clearly excessive

8   force, in my opinion.

9   *Q.*  And in Seattle, did that decision to deploy gas result in

10  avoidable violence?

11  *A.*  Absolutely.

12  *Q.*  I want to take a look at what happened on the first night

13  of the protests in Denver and ask you some questions about how

14  it affected the course of this -- this incident happened on

15  May 28, the first day of the protests in Denver, a little

16  before 10 o'clock.

17          On the first day of protest, was there a curfew in

18  place?

19  *A.*  No.

20          *MR. ARO:*  And I'm going to put up first Exhibit 596,

21  which I'll offer by stipulation, Your Honor.

22          *THE COURT:*  Admitted.

23          (Exhibit 596 admitted.)

24  *BY MR. ARO:*

25  *Q.*  And what we have here is a group of protesters that you can

Norman Stamper - Direct

1    see there in the middle of Lincoln Street, right in front of

2    the state capitol.

3    A.   Yes.

4    Q.   And I want to play a little bit of video from this view and

5    then take a couple of other looks at it.  This is from the

6    body-worn camera of DPD Officer Cain.

7              (Video played.)

8              Now, this is part of a much longer video that you've

9    looked at as part of your work here; correct?

10   A.   Yes.

11   Q.   Before the officers deployed tear gas and fired their

12   pepper ball weapons, systems, had you anything from that crowd

13   that involved violence directed towards the protesters?

14   A.   Towards --

15   Q.   Excuse me.  Towards the officers?

16   A.   I did not.  No.

17   Q.   Did you see any bottles being thrown, rocks being thrown?

18   A.   No.

19   Q.   Weapons being brandished?

20   A.   No.

21   Q.   And did you hear before the gas was deployed a dispersal

22   order that was audible to the crowd?

23   A.   No.

24   Q.   Now, you can't see because of the way that the officer is

25   facing who threw those cans, so we need to look at a different

Norman Stamper - Direct

1    video for that.

2            This is Exhibit 24, Your Honor, which we'd offer by

3    stipulation.

4            *THE COURT:* All right.  Admitted.

5            (Exhibit 24 admitted.)

6    *BY MR. ARO:*

7    *Q.* Now, this comes from a Colorado State Patrol camera that is

8    mounted above the -- on the top of the capitol, sort of looking

9    down on the protesters; correct?

10   *A.* Yes.

11   *Q.* And we can see right here -- I've circled on the screen --

12   the skirmish line of officers that we were just looking at a

13   body-worn camera from; correct?

14   *A.* Correct.

15   *Q.* The officer who had that camera is probably located over

16   there towards this side.

17           Now, as I play this, I want you to watch the vehicle

18   just entering the screen on the upper left-hand corner of the

19   screen.  Do you see that?

20   *A.* Yes, I do.

21   *Q.* Now, we see a white vehicle entering the screen that has

22   sort of dark sides on it.

23   *A.* Yes.

24           *MR. ARO:* Would you pause that for us.

25

Norman Stamper – Direct

1    *BY MR. ARO:*

2    *Q.*  Now, are you familiar with what we're looking at there,

3    that white vehicle?

4    *A.*  I am.

5    *Q.*  What is that?

6    *A.*  It's called commonly a rapid deployment vehicle.

7    *Q.*  And that's basically a big SUV that has rails and steps on

8    the outside for officers to hang onto?

9    *A.*  Yes.

10   *Q.*  It's a way to get officers quickly from one place to

11   another?

12   *A.*  Correct.

13   *Q.*  And what are the black things or gray things that we see on

14   the outside of the vehicle?

15   *A.*  Those would be people.  Those are the police officers.

16          (Video played.)

17   *Q.*  Okay.  So -- sorry.  We will -- we will continue to watch

18   the vehicle pull forward and watch as the officers step off the

19   vehicle and approach the line.

20          So we see people in green fatigues; right?

21   *A.*  Yes.

22   *Q.*  And look in this area here.  Do you see things being thrown

23   through the air?

24   *A.*  I do.

25   *Q.*  What are those?

Norman Stamper - Direct

1   *A.*  They appear to be flash-bangs.  I can't be absolutely

2   certain, but they are certainly chemical agents.

3   *Q.*  Of some kind?

4   *A.*  Of some kind.

5   *Q.*  Either gas --

6   *A.*  Either smoke or gas.  Yes.

7   *Q.*  And we see the explosions rising over to the right where

8   they land; correct?

9   *A.*  Correct.

10  *Q.*  All right.  So I want to go to another body-worn camera to

11  see what exactly happened when those officers got off and a

12  little bit of sound.

13          This is Exhibit 529, which plaintiffs offer by

14  stipulation.

15          *THE COURT:*  All right.  Admitted.

16          (Exhibit 529 admitted.)

17          (Video played.)

18  *BY MR. ARO:*

19  *Q.*  And there is an officer in fatigues circled in the lower

20  right-hand corner, just as a point of emphasis.  As we play the

21  video, watch what he does.  Then we see a number of other

22  officers lobbing munitions into the crowd.

23          Now, as you intimated earlier, clearly, the deployment

24  of these munitions had the intended effect of dispersing that

25  crowd?

Norman Stamper - Direct

1    *A.*  Yes.

2    *Q.*  Quickly?

3    *A.*  Yes.

4    *Q.*  We also see here that even after the crowd had dispersed,

5    additional chemical agents were thrown into the cloud?

6    *A.*  Right.

7    *Q.*  What's the legitimate police purpose behind throwing

8    additional chemical munitions into a cloud where everybody in

9    the site has already vacated?

10   *A.*  I cannot think of a single one.  I don't believe there is

11   any justification.

12   *Q.*  Okay.  One more view of this scene, again from a body-worn

13   camera.  And the principal purpose of this is to sort of see a

14   different perspective and also to listen to what is said.

15        Have you reviewed the audio recording of the order

16   that resulted in the deployment of gas on that group of

17   protesters?

18   *A.*  Yes.

19        *MR. ARO:*  And I'm going to offer this, Your Honor.

20   It's 598 by stipulation.  And the only thing that I want to

21   offer into evidence is the videotape itself.  The order is kind

22   of hard to hear, so we've added a subtitle across the screen so

23   the jury can follow it.

24        And I invite counsel to object if he think it's

25   inaccurate.

Norman Stamper - Direct

1          THE COURT:  All right.  598, no objection.  Admitted.

2          (Exhibit 598 admitted.)

3     BY MR. ARO:

4     Q.  So this is the other end of the skirmish line on the side

5     of the street near the capitol itself; right?

6     A.  Yes.

7     Q.  And we're looking at the same crowd.  And I'm going to just

8     play this video and ask you and the jury to listen for what the

9     officer says.

10         Do you know who the officer that gave this order is?

11    A.  I do.

12    Q.  Who is it?

13    A.  Commander Phelan.

14    Q.  Who is the incident commander?

15    A.  Who is the incident commander.

16         (Video played.)

17    Q.  To this point, had you seen anything on any of the video

18    views you had of provocation from the crowd towards the police?

19    A.  No.

20    Q.  To this day, do you have any idea why Commander Phelan gave

21    that order?

22    A.  I can speculate; but the short answer is, no, I do not.

23    Q.  So let's watch what happens in that video, then.

24         Can you play that for me?

25         (Video played.)

Norman Stamper - Direct

1    And shortly after this, the explosives start to rain

2    down on this crowd; is that fair?

3    A.   Yes.

4    Q.   We cut it short.  What's the predictable response of a

5    peaceful crowd to being tear-gassed under the circumstances

6    we've just seen?

7    A.   Well, as I mentioned, the first predictable response is

8    that they will, in fact, disperse.  They'll move this direction

9    and that direction.  They're generally blinded at that moment

10   and find it very difficult to actually see.  But then there is

11   an almost inevitable -- all but inevitable response to

12   reassemble.

13   Q.   And when they reassemble, what's their mood, typically?

14   A.   They're angry and hurt.  They typically feel betrayed, from

15   my conversations with many over the years.  We weren't doing

16   anything wrong.  We were chanting, for example, "Hands up.

17   Don't shoot," or "No justice, no peace," and we got a face full

18   of gas.

19   Q.   All right.  I want to move to another situation in which

20   chemical agents were deployed under circumstances that you

21   question.

22   This happened on the third day, May 30, that Saturday,

23   at about 5:45 in the afternoon on Lincoln just north of Colfax;

24   correct?

25   A.   Uh-huh.

Norman Stamper - Direct

1    *Q.*  And the first view of this that we have is Exhibit 56 --

2    excuse me -- 656, which plaintiffs offer by stipulation.

3                *THE COURT:*  Admitted.

4                (Exhibit 656 admitted.)

5    *BY MR. ARO:*

6    *Q.*  And we see the crowd across the street, capitol on the

7    left, and the downtown city bus terminal on the right side of

8    the street; correct?

9    *A.*  Yes.

10               (Video played.)

11   *Q.*  So at this point we have -- the skirmish line is moving

12   forward; correct?

13   *A.*  Yes.

14   *Q.*  And is there a police term for the tactic of sort of using

15   a moving skirmish line to move a crowd?

16   *A.*  I'm sure that there is one that escapes me.  But it's,

17   essentially, form a skirmish line, move -- the idea being to

18   move that crowd.

19   *Q.*  So pushing them out of the way?

20   *A.*  Absolutely.  Yes.

21   *Q.*  Not using munitions but just the physical police presence?

22   *A.*  Exactly.  Oftentimes batons are used in this particular

23   formation.

24   *Q.*  So a baton is essentially a long stick?

25   *A.*  Yes.

Norman Stamper - Direct

1    Q.  And in a push situation like this, that stick would be held

2    this way?

3    A.  It either could be held that way, which is described as

4    port arms, or it could be held straight out.  The idea is that

5    it is not being used, for example, as many might think, as a

6    club.  It isn't that being used to move a crowd.

7    Q.  Is this sort of technique, using a moving skirmish line to

8    relocate a crowd, an effective and approved tactic?

9    A.  It absolutely is.  Yes.

10   Q.  Commonly used by police departments?

11   A.  Yes.

12   Q.  When you're facing a situation like this, with the skirmish

13   line getting very close to the front line of the protesters, is

14   the proper police tactic to use that moving skirmish line

15   instead of a chemical agent or to use it in addition to

16   chemical agents to move the crowd?

17   A.  It is intended at that point to use it instead of chemical

18   agents.

19   Q.  Why?

20   A.  For reasons, really, that we have discussed.  That chemical

21   agents are painful, disorienting, and oftentimes backfire.

22   Have the effect of creating even more animosity toward the

23   police.

24   Q.  So let's see what these officers chose to do.

25            Would you keep playing that video from where we were.

Norman Stamper - Direct

1         (Video played.)

2         So at this point the officers, instead of using the

3    moving skirmish line to move the crowd, what happened?

4    A.   They advanced on the crowd, then pretty much stopped and

5    deployed chemical agents.  Pepper ball is very prominent in

6    this particular scenario.  You can see evidence of the pepper

7    balls on the asphalt.

8    Q.   So the little white things on the ground are the residue

9    from the pepper balls bouncing off the ground?

10   A.   Yes.

11   Q.   And these shots obviously were not fired directly at the

12   protesters; they were fired deliberately into the ground?

13   A.   Yes.

14   Q.   What's the technique called when you fire those pepper

15   balls into the ground?

16   A.   Well, that's a skip-firing process, the idea being to lay

17   down that chemical munition, not against people but, rather,

18   against the ground.  And then the smoke comes up and works its

19   magic.

20   Q.   We also see an officer on the right-hand side here standing

21   on top of the hill with a red can in his hand; correct?

22   A.   Yes.

23   Q.   What is that can?

24   A.   That would be CS -- excuse me.  That would be pepper spray.

25   Q.   Okay.  And we see that spray basically covering that area;

Norman Stamper - Direct

1    right?

2    *A.*   Yes.

3    *Q.*   Being aimed at the gentleman with what looks like a vest

4    with some kind of symbol on the back of it?

5    *A.*   It does to me.  Yes.

6    *Q.*   Did you see that protester do anything to justify being

7    sprayed with pepper spray here?

8    *A.*   No.

9    *Q.*   And is there any justification for an officer in a

10   crowd-moving scenario to spray somebody who is just standing

11   there?

12   *A.*   No.

13          MR. ARO:  If you would keep going with that video for

14   me.

15          (Video played.)

16   *BY MR. ARO:*

17   *Q.*   Did you see the officer deploy pepper ball behind the

18   retreating crowd?

19   *A.*   I did.

20   *Q.*   Is that an approved police tactic to keep the crowd moving?

21   *A.*   If the crowd was moving, if it's showing no sign of

22   stopping, the question I would have, and in this case do have,

23   is why?  Why use any chemical agent or other weapon or tool at

24   that moment?  The crowd is doing what you want it to do.

25   *Q.*   Okay.  Now, in this next vignette, we've got the guy in the

Norman Stamper - Direct

1   vest here on the right-hand side of the screen.  See the guy up

2   on top of that concrete structure?

3   A.  I do.

4   Q.  He's the next person I'd like you to watch as we move

5   forward.

6          Actually, before we do that, do you see this officer

7   right here --

8   A.  Yes.

9   Q.  -- on the right side of the screen?

10  A.  Yes.

11  Q.  What's he holding?

12  A.  Pepper ball gun.

13  Q.  And what does he appear to be doing with it?

14  A.  He's pointing it.  He's aiming it.

15  Q.  Okay.  Like Mr. Macdonald, I grew up in a family of

16  hunters; and I was taught, you don't point something at

17  something you're not going to shoot.  Is that also true with

18  police and less-lethal weapons?

19  A.  I think it's essentially true.  Yes.

20  Q.  So are you aware, having looked at this video many times,

21  of any justification for that officer to be pointing a

22  presumably loaded weapon -- a chemical weapon at a protester?

23  A.  No, I'm not.

24  Q.  What's the impact on a crowd when officers are pointing

25  weapons at them when they're complying with orders or not

Norman Stamper – Direct

1    acting in violation of the law?

2            MR. RINGEL:  Objection.  Speculation.

3            THE COURT:  Sustained.

4            MR. ARO:  Let's move on to the next section.  Would

5    you play that forward.

6            (Video played.)

7    BY MR. ARO:

8    Q.  So we see there the crowd is being driven towards Colfax;

9    correct?

10   A.  Yes.

11           MR. ARO:  We'll take another look at that in a second,

12   but first I want to bring up Exhibit 42.  And I know there is

13   an objection to this, but I want to lay some foundation first.

14   BY MR. ARO:

15   Q.  Do you recognize Exhibit 42?  This is a still from the

16   beginning of a video, but do you recognize this as the

17   beginning of a video?

18   A.  Yes.

19   Q.  And have you looked at a lot of video of the events that

20   are being depicted here?

21   A.  I have.

22   Q.  Do you recognize this based on all of the video that you've

23   seen as depicting from an aerial standpoint, a helicopter

24   standpoint, the events that were happening on May 30, 2020, at

25   about 5:45 near Civic Center?

Norman Stamper - Direct

1    *A.*  Yes.

2    *Q.*  And you can identify this video as showing those events?

3    *A.*  Yes.

4          *MR. ARO:*  So we'd offer Exhibit 42 --

5    *BY MR. ARO:*

6    *Q.*  This is a video that you watched and relied on in forming

7    your opinions?

8    *A.*  That's correct.

9          *MR. ARO:*  We'd offer Exhibit 42.

10         *MR. RINGEL:*  May we approach?

11         *THE COURT:*  Sure.

12         (Hearing commenced at the bench.)

13         *MR. RINGEL:*  No problem with the video.  It's a 9News

14   video, so it doesn't have any time stamp on it.  I understand

15   he's trying to lay the foundation with it; but, fundamentally,

16   it doesn't have sufficient providence.  All of the HALO video,

17   all of the body-worn camera video have time stamps and date

18   stamps so we can tell when it is.

19         I don't necessarily doubt that this was the same

20   event, but there is nothing about this particular video that

21   demonstrates that it is what it purports to be.

22         *MR. ARO:*  So we subpoenaed 9News to provide a

23   foundation witness for this and a couple of other videos.  They

24   asked us if we would be satisfied with a declaration in lieu of

25   providing a live witness.  We talked to them.  They said that

Norman Stamper - Direct

1    they would stipulate to the authenticity of that video to spare

2    us from that.  So we have an unsigned declaration that we would

3    have had signed, but for their stipulation.  I'm happy to bring

4    that witness down here, but I can't get the witness here before

5    he testifies.  And it was their stipulation to the authenticity

6    of the 9News video that caused us to call him before we called

7    that authentication witness.

8         We were prepared to call the other witness first to

9    get this in before this examination, they stipped to it, and

10   now they're saying they can't agree to it.

11        THE COURT:  That doesn't sound like you.

12        MR. RINGEL:  I stipped to the authenticity, but that

13   doesn't mean that it's what it purports to be.  It's just that

14   I didn't think it was necessary for him to have a 9News person

15   to come in, but there isn't any time stamp on the video.  I

16   understand that this witness may have just provided sufficient

17   testimony to link it up based on his review of other video.

18   But my concern is it doesn't link itself up, and that's

19   different from all the other video we have in this case.

20        THE COURT:  Is there something in particular about

21   this video that is troublesome?

22        MR. RINGEL:  No.  It's the fact that it's -- no.

23   Compared to all of the other videos, no.  It's just -- it's the

24   principle of the news video being admitted into evidence in

25   this instance.  But there is no 403 issue or anything like

Norman Stamper - Direct

1    that, Your Honor.

2            *MR. ARO:*  And just for the Court's benefit, it's

3    silent.  It doesn't have any sound to it.  It's just a

4    helicopter video so you can see things, but there is no

5    commentary.

6            *THE COURT:*  All right.  Objection is overruled.

7            (Hearing continued in open court.)

8            *THE COURT:*  Okay.  Is Julie telling you stories over

9    there?  She's got a million of them.

10           *MR. ARO:*  It's Exhibit 42, Your Honor.

11           *THE COURT:*  42 is admitted.

12           (Exhibit 42 admitted.)

13           (Video played.)

14   *BY MR. ARO:*

15   *Q.*  So what we have here is an overhead video that is silent;

16   correct?

17   *A.*  Yes.

18   *Q.*  And what we see in the middle of the street --

19           Stop it, please.

20           -- is the skirmish line of officers that we were just

21   looking at; correct?

22   *A.*  Right.

23   *Q.*  So the officer whose camera we were looking at is probably

24   there or there walking over the dirt; right?

25   *A.*  I believe so.  Yes.

Norman Stamper - Direct

1   *Q.*  And we've got the line of protesters here that those

2   officers were walking towards; right?

3   *A.*  Correct.

4   *Q.*  So let's walk -- my bad.

5            Please play that.

6            (Video played.)

7            You see the officers moving forward?

8   *A.*  Correct.

9            *MR. ARO:*  Stop again, please.

10  *BY MR. ARO:*

11  *Q.*  We see here protesters in front of the police vehicle with

12  their hands up; right?

13  *A.*  Yes.

14  *Q.*  Is that unusual as a police -- as a protest tactic?

15  *A.*  It is not.

16  *Q.*  And --

17            *THE COURT:*  Where is the guy standing on the concrete?

18            *THE WITNESS:*  He is --

19            *MR. ARO:*  He'll come into view in just a moment, Your

20  Honor.  We'll see him in just a second.

21            *THE WITNESS:*  He's to the left.

22            *THE COURT:*  I'm only asking because the question was,

23  is this actually the same day?

24            *MR. ARO:*  We will see him in just a second.

25            If you would play that forward.

Norman Stamper – Direct

1              (Video played.)

2     *BY MR. ARO:*

3     *Q.*  And in the middle of the screen in just a second, we'll

4     start to see the deployment of the pepper ball and see the

5     shots hit the ground.

6              You can stop it.

7              Now, we see the crowd very quickly retreat; correct?

8     *A.*  Yes.

9              *MR. ARO:*  And if you back up just a little bit.  I

10    didn't stop you quite quickly enough.  And play it from there.

11    *BY MR. ARO:*

12    *Q.*  I'm going to circle an officer really quickly who I'd like

13    you to watch.

14             And then play it a little bit longer.

15             And we start to see chemical munitions on the ground

16    to the right; correct?

17    *A.*  Yes.

18    *Q.*  And then additional munitions being deployed?

19    *A.*  Yes.

20    *Q.*  Or pepper balls.

21             Stop there.

22             Your Honor, to answer your question, the guy on the

23    concrete structure is right there.

24             *THE COURT:*  Thank you.

25

Norman Stamper – Direct

1   BY MR. ARO:

2   Q.  The protesters are retreating.  But is it fair to say we

3   continue to see more munitions being launched into the crowed?

4   A.  We do.

5   Q.  Any justification for that from a policing standpoint?

6   A.  Not that I can see.

7           MR. ARO:  Okay.  If we can get to where we were.

8           (Video played.)

9   BY MR. ARO:

10  Q.  Now, the skirmish line gets into this area.  I want to

11  focus particular attention on one officer, this guy right here.

12  See him?

13  A.  I do.

14  Q.  And you see him with a large black object in his hand, kind

15  of rousting those protesters?

16  A.  Yes.

17  Q.  And now he's walking towards the crowd?

18  A.  Yes.

19  Q.  Do you know what that object is that he's holding?

20  A.  I believe it's a 40-millimeter.

21  Q.  He puts it down and walks away.  And we see a guy with a

22  white hat walking toward him; right?

23  A.  Yes.

24  Q.  And then he turns and walks away; right?

25  A.  Correct.

Norman Stamper - Direct

1    *Q.*  All right.  Now, we're going to look at that officer's

2    body-worn camera in just a second.  But what do you see when

3    you see that officer break from the skirmish line and walk off

4    into the crowd?

5    *A.*  I see a lack of discipline, or a lack of training, or both.

6    *Q.*  Why is that -- why is what he did a problem?

7    *A.*  He was part of a skirmish line.  He was part of a team of

8    officers who whether we support their actions or not was

9    involved in what was supposed to have been a disciplined

10   skirmish line.  You don't break ranks.

11   *Q.*  Why is what he did a problem from an effective policing

12   standpoint?

13   *A.*  Well, he created a hole in that line, for one thing.  He

14   also in going off on his own theoretically put himself at some

15   risk, if in fact there were a physical threat.  To be clear, I

16   saw no physical threat or cause for concern about his safety.

17   But had there been a concern for his safety, he would have

18   jeopardized it and in the process, jeopardized the safety of

19   his fellow officers.

20        *MR. ARO:*  Okay.  Now, I want to go to the next

21   exhibit.  This one is Exhibit 648.  This one has not been

22   stipulated.  This is Officer Bolton's body-worn camera, and the

23   clip begins at 2347.

24        *MR. RINGEL:*  Yeah, I stipulated to 2348.

25        *MR. ARO:*  It's about that long.

Norman Stamper – Direct

1          MR. RINGEL:  I stipulate to that.

2          MR. ARO:  So Exhibit 648 we offer by stipulation, Your

3     Honor.

4          THE COURT:  All right.  Admitted.

5          MR. ARO:  Thank you.

6          (Exhibit 648 admitted.)

7     BY MR. ARO:

8     Q.  Thank you.  Just as a warning, the first 30 seconds or so

9     of this video is silent because the officer turned his camera

10    on later.  And when an officer turns his camera on, it

11    basically saves the video that it's already recorded but not

12    the sound that is already recorded for the preceding 30

13    seconds.  Is that your understanding?

14    A.  I'm aware of that.  Yes.

15    Q.  So we hear no sound at the beginning, but then we pick up

16    the sound about 30 seconds in.

17    A.  Yes.

18         (Video played.)

19    Q.  So the officer is pointing his 40 at these protesters;

20    right?

21    A.  Yes.

22    Q.  Do you see him using the barrel of the 40 to roust them?

23    A.  I do.

24    Q.  Is that an appropriate way to engage and move protesters?

25    A.  No.

Norman Stamper - Direct

1    Q.  Why not?

2    A.  Dangerous.  Reckless.

3    Q.  In what way?

4    A.  You're pointing a weapon that certainly can do major, major

5    damage to flesh and bone.

6    Q.  Okay.  And now we see him, he's walked a little bit.  And

7    I'm sorry, I was playing while you were answering.

8           So if you will go back just a little bit, Dan.  There

9    we go.

10          We see him walking towards folks in the crowd.  And

11   let's let it play from here.

12          (Video played.)

13          Did you hear what he said at the end of that video?

14   A.  I did.

15   Q.  When somebody says something like that in the presence of

16   protesters, what effect does that have on the public mood

17   towards policing?

18          MR. RINGEL:  Objection.  Calls for speculation.

19          THE COURT:  Sustained.

20   BY MR. ARO:

21   Q.  If you had watched this video of that officer's conduct,

22   leaving the skirmish line, engaging that protesters, using that

23   language, pointing his weapon at folks, what would have

24   happened to this officer?

25   A.  Pending an investigation and given an outcome of a

Norman Stamper - Direct

1    sustained complaint, I would terminate that officer.

2    Q.   To the best of your knowledge, as you sit here today, has

3    that officer ever been disciplined for anything he did during

4    the protests?

5    A.   To my knowledge, he hasn't been talked to.

6    Q.   All right.  Let's move on to the weapons.  We talked about

7    a couple of them.  And before we get into the use of these

8    weapons in other ways, the kinetic weapons and the chemical

9    weapons, I just want to talk about what they are.

10           Actually, I jumped ahead.  Excuse me.  This is

11   Exhibit 656 that we will offer by stipulation.  It's another

12   body-worn camera from the same scene.

13           THE COURT:  All right.  Admitted.

14           (Exhibit 656 admitted.)

15           (Video played.)

16   BY MR. ARO:

17   Q.   So we saw a number of pepper balls being fired into the

18   ground near the protesters in the street; right?

19   A.   Yes.

20   Q.   And behind those protesters we see cars?

21   A.   We do.

22   Q.   Now, was there active traffic on Colfax and Lincoln at the

23   time this event happened?

24   A.   There was.

25   Q.   And what direction were the DPD officers driving the

Norman Stamper - Direct

1    protesters by using the munitions they did?

2    A.  Directly into moving traffic.

3    Q.  Is that an accepted police practice in a crowd management

4    scenario?

5    A.  Absolutely not.

6    Q.  Why?

7    A.  For the obvious reason, that that person could get run

8    over, that there could be, in fact, a tragedy that need not

9    have happened.

10   Q.  All right.  Now, we see this guy standing up against the

11   pole; right?

12   A.  Yes.

13   Q.  And is that the same guy who got pepper-sprayed a couple of

14   minutes ago with the vest?

15   A.  Yes.

16   Q.  All right.  Let's look at what happens here.

17            (Video played.)

18            Did you hear what he said to those officers?

19   A.  "Being tyrants," as I recall.

20   Q.  "Do you enjoy being tyrants?"

21   A.  "Do you enjoy being tyrants?"  Yes.

22   Q.  And what was the police response to that statement?

23   A.  To fire on him with a pepper ball.

24   Q.  Which almost resulted in what?

25   A.  I flinch every time I see this still.  He turned around and

Norman Stamper - Direct

1    walked out into traffic.  And it was actually sort of backing

2    up, then turned around, and was almost -- almost struck by that

3    car.

4    Q.  Is what the officer did in driving him into traffic by

5    shooting him in response to what he said an appropriate police

6    tactic?

7    A.  It is not.

8    Q.  To this day, do you have any idea whether that officer

9    faced any discipline for what he did?

10   A.  I have been told that he has not.

11   Q.  All right.  Now I want to move to the description -- just

12   quick description of the weapons we're seeing here, just so

13   everybody understands what they are.

14         You examined the weapons -- the less-lethal weapons

15   that the DPD and its sister agencies used in connection with

16   the protests; correct?

17   A.  I did.

18   Q.  And you're familiar with those weapons from your own

19   experience?

20   A.  Well, some of those weapons have actually come along since

21   I retired; but I have certainly kept abreast of the weaponry

22   that is available to officers.

23   Q.  Do you in thinking about these weapons sort of separate

24   these weapons into kinetic weapons and chemical weapons?

25   A.  I do.

Norman Stamper - Direct

1   Q.  Generally, what is a kinetic weapon?

2   A.  A kinetic weapon is, essentially, a firearm, absent the

3   powder charge.  So it doesn't -- for example, in the case of

4   the 40-millimeter, which we've seen several times, does not

5   fire a live round.  What it fires is a munition that is

6   intended to hurt and to repel people but essentially not

7   penetrate them and, theoretically, not kill them.  I choose to

8   call so-called less-lethal potentially fatal weapons.  We have

9   too many examples of uses of these weapons, the kinetic

10  weapons, that have done major damage to people.

11  Q.  So all of these weapons we're seeing in some form in the

12  opening statement -- this is what we've talked about as a

13  40-millimeter launcher; right?

14  A.  Yes.

15  Q.  And we have two grips, one for the hand -- each of the

16  officer's hands; right?

17  A.  Yes.

18  Q.  And this area in the middle is a rotary magazine that holds

19  more than one round?

20  A.  Yes.

21  Q.  And a barrel over here, and this is this butt which fits up

22  on the officer's shoulder; correct?

23  A.  Correct.

24  Q.  Okay.  I want to look quickly at the projectile that these

25  weapons used.

Norman Stamper – Direct

1        Exhibit 656 is admitted, and this is just a screenshot

2    from it.

3        We see on this officer's sort of a bandolier, the

4    stock of his weapon, we see three 40-millimeter rounds; right?

5    A.  Yes.

6        *COURTROOM DEPUTY:*  Sorry.  The jury is not seeing this

7    because I don't have 1039 as admitted.

8        *MR. ARO:*  1039, we offer by stipulation.  Thank you.

9        *THE COURT:*  Okay.  It's admitted.

10        (Exhibit 1039 admitted.)

11    *BY MR. ARO:*

12    Q.  We'll try that again.  In the picture on the left, we see

13    these three silver and blue objects that are attached to the

14    stock of a 40-millimeter weapon; right?

15    A.  Yes.

16    Q.  And there is a silver end, which is, essentially, the back

17    end that stays in the weapon after it's fired; correct?

18    A.  Correct.

19    Q.  And the blue part is the projectile?

20    A.  Yes.

21    Q.  So about that big around?

22    A.  Yes.

23    Q.  And it's a hard plastic projectile that has sort of a foam

24    cap that disintegrates after it's fired?

25    A.  Yes.  I think it's important to clarify that that foam

Norman Stamper - Direct

1   sounds kind of innocuous, and it is not.

2   Q.  And generally speaking, that weapon is designed to knock

3   somebody down; right?

4   A.  That's correct.  Or to stop them.

5   Q.  Okay.  And on the right-hand side, we see -- in

6   Exhibit 1039, we see an officer -- this person is from the

7   Jefferson County Sheriff's Office -- wearing what you described

8   as the hard gear; right?

9   A.  Yes.

10  Q.  So the shin guards and the chest protector, sort of

11  shoulder pads and a ballistic helmet?

12  A.  Yes.

13  Q.  And he also in that picture has a 40-millimeter launcher

14  like we're talking about; right?

15  A.  He does.

16  Q.  Now, this is a still from a video that was shown yesterday

17  during Claire Sannier's testimony that I won't play the video

18  of, but I do want to talk about this particular picture.

19          You see up on the left-hand side an officer holding a

20  40 aimed at the man in the crosswalk; correct?

21  A.  Yes.

22  Q.  The guy in the crosswalk appears to be doing yoga or

23  stretching or something; right?

24  A.  Yes.  He's doing the splits, it looks like to me.

25  Q.  Whatever he's doing, he's not threatening the police?

Norman Stamper - Direct

1    A.   That's correct.

2    Q.   Is there any police justification for an officer standing

3    in a skirmish line in front of a crowd like this, pointing a

4    40-millimeter launcher with projectiles this big at somebody

5    who is doing the splits in the middle of a crosswalk?

6    A.   No.

7    Q.   To the best of your knowledge, has this officer been

8    corrected or disciplined for aiming that weapon at an unarmed

9    nonviolent protester?

10   A.   No.

11   Q.   Would you consider what he's doing here to be an act of

12   misconduct?

13   A.   I would.

14   Q.   Okay.  Next weapon that we have that we've heard about in

15   Mr. Packard's testimony is the 12-gauge shotguns that were

16   used; correct?

17   A.   Yes.

18   Q.   And this was the weapon that was used to shoot him;

19   correct?

20   A.   That's correct.

21   Q.   And on the left-hand side --

22        Let me get these into evidence first.  Excuse me,

23   members of the jury.

24        We offer Exhibits 1039 and 1235 by stipulation.

25        THE COURT:  1039 was already admitted, and 1235 is

Norman Stamper - Direct

 1    admitted.

 2              *MR. ARO:*  Thank you, Your Honor.

 3              (Exhibit 1235 admitted.)

 4    *BY MR. ARO:*

 5    *Q.*  Now, the shotguns we're talking about here are the weapons

 6    that we see here and here and here; correct?

 7    *A.*  Yes.

 8    *Q.*  And are those weapons capable of firing a shotgun round

 9    that you could use for hunting or to try to kill somebody if

10    they were breaking into your house?

11    *A.*  They could be full of shot; they could be full of slugs.

12    Yes.  Yes.

13    *Q.*  Okay.  Same weapons?

14    *A.*  It's the same weapon.

15    *Q.*  But they have different colored stocks -- bright orange

16    stocks?

17    *A.*  That intends to signify that it is a so-called less-lethal.

18    *Q.*  And that's because the ammunition that is loaded into that

19    gun is not conventional designed-to-kill ammunition.  It's

20    designed to be less than fully lethal?

21    *A.*  Yes.

22    *Q.*  We see on the right-hand side in Exhibit 1235 the shotgun

23    shells that are loaded into some kind of a holder; correct?

24    *A.*  Yes.

25    *Q.*  And, again, the brass part remains in the gun after the

Norman Stamper - Direct

1   round is fired.  The actual projectile is this thing up here;

2   right?

3   A.  Correct.

4   Q.  And is it fair to say that that projectile is a bag of a

5   fabric called Kevlar that is full of lead shot?

6   A.  Yes.

7   Q.  That's what hit Zach Packard in the eye?

8   A.  Correct.

9   Q.  All right.  The next weapon I want to talk about is the

10  pepper ball launcher.  We looked at a picture before.  We

11  see --

12       Exhibit 964 and 658 are both being offered by

13  stipulation.  658 is a screen grab from the video that is

14  stipulated.

15       THE COURT:  Admitted.

16       (Exhibits 964 and 658 admitted.)

17  BY MR. ARO:

18  Q.  So we see the pepper ball launcher over here; right?

19  A.  Yes.

20  Q.  And we've got a thing on the top that you put the pepper

21  balls in, and then there is a tank of compressed gas down there

22  that is used to propel them.  Correct?

23  A.  That's correct.

24  Q.  And we have the barrel that is used to aim is right there;

25  right?

Norman Stamper - Direct

1    *A.*  Right.

2    *Q.*  And upon -- in Exhibit 658, we've got a container with

3    pepper balls in it; right?

4    *A.*  Yes.

5    *Q.*  And I think they've been described before as sort of a

6    plastic or gelatin kind of capsule that contains a noxious

7    powder or can sometimes contain an inert powder; right?

8    *A.*  Exactly.

9    *Q.*  Okay.  Now is there an IACP policy that addresses the

10   question of using what are termed there impact projectiles?

11   *A.*  Yes.

12   *Q.*  And an impact projectile is anything that is fired out of a

13   gun that's designed not to just disperse something but to

14   actually to impact an offender or somebody in the crowd; right?

15   *A.*  Right.

16          *MR. ARO:*  We'd offer Exhibit 1015, Andrew.  It is a

17   call-out from the crowd management manual from the IACP.

18          *MR. RINGEL:*  No objection.

19          *THE COURT:*  All right.  It's admitted.

20          (Exhibit 1015 admitted.)

21   *BY MR. ARO:*

22   *Q.*  So we bring up Exhibit 1015.  This, again, comes from the

23   police sort of training clearinghouse for policies.  And this

24   particular policy deals with the use of impact projectiles;

25   right?

Norman Stamper - Direct

1   A.   That's right.

2   Q.   So it starts, "Impact projectiles shall not be fired

3   indiscriminately into crowds."

4          We talked earlier about what indiscriminately means in

5   this context.

6          "Non-direct skip-fired projectiles and munitions may

7   be used in civil disturbances where life is in immediate

8   jeopardy or the need to use the device outweighs the potential

9   risks involved."

10         So we're talking, for example, about using a pepper

11  ball where the projectile is aimed at the ground and all we're

12  doing is dispersing chemicals; right?

13  A.   That is correct.

14  Q.   And that is authorized under this model policy only where

15  life is in jeopardy or where somebody makes the judgment that

16  the need to use the device outweighs the potential risks

17  involved?

18  A.   Yes.

19  Q.   And with respect to pepper balls, these are not designed to

20  kill?

21  A.   Correct.

22  Q.   And you've seen lots of video where people have been struck

23  by them and didn't die; right?

24  A.   Yes.

25  Q.   What are the sorts of circumstances where deploying pepper

Norman Stamper - Direct

1    ball is appropriate where no life is in jeopardy and you use

2    the skip-fire technique?

3    A.   If no -- if no life is at risk, the question that I would

4    have is, why would pepper ball be used at all under those

5    circumstances?

6    Q.   Is the skip-fire technique we've seen a primary means --

7    appropriate primary means to move a crowd?

8    A.   Yes.

9    Q.   Okay.

10   A.   It certainly can be.  Yes.

11   Q.   All right.  "Direct-fired impact munitions" -- which would

12   include anything that is shot at a person --

13   A.   Right.

14   Q.   -- including pepper balls; correct?

15   A.   Correct.

16   Q.   -- "to include beanbag and related projectiles may be used

17   during civil disturbances against specific individuals who are

18   engaged in conduct that poses an immediate threat of death or

19   serious injury."

20   A.   Yes.

21   Q.   So is it fair to say that the idea here is you don't shoot

22   people, even with less-lethal munitions, unless there is an

23   immediate threat of death or serious injury?

24   A.   Exactly.

25   Q.   Okay.  And how about somebody saying, I have a right to be

Norman Stamper – Direct

1   on the street corner?

2   *A.*   That's an American expressing an opinion.  There is no

3   justification under those circumstances.  Those circumstances

4   only are the use of any level of force.

5   *Q.*   "A verbal warning should be given prior to the use of

6   impact projectiles when reasonably possible."  That makes

7   sense.

8   *A.*   Yes.

9   *Q.*   If you're going to shoot somebody, you say, "Stop, or I'm

10  going to shoot?"

11  *A.*   Yes.

12  *Q.*   Okay.  Now, Exhibit 75 is a photograph that was admitted

13  during the testimony of Zach Packard yesterday.  And I'm not

14  going to get too far into the situation, because the jury has

15  already heard the story.  But this is a picture right after he

16  was struck in the head with a Kevlar bag full of lead; right?

17          *COURTROOM DEPUTY:*  I actually have 76, not 75.

18          *MR. ARO:*  Okay.  We'll move 75.  I apologize.  I

19  thought it had been admitted.

20          *MR. RINGEL:*  No objection.

21          *THE COURT:*  All right.

22          (Exhibit 75 admitted.)

23  *BY MR. ARO:*

24  *Q.*   So Exhibit 75 is one of a series of photographs that was

25  taken of Zach Packard at the moment he was shot; correct?

Norman Stamper - Direct

1    A.   Yes.

2    Q.   And this one just happens to be right after he's struck,

3    because he's beginning to fall down.  Now, you've viewed video

4    of that situation and understand the circumstances of his

5    shooting; right?

6    A.   I believe I've seen a series of stills, as opposed to

7    video.  But, yes, I've seen that --

8    Q.   Okay.

9    A.   -- in succession, in rapid order.

10   Q.   And you understand that the basic circumstances are, he

11   kicked a tear-gas canister away from protesters 5 or 10 feet

12   and immediately was shot in the head.

13   A.   That's --

14            MR. RINGEL:  Objection.  Leading.

15            THE COURT:  Sustained.

16   BY MR. ARO:

17   Q.   Okay.  Would you describe --

18            I was trying to move quickly through what has --

19            THE COURT:  Well --

20   BY MR. ARO:

21   Q.   Would you describe what the circumstances were that

22   immediately preceded him being shot?

23   A.   Yes.  The circumstances were that a canister of gas had, in

24   fact, begun to release its chemical agent.  And he saw this; he

25   saw protesters; he kicked the can anywhere between 5 to

Norman Stamper - Direct

1    10 feet.

2    Q.  And was almost immediately struck?

3    A.  Exactly.

4    Q.  So under that IACP guideline we just talked about, was

5    anything he did -- could it be reasonably considered to involve

6    or pose an immediate threat of death or serious injury?

7    A.  No.

8    Q.  Under the IACP's conception of the use of direct-impact

9    weapons, was it appropriate for that officer to shoot Zach

10   Packard?

11   A.  No.

12   Q.  Now, we've seen this video just a second ago, and I'm not

13   going to play it again, but we've got a couple stills from

14   Exhibit 656, with the protester who was almost struck by a

15   vehicle after being shot.

16          Any justification for the deployment of pepper ball at

17   him in this circumstance?

18   A.  No.

19   Q.  Was he doing anything that created an immediate risk of

20   death or serious harm?

21   A.  Only to himself.

22          MR. ARO:  Another example.  This is 1127.  This is

23   offered by stipulation, Your Honor.

24          THE COURT:  All right.  Admitted.

25          (Exhibit 1127 admitted.)

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  Now, this is on May 30, day three, at about 6:11.  So this

3    happened about 15 minutes after the officers cleared the area

4    around the bus station.

5    *A.*  Right.

6             (Video played.)

7    *Q.*  And you can see they continue to try to move protesters

8    away from the area.

9             So what we see there is an officer with -- that's a

10   pepper ball system?

11   *A.*  I believe it is.  Yes.

12   *Q.*  And these two protesters are standing with their hands up.

13   And you heard the man say, "I'm not being a dick right now."

14   *A.*  I heard that.

15   *Q.*  And did you hear the officer say anything in response or

16   give a warning?

17   *A.*  I did not.

18   *Q.*  Any justification for the officer shooting those people?

19   *A.*  No.

20   *Q.*  Is shooting a pepper ball into the body of a protester in

21   this circumstance an approved use of force --

22   *A.*  No.

23   *Q.*  -- in any police department that you're aware of?

24   *A.*  I apologize.  No.

25   *Q.*  Has this officer been disciplined for what we just saw?

Norman Stamper - Direct

1    *A.*  No.

2    *Q.*  Now, moving from the kinetic weapons or the projectile

3    weapons to the explosive weapons.  You've -- you looked at the

4    use of blast grenades in connection with the protest; correct?

5    *A.*  I did.

6    *Q.*  And what is your opinion about how blast grenades were used

7    against protesters during the course of the protest in May and

8    early June of 2020?

9    *A.*  It is my belief that they were inappropriately used on

10   many, many occasions.

11   *Q.*  Now, as a general proposition, under the IACP model of the

12   use of these kinds of weapons, kinetic weapons can be used in

13   certain circumstances; correct?

14   *A.*  Yes.

15   *Q.*  Excuse me.  Not kinetic.  Explosive weapons --

16   *A.*  Yes.

17   *Q.*  -- like a blast grenade?

18   *A.*  Yes.

19   *Q.*  One situation where they might be used is when officers are

20   raiding a house, they use an explosive device as a diversionary

21   tactic?

22   *A.*  Yes.  And not merely diversionary, but to really distract,

23   disorient, and effectively immobilize someone as they're making

24   their entry.

25   *Q.*  Okay.  Are they approved for use against people in a

Norman Stamper - Direct

1    demonstration scenario?

2    A.  It depends on the local agency.  In general, the answer

3    would be no, at least in terms of policies, practices, customs,

4    training, no.

5    Q.  Are they typically deployed without warning against people

6    who are not resisting or defying a lawful order?

7    A.  They certainly ought not to be, but we've seen ample

8    evidence here that that was the case.

9    Q.  Okay.  Let's take a look at a blast grenade.  This is one

10   of the forms of grenades that was used during the George Floyd

11   protests in Denver; correct?

12   A.  Yes.

13           MR. ARO:  This is Exhibit 710.  We offer it without --

14   by stipulation.  It's a still from a video.

15           THE COURT:  Okay.  Admitted.

16           (Exhibit 710 admitted.)

17   BY MR. ARO:

18   Q.  And is it fair to say that these are -- this particular

19   weapon is fired by pulling a pin and throwing it, like you

20   might see in a movie?

21   A.  Classic grenade kind of effect.  Yes.

22   Q.  So I want to take a look at a couple of uses of grenades

23   during the protest.

24           The first is Exhibit 1190, which we offer by

25   stipulation.

Norman Stamper - Direct

1            *THE COURT:*  Admitted.

2            (Exhibit 1190 admitted.)

3    *BY MR. ARO:*

4    *Q.*  This is the body-worn camera of Officer Schaal of the DPD.

5    This was taken on Broadway near 13th Street over by the state

6    Supreme Court.  Have you visited that site?

7    *A.*  Yes.

8            (Video played.)

9    *Q.*  Okay.  And the beginning of this is a little bit hard to

10   see, so we're going to have to stop it a couple times.  We've

11   got moving traffic here and officers facing across the street.

12           Pause here.

13           Where we're going to be looking is in this area right

14   here.  You're going to see the officer throw something and it

15   land over in that area.

16           Could you play it from there now.

17           (Video played.)

18           Did you hear the officer or his partner react to that

19   explosion?

20   *A.*  I certainly heard somebody react to it.  Yes.

21   *Q.*  Did you hear any commentary or warnings from the officers

22   beforehand?

23   *A.*  None.

24   *Q.*  What do we see in that video immediately preceding the

25   explosion?

Norman Stamper - Direct

1   A.  We see moving traffic; we see an officer on this side of

2   the street who is apparently the person who threw that.

3   Q.  What are the people in the car they threw it at doing?

4   A.  From everything I can tell, they're doing nothing.  A woman

5   gets out -- a passenger gets out of the vehicle and is almost

6   instantly struck by that flash-bang.

7   Q.  Was that officer, Officer Schaal, disciplined over this

8   incident?

9   A.  No.

10  Q.  Now, this is another view of an incident that Stanford

11  Smith described yesterday, where an explosion went off near

12  another person who was right next to him.  And this is a view

13  from a body-worn camera of that particular explosion.  It

14  happens really quickly, so we're going to show two views, one

15  full speed, one slowed down.

16          This is Exhibit 626, which has already been admitted.

17          And the guy that we're looking for who is struck by

18  the munition is this guy right here, who is against the wall,

19  moves down here, and he's struck right about here.  And the

20  record reflects that at the time that happened, Mr. Smith was

21  right around the corner, filming the same event.

22          So watch at full speed first.

23          (Video played.)

24          Now, did you see anything that that protester did that

25  constituted resistance to the officers?

Norman Stamper - Direct

1   *A.*   No.

2   *Q.*   Did he do anything to provoke that?

3   *A.*   No.

4   *Q.*   Did he throw anything?

5   *A.*   No.

6   *Q.*   What was he doing at the time that explosion happened?

7   *A.*   He was walking.  Had reached the corner.

8   *Q.*   Okay.  Now, if you watch slowly, a question was raised

9   during the examination yesterday about whether this individual

10  was knocked unconscious.  Let's take a look at what the slow

11  motion video tells us.

12          (Video played.)

13          Now, understanding you weren't there at the time, what

14  appears to you to have happened?

15  *A.*   What appears to me to have happened is that that explosive

16  hit him either in the head or very close to his head.  I can't

17  tell for sure.  What I can tell is that the -- that his

18  reaction to it appeared to be immediate and revealing.  I mean,

19  he just went down.

20  *Q.*   Has that officer been disciplined?

21  *A.*   No.

22  *Q.*   This is another one that we need to take a couple of views

23  at to see exactly what happened.

24          The first is Exhibit 1129, and that's offered by

25  stipulation by the plaintiffs.

Norman Stamper - Direct

1           *THE COURT:*  Okay.  Admitted.

2                  (Exhibit 1129 admitted.)

3    *BY MR. ARO:*

4    *Q.*  So this is headed south on Broadway, right near the Denver

5    Public Library at about 11 o'clock on the first day of the

6    protests -- a little after 11:00 that evening.  And the area

7    that we're going to be watching -- they're going to walk for a

8    little bit.  We're going to be watching sort of right in the

9    intersection about where I made that mark.

10                 (Video played.)

11                 Now, we know that this is a body-worn camera.  There

12   is a group of officers pushing people to the south; right?

13   *A.*  Yes.

14   *Q.*  Is anybody in this crowd resisting?

15   *A.*  No.

16   *Q.*  Is anybody throwing anything?

17   *A.*  No.

18                 (Video played.)

19   *Q.*  So we can't see in that instance the officer who threw the

20   munition; correct?

21   *A.*  Correct.

22   *Q.*  But there is another view where we can.

23                 This is Exhibit 1130, we offer by stipulation.

24           *THE COURT:*  Okay.

25                 (Exhibit 1130 admitted.)

Norman Stamper - Direct

1          (Video played.)

2   *BY MR. ARO:*

3   *Q.*  So this officer is a little behind the front of the line,

4   behind the person we saw, in this area here.

5          Did you hear any warning from either of those

6   body-worn cameras before that explosive was deployed?

7   *A.*  No.

8   *Q.*  How close to the protesters that it almost hit did it land?

9   *A.*  Right there.

10  *Q.*  Any justification for what we just saw under any theory of

11  policing?

12  *A.*  Under no theory of policing is there justification.

13  *Q.*  Did anybody get disciplined as a result of this?

14  *A.*  No.

15  *Q.*  And to be clear, all video we saw is DPD body-worn camera?

16  *A.*  Yes.

17  *Q.*  Did you also look at the use by DPD of tear gas?

18  *A.*  I did.

19  *Q.*  And what was your opinion about how tear gas was used

20  against protesters during the George Floyd protests?

21  *A.*  I would characterize it as indiscriminate and excessive and

22  in many instances, no justification whatsoever.

23  *Q.*  Now, before we see an example of that, I just want to look

24  at the actual munitions we're talking about, starting with

25  Exhibit 1165.

Norman Stamper - Direct

1          Which is offered by stipulation.

2          THE COURT:  Admitted.

3          (Exhibit 1165 admitted.)

4  BY MR. ARO:

5  Q.  Now, what we see here are various cans that are used for

6  smoke and other gas munitions; right?

7  A.  Yes.

8  Q.  And on the left we see something called aerosol grenade;

9  correct?

10  A.  Correct.

11  Q.  And the one on the right -- I'm talking about the left-hand

12  picture says -- Jet-Lite CS Smoke?

13  A.  Yes.

14  Q.  When we see "CS," what does that designate?

15  A.  It designates tear gas as it's classically understood.

16  Q.  And sometimes officers also just throw smoke that doesn't

17  have tear gas; right?

18  A.  That's correct.

19  Q.  And smoke in that context would be smoke that is sort of

20  like wood smoke without the wood aroma?

21  A.  The best I understand it to be, yes, that's the case.

22  Q.  And is smoke -- what is smoke without CS gas intended to

23  do?  What's the purpose?

24  A.  Obscure situations.

25  Q.  So it's making it hard to see?

Norman Stamper - Direct

1    *A.*  Making it hard to see.

2    *Q.*  And the CS gas is intended to --

3    *A.*  It is intended to affect the person, to produce the extreme

4    pain to the eyes, the nose, the mouth, the throat.  It is

5    intended to disorient people, as well.

6    *Q.*  And these weapons are deployed -- they're a can of some

7    sort, and they're deployed by pulling a tab and tossing or

8    bowling them into a crowd.  Correct?

9    *A.*  Yes.  I think there are different delivery systems, but

10   that's essentially it.

11   *Q.*  That's what we saw in front of the capitol the first night

12   of protests when officers were kind of over-arm throwing them;

13   correct?

14   *A.*  That's correct.

15            *MR. ARO:*  All right.  And this is a still image,

16   Exhibit 645, which we offer by stipulation.

17            *THE COURT:*  Admitted.

18            (Exhibit 645 admitted.)

19   *BY MR. ARO:*

20   *Q.*  And this scene depicts an event outside the state capitol

21   during the protests.  And we see a canister in the lower left

22   that is emitting smoke; right?

23   *A.*  Yes.  Appears to be smoke.

24   *Q.*  And we see sort of a haze over the whole crowd?

25   *A.*  Yes.

Norman Stamper - Direct

1          MR. ARO:  And I want to talk a little bit about how

2     the IACP looks at this.

3          Offering Exhibit 1015, Andrew.  This is just their

4     policy on the use of CS.

5          MR. RINGEL:  No objection.

6          THE COURT:  It's already in.

7          MR. ARO:  Sorry about that, Your Honor.

8     BY MR. ARO:

9     Q.  All right.  So the IACP policy speaks to the use of CS

10    chemical agents as primarily offensive weapons that should be

11    used with the utmost caution?

12    A.  Yes.

13    Q.  What is an offensive versus a defensive weapon in a crowd

14    management situation?

15    A.  Well, if you can imagine a group of people who are being

16    threatened or who are being attacked to be able to actually, as

17    Commander Phelan suggested, lay down gas, that that would in

18    fact have the effect of dispersing people.

19    Q.  And the IACP policies speaks to the idea of using these

20    weapons with the utmost caution.  What's the idea -- obviously,

21    I understand what caution means; but why should these weapons

22    be used with the utmost caution?

23    A.  They can inflict serious injury.  They can have a lasting

24    effect on people and their health.

25          MR. ARO:  Okay.  Now, this is Exhibit 106, which is a

Norman Stamper - Direct

1    video that was shot by Elisabeth Epps, which we offer by

2    stipulation, Your Honor.

3            *THE COURT:*  All right.  Admitted.

4            (Exhibit 106 admitted.)

5    *BY MR. ARO:*

6    *Q.*  This video was shot on the first day of the protest, the

7    first big gathering on the south side of the capitol; right?

8    *A.*  Yes.

9    *Q.*  And Ms. Epps will describe the circumstances of this later.

10   But, essentially, what she's doing here is interviewing

11   somebody livestream; correct?

12   *A.*  Correct.

13           (Video played.)

14   *Q.*  Now, you've looked at a lot of different video angles of

15   this event on the south steps of the capitol the first night of

16   the protest?

17   *A.*  Yes.  That's correct.

18   *Q.*  And at the time that the gas was deployed, were people

19   launching waves of bottles and rocks at the officers?

20   *A.*  I saw none.

21   *Q.*  Now, this is a minute later.  We just edited it to speed

22   things up a little bit.  This is continuation of Exhibit 106.

23           (Video played.)

24           Is what we see in her face characteristic of the way

25   tear gas affects people?

Norman Stamper - Direct

1   *A.* It is.

2          (Video played.)

3   *Q.* In your opinion, having looked at the circumstances of this

4   event, did DPD deploy CS gas at this site using the utmost

5   care?

6   *A.* No.

7   *Q.* There has been a lot of discussion about pepper spray, and

8   I think most of us have some familiarity with what this is.

9   But before we get to what it is, what's your opinion about the

10  way DPD deployed pepper spray during the course of the George

11  Floyd protests?

12  *A.* I guess I would characterize it as altogether too much of

13  it, under inappropriate circumstances.

14          *MR. ARO:* Now, we'll offer Exhibit 1176 by

15  stipulation. It's been combined and shown with the

16  demonstrative, which I believe is not objected to.

17          *THE COURT:* Well, 1176 is admitted.

18          (Exhibit 1176 admitted.)

19          But I want to stop here and take a break. It's

20  3 o'clock.

21          *MR. ARO:* Okay. Thank you.

22          *THE COURT:* Let's take ten minutes.

23          (Recess at 2:59 p.m.)

24          (In open court at 3:14 p.m.)

25          *THE COURT:* Okay.

Norman Stamper - Direct

1    *BY MR. ARO:*

2    Q.   When we broke, we had just begun talking about pepper

3    spray, and I just put up the image of Exhibit 1176.  We see in

4    the circle a red can that's a can of spray that's being

5    deployed towards that protesters; correct?

6    A.   Yes.

7    Q.   And on the right-hand side of that image, we see three

8    different containers of aerosol irritant; right?

9    A.   Yes.

10   Q.   On the right-hand side, we see a can of mace or some sort

11   of pepper spray that you could buy at 7-Eleven and people could

12   carry in their purse or their pocket; right?

13   A.   Well, probably shouldn't be able to buy it at 7-Eleven;

14   but, yes.

15   Q.   Okay.  But it's a personal protection and very common

16   instrument that people sometimes carry around?

17   A.   Correct.

18   Q.   All right.  To the left of that is the MK-9 police or

19   military grade pepper spray that we see in Exhibit 1176;

20   correct?

21   A.   Yes.

22   Q.   And then next to that, we see the MK-46H police or military

23   grade pepper ball device; right?  Excuse me -- pepper spray

24   device; right?

25   A.   Yes.  Pepper spray.

Norman Stamper – Direct

1    *Q.* And describe for me how the contents of a police or

2    military grade pepper spray device differs from what you could

3    get at 7-Eleven or anyplace else?

4    *A.* Well, clearly, just looking at the size of those two

5    devices on the left, you're looking at a much larger supply and

6    very much under higher pressure than what you would get with

7    the commercial version. And they will generally spray much,

8    much further, much faster, and in greater quantity, those on

9    the left.

10   *Q.* Okay. Now, the IACP model policies also contain guidance

11   on the deployment of pepper spray; true?

12   *A.* Yes. That's correct.

13   *Q.* And we see that in Exhibit 1015, where the IACP refers to

14   this device as aerosol restraint spray; right?

15   *A.* Yes.

16   *Q.* And they refer to it by its full name. I call it OC

17   because I can't say the other words. "Oleoresin capsicum" --

18   *A.* Perfect.

19   *Q.* -- "may be used against specific individuals engaged in

20   unlawful conduct or actively resisting arrest or as necessary

21   in a defensive capacity."

22   *A.* Correct.

23   *Q.* They're describing when it's appropriately used against a

24   particular individual.

25   *A.* Yes.

Norman Stamper - Direct

1   Q.  And they're saying it can be used if somebody is throwing a

2   rock, you can spray them?

3   A.  Right.

4   Q.  Or if somebody is attacking you, you can use it to deter

5   them?

6   A.  Yes.

7   Q.  The guidance then says, "OC spray shall not be used

8   indiscriminately against groups of people where bystanders

9   would be unreasonably affected or against passively resistant

10  individuals."

11      So we get the idea, bystanders -- you're not supposed

12  to spray bystanders who haven't done anything wrong?

13  A.  That's right.

14  Q.  What in police jargon is a person who is passively

15  resistant -- what is a person doing if they're passively

16  resisting?

17  A.  Somebody who is essentially not paying attention to your

18  orders or your direction but who is not confronting you

19  physically.  Not attempting to attack you.

20  Q.  So, for example, a little bit ago we saw a video of a guy

21  with a vest and the signal on the back who was standing on a

22  hill of dirt; the officers were pushing forward in a skirmish

23  line by the Denver bus station; he didn't move; and an officer

24  sprayed him.

25  A.  Correct.

Norman Stamper - Direct

1    *Q.*  Was that guy engaged in passive resistance?

2    *A.*  He was.

3    *Q.*  Okay.  And this says OC spray should not be used against

4    somebody like that; right?

5    *A.*  Correct.

6    *Q.*  All right.  "High-volume OC delivery systems, such as MK-9

7    and MK-46" -- which are the big cannisters we just looked at --

8    "are designed for and may be used in civil disturbances against

9    groups of people engaged in unlawful acts or endangering public

10   safety and security when approved by the IC."  The IC in that

11   context is the incident commander?

12   *A.*  That's correct.

13   *Q.*  And what's the idea of requiring the approval of the

14   incident commander before these high-capacity, high-volume

15   delivery systems can be used against groups of people, all of

16   whom are engaging in some kind of unlawful conduct?

17   *A.*  That's an acknowledgement of the seriousness of this

18   munition in use in protest situations.  In theory, the incident

19   commander is going to be -- have a larger body of knowledge,

20   greater awareness of the impact of that protest activity on the

21   city and its residents, its visitors, as well as its police

22   officers.  So the idea is, you get authorization before you use

23   that from the incident commander.

24   *Q.*  So the officer on the ground sees a group of people engaged

25   in some sort of destructive behavior, calls the IC, says, we

Norman Stamper - Direct

1    think we need to use these high-volume systems to solve that

2    particular problem?

3    A.  Well, as a practical matter, I believe in most cases the IC

4    would say in advance, here are the one to six situations where

5    you can -- you are authorized to use it.

6    Q.  Only if there is a group that is endangering public safety

7    can you use it against a group?

8    A.  Exactly.

9    Q.  All right.  The last line is, "Whenever reasonably

10   possible, a verbal warning should be issued prior to the use of

11   these systems."  The idea there being, do what I say or else?

12   A.  Yes.

13   Q.  Okay.  Let's take a look at a couple of examples of DPD

14   deployment of these high-volume systems -- pepper spray

15   systems, starting with Exhibit 670.

16            Which we offer by stipulation.

17            THE COURT:  All right.

18            (Exhibit 670 admitted.)

19            MR. ARO:  Excuse me, Your Honor.  I didn't mean to cut

20   you off.

21   BY MR. ARO:

22   Q.  This was from about 8:20 p.m. on the third day of the

23   protests, May 30, on the steps of the Colorado Supreme Court,

24   right along 14th Avenue between Lincoln and Broadway.  This is

25   DPD Officer Hastings' body-worn camera.

Norman Stamper - Direct

1          (Video played.)

2          So in this situation, unfortunately, only saw it from

3   the side of the screen.  What did you see the officers do to

4   the woman that we now see in black with the black garment

5   around her waist?

6   *A.*  Pepper-sprayed her.

7   *Q.*  What was she doing when they did that?

8   *A.*  I couldn't tell you, other than being there.

9   *Q.*  Was she walking backwards?

10  *A.*  She was, as a matter of fact.

11  *Q.*  Was there any warning given that you heard on that

12  recording?

13  *A.*  I did not hear one.

14  *Q.*  Okay.  We see another example -- another view of this same

15  incident in Exhibit 672.

16          Which we offer by stipulation.

17          *THE COURT:*  Admitted.

18          (Exhibit 672 admitted.)

19  *BY MR. ARO:*

20  *Q.*  Same individual standing there, holding a little cardboard

21  sign.

22  *A.*  Yes.

23          (Video played.)

24          *MR. ARO:*  Can you play that for me again, please.

25          (Video played.)

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  Did it appear to you that two officers hit her at the same

3    time with the spray?

4    *A.*  That's how it appeared to me.  Yes.

5    *Q.*  Okay.  And was there any warning given to her before she

6    was sprayed?

7    *A.*  Only in the most general sense, and not a warning

8    specifically with respect to the spray.

9    *Q.*  They told her just to move along?

10   *A.*  They told her to move along.

11   *Q.*  Was she moving along?

12   *A.*  She was moving along.

13   *Q.*  Okay.  So we continue the same video, as we walk a little

14   further down the sidewalk.

15           Can you play the rest of it.

16           (Video played.)

17           So did you see there two officers spraying the same

18   woman again?

19   *A.*  Yes.

20   *Q.*  And when we look at the one in the center of the screen

21   there, what are those you see on his shoulder?

22   *A.*  Those are sergeant's chevrons.

23   *Q.*  And is it fair to say that in a police department, the

24   sergeant is the sort of first-line supervisor of regular street

25   officers -- patrol officers?

Norman Stamper - Direct

1    *A.*  Yes.

2    *Q.*  So a sergeant might supervise a group of eight or ten

3    officers?

4    *A.*  Exactly.

5    *Q.*  And when we see a supervisory officer like a sergeant

6    engaging in what we just saw, is there a message that is going

7    out to his or her subordinates?

8    *A.*  Yes.

9    *Q.*  What is that message?

10   *A.*  That message is, I am licensing you to do what I'm doing.

11   And even if there is no justification, as I view this

12   situation, for his use of the pepper spray, he's saying to all

13   of his officers, you can do the same.

14   *Q.*  When this woman was sprayed for the second time by two

15   officers, is it fair to say she was sort of standing recovering

16   from the first spray?

17   *A.*  I'm not sure she was recovering; but, yes.  I think she was

18   suffering the effects of that first spray when she was hit with

19   the second.

20   *Q.*  Was she doing anything aggressive or threatening towards

21   the officers?

22   *A.*  No.

23   *Q.*  As far as you know, had any of the officers involved in

24   this incident been disciplined for it?

25   *A.*  No.

Norman Stamper - Direct

1    *Q.* Now, there obviously are officers all around this area;

2    correct?

3    *A.* Yes.

4    *Q.* When one officer sees another officer doing something

5    wrong -- whatever it is, applying excessive force, violating

6    some policy -- does the officer who sees that have any

7    obligation to report that behavior?

8    *A.* Not merely report it but intervene and stop it, if that's

9    possible.

10   *Q.* Okay. And did you -- have you seen any evidence ever in

11   all of the videos you've watched of a DPD officer intervening

12   or trying to stop the use of any of the munitions or weapons

13   we've talked about by another DPD or mutual support agency?

14   *A.* Yes.

15   *Q.* When did that happen -- actually, we'll get to that in a

16   little bit. Did it happen one time that you're aware of?

17   *A.* Only once.

18   *Q.* Okay. Were there lots of times when lots of officers saw

19   the kind of thing we saw here and said nothing and intervened

20   not at all?

21   *A.* Exactly.

22   *Q.* Okay. Now, I want to look at another incident along

23   similar lines that happened a little later the same day. The

24   one we just looked at was at 8:20 in front of the Supreme

25   Court. About five minutes later, just around the corner from

Norman Stamper - Direct

1   where we just saw what we saw, there is another incident that

2   happens on southbound Broadway.

3          This is represented in Exhibit 741, which we offer by

4   stipulation.

5          THE COURT:  It's admitted.

6          (Exhibit 741 admitted.)

7   BY MR. ARO:

8   Q.  And what we see here in the still is people walking

9   southbound on Broadway past the Denver Public Library; correct?

10  A.  Correct.

11  Q.  And the people that we're going to be looking at here start

12  out sort of over here.  And as they -- the video proceeds, they

13  kind of come this way.

14         And, actually, I think I did that wrong.  I think it's

15  these two who go over this way, and what we're going to be

16  looking for happens right there.

17         (Video played.)

18         Did you hear any warning?

19  A.  No.

20  Q.  Was there any resistance or aggression on the part of those

21  protesters?

22  A.  No.

23  Q.  Was there any justification for what that officer did?

24  A.  No.

25  Q.  Was that officer disciplined, to the best of your

Norman Stamper - Direct

1    knowledge?

2    *A.*   No.

3    *Q.*   Another situation that happened the first night of the

4    protests, 9:35 on May 28 -- this is about 15 minutes after the

5    tear-gassing that we saw Ms. Epps talk about at the corner of

6    14th and Lincoln.  So you see over here, this is the Supreme

7    Court building, where we --

8            *THE COURT:*  Hold on.  This is 562?

9            *MR. ARO:*  I'm sorry, Your Honor.  562, we offer by

10   stipulation.

11           *THE COURT:*  Got it.

12           (Exhibit 562 admitted.)

13   *BY MR. ARO:*

14   *Q.*   Let me try that again.  So this is at the corner of -- this

15   is 17th, this is 14th, and this is the state Supreme Court over

16   here, where we just saw that video from; right?

17   *A.*   Yes.

18   *Q.*   And the person that we're going to be looking at is this

19   guy right here.

20           (Video played.)

21           *MR. ARO:*  Stop for a second.

22   *BY MR. ARO:*

23   *Q.*   What is that gentleman that I'm directing you to appear to

24   have in his hands?

25   *A.*   A camera, it would appear to me.

Norman Stamper - Direct

1   *Q.*  He's pointing it up in the direction of the state capitol?

2   *A.*  I think perhaps originally, but at this point he's pointing

3   it appears to be down the street.

4   *Q.*  Okay.

5   *A.*  Or off to the side of the street.

6   *Q.*  Okay.

7            (Video played.)

8            Now, did you hear any warning before the pepper spray

9   was deployed?

10  *A.*  I did not.

11  *Q.*  Okay.  There was a "disperse" statement, one word,

12  afterwards; correct?

13  *A.*  Correct.

14  *Q.*  Was the guy taking photographs acting in a provocative

15  fashion?

16  *A.*  No.

17  *Q.*  Was that officer disciplined?

18  *A.*  No.

19  *Q.*  The last pepper spray incident that we're going to look at

20  in this sequence, this was shot on May 30, same night, a little

21  after midnight -- excuse me -- this was on the night of the

22  29th, the morning of the 30th, so this was at the end of day

23  two of the protests.  This is at Colfax and Broadway.

24           A body-worn camera that we've marked and will offer

25  as -- by stipulation as Exhibit 1126.

Norman Stamper - Direct

1          *THE COURT:*  All right.  Admitted.

2              (Exhibit 1126 admitted.)

3    *BY MR. ARO:*

4    *Q.*  And this officer will walk towards this vehicle, and what

5    we're going to be looking for happens right about there.

6              (Video played.)

7              He walked around and comes back around the other side

8    of the vehicle.

9              (Video played.)

10             Now, there was no warning before either of those

11   incidents; right?

12   *A.*  That's correct.

13   *Q.*  We see an officer right here with sergeant chevrons; right?

14   *A.*  Yes.

15   *Q.*  And we saw the same officer spray a driver through both

16   sides of a car; right?

17   *A.*  Correct.

18   *Q.*  Is there a particular concern about deploying pepper spray

19   into a motor vehicle that's actually in traffic?

20   *A.*  Oh, gosh, yes.

21   *Q.*  What's the problem?

22   *A.*  The problem is, that driver is very likely to be

23   temporarily blinded, as well as disoriented, and very much in

24   pain.  And he is behind the wheel of a 3,000, 4,000-pound

25   dangerous weapon.

Norman Stamper - Direct

1    *Q.*  Now, in this particular instance, there was an IA

2    investigation; true?

3    *A.*  I believe there was.  Yes.

4    *Q.*  And was the person fired or suspended for what he did?

5    *A.*  No.

6    *Q.*  What happened to him?

7    *A.*  As I recall, it was treated as an educational moment -- or

8    whatever language that the Denver Police Department uses for

9    a -- essentially a written record of the event.

10   *Q.*  And sort of saying, you could have done better here?

11   *A.*  Don't do that again.  You could have done better.

12   *Q.*  Now, we saw an incident earlier where DPD deployed pepper

13   balls into a guy who stepped off the curb nearly into the path

14   of a car; right?

15   *A.*  Yes.

16   *Q.*  Did you study the circumstances of the use of force in

17   consideration of DPD putting protesters in dangerous

18   situations?

19   *A.*  Yes.

20   *Q.*  Sometimes into traffic?  Yes?

21   *A.*  Yes.

22   *Q.*  And also into confined spaces with no means of egress?

23   *A.*  Exactly.  Yes.

24   *Q.*  So when we're talking about the use of chemical agents to

25   disperse a crowd -- and making reference again to the IACP,

Norman Stamper - Direct

1    Exhibit 1015, which is already in evidence -- that policy

2    speaks to using chemical agents, "shall be deployed at the

3    direction of the IC and only when avenues of egress are

4    available to the crowd."  What's the idea there?

5    *A.*  Actually, IACP is very, very clear in their model policy

6    recommendations, that is that you do not -- even when you're

7    wanting everyone to disperse from an area and thinking you may

8    wind up arresting them, to deny them an avenue of escape,

9    egress.  The reasoning is very, very clear; and that is that if

10   you have got somebody who is engaged in lawful -- or for that

11   matter, unlawful -- protest, you still want them to be able to

12   escape the chemical agents if they are to be used.

13   *Q.*  Why would you want them to be able to escape?

14   *A.*  Because of the danger, the harm that can be done to the

15   human body.

16   *Q.*  Okay.  And is deploying chemical weapons against a group of

17   people who are in a confined area, does that raise another

18   potential danger?

19   *A.*  It certainly does.

20   *Q.*  What's the danger that is raised by that scenario?

21   *A.*  That people who have been rendered unable to see, perhaps

22   even reason, in a confined quarters with others could panic,

23   could, in fact, run out into traffic, could create some other

24   kind of physical hazard to everyone within that group.

25   *Q.*  Okay.  Now, are you familiar with the situation that

Norman Stamper - Direct

1    happened on day four at about 9:40 -- it's on Sunday evening,

2    May 31, 2020, in front of the Basilica of the Immaculate

3    Conception near downtown?

4    *A.*  I am.

5    *Q.*  I want to go through that.  I know that Ms. Sannier

6    discussed that during her testimony yesterday, but I want to

7    look at it from a law enforcement perspective.

8         Are you familiar with the overhead view of the area in

9    which this incident occurred?

10   *A.*  Yes.

11   *Q.*  And I just want to sort of orient folks to the video.  This

12   street here that I just highlighted is Colfax; right?

13   *A.*  Yes.

14   *Q.*  And the state capitol is a couple blocks that direction;

15   correct?

16   *A.*  Yes.

17   *Q.*  This street is Pennsylvania?

18   *A.*  Yes.

19   *Q.*  And this street over here is Logan; correct?

20   *A.*  Yes.

21   *Q.*  Now, on the south side of Colfax in this block we have a

22   couple of buildings; right?

23   *A.*  Right.

24   *Q.*  And then between them there is an alleyway?

25   *A.*  Yes.

Norman Stamper - Direct

1   Q.  Have you been in that alleyway?

2   A.  I have.

3   Q.  How big is it?

4   A.  You get a car in it with maybe a foot or two on either side

5   to spare.

6   Q.  Any chance that two cars could pass each other in it?

7   A.  I couldn't imagine it.

8   Q.  Okay.  On the other side of the street, we have the

9   basilica itself; right?

10  A.  Yes.

11  Q.  And then here, there is a parking lot.  What surrounds that

12  parking lot?

13  A.  A tall iron fence.

14  Q.  What's the top of the fence, like this high?

15  A.  Probably, maybe even a little bit higher.  It's quite tall.

16  Q.  Seven feet?

17  A.  Yeah, probably.  It is tall.

18  Q.  Made out of?

19  A.  Wrought iron.

20  Q.  What's the top of the fence?

21  A.  Pointed -- the pointed ends of each wrought iron member.

22  Q.  And is there any effective way for somebody who is out here

23  to go this direction?

24  A.  No.

25  Q.  And on this side of the street, is there any way other than

Norman Stamper - Direct

1   that single alley for folks to exit?

2   *A.*   No.  It's wall to wall businesses.

3   *Q.*   All right.  So as Ms. Sannier discussed -- and I want to go

4   into it in a little more detail -- there are some cameras in --

5           Actually, let me back up.  Are you familiar with HALO

6   cameras?

7   *A.*   I am.

8   *Q.*   And, generally, without getting into a lot of technical

9   detail, what are they?

10  *A.*   Security cameras, in this case installed by the city.

11  *Q.*   And so Denver in various locations in downtown Denver has a

12  security camera that is sort of put on top of light posts,

13  basically?

14  *A.*   Usually, yes.

15  *Q.*   Are those cameras fixed in one direction, or can they move?

16  *A.*   They can move.

17  *Q.*   Okay.  And if somebody is monitoring them, they can move

18  around and zoom in?

19  *A.*   Yes.

20  *Q.*   Okay.  Now, there is a HALO cam, is there not, on this

21  corner?

22  *A.*   There is.

23  *Q.*   And at the beginning of the scene we're going to look at,

24  it's pointing this direction?

25  *A.*   Correct.

Norman Stamper - Direct

1    *Q.*  Up Colfax towards the next block?

2    *A.*  I'm sorry.  Yes.

3          *MR. ARO:*  Okay.  Now, this first video is -- from that

4    HALO camera is Exhibit 547, which we will offer by stipulation,

5    Your Honor.

6          *THE COURT:*  All right.  Admitted.

7          (Exhibit 547 admitted.)

8    *BY MR. ARO:*

9    *Q.*  So looking up Colfax to the east; right?

10   *A.*  Yes.

11   *Q.*  And up here, we see a group of officers?

12   *A.*  We do.

13   *Q.*  And there is a vehicle here; right?

14   *A.*  Yes.

15   *Q.*  And it's -- is it your experience that police departments

16   sometimes use vehicles in the middle of skirmish lines to give

17   them a little bit more heft?

18   *A.*  They can.  It has certainly been done.

19   *Q.*  Okay.  And do you know where these officers were from, what

20   agency?

21   *A.*  The Aurora Police Department.

22   *Q.*  So they're going to start moving this direction.

23   *A.*  Correct.

24   *Q.*  And HALO, just for everybody's information, doesn't have

25   sound; correct?

Norman Stamper - Direct

1    *A.*  Correct.

2            (Video played.)

3    *Q.*  So we see over on the right-hand side up here, some kind of

4    munition; right?

5    *A.*  Smoke or gas.  Yes.

6    *Q.*  Right.  And we see the officers advancing in the skirmish

7    line, and the protesters who are in the street, a few

8    protesters being sort of driven to the west; right?

9    *A.*  Correct.  Yes.

10   *Q.*  And we see there some kind of other munition deployed by

11   the officers?

12   *A.*  Yes.  That would be, once again, smoke or gas.

13   *Q.*  Looking at these, do you have any way of knowing whether

14   that was tear gas or smoke?

15   *A.*  I don't.  Somebody with a better understanding of the

16   distinction between those two in terms of their physical

17   appearance might; but it's notorious.  You see some footage,

18   and you don't know typically whether it is gas or smoke.

19   *Q.*  Okay.  So we see these officers sort of stop at the bottom

20   of the screen?

21   *A.*  Yes.

22   *Q.*  And is it your understanding that where they are set up at

23   that point is right along Pennsylvania?

24   *A.*  That's correct.

25   *Q.*  And they set up a skirmish line there; right?

Norman Stamper - Direct

1    A.  Yes.

2    Q.  And we see what appears to be a fairly large amount of

3    smoke --

4    A.  We do.

5    Q.  -- sort of wafting over them?

6    A.  Yes.

7              MR. ARO:  Now, the next video is from some of those

8    officers -- one of the officers from Aurora -- as they walk

9    towards the intersection.  This one does have a little bit of

10   sound.

11             This is Exhibit 372 that we offer by stipulation.

12             THE COURT:  Admitted.

13             (Exhibit 372 admitted.)

14             (Video played.)

15   BY MR. ARO:

16   Q.  So there is a lot of gas at this point or smoke.  We don't

17   know what it is.

18             Stop here.  Go back just a little bit.

19             We see here a dumpster, that yellow thing out in the

20   middle of the street; right?

21   A.  Correct.

22   Q.  And behind that -- and it's kind of hard to see because

23   she's behind people -- we have protesters who are coming from

24   the other direction; right?

25   A.  Yes.

Norman Stamper - Direct

1   Q.  And the building that we see over here is one of those

2   buildings that we saw on the south side of that block; correct?

3   A.  Yes.

4   Q.  And the basilica is this thing we can see right there?

5   A.  Correct.

6           MR. ARO:  All right.  Now, the next video is shot from

7   another HALO cam up one block to the west, pointing towards the

8   east.  So we are essentially pointing towards that line of

9   officers.  This is at the same time frame, 9:41 that night.

10          This one is 546, which I believe has been admitted.

11  But if it hasn't, I will offer it, I believe by stipulation.

12          THE COURT:  Yes.  It's already admitted.

13  BY MR. ARO:

14  Q.  So we're looking towards the east, and those Aurora

15  officers would be up here; right?

16  A.  Correct.

17          MR. ARO:  So -- and I'll just let the Court know,

18  because this has been played before, we advanced the speed just

19  in the interest of time.  I'd be happy to play it regular speed

20  also.

21          Are you okay with me playing it double time?

22          MR. RINGEL:  No problem.

23          (Video played.)

24  BY MR. ARO:

25  Q.  So we see people who are marching essentially from the

Norman Stamper - Direct

1  state capitol towards the east?

2  *A.*  Yes.

3  *Q.*  Do you know what is behind them?

4  *A.*  I do.

5  *Q.*  What is?

6  *A.*  It's a line of Denver police officers.

7  *Q.*  Who were advancing in a skirmish line?

8  *A.*  Correct.

9  *Q.*  Okay.  And we see those folks start to fill in.  And at

10  this point do you see any sort of aggression towards either the

11  officers at the far end of the block or the officers behind

12  them?

13  *A.*  I do not.

14  *Q.*  People appear to be walking calmly?

15  *A.*  Yes.

16  *Q.*  And what I'll ask you to do is kind of look up here to see

17  what happens, so you get to this point.  People start to

18  collect.  That alleyway is over here; right?

19  *A.*  It is.

20  *Q.*  At about here, we start to see people moving away from the

21  Aurora lines; right?

22  *A.*  Yes.

23  *Q.*  What's going on up there?

24  *A.*  It -- it would appear that they are being pushed back this

25  way.

Norman Stamper - Direct

1    *Q.*  By physical force or by munitions?

2    *A.*  By physical force.  The line -- the skirmish line is

3    moving.

4    *Q.*  And we can see up there in the corner what?

5    *A.*  I'm sorry.  Which corner?

6    *Q.*  With the yellow circle around it.

7    *A.*  Yes.  That definitely appears to be a chemical weapon.

8    *Q.*  Okay.  So we've got chemicals being deployed on the other

9    end, protesters are coming back this direction, folks are still

10   coming from the capitol; right?

11   *A.*  Yes.

12   *Q.*  Okay.  At this point we don't have any signs either of

13   violence towards officers or of panic; true?

14   *A.*  That's true.

15   *Q.*  But we're still seeing more munitions being deployed up at

16   the top; correct?

17   *A.*  Yes, we are.

18   *Q.*  More people funneling into the block?

19   *A.*  Right.

20   *Q.*  Sorry about the pixelation there.

21          And we now see vehicles starting to enter this area

22   for unknown reasons.  They don't appear to be police vehicles;

23   correct?

24   *A.*  That's correct.

25   *Q.*  But at this point, we've got a lot of people in that area;

Norman Stamper - Direct

 1    would you agree?

 2    A.   I would agree.

 3    Q.   And on one end we have Aurora, and on the other end we have

 4    DPD?

 5    A.   Yes.

 6    Q.   And we continue to see munitions being deployed up here;

 7    right?

 8    A.   We do.  Yes.

 9    Q.   Now I want to move -- there is another explosion.  We don't

10    know exactly what that was?

11    A.   Correct.

12    Q.   But the crowd reacted pretty quickly; right?

13    A.   Yes.

14    Q.   And we see more munitions here, some kind of smoke.

15    A.   Yeah.

16    Q.   All right.  Now, at the other end of the block -- we looked

17    at the HALO camera down here that's already been admitted.  If

18    we can go a little bit further into that video, we see the line

19    of the Aurora officers with this -- what's the big thing in the

20    middle, the vehicle?

21    A.   Often referred to as a bearcat.

22    Q.   Essentially, an armored personnel carrier?

23    A.   It's an armored personnel carrier.

24    Q.   We've got a couple of other armored vehicles back here?

25    A.   At least one -- two.  I apologize.

Norman Stamper - Direct

1    Q.   Now, this camera, as you said, can rotate.  In just a

2    second, we're going to see it turn towards the protesters.  You

3    see a lot of gas -- or some sort of -- something is in the air;

4    right?

5    A.   Yes.

6    Q.   And what are we seeing here on the back side being deployed

7    from the direction of the DPD officers?

8    A.   A lot of chemical agents deployed by DPD.  Yes.

9    Q.   And where are those people going right now?

10   A.   They are entering that alley that we identified earlier.

11   Q.   And as you look at this and see those people crowding into

12   the alley, as a person watching this, as an experienced

13   officer, if you were in the command post watching this, what's

14   your reaction to this situation?

15   A.   My reaction is, if they -- officers have decided to kettle

16   the protesters, to actually contain or encircle them, leaving

17   them that one very narrow egress.

18   Q.   Now, we saw the camera swing around and zoom in; right?

19   A.   Yes.

20   Q.   Does that connote that there was somebody watching it and

21   zooming in on that scene?

22   A.   Yes.

23   Q.   Are you aware of any order given by whoever was watching

24   that camera saying, Stop what you're doing because people are

25   in danger?

Norman Stamper - Direct

1   *A.*  No.

2   *Q.*  And you see -- as those people are packing into that

3   corner, we see more gas?

4   *A.*  We do.

5   *Q.*  Okay.  And Ms. Sannier was one of the people down there,

6   who described her experience yesterday, so I don't want to go

7   through that.

8          But the last piece of this that I want to ask you

9   about is the body-worn camera of a DPD officer who was down in

10  the skirmish line on the other end of the block, from Aurora,

11  in the location where you see the red dot.  This is about the

12  same time, a little bit after, because, as we're going to see

13  there weren't a lot of people left in that area.

14          *MR. ARO:*  I'm going to offer Exhibit 709 by

15  stipulation.

16          *THE COURT:*  Okay.

17          (Exhibit 709 admitted.)

18          (Video played.)

19          *MR. ARO:*  Could you start that over again.  Thank you

20  very much.

21          (Video played.)

22          Back it up just a little bit.

23  *BY MR. ARO:*

24  *Q.*  We're looking at the -- the basilica is basically right

25  here; correct?

Norman Stamper - Direct

1    *A.*   Yes.

2    *Q.*   And the officer is going to approach a white vehicle, and

3    you can hear an exchange between him and what sounds like a

4    woman's voice coming from the vehicle.

5              (Video played.)

6              What did you hear the officer say --

7    *A.*   I'm sorry, the woman --

8    *Q.*   What did you hear the woman say?

9    *A.*   That she was informing the officer of an individual with a

10   head injury.

11   *Q.*   And the officer responded?

12   *A.*   I could not make that out.

13             *MR. ARO:*   Would you back that up a little.  It kind of

14   pixelated right at the crucial moment.

15             (Video played.)

16   *BY MR. ARO:*

17   *Q.*   Did you hear it that time?

18   *A.*   I did.

19   *Q.*   Did he say, Get out of the F-ing way?

20   *A.*   Yes.

21   *Q.*   In that circumstance when a citizen is informing a police

22   officer of a head injury, where a guy is bleeding from his

23   head, even if that officer is assigned to secure the area, how

24   does his mission change when he hears about somebody with that

25   kind of injury?

Norman Stamper - Direct

1   *A.* It changes profoundly to one of life saving.  His

2   responsibility -- first responsibility is protection of life

3   and property; and at this point, life has primacy.

4   *Q.* Okay.  Did that officer respond as would somebody who is

5   properly trained?

6   *A.* No.

7   *Q.* To best of your knowledge, was Officer Hoffecker ever

8   disciplined for that?

9   *A.* No.

10          *MR. ARO:* Would you continue, please.

11          (Video played.)

12  *BY MR. ARO:*

13  *Q.* He turns back towards Colfax?

14  *A.* Yes.

15  *Q.* And we --

16          Go ahead and play now.

17          (Video played.)

18          Pause it, please.

19          Off in the distance we see still more munitions being

20  deployed?

21  *A.* Correct.

22  *Q.* Would you say that this crowd is pretty well dispersed as

23  best they can?

24  *A.* I would say exactly that.

25  *Q.* Is there any justification you're aware of for continuing

Norman Stamper - Direct

1    to deploy chemical munitions against a crowd that is dispersing

2    by trying to escape through an alley?

3    A.  No.

4    Q.  And we see the remnants of the crowd right here headed

5    towards the alley we talked about; right?

6    A.  Yes.

7          MR. ARO:  Would you pick it up from there, show the

8    last probably 30 seconds of that clip.

9          (Video shown.)

10   BY MR. ARO:

11   Q.  So we've seen this long sequence of events.  And you

12   described a second ago, using the word "kettling."  To the best

13   of your knowledge, was anybody at DPD reprimanded or otherwise

14   disciplined for ordering or participating in what we just saw?

15   A.  No.

16   Q.  We also saw an example of an individual earlier -- the guy

17   with the symbol on his vest -- be pushed into traffic.  I want

18   to return to that idea.  Was that a single event, or did that

19   happen more than once?

20   A.  Certainly more than once.  Several times, at least.

21         MR. ARO:  I want to look at an example of that.  This

22   is Exhibit 623 that we'll offer by stipulation.

23         THE COURT:  Okay.  Admitted.

24         (Exhibit 623 admitted.)

25

Norman Stamper - Direct

 1  *BY MR. ARO:*

 2  *Q.* And this is from a body-worn camera of Officer Valentine,

 3  facing away from the capitol.  On the front steps of the

 4  capitol, you see the obelisk monument across the street in

 5  Liberty Park.  And we see an individual right down here, who is

 6  going to be the person we're looking at.

 7          (Video played.)

 8          Did you see anything in the nature of provocation

 9  there?

10  *A.* No.

11  *Q.* Obviously, danger that this guy might be hit or a person

12  driving might cause an accident trying to avoid him?

13  *A.* Exactly.

14  *Q.* And as far as you know, was this officer disciplined?

15  *A.* No.

16  *Q.* We have -- going back to one of the things we saw earlier.

17  This is a still image at this point of the dispersal of the

18  crowd on the first night of the protests in front -- basically

19  the same location, right in front of the capitol?

20  *A.* Right.

21  *Q.* And we talked before about the officers coming up from

22  behind the skirmish line and deploying the chemicals.  The

23  point I want to focus on here is where these people go.

24          Is that Colfax?

25  *A.* Yes.

Norman Stamper - Direct

1    Q.  Is it an active traffic situation or location at that time?

2    A.  Yes.

3    Q.  And the munitions were deployed this way; correct?

4    A.  Correct.

5              (Video played.)

6    Q.  Let's take a look at what the protesters did.  We see --

7              Could you stop that, Dan.

8              We see a whole string of munitions that are deployed

9    kind of in a wave towards -- pushing them not just away from

10   where they were, but really far away; right?

11   A.  Yes.

12   Q.  And where are all of those protesters being driven?

13   A.  To Colfax.  Moving traffic on Colfax.

14   Q.  Raises the same concern?

15   A.  Certainly does.  Yes.

16   Q.  Did Commander Phelan receive any kind of discipline for

17   ordering the chemical deployment that resulted in that?

18   A.  No.

19   Q.  Anybody else disciplined on the DPD for what we just saw?

20   A.  No.

21           MR. ARO:  This is the incident that happened at

22   Lincoln and Colfax, same area, on the afternoon of day three.

23   This is, again, right after the officers cleared out the

24   protesters.  It's actually part of that whole scene from the

25   bus station.

Norman Stamper - Direct

1          This is Exhibit 14, which we offer by stipulation.

2          *THE COURT:*  Okay.  Admitted.

3          (Exhibit 14 admitted.)

4   *BY MR. ARO:*

5   *Q.*  This is a camera -- Colorado State Patrol camera.  They

6   have a number of security cameras around the state capitol;

7   correct?

8   *A.*  Yes.

9          (Video played.)

10  *Q.*  And this is just another angle of what we saw before.  We

11  see the police vehicles that were starting to disperse the

12  crowd there, and the camera kind of pulls back.  The crowd

13  starts to rush away from the officers who we saw earlier.

14          And you can stop it there.

15          This is Colfax; right?

16  *A.*  Yes.

17  *Q.*  A lot of traffic at that point?

18  *A.*  Yes.

19  *Q.*  And all of those people are running.

20          You can play it, Dan.

21          (Video played.)

22          And, again, being followed by a series of munitions;

23  right?

24  *A.*  Yes.

25  *Q.*  And this is the same basic traffic flow that we saw the guy

Norman Stamper - Direct

1    get pepper-balled and almost hit by a car; right?

2    A.   Correct.

3    Q.   Now, there is also a lot of chemical that is wafting across

4    this traffic lane; right?

5    A.   Yes.

6    Q.   Is there a concern about deploying gas and -- smoke and

7    tear gas into a place where drivers are going to be exposed to

8    it?

9    A.   Absolutely.

10   Q.   Particularly when there are people running in the clouds of

11   smoke and gas?

12   A.   Yes.

13   Q.   Obvious danger of somebody hitting something that they

14   don't want to hit; right?

15   A.   Correct.

16         MR. ARO:   If I might ask the Court a question.  I am

17   probably 45 minutes from done with my direct.  And I'm happy to

18   continue, but given your expression of concern about getting

19   folks out before traffic, I just wanted to know where you'd

20   like me to stop.

21         THE COURT:   Let's keep going a little while longer.

22         MR. ARO:   Okay.

23   BY MR. ARO:

24   Q.   Now, we talked a little bit earlier about dispersal orders

25   and the whole idea of dispersal orders and making sure the

Norman Stamper - Direct

1    dispersal orders are appropriately heard.  I want to return to

2    that idea.

3              You said earlier that there were certain -- many

4    circumstances in which DPD didn't offer effective dispersal

5    orders?

6    A.  Correct.

7    Q.  And when it comes to a group protest or group

8    demonstration, one of the problems that confronts the police is

9    noise; right?

10   A.  Correct.

11   Q.  Chanting, yelling, singing, doing whatever protesters are

12   doing?

13   A.  Yes.

14   Q.  All of which is perfectly legal, as long as it's not

15   accompanied by violence?

16   A.  Yes.  Or property destruction.

17   Q.  So police agencies often use bullhorns or other

18   magnification to make dispersal orders; right?

19   A.  Yes.

20   Q.  Is there a tactic or technique that police officers can use

21   to make sure not just that their voices are expressed, but that

22   the protesters hear what they are saying?

23   A.  Yes.

24   Q.  Have you used that tactic yourself in a large protest

25   situation?

Norman Stamper - Direct

1    *A.*  Yes, I have.

2    *Q.*  What's that tactic?

3    *A.*  During the World Trade Organization protests, given that

4    intersection that I described earlier, the sitdown

5    demonstration, when it was decided to order that group of

6    people to disperse, I went around to the far side to see if I

7    could hear my captain audibly and clearly and listened, as I

8    mentioned, to about 30 minutes of his dispersal order repeated

9    however many times.  Many, many times.

10   *Q.*  The first time you heard it, could you hear it clearly?

11   *A.*  I could.

12   *Q.*  And if you hadn't been able to hear it clearly, what would

13   you have done?

14   *A.*  I would have conveyed that to him.

15   *Q.*  Using what?

16   *A.*  I would have walked directly back to him and told him that

17   that the protesters at the far end of the crowd cannot hear

18   this.

19   *Q.*  Okay.  Could you also use a radio for that purpose?

20   *A.*  I could have.  Yes.

21   *Q.*  Now, this protest in Seattle, you said involved tens of

22   thousands of protesters?

23   *A.*  Yes.

24   *Q.*  That particular sit-in did not become violent, in the sense

25   of people hurling things at officers?

Norman Stamper - Direct

1    A.   That's correct.

2    Q.   Is there a safety concern for a uniformed police officer,

3    the chief of police, to walk through a throng of people to the

4    far side of a protest to hear for his own ears whether those

5    dispersal orders can be heard by the protesters?

6    A.   There is always the potential -- which is why it's

7    important to sort of size up the tenor of the crowd itself.

8    Q.   And if you feel like that crowd may pose a threat, can you

9    use a police vehicle to go around the back side?

10   A.   Yes, you could.

11   Q.   Or take people in hard gear?

12   A.   Yes.

13   Q.   Okay.  So is -- are you the only guy who has ever thought

14   of this idea of going to the back side of a crowd to make sure

15   that a dispersal order is heard?

16   A.   No, I am certainly not.

17   Q.   Is that a standard police tactic?

18   A.   It is.  It is part of the model policy of the IACP.  And,

19   in fact, they suggest sending two people to the back of the

20   crowd.

21   Q.   Why?

22   A.   So that if, for example, there is a discrepancy between the

23   two, you can sort of negotiate what was said there and

24   essentially come to a conclusion about whether that crowd can

25   hear what you're saying and hear it loudly enough and clearly

Norman Stamper - Direct

1    enough.

2    Q.  Did -- in looking at all of the video that you've looked at

3    of the DPD's handling of the George Floyd protests, did you try

4    to identify dispersal orders and try to identify whether the

5    crowd was able to hear them?

6    A.  I did.

7    Q.  And what is your opinion about whether DPD issued effective

8    dispersal orders before deploying chemical munitions or using

9    kinetic munitions against protesters?

10   A.  I think I would have to say that, number one, I rarely

11   heard a dispersal order at all before force was used -- before

12   chemical agents, for example, were used.  Someone recently did

13   point out to me that there was an example of an individual who

14   used a dispersal order.  That would have been the first that I

15   had heard.

16   Q.  Okay.  And the obvious concern here is, if you don't make a

17   dispersal order heard, people don't have a chance to respond

18   before being subjected to chemical munitions?

19   A.  That's one concern.  Yes.

20   Q.  What are the other concerns, from a policing standpoint?

21   A.  Another is that if one of your purposes is to arrest and

22   theoretically prosecute someone for disobeying that order, you

23   wouldn't have the kind of legal justification, the kind of

24   support necessary in court.

25   Q.  If we take a look at the IACP guidance on this, we see --

Norman Stamper - Direct

1    this, again, is Exhibit 1015, which is already in evidence --

2    "When the incident commander has made a determination that

3    crowd dispersal is required, he or she shall direct unit

4    commanders, where time and circumstances permit, to issue

5    warnings prior to taking action to disperse the crowd."

6           There is nothing controversial there?

7    A.   Right.

8    Q.   We then see some more specifics about what the dispersal

9    orders ought to be.  "The warning shall consist of an

10   announcement citing the offenses or violations being committed,

11   an order to disperse, and designated dispersal routes."

12          Why are the officers obligated to tell people where

13   their dispersal routes are located?

14   A.   Fundamentally, for safety purposes, to make sure that if,

15   in fact, a dispersal order is given and the crowd complies,

16   that they will move in a safe direction and not unnecessarily

17   face any kind of injury, for example.

18   Q.   So, like, don't run into Colfax?

19   A.   Don't run into Colfax comes to mind.

20   Q.   "A second and third warning should be issued at a

21   reasonable time" -- excuse me -- try that again.  "A second and

22   third warning should be issued at reasonable time intervals

23   before designated actions are taken to disperse the crowd."

24   Repetition increases the likelihood that folks hear it?

25   A.   Yes.

Norman Stamper - Direct

1    Q.  Lastly, "Where possible, the warnings should be audio or

2    video recorded and the time and names of the issuing officers

3    recorded in the IC's event log," so that you can later prove

4    it; right?

5    A.  Exactly.

6    Q.  Now, you're familiar with the operations plans that were

7    used by the DPD each day during the George Floyd protests;

8    correct?

9    A.  I am.

10   Q.  And we have an example here, Exhibit 472, of one of those

11   plans.  This one for the first day; right?

12   A.  Correct.

13          MR. ARO:  Do you have an objection to this, Andrew?

14          We'll offer Exhibit 472 by stipulation.

15          THE COURT:  It's admitted.

16          (Exhibit 472 admitted.)

17   BY MR. ARO:

18   Q.  And one of the things that these operations plans deal with

19   is this idea of dispersal orders; right?

20   A.  Yes.

21   Q.  And what we see the DPD saying is that in the event an

22   unlawful assembly is declared, the following dispersal order

23   must be given:  Three warnings will be given using an amplified

24   sound system.  All warnings and arrests will be videotaped.

25   The command officer that gives the dispersal order is required

Norman Stamper - Direct

1    to write a statement.  Copies of that statement should be

2    attached to the city attorney's copy of the paperwork.  The

3    order to disperse will be given by a lieutenant designated by

4    the IC.  Right?

5    *A.*  Yes.

6    *Q.*  Pretty much tracks the IACP concept; right?

7    *A.*  It does.

8    *Q.*  And we then have actually the text of the dispersal order

9    that is supposed to be issued by DPD; right?

10   *A.*  Yes.

11   *Q.*  Ballpark, how many times did you hear the text that is

12   specified in the operations plan of the DPD used during the

13   George Floyd protests before chemical munitions were deployed

14   on protesters?

15   *A.*  Not once.

16   *Q.*  Okay.  Now, we have the example that -- this is a still

17   photo.  We looked at this video earlier of the officers,

18   Officer Schaal, lobbing some sort of a grenade at the woman

19   across the street getting out of the car.  Was there a

20   dispersal order before that?

21   *A.*  No.

22   *Q.*  When there was a dispersal order, are you aware of any

23   circumstance in which DPD used the methodology that you talked

24   about to make sure it was heard?

25   *A.*  No.

Norman Stamper - Direct

1   Q.  So there is the one example we want to talk about -- and

2   then I'll ask you if there are others -- is, again that first

3   day of the protest, this is right before the deployment of some

4   sort of chemical munitions that was recorded by Elisabeth Epps

5   as she was livestreaming.

6   A.  Yes.

7   Q.  And what we see here is --

8          This is Exhibit 562, which we offer by stipulation.

9          THE COURT:  All right.  Admitted.

10         (Exhibit 562 admitted.)

11  BY MR. ARO:

12  Q.  The gentleman who is going to be sort of the centerpiece of

13  this is standing right here, inside that yellow circle, and --

14         (Video played.)

15         Now, if you'll listen carefully, you can hear a

16  dispersal order.  The officer -- some officer off screen said,

17  "All right, folks, for a third time."  And then listen to what

18  happens now.

19         (Video played.)

20         These announcements -- we see a DPD truck there.  Are

21  announcements of that sort usually made sort of in that area

22  behind the skirmish line?

23  A.  I would say generally from behind -- at or from behind the

24  skirmish line.  Yes.

25  Q.  And we don't have any idea where this individual was

Norman Stamper - Direct

 1   standing, whoever was making whatever announcement he or she

 2   was making?

 3   A.  I certainly do not.

 4   Q.  Okay.  But we know if we go back a little bit that this

 5   area behind the skirmish line is -- keep going -- is literally

 6   50 feet or so from this guy?

 7   A.  I would say roughly, yes.

 8           MR. ARO:  So go back to where we were with the truck

 9   and play the rest of whatever is being said.

10           (Video played.)

11   BY MR. ARO:

12   Q.  So we're about a minute after whatever was said was said by

13   the PA system; right?

14   A.  Yes.

15           MR. ARO:  Stop there.

16   BY MR. ARO:

17   Q.  This is somebody who is in the crowd right by the skirmish

18   line?

19   A.  Yes.

20   Q.  And he asks the officer, "What did that guy on the PA say?"

21   A.  Right.

22   Q.  And the officer replies --

23   A.  They're --

24   Q.  -- "they're going to deploy gas."

25   A.  I'm sorry.  That's correct.

Norman Stamper - Direct

1   *Q.*  Now, that officer from that exchange could conclude what

2   about the effectiveness of the dispersal order?

3   *A.*  That it was ineffective; that the protesters did not hear

4   it.

5   *Q.*  Could that officer have done anything in that moment to

6   make sure that there was an effective dispersal order given?

7   *A.*  Yes.  Either in person or on the radio he could have

8   informed that particular supervisor exactly that, that the

9   crowd has not -- could not hear the order.

10  *Q.*  As best you know, was that done?

11  *A.*  No.

12  *Q.*  And shortly after that exchange, gas was deployed on that

13  crowd?

14  *A.*  Correct.

15  *Q.*  Was that a unique circumstance?

16  *A.*  No.

17        *THE COURT:*  Are you finished with your dispersal

18  questions?

19        *MR. ARO:*  I am, Your Honor.

20        *THE COURT:*  This would be a good place to stop.

21        *MR. ARO:*  Thank you very much, Your Honor.

22        *THE COURT:*  Ladies and gentlemen, thank you for your

23  service today.  It's been a long day, and you've worked hard.

24  I know you're tired.  Go home and have a nice meal, don't do

25  any research, don't talk to anybody.  Forget it.  We'll see you

1    at 9 o'clock in the morning.

2            (Jury out at 4:18 p.m.)

3            THE COURT:  4:18, the jury is out.  What do we want to

4    say on the record tonight?

5            MR. ARO:  Nothing from us, Your Honor.

6            MR. RINGEL:  Nothing from the defendants.

7            THE COURT:  Any depositions you need looked at

8    tonight?

9            MR. MACDONALD:  The next one, Your Honor, which I feel

10   will not be needed for tomorrow -- but the next one would be

11   Grothe, G-R-O-T-H-E.

12           THE COURT:  Thank you.  Have a nice evening.

13           (Recess at 4:19 p.m.)

14

15                          **I N D E X**

16   **Item**                                                    **Page**

17      AARON SANCHEZ
            Direct Examination By Mr. Douglas            308
18          Cross-examination By Ms. Hoffman             356
            Redirect Examination By Mr. Douglas          387
19          Examination By Mr. Douglas                   394
        NORMAN STAMPER
20          Direct Examination By Mr. Aro                395

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 20-cv-01878-RBJ
3
   ELISABETH EPPS,
4  AMANDA BLASINGAME,
   ASHLEE WEDGEWORTH,
5  MAYA ROTHLEIN,
   ZACH PACKARD,
6  HOLLIS LYMAN,
   CIDNEY FISK,
7  STANFORD SMITH,
   SARA FITOURI,
8  JACQUELYN PARKINS,
   KELSEY TAYLOR,
9  JOE DERAS, and
   CLAIRE SANNIER,
10
       Plaintiffs,
11
   vs.
12
   CITY AND COUNTY OF DENVER, and
13 JONATHAN CHRISTIAN,

14     Defendants.
   _____
15

16               **REPORTER'S TRANSCRIPT**
              TRIAL TO JURY – DAY FOUR
17
   _____
18

19         Proceedings before the HONORABLE R. BROOKE JACKSON,

20 Senior Judge, United States District Court for the District of

21 Colorado, continuing at 9:02 a.m., on the 10th day of March,

22 2022, in Courtroom A902, United States Courthouse, Denver,

23 Colorado.

24              THERESE LINDBLOM, Official Reporter
              901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1                    **A P P E A R A N C E S**

2          TIMOTHY R. MACDONALD, ROBERT REEVES ANDERSON, and
EDWARD PACKARD ARO, Attorneys at Law, Arnold & Porter Kaye
3    Scholer LLP, 1144 Fifteenth Street, Suite 3100, Denver,
Colorado, 80202, appearing for the Plaintiffs.
4
           DIANA K. STERK, Attorney at Law, Arnold & Porter Kaye
5    Scholer LLP, 250 West 55th Street, New York, New York, 10019,
appearing for the Plaintiffs.
6
           ELIZABETH C. WANG, Attorney at Law, Loevy & Loevy,
7    2060 Broadway Street, Suite 460, Boulder, Colorado, appearing
for the Plaintiffs.
8
           MAKEBA RUTAHINDURWA, Attorney at Law, Loevy & Loevy,
9    311 North Aberdeen Street, Chicago, Illinois, 60607, appearing
for the Plaintiffs.
10
           ANDREW DAVID RINGEL, KATHERINE HOFFMAN, and ROBERT
11   ALAN WEINER, Attorneys at Law, Hall & Evans, 1001 Seventeenth
Street, Suite 300, Denver, Colorado, 80202, appearing for the
12   Defendants.

13         HOLLIE RENEE BIRKHOLZ and LINDSAY MICHELLE JORDAN,
Attorneys at Law, Denver City and County Attorney's Office, 201
14   West Colfax Avenue, Denver, Colorado, 80202, appearing for the
Defendants.
15

16                    *   *   *   *   *

17                    **P R O C E E D I N G S**

18         (In open court at 9:02 a.m.)

19         *THE COURT:*  Good morning, everyone.

20         (Jury in at 9:03 a.m.)

21         *THE COURT:*  Good morning, ladies and gentlemen.  How

22   are the best jurors in Colorado today?

23         Okay.  Onward.

24         *MR. ARO:*  Good morning, Your Honor.

25         *THE COURT:*  Good morning.

1    (**NORMAN STAMPER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN**)

2    **DIRECT EXAMINATION CONTINUED**

3    *BY MR. ARO:*

4    *Q.*  Good morning, Chief.

5    *A.*  Good morning.

6    *Q.*  So did you take a look as you were examining what happened

7    during the George Floyd protests the way in which the DPD

8    limited or didn't limit the ability of officers to use whatever

9    weapons they chose to use in responding to the demonstrators?

10   *A.*  Yes.

11   *Q.*  And what's your opinion on that subject?

12   *A.*  My opinion is that it was an altogether very loose policy.

13   Officers were essentially permitted, it appears from all

14   accounts, to select whatever weapons or tools they wanted to

15   use, and did so.

16   *Q.*  Okay.  Is there a problem from a policing standpoint with

17   providing officers with that level of discretion to determine

18   what weapons to use?

19   *A.*  In my professional opinion, yes.

20   *Q.*  What's the problem?

21   *A.*  The problem is that in order to use any of these particular

22   weapons, you need to be very, very proficient in the policies,

23   procedures, and, of course, the mechanics of that particular

24   weapon.

25   *Q.*  And if folks pick weapons that they aren't proficient with

Norman Stamper - Direct

1    or pick weapons that they use simultaneously -- more than one

2    weapon at the same time -- is that a concern?

3    A.  Yes, it is.

4    Q.  What's the concern there?

5    A.  The concern, once again, is a lack of discipline, a lack of

6    accuracy, a lack of I would call it judgment under those

7    circumstances.

8    Q.  Let's look at a situation involving that sort of a

9    situation.  We're referring back to Exhibit 658, which is

10   already in evidence.  And I'm going to play this, and then

11   we'll pause it a couple times and ask you what we are seeing.

12            (Video played.)

13            We see in the upper right-hand corner of that video a

14   pepper ball system; correct?

15   A.  Yes.

16   Q.  Did it appear to you that the officer was carrying that in

17   his right hand?

18   A.  Yes.

19            MR. ARO:  And just for the record, this all comes from

20   the afternoon of day three, May 30, about 6:00 p.m.  You can

21   see the body-worn camera at the corner of Colfax and Lincoln.

22   It's a little bit after the officers cleared out the bus

23   station, pushed the protesters south of Colfax.

24            So if you want to continue that for me, Dan.  I'm

25   sorry.

Norman Stamper – Direct

1    *BY MR. ARO:*

2    Q.  Actually, I should ask about that.  You saw the officer

3    refill his weapon or have it refilled with pepper ball;

4    correct?

5    A.  Correct.

6    Q.  Did there appear to be any effort by the officer who was

7    filling the device up to track how many pepper ball had been

8    deployed by that officer or how many were being added?

9    A.  Not at all.

10   Q.  Is that something that a properly deployed police force

11   would want to do?

12   A.  Yes.

13   Q.  Why?

14   A.  Accountability.

15   Q.  And in what respect?

16   A.  In the sense that officers are allowed the discretion to

17   select whatever tool or weapon they choose, firing

18   indiscriminately -- I would point out that over and over and

19   over, I saw evidence of what I consider to be indiscriminate

20   use of pepper ball.  And it's inconceivable to me that you

21   wouldn't track that in order to assure accountability, officers

22   using the weapon as it's intended under the circumstances that

23   are approved.

24   Q.  And if an officer was using an excessive volume of pepper

25   ball in a situation, and that was determined by the DPD, how

Norman Stamper - Direct

1    would that help assign accountability to that officer?

2    *A.* Well, it very well could be that that might be an officer

3    who should be taken off the line.  If he is firing

4    indiscriminately in huge numbers of pepper ball, that would

5    suggest irresponsibility.

6    *Q.* Did you see any evidence as you looked through the material

7    that you reviewed that DPD made any effort to track who was

8    shooting what weapons, at whom, and in what volumes?

9    *A.* Not at all.

10   *Q.* Okay.  So we're going back to the back of the truck as the

11   officer reaches inside.

12          Want to show that to us now.

13          (Video played.)

14          The officers retrieved something from the back of the

15   truck; right?

16   *A.* Yes.

17   *Q.* Is that an M-46, one of the big pepper ball sprayers?

18   *A.* Yes.  It's huge.

19   *Q.* And you said yesterday that the IACP guidelines suggest

20   that that sort of a device, those high-pressure pepper spray

21   deployment systems, should be used with the utmost caution?

22   *A.* Yes.  I believe I heard you say pepper -- he was reaching

23   in for pepper ball.  He was reaching in for pepper spray.

24   *Q.* That's my mistake.

25          Would you roll the tape a little further, Dan.

1          (Video played.)

2          So we see there the officer removing a pin from

3   that -- is that a safety device, to prevent it from being fired

4   accidentally?

5   *A.*   Yes.  It cannot be fired when that's in.

6          *MR. ARO:*  Okay.  If you'd continue.

7          (Video played.)

8   *BY MR. ARO:*

9   *Q.*   Now, we saw a different view of this incident that we're

10  looking at here.  This is shortly before a woman throws a water

11  bottle at the officers; correct?

12  *A.*   Correct.

13  *Q.*   And that woman, you can barely see her kind of right here

14  behind the gentleman with the tan pants.

15  *A.*   Yes.

16  *Q.*   In this instance, try to look at that, but also we're going

17  to be looking at the response of the officer and what weapon or

18  weapons he deploys in response to that bottle being thrown.

19          You can proceed, Dan.

20          (Video played.)

21          Now, do you have concerns from a proper policing

22  standpoint about how that particular officer deployed the

23  weapon systems in his hands during that incident?

24  *A.*   Yes, I do.

25  *Q.*   What's the concern?

Norman Stamper - Direct

1    *A.* The concern is, he's holding in each hand a weapon and

2    firing both. I've never seen anything like that. It is

3    completely irresponsible and outside of the customs and

4    practices of a professional law enforcement agency.

5    *Q.* So he had a pepper ball in one hand?

6    *A.* Yes.

7    *Q.* The high-volume sprayer in the other hand?

8    *A.* Correct.

9    *Q.* And did he appear to be targeting the individual who threw

10   that water bottle?

11   *A.* Initially he did.

12   *Q.* And then?

13   *A.* He moved -- just literally moved from right to left and

14   left to right, encompassing many other protesters who had not

15   engaged in any unlawful conduct.

16   *Q.* You have received weapons training over the course of your

17   police career?

18   *A.* I did.

19   *Q.* And based on your training and experience, both as a leader

20   and as a patrol officer, do you believe it's possible to

21   responsibly use two weapons simultaneously as you're going back

22   and forth like this in front of a crowd?

23   *A.* Well, it's certainly possible; but it's definitely

24   irresponsible.

25   *Q.* As far as you know, did this officer get disciplined for

Norman Stamper - Direct

1    what we just saw on the tape?

2    A.   No.

3    Q.   All right.  Now, the last set of videos that we're going to

4    look at addresses a question I think everybody reasonably has,

5    and that's whether what we have seen on these videos is an

6    aberration, sort of cherrypicking, or whether this is the

7    custom and practice and policy of the DPD to behave this way.

8         And we're going to focus on what occurred on May 30.

9    So the time frame that we just were talking about, between 6:48

10   and 7:33 -- so about 45 minutes -- right after the DPD officers

11   pushed the protesters from the bus station, through traffic,

12   into the area in front of the state capitol.

13   A.   Yes.

14   Q.   And you studied videotape about what happened with a small

15   group of officers during that period?

16   A.   I did.

17   Q.   We'll get to the video in just a second.  But for context,

18   what's your opinion about what we see in this 45 minutes of

19   activity by a small group of DPD officers in front of the state

20   capitol?

21   A.   What I saw was undisciplined, presumably untrained officers

22   engaging in what I would consider to be excessive force.

23   Q.   All right.  And was the excessive force you saw isolated?

24   A.   No.

25   Q.   Okay.  Now, to help sort of orient folks, we have the

Norman Stamper - Direct

1    overhead picture, which is sort of zoomed in, and placed dots

2    on the screen sort of where each of these incidents occurred,

3    to help people keep track of the incidents and how they relate

4    to one another.

5            You're familiar with the first incident here that

6    happened at 6:48 --

7    A.   I --

8    Q.   -- marked by No. 1?

9    A.   I'm sorry.  I am.

10   Q.   Okay.  So as with prior videos that we've seen, the guy

11   that we're going to be looking at here is wearing a yellow

12   vest, circled in yellow there.  Can you see him?

13   A.   Yes.  I would call that an orange vest and circled in

14   yellow.

15           THE COURT:  He's not much of a Broncos fan.

16           MR. ARO:  Lifelong.  I just have tired eyes, Your

17   Honor.

18   BY MR. ARO:

19   Q.   What do you see on that protester's right hip?

20   A.   A megaphone.

21   Q.   Okay.  And we're going to watch and listen to what he says

22   and to the response of the officers to him.

23           (Video played.)

24           Does he appear to you to be reading from something?

25   A.   He does.

Norman Stamper – Direct

1    *Q.* Do you know what he's reading from?

2    *A.* I cannot recall.  I couldn't actually hear the words this

3    time.

4    *Q.* With a little more volume, you were able to make them out

5    before?

6    *A.* Yes.

7    *Q.* Okay.  And is anything he's doing here in your view

8    provocative or outside the proper bounds of legitimate free

9    expression?

10   *A.* No.

11          *MR. ARO:* Go ahead and play that.

12          (Video played.)

13   *BY MR. ARO:*

14   *Q.* Did you hear him say, "You have no authority over us"?

15   *A.* I did.

16   *Q.* And the response by the police was?

17   *A.* To fire pepper balls, it appears, at him.

18   *Q.* And those were fired, five or six of them, in that skip

19   technique that you talked about yesterday?

20   *A.* Exactly.

21   *Q.* So they didn't hit him?

22   *A.* Correct.

23   *Q.* But they deployed some kind of powder in his direction?

24   *A.* Yes.

25   *Q.* And stopped him from talking?

Norman Stamper - Direct

1    *A.*  Yes.

2    *Q.*  Backed him up?

3    *A.*  Yes.

4    *Q.*  Was there anything in what he was doing that represented

5    any sort of legitimate threat to the officers?

6    *A.*  No.

7    *Q.*  The next incident happens over on the corner here.  This is

8    the area where we just saw the officer deploying a couple of

9    different weapons.  And this incident involved the gentleman

10   who is sitting on the curb with his hands up.  Do you see him?

11   *A.*  I do.

12   *Q.*  You're familiar with this?

13   *A.*  Yes.

14   *Q.*  You're going to need to listen to what he says.  He's

15   asking the officers a question here, and we're going to be

16   looking for the police response.

17          (Video played.)

18          Pause.

19          Did you hear him -- what he said?

20   *A.*  I did not.

21          *MR. ARO:*  If you could play that back a little bit,

22   and if we might have just a little bit more volume.

23          *THE WITNESS:*  Please.

24          (Video played.)

25

Norman Stamper - Direct

1    *BY MR. ARO:*

2    *Q.*  Did you hear him that time say, "Which one of you all shot

3    me?"

4    *A.*  Yes, I did.

5         *MR. ARO:*  Let's play it forward from there.

6         (Video played.)

7    *BY MR. ARO:*

8    *Q.*  Did you see right at the end of that tape this woman yell

9    something at the police officers?

10   *A.*  I did.

11   *Q.*  She's saying "F" you?

12   *A.*  Yes.

13   *Q.*  That's the woman who threw the water bottle at the officers

14   a couple of minutes later?

15   *A.*  It appears to be.  Yes.

16   *Q.*  Is asking officers three times, "Which one of you all shot

17   me" an act that justifies the use of force we just saw?

18   *A.*  No.

19   *Q.*  Is asking, "Which one of you all shot me," a legitimate

20   inquiry for a citizen who believes that he had been subject to

21   excessive force at a protest?

22   *A.*  I believe so.  Yes.

23   *Q.*  And is spraying that person in response to that question a

24   means of interfering with him getting the information that

25   Denver has asked the protesters in this case to provide?

Norman Stamper - Direct

1    *A.*  It effectively shut him down.

2    *Q.*  Now, the next clip is, essentially, a continuation of the

3    same thing we were just looking at.  You can see in the circle

4    that I'm drawing right now, the guy that we just saw get

5    sprayed in the face sitting on the curb and the woman who

6    throws the bottle appears to be assisting him.

7    *A.*  Yes.

8    *Q.*  There is another woman in the yellow oval to the right who

9    we'll see in a minute is holding a megaphone.  I'd like you to

10   watch her and hear what she's saying and how the police respond

11   to her.

12           That incident is marked with the No. 3 that we see

13   here, just to the right of No. 2.

14           (Video played.)

15           Did you hear the guy in the brown shirt yell, "Hey,

16   Buddy, put your can of poison away"?

17   *A.*  I did.

18   *Q.*  And we now see the megaphone with the woman I had indicated

19   we're looking at right there.

20   *A.*  Yes.

21           *MR. ARO:*  Would you play that forward, Dan.

22           (Video played.)

23   *BY MR. ARO:*

24   *Q.*  Did you see the woman with the megaphone say something

25   through the megaphone, maybe yell something through the

Norman Stamper - Direct

1    megaphone, and get sprayed?

2    *A.*  Yes.

3    *Q.*  Did anything she did justify the use of force that we just

4    saw?

5    *A.*  No.

6    *Q.*  So the next incident happens in that corner right behind

7    the two that we just saw about a minute later.  And, again,

8    we're looking at the woman who appears to throw that bottle;

9    right?

10   *A.*  Yes.

11   *Q.*  And this is a view of the same incident that we've seen

12   with her throwing the same bottle in response.  It's a

13   different officer's camera that shows a different angle of what

14   we're seeing.

15            (Video played.)

16            There we see Officer Carmody with weapons in both

17   hands spraying the protesters; correct?

18   *A.*  Yes.

19   *Q.*  Based on how he's holding that pepper ball, does it look

20   like there is any way that he is actually able to sight that

21   weapon?

22   *A.*  I couldn't imagine it.  No.

23   *Q.*  Because it's kind of down here --

24   *A.*  Yes.

25   *Q.*  -- and he's shooting it like this; correct?

Norman Stamper - Direct

1    A.   Correct.

2    Q.   And at this point the woman who threw the bottle, she ran

3    up this direction; right?

4    A.   She did.

5    Q.   And who is Officer Carmody spraying right now?

6    A.   He has moved the spray, obviously, to the left and

7    definitely striking with it other protesters --

8    Q.   And --

9    A.   -- who were to the right of the woman that threw the water

10   bottle.

11   Q.   In any of the videos that you've seen of this incident from

12   any of the officers there, did you see any sort of projectiles

13   or violence directed to the officers coming from the direction

14   that he is currently shooting?

15   A.   I did not.

16   Q.   So the next episode happens out in the middle of the

17   crosswalk, indicated No. 5.  This is seven minutes after the

18   incident we just saw.  And, again, this is a still image from a

19   video that the jury saw two days ago during Claire Sannier's

20   testimony.

21        And we see here on the left-hand side an officer

22   aiming the .40 caliber weapon at the gentleman who appears to

23   be doing splits; right?

24   A.   Yes.

25   Q.   And you talked about this earlier as being improper?

Norman Stamper - Direct

1    *A.*   Correct.

2    *Q.*   In the context that we see here, with officers spraying and

3    shooting people in what you've described as an indiscriminate

4    fashion, is the act of pointing a weapon like the 40 at a

5    nonviolent protester particularly provocative?

6    *A.*   I believe it is.

7    *Q.*   Why?

8    *A.*   Because it is essentially a weapon that can do significant

9    damage to a person.  And when there is no provocation, no arms,

10   no thrown objects or objects ready to be thrown, it just sends

11   a message that the police are using excessive force.

12   *Q.*   Okay.  Now, this is another still that reflects an incident

13   that the jury saw earlier with the protesters in the red jacket

14   and the lady with the megaphone again getting sprayed by an

15   officer.  You've watched this video?

16   *A.*   I have.

17   *Q.*   Did any of the people in that photograph engage in any sort

18   of unlawful conduct before this pepper spray was deployed on

19   them?

20   *A.*   No.

21   *Q.*   And that incident happened within seconds after the one we

22   just saw?

23   *A.*   That's correct.

24   *Q.*   The next incident I want to look at is indicated at the --

25   the location of it is indicated with No. 6 here.  It happened

Norman Stamper - Direct

1    two minutes after the one we just referred to.  Again, this is

2    a still from the image that was seen earlier with the protester

3    walking across the front of the police line, extending his

4    middle finger towards them.

5    *A.*   Correct.

6    *Q.*   Disrespectful by him?

7    *A.*   Disrespectful, sure.

8    *Q.*   Cause for any use of force?

9    *A.*   No.

10   *Q.*   And, for the record, this is Exhibit 666.  The still is

11   taken from that.  And you saw seconds after he displayed the

12   universal sign of contempt to the officers, he was sprayed in

13   the face; right?

14   *A.*   Correct.

15   *Q.*   Legitimate use of force?

16   *A.*   Illegitimate use of force.

17   *Q.*   So this is another still from that same body-worn camera of

18   the response following up the spraying.  Do you recall seeing

19   officers firing into a retreating crowd?

20   *A.*   I do.

21   *Q.*   Legitimate?

22   *A.*   No.

23   *Q.*   Another still.  And in this one we see this guy right over

24   here -- do you see him?

25   *A.*   I do.

Norman Stamper - Direct

1    *Q.*  And in the following sequence, we're going to be watching

2    what happens to him as he stands on the corner with his hands

3    in the air.  This is --

4            But before we do that, that guy standing right here --

5    we can see him -- before we do that, we're going to go over to

6    what happened shortly before what happens to this guy.

7            Incident 7, 7:06 p.m., you see a guy in a red

8    sleeveless shirt with crutches; correct?

9    *A.*  Yes.

10           *MR. ARO:*  And just making sure this one is in and the

11   jury can see it.  Thank you.

12           And we're going to watch what happens to the gentleman

13   with crutches.  In particular, pay attention to what he's doing

14   with his hands before he's shot.

15           (Video played.)

16           Pause it, please.

17   *BY MR. ARO:*

18   *Q.*  So did you see his hands kind of like this, pinching his

19   crutches to his sides and holding them up?

20   *A.*  I did.

21   *Q.*  Did he throw anything?

22   *A.*  Correct.

23   *Q.*  He did throw something?

24   *A.*  He did not.

25   *Q.*  Did he engage in any kind of provocation?

Norman Stamper - Direct

1    *A.*  No.

2    *Q.*  And we saw him get hit on the side with pepper ball?

3    *A.*  Yes.

4    *Q.*  Now we're going to move back to this gentleman, in the same

5    time sequence.  We can still see the guy on crutches lying on

6    the ground over here being assisted by other protesters?

7    *A.*  Correct.

8    *Q.*  We're going to shift our focus now to the gentleman in

9    black with his hands up.

10            (Video played.)

11            Now, some kind of a munition -- explosive munition --

12    was rolled at his feet; is that correct?

13    *A.*  That's correct.

14    *Q.*  Are you able sitting here to tell what that munition was?

15    *A.*  It appeared to be smoke, but it easily could have been gas.

16    I don't know.

17    *Q.*  Okay.  Did you see any justification for deploying smoke,

18    gas, or any other munitions towards that gentleman?

19    *A.*  I did not.

20    *Q.*  Let's see what happens next to the gentleman.  This is one

21    minute after that can exploded, same video, and he's been

22    joined now by a friend.

23            (Video played.)

24            Any justification for shooting those two people with

25    their hands up on the corner?

Norman Stamper - Direct

1    A.   No.

2    Q.   Watch what happens next.  In particular, I want you to

3    watch this guy's head as the tape rolls.

4              (Video played.)

5              Did you see him struck repeatedly around the top of

6    his head?

7    A.   I did.

8    Q.   Now, when officers are trained to use pepper ball, are they

9    trained -- at least properly trained officers, are they trained

10   to deploy it at an individual?

11   A.   They are trained not to point them at an individual.

12   Q.   They're trained to shoot it with skip; right?

13   A.   Yes.

14   Q.   And when you're dealing with kinetic weapons, what's the

15   danger of repeatedly shooting somebody who has already been

16   subjected to chemicals in the face and neck with multiple

17   pepper ball shots?

18   A.   There is at the extreme, a risk of death.  There is

19   certainly a risk of head or brain injury, eye injuries.  And

20   particularly with those -- any kind of a pre-existing medical

21   condition, the possibility of aggravation to an extreme degree

22   of those individuals.

23   Q.   If you'd been standing as a commander, leadership officer,

24   in this group on that evening and you saw these officers do

25   what you just did to those two protesters, what would you have

Norman Stamper - Direct

1    done?

2    *A.*  Put an immediate stop to it.

3    *Q.*  By doing what?

4    *A.*  Taking them off the line, particularly, if they had been

5    warned before.  Particularly, if they have received training.

6    And given what I just saw, I would -- I would question whether

7    they were actually trained in what they were supposed to be

8    doing with that weapon.

9            *MR. ARO:*  Now, this is another body-worn camera from

10    another officer, Exhibit 662.  And I want to play --

11            *COURTROOM DEPUTY:*  This is not in evidence.

12            *MR. ARO:*  We'll move 662 into evidence by stipulation.

13    I'm sorry.  I thought that one was in.

14            *THE COURT:*  All right.  Admitted.

15            (Exhibit 662 admitted.)

16    *BY MR. ARO:*

17    *Q.*  This is a slightly different perspective on what you just

18    saw.

19            (Video played.)

20            Pause.

21            We've seen a couple of incoming rocks on the left-hand

22    side or this, or bottles, or some kind of projectiles --

23    *A.*  Some kind of projectile.

24    *Q.*  Right?

25    *A.*  Yes.

Norman Stamper – Direct

1    *Q.* And as we see this officer firing pepper balls, are those

2    pepper balls going in the direction from which those

3    projectiles came?

4    *A.* No.

5          MR. ARO: Can you continue the tape now.

6          (Video played.)

7    *BY MR. ARO:*

8    *Q.* As far as you know, was that officer disciplined for what

9    she just did?

10   *A.* No.

11         MR. ARO: Now, the next episode is a second incident

12   involving the gentleman with the crutches and the red shirt

13   that happened two minutes after what we just saw.

14         Your Honor, this particular video is offered by

15   stipulation with a proviso. And that is that we've agreed with

16   counsel for the City to remove a section from the overall

17   video. The video itself is Exhibit 349. And we move for

18   admission of that video by stipulation but with the segment

19   from the time stamp 19:12:22 through 19:12:53 removed from the

20   video.

21         And before the final exhibit is provided to the jury's

22   view, we'll review that with counsel for the City and make sure

23   the excised portion is --

24         MR. RINGEL: That's the agreement, Your Honor.

25         THE COURT: All right.

Norman Stamper - Direct

1          (Exhibit 349 admitted.)

2     *BY MR. ARO:*

3     *Q.* So before we do this one, I forgot to ask one question

4     about the gentleman we see here, who we just saw shot

5     repeatedly.

6          In listening to the videos, do you recall him saying

7     in the middle of the shooting, "I'm a goddamn United States

8     Marine"?

9     *A.* I did hear that.

10    *Q.* Does that stop the officers from shooting him?

11    *A.* No.

12    *Q.* Let's go back to the man with crutches.  This is a

13    body-worn camera from an Aurora Officer Shaker, who we have

14    several clips that we're going to show from.  The first, we see

15    again the man with the crutches.

16         And just so that the jury is oriented, the other

17    cameras that we saw were on officers there, kind of looking to

18    their right; correct?

19    *A.* Yes.

20    *Q.* And Officer Shaker appears to be just off the side of that

21    screen, looking at the action from a little further to the

22    right; yes?

23    *A.* Yes.

24    *Q.* All right.

25         (Video played.)

Norman Stamper - Direct

1          Now, we see here the mark from the pepper ball we saw

2     him hit with earlier; correct?

3     A.  Correct.  Or what appears to be.

4     Q.  It looks like -- it's consistent with pepper ball residue

5     on his shirt?

6     A.  Absolutely, yes.

7          MR. ARO:  Would you play it forward again.

8          (Video played.)

9     BY MR. ARO:

10    Q.  Did you hear him say, "You don't need to shoot"?

11    A.  I thought I heard, "Don't shoot."  But, yes, I heard that

12    comment.

13         MR. ARO:  Okay.  Drag it back just a little bit, Dan.

14    Play it forward.

15         (Video played.)

16         THE WITNESS:  Yes.

17    BY MR. ARO:

18    Q.  Anything provocative there?

19    A.  No.

20    Q.  Now, watch what happens to these protesters who are going

21    to his aid.  And after a bit, you'll see some shooting toward

22    them, and you'll hear a woman say something.  And you've got to

23    listen carefully for it, but you can hear it distinctly.  She

24    asks the officers a question.

25         (Video played.)

Norman Stamper - Direct

1          Did you hear her say -- what did you hear her say?

2    A.  I heard her say something before she said, "Are you

3    insane?"

4          MR. ARO:  You want to play it back a little bit?

5    BY MR. ARO:

6    Q.  Listen, and I'll ask you if you heard her say, "Do not

7    shoot the people who are helping this man."

8    A.  Sure.

9          (Video played.)

10   Q.  Did you hear it that time?

11   A.  Yeah.  "Do not shoot these people who are helping this man.

12   Are you insane?"

13   Q.  Did you hear an answer from the officers?

14   A.  No.  Not an audible or verbal answer.

15         MR. ARO:  Okay.  Let's play it forward.

16         (Video played.)

17         Pause it, please.

18   BY MR. ARO:

19   Q.  Now, Officer Shaker was approached by an officer wearing

20   green; true?

21   A.  Yes.

22   Q.  Do you recognize that officer wearing green as a member of

23   the Denver SWAT team?

24   A.  Metro SWAT team.  Yes.

25   Q.  What did the Metro SWAT team officer ask Officer Shaker to

Norman Stamper - Direct

1    do?

2    A.  I believe he was asking whether he should fire at those

3    individuals.

4    Q.  Okay.  And why did he want to fire at them?

5    A.  I couldn't tell you.  I don't know what was in his mind at

6    the time.

7    Q.  Let's back up, and he'll tell you exactly why he wanted to

8    deploy gas.

9            Would you back up just a little bit.

10            (Video played.)

11            "He's just mouthy?"

12    A.  Yes.

13    Q.  And Officer Shaker thankfully said, "No, we're good," I'm

14    not going to spray him?

15    A.  Correct.

16    Q.  Now, he's going to walk around a little bit, and then he's

17    going to walk over and talk to another Aurora officer.  And I

18    want you to listen to that discussion.

19            (Video played.)

20            Would you play that again?  It got a little digitized

21    there.  Just the last part, where the -- he explains -- Officer

22    Shaker explains what we need to do.

23            (Video played.)

24            You've seen that video a couple times; right?

25    A.  I have.  Yes.

Norman Stamper - Direct

1    *Q.*  And what he says is, "You guys in green are getting a

2    little out of hand, and it's starting to cause problems."

3    Right?

4    *A.*  "We need to reach out to command in order to do that."

5    *Q.*  Who are the guys in green?

6    *A.*  They are Denver Metro SWAT.

7          *MR. ARO:*  And is that the end of the clip, or do we

8    have a little bit more?

9          Now, the last incident that I want to play --

10   actually, two more incidents in this video montage.

11         This is -- pause and skip past that.  Sorry about

12   that.

13         We're going to look back now across the street, four

14   minutes after what we just saw; and we're going to be back on

15   this corner.  And what we're going to be looking for is a guy

16   with the skateboard who does something and the police response

17   to that.

18         And the guy with the skateboard comes in over on the

19   right-hand side here.  This is the guy that we're looking at.

20   All right?  And you can play it.

21         (Video played.)

22         *COURTROOM DEPUTY:*  I don't have this one admitted.

23         *MR. ARO:*  Apologize.  Exhibit 669 is offered by

24   stipulation, Your Honor.

25         *THE COURT:*  Okay.

Norman Stamper - Direct

1          (Exhibit 669 admitted.)

2          MR. ARO:  Let's start that again, please.  I

3     apologize.

4          (Video played.)

5     BY MR. ARO:

6     Q.  You see this guy here?

7          Go ahead.

8          (Video played.)

9          And we saw that guy kind of rear back and throw an

10    object with his hand; right?

11    A.  Yes.

12         MR. ARO:  All right.  Back up just a little bit and

13    then play it forward.

14         There you go.

15         (Video played.)

16    BY MR. ARO:

17    Q.  All right.  So I'm not sure what's wrong with the video,

18    but you've seen that many times; correct?

19    A.  I have.

20    Q.  And what happened is, the gentleman here throws the bottle

21    and then runs this direction up the stairs; correct?

22    A.  Correct.

23    Q.  And the DPD officers follow that up with a spray of pepper

24    ball; correct?

25    A.  Yes.

Norman Stamper - Direct

1    *Q.*  Now, when you are firing multiple pepper ball into a crowd,

2    where a person is running, trying to evade you, are you

3    creating a risk that somebody else is going to get hit?

4    *A.*  Absolutely.

5    *Q.*  And are you aware that one of the people that got hit by

6    one of the pepper balls was the plaintiff Elisabeth Epps?

7    *A.*  I am.

8    *Q.*  Okay.  We'll learn more about that when Ms. Epps testifies.

9           The last incident happened 17 minutes after what we

10   just saw, and it happened -- this cluster of dots that we see

11   on the screen is right at the intersection of Colfax and

12   Lincoln.  And now the action has moved about half a block to

13   the west, where we see a line of officers on the edge of the

14   sidewalk; right?

15   *A.*  Yes.

16   *Q.*  And the incident that occurred there that same day was

17   Dr. Smith being sprayed in the face with pepper spray, as he

18   described during his testimony; right?

19   *A.*  Right.

20   *Q.*  And this is a still from Exhibit 30, which is already in

21   evidence.  We're not going to play that video again.

22          So we've got this sequence of events that plays out

23   over about 45 minutes, same location.  Almost all of the

24   incidents involve a cluster of DPD officers at the

25   intersection.

Norman Stamper - Direct

1          You've already talked about the lack of justification.

2    I don't want to go back to that, but what do we learn when we

3    look at a series of events like we've just seen in the video

4    about the leadership and the training and the supervision and

5    the accountability of officers at DPD who were involved in

6    responding to the George Floyd protests?

7    A.   I think we learn essentially the opposite of what you want

8    to see in circumstances like these:  A breakdown of leadership,

9    training, and certainly proper procedures.

10   Q.   Was this particular event selectively culled from all of

11   the stuff you looked at, or could we see the same sort of

12   repeated behaviors if we look at other events during these

13   protests?

14   A.   Unfortunately, you see the same pattern repeated over and

15   over.

16   Q.   As you looked at this -- actually, let me back up.

17          Would you agree with the idea that most cops are well

18   intentioned when they're put on the street to respond to this

19   sort of situation?

20   A.   I would.  Yes.

21   Q.   And would you also agree that most police departments, big

22   city police departments, are going to have some bad apples?

23   A.   Yes.

24   Q.   And I think everybody in this room agrees that bad apples

25   should be culled out of the barrel?

Norman Stamper - Direct

1   A.   Exactly.

2   Q.   I want to focus on what happens to good officers who are

3   put in the situation we just saw by leadership teams who don't

4   do their jobs.

5        Describe for me the situation that good officers face

6   in situations like we're looking at here when their leadership

7   fails them.

8   A.   A good police officer, knowledgeable, informed, highly

9   disciplined, well trained is going to get the job done,

10  oftentimes even absent effective leadership.  But in the

11  absence of effective leadership and supervision, it's sort of

12  important to point out that supervision is super-viewing the

13  work and correcting any problems that might exist on the part

14  of those people doing the job.  So we -- in my judgment, we

15  cheat good police officers when we deny them good leadership

16  and good supervision and adequate training, at least.

17  Q.   You were an officer for the better part of 40 years?

18  A.   Thirty-four years.

19  Q.   And you agree that being an officer, particularly in this

20  sort of situation that we're talking about here, is a

21  challenge; right?

22  A.   I do.

23  Q.   It's hot, people yelling at you, showing you the finger,

24  disrespecting you personally.

25  A.   Yes.

553
Norman Stamper - Direct

1    Q.   Does bad leadership and supervision make that job harder?

2    A.   Infinitely harder.  Yes.

3    Q.   In what way?

4    A.   In the sense that, coming from the people you expect to

5    provide leadership and guidance and support, you get the

6    opposite of that.  No matter how well intentioned you are, you

7    are likely to be making mistakes, of the head and/or the heart.

8    Q.   I want to shift to the question -- and we're sort of

9    getting pretty close to the end here -- of accountability.  You

10   talked about that as an issue you looked at.

11        Did any of the officers who engaged in any of the

12   behavior we just saw face discipline for what they did --

13   A.   No.

14   Q.   -- as far as you know?

15   A.   I'm sorry.  No.

16   Q.   And did you look at the discipline process and what sort of

17   discipline was imposed on DPD officers following the George

18   Floyd protests?

19   A.   I looked for it.  Yes.

20   Q.   And I want to go through a couple of the factors that go

21   into holding people accountable when things go wrong.

22        Do you believe that DPD made a series of errors in

23   failing to accumulate the information they need to hold

24   officers accountable?

25   A.   I do.  Yes.

Norman Stamper - Direct

1   Q.  One of the things that we talked about briefly earlier was

2   developing or using a tracking system for chemical munitions.

3   Is that one of those errors?

4   A.  It is.

5   Q.  And if they had had that tracking system, I think you said

6   earlier they would have been able to identify people who were

7   using too many pepper ball?

8   A.  Yes.

9   Q.  And at least look at their body-worn camera and figure out

10  what they were doing with them; right?

11  A.  Yes.

12  Q.  Did DPD have any such system?

13  A.  No.

14  Q.  Now, we talked about giving officers discretion to

15  discharge their weapons the way that we've seen; correct?

16  A.  Correct.

17  Q.  Had they had supervision on site, watching what people were

18  doing and correcting them, would that have allowed them better

19  opportunity to hold officers accountable?

20  A.  Absolutely.

21  Q.  During the video of the incidents that we just saw for

22  45 minutes right in front of the state capitol, did you see any

23  command officers take any action to try to correct or impose

24  accountability on the officers who were doing what we just saw?

25  A.  No.

Norman Stamper - Direct

1    Q.  Okay.  You also have opinions about the use of something

2    called personnel rosters; right?

3    A.  Yes.

4    Q.  So in a crowd control situation -- we've talked and we've

5    heard a lot of testimony about command posts; right?

6    A.  Correct.

7    Q.  The command post is sort of where the leadership sits

8    watching everything from a bird's-eye view, trying to figure

9    out how to do things well; is that fair?

10   A.  That is fair.  Yes.

11   Q.  What is the role of a personnel roster and the person who

12   keeps that roster in a command center during a crowd control

13   situation like the George Floyd protests?

14   A.  It is to be able to know where your people are at any given

15   moment.

16   Q.  Does a well-run police force assign that responsibility to

17   a particular person who works in the command post?

18   A.  Yes.

19   Q.  What person?

20   A.  We call that position scribe, but the IACP refers to it as

21   a recorder.  This is a person who is assigned to the command

22   post and monitors each and every movement of personnel, by

23   individual.

24   Q.  And do they record what they're monitoring?

25   A.  Yes.

Norman Stamper - Direct

1   *Q.*  How does having a scribe keeping track of personnel help

2   with the accountability of officers who may engage in

3   misconduct?

4   *A.*  It allows command -- it allows supervisors and managers to

5   look at -- for example, in the case of a situation that went

6   badly, who was there, doing what work under what circumstances.

7   *Q.*  And is -- is there any evidence that you've seen that

8   indicates that DPD employed a scribe or a recorder, as you've

9   just described?

10  *A.*  As I came to understand it, they did not do that.

11  *Q.*  All right.  And you're familiar with the Internal Affairs

12  records that showed the resolution of citizen complaints about

13  a number of DPD officers?

14  *A.*  Yes.

15  *Q.*  And is it fair to say a number of those were dismissed

16  because DPD could not identify which of its officers had

17  engaged in misconduct?

18  *A.*  Yes.

19  *Q.*  Would a scribe doing the function that you described

20  properly have limited the number of officers who engaged in

21  misconduct who got away with it because DPD didn't know who

22  they were?

23  *A.*  Yes.

24  *Q.*  There has been a lot of discussion about use-of-force

25  reports, when they were prepared, how they were prepared.  I

Norman Stamper - Direct

1    don't want to go back through all of that.  But you're familiar

2    with the circumstances under which the officers who are

3    involved in the policing of the George Floyd protests generated

4    sort of after-the-fact use-of-force reports?

5    A.  I am.

6    Q.  What role does a timely use-of-force report play in

7    accountability of officers who may engage in misconduct?

8    A.  In this case, it contributed to a lack of accountability.

9    Q.  How?

10   A.  DPD was unable night by night and upon conclusion of the

11   George Floyd protests to say who was where doing what under

12   what circumstances at all.

13   Q.  How would use-of-force reports that were prepared timely

14   have prevented that, or at least limited that?

15   A.  It would have been a record of what force was used, a

16   judgment presumably made as to whether or not that force was

17   within or outside department policy.

18   Q.  Now, you also looked at DPD policies concerning the use of

19   body-worn cameras?

20   A.  Yes.

21   Q.  And we've obviously seen lots of body-worn-camera footage;

22   correct?

23   A.  Correct.

24   Q.  And, in fact, some of the bad behavior we've seen was

25   recorded when the officer was actually using the body-worn

Norman Stamper - Direct

1   camera as intended; right?

2   A.   Right.

3   Q.   Was all of the -- was the entire DPD detachment that was

4   responsible for these protests consistently using their

5   body-worn cameras as they were supposed to?

6   A.   No.

7   Q.   Are you aware of significant gaps in the usage of body-worn

8   cameras?

9   A.   Yes.

10  Q.   And how does the failure of DPD to enforce the policies,

11  procedures, and customs around body-worn cameras by police

12  officers impair accountability?

13  A.   It can effectively gut accountability.  If you have a fully

14  operational body-worn camera policy with each and every

15  individual adhering to it, you then have a very complete record

16  of what happened.

17  Q.   Okay.  And the absence of body-worn camera prevents us from

18  knowing what particular officers did; right?  Or can?

19  A.   It is still possible to learn, in answer to that question.

20  But, generally, if the body-worn-camera policy is not being

21  followed, you will have huge gaps in the record -- in the

22  history of what took place.

23  Q.   Okay.  Now, you mentioned earlier in your testimony that

24  out of the many citizen and other complaints arising from the

25  George Floyd protests, there were fairly few officers that were

Norman Stamper - Direct

1   disciplined for what they did?

2   *A.*   Yes.

3   *Q.*   Is that true?

4   *A.*   Yes.

5   *Q.*   What does that tell us about the DPD leadership's attitude

6   about accountability for officers who don't do the right thing?

7   *A.*   I would characterize that as a breakdown in the discipline

8   of the higher-level officers, the command staff, the executives

9   of that department.  I don't -- I cannot imagine how any police

10  department can manage and control performance and conduct

11  without adequate mechanisms for recording what is going on --

12  *Q.*   Based --

13  *A.*   -- and reviewing and analyzing what is going on.

14  *Q.*   Based on what you've seen and all the video we've watched

15  today and the other materials you've seen, in your view, in

16  your opinion, should more officers have been disciplined than a

17  handful?

18  *A.*   Yes.

19  *Q.*   Many more?

20  *A.*   Many more.

21  *Q.*   What message does it send to the line officers and the

22  lower-level leadership officers -- sergeants and lieutenants --

23  when people who do the stuff we've seen get away with it with

24  no discipline?

25  *A.*   Well, my attitude and belief, based on all of my experience

Norman Stamper - Direct

1    and all of the research that I've done since my career, is that

2    officers are being told day in and day out, night in and night

3    out, what is okay, what's acceptable by the silence of

4    supervisors and managers or the commentary of supervisors and

5    managers.

6    Q.  Now, with respect to training, at various points you talked

7    about, you see evidence of a failure to train based on how

8    officers performed.  And I don't want to go back through all of

9    that.  But what is your opinion about the actual practice and

10   custom and policy of the DPD concerning training people for

11   group demonstrations and to deal with the situation we're

12   dealing with here, based on everything you've seen?

13   A.  Based on everything I've seen, what was communicated to me

14   is that both training and discipline were lacking throughout

15   the George Floyd protests, that the behavior of the officers on

16   the streets is what is accepted, what is acceptable.  And I

17   think what that conveys to the officers is a false impression

18   of what is -- of what is wanted and needed of them in a protest

19   situation.

20   Q.  Okay.  Related to the question of training is the question

21   of actual preparation, when there is something that you think

22   may happen, the efforts of leadership to figure out, how are we

23   going to respond to this potential situation?  And I want to

24   start the idea of the preparation testimony that you have

25   about -- I guess, two questions.

Norman Stamper - Direct

1          Number one, do you believe that the command staff at

2    the DPD failed to prepare for response to demonstrations or

3    protests before George Floyd's murder?

4    *A.*  I do.

5    *Q.*  And do you also believe that in the time between the murder

6    and the protests in Denver, DPD failed to take appropriate

7    steps to prepare for what might happen?

8    *A.*  I do.

9    *Q.*  Okay.  I want to talk about those issues separately.

10   Should it be any surprise to leadership of a police force like

11   the Denver police force that there may be a large-scale civil

12   justice protest in America in 2020?

13   *A.*  I think it was utterly predictable and negligent on the

14   part of police department leaders that they did not prepare for

15   those eventualities.

16   *Q.*  Okay.  And we've heard testimony about how the officers in

17   DPD were surprised by the scale of these protests --

18   *A.*  Yes.

19   *Q.*  -- that involved -- I think the numbers we've heard are

20   several thousand people.  Is that consistent with your

21   understanding?

22   *A.*  Yes.

23   *Q.*  All right.  And you've mentioned that you've been involved

24   in planning for protests involving 20 times that; right?

25   *A.*  Correct.

Norman Stamper - Direct

1   Q.  Before a particular event that might spark a protest

2   occurs, what does a properly run police force leadership team

3   do to prepare and train the force for the eventuality of some

4   kind of a significant public protest?

5   A.  It accepts the responsibility, first, for understanding

6   that those kinds of events can and indeed will take place, that

7   the fewer instances of covering those kinds of events that

8   happens to exist in the history of a given department means the

9   greater the responsibility to be prepared.

10  Q.  So that's a little counterintuitive.

11  A.  Yes.

12  Q.  You said the less frequent there are big protests means the

13  more that you need to focus on preparation?

14  A.  Absolutely.

15  Q.  Why is that so?

16  A.  Because you get rusty, because you become over time less

17  well informed about what is taking place.  For example, even

18  before George Floyd, we had Laquan McDonald in Chicago; we had

19  Tamir Rice in Cleveland, the 12-year-old boy shot and killed by

20  police officers.  You have situations that virtually

21  guarantee -- Michael Brown in Ferguson, for example --

22  guarantee that there will be civil unrest as a result of those

23  catalytic events, those events that are captured by media and

24  broadcast coast to coast and border to border.  It becomes part

25  of the everyday life, really, of people and -- citizens,

Norman Stamper - Direct

1    really, across the country.

2    Q.  So understanding that one of those events can happen at any

3    time --

4    A.  Any time --

5    Q.  -- because police officers encounter citizens on the

6    streets of America every day --

7    A.  Yes.

8    Q.  -- what does a properly operated police force leadership

9    team do to prepare for the rare event that a particular

10   incident here or elsewhere will trigger a wide-spread reaction

11   from the populace in Denver?

12   A.  It conditions the workforce -- it conditions police

13   officers, the supervisors, the managers to the reality that it

14   can and likely will happen in our city.  And that means we need

15   to be prepared.

16   Q.  So --

17   A.  Need to be conscious.

18   Q.  I'm sorry.  I didn't mean to cut you off.

19   A.  I'm sorry.  We need to be conscious, and we need to be

20   providing continuous education and training.

21   Q.  So what are the components of preparation?  You said,

22   education, training.  Anything else?

23   A.  You need to look at your inventory; you need to look at

24   policies and procedures.  By inventory, of course, talking

25   about so-called less-lethal weapons and all other forms of

Norman Stamper - Direct

1    munitions, equipment.  Pretty much everything under the sun.

2    Anything that one can imagine being put to use during a

3    demonstration needs to be inventoried.  And that inventory, by

4    the way, needs to be kept up to date and fresh.

5    Q.  Now, again, we've heard testimony that the DPD was

6    surprised by the scale.  In your opinion, from the standpoint

7    of a chief of police and a leadership team in a city the size

8    of Denver, should they be surprised by 2,000 or 3,000

9    protesting an event like the murder of George Floyd?

10   A.  Not at all.

11   Q.  Now, after George Floyd was murdered, unrest started that

12   same day up in Minneapolis and spread to other cities, as you

13   talked about earlier.  During the period between that murder

14   and the beginning of the demonstrations in Denver, what could

15   Denver have done to prepare better to respond to the protests?

16   A.  It could have -- and I do believe should have -- conducted

17   roll-call training around the clock with each officer.  Doesn't

18   have to be exhaustive.  Doesn't need to be preceded by

19   sophisticated lesson plans and curriculum designs and so forth.

20   Ten or fifteen minutes -- five or ten minutes at roll call,

21   dealing with, let's say, three questions per session.

22   Q.  So roll-call training would be training of line officers,

23   patrol officers by their sergeants, saying, if there is a

24   demonstration, here is what you need to do?

25   A.  Yes.

Norman Stamper - Direct

1    *Q.* And you said two or three issues per session?

2    *A.* Yes.

3    *Q.* Why would you limit it to two or three issues?

4    *A.* Time and focus. You want officers to be completely on

5    board and understanding of the administration's philosophy and

6    its expectations.

7    *Q.* Based on what you saw of the conduct of the officers at the

8    beginning and through the rest of the days at the protest, did

9    you see any evidence of effective roll-call training of those

10   officers in the days leading to the protests?

11   *A.* I saw none.

12   *Q.* Okay. Now, during the course of the protests -- we looked

13   earlier at Exhibit 472, which is a daily operations plan for

14   the first day of the protest, May 28. Are there also

15   operations plans for the second day, the third day, the fourth

16   day?

17   *A.* Yes.

18   *Q.* And you reviewed all of them?

19   *A.* I did.

20   *Q.* In a properly operated police command team, would there be

21   any effort in operations plans to reflect on what happened last

22   night and make plans so that tonight we do a better job than we

23   did last night?

24   *A.* I view that as essential.

25   *Q.* Because we want to learn from mistakes that were made and

Norman Stamper - Direct

1    do better?

2    A.   Yes.  And we want to capitalize on what was done right,

3    what was done well.

4    Q.   Did you see any evidence in the operations plans for the

5    second day and the third day and the fourth day and the fifth

6    day of the George Floyd protests in Denver that the command

7    staff of the Denver Police Department tried to capture lessons

8    learned from the previous night and apply them to the next

9    night's deployments?

10   A.   No.

11   Q.   What did you see instead in these operations plans?

12   A.   What I saw was boilerplate operations planning.  I've seen

13   it many times over the course of my adult life.  And it does,

14   to my way of thinking, reflect a failure to understand how

15   important it is to learn those lessons from one day to the

16   next.

17   Q.   And as you looked at the video from the first day and the

18   second day and the third day and the fourth day, did you see

19   any effort to adjust tactics or strategies so that the police

20   officers were reducing the number of mistakes they were making

21   as the protests went on?

22   A.   I did not.  My sense is that they doubled down on the very

23   behaviors that caused the problems --

24   Q.   What do you mean --

25   A.   -- from one night to the next.

Norman Stamper - Direct

1    Q.   What do you mean, "doubled down"?

2    A.   They -- I saw more, for example, instances of excessive

3    force or reckless behavior on the part of officers -- what I

4    would view as reckless behavior -- from one day to the next.

5    Intensification, a greater concentration of those kinds of

6    tactics and strategies that got them in trouble from one day to

7    the next.

8    Q.   The last question that I want to ask you is, as you sort of

9    look at the big picture here -- draw back from all of the

10   details that we've talked about, draw back from the specific

11   incidents and the failure to discipline, and so forth, and try

12   to get at the root cause of what went wrong in Denver -- what's

13   your opinion about what that root cause or those root causes

14   were?

15   A.   The root cause, from my perspective, was a failure of

16   leadership.  And in that context, I place leadership over --

17   over supervision, over discipline, over training, over

18   accountability.

19   Q.   What do you believe caused the injuries of the plaintiffs

20   in this case?  Bad patrol officers, or something else?

21   A.   This is difficult for me to express, so I'll try to do my

22   best.

23        I believe it began with a fundamental failure on the

24   part of rank and file and supervisory and executive-level

25   positions within the organization to comprehend what their job

Norman Stamper – Cross

1    was.  It was to protect those who assemble and express

2    themselves nonviolently.  I totally get, I totally understand

3    the need for force where force is reasonable and necessary,

4    objectively reasonable.  But what I got in reviewing everything

5    that I reviewed was a failure on the part of the Denver Police

6    Department to understand their purpose and what they were here

7    to do.

8            They were here to protect those protesters.  They were

9    here, for sure, to ensure that they did the best they could and

10   controlling for any kind of vandalism, damage, and certainly

11   personal injury caused by protesters.  But the overwhelming

12   challenge that they faced over the course of that week, as I

13   interpreted it from everything that I reviewed, was they didn't

14   get that they were here to help their fellow Americans carry

15   out a constitutional right that they had.

16           *MR. ARO:*  I don't have any further questions, Chief.

17   Thank you.

18           *THE COURT:*  Cross-examination.

19                        **CROSS-EXAMINATION**

20   *BY MR. RINGEL:*

21   *Q.*  Good morning.

22   *A.*  Good morning.

23   *Q.*  My name is Andrew Ringel.  I represent the defendants in

24   this case.

25           You and I have never met; correct?

Norman Stamper - Cross

1    *A.*  Correct.

2    *Q.*  We've never had an opportunity to have a conversation, have

3    we?

4    *A.*  That's correct.

5    *Q.*  Today is the first day that anybody from my side has asked

6    you any questions; right?

7    *A.*  Yes.

8    *Q.*  Okay.  I have some follow-up that I'd like to talk to you

9    about.  And I'll try to be organized about it and do it in

10   topic fashion, about the questions and the answers that were

11   provided and your opinions and the lengthy discussion you just

12   had with Mr. Aro.

13          So the first thing I wanted to talk a little about is

14   your background.  My understanding is the last time you served

15   in any official law enforcement capacity was February 8 of

16   2020; is that right?

17   *A.*  That's correct.

18   *Q.*  Okay.  And since that time, you've been a writer, a

19   speaker, a management consultant, and a trainer; right?

20   *A.*  Yes.

21   *Q.*  And an expert witness in lawsuits?

22   *A.*  Correct.

23   *Q.*  Okay.  And as the chief of police in Seattle, which was

24   your last position, your role as the chief with respect to the

25   World Trade Organization protests was not as the incident

Norman Stamper - Cross

1    commander; correct?

2    *A.*  That is correct.

3    *Q.*  It was not as the field commander or, as Chief Sanchez said

4    yesterday, the operations person; right?

5    *A.*  That's correct.

6    *Q.*  Okay.  As a chief under the incident command system, the

7    role of a chief is different than those things; right?

8    *A.*  It is.

9    *Q.*  Okay.  And so my understanding is, as chief -- which you

10   were for six years -- you weren't directly involved in planning

11   for or managing any protest in the city of Seattle; right?

12   *A.*  I would clarify that by saying that I was definitely

13   responsible in an oversight capacity in the planning.  I did

14   spend a considerable amount of time sitting in on table-talk

15   exercises and various planning sessions, as well as observing

16   the training that was being provided.

17   *Q.*  Understood.  As the chief of any department, you're

18   ultimately responsible for everything that happens in that

19   department; right?

20   *A.*  That's correct.

21   *Q.*  But with respect to a protest response or planning for a

22   protest, a chief is not responsible for actually himself or

23   herself doing all of the day-to-day activities.  There are

24   other people that do that; right?

25   *A.*  Yes.

Norman Stamper - Cross

 1   *Q.*  Okay.  In Seattle -- prior to being the chief in Seattle,

 2   you had a variety of different positions at the San Diego

 3   Police Department; right?

 4   *A.*  Yes.  That's correct.

 5   *Q.*  And towards the latter part of your career at the San Diego

 6   Police Department, you were in what I would consider

 7   supervisory and administrative roles; is that a fair way to

 8   think about it?

 9   *A.*  I wouldn't characterize it as supervisory in the terms that

10   we're all pretty much familiar with but, rather, executive

11   leadership, as the -- if you want to put it this way, the

12   operational commander of the department.

13   *Q.*  Okay.  Fair enough.  That makes sense to me.  So in

14   San Diego, did you ever have an incident command role for a

15   protest?

16   *A.*  I did.

17   *Q.*  What year was that, sir?

18   *A.*  Happened several times as a lieutenant.  I am sorry.  I

19   confused the field command job with the incident command.  I

20   was an incident commander several times during my tenure as the

21   field operations chief of the department.

22   *Q.*  Okay.  So what was the last time you were field operations

23   chief of the department?

24   *A.*  Probably early '80s, mid '80s.

25   *Q.*  Okay.  So at the -- the last time you served as a field

Norman Stamper - Cross

1    operations chief in any protest experience was approximately

2    1985?

3    A.  That's as good a guess as any; but it was a long time ago.

4    Yes.

5    Q.  Okay.  And then before that, you were -- as a lieutenant

6    for the San Diego Police Department, you did some sort of field

7    operations work in the context of protests; right?

8    A.  I did.

9    Q.  Okay.  And what time frame are we talking about that there,

10   sir?

11   A.  We are talking about the '70s, during that period.

12   Q.  All right.  So a very long time ago?

13   A.  Very long time ago.  Yes.

14   Q.  Okay.  You were hired in this case as an expert for the

15   plaintiffs; right?

16   A.  Correct.

17   Q.  What date were you hired?

18   A.  I don't recall.  A year ago, probably.

19   Q.  Okay.  And about how many hours have you spent working on

20   this project, in total?

21   A.  I would say countless.  Many, many hours.

22   Q.  Okay.  So what does that mean?  Does that mean 1,000 hours?

23   A.  No.  No.  Likely in the range of 80 to 100 to 150 hours.

24   I've kept records, I could produce those, but I don't recall

25   exactly how many.

Norman Stamper - Cross

1    *Q.*  Okay.  So you believe you've spent at the maximum 150

2    hours?

3    *A.*  Let's say yes.

4    *Q.*  Okay.  And you're being paid $450 per hour of your time;

5    right?

6    *A.*  I am.

7    *Q.*  So that -- if my math is right, that means that

8    approximately, you've been paid $80,000 for your work as an

9    expert in this case?

10   *A.*  I think it's substantially less than that.  It's not my --

11   it's not something that I pay as much attention to, probably,

12   as I should.  But --

13   *Q.*  Okay.  But, theoretically, your agreement is to be paid by

14   the hour; and if you spent the hour working on it, you were

15   able to under your agreement send a bill to counsel for the

16   plaintiffs?

17   *A.*  That's correct.

18   *Q.*  Okay.  I wanted to orient and understand your sort of

19   post-chief of police Seattle role.

20   *A.*  Yes.

21   *Q.*  And one of the things that I understand about your career,

22   sir, is that you regularly write, speak, and appear in public

23   on issues related to policing in the United States; true?

24   *A.*  Yes.

25   *Q.*  Okay.  Is it fair to consider you a critic of modern

Norman Stamper - Cross

1  policing?

2  *A.*  Yes.

3  *Q.*  Okay.  In 2016, you wrote a book called *To Protect and*

4  *Serve:  How to Fix America's Police*; right?

5  *A.*  Yes.

6  *Q.*  And one of the central tenets of that book is that the

7  police system in the United States is broken, in your view;

8  right?

9  *A.*  Yes.  The system is broken, in my view.

10  *Q.*  Right.  Policing in the United States, as of 2016 -- and

11  probably before, in your view -- is broken?

12  *A.*  Yes.  And to be clear, there are many police officers who

13  are dedicated, competent, effective at what they do.  My

14  criticism, my critique, of policing is definitely aimed at the

15  system -- the systemic obstacles to fair and effective policing

16  and treatment of police officers.

17  *Q.*  I understand.  So I wanted to read to you a summary of your

18  book*, To Protect and Serve:  How to Fix America's Police*, that

19  was promulgated by your publisher to see if you agree that this

20  is a fair summary of what your book is about.

21  *A.*  Sure.

22  *Q.*  Okay.  "American policing is in crisis.  The last decade

23  witnessed a vast increase in police aggression, misconduct, and

24  militarization, along with a corresponding reduction in

25  transparency and accountability.  Nowhere is this more

Norman Stamper - Cross

1  noticeable and painful than in African-American and other

2  ethnic minority communities.  Racism -- from raw,

3  individualized versions -- to insidious systemic examples,

4  appears to be on the rise in police departments.  Overall, our

5  police officers have grown more and more alienated from the

6  people they have been hired to serve.

7        "In *To Protect and Serve*, Norm Stamper offers new

8  insights into the conditions that have created this crisis,

9  reminding us that police in a democratic society belong to the

10  people and not the other way around.  *To Protect and Serve* also

11  delivers a revolutionary new model for American law

12  enforcement, the community-based police department.  It calls

13  for citizen participation in all aspects of police operations,

14  policymaking, program development, crime fighting, and service

15  delivery, entry-level and ongoing education and training,

16  oversight of police conduct, and -- especially relevant to

17  today's challenges -- joint community-police crisis management.

18  Nothing will ever change until the system itself is radically

19  restructured.  And, here, Norm Stamper shows us how."

20        Is that a fair summary of what that book is about?

21  *A.*  Yes, it is.

22  *Q.*  Okay.  You still believe what you wrote in your book;

23  right?

24  *A.*  I do.

25  *Q.*  And your views about policing in general impact your views

Norman Stamper - Cross

1    about what happened with respect to the Denver Police

2    Department and the George Floyd protests here in Denver; true?

3    A.  I certainly can't divorce those views from the observations

4    that I developed over time with respect to the Denver Police

5    Department.  Yes.

6    Q.  I mean, isn't that the lens that you look at policing

7    always now?  Isn't that your lens?

8    A.  It is the lens, certainly, of a critic who loves policing.

9    Q.  I understand.  But that's the perspective you bring to your

10   work as an expert in this case; isn't it?

11   A.  It is.

12   Q.  Okay.  And as an expert on police issues, you tend to work

13   for people that are suing the police, not the police; right?

14   A.  I have always been open to working for those who are sued

15   by citizens; but I have not been offered such a position, nor

16   have I in conversations with attorneys across the country

17   believed that I could fairly represent the defense in a variety

18   of these cases.

19   Q.  Okay.  Because of your perspective about the police

20   generally, or why?

21   A.  Well, certainly -- I believe I have the capacity -- I work

22   hard to demonstrate it -- to view objectively -- as objectively

23   as one human being can -- whether a particular allegation of

24   police misconduct, for example, is fair, accurate.  But, yes,

25   it is true that I do see the world through my own filter.

Norman Stamper - Cross

1   *Q.*  As everyone does; right?

2   *A.*  Certainly.

3   *Q.*  Okay.  One of the filters that you see the world from is

4   the so-called Battle for or Battle in Seattle; right?

5   *A.*  Yes.

6   *Q.*  Fair to say that was a formative experience in your police

7   career?

8   *A.*  It happened at the end of my career; so it's kind of

9   difficult, I think, to call it a formative experience.  But,

10  yes, I think that is a fair characterization; it was a very

11  significant event.

12  *Q.*  That's fair.  Formative means it formed you as a police

13  officer.  Is it fair to say that your experience with respect

14  to the WTO conference protests and the response of the Seattle

15  Police Department was in some ways formative as to how you

16  think about policing today?

17  *A.*  That's difficult for me to answer.  It's not that I haven't

18  thought about a whole host of issues that became relevant

19  during the WTO.  So I couldn't call them new or formative.

20  Most of them -- virtually all of them existed, with maybe two

21  or three exceptions, during that time frame.

22  *Q.*  Okay.  Fair enough.  I understand.

23          All right.  So to provide some context of the WTO

24  issue, the World Trade Organization conference of ministers was

25  in Seattle from November 22, 1999, until December 3 of 1999;

Norman Stamper – Cross

1    correct?

2    A.   That's correct.

3    Q.   And it was an event that had been granted to Seattle at

4    least several years before that; right?

5    A.   No.  It was approximately eleven or twelve months before.

6    Q.   Okay.  So you had eleven or twelve months to plan for and

7    prepare for a planned event with planned locations?

8    A.   Correct.

9    Q.   And so it's kind of like planning for a political

10   convention; right?

11   A.   In some respects, yes.

12   Q.   Okay.  And you understand that Denver -- Denver had the

13   Democratic National Convention in 2008?

14   A.   I do.

15   Q.   Would you compare the kind of planning process that would

16   exist for a convention like the one in 2008 and the WTO

17   convention from a police response perspective?

18   A.   In general, yes.  The exceptions are important; but, yes.

19   Q.   Okay.  You said the exceptions are important.  What's an

20   important exception that you can identify?

21   A.   The distinction between the Republican party's convention,

22   the Democratic party's convention in an American city and the

23   World Trade Organization is that the WTO is an international

24   organization, dealing with very sensitive, controversial,

25   sometimes delicate issues, a whole range of issues that brought

579
Norman Stamper - Cross

1    protesters of differing political perspectives together in that

2    city.

3    Q.  Okay.  That would be true with respect to any political --

4    national political convention in the United States; right?

5    There would be protesters or people that would come to the

6    convention that are supportive of the particular party that is

7    holding the convention.  There would be people that would be

8    against the particular party that is holding the convention;

9    right?

10   A.  Certainly, in that sense, I would agree with you.  Yes.

11   Q.  Okay.  But the difference from your perspective about WTO

12   is the international component?

13   A.  The international component and the reach of the political

14   issues that were being addressed.

15   Q.  All right.  The distinction that I wanted to draw and see

16   if you agree with is, you had just talked to Mr. Aro about

17   planning for the George Floyd protests in Denver.  The ability

18   to plan for an event that is not scheduled and not planned is

19   different than the ability to plan for something like the WTO

20   or a political convention; right?

21   A.  Yes.  I agree.

22   Q.  Or a major event in a city like the Super Bowl?

23   A.  Of course.

24   Q.  The protests in Seattle were large; right?

25   A.  They were.

Norman Stamper – Cross

1   *Q.* And during the protests, there were people that were

2   peacefully protesting in Seattle, and there were also people

3   who were agitators and maybe even anarchists in the crowds,

4   too; right?

5   *A.* Yes.

6   *Q.* And the Seattle police officers used -- police officers

7   under your command used pepper spray and tear gas and devices

8   that fired rubber pellets; right?

9   *A.* That's correct.

10  *Q.* Okay. And the reason those were used was to clear the

11  streets of Seattle when that became necessary; right?

12  *A.* Correct.

13  *Q.* Okay. And that was one of the common tactics that your

14  police department used in response to the WTO protests; true?

15  *A.* Yes.

16  *Q.* All right. Now, there were lawsuits related to the WTO

17  events; right?

18  *A.* Yes.

19  *Q.* And you had your deposition taken probably multiple times;

20  true?

21  *A.* It was several times; I don't recall how many. Yes.

22  *Q.* Okay. So I wanted to reference to you -- and if you need

23  me to, I can show it to you -- but I've reviewed a deposition

24  of yours from January 26 of 2001, talking about the response of

25  the Seattle Police Department to the WTO protests.

Norman Stamper - Cross

1   A.  Yes.

2   Q.  Do you recall having a deposition?

3   A.  I certainly do recall having it taken.  Yes.

4   Q.  Okay.  And in that deposition, you indicated that you

5   thought that the -- your department had done an extraordinary

6   job against all odds; is that consistent with your belief?

7   A.  It is consistent with my overall belief.  Yes.

8   Q.  Okay.  And you also described that during your observations

9   of the response to the WTO protests, that you personally

10  witnessed your officers use remarkable restraint; right?

11  A.  I did.  Yes.

12  Q.  Okay.  You -- during a protest -- you're quoted on

13  December 1 in the *Seattle Times* as saying, quote, The

14  demonstrators, particularly those bent on violence and

15  destruction, used techniques that made it extremely difficult

16  for us to respond to the moment with anything resembling mass

17  arrests.

18      I'm not going to ask you if that's an accurate quote,

19  but is that accurate from your perspective about what you saw

20  at the WTO?

21  A.  It is.  I would clarify that it is because of conditions

22  that we helped to create that caused that reality.

23  Q.  And that's what you were talking about with respect to the

24  first event -- or the event that you described with Mr. Aro

25  yesterday?

Norman Stamper - Cross

1    *A.*  That's correct.

2    *Q.*  Okay.  In the deposition that I read, you characterized the

3    protesters at the WTO into three different categories.

4    *A.*  I did.

5    *Q.*  And one of the categories were people who assembled and

6    were peacefully expressing their opposition to the WTO?

7    *A.*  Yes.

8    *Q.*  A second category was people who were engaged in

9    destructive or violent activities?

10   *A.*  Correct.

11   *Q.*  And a third category is what you called recreational

12   rioters?

13   *A.*  Yes.

14   *Q.*  Okay.  Isn't it fair, sir, that those three categories of

15   people are generally present in protest crowds in the

16   United States?

17   *A.*  I would say generally, yes.

18   *Q.*  Okay.  Including the crowds in the George Floyd protests

19   here in Denver?

20   *A.*  That's a little bit more difficult for me to answer based

21   on everything that I read and viewed in the context of these

22   videos.  I did not see, with, perhaps, one or two very minor

23   exceptions, what I would call individuals or groups of

24   individuals who were engaged in what I perhaps flippantly call

25   recreational rioting.  People sitting in a tavern watching the

Norman Stamper - Cross

1    news, deciding to go downtown and join the action without any

2    kind of a political perspective.

3    Q.  Okay.  In Seattle, there was difficulty with your officers

4    differentiating between people that fell in any of those three

5    groups at any given time; right?

6    A.  Well -- I'm sorry.  May I ask, did I make that statement?

7    Q.  Yeah, you made that statement.  That it was hard for the

8    police to differentiate between the different categories of

9    people.

10   A.  Yeah.  I was looking for the context.  You're right.  I

11   think it's sometimes difficult, for example, if you're on the

12   lines of a pitched battle that is going on between police and

13   protesters, to draw distinctions behind those who may be in

14   fact throwing rocks and bottles and those who are peacefully

15   assembled and expressing their views.

16   Q.  And you would agree that sometimes in a protest context,

17   people who are bent on aggression and agitation obscure their

18   participation in such things by being in the middle of a crowd

19   or things like that, that might otherwise be peaceful; right?

20   A.  I would say generally, yes.

21   Q.  That's a tactic that exists among people who are wanting to

22   engage in that kind of conduct in the context of a peaceful

23   protest?

24   A.  Once again, I would say, generally, yes.  I saw very little

25   of that in Denver, based on the materials that I reviewed.

Norman Stamper - Cross

1    Q.  Okay.  In your deposition in the Seattle case -- Seattle --

2    about the WTO, you talked about how it was not an effective

3    strategy to do what you said should have happened here in terms

4    of using arrest teams to go into the crowd and identify people

5    who were engaged in destructive and agitating behavior.  Do you

6    remember that?

7    A.  I do.

8    Q.  Okay.  And I take it that what you're saying now is, the

9    extent of the activities in Denver were different; and,

10   therefore, you think it could have been done?

11   A.  I do believe it could have been done.  Yes.

12   Q.  Okay.  But it couldn't have been done in Seattle?

13   A.  We were looking at crowds of -- in the tens of thousands,

14   so I would stand by that statement.

15   Q.  Okay.  One of the things that the lawsuits against you and

16   others with the Seattle Police Department alleged was that

17   there was an indiscriminate use of chemical agents on peaceful

18   protesters; right?

19   A.  Correct.

20   Q.  And another thing that they alleged is that there was a

21   failure of police officers to distinguish between those engaged

22   in peaceful protests and those engaged in violent and

23   destructive acts and how to respond to each of the different

24   categories of people; right?

25   A.  Correct.

Norman Stamper - Cross

1   *Q.*  The same criticisms that you're leveling against the Denver

2   Police Department here?

3   *A.*  Absolutely.

4   *Q.*  Okay.  When you were the chief of police in Seattle, you

5   were a member of an organization called the Major Cities Chiefs

6   Association?

7   *A.*  I was.

8   *Q.*  You would recognize that organization as a sort of

9   authoritative organization for policing in the United States?

10  *A.*  I believe so.  Yes.

11        *MR. RINGEL:*  Okay.  If we could, Mr. Atencio, put up

12  the -- just so that the witness can see -- the major -- the

13  first page of the Major Cities Chiefs Association report from

14  October.

15        *THE COURT:*  Does it have an exhibit number?

16        *MR. RINGEL:*  I'm just using it for purposes of

17  examining -- it's just for purposes of cross-examination.  It's

18  not an exhibit.

19        *THE COURT:*  So you don't want me or the jury to see

20  it?

21        *MR. RINGEL:*  I'm happy to make it an exhibit, but I

22  didn't know -- I haven't identified it as an exhibit.

23        *MR. ARO:*  As far as we know, Your Honor, it's never

24  been produced to us.

25        *MR. RINGEL:*  It's a publicly available document.

Norman Stamper - Cross

1         MR. ARO:  Still wasn't produced.  It wasn't on their

2    exhibit list.

3         THE COURT:  Let's use something else.

4         MR. RINGEL:  Your Honor, I can't use an authoritative

5    report to cross-examine an expert?

6         THE COURT:  You didn't identify it as an exhibit in

7    advance.

8         MR. RINGEL:  It's an authoritative report.  I should

9    be able to cross-examine an expert with any authoritative --

10        THE COURT:  Go ahead and cross-examine.

11        MR. RINGEL:  Okay.  You're not allowing me to use the

12   report?

13        THE COURT:  Are you objecting to the use of it?

14        MR. ARO:  We are objecting.

15        THE COURT:  Sustained.

16   BY MR. RINGEL:

17   Q.  One of the things that you don't talk about anywhere in

18   your report or anywhere in your discussions about the response

19   to the George Floyd protests is the context of protests all

20   over the United States; correct?

21   A.  I do believe that I have expressed on any number of

22   occasions in a variety of venues that the response to the

23   George Floyd protests was truly global in nature.  Every single

24   one of our states, thousands of our cities, all seven

25   continents, people generally reacting in protest around the

Norman Stamper - Cross

1    world to the Derek Chauvin murder of George Floyd.

2    Q.  I understand, and you did say that.  But nothing about your

3    report makes any effort to compare what happened in Denver to

4    what happened in any other city; correct?

5    A.  That is correct.  Yes.

6    Q.  Okay.  There were protests all over the United States and

7    Canada; right?

8    A.  Yes.

9    Q.  And they happened over days and months?

10   A.  In some cases, up to a year.

11   Q.  And you would agree that the level of protest activity in

12   the United States as a whole related to what happened to George

13   Floyd on May 25, 2020, and thereafter and responding to things

14   that happened before was unprecedented; right?

15   A.  Could you repeat the question?  I'm sorry.

16   Q.  Sure.  The scale of protest activity in the United States

17   following George Floyd's death was unprecedented; right?

18   A.  That is correct.

19   Q.  And --

20   A.  I'm sorry.

21   Q.  And protests throughout the United States were violent in

22   nature?

23   A.  Most experienced some degree of violence or property

24   destruction.  Not all.

25   Q.  Okay.  And Denver's was one of the most violent; right?

Norman Stamper - Cross

1    *A.*  I'm not sure I would say that.

2    *Q.*  Okay.

3    *A.*  If I were comparing, for example, Denver with Eugene or

4    Portland or Los Angeles, I -- I guess we could quibble over the

5    nature and the degree of violence, but it was present in a

6    number of cases.

7    *Q.*  Okay.  The protests were used by people all over the

8    country to exploit and to engage in violence; right?

9    *A.*  They were used by some in each of those instances, yes.

10   *Q.*  Right.  Including in Denver?

11   *A.*  Yes.  Correct.

12   *Q.*  The protests in the United States were characterized by the

13   use of a lot of different weapons; right?

14   *A.*  By police?

15   *Q.*  By people in the protest crowds.

16   *A.*  I'm not sure I would characterize it as "a lot."  I -- I

17   know rocks and bottles certainly were thrown.  That was

18   probably the most common use of personal violence.

19   *Q.*  Okay.  Have you done anything to study protests in any

20   other city other than Denver for any work that you have done?

21   *A.*  Well, certainly, in Seattle and San Diego, the answer would

22   be yes.  Other than Denver, in terms of my personal expert

23   witness work or consulting, the answer would be generally no.

24   I've done a number of organizational interventions and speeches

25   and so forth in various cities that have experienced

Norman Stamper - Cross

1    significant protest activity.

2            I hope that answers your question.  I'm sorry.

3    Q.  My question may have been confusing.  If it was, I

4    apologize.  You studied the response by the Denver Police

5    Department to the George Floyd protests; right?

6    A.  I did.

7    Q.  You've not studied the responses of any other jurisdiction

8    in the United States or Canada related to the George Floyd

9    protests?

10   A.  I think I would put it as, I've examined responses in

11   various other jurisdictions.  I certainly have not studied

12   them.

13   Q.  Okay.  So you've done nothing to analyze whether or not

14   things were different in Denver, either in terms of the nature

15   of the protests or the response?

16   A.  I'm sorry.  Could you repeat that?

17   Q.  You haven't analyzed whether anything about the protests in

18   Denver were different than other places in the United States?

19   A.  Correct, not as such.

20   Q.  And you haven't done anything to examine whether anything

21   in Denver, in terms of its response, was different or

22   consistent with protest responses from other jurisdictions in

23   the United States?

24   A.  In general, that would be correct.  Yes.

25   Q.  Okay.  How much violence do you think was in Denver?

Norman Stamper - Cross

1    *A.*  I am at a loss to answer that question.  I'm sorry.  In

2    contrast, for example, to what was happening in Portland,

3    Oregon -- I would say that the level of violence here was

4    lower, certainly, than it was in Portland, perhaps even in

5    Seattle, as well as several other jurisdictions.

6    *Q.*  Okay.

7    *A.*  It's very, very hard for me to answer the question.  I'm

8    sorry.

9    *Q.*  All right.  You -- the opinions you offered with Mr. Aro

10   didn't talk about the level of violence; did they?

11   *A.*  I think they did, but I -- you know, video after video

12   after video showed what was described, certainly, as some form

13   of provocation.  You know, that -- I guess what I would say is,

14   there were incidents, in my view, of provocation; and in

15   general, I think the response of the Denver Police Department

16   to that provocation was indiscriminate and excessive.

17   *Q.*  You understand that more than 70 officers were injured as

18   part of the response to the protesters?

19   *A.*  I do, and my heart goes out to them.

20   *Q.*  Okay.  And you understand that they were injured based on

21   the violent acts of other people, generally speaking; right?

22   *A.*  I would describe that as a direct cause; but I would also

23   have to say that provocation on the part of the Denver Police

24   Department helped create those conditions in which they

25   sustained injury.

Norman Stamper - Cross

1   Q.   Okay.  So it's your opinion that there -- that absent the

2   actions of the Denver Police Department, there wouldn't have

3   been any injuries to the officers, because nobody who was

4   attending these protests was bent on violence and destruction?

5   A.   Not -- I'm not saying that at all.  I do believe that there

6   were individuals, for example, within various crowds over the

7   course of that week who were bent on violence.

8   Q.   Okay.  And some of those individuals succeeded in injuring

9   police officers; right?

10  A.   Yes.

11  Q.   Okay.  And other of those individuals succeeded in causing

12  mayhem, like starting a bunch of fires; right?

13  A.   I did see evidence of fires and window breaking, other

14  forms of what is often called vandalism.  But, yes, the answer

15  is yes.

16  Q.   Okay.  And you understand from materials that you have

17  reviewed that the Denver Fire Department responded to more than

18  200 calls for service for fires during this time frame?

19  A.   I actually think I'm hearing that for the first time, but

20  it wouldn't surprise me.

21  Q.   And do you understand that sometimes the police needed to

22  protect firefighters and EMT personnel to respond and do their

23  jobs as part of the protests?

24  A.   Yes.

25  Q.   When -- you understand that there were a variety of

Norman Stamper - Cross

1    firearms found as part of the crowds in the protests in Denver;

2    right?

3    A.  Correct.

4    Q.  Thirty-three, as identified by the Office of the

5    Independent Monitor?

6    A.  I believe I did see that figure.  I don't have an

7    independent recollection of it.

8    Q.  And there were shots -- there were gunshots fired at

9    various times as part of the protests?

10   A.  I did believe I heard that, as well.  I -- the natural

11   question that comes up for any cop is, how many of those

12   supposed gunshots were in fact flash-bangs or other munitions

13   employed by the police?

14   Q.  Okay.  You understand that there was extensive property

15   damage in the areas where the protests were; right?

16   A.  I do.

17   Q.  Millions of dollars of property damage?

18   A.  Yes.

19   Q.  Including to lots of private businesses up and down the

20   16th Street Mall?

21   A.  Yes.

22   Q.  One of the things that I wanted to see if you agreed with

23   me about was examining the totality of the evidence and

24   circumstances related to the protests and the response of the

25   police.  You would agree that that's an appropriate thing to

Norman Stamper - Cross

1    do; right?

2    A.   I do.

3    Q.   During your examination with Mr. Aro, we all looked at and

4    you described a variety of videos; right?

5    A.   Yes.

6    Q.   I didn't keep track, but I would estimate that the total

7    amount of video footage that you went over with Mr. Aro was

8    less than an hour; would you agree with that, as a basic

9    estimate?

10   A.   I really don't -- I really don't think I can answer that.

11   When I'm involved in it, I'm involved in it; I'm not, you know,

12   keeping time, so to speak.

13   Q.   Okay.  Fair enough.  There were approximately 50 clips that

14   we looked at?

15   A.   That sounds familiar.

16   Q.   Well, you were involved in the presentation -- preparation

17   of that presentation; right?

18   A.   Which presentation are you talking about?

19   Q.   The selection of the clips and the decisions to talk about

20   specific clips, that was something you were actively involved

21   with?

22   A.   I wrote three reports.  From those reports, the attorneys

23   established, essentially, the questioning that they were going

24   to subject me to.

25   Q.   Okay.  You didn't review that PowerPoint before your

Norman Stamper - Cross

1  testimony?

2  *A.*  Oh, yes, I certainly did.  Yes.

3  *Q.*  Okay.  And practiced your testimony?

4  *A.*  Yes.

5  *Q.*  I wanted to see if we could put those videos and the events

6  that you've talked about in a context of the overall scope of

7  the protests in Denver, in terms of size and extent and see if

8  we can establish a common understanding of what all of those

9  things are.

10        So the first thing that I would -- wanted to talk to

11  you about is the notion that not everything that happened in

12  the protest is on video; right?

13  *A.*  Correct.

14  *Q.*  Okay.  And I also wanted to talk to you about some of the

15  limitations on some of the video means that we've looked at;

16  right?

17  *A.*  Sure.

18  *Q.*  So body-worn camera is something that is worn on the chest

19  of a particular officer; right?

20  *A.*  Yes.

21  *Q.*  And what would you -- the field of vision of a body-worn

22  camera is limited; right?

23  *A.*  That's correct.

24  *Q.*  Okay.  So if I'm standing here, and I have a body-worn

25  camera on my chest, the field of vision of the body-worn camera

Norman Stamper - Cross

1  would be in the direction of the camera; right?

2  A.  In general, yes.

3  Q.  Right.

4  A.  I mean, it depends -- certainly, if you've got a body-worn

5  camera here, and you move like that, and you move like that,

6  you're going to pick up considerably more.  If you're staring

7  straight ahead, it would be less, by definition.

8  Q.  I understand.  But in comparison to the utility of a

9  person's eyes, a body-worn camera is more limited; is it not?

10  A.  Yes, it is.

11  Q.  When anyone -- your eyes can move in much different

12  directions, even when your head or your body is not moving;

13  right?

14  A.  Correct.

15  Q.  So the field of vision that an officer would have with his

16  or her eyes would be broader than the field of vision that you

17  would see on a body-worn camera; right?

18  A.  That's correct.

19  Q.  Okay.  The other thing that -- if you're present at a

20  particular event, you have the ability to use all of your other

21  senses to understand what is happening in the event different

22  from what is just reflected on a video of that event on a

23  body-worn camera; is that a fair --

24  A.  That's definitely fair.  Yes.

25  Q.  Okay.  And you would expect a well-trained police officer

Norman Stamper - Cross

1    to use all of those senses, and they talk about having a sixth

2    sense, to try to figure out what is behind you?  And that is

3    something that is very important for an officer to sort of

4    understand; right?

5    A.  I would agree with that.  Yes.

6    Q.  Okay.  And so there is an element of people -- particularly

7    within a crowd and unpredictability, that the officers are kind

8    of darting their eyes and looking around and keeping all of

9    their senses active to try to understand everything that is

10   going on; right?

11   A.  Ideally, yes.

12   Q.  I mean, that's what police officers should do all the time;

13   right?

14   A.  It -- it is.  It's also I think important to point out that

15   officers, like anyone else, can get tunnel vision and see less

16   than, for example, another officer might see.

17   Q.  I understand that.  And problems with tunnel vision happen

18   with officers, and they happen with everyone.  Right?

19   A.  Yes.

20   Q.  Including sometimes experts?

21   A.  I would have to agree with you.

22            THE COURT:  Is this a good time to break?

23            MR. RINGEL:  It is.  Thank you, Your Honor.

24            THE COURT:  Let's take about twelve minutes or so.

25            (Recess at 10:57 a.m.)

Norman Stamper - Cross

1          (In open court at 11:13 a.m.)

2          *MR. RINGEL:* May I proceed, Your Honor?

3          *THE COURT:* Of course.

4    *BY MR. RINGEL:*

5    *Q.* When we were talking before the morning break we were

6    talking about the protests and all of the activities, and we

7    started a discussion about video, and we had talked about how

8    not everything was on video, and proceeded to look at

9    limitations of video, and then talked about body-worn camera.

10   So I wanted to continue that discussion. Okay?

11   *A.* Yes.

12   *Q.* There are other types of videos that exist sort of in the

13   universe of videos that you've reviewed; right?

14   *A.* Yes. That's correct.

15   *Q.* And another category of videos is the HALO camera; right?

16   *A.* Yes.

17   *Q.* And the HALO cameras are -- what does HALO stand for, sir?

18   *A.* I don't know. I can't remember now.

19   *Q.* Okay. When you were in active law enforcement, there were

20   no such thing as HALO cameras, at least in the United States?

21   *A.* There were I would describe them as very primitive, early

22   generation versions of what today is called a HALO.

23   *Q.* So a HALO camera is, essentially, a fixed camera that is at

24   a higher elevation on like a light post or streetlight or some

25   fixed location; right?

Norman Stamper - Cross

1    *A.*  Yes.

2    *Q.*  And when you walk around any city in the United States or,

3    frankly, in the world, you see a -- sort of a plastic half

4    bubble that has a camera in it; right?  You can't see the

5    camera when you're walking around, but those are what the HALO

6    cameras are; right?

7    *A.*  Correct.

8    *Q.*  And HALO cameras can be moved by the operators of the HALO

9    camera system; right?

10   *A.*  Yes.

11   *Q.*  And they can be focused, and the angle of it can be changed

12   if someone is monitoring that particular camera at that

13   particular moment and making that happen.  Fair?

14   *A.*  Correct.

15   *Q.*  Okay.  But there are some limitations of HALO cameras,

16   based on the nature of the technology; would you agree?

17   *A.*  I would.

18   *Q.*  One of the things is they don't have sound?

19   *A.*  Correct.

20   *Q.*  Another thing is the angles and the distance from a HALO

21   camera can sometimes make it hard to pick out things that are

22   farther away from the HALO camera or are not focused on by the

23   HALO camera; is that fair?

24   *A.*  I believe that is fair.  Yes.

25   *Q.*  Okay.  One of the things that I'm wondering if you agree

Norman Stamper - Cross

 1   with me is that HALO cameras don't pick up solid objects that

 2   are being thrown from the ground level up into the air at

 3   night.

 4   A.  I believe that that is generally true.  I'm not familiar

 5   with the limitations -- capacities, really, of the HALO cameras

 6   in that context.

 7   Q.  Okay.  Fair enough.  You use HALO cameras in your work, and

 8   you know that they exist, and you know that it's a tool that

 9   law enforcement uses, but it's not something you drilled down

10   upon and sort of got into detail in your own studies about?

11   A.  Well, to clarify, I have never used HALOs in my career.

12   Q.  Okay.  But you used -- you -- in this case, you watched

13   HALO footage?

14   A.  Yes.

15   Q.  Have you ever had a case before where you had to look at

16   HALO footage?

17   A.  Nothing like this.

18   Q.  Okay.  One of the other pieces of video that we have or

19   categories of video is video from the Colorado State Patrol;

20   right?

21   A.  Yes.

22   Q.  And you understand that that's a fixed video camera system

23   that is directed at the state capitol building and the grounds

24   of the capitol, which are under the sort of oversight,

25   responsibility of the Colorado State Patrol?

Norman Stamper - Cross

1    *A.*  Correct.

2    *Q.*  Okay.  And those cameras also can be guided to a particular

3    event if an operator happens to be looking at that event;

4    right?

5    *A.*  I'll take that as accurate.  I'm not familiar, actually,

6    with that technology.

7    *Q.*  Okay.  Fair enough.  And would you agree with me that given

8    the position of the Colorado State Patrol cameras, a similar

9    issue exists as to whether you were able to see objects being

10   launched from the ground up into the air at night?

11   *A.*  Based on my limited experience, I would say that that is

12   true.

13   *Q.*  Okay.  Then the other sort of evidence that we have on

14   video is evidence from people who either take photographs or

15   take videos, principally on their cell phones; right?

16   *A.*  Sure.

17   *Q.*  We now live in an age where everybody takes -- everybody

18   has a nice camera in their pocket; right?

19   *A.*  Essentially, I say that's true.

20   *Q.*  And people can take videos of all sorts of things that

21   happen in their lives, including interactions with police at

22   protests; right?

23   *A.*  Yes.

24   *Q.*  Okay.  But there are limitations on how much that camera

25   shows, depending on the angle, depending on the quality, and

Norman Stamper - Cross

1    depending on the ability of the photographer; fair?

2    A.  I think that's fair.  Yes.

3    Q.  All right.  But even talking about all of those videos,

4    there is a lot of activity that happens at these protests that

5    is not on video; right?

6    A.  Right.

7    Q.  So I wanted to see if we could drill down and if you and I

8    could reach an agreement as to the general parameters of that.

9    You would agree, would you not, that the protests, as a whole,

10   the sort of most concentrated protests were from May 28 through

11   June 2; is that fair?

12   A.  Yes.

13   Q.  And that's over six days, generally speaking?

14   A.  Generally, yes.

15   Q.  And I think you would agree that protests didn't last 24 --

16   all the time.  There were some times during the 24-hour period

17   of time when protests were not occurring?

18   A.  That's correct.

19   Q.  But is it -- would it be reasonable to you to suggest that

20   on average, there was protest activity approximately 16 hours

21   on each of those six days?

22   A.  I would accept that as a good generalization.

23   Q.  Yeah.  I'm just trying to be general here.

24   A.  Sure.

25   Q.  Okay.  So that's 96 hours of protests; right?

Norman Stamper - Cross

1    A.   Yes.

2    Q.   Okay.  And do you have any sense of how much that 96-hour

3    period of time is captured on video?

4    A.   No.

5    Q.   Okay.  You've not made an analysis of that issue at all?

6    A.   I have not.

7    Q.   All right.  And then a complicating factor is that for a

8    lot of those 96 hours, events are happening during the protest

9    at multiple locations at the same time?

10   A.   Correct.

11   Q.   Okay.  So if an event is happening -- if there is an event

12   happening at the District 6 station at Colfax and Washington

13   and an event happening at the capitol building at Colfax and

14   Sherman at the same moment in time, that would geometrically

15   mean that there is more content about what is happening in the

16   protests?

17   A.   I think that's fair.  Yes.

18   Q.   If there are 15 events happening at the same time, even

19   more?

20   A.   Even more.

21   Q.   Okay.  Essentially, there were a lot of different actors

22   that were acting in relationship to each other during the

23   protests?

24   A.   Yes.

25   Q.   Let me see if I can break down what I mean by that.

Norman Stamper - Cross

1   Approximately several hundred police officers were responding

2   to each day of these protests; is that fair?

3   A.  Yes.

4   Q.  And you think that there were approximately 3,000

5   protesters at any given time?

6   A.  I don't believe I have ever said that.

7   Q.  Okay.  How many protesters do you think would be a fair

8   estimate of the number of protesters that were present?

9   A.  I would describe, I guess, the level of protest

10  participation as at least several hundred in most cases, up to

11  perhaps a couple of thousand.  But I -- I haven't actually made

12  an estimate of the numbers of people involved.

13  Q.  Okay.  So -- and when you're saying several hundred to --

14  perhaps up to a thousand, that would be a particular event at a

15  particular time at a particular location?

16  A.  That's correct.

17  Q.  So, again, if there are multiple events happening at

18  different locations at the same time, there would be an order

19  of magnitude bigger; right?

20  A.  Yes.

21  Q.  Okay.  So given the fact that just -- so let's just -- even

22  if we use a conservative estimate of 1,000 protesters being

23  actively protesting at any given time -- if you have 1,000

24  protesters engaged in behavior and 200 police officers engaged

25  in behavior, there is a lot of different events that are

Norman Stamper - Cross

1   happening at any one period of time; right?

2   A.  I think that's fair.  Yes.

3   Q.  Okay.  And you haven't focused on the totality of all of

4   those interactions, have you?

5   A.  I'm not sure what you mean by that.  I certainly have

6   focused on the George Floyd protests, with the understanding

7   that there could be multiple venues.  And as such, I think it's

8   important to know what is going on at each and every one of

9   them.

10  Q.  Okay.  Fair enough.

11          Is it fair to say that one of the major focuses of

12  your analysis of what happened at the George Floyd protests was

13  video?

14  A.  Yes.

15  Q.  And you reviewed -- do you believe you reviewed all of the

16  video that is available related to the George Floyd protests?

17  A.  I don't know.

18  Q.  But you said earlier, I think, that you spent maybe about

19  80 hours on your work on this case?

20  A.  I don't recall -- I think I probably agreed with your

21  estimate, but I -- I couldn't confirm that.  I would say in

22  that vicinity.

23  Q.  Okay.  And you would agree that there is more than 80 hours

24  of video that exists?

25  A.  Yes.

Norman Stamper - Cross

1    Q.  Did anybody help you review the video?

2    A.  Could you explain what you mean by that?

3    Q.  So did anybody else working with you help you review the

4    video?

5    A.  I'm sorry, that -- that sounds like the same question, and

6    I -- I'm trying to seek clarity --

7    Q.  Okay.

8    A.  -- about what you mean by help.

9    Q.  All right.  Fair enough.  Fair enough.  You reviewed video;

10   true?

11   A.  I did.

12   Q.  You didn't have an assistant or multiple assistants

13   reviewing video and pointing out video to you as to things that

14   you should specifically look at?

15   A.  My personal assistants?

16   Q.  Right.

17   A.  That's correct.  I did not.

18   Q.  But would you get video -- were you -- was video that could

19   be of interest to you identified for you by counsel for the

20   plaintiffs?

21   A.  Yes, of course.

22   Q.  So the plaintiffs' lawyers were engaged in reviewing video,

23   and they provided you video from their review that you looked

24   at?

25   A.  That is correct.

Norman Stamper - Cross

1    Q.  Did you do your own sort of general analysis of the video,

2    or did you rely principally on the video that was identified by

3    counsel for the plaintiffs?

4    A.  Well, I certainly relied exclusively on video that was

5    provided to me by counsel.

6    Q.  Okay.  But my understanding is, you got all of the video

7    that was produced by the City and County of Denver in this

8    case; right?

9    A.  I don't know that.

10   Q.  Okay.  You tried to be as comprehensive as possible in

11   reviewing everything that you thought necessary to review;

12   right?

13   A.  I did.  Yes.

14   Q.  Okay.  But you would agree that you -- well, let me back

15   up.  How much time in total did you spend reviewing video

16   generally for yourself to sort of cut the wheat from the chaff?

17   A.  I'm not sure that was my purpose or intention; but the

18   short answer is, many, many hours.

19   Q.  Okay.  How many?

20   A.  I don't recall.

21   Q.  Okay.

22   A.  I certainly have a record of that, but I don't have it at

23   my fingertips now.

24   Q.  Okay.

25   A.  Dozens and dozens of hours.

Norman Stamper - Cross

1   Q.  Okay.  Fair enough.  And so you would say, okay, I'm going

2   to look at Officer Smith -- I'm going to look at all of Officer

3   Smith's body-worn camera for all of that officer's response to

4   the protests; is that how it would work?

5   A.  I would say no.  I was sent video and asked to look at and

6   analyze what I saw.  The question basically is -- is, what do

7   you see here?

8   Q.  Okay.  So, essentially, the video that you were asked to

9   look at was selected for you?

10  A.  Essentially, yes.  I might, for example, ask, do you have

11  any video of what I read in a document?

12  Q.  Okay.  But you weren't looking at all of the video and

13  making your own independent judgment of what the video in its

14  totality says or doesn't say; right?

15  A.  Right.

16  Q.  Okay.  You're focused on videos and events that are brought

17  to your attention?

18  A.  In general, yes.  Occasionally, as I mentioned, I would ask

19  if there was video.  If there was, it would certainly be sent

20  to me.

21  Q.  Okay.  So let me see if I can get an understanding and

22  maybe achieve some clarification related to this video.  One of

23  the incidents that you talked about yesterday was the incident

24  related to the basilica between Pennsylvania and Logan on

25  Colfax; right?

Norman Stamper - Cross

1   A.  Yes.

2   Q.  Do you believe you looked at every single bit of video

3   related to that incident?

4   A.  I don't know.

5   Q.  Okay.  Did you make an inquiry to know whether or not you

6   looked at every available video to understand the totality of

7   the circumstances related to that incident?

8   A.  I made a good faith assumption, was never disappointed in

9   that, that I was in fact sent everything that I needed to see.

10  Q.  Okay.  You relied on counsel for the plaintiffs to send you

11  their selection of what the video about that event showed;

12  true?

13  A.  Combined -- I apologize for repeating myself -- but

14  combined with any queries or requests that I may have had to

15  augment my understanding.

16  Q.  Okay.  But none of the queries or requests that you had

17  was, please send me every minute of video related to this

18  incident so that I could understand it in its totality?

19  A.  I never made that statement.

20  Q.  Did you listen to all of the radio traffic related to that

21  incident?

22  A.  Probably not.  There was a huge amount of radio traffic.  I

23  listened to that which was made available to me in the context

24  of the DPD's response, for example, to the basilica incident.

25  Q.  Okay.  So if there is radio related to the basilica, the

Norman Stamper - Cross

1    only radio that you reviewed with respect to that is radio that

2    was provided to you by counsel for the plaintiffs?

3    *A.*   Sure.  Yes.

4    *Q.*   So one of the things that we looked at related to that

5    incident was one statement on the radio by Commander Phelan;

6    right?

7    *A.*   Yes.

8    *Q.*   You don't know, do you, what Commander Phelan may have said

9    on the radio 15 minutes before that statement, do you?

10   *A.*   I do not.

11   *Q.*   Or maybe an hour before?

12   *A.*   I do not.  Yes.

13   *Q.*   And fair to say that of all the 50 incidents that we looked

14   at on video -- that you looked at video during Mr. Aro's

15   questioning of you, your understanding of what is on those

16   videos is limited to the information that was presented to you

17   by counsel for the plaintiffs?

18   *A.*   Yes.

19   *Q.*   You didn't with respect to any of those body camera -- so

20   we looked at -- this morning we looked at various events that

21   happened at the intersection of I believe it's Lincoln and

22   Colfax; right?

23   *A.*   I'm not sure what you're referring to.

24   *Q.*   Okay.  Mr. Aro stood here, and there were ten or eleven

25   incidents that you said over a 45-minute period demonstrated

Norman Stamper - Cross

1    some sort of pattern that you believed existed; do you remember

2    that?

3    *A.*  I certainly do.  Yes.

4    *Q.*  What was the intersection that was related to this?

5    *A.*  I don't recall at this moment which example you are talking

6    about.  We looked at, for example, the Aurora police aligned in

7    a skirmish line at one end of the block and Denver police

8    officers aligned in a similar skirmish line at the other end of

9    the block.

10   *Q.*  Right.  And that's related to the basilica; right?

11   *A.*  Yes.

12   *Q.*  I'm not talking about the basilica.  This morning, sir,

13   there were ten or eleven incidents that you looked at with

14   Mr. Aro.

15   *A.*  Correct.

16   *Q.*  Do you remember that?  He put on the screen these pretty

17   little things that said 1, 2, 3, 4, 5; do you remember that?

18   *A.*  Yes.

19   *Q.*  What intersection was that?

20   *A.*  I don't recall at the moment.

21   *Q.*  But you don't know -- you didn't review all of the

22   body-worn camera from all of the people at that intersection,

23   did you?

24   *A.*  I'm sure I didn't.  Although we certainly heard testimony

25   that a number of officers did not employ their body-worn

Norman Stamper - Cross

 1    cameras during this protest -- or at certain places and times

 2    during the process.

 3    Q.  Right.  And I understand that.  But if you want to make an

 4    opinion that a particular event or a series of events that

 5    occurred at one location over a 45-minute period of time

 6    created pattern and practice at the Denver Police Department --

 7    that's your opinion; right?

 8    A.  I'm sorry.  I didn't follow your question.

 9    Q.  You have the opinion that those incidents at the

10    intersection that you cannot remember, that Mr. Aro put on the

11    screen and talked to you about, created a pattern and practice

12    of the police department; right?

13    A.  Yes.  That's correct.

14    Q.  You can't -- how is it fair, sir, to reach a pattern and

15    practice opinion like the one that you did without looking at

16    all of the video that exists related to that 45-minute period

17    of time?

18    A.  I'm sorry, but I don't believe I missed any video,

19    regardless of the origins of that video.  For example, that

20    described the incident we were talking about this morning.

21    That video was, in fact, furnished to me; and, of course, I

22    reviewed it.

23    Q.  Right.  But you didn't -- you don't -- you have not looked

24    at every video that is available related to those incidents,

25    have you?

Norman Stamper - Cross

1   A.  I don't know.  My belief is, I have reviewed -- I know that

2   I have reviewed everything that was sent to me.

3   Q.  Okay.  But you don't know what exists that wasn't sent to

4   you?

5   A.  I certainly do not.  You're correct.

6   Q.  Okay.  All right.  I wanted to talk to you about a concept

7   that is from the field of psychology.  And you -- you have a

8   Ph.D. in what, sir?

9   A.  Leadership and human behavior in the school of psychology.

10  Q.  Right.  So I assume, sir, that you're familiar with the

11  psychological concept of confirmation bias?

12  A.  Sure.

13  Q.  And I have a working definition that I'd like to see if you

14  agree with from the American Psychological Association related

15  to confirmation bias.  Okay?

16  A.  Sure.

17  Q.  "Confirmation bias is the tendency to look for information

18  that supports rather than rejects one's perceptions, typically

19  by interpreting evidence to confirm existing beliefs while

20  rejecting or ignoring any conflicting data."

21          Is that a fair working definition of confirmation

22  bias?

23  A.  I believe it's a very good definition.  Yes.

24  Q.  Okay.  And you understand from your work in psychology that

25  confirmation bias does not have to be conscious?

Norman Stamper - Cross

1   *A.*  Almost by definition, it is usually not conscious.

2   *Q.*  And so when I have used the term "confirmation bias," it's

3   not the same thing as saying someone is biased against a

4   particular person because of their race or religion or

5   something like that; right?

6   *A.*  I'm sorry.  Could you repeat that?

7   *Q.*  Sure.  Bias in the context of confirmation bias is

8   different than bias in the context of discrimination?

9   *A.*  As we are discussing that this morning, I would say yes to

10  that.

11  *Q.*  Okay.  Fair enough.  You've written several expert reports

12  in this case; right?

13  *A.*  Yes.

14  *Q.*  And they total more than 100 hours -- they total more than

15  100 pages -- excuse me.

16  *A.*  Yes, they certainly do.

17  *Q.*  And you testified at length from starting at about 11:00

18  yesterday all the rest of the day and then into this morning

19  with Mr. Aro; right?

20  *A.*  Yes.

21  *Q.*  And nothing about any of your opinions addresses the

22  concept of confirmation bias, does it?

23  *A.*  No, it does not.

24  *Q.*  And you would agree that avoiding confirmation bias is an

25  important thing for experts to avoid?

Norman Stamper - Cross

1    *A.*  I believe it's critical.  Yes.

2    *Q.*  I wanted to sort of talk to you about some things that I

3    don't see as part of your opinions and see if you agree with me

4    that they're not part of your opinions.  Okay?

5    *A.*  Yes.

6    *Q.*  Your opinions do not try to place the protests in Denver in

7    the context of the other George Floyd protests throughout the

8    United States; true?

9    *A.*  Yes.  True.

10   *Q.*  You don't attempt to compare Denver's response to the

11   response of other jurisdictions?

12   *A.*  I don't attempt to do that.  I acknowledge that it's pretty

13   much inevitable that if you're looking at this country's

14   response to the murder of George Floyd and then individual law

15   enforcement agencies' response to protests arising out of that,

16   that you're going to do that.  You are in fact going to be

17   thinking about that.  So I do acknowledge that.

18   *Q.*  Right.  In the sense that at the beginning of your

19   report -- your first report in this case -- it talks about that

20   the protests here were in the context of protests in other

21   places; right?

22   *A.*  I'm sure I made a statement similar to that, yes.

23   *Q.*  Okay.  But you don't do a sort of comparative analysis to

24   say, here is how much OC Denver used, here is how much OC

25   Minneapolis used, here is the level of violence in these two

Norman Stamper - Cross

1    cities, and, therefore, it makes sense to me or it doesn't make

2    sense to me that Denver used this amount of OC?

3    A.   That's correct.

4    Q.   Okay.  Did anything prevent you from doing that?

5    A.   My understanding of the scope and nature of the assignment

6    that I undertook.

7    Q.   Okay.  And the assignment was defined by counsel for the

8    plaintiffs?

9    A.   Yes.

10   Q.   You don't believe as an expert that you have the right to

11   help define your assignment?

12   A.   Oh, I absolutely believe in that.

13   Q.   Okay.  So if you had thought that it was important to place

14   the protests in Denver in context -- in a broader context, that

15   is something that you could have suggested to counsel for the

16   plaintiffs; correct?

17   A.   Yes.

18   Q.   Not something that occurred to you?

19   A.   No.  I have to say, it wouldn't have.  I was not being

20   retained by Minneapolis or any other jurisdiction.

21   Q.   Okay.  But isn't -- isn't your use of terms that -- that

22   the use of a particular chemical is indiscriminate, isn't that

23   a relative term?

24   A.   Could you explain what you mean by that, please?

25   Q.   Sure.  Something is indiscriminate in comparison to

Norman Stamper - Cross

1    something else; right?

2    *A.*  Yes.  I think the answer is that indiscriminate use of a

3    particular chemical agent, for example, can be compared against

4    the history of that agency's use of that chemical agent.  It

5    could be compared beyond the scope of my involvement here with

6    other jurisdictions.

7    *Q.*  Okay.  Fair enough.  Your expert opinions don't talk about

8    all of the weapons that were found in the protests; right?

9    *A.*  They do not.

10   *Q.*  You understand that some -- depositions from various of the

11   people that were present at the protests were provided to you,

12   and you reviewed them; right?

13   *A.*  Yes.

14   *Q.*  Okay.  And among the depositions that you reviewed were

15   depositions of some of the lieutenants that were leading some

16   of these units to respond to the protests; right?

17   *A.*  Correct.

18   *Q.*  And those lieutenants, generally speaking, talked about all

19   of the things that they experienced related to the crowds;

20   right?

21   *A.*  There is no way I can answer that question.  I'm sorry.

22   *Q.*  Okay.  You recall reading deposition testimony from

23   lieutenants that talked about their experiences about things

24   that happened during the protests?

25   *A.*  Correct.  Yes.

Norman Stamper - Cross

1   Q.   Okay.  Do you recall testimony about the protesters or

2   people in the crowds, agitators, using lacrosse sticks to send

3   projectiles toward the police lines?

4   A.   I had heard about that -- read about that earlier.  That's

5   correct.

6   Q.   Have you -- do you recall as part of the testimony in those

7   depositions that agitators in the crowd were using tennis

8   rackets for the same purpose?

9   A.   Yes.

10  Q.   How about slingshots?

11  A.   I believe I read that, yes.

12  Q.   There was a fair amount of discussion about fireworks that

13  were used by people in the crowds; right?

14  A.   I guess a fair amount, yes.

15  Q.   Okay.  And none of those concepts or events made it

16  anywhere in your expert opinions; right?

17  A.   That's correct.

18  Q.   One of the things that was discussed at length in the

19  depositions is the intelligence that the Denver Police

20  Department had related to a potential effort to burn down the

21  District 6 police station at Colfax and Washington; right?

22  A.   I did hear of that, yes.

23  Q.   And on May 28 of 2020, a police station in Minneapolis was

24  burned to the ground; was it not?

25  A.   Yes, it was.

Norman Stamper - Cross

1   Q.  So it wasn't a flight of fancy by the Denver Police

2   Department to be concerned about that kind of intelligence;

3   right?

4   A.  I can't speak to the quality or origin of the intelligence,

5   but I would not call it unusual.  And I would, in fact, argue

6   that the police needed to be aware of such rumors and to treat

7   them seriously.

8   Q.  Right.  And so it was important for the police to keep a

9   presence by the District 6 police station to try to avoid the

10  notion of people overrunning the police station and potentially

11  burning it to the ground?

12  A.  I believe that's correct.  Yes.

13  Q.  Okay.  That's a reasonable tactical approach by the Denver

14  Police Department?

15  A.  I believe so.  Yes.

16  Q.  Based on the intelligence and based on the experience of

17  what happened at District 3 in Minneapolis?

18  A.  Yes.

19  Q.  None of your opinions talk about that issue; right?

20  A.  That's correct.

21  Q.  Okay.  We looked at -- you looked at yesterday video

22  related to the RTD Civic Center bus station.

23  A.  Uh-huh.

24  Q.  That's at the corner of Lincoln and Colfax; right?

25  A.  Correct.

Norman Stamper - Cross

1    *Q.* Are you aware, sir, that there were a variety of problems

2    that the police experienced related to a rock pile that was

3    present in front of that RTD bus station?

4    *A.* Certainly aware that there was a legitimate, in my

5    judgment, concern on the police about that rock pile.

6    *Q.* Okay. There was a pile of rocks there; right?

7    *A.* Yes.

8    *Q.* A large pile of rocks?

9    *A.* Correct.

10   *Q.* And it -- people who were agitators in the protests were

11   gathering those rocks and using them as projectiles against the

12   police; right?

13   *A.* That's certainly what I heard, or that they could be doing

14   just that.

15   *Q.* Okay. And there was a major effort by the police to try to

16   prevent that from occurring?

17   *A.* Correct.

18   *Q.* And that included police lines and efforts to keep people

19   away from that location so that maintenance folks could

20   mitigate that risk; right?

21   *A.* Yes.

22   *Q.* And some of those pictures that we saw yesterday, there

23   is -- looks like there is gravel that is raised above the flat

24   surface of the ground; right?

25   *A.* I saw it as dirt. If it was gravel --

Norman Stamper - Cross

1   Q.  Maybe it's dirt, maybe it's gravel, but you know what I'm

2   talking about?

3   A.  I do.  Yes.

4   Q.  And in one particular corner -- on the sort of Broadway and

5   Colfax corner -- there is a big pile of dirt or gravel,

6   depending on which of us --

7   A.  Sure.  I agree.

8   Q.  Is it your understanding that that dirt is above a pile of

9   rocks?

10  A.  Yes.

11  Q.  And is it your understanding that the rest of those sort of

12  smaller piles of dirt or gravel are above piles of rocks?

13  A.  Same thing.  Yes.

14  Q.  Okay.  And so from a tactical perspective, does it make

15  sense to you for the police to worry about keeping protesters

16  away from that problematic area as a general matter?

17  A.  Yes.

18  Q.  Okay.  That seems perfectly rational to you; right?

19  A.  It does.

20  Q.  Okay.  And a legitimate tactical objective for the police

21  to have?

22  A.  Correct.

23  Q.  And that context of tactics isn't anywhere in any of your

24  opinions; right?

25  A.  I don't believe I made reference to that.

Norman Stamper - Cross

1    Q.  All right.  One of the things that -- another thing that we

2    talked -- that was referred to during Ms. Sannier's

3    testimony -- were you here for that, sir?

4    A.  I was not.

5    Q.  Okay.  You're familiar with -- on the 28th of May, the

6    first evening of the protests, an effort by people to access

7    and protest on I-25?

8    A.  Yes.

9    Q.  That's not something that you talked about in any of your

10   opinions either; right?

11   A.  I'm -- I have a memory of acknowledging that that in fact

12   had happened.

13   Q.  Okay.  And you would agree that from a tactical

14   perspective, a police department trying to keep protesters from

15   accessing an interstate highway and blocking traffic is a

16   legitimate tactical goal?

17   A.  I do.

18   Q.  And you would agree that it's dangerous to allow protesters

19   to take over a highway?

20   A.  In support of that, two protesters during George Floyd

21   protests in Seattle were struck, one killed, the other

22   catastrophically injured, as a result of their having been on

23   the freeway.

24   Q.  Right.  And it's somewhat of a more modern protest tactic

25   to try to get highways; is that a fair way to put it?

Norman Stamper - Cross

1  A.  I would have to say no emphatically to that.

2  Q.  Okay.

3  A.  It's not new.

4  Q.  Okay.

5  A.  It's as dangerous today as it was many, many years ago.

6  Q.  From your time in San Diego, that was something that -- the

7  protesters would try to get the San Diego freeway, the 5,

8  sometimes?

9  A.  I actually do not have an independent memory of any effort

10  in San Diego.

11  Q.  Okay.

12  A.  I do remember reading about protests in the '60s in

13  Seattle, when demonstrators took to the -- basically,

14  University of Washington students who took the freeway in

15  Seattle, I-5, as a matter of fact.

16  Q.  Okay.  So you had discussed this morning related to some of

17  Mr. Aro's questions about -- he showed you a picture of the

18  operations plan.

19  A.  Yes.

20  Q.  And some of the -- some of the sort of basic operations

21  objectives that were articulated by Commander Phelan were,

22  we're going to keep protesters from the interstate?

23  A.  Yes.

24  Q.  And we're going to keep protesters from police stations?

25  A.  Yes.  I believe I read that.

Norman Stamper - Cross

1    Q.  And those are two legitimate objectives, from your

2    perspective?

3    A.  They are.

4    Q.  Okay.  I was struck by -- you know, you have a lot of

5    criticisms of the Denver Police Department in your opinions;

6    and we're going to talk about some of those with more

7    specificity as I continue my examination.  But nowhere in any

8    of your opinions do you talk about anything that the Denver

9    Police Department did right.

10   A.  My focus was clearly as an expert witness on policies,

11   procedures, equipment, training, supervision, and leadership

12   that I think were deserving of criticism.  It was certainly not

13   my intention to identify the many, many things that I think

14   that the Denver Police Department has earned praise.

15   Q.  Okay.  So you were not universally critical of the response

16   to the George Floyd protests by the Denver Police Department?

17   A.  I am pretty much universally critical.

18   Q.  Okay.

19   A.  But I'm not condemning or in any fashion criticizing the

20   men and women of that department or the intentions of people at

21   the various positions.

22   Q.  Okay.  So your criticism is how they performed in that

23   particular instance, but you're not criticizing -- well, we'll

24   leave it at that.  Your criticism is how people performed in

25   responding to the protests?

Norman Stamper - Cross

1   *A.*  Positions taken, actions undertaken, that sort of thing.

2   Yes.

3   *Q.*  With the recognition that all of the people that made those

4   different decisions are human beings?

5   *A.*  Absolutely.

6   *Q.*  Okay.  One of the things that also is not part of your

7   analysis is anything historical related to the Denver Police

8   Department; fair?

9   *A.*  It's certainly fair.  I don't recall having written that.

10  I'm well aware of Denver's response to political conventions,

11  Super Bowl victories and the like.

12  *Q.*  Okay.  You have a general sense of some of the -- you know,

13  part of the record of all of the information that you have is

14  other examples of protest gatherings, similar things that

15  happened in the City and County of Denver that the Denver

16  Police Department was responsible for responding to?

17  *A.*  Sure.  That's true.

18  *Q.*  But your opinions don't relate to those earlier events in

19  any way?

20  *A.*  Could you repeat that?  I'm sorry.  I didn't follow the

21  question.

22  *Q.*  Sure.  The opinions that you give in this case about the

23  response to the George Floyd protests are not related by you to

24  any prior events involving the Denver Police Department?

25  *A.*  That is correct.

Norman Stamper - Cross

1    *Q.*  All right.  Why?

2    *A.*  That's beyond the scope of my responsibilities as I saw

3    them.

4            *MR. RINGEL:*  Your Honor, I'm going to move to a

5    different topic.  I can keep going, but I thought since it's 5

6    to 12:00, I would give you a sense of what you want to do.

7            *THE COURT:*  This is fine.  Thank you.

8            How much time, folks?  Hour and 15.  Works for me.

9            (Jury out at 11:54 a.m.)

10           (Jury in at 1:19 p.m.)

11           *THE COURT:*  Mr. Ringel.

12   *BY MR. RINGEL:*

13   *Q.*  Good afternoon.

14   *A.*  Good afternoon.

15   *Q.*  As promised, we're going to shift topics now.  And I wanted

16   to focus on some of your opinions and talk to you about them.

17           The first one that I wanted to talk about is some of

18   the opinions you have related to the use of force with respect

19   to the George Floyd protests.  The first opinion I wanted to

20   talk about is that -- your opinion related to a failure to give

21   dispersal orders or at least audible dispersal orders before

22   the use of munitions.  Okay?

23   *A.*  All right.

24   *Q.*  First, the pattern and practice that you have identified is

25   solely and exclusively related to the -- this response to these

Norman Stamper - Cross

1    George Floyd protests; correct?

2    A.  I'm sorry.  I didn't understand the question.

3    Q.  Okay.  The pattern and practice that you've identified

4    that -- the substance of it is only based on your assessment of

5    the George Floyd protests response and nothing else that the

6    Denver Police Department has ever done; correct?

7    A.  That is correct.

8    Q.  In terms of the issue of dispersal orders, you indicated

9    that you did not hear dispersal orders all that often; right?

10   A.  Very rarely.  Yes.

11   Q.  Does that include all of the notifications related to

12   curfew, or do you put that in a separate --

13   A.  I don't put it in a separate category.

14   Q.  You do, or you do not?

15   A.  I do not.

16   Q.  Okay.  So you understand that there were all sorts of

17   notifications related to the curfew; right?

18   A.  Yes.  I've heard that.

19   Q.  Okay.  You know, for instance, that the City sent out a

20   cell-phone-wide notification that gave everybody alert on all

21   of their cell phones, kind of like when you get an Amber Alert?

22   You knew that?

23   A.  I did.

24   Q.  So if the cell phone was in the area where there were --

25   there was a notification, every cell phone would have pinged,

Norman Stamper - Cross

1   and everyone would have been notified about the curfew.  Right?

2   A.  Yes.

3   Q.  And you heard -- you have seen in various videos

4   notifications about curfew; right?

5   A.  Yes.

6   Q.  Okay.  So is it your opinion that there was just none or

7   that they were inadequate?

8   A.  It is my opinion that -- well, my observation is that

9   rarely did I hear a dispersal order before weapons, munitions

10  were employed to disperse a group.

11  Q.  Okay.  And it's my understanding of your opinion that you

12  believe that a dispersal order is required in every instance

13  when a -- something like pepper ball or gas is used for the

14  purpose of dispersal?

15  A.  That is my view -- my opinion.  Yes.

16  Q.  Okay.  Do you have the understanding, based on the

17  depositions that you read, that sometimes those tools were used

18  by Denver police officers and others for the purpose of officer

19  safety?

20  A.  I'm not -- I would ask you if you could repeat the

21  question, please.  I'm not following that.

22  Q.  Okay.  There are different purposes that one might use

23  something like gas; right?

24  A.  Sure.  Yes.

25  Q.  And the purpose that one uses gas, where a dispersal order,

Norman Stamper - Cross

1   my understanding, is necessary, is when you're doing it for the

2   specific purpose of dispersing a crowd?

3   *A.*   Yes.

4   *Q.*   Okay.  Another reason that one might use gas is for

5   purposes of officer safety; correct?

6   *A.*   Theoretically, yes.

7   *Q.*   Okay.  So, for example, if officers at Colfax and

8   Washington were feeling like they were getting pelted with

9   rocks, and they wanted to create distance between the crowd and

10  themselves on the line, because they couldn't differentiate

11  between those who were throwing rocks and those who weren't,

12  they might choose to use gas for that purpose; right?

13  *A.*   Yes.  Once again, theoretically, yes.

14  *Q.*   Okay.  And that purpose would be an officer-safety purpose,

15  and there may not be time in that kind of context to give a

16  dispersal order.  True?

17  *A.*   I certainly do believe that.  Under certain circumstances,

18  there is not time.

19  *Q.*   Okay.  And you would agree that the rationale for a

20  dispersal order, and as it's explained in the IACP guidance, is

21  when it's a formal dispersal order in the sense of what you

22  were talking about related to the WTO and the event that you

23  spoke of with Mr. Aro?

24  *A.*   I'm sorry.  I lost track of your unfolding the question.

25  My apologies.

Norman Stamper - Cross

1    Q.   Okay.  An issue with respect to the IACP standard related

2    to dispersal order has to do with a formal action of dispersing

3    a crowd; right?

4    A.   Yes.  The IACP.

5    Q.   The IACP.

6    A.   Correct.

7    Q.   And the IACP guidelines talk about dispersal similar to the

8    context that you talked about yesterday related to the WTO and

9    the half hour of dispersal orders that your underling gave that

10   you went to the back of the crowd and listened for?

11   A.   Correct.

12   Q.   Okay.  You would agree that in circumstances where things

13   are more immediate and when there is an officer safety

14   component, that there may not be time and the ability to give

15   that same kind of dispersal order?

16   A.   Certainly in theory, that's true.

17   Q.   Okay.  You talk about a pattern of indiscriminate and

18   inappropriate use of gas; right?

19   A.   Correct.

20   Q.   Okay.  And would -- my understanding of your methodology

21   is, you looked at a certain number of videos, you collected

22   incidents of what you consider to be inappropriate or

23   indiscriminate use of gas, collected them together, and reached

24   that conclusion; is that about right?

25   A.   It is.  I would add to the mix the numbers of depositions

Norman Stamper - Cross

1    and declarations coming from the officers that I read, as well.

2    Q.  Okay.  Fair enough.  In your testimony with Mr. Aro, you

3    didn't cite any deposition from any officer as evidence about

4    what the use of gas was; correct?

5    A.  That is correct.

6    Q.  Okay.  And you didn't -- you know, as we talked about

7    before, whether something is indiscriminate or not is a term

8    of -- it has to be in relation to something else; right?

9    A.  Could you maybe explain what you mean by that?  I'm sorry.

10   Q.  Okay.  If something is indiscriminate, you have to be

11   describing it in relationship to some kind of baseline, to some

12   kind of other thing.  And my understanding is that you were

13   using that term in the sense of analyzing the use of chemical

14   munitions based on what you think from your experience should

15   be the general use of chemical munitions?

16   A.  What I'm saying -- what I have said is that the use, for

17   example, of chemical agents against an entire crowd or a large

18   body of individuals, when, in fact, a threat, for example, may

19   have materialized between just a small group of people.

20   Q.  Okay.  I think I sort of understand.  But you didn't look

21   at every single incident of chemical usage and try to quantify

22   how many were appropriate and how many were inappropriate?

23   A.  I did not keep a count of the ones that I felt were

24   appropriate or inappropriate.

25   Q.  Right.  And in none of your testimony either yesterday or

Norman Stamper - Cross

1    today with Mr. Aro did you come up with -- did you talk about

2    any example of where, this is an appropriate use of chemical

3    munitions, and what the Denver Police Department did here was

4    correct and proper and something that they ought to do?

5    A.  I'm sorry.  Could you repeat that?

6    Q.  None of the example -- you never identified any example of

7    a correct usage of a gas by the Denver Police Department in any

8    of your opinions; correct?

9    A.  I believe that to be correct.  I can tell you that of all

10   of the uses of chemical agents that I observed in the materials

11   that I reviewed, I did not see justifiable use.  I saw, rather,

12   indiscriminate use.  Rarely, for example, was there a physical

13   threat or even a verbal threat to do harm to the officers.

14   Q.  Okay.  But we -- we established this morning, didn't we,

15   that you -- the quantum of video that you reviewed was selected

16   for you by counsel for the plaintiff?

17   A.  It was.  I have been made to understand that counsel sent

18   everything to me.

19   Q.  Okay.  But you haven't -- you haven't watched the thousands

20   and thousands of hours of video that exist, that's been

21   produced in this case, have you?

22   A.  No.  I have not watched thousand and thousands of hours,

23   no.

24   Q.  Okay.  With respect to your opinions about pepper balls,

25   your first opinion is that, again, the use of them was

Norman Stamper - Cross

1  indiscriminate and inappropriate; right?

2  *A.*  Yes.

3  *Q.*  Okay.  Would you agree that some usage of the pepper balls

4  was -- that you observed as part of your review of all of this

5  material was in fact appropriate?

6  *A.*  I cannot recall an instance where I believed that the use

7  of pepper ball was appropriate.

8  *Q.*  Okay.  There are two ways that the DPD used pepper balls;

9  correct?

10  *A.*  I would have to hear what -- what those two ways are,

11  but -- there are many ways that pepper ball can be used.

12  *Q.*  Okay.

13  *A.*  And only very few in which they were used appropriately.

14  *Q.*  One way that pepper ball was used was for the purposes of

15  area saturation in a crowd dispersement methodology; right?

16  *A.*  I would say that that is in fact what happened.  I

17  certainly wouldn't express approval of that.

18  *Q.*  Okay.  You don't believe that is a recognized way to use

19  pepper ball?

20  *A.*  I believe that if done properly and under circumstances

21  that would justify that level of force, that certainly could be

22  true; but what I saw was pepper ball being aimed at and fired

23  at individuals literally from head to toe, in some instances.

24  *Q.*  Okay.  Another way that one can use pepper ball is in the

25  face of active aggression, to target a particular individual to

Norman Stamper - Cross

1    stop active aggression; right?

2    A.   Absolutely.

3    Q.   Okay.   That's a recognized appropriate use of pepper ball?

4    A.   Or various other forms of force, yes.

5    Q.   Understood.   Okay.   And unlike with tear gas, you also

6    indicate that there was a problem with the adequacy of the

7    training relating to pepper balls; right?

8    A.   I'm not sure what you mean by the context of the tear gas

9    and pepper ball -- and pepper balls.

10   Q.   Okay.   You don't have an opinion in your expert report that

11   says there was inadequate training related to the use of tear

12   gas; true?

13   A.   Inadequate training?

14   Q.   Correct.

15   A.   My position is, the way those munitions were used, pepper

16   ball, pepper spray, tear gas, was a reflection either of a lack

17   of training or a decision to ignore that training.

18   Q.   Okay.   And the way that your analysis has worked, as I

19   understand it is, you look at the -- what you see in the

20   events, and then you try to understand what might have caused

21   what you see in the events, and one of the things that you

22   identify is the possibility of training being a problem.

23   A.   Yes.

24   Q.   Okay.

25   A.   Yes.

Norman Stamper - Cross

634

1    Q.  But you don't do as part of your opinion at all any

2    assessment of the actual training that's provided to the people

3    that operate pepper ball; right?

4    A.  That is correct.

5    Q.  And all those materials were available to you, were they

6    not?

7    A.  I'm sure they were.  I guess what I'm saying to you is,

8    with respect to the training, policies, procedures, tactics

9    being passed along to the officers, I saw no evidence of that.

10   I heard, on the contrary, that the department for various

11   reasons had minimized the significance -- the importance of

12   training.

13   Q.  Okay.

14        THE COURT:  So his question was just, those materials

15   were available to you?

16        THE WITNESS:  Yes, Your Honor.  Yes.  Sorry.

17        THE COURT:  I would ask that you just answer his

18   questions, please.

19        THE WITNESS:  Thank you.

20        Could you repeat the question, please.

21   BY MR. RINGEL:

22   Q.  Sure.  The training materials about pepper ball that were

23   used by the Denver Police Department were available to you;

24   correct?

25   A.  Yes.

Norman Stamper - Cross

1    Q.  And you did not assess them as part of your analysis?

2    A.  I actually did assess them as part of my analysis.

3    Q.  Okay.  There was no discussion in your colloquy with

4    Mr. Aro yesterday or today about the actual contents of, this

5    is the pepper ball training for the Denver Police Department,

6    and these are the deficiencies I see in that training; true?

7    A.  That is true.

8    Q.  Okay.  You have no opinion as to the number of hours that

9    pepper ball training is and whether that's adequate or not;

10   right?

11   A.  I -- I'm sorry.  I do not.

12   Q.  Okay.  So your assessment of the issue of training is not

13   based on the specificity of what the training that the

14   department -- that the Denver Police Department does about

15   pepper ball; right?

16   A.  I'm sorry.  I -- can you explain what you mean by that?

17   Q.  Okay.  Your analysis is, there is -- I've identified stuff

18   on video that I don't think is an appropriate use of pepper

19   ball?

20   A.  Correct.

21   Q.  And what I'm focused on is the secondary opinion that you

22   have, which is, these things I identified are based on a

23   failure of training.

24   A.  Correct.

25   Q.  Okay.  You don't have a specific assessment of what the

Norman Stamper - Cross

1    pepper ball training was and what was wrong with it; right?

2    A.   That is correct.

3    Q.   So isn't it just an assumption on your part that these are

4    the issues that exist that I see in these videos, and it must

5    be about training?  Because you've never assessed the training.

6    A.   I -- I have heard and read testimony from -- reports from

7    individual officers who challenge or criticize the adequacy of

8    training, particularly in crowd control, crowd management.

9    Q.   Okay.  Name one.

10   A.   I'll probably get her name wrong.  Sich, I believe is the

11   name.  The critic of the adequacy of the training, the

12   frequency, the relevance of the training.  She, for example,

13   made a statement to the effect that, if our officers did not

14   handle themselves well, how could we expect them to do that in

15   the absence of training -- adequate training?

16   Q.   Okay.  And the -- the information you were relying on is a

17   few paragraph report in an interview that someone did with

18   Captain Sich; right?

19   A.   That plus at least one other interview conducted of another

20   member of the department.

21   Q.   Okay.  And who is that?

22   A.   I can't recall at the moment.

23   Q.   These are interviews that were conducted by the Office of

24   the Independent Monitor?

25   A.   I believe they were.  Yes.

Norman Stamper - Cross

1    Q.  And the topic of training in each of them is at most a few

2    paragraphs; true?

3    A.  I would certainly accept that, based on what I've read,

4    what I've heard.

5    Q.  And neither of those two people had their depositions

6    taken; right?

7    A.  I don't recall.

8    Q.  Okay.  And there was an entire deposition taken of the

9    person who actually conducts the training related to

10   40 millimeters and pepper balls; right?

11   A.  Correct.

12   Q.  And I didn't hear you mention that person's name during any

13   of your testimony; right?

14   A.  I wasn't asked, and -- I would have to say that I have not

15   been asked about that either yesterday or today.

16   Q.  What's his name?

17   A.  I don't recall.

18   Q.  Who were the people at the Denver Police Department who are

19   authorized to use flash-bangs?

20   A.  I know for a fact that Metro SWAT is authorized to use

21   flash-bangs.

22   Q.  Okay.  And you also know for a fact that Metro SWAT has a

23   variety of different training than your ordinary officer;

24   right?

25   A.  Yes.

Norman Stamper - Cross

1   Q.   Okay.  And you would anticipate that, based on your

2   experience of what SWAT does; right?

3   A.   Correct.

4   Q.   Okay.  And you opine that there wasn't appropriate training

5   related to the use of that particular device; right?

6   A.   That is correct.

7   Q.   But, again, you didn't assess that the actual training that

8   the SWAT officers go through related to the use of that device;

9   right?

10  A.   That's correct.

11  Q.   And you also didn't assess or at least talk about the

12  context of what those SWAT officers said in their depositions

13  as to why they use those devices?

14  A.   I'm sorry.  Could you repeat the question?

15  Q.   Sure.  You're aware from the depositions that there were

16  different reasons why flash-bang devices were used as part of

17  the protests?

18  A.   That's correct.

19  Q.   And one of those reasons was for purposes of creating

20  distance; right?

21  A.   Yes.

22  Q.   And at least conceivably, that could be a legitimate reason

23  to use that kind of device; right?

24  A.   I don't believe that that -- I would not make that

25  statement.  No.

Norman Stamper - Cross

1    Q.  Okay.  Fair enough.  There is a couple other parts of your

2    opinion that I wanted to talk to you about.  One of them is

3    body-worn camera.  And when did the Denver Police Department

4    adopt body-worn camera?

5    A.  I want to say 2015 or thereabouts.

6    Q.  Okay.  Have you ever worked at a department that had

7    body-worn camera?

8    A.  No.

9    Q.  Okay.  Have you ever worn a body-worn camera?

10   A.  I have not.

11   Q.  Okay.  Have you ever operated one?

12   A.  I have not.

13   Q.  Okay.  You would agree that there is no body-worn camera

14   written policy as to when an officer was supposed to use his or

15   her body-worn camera in a protest response context?

16   A.  Not specifically in a protest response context.

17   Q.  Okay.

18   A.  No.

19   Q.  And prior to -- I mean, one of the things that you're

20   critical of is the amount of body-worn camera that exists;

21   right?

22   A.  No.

23   Q.  You -- I thought you -- I thought my understanding was that

24   you thought that there was a deficiency in the amount of

25   body-worn camera that should exist related to the protests.

Norman Stamper - Cross

1    *A.* I never said that. I'm sorry.

2    *Q.* Okay. You talked this morning, I believe -- or maybe it

3    was yesterday -- with Mr. Aro related to there being

4    inconsistency and gaps in body-worn-camera footage. Do you

5    remember talking about that?

6    *A.* Yes, I do.

7    *Q.* So that strikes me that you're critical of the fact that

8    every minute by the officers responding to the protest wasn't

9    captured on body-worn camera?

10   *A.* I haven't said that, and I don't believe that at all.

11   *Q.* Okay. Tell me what the problem is with respect to the

12   amount of body-worn camera.

13   *A.* Body-worn cameras are intended to capture police activity.

14   And the individual officers have a personal responsibility to

15   make sure that those body-worn cameras are activated as they

16   are engaging in their police practices.

17   *Q.* Okay. And that's part of your overall theme related to

18   accountability?

19   *A.* It is. Yes.

20   *Q.* Okay. So I want to talk about a few things related to

21   that. But with respect to body-worn camera, you didn't study

22   any usage rates of the Denver Police Department related to

23   body-worn camera, did you?

24   *A.* That's correct. I did not.

25   *Q.* And you didn't examine whether there had ever been a

Norman Stamper - Cross

1    problem with respect to body-worn camera at a similar event

2    like these protests after the adoption of the body-worn-camera

3    policy?

4    *A.*  I know that I recall reading concerns being expressed by

5    department leaders about the consistency with which the

6    officers in their day-to-day work were activating their

7    cameras.

8    *Q.*  Okay.  It's a major difference for officers to learn how to

9    appropriately wear body-worn cameras; right?

10   *A.*  I'm sorry.  Major --

11   *Q.*  It's a major difference in the way police operate to

12   introduce body-worn cameras as to something that they need to

13   pay attention to; fair?

14   *A.*  I'm very sorry.  I don't understand the question.

15   *Q.*  Okay.  You never worked as a police officer with body-worn

16   cameras?

17   *A.*  Body-worn cameras came after I left police work, so the

18   answer is yes.

19   *Q.*  I understand that.  So would you agree that a lot of police

20   officers and a lot of police departments have had difficulty,

21   challenges, newness related to adopting and using body-worn

22   cameras?

23   *A.*  I would.  And I would add that once that program has been

24   introduced into that particular organizational culture, the

25   wrinkles get ironed out; policies are established, procedures,

Norman Stamper - Cross

1    likewise; and departments find themselves operating

2    efficiently, effectively, competently the body-worn camera

3    program.

4    Q.  I agree with you.  But in the absence of a prior event

5    involving body-worn cameras and protective safety gear and

6    protests, isn't it hard to evaluate whether the body-worn

7    camera -- whether anyone at the department knew that the

8    body-worn cameras were a problem prior to these protests?

9    A.  I would say that -- I hope I'm getting your question

10   right -- if police officers have had body-worn camera since

11   2015, and given Denver's acknowledged frequency in handling

12   political and other protests, that those kinds of issues were

13   or certainly should have been ironed out years ago.

14   Q.  Okay.  But if -- if various people were to testify that

15   there was no knowledge that this was a particular problem

16   related to body-worn cameras, you wouldn't have any basis to

17   disagree with such testimony, because you've never studied the

18   prior body-worn camera usage; right?

19   A.  I would simply go back to the statement that I just made.

20   Q.  Okay.  With respect to body-worn cameras and also

21   use-of-force reports, those are tools of accountability; right?

22   A.  They are.

23   Q.  And when you talk about a tool of accountability, that's

24   making an officer accountable for an action that he or she has

25   already done; right?

Norman Stamper - Cross

1    A.  It certainly is after the fact, yes.

2    Q.  Right.  Whether or not someone clicks a body-worn camera on

3    or off before they take a particular police action isn't

4    determinative about whether they use excessive force in the

5    action that they take; right?

6    A.  Correct.  I would not call that determinative of their

7    decision.  It is a reflection, however, I believe, of the

8    officer's willingness to be transparent and accountable.

9    Q.  Okay.  So -- fair enough.  But it could also, could it not

10   be, just a simple fact of inadvertence or the body-worn camera

11   wasn't tapped the two times necessary to activate it?

12   A.  I believe that that is excusing policy violations.  That a

13   department that has had a program as long as Denver has had

14   BWCs -- body-worn cameras -- that there would not be any

15   plausible explanation for failure to activate under

16   circumstances that I reviewed.

17   Q.  Okay.  Fair enough.  But, again, whether there was a

18   body-worn camera for any incident doesn't mean that one way or

19   the other there was an excessive use of force or inappropriate

20   police activity on what wasn't filmed; right?

21   A.  I believe that if there is -- as I understand your

22   question -- a causal relationship there, that it would be

23   between an officer's motive in, for example, not activating the

24   body-worn camera and then engaging in what I and perhaps

25   everyone else would agree with would be excessive force.

Norman Stamper - Cross

1   Q.  Okay.  Fair enough.  Similarly -- and I want to see if you

2   think a similar analysis applies to the use -- the concept of a

3   use-of-force report.

4   A.  Sure.

5   Q.  A use-of-force report is also retrospective; right?

6   A.  It is.

7   Q.  So it doesn't say anything -- it doesn't impact the type or

8   level of force that is used in a particular event; it simply

9   reports on what happens and allows analysis of whether what is

10  contained in the report is appropriate use of force or not?

11  A.  I agree with that.  Yes.

12  Q.  Okay.  So, again, from a causal perspective, whether or not

13  someone used -- completes a use-of-force report doesn't cause

14  them one way or the other to use force in the underlying event;

15  right?

16  A.  I can tell you that I have viewed police officers' use of

17  force, read reports after the fact, and on occasion seeing no

18  relationship between what actually happened and what has been

19  reported.

20  Q.  I understand.  But that's a failure to report.  That's

21  not -- that doesn't say, necessarily, that the officer used

22  excessive force in the underlying event?

23  A.  I think there is the objective reality of the force that

24  was used -- a certain force was used by that officer and the

25  report.  The question is, is it accurate?  Is it thorough?  And

Norman Stamper - Cross

1    I would add, is it timely?

2    Q.  Understood.  And one could argue whether use-of-force

3    reports in relationship to the protests are accurate, thorough,

4    and timely; but whether the use-of-force reports were accurate,

5    thorough, and timely doesn't have a bearing on whether the

6    force that was used, that maybe should have been reported was

7    excessive or not.  That's a separate inquiry, isn't it?

8    A.  I certainly see that as a separate inquiry.  I would also

9    add that knowledge of a use-of-force reporting requirement

10   affects behavior.  It affects the behavior of an individual

11   officer and others who are either complying with that

12   use-of-force policy or defying that use-of-force policy.

13   Q.  Understood.  And that makes sense to me.  But one of the

14   things that you didn't look at was any potential failure to

15   complete use-of-force reports prior to the George Floyd

16   protests; right?

17   A.  I did not look at that at all.  Yes.

18   Q.  So just as -- bear with me for a second.  With respect to

19   the first day of the protests, May 28, 2020, for there to have

20   been created a culture of lack of accountability from there

21   being a problem related to use-of-force reporting in this

22   particular context involving protests, there would have to be

23   evidence that this was a problem prior to May 28, 2020; right?

24   A.  I'm sorry.  Are you asking me whether I believe there was a

25   problem with use-of-force reporting before the George Floyd

Norman Stamper - Cross

1    protests?

2    *Q.*  No.  I'm asking you -- you don't have any evidence that

3    there was a problem before the George Floyd protests, because

4    it's not something that you looked at?

5    *A.*  That is correct.

6    *Q.*  And from a causation perspective, as you talked about, for

7    there to be a causation related to use-of-force reports, there

8    has to be an event prior to the event in question to create the

9    lack of accountability that you're describing related to the

10   use-of-force reports; true?

11   *A.*  Once again, I apologize.  I had trouble tracking what you

12   were asking.  Could you repeat that?

13   *Q.*  Okay.  Time moves forward; right?  For one event to be

14   caused by another event, the first event has to happen before

15   the second event; right?

16   *A.*  Sure.

17   *Q.*  Okay.  You have May 28, 2020, first day of the protests;

18   right?

19   *A.*  Correct.

20   *Q.*  In order for there to be a problem that caused anything to

21   happen on the first day of the protests related to a failure to

22   complete use-of-force reports, there has to be that as an

23   identified problem sometime before; right?

24   *A.*  No.  At least as I understand your question, that problem

25   could have cropped up on day one, two, three, four, whatever,

Norman Stamper - Cross

1   of the George Floyd protests.  In other words -- I hope I'm

2   understanding what you're asking -- if the Denver Police

3   Department had a problem with its officers not complying with

4   use-of-force reporting before the George Floyd protests, then I

5   would say that is in one sense a separate issue, because we are

6   focused on the George Floyd protests here.  At least that's

7   been my role in helping to analyze what has gone on here.

8   Q.  Okay.  I understand that something could have developed

9   during the George Floyd protests; but no one would have known

10  it was a problem on 5/28, right, unless there was prior

11  evidence that it was a problem?

12  A.  I think supervisors who are attuned to the practices of

13  their officers would know that, essentially, on day one.  If

14  I'm a sergeant, for example, and you're working for me, I would

15  say, Did you use force?  Your obligation is to complete a

16  report on that use of force.

17  Q.  Okay.

18  A.  And at the end of the shift, if I don't have that report,

19  then I'd be at least questioning what happened, on day one.

20  Q.  Okay.  Fair enough.  Practically speaking, how would the

21  Denver Police Department possibly have completed use-of-force

22  reports for all of the incidents that happened on May 28, 2020,

23  in any kind of timely or comprehensive fashion and still been

24  able to have anyone available to police the protests on the

25  next day?

Norman Stamper - Cross

1   *A.* Well, I'm certainly not talking about stepping off the line

2   or going back to the station or even to one's car to sit there

3   and do the reporting in the middle of that action. What I am

4   suggesting is that when they go off shift -- before they go off

5   shift, they complete the reports. And I totally appreciate

6   that that extends the day, that it is a headache. As a

7   practical matter, it's a real problem for many officers who

8   have made arrests that night, for example, or used force that

9   night to submit the reports. So the question that I would have

10  is, is this important enough to make sure that it gets done?

11  My answer to that -- the more, I guess, rhetorical question is,

12  yes, absolutely, if you want to be an accountable public

13  agency.

14  *Q.* Okay. So my understanding of your practical conception is,

15  the officers should have worked the entirety of their time on

16  the protest -- which was longer than a normal shift, into the

17  night -- and then gone back to wherever their station was and

18  spent several hours documenting all of the use of all of these

19  different tools that we've talked about at every single

20  instance that they may have used it during that particular day

21  of the protest? That's your conception of what they should

22  have done?

23  *A.* I certainly make provision for extending the time during

24  which an officer would be required to submit the reports under

25  the circumstances you're describing. I'm very, very

Norman Stamper - Cross

1  sympathetic to that.  Officers worked long, they worked hard,

2  and have, in fact, been consumed in what has been going on.

3  But they also have a responsibility to make sure, in the

4  interest of justice, as well as accountability, that they do

5  their job, that they submit those reports.  I think the

6  department has a responsibility to those officers to provide

7  education, training, and, indeed, technology so that you can

8  ease that reporting requirement, that burden.

9  Q.  Okay.  But isn't it, effectively, a person-power problem

10  too?

11  A.  Is it what?

12  Q.  Isn't it a person-power problem?

13  A.  Absolutely, I agree with that.

14  Q.  Because for every minute you have someone on duty doing a

15  report, they can't rest, and then they can't be ready to

16  respond the next day to the protests that you're anticipating

17  are going to need a response?

18  A.  I do believe that that's a good frame for the challenge

19  that the agency faces, as well as individual officers.

20  Q.  Right.

21  A.  Yes.

22  Q.  And every agency has limitations on their available

23  resources?

24  A.  Correct.

25  Q.  Okay.  Let's shift to talking about discipline.

Norman Stamper - Cross

1          One of the things that you were critical about -- and

2    there were a lot of examples about it -- was whether or not a

3    particular officer was disciplined for a particular event on a

4    video that we watched; right?

5    *A.*   Yes.

6    *Q.*   Okay.  One of the things that you didn't talk about was the

7    context of how discipline works in police departments; right?

8    *A.*   That's correct.  I did not.

9    *Q.*   And you're aware of the context of how discipline works in

10   police departments?

11   *A.*   I am.

12   *Q.*   Typically, discipline is a complaint-driven process; is it

13   not?

14   *A.*   Typically it is, yes.

15   *Q.*   It would -- that means some member of the public or a

16   fellow officer initiates a complaint about a particular event,

17   it gets referred to Internal Affairs, and then it goes through

18   all the different steps of a complaint process?

19   *A.*   Yes.  I would add, a supervisor very well could be viewing

20   the policy violation or other form of misconduct.  I would

21   simply add that to your initial list.

22   *Q.*   Absolutely.  That's either a fellow officer or a

23   supervisor.  Someone has to witness the potential violation,

24   generate a complaint of some kind, and then it gets referred to

25   IA?

Norman Stamper - Cross

1    *A.* Correct.

2    *Q.* IA doesn't spend its time looking at body-worn-camera video

3    to determine all of the different potential violations that

4    might have existed out in the street today or on May 28, 2020;

5    right?

6    *A.* If a complaint has been made and that complaint has been

7    assigned for investigation to an individual officer, they

8    would, in fact, be reviewing body-worn-camera footage.

9    *Q.* I understand that; but that wasn't my question, sir. My

10   question was, it doesn't work in an IA system for there to be

11   generally IA folks just reviewing randomly or spot-check or

12   generally a bunch of body-worn-camera footage to determine if

13   there are any policy violations?

14   *A.* No. That is absolutely beyond the scope of internal

15   investigations.

16   *Q.* Right. Once there is a complaint, then IA would look at

17   every single body-worn-camera video that exists to get to the

18   bottom of what would happen with the complaint?

19   *A.* Correct.

20   *Q.* Okay. So you don't have any idea, do you, whether or not

21   all or some or none of the events that you've identified have

22   even been part of any discipline looked at; right?

23   *A.* Can you repeat the question, please?

24   *Q.* Okay. We've talked about that IA is a complaint-driven

25   process.

Norman Stamper - Cross

1    *A.*  It is reactive.

2    *Q.*  Correct.

3    *A.*  Yes.

4    *Q.*  So in order for any of the incidents that we watched to

5    generate a disciplinary process which starts with an IA

6    investigation, would require someone bringing that complaint to

7    the attention of IA; right?

8    *A.*  Yes.

9    *Q.*  Sitting here today, you have no idea what complaints were

10   brought to IA and which ones were not; right?

11   *A.*  I did read a number of IA responses to complaints; answers,

12   for example, from IA investigators to citizens who had filed

13   complaints.

14   *Q.*  I understand.  And there were a lot of citizen complaints

15   and there were a lot of other complaints.  But what I'm driving

16   at is, you don't have an idea of a specific incident that

17   you've identified that you talked with Mr. Aro about and then

18   said, this person hasn't been disciplined -- they would only

19   get disciplined if it was a complaint that was given to IA in

20   the first place; right?

21   *A.*  And if that complaint were accurately, thoroughly

22   investigated and an objective conclusion reached.  That is

23   correct.

24   *Q.*  Okay.  So the way that it -- IA with the Denver Police

25   Department is a complicated process; is it not?

653
Norman Stamper - Cross

1    A.   I don't see it as particularly complicated.

2    Q.   All right.  Things go to IA, then they go to something

3    called conduct review office; right?

4    A.   Yeah.  I didn't know the title of that position; but, yes.

5    Q.   Okay.  And then it ultimately goes all the way to the

6    executive director of the department of safety; right?

7    A.   As I understand the system, yes.

8    Q.   Okay.  And officers have the right to have counsel in those

9    proceedings?

10   A.   They do, typically.

11   Q.   And they are generally sort of proceedings that the due

12   process clause of the United States Constitution applies to?

13   A.   I would assume that it certainly applies to that.

14   Q.   Okay.  And there are a lot of rules, and there is a lot of

15   things, and it takes a lot of time?

16   A.   Yes.

17   Q.   Okay.  And so that's part of the reason why it's a

18   complaint-driven process; right?

19   A.   I'm not sure I would say that's one of the reasons that

20   it's a complaint-driven process.  Unless an officer comes

21   forward and says, for example, I engaged in this conduct on

22   such and such a date and time, I think you should investigate

23   me -- I'm not trying to be silly here.  What I'm saying is, if

24   a complaint is made, then the investigation is launched under

25   normal circumstances.

Norman Stamper - Cross

1  Q.  Right.  There is no police department in the United States

2  that you're aware of that has a disciplinary process that's not

3  complaint based; correct?

4  A.  Correct.  That's correct.

5  Q.  That's how it works all over the place.  And from your

6  perspective, that's a reasonable way for people to do business?

7  A.  I agree.

8  Q.  Okay.  All right.  A couple more things to talk about, and

9  then I'm going to sit down.

10        In many of the videos that we watched, it seemed to me

11  that there was some sort of tactical objective that -- at least

12  sort of from an overall perspective of what the police were

13  trying to do in a particular instance; would you agree with

14  that?

15  A.  I'm not sure I would.

16  Q.  Okay.  So, for example, we watched videos related to an

17  effort to clear the entire park in front of the capitol.  Do

18  you remember that?

19  A.  I do.  Yes.

20  Q.  Okay.  So that was a tactical objective that was trying to

21  be met --

22  A.  Yes.

23  Q.  -- with those actions.  And one could argue whether -- and

24  I'm sure you do -- whether some of the individual events that

25  are part of that tactical objective are legitimate or not.  But

Norman Stamper - Cross

1    setting that aside, I was struck that none of your analysis of

2    any of these events had any consideration of the actual

3    tactical objectives of the police department.  Why is that,

4    sir?

5    A.  It was my conclusion based on my observation and analysis

6    that there were any number of several tactical situations in

7    which the only objective seemed to be to move people away from

8    a particular location.  And for me, that was problematic, given

9    the First Amendment; and it was problematic from the point of

10   view of the objectively unreasonable force that was used

11   against nonviolent and, indeed, nonthreatening citizens.

12   Q.  Okay.  So you didn't agree with the tactics, so you didn't

13   talk about the tactics at all; is that basically what I might

14   take away --

15   A.  That's not what I said and certainly not what I meant.

16   What I'm saying is that as I looked at case after case after

17   case, location after location after location, I was left

18   wondering, what are they trying to do?  What are my former

19   colleagues trying to do in this particular situation?

20           I'll cite one example.  There was a moment during the

21   life of this event in which officers were remarkably restrained

22   and disciplined.  They were not out in hard gear; they were in

23   their normal uniforms.  They happened to be wearing helmets,

24   which I approved of under those circumstances.  And for a very

25   long period of time, comparatively speaking -- 15 minutes,

Norman Stamper - Cross

1    maybe -- they were simply with -- they were simply accepting

2    the shouting, the chanting that was coming from the crowd.

3    There weren't any rocks; there weren't any bottles; nobody was

4    throwing anything at them; but they were, in fact, standing in

5    what I would consider to be very disciplined fashion and

6    observing.  That's what they were doing.

7         And then, unfortunately, toward the end of that time,

8    they actually did in fact go to a -- what I would consider to

9    be an objectively unreasonable use of force.

10   Q.  Okay.  I understand, I think.  We watched a lot of video

11   during your examination yesterday and today.

12   A.  Yes.

13   Q.  And of all of the video -- and correct me if I'm wrong

14   about this -- the only plaintiff that is shown in any of those

15   videos is Elisabeth Epps; right?

16   A.  I believe that to be true.  Yes.

17   Q.  And then there was a picture related to the event that

18   happened with Zachary Packard; right?

19   A.  That's correct.

20   Q.  Okay.  All of those other videos involve what you've

21   labeled inappropriate police conduct but not related to the

22   twelve plaintiffs that are here before the Court; right?

23   A.  I guess that's correct.  Yes.

24        MR. RINGEL:  Those are my questions for Mr. Stamper.

25   Let me just move my stuff out of the way.

Norman Stamper - Redirect

1           Thank you, sir.

2               *THE WITNESS:*  Thank you.

3               *THE COURT:*  Redirect.

4               *MR. ARO:*  Briefly, Your Honor.

5                   **REDIRECT EXAMINATION**

6   *BY MR. ARO:*

7   *Q.*  I want to start right where Mr. Ringel left off.  You'll

8   recall this morning we went through the vignettes that played

9   out at Lincoln and Colfax on the third day of the protest, late

10  in the afternoon; right?

11  *A.*  Yes.

12  *Q.*  We looked at a bunch of numbers and correlated those two

13  events.  One of those events was Stanford Smith being sprayed

14  in the face; is that right?

15  *A.*  Exactly.

16  *Q.*  You were not present when Claire Sannier said she was

17  sitting in the front row of the protesters behind the yoga guy,

18  who had a 40-millimeter cannon pointed at him.  Do you remember

19  that?

20  *A.*  I do.

21  *Q.*  All right.  And is it also your understanding that a number

22  of other plaintiffs were in that crowd, right behind the people

23  who the officers of the DPD were being shot at?

24  *A.*  Yes.

25  *Q.*  Now, the situation that you were talking about where there

Norman Stamper – Redirect

1    were officers who were restrained and behaving as you would

2    expect officers to behave, it was the first night of the

3    protest; correct?

4    A.  That's correct.

5    Q.  It was the first major gathering of protesters on the south

6    side of the state capitol; right?

7    A.  Also correct.

8    Q.  You said for a long time officers stood with protesters

9    near them?

10   A.  Yes.

11   Q.  And the protesters were engaging the officers and directing

12   some insults and asking questions; true?

13   A.  Yes.

14   Q.  And you said there were no rocks, no bottles, no violence

15   by anybody in the crowd that was evident at that point;

16   correct?

17   A.  Correct.

18   Q.  And then you said that there was an excessive use of force

19   deployed on that crowd?

20   A.  Yes.

21   Q.  Isn't it true that that excessive use of force was the

22   tear-gas bombing of the crowd by officers without giving any

23   warning that could be heard by the crowd?

24   A.  Absolutely correct.

25   Q.  And that was the scene where we had the guy walk up to the

Norman Stamper - Redirect

 1   officer and say, "What did that guy just say on the PA?"

 2   A.  Exactly.

 3   Q.  And two minutes later the DPD launched tear gas into the

 4   crowd, which was doing nothing to provoke that; true?

 5   A.  That's correct.

 6   Q.  And moments after that, Elisabeth Epps was holding the

 7   camera as that billowing cloud of tear gas approached her?

 8   A.  Yes.

 9   Q.  Was that the point where things started to change in the

10   crowd, from your review of all of the video you've seen?

11   A.  Absolutely.

12   Q.  Now, I want to ask also about the training questions that

13   Mr. Ringel was asking you.  He was talking about the -- your

14   review of training materials.  And he asked you some questions

15   about the training that is provided with respect to

16   flash-bangs; right?

17   A.  Yes.

18   Q.  And he asked you the name of the person who testified about

19   that question.  You said you couldn't recall?

20   A.  That's correct.

21   Q.  Does the name Ryan Grothe sound familiar to you?

22   A.  It certainly does now, yes.  Thank you.

23   Q.  You said you couldn't recall what Officer Grothe said about

24   the training that Metro SWAT received concerning the use of

25   flash-bangs?

Norman Stamper - Redirect

1    A.   That's correct.

2    Q.   Would your report where you address that issue help refresh

3    your recollection about what Officer Grothe said?

4    A.   It would.

5         MR. ARO:   May I approach, Your Honor?

6         THE COURT:   Sure.

7    BY MR. ARO:

8    Q.   I'm going to hand you, for the record, your report dated

9    December 22, 2021.  And I'll direct you to the report, page 6,

10   paragraphs 9C and D.  Please read those to yourself, and let me

11   know when you have done that.

12   A.   Thank you.

13   Q.   Let me take that back.

14        I think I may have misspoke.  I think I said Officer

15   Grothe was a SWAT officer.  I meant to say he is a patrol

16   officer.

17   A.   Yeah.  I think he's actually a technician, if I got that

18   right.

19   Q.   Okay.  Now, did reviewing the report that you wrote and

20   that was delivered to counsel for the City in December 2021

21   refresh your recollection about the training that was described

22   by Ryan Grothe?

23   A.   Yes.

24   Q.   It's your understanding that Ryan Grothe was the person put

25   forward by Denver as their representative to explain the

Norman Stamper - Redirect

1    training that was provided to their officers?

2    *A.*  Yes.

3    *Q.*  Having your memory refreshed, what do you now recall about

4    the training that DPD provided to its officers concerning the

5    use of flash-bangs?

6    *A.*  He essentially said that there was no training, that use of

7    flash-bangs was covered in SWAT training, but he was unfamiliar

8    with it.

9    *Q.*  Okay.  And does having reviewed your report also refresh

10   your recollection about what SWAT Corporal Richard Ebberharder

11   said about the training he received using flash-bangs?

12   *A.*  Yes.

13   *Q.*  What did the SWAT technician, Corporal Ebberharder, say

14   about training that he as a SWAT member had received concerning

15   the use of flash-bangs?

16   *A.*  He had received none.

17   *Q.*  Did DPD's policies reflect or reference the use of Stinger

18   grenades?

19   *A.*  Yes.  And I -- I apologize.  Could you repeat that

20   question?

21   *Q.*  Sure.  Do you remember ever seeing anything in any of DPD's

22   policies relating to the use of Stinger grenades?

23   *A.*  No.  I was referring to that in the context of his saying

24   they had not received any training in Stingers.

25   *Q.*  All right.  Do you suppose that not training officers and

Norman Stamper - Redirect

1    SWAT officers on the use of Stinger grenades might have had

2    something to do with the deployment of Stinger grenades the way

3    that we witnessed in the videos that we saw yesterday and

4    today?

5    *A.* Of course.  Inevitable that there would be problems and

6    issues associated with the complete absence of training in that

7    particular munition.

8    *Q.* You also received a number of questions from counsel

9    concerning confirmation bias and the idea that maybe you just

10   looked only for what you were trying to find, which was

11   misconduct.

12   *A.* I do remember that.  Yes.

13   *Q.* And did you understand the implication of those questions

14   to be that there existed video that explained why DPD officers

15   did the things we've seen on tape the last two days?

16   *A.* Sure.  Yes.

17   *Q.* Do you remember him showing you any video that explained

18   why DPD officers blasted three people who were standing on a

19   street corner at Colfax and Lincoln repeatedly with pepper

20   balls?

21   *A.* Did I -- could you repeat the question?

22   *Q.* Sure.  Did you see any video that explained why DPD

23   officers did that?

24   *A.* No.

25   *Q.* Did you see any video from him?

Norman Stamper - Redirect

1    A.   Not on that issue.  No.

2    Q.   And do you suppose that counsel has access to all of the

3    body-worn camera and other video that was collected by DPD?

4    A.   That would be my assumption, yes.

5    Q.   And if anything existed that would exonerate those

6    officers, do you think he would have shown it to you?

7    A.   I do.

8    Q.   Last question about -- that I have is about the question of

9    discipline.  You mentioned that you had read a lot of IA files

10   that have been generated in this complaint-driven process that

11   was orchestrated -- used by DPD to review claims of officer

12   misconduct?

13   A.   Yes.

14   Q.   Do you remember, ballpark, hearing how many IA

15   investigations there were of various complaints of officer

16   misconduct concerning the George Floyd protests?

17   A.   Yeah.  And I guess the best estimate that I can provide

18   would be between a half a dozen or a dozen.

19   Q.   A dozen complaints?

20   A.   Complaints.

21   Q.   Or a dozen disciplines?

22   A.   On disciplines, dramatically fewer than that.

23   Q.   So when you say four or five complaints, you're saying that

24   only four or five complaints of misconduct were lodged with the

25   DPD after these protests?

Norman Stamper - Redirect

1    *A.*  Not at all.  There were a large number of complaints filed.

2    *Q.*  Does 120 or so sound correct?

3    *A.*  Yes.

4    *Q.*  And how many of those instances resulted in the imposition

5    of discipline against a DPD officer?

6    *A.*  Well, I don't have a -- any kind of evidence of the number

7    of complaints as such that generated discipline.

8    *Q.*  Uh-huh.

9    *A.*  Citizen complaints, I'm now talking about.

10   *Q.*  How many officers were disciplined?  That's a simpler

11   question.

12   *A.*  Three or four.

13   *Q.*  Okay.  And did you see officers, including officers in

14   leadership, standing in the videos behind the skirmish line at

15   Colfax and Lincoln watching what those officers were doing?

16   *A.*  I do remember that.

17   *Q.*  Did those officers, any of them, have the opportunity to

18   initiate a complaint if they saw something that they thought

19   was inconsistent with DPD's actual policy, practice, and

20   custom?

21   *A.*  They had the opportunity to keep that from happening, and

22   they certainly had the opportunity to take action against that

23   behavior.

24   *Q.*  And, in fact, you said that when an officer sees misconduct

25   of that sort, it's not just an opportunity to take action, but

1  the person has an obligation to do so?

2  *A.*  Absolutely.

3        MR. ARO:  I don't have anything further, Your Honor.

4  Thank you.

5        THE COURT:  Thank you.

6        How about the jurors, do you have any questions?

7        Yes.  Okay.

8        COURTROOM DEPUTY:  Your Honor, is it okay if we take a

9  quick break?

10        THE COURT:  Yeah.  Of course.

11        (Jury out at 2:22 p.m.)

12        (Hearing commenced at the bench.)

13        MR. ARO:  We don't have any objection to it, but --

14        THE COURT:  Are you objecting?

15        MR. RINGEL:  Well, it's asking about -- it says, "Do

16  chemical agents, pepper balls, pepper spray, tear gas, cause

17  lasting environmental impacts?"  I don't think that's relevant.

18  Yes, I'm objecting.  It's not relevant.

19        MR. ARO:  I will leave it to your discretion, Your

20  Honor.

21        THE COURT:  Coward.

22        MR. ARO:  Okay.  I'm going to oppose the objection

23  vociferously and also tell you, I'm not sure if he has any

24  idea.  But --

25        THE COURT:  Okay.  Objection is sustained.

1          *MR. ARO:*  No problem with that.

2          *MR. RINGEL:*  No objection.

3          *THE COURT:*  Okay.

4          *MR. ARO:*  No objection with that.

5          *MR. RINGEL:*  Let me read it.

6          No objection.

7          *THE COURT:*  Okay.

8          *MR. ARO:*  Thank you, Your Honor.

9          *THE COURT:*  Would you guys like a break?

10         *MR. ARO:*  Can we have seven minutes?

11         *THE COURT:*  Sure.

12         (Hearing continued in open court.)

13         *THE COURT:*  All right.  We'll take a break for

14    everybody here.

15         (Recess at 2:24 p.m.)

16         (In open court at 2:31 p.m.)

17         *THE COURT:*  So our ever-vigilant reporter wants you

18    all to know that baseball is back.

19         (Jury in at 2:32 p.m.)

20         *THE COURT:*  Mr. Stamper, the jurors have a few

21    questions for you.

22         Remember, folks, if I don't ask the question, that

23    doesn't mean it wasn't a good question.  It probably was.  In

24    fact, any question you ask is a good question, because you're

25    the jury.  But once in a while, I can't ask one, so -- that's

1    just the way it does work.

2          Now, let's see.  Question:  If the police followed the

3    IACP policies, would there be as many injuries to police?

4          *THE WITNESS:*  In my opinion, there would not be, that

5    there would be a dramatic reduction in injuries to officers.

6          *THE COURT:*  And why is that?

7          *THE WITNESS:*  Because those policies -- and I reviewed

8    them actually in the past, been part of the process of

9    formulating them -- really do anticipate all of the conceivable

10   questions, challenges, and so forth that are associated with

11   policies, especially in the area of use of force.  And I think

12   officers who abide by those recommendations, translated into

13   policies, are making themselves just so much more knowledgeable

14   and informed and effective at protecting themselves and

15   protecting people they've been hired to protect.

16         *THE COURT:*  Question:  Is the use of chemical weapons

17   on innocent protesters a cause of escalation on the part of the

18   other protesters who witnessed the events?

19         *THE WITNESS:*  I personally have seen that exactly that

20   as the outcome many times.

21         *THE COURT:*  Okay.  Question:  Do you believe that the

22   police's use of pepper balls on innocent protesters that first

23   day set the tone of police escalation of use of chemical means

24   of dispersal of lawful protesters?

25         *THE WITNESS:*  I believe that to be the case.

Norman Stamper – Examination

1          *THE COURT:*  Any other questions, ladies and gentlemen?

2          (No response.)

3          Follow-up questions, plaintiff?

4          *MR. ARO:*  Nothing from the plaintiffs, Your Honor.

5          *THE COURT:*  Mr. Ringel?

6          *MR. RINGEL:*  I have one area of inquiry, Your Honor.

7          *THE COURT:*  Sure.

8                              **EXAMINATION**

9     *BY MR. RINGEL:*

10    *Q.*  I haven't seen any assessment by you in any of your reports

11    or any of your opinions about any of the specific events

12    involving injury to officers; is that true?

13    *A.*  That is true.

14    *Q.*  So you don't really have a basis to analyze how or why any

15    of those officers were injured; right?

16    *A.*  That is correct.

17          *MR. RINGEL:*  Nothing further, Your Honor.

18          *THE COURT:*  All right.

19          Thank you, sir.

20          *THE WITNESS:*  Thank you, Your Honor.

21          *THE COURT:*  You are excused and free to leave or

22    welcome to stay, whichever you prefer.

23          *THE WITNESS:*  Thank you.

24          *THE COURT:*  Now, do you have any more witnesses?

25          *MS. RUTAHINDURWA:*  Plaintiffs call Sara Fitouri.