# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-1338

JAZMINE BJELLAND, et al.,

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, et al.,

Defendants

---

## EXPERT REPORT OF DR. EDWARD R. MAGUIRE

---

## Contents

I.      Experience and Qualifications                                          2

II.     Relevant Background Facts                                              3

III.    DPD Policies, Training, Strategies, and Tactics                       4

        A. Insufficient and Outdated Training in Crowd Management and Control   4

        B. Major Events from the GFP                                          14

        C. Insufficient Reliance on Crowd Management Strategies               16

        D. Inappropriate Use of Force by Outside Police Forces               31

        E. Use of Inappropriate Crowd Control Tactics                        32

        F. Insufficient Internal Controls for Addressing Officer Misconduct  58

        G. Summary of Opinions                                               65

## I. Experience and Qualifications

1.      I am a Professor of Criminology and Criminal Justice at Arizona State University, where I also serve as director of the Public Safety Innovation Lab. I earned a Ph.D. in criminal justice from the State University of New York at Albany in 1997. I have been involved in studying, teaching, training, providing technical assistance for, and collaborating with police for more than 25 years. My work focuses primarily on policing and violence. One of the areas I specialize in is the study of policing crowds, including protests and riots.

2.      I have authored or edited seven books or monographs, and published more than 115 scientific journal articles and book chapters on a variety of criminal justice issues. Most of that work focuses on policing and violence, with much of my recent work focusing specifically on policing protests and riots.

3.      In January 2020, I published a guidebook for police entitled *Policing Protests: Lessons from the Occupy Movement, Ferguson, and Beyond*.[1] The guidebook presents a summary of scientific evidence from criminology and social psychology on crowds and the police response to crowd events. It also provides an analysis of the police response to Occupy Wall Street and other protests by law enforcement agencies in the United States and abroad. Finally, the guidebook provides a detailed framework for policing protests in a manner that seeks to prevent conflict and violence and minimize harm to protesters, police, and bystanders. The research featured in the guidebook was funded by the Office of Community Oriented Policing Services, a component of the United States Department of Justice.

4.      I also serve as Chair of the Police Executive Research Forum's ("PERF") Research Advisory Board (the "Board"), a group of researchers and law enforcement practitioners who advise PERF's efforts to advance police research and innovation. The Board assists PERF's staff in identifying potential research topics; coordinating research efforts with other organizations; conducting human subjects reviews; and disseminating findings to the academic and policing professions. As part of my duties as Chair of the Board, I regularly attend and participate in law enforcement leadership conferences. I also communicate with law enforcement leaders throughout the country to identify and help to implement evidence-based policing practices associated with leadership and management, community policing, patrol and criminal investigation practices, and crowd management.

5.      In addition, I serve as the senior researcher for law enforcement for CrimeSolutions.gov, an effort coordinated by the National Institute of Justice, a component of the U.S. Department of Justice. The purpose of the project is to provide policymakers and practitioners with an easy-to-follow resource for understanding scientific evidence associated with improving criminal justice practices and reducing crime and violence. My role is to coordinate all reviews of research associated with law enforcement and policing for this U.S. government project.

6.      Much of my research and consulting in recent years has focused on crowd

---

[1] Maguire, E.R., & Oakley, M. (2020). *Policing Protests: Lessons from the Occupy Movement, Ferguson, and Beyond*. New York: Harry Frank Guggenheim Foundation. https://www.hfg.org/s/Policing-Protests.pdf

management and the police response to protests and riots. I have worked with the Columbus Police (OH) and the Phoenix Police (AZ) to assess their responses to the protests following the death of George Floyd and provide recommendations for reform. I worked with the New York City Corporation Counsel's Office to examine the NYPD's response to the George Floyd protests. I also worked with Seattle's Office of the Inspector General to examine the response of the Seattle Police Department and other city agencies to the protest encampment in downtown Seattle. I was also commissioned by the Inter-American Development Bank to write a guide for police in Latin America and the Caribbean on appropriate police responses to protests. I have been invited to speak or provide training on policing crowd events for police in five countries (Australia, Canada, Honduras, the U.K., and the U.S.).

7.      My experience, training, and background is more fully described in my C.V., attached to this report. A list of materials I was provided for review is included at the end of this report. I testified at trial in *Epps, et al. v. City and County of Denver*, No. 20-cv-1878-RBJ, in March 2022.

8.      My opinions are based upon the totality of my specialized knowledge, experience, and my expertise in the field of criminology generally, and policing and violence more specifically. My expertise has been developed during my decades of research of and engagement with law enforcement and my continued experience as a professor, researcher, author, and consultant to governments and law enforcement agencies. Moreover, my expertise is based on an intimate familiarity with standards of training and police practices that have been examined and/or adjudicated in case law; departmental policies and procedures; applicable federal, state and local police training programs; model policies; and training and research from scholars and police professional organizations.

## II. Relevant Background Facts

9.      On May 25, 2020, Minneapolis police officers arrested George Floyd after receiving a complaint that he had used counterfeit money. Officer Derek Chauvin knelt on Mr. Floyd's neck until he stopped breathing and died. Beginning on May 28, 2020, protests over the death of Mr. Floyd began in Denver. During the first day of the protests, the Denver Police Department ("DPD") was solely responsible for monitoring and managing the protests. In the days that followed, outside law enforcement agencies were brought in at the request of DPD to assist in crowd management and control.

10.      The purpose of this report is to examine and assess the crowd management and crowd control policies, training, strategies, and tactics of the Denver Police Department ("DPD") at the time of the George Floyd protests (referred to herein as "GFP") as compared to nationally accepted police standards and practices at the time of the GFP. This report also examines the DPD's preparation for and use of force during the GFP, including how that relates to DPD policy and practice, as well as the DPD's policy and practice of reporting, reviewing, and addressing use of force during the GFP. For purposes of this report, my analysis will focus on DPD policies, training, strategies and tactics that were in place at the time of the GFP, or that occurred during the GFP, defined here as the first six days of protests that occurred from May 28, 2020 through June 2, 2020.

### III. DPD Policies, Training, Strategies, and Tactics

#### A. Insufficient and Outdated Training in Crowd Management and Control

11.     Below is a table listing the training materials produced by the City of Denver in the *Epps* case, which lists the title of the document, the date of creation/publication (where available), and the purpose of the document.[2] This table is not intended to analyze the documents, but to set forth the scope of documents that helped inform the analysis to be undertaken in this section of the report.

| Title and Bates Number | Date | Purpose |
|---|---|---|
| Denver Police Department Crowd Management Manual - DEN000068 | February 13, 2019 | The manual serves as a guide for crowd management and control operations. |
| Crowd Management and Control for Supervisors Part 1 and Part 2 - DEN000235 | May 14, 2008 | This presentation covers protestor tactics and police preparation for civil disturbance. |
| Chemical Agents: O.C. Pepperspray - DEN000317 | September 2008 | A presentation detailing what are chemical agents and when can they be used in the field. |
| 40mm Operator Course - DEN000336 | November 2019[3] | Course that must be completed and refreshed by Denver Police Department officers who become certified to utilize 40mm systems. |
| 40mm Operator Course Outline - DEN000414 | November 2019[4] | Outline for the instructor presenting the 40mm Operator course training. |
| 40mm Operator Course - Safety Brief for Practical Qualification | | Outline detailing safety instructions for the practical exercise required to complete certification for the 40mm Operator course training. |

---

[2] It is my understanding that the parties have designated materials from the *Epps* case, including depositions, as applicable to this case.

[3] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual. Accordingly, I have dated this as November 2019.

[4] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual. Accordingly, I have dated this as November 2019.

| | | |
|---|---|---|
| 40mm Operator Course - Written Exam - DEN000418 | November 2019[5] | Written examination required to complete certification for the 40mm Operator course training. |
| 40mm Operator Course - Written Exam Answers - DEN000422 | November 2019[6] | Answers to written examination required to complete certification for the 40mm Operator course training. |
| 40MM DIRECT IMPACT® ROUND OC, CS, INERT & MARKING - DEN000426 | September 2018 | Product and projectile specifications for 40mm Direct Impact rounds. |
| 40MM eXact iMpact™ SPONGE ROUND - DEN000427 | September 2018 | Product and projectile specifications for 40mm eXact iMpact sponge rounds. |
| 40MM 250-SHOT TRAINING KIT - DEN000428 | September 2018 | Document summarizing the materials and devices included in the 40mm 250- Shot system kit. |
| 40MM MULTI SHOT, PUMP ADVANCE LAUNCHER, 5" CYLINDER - PENN ARMS Product Specification Chart - DEN000429 | | Document describing the product specifications of the Penn Arms' 40mm Multi Shot, Pump Advance Launcher. |
| 40MM SINGLE SHOT LAUNCHER COMPACT - PENN ARMS Product Specification Chart - DEN000430 | | Document describing the product specifications of the Penn Arms' 40mm Single Shot Launcher Compact. |
| 8 Hour Schedule (Redacted) - DEN000432 | Post-March 2019[7] | Schedule detailing a training seminar related to field management and field force deployment. |

[5] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual. Accordingly, I have dated this as November 2019.

[6] This document is labeled as "Version 11.19", and adopts some of the structure set forth in the Crowd Management Manual. Accordingly, I have dated this as November 2019.

[7] I will note that the document references the Hong Kong protestor tactics. Assuming this is in reference to the Hong Kong anti-extradition bill protests, then this training schedule would date to a point in time after March 2019.

| | | |
|---|---|---|
| Crowd Control Leadership Training (Redacted) - DEN000433 | | Presentation related to crowd control tactics, commands, and equipment. |
| Practice Handout (Redacted) - DEN000580 | | Handout which instructs training exercises. |
| DPD Crowd Control - Online Refresher Training (Redacted) - DEN000583 | | |
| PepperBall Operator Course - DEN000584 | | Presentation detailing the use and policies surrounding PepperBall systems. |
| PepperBall Operator Practical Qualification - DEN000672 | | Safety brief detailing process for practical qualification for PepperBall Operator course. |
| PepperBall Operator Written Exam_- DEN000675 | | Written exam for PepperBall Operator course. |
| PepperBall Operator Written Exam - Answer Key - DEN000678 | | Answer key to written exam for PepperBall Operator course. |
| Full Tactical Carbine PepperBall System User Manual - DEN000682 | | User manual for the Full Tactical Carbine PepperBall system. |
| PepperBall FTC Specification Sheet - DEN000691 | | Specification chart for PepperBall Full Tactical Carbine system. |
| PepperBall Accessories (13 CU. IN. HPA) Specification Sheet - DEN000692 | | Specification chart for pressure gauge and gas cannister device accessory for PepperBall system. |
| PepperBall Accessories (Scuba Tank) Specification Sheet - DEN000693 | | Specification chart for scuba tank accessory for PepperBall system. |

| | | |
|---|---|---|
| PepperBall Projectile Round Live-X Specification Sheet - DEN000694 | | Specification chart for Live-X ammunition for PepperBall system. |
| PepperBall Projectile Round Inert Specification Sheet - DEN000695 | | Specification chart for Inert ammunition for PepperBall system. |
| Crowd Control Recruit Training (Speaker Notes) - DEN000696 (Redacted) | | Presenter annotated version of presentation covering crowd control tactics and protocols. |
| Crowd Control Recruit Training - DEN000823 (Redacted) | | Presentation covering crowd control tactics and protocols. |
| Denver Police Department Training Bulletin - June 6, 2019 (Updated June 10, 2019) - DEN001909 | June 10, 2019 | Training bulletin published on June 10, 2019 under the name of Chief Paul M. Pazen regarding First Amendment and Free Speech protections. |
| Denver Police Department Training Bulletin - August 16, 2018 - DEN001912 | August 16, 2018 | Training bulletin published on August 16, 2018 under the name of Chief Paul M. Pazen regarding First Amendment considerations. |

12.    As evidenced by the above table, certain of the key training materials that were produced by the City of Denver as the controlling documents to guide the DPD response to the GFP are dated, with some not having been updated since 2008. Significant advances in our understanding of policing protests and crowd psychology have occurred in recent years. The use of dated training materials, as I will illustrate below, results in the use of outdated and inappropriate strategies and tactics for policing protests. Moreover, even when the training materials have been updated more recently, many of them contain content that is outdated and inconsistent with nationally accepted standards and practices. More alarmingly, as I will show below, they are also inconsistent with the DPD's own policies. These training materials need to be updated and aligned with nationally accepted police standards and practices, as well as the DPD's own policies.

13.    The two principal documents outlining DPD policies relevant to this case are the *Operations Manual* (DEN000950-001754) and the *Crowd Management Manual* (DEN001755-1798). The *Operations Manual* is more than 800 pages long and covers policies and procedures governing a wide array of DPD operations. For instance, it includes general policies and procedures associated with using force, making arrests, managing traffic, investigating crimes, and many other topics. The *Crowd Management Manual* is 44 pages long and focuses specifically on

policies associated with handling crowd events, including protests.[8]

14.    The DPD's *Crowd Management Manual* divides the police response to crowds into two categories: crowd management, and crowd control. The DPD's *Crowd Management Manual* defines crowd <u>management</u> as "Techniques used to address lawful public assemblies before they begin and during the event for the purpose of guaranteeing a safe and lawful assembly. This can be accomplished in part through coordination with event planners and group leaders, permit monitoring, past event critiques and future planning" (p. 5).

15.    The *Crowd Management Manual* defines crowd <u>control</u> as "Techniques used to protect lawful public assemblies and free speech activities and prevent unlawful conduct. The techniques could include a display of formidable numbers of police officers, crowd containment tactics, crowd dispersal tactics, and individual or group arrest procedures" (p. 6). The *Crowd Management Manual* notes, "When possible, crowd management tactics will be used prior to implementing crowd control tactics. Crowd control tactics are generally intended for use when efforts to manage a crowd or event have been unsuccessful or simply require a greater level of intervention. Some situations, both planned and spontaneous, may require a combination of management and control" (p. 4). Although I do not use the crowd management/crowd control dichotomy in my guidebook on policing protests, the framework that I recommend based on the research evidence is consistent with the idea that some crowd events require the simultaneous use of crowd management and crowd control approaches.

16.    Consistent with best practices in policing, the DPD *Crowd Management Manual* states that "the overriding goal of police actions at the onset of civil disturbance problems is the de-escalation of violence" (p. 8). A key element of de-escalation is communication and dialogue between police and crowd members. The *Crowd Management Manual* emphasizes this point, noting, "The preferred use of uniformed and non-uniformed police officers is to communicate as much as possible to demonstrators and their leaders that police officers are present in order to facilitate the peaceful and lawful expression of First Amendment rights." In my opinion, the *Crowd Management Manual* does a good job of setting the tone for an appropriate police response to crowd events, one that relies heavily on "communication, mediation, and negotiation" (p. 11).

17.    Unfortunately, the aspirational language used in the *Crowd Management Manual* to emphasize the importance of de-escalation and communication strategies for avoiding conflict and violence does not match the content of the training materials I reviewed. Those training materials focus primarily on crowd control rather than crowd management. They focus very little on de-escalation, communication, mediation, or negotiation. Therefore, they set the tone for officers to respond to crowd events in a manner that, consistent with their training, focuses primarily on crowd control. Below I will outline some examples in which the training provided to DPD officers on crowd management and control is deficient relative to nationally accepted police standards and practices.

---

[8] The copy of the DPD *Crowd Management Manual* provided by the city contained redacted text. As a result, I was unable to review the full document. Portions of the text on pp. 9-11 and pp. 25-26 were redacted. In addition, the full text of pp. 27-41 was redacted.

18.    Current best practices in crowd management and control are based heavily on research evidence from psychology, particularly research on crowd psychology and behavior. Understanding how crowds think and behave is useful for managing them and avoiding unintended consequences, including conflict and violence. The guidebook that I authored on policing protests notes that some protest policing practices "are consistent with current perspectives from crowd psychology while others are more consistent with older perspectives in crowd psychology that have since been discredited."[9] Basing police practices on an inaccurate or outdated understanding of crowd psychology "is a recipe for conflict and can endanger both crowds and the police."[10]

19.    Research evidence from crowd psychology is useful for understanding how conflict evolves between police and crowds. When police choose to engage primarily in crowd control strategies, particularly the use of indiscriminate force – rather than focusing on crowd management approaches like de-escalation, communication, mediation, and negotiation – they tend to escalate conflict and increase the likelihood that crowds will react in a rebellious manner. This is especially true if police use force against an entire crowd in response to the misbehavior of a subset of its members. Under such circumstances, "the entire crowd will unite around a sense of opposition to the police."[11]

20.    This research evidence has direct implications for policing protests. Consider the following quote from Her Majesty's Chief Inspector of the Constabulary in England and Wales: "Indiscriminate use of force by the police can create a sense of unity in the crowd through a common perception of the illegitimacy of police action and corresponding opposition in response. Perceptions of police legitimacy are critical because they affect the crowd's internal dynamics, facilitating or undermining the ability of those seeking conflict to exert social influence over others in the crowd. Consequently, there is an increase in the numbers within the crowd who perceive conflict against the police as acceptable or legitimate behaviour, thereby empowering those prepared to engage in physical confrontation with the police. In this way, the crowd is drawn into conflict even though the vast majority had no prior intention of engaging in disorder" (p. 86).[12]

21.    These issues are especially salient when the protests are about the police. In this case, the protests were focused primarily on the death of George Floyd specifically and the police use of excessive force against minorities more generally. As noted in my guidebook on policing protests, when police are the object of protests, thoughtful crowd management strategies are especially important because "efforts to block protests will inevitably strengthen the perception that police are unjust and illegitimate."[13] In such circumstances, the use of de-escalation, communication, mediation, and negotiation – as outlined in the DPD's *Crowd Management Manual* – is especially important for calming tensions, reducing conflict and violence, and

---

[9] Maguire & Oakley (2020), note 1 (p. 46).

[10] Maguire & Oakley (2020), note 1 (p. 46-47).

[11] Maguire & Oakley (2020), note 1 (p. 50).

[12] Her Majesty's Chief Inspector of the Constabulary (2009). *Adapting to Protest: Nurturing the British Model of Policing*. https://www.justiceinspectorates.gov.uk/hmicfrs/media/adapting-to-protest-nurturing-the-british-model-of-policing-20091125.pdf

[13] Maguire & Oakley (2020), note 1 (p. 62).

minimizing harm to police officers and the public. Unfortunately, the DPD did not train its officers sufficiently on the importance or use of these crowd management methods, therefore it is not surprising that officers did not rely on them during the GFP.

22.     The DPD's "Crowd Control Recruit Training" course (DEN 696-822) focuses primarily on crowd control rather than crowd management. Most of the material in this course focuses on field force tactics such as formations, arrests, and the use of force. Crowd psychology is covered briefly but the coverage of this topic is dated, incomplete, and inaccurate. For instance, page 5 lists contagion as a source of escalation in crowds, but research has discredited this idea long ago.[14] Page 6 focuses on intelligence and planning, but misses the importance of identifying potential allies who can partner with the police to help de-escalate tensions from inside the crowd. Page 19 covers different types of protesters. The typology it presents is inconsistent with research evidence on the composition of protest crowds. Finally, crowd management principles are covered on just *one* page in this 127-page document. The imbalance in coverage of crowd management and crowd control in this course sends the unfortunate and inappropriate message that crowd control is the dominant tool police should use in responding to protests.

23.     The DPD's "Crowd Management and Control for Supervisors" (DEN 235-316) course has not been updated since 2008. The training is outdated, poorly organized, inconsistent with the DPD's *Crowd Management Manual*, and does not reflect current nationally accepted protest policing standards and practices. It covers very little of the crowd management strategies described in the *Crowd Management Manual* and focuses primarily on crowd control tactics such as platoon movements, formations, arrest teams, and use of force. It provides no real coverage of crowd psychology and the factors that tend to escalate conflict and violence during crowd events. Based on the course content, a supervisor taking this course would naturally conclude that crowd control tactics – including the use of force and less lethal weapons – are much more important than the crowd management strategies contained in the DPD *Crowd Management Manual* when handling crowd events, including protests.

24.     The DPD's "Crowd Control Leadership Training" (DEN 433-579) course contains some of the same material covered in the previous two paragraphs. Like the other courses, it is outdated, poorly organized, inconsistent with the DPD's *Crowd Management Manual*, and does not reflect current nationally accepted protest policing standards and practices. Its coverage of "types of protesters" is misleading and inconsistent with what we know from crowd psychology. Its coverage of intelligence and planning is incomplete and does not account for the importance of identifying potential allies who can help de-escalate tensions from within the crowd. It focuses primarily on crowd control tactics such as movements, formations, arrest teams, and use of force. Once again, based on the course content, a participant taking this course would naturally conclude that crowd control tactics – including the use of force and less lethal weapons – are much more important than the crowd management strategies contained in the *Crowd Management Manual* when handling crowd events, including protests.

25.     In addition to providing outdated and insufficient training on crowd <u>management</u>,

---

[14] Reicher, S., Stott, C., Cronin, P., & Adang, O. (2004). An integrated approach to crowd psychology and public order policing. *Policing: An International Journal of Police Strategies and Management*, 27(4), 558-572.

the DPD also provided officers with insufficient training on crowd <u>control</u>. For instance, the Office of the Independent Monitor's (OIM) report (DEN 3925-4018) on the police response to the GFP listed several training deficiencies. One such deficiency concerned the lack of training and policy in the DPD on the use of flash-bang grenades (also known as noise-flash diversionary devices, distraction grenades, or stun grenades). These devices emit an intense flash of light and a loud explosion sound to distract and disorient people temporarily. Flash bang grenades can result in several health risks to crowd members, bystanders, and police officers, including burns and other injuries related to the explosion, eye injuries associated with the intense flash of light, and ear-related injuries (including irreversible hearing loss) associated with the loud noise.[15] In addition to the health risks associated with these devices, there is some evidence to suggest that they may escalate conflict and violence with crowds rather than achieving their intended objective of dispersing crowds.[16] Because of these various issues, police must use great caution in deploying flash-bang devices and must train their officers on the safe and proper use of these devices.

26.    The OIM report (DEN 3925-4018) also concluded that during the GFP, some DPD officers used less-lethal weapons (PepperBall and 40mm launchers) that they were not trained or certified to use (p. 29). Proper training is essential to reduce the risk of injury or death among people struck by the kinetic impact projectiles fired by these weapons.[17]

27.    Third, the OIM report notes that the DPD provides no training on certain "high-risk explosive devices" such as rubber-ball grenades. These are dangerous devices because when they explode, the rubber balls or pellets spray indiscriminately striking anyone located nearby. They cannot be carefully aimed, and for that reason, they should only be used under very restrictive conditions. Proper training on their use is essential to minimize the risk of injury or death.

28.    Finally, the OIM review found that "there has been a decline in the volume and frequency of crowd control and field force training in recent years" (p. 51). The report concluded that the DPD "needs to substantially increase its investments in crowd control and field force training to properly prepare officers for the possibility of other mass protest events in the future." I agree with this assessment.

29.    I also reviewed training materials for several courses related to less-lethal munitions. Two of the courses contained in this 239-page document are a *PepperBall Instructor Course* and *PepperBall Operator Course*. These two courses appear to be copyrighted training materials developed by PepperBall®. Both courses focus primarily on technical issues such as *how* to use the weapons, with little coverage of *when* it is appropriate to use them. Both courses make irresponsible and inaccurate claims about the physiological and psychological effects of these

---

[15] Cazares, S.M., Hirsch, L.R., & King, A.L. (2015). *Significance of Tympanic Membrane Rupture Potentially Caused by Flashbang Grenades*. Alexandria, VA: Institute for Defense Analyses; Hoskin, A.K., Atlas, M.D., & Mackey, D.A. (2015). The Sydney siege: Courage, compassion, and connectedness. *Medical Journal of Australia*, 202(7), 360; Wang, H., Burgei, W., & Zhou, H. (2018). Risk of hearing loss injury caused by multiple flash bangs on a crowd. *American Journal of Operations Research*, 8, 239- 265.

[16] Haar, R.J., & Iacopino, V. (2016). *Lethal in Disguise: The Health Consequences of Crowd-Control Weapons*. Physicians for Human Rights. https://phr.org/resources/lethal-in-disguise.

[17] Haar, R.J., Iacopino, V., Ranadive, N., Dandu, M., & Weiser, S.D. (2017). Death, injury and disability from kinetic impact projectiles in crowd-control settings: A systematic review. *BMJ Open*, *7*(12), e018154.

weapons.

30.    In terms of physiological effects, both courses claim that the PepperBall is "nonlethal." This description is inaccurate. All kinetic impact munitions are potentially lethal depending on a variety of factors such as their composition, their velocity at impact, and where they strike the body.[18] For that reason, no kinetic impact munition should be referred to as nonlethal. The appropriate terminology is "less-lethal." This is important, because any training that describes these munitions as non-lethal suggests to course participants that these munitions are less dangerous than they really are. Having such a mindset can lead officers to use these dangerous weapons irresponsibly.

31.    Consistent with this perspective, DPD Less Lethal Coordinator Ryan Grothe, one of the City's Rule 30(b)(6) witnesses, testified, "we don't call it nonlethal force. It's less-lethal force" (Grothe deposition, p. 69). Grothe explained that the less-lethal weapons options used by the DPD are designed to reduce the possibility of a lethal outcome, "but there is a possibility of serious bodily injury or death when you use those" (Grothe deposition, p. 70).

32.    Both courses also state that the PepperBall system has resulted in "no deaths or serious injuries." This is factually inaccurate and professionally irresponsible. Kinetic impact munitions often result in serious injuries,[19] especially eye injuries.[20] As noted by one set of physicians studying the effects of less-lethal weapons on ophthalmic injuries, "the eye is at particular risk of injury due to its delicate organ structure and the ability of the projectile to bypass the protection afforded by the bony orbit." During the George Floyd protests (GFP) in 2020, media reports featured several people in the United States who claimed to have sustained eye injuries from being struck by PepperBalls. For instance, one protester in Denver had to have his eyeball removed after being struck by a PepperBall.[21] Eye injuries due to PepperBalls were also reported by people attending protests in Omaha,[22] Portland,[23] and Washington, DC.[24] So far, the medical literature has documented two cases of serious eye injuries resulting from PepperBall strikes during protests.[25] The number of injuries is likely much higher, but it is difficult to document

---

[18] Haar et al. (2017), note 17.

[19] *Id.*

[20] Ifantides, C., Deitz, G. A., Christopher, K. L., Slingsby, T. J., & Subramanian, P. S. (2020). Less-lethal weapons resulting in ophthalmic injuries: A review and recent example of eye trauma. *Ophthalmology and Therapy, 9*(3), 1-7; Rodríguez, Á., Peña, S., Cavieres, I., Vergara, M. J., Pérez, M., Campos, M., ... & Morales, S. (2021). Ocular trauma by kinetic impact projectiles during civil unrest in Chile. *Eye, 35*(6), 1666-1672.

[21]    https://kdvr.com/news/local/dpd-internal-affairs-man-who-lost-eye-during-protests-was-struck-by-pepperball

[22]    https://www.ketv.com/article/bystander-legally-blind-from-pepperball-during-omaha-protests-files-claim-against-sarpy-county/34340372

[23] https://www.cnn.com/2020/07/30/us/journalist-portland-protest-federal-agents-trnd/index.html

[24]    https://patch.com/district-columbia/washingtondc/dc-protester-continues-recovery-after-being-shot-pepper-bullet

accurately because many people who are not knowledgeable about less lethal projectiles refer to all of them using the generic term "rubber bullets." This likely obscures the true number of PepperBall injuries.

33.     Both courses also demonstrate a profound lack of understanding of crowd psychology and its implications for the use of these weapons. For instance, when listing the psychological effects of being struck by a PepperBall, the training materials mention responses such as panic, fear, anxiety, nervousness and irrational decision-making. But they do not list anger and frustration, which are the psychological reactions most frequently documented in the crowd psychology literature in settings where police are perceived by crowd members as using force unfairly or indiscriminately. This is a crucial omission because it demonstrates a fundamental misunderstanding of basic crowd psychology principles. Understanding these principles is vital for developing crowd management and control strategies that minimize conflict and violence.

34.     Research evidence from crowd psychology shows that when police rely on the indiscriminate use of force from the outset – rather than softer crowd management approaches like communication, de-escalation, mediation, and negotiation – their actions tend to escalate conflict and increase the likelihood that crowds will rebel. When people in a crowd perceive that force is being used against them or their peers unfairly and/or illegally, "the entire crowd will unite around a sense of opposition to the police."[26] Moreover, in such circumstances, protesters – even those who are ordinarily peaceful and law abiding – may begin to feel morally justified in resisting or behaving violently toward the police.[27]

35.     I also reviewed documents from the Denver Police Department "Less Lethal Operator" course. This course also demonstrates an inaccurate understanding of crowd psychology. On pages 183 and 231, it states that "less lethal force takes away their will to fight." This may be true for some people, but for others, less lethal force is likely to have the opposite effect. If people believe the force was used unfairly and/or illegally, they will often rebel. Moreover, if others in the crowd believe the force was inappropriate, they may begin to unite in opposition to the police. This is especially true when police are the object of the protest.

36.     This same course demonstrates a further misunderstanding of crowd psychology on pages 184 and 232 where it lists three reasons why less lethal weapons may fail to gain the crowd's compliance: suspect intoxication, suspect focus/mental illness, and limitations of the system. Again, it misses perhaps the most important reason why less lethal weapons may fail. If people believe the weapons were used inappropriately or illegitimately, they will often rebel rather than comply. These are basic principles from crowd psychology that should serve as the foundation for developing effective, evidence-based crowd management and control strategies.

37.     During his interview with the Office of Independent Monitor (OIM) Lt. John Coppedge, who was assigned to the DPD Training Academy during the GFP, characterized the Department's response to the GFP as a total "leadership failure" (DEN ICR 011714). He explained that previous police chiefs were more committed to training than Chief Pazen. He further noted

---

[26] Maguire & Oakley (2020), note 1.

[27] Maguire, E. R., Barak, M., Cross, K., & Lugo, K. (2018). Attitudes among Occupy DC participants about the use of violence against police. *Policing and Society*, *28*(5), 526-540.

that under Chief Pazen, "the prevailing attitude is that training is not important" (DEN ICR 011715). As a result, when Lt. Coppedge held training related to protest response, only six people attended.

38.    Sgt. Erik Knutson, who was assigned to the Training Academy prior to and during the GFP, is the DPD's "primary crowd control trainer" (DEN ICR 11726). During his OIM interview, Sgt. Knutson noted that he had difficulty getting commanders to allow officers to attend his protest- related training courses. Training is essential for teaching officers at every level the appropriate strategies and tactics for handling protests fairly and effectively. The lack of emphasis on training described by Lt. Coppedge and Sgt. Knutson supports my opinion that the DPD did not provide its officers with sufficient training on how to prepare and respond in a professional and appropriate manner to the GFP.

39.    To summarize, at the time of the GFP, the DPD used deficient training for crowd control and crowd management. That training was inconsistent with the DPD's own *Crowd Management Manual*. It devoted insufficient attention to crowd management strategies, including de- escalation, communication, mediation, and negotiation. It provided almost no coverage of crowd psychology and behavior, and what coverage it did provide was dated and inaccurate. Finally, as noted in the OIM report, the crowd control training provided by the DPD was insufficient in content, volume, and frequency and therefore did not adequately prepare officers for the challenges they faced during the GFP. The foreseeable consequence of DPD's failure to provide adequate training to its officers was officers' use of inappropriate tactics on, and violation of the constitutional rights of, the Plaintiffs and other protestors.

**B.  Major Events from the GFP**

40.    In this section I will highlight some of the major events during the GFP. These events will provide necessary context for the opinions contained in this report.

41.    As previously discussed, the protests began on May 28, 2020, and continued on May 29, 2020. Between 8:00-9:30 p.m. on May 28, there was a large number of protesters in the park south of Colfax between Lincoln and Broadway, across from the State Capitol. There were also many protesters on the Capitol lawn. Body-Worn Camera ("BWC") video shows DPD officers, including Metro/SWAT officers, in the parking lots north of Colfax on either side of Lincoln. Crowd members threw some objects at police officers. Meanwhile, police officers deployed less-lethal weapons, including CS ("tear gas") and PepperBalls, at protesters across the street (south of Colfax).



42.     During the course of these protests, the DPD experienced "compounding munitions shortages," which resulted in the Colorado State Patrol flying to Wyoming to purchase less-lethal munitions from a manufacturer, including some munitions that had been ordered by DPD (OIM Report, pp. 4-5). The need for additional munitions within the initial days of the GFP is concerning because it suggests that either: (a) the DPD did not maintain a sufficient stock of munitions, or (b) the DPD deployed more munitions than necessary during the early portion of the GFP. Although both explanations are possible, my review of video footage showing the DPD and its partners deploying less-lethal weapons during the evening of May 28 suggests that this shortage was likely caused by the DPD's excessive use of chemical agents, kinetic impact projectiles, and other less-lethal munitions.

43.     Relatedly, the DPD did not track the less-lethal munitions that its officers, and those of its mutual aid partners, deployed during the GFP (OIM Report, p. 53). The OIM recommended that the DPD amend its manuals to require the creation of a log or tracking system for the distribution and deployment of all less-lethal munitions during crowd control events (Mitchell Deposition, pp. 64-65). Consistent with this perspective, former Independent Monitor Nicholas Mitchell testified at his deposition:

> [P]olice management with an effective log or tracking system in place, managers of the police department who are overseeing the response would have a better sense of … which officers or which teams were utilizing which kinds of munitions and at what rates. It would facilitate an investigation into any allegations of inappropriate force that might be raised. It would allow for supervisory intervention if one team in particular, for example, is using particular kinds of munitions at disproportionate rates.

> So, developing a log or tracking system would enable, you know, more proactive management to make sure that less-lethal munitions are being used in conformity with the policies of the Denver Police Department (Mitchell Deposition, p. 66).

15

44.    I agree. In addition, it is my opinion that the DPD should have had a tracking system in place before the GFP, and the failure to do so was contrary to generally accepted police practices prior to May 2020.[28]

45.    By May 30, a large number of officers from outside law enforcement agencies was also providing mutual aid assistance to the DPD (OIM Report, pp. 4-5). According to the OIM, an estimated 150-200 officers worked the GFP on May 28, 100-150 on May 29, 450-500 on May 30, and 450-500 on May 31 (OIM Report, pp. 2-5). The DPD did not create rosters for most protest days and nights during the first five days of the GFP (OIM Report, pp. 12, 20; Mitchell Deposition pp. 66-67). The OIM concluded that the creation of such rosters would "permit the incident commander and others to determine where they have enough resources and where they may be deficient in resources. It would … be very helpful for investigations into individual incidents to have information about officer assignments and who was assigned to do what where, given the challenges that we experienced in identifying officers…in investigations into allegations of excessive force" (Mitchell Deposition, p. 68). I agree. Creating such rosters is a basic recordkeeping function that facilitates planning and accountability. It is my opinion that the failure to do so prior to the GFP was contrary to generally accepted police practices.[29] The IACP Law Enforcement Policy Center's model policy on Incident Command recommends the creation of a "master record of all personnel and components involved in the response to a critical incident."[30] It is also my opinion that the DPD's failure to maintain personnel rosters contributed to its failure to hold accountable officers who used excessive force or violated the constitutional rights of protesters.

### C. Insufficient Reliance on Crowd Management Strategies

46.    Consistent with my findings regarding the DPD's *training* on crowd management and control, the DPD's *response* to the GFP involved an insufficient reliance on crowd management strategies. Instead, the evidence reveals that the DPD relied primarily on crowd control tactics, particularly the largely indiscriminate use of coercive law enforcement authority, including but not limited to the use of skirmish lines, less lethal weapons, and arrests. This heavy reliance on crowd control and insufficient use of crowd management is inconsistent with nationally accepted police standards and practices, and the DPD's own *Crowd Management Manual*.

47.    The materials I reviewed provide no evidence that the DPD relied on dialogue-based de-escalation strategies to reduce tension and prevent conflict and violence with crowds during the GFP. Instead, the DPD relied on militaristic crowd control tactics. The *Crowd Management Manual* states, "The policy of the Denver Police Department is not to choose a standard police reaction (such as skirmish lines and the use of chemical agents) in a robotic response to problematic crowds. Techniques such as communication, mediation, and

---

[28] See OIM Report, p. 19; also see Police Foundation (2018), *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, p. 27.

[29] See OIM Report, p. 20; also see Police Foundation (2018), *Managing Large-Scale Security Events: A Planning Primer for Local Law Enforcement Agencies*, p. 29.

[30] International Association of Chiefs of Police (2009). *Incident command, Model policy*. https://www.theiacp.org%2Fsites%2Fdefault%2Ffiles%2F2018-08%2FIncidentCommandPolicy.pdf

negotiation… are preferred in an attempt to prevent the escalation of violence" (p. 11). The wisdom of this approach, as the stated policy of the DPD, is backed up by a substantial body of research evidence from the study of protests and other crowd events. This research has taken place in a variety of settings around the world and has accumulated over nearly four decades.[31]

48.     Unfortunately, the DPD did not follow its own crowd management policy during its handling of the GFP. My extensive review of video footage from the GFP revealed that DPD officers and their partners from other law enforcement agencies relied heavily on skirmish lines, kinetic impact munitions (such as PepperBalls and 40mm foam baton rounds), and chemical agents (such as CS gas and OC spray) as their primary method for controlling crowds. The After-Action reports completed by DPD Lieutenants Wyckoff and Wheaton from May 28, 2020 to June 2, 2020 do not list any attempts to communicate with the crowd or engage in verbal de-escalation, communication, mediation, or negotiation for the first four days of the protests (DEN 1916- 1936). On the fifth day, Chief Pazen marched with the crowd (DPD After-Action Report for June 1, 2020, DEN 1930-1933). On the sixth day, Murphy Robinson, Executive Director of the Department of Public Safety, marched with the crowd (DPD After-Action Report for June 2, 2020, DEN 1934-1936). The decision of these leaders to march with the crowd was a good one. Unfortunately, these efforts did not occur until the conflict and violence had already been escalating for four days. The daily Operations Plans issued by Commander Phelan do not provide any evidence of officers engaging in dialogue or de-escalation with protesters. The Operations Plans list assignments for various functions, but there is no evidence of any personnel being assigned to roles focusing specifically on dialogue or de-escalation. The standard approach in policing, even for spontaneous protests, is to communicate with protest organizers or participants before, during, and after protests. A continuous line of communication between police and protesters reduces tension and prevents conflict and violence from escalating. I do not see any evidence that this type of communication occurred between police and protesters in Denver during the GFP.

49.     The use of dialogue-based crowd management strategies is especially important when protests are focused on the police. As noted in my guidebook for policing protests, "In the aftermath of a controversial arrest or use-of-force incident, people are angry, emotions run high, and event participants may be less willing to communicate or cooperate with police in a calm and productive manner. The ratio of moderates to radicals may be smaller than usual relative to other types of protests. Police may naturally feel frustrated and defensive and less willing to negotiate or facilitate under these conditions. While this is certainly understandable at a human level, at a professional level these are exactly the moments when communication and facilitation become most important. People who are protesting police misconduct expect the police to treat them poorly. They may even attempt to goad the police into treating them poorly to capture it on video, provide grounds for a complaint or a lawsuit, or otherwise prove a point. Changing the interpersonal dynamic at moments like this can have powerful effects on the tone of these events and prevent them from escalating into conflict or violence. Communicating in a patient, thoughtful, and professional manner when people are angry or frustrated with you and the institution you represent can sometimes help calm people down."[32] Because the protests were about the police,

---

[31] Reicher, S.D. (1984). The St. Pauls' riot: An explanation of the limits of crowd action in terms of a social identity model. *European Journal of Social Psychology*, 14(1), 1-21.

[32] Maguire & Oakley (2000), note 1 (p. 69).

the DPD's decision to rely so heavily on crowd control tactics, in lieu of the types of crowd management strategies outlined in its own *Crowd Management Manual*, very likely inflamed tensions and promoted unnecessary tension and conflict between police and protesters.

50.    Aside from dialogue and de-escalation, another crucial element of crowd management is providing verbal warnings or dispersal orders prior to using force against a crowd. My review of video footage from the GFP revealed numerous instances of police using force against crowds without any warning ahead of time or without an order to disperse. Numerous officers justified this approach during their depositions, citing exigent circumstances because people in the crowd were throwing objects at them (for example, see Lt. Canino's deposition, pp. 33-38, p. 46, and p. 63).

51.    In his deposition, Commander Phelan stated that there are times when giving an announcement "wouldn't be prudent." I do not understand or agree with this sentiment. It is especially concerning coming from the person who served as incident commander during the GFP and who set the tone for the overall DPD response to the protests. There may be moments when exigent circumstances (in the form of serious threats to officer safety) do not allow police officers to issue a warning or dispersal order first and then wait before using force. However, even in circumstances where police officers are encountering active aggression from people in the crowd, there should still be a person designated to make announcements to the crowd while other officers handle the aggressors. Aurora Commander Redfearn stated in his deposition that it is customary to issue warnings prior to deploying tear gas unless there are immediate life safety issues. I agree. My review of the video evidence and depositions revealed a widespread custom or practice of firing chemical agents and kinetic impact munitions at crowds in the absence of warnings or orders to disperse. The research evidence shows that decisions like this tend to escalate conflict and violence between police and crowds. This is why British police rely on a "no surprises" approach, letting protesters know ahead of time about likely police actions so they can make informed choices about whether to alter their behavior or exit the area.[33] In those moments when exigent circumstances do not allow police to issue warnings or announcements prior to using reasonable force, they can simply issue those warnings or announcements as soon as practicably possible. The idea that once a crowd is aggressive, police no longer need to communicate with or issue announcements to the crowd is professionally irresponsible and dangerous.

52.    In addition to the need to issue verbal warnings or dispersal orders before using force against a crowd, police also have an obligation to ensure that these warnings are loud enough for the crowd to hear them.[34] Crowd events tend to be loud, and the amplification devices used by police are sometimes not loud enough to enable the full crowd to hear police announcements. The materials I reviewed suggest that when warnings were issued, they were often made without amplification or were amplified using a public address system in a police vehicle. The video footage reveals that some of these announcements were not loud enough to reach the full crowd. Moreover, evidence from the depositions reveals that DPD officers were not particularly sensitive

---

[33] Her Majesty's Chief Inspector of the Constabulary (2009), note 12 (p. 164).

[34] The International Association of Chiefs of Police ("IACP") states, "A warning should be issued loudly and often enough to be heard by the entire crowd … To ensure the warnings have been heard throughout the crowd, it is recommended that at least two officers go to the rear of the crowd to verify the warnings are audible" (Crowd Management: Concepts & Issues Paper, Fitouri 18374.)

to this issue. For instance, in their depositions, both Lt. Pine and Lt. Williams stated that they did not do anything to ensure that the crowd could hear the announcements by police. When asked why he didn't do anything, Lt. Pine said it was because he was busy. When asked the same question, Lt. Williams stated, "I don't really know what we could have done to… verify it" (p. 107). Evidence of protesters not being able to hear announcements made by police is also present in the depositions of Sergeant Beall (pp. 57-58) and Mr. Mitchell (pp. 72-75). I conclude from the available evidence that the DPD did not take seriously the question of whether the crowd could hear their warnings or orders to disperse. As a result, some protesters were "subjected to less lethal munitions before hearing any warning or order" (OIM report, p. 26).

53.     One such example occurred on May 28, 2020, at 9:10 p.m., on 14th and Sherman. (*See, e.g.,* Beall Deposition, p. 54; DEN 4021 and other DPD BWC from 5/28 at 14th & Sherman such as DEN 4023; DEN 4025; DEN 4027; DEN 4030; Taylor Declaration, ¶ 6; Sanchez Declaration, ¶ 16.).

54.     At approximately 8:26 p.m., DPD officers arrived at the intersection of 14th and Sherman. They formed a north-south line facing east down 14th Avenue. The officers were led by Lt. Williams and Lt. Pine. 14th and Sherman is on the south side of the State Capitol.





CSP video 05282020 v.63 at 8:27:51 p.m. MT (annotated)

55.    By about 8:35 p.m., a crowd of protesters formed facing the officers. I did not see evidence in the video that anyone was throwing objects at the officers at that time.



CSP video 05282020 v.63 at 8:36:17 p.m. MT (annotated)

56.    On the radio at around 8:48 p.m., Commander Phelan communicated with "Metro 2" (Lt. Pine), who was at 14th and Sherman. Phelan asked if the officers at that location are OK and if they need to "deploy" (AirOne video 5/28 (DEN 3840) at 8:47:57 p.m. MT). Lt. Pine responded, saying, no, they are ok, and that they are getting their gas masks on before they make that call (AirOne video, 5/28).



AirOne video 5/28 (DEN 3840) at 8:48:02 p.m. MT (annotated)

57.    On the radio at 8:59 p.m., Lt. Pine said that they are making "announcements" and that they are going to move protesters out of the street. Commander Phelan responded, "all right" (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.58.54_Ch33, 2020-05-28_20.59.02_Ch33; AirOne video 5/28 (DEN 3840) at 8:58:58 p.m.-8:59:04 p.m. MT).

58.    The video produced in this case for this time and location, including the body- worn camera footage from DPD officers at the scene at the time shows that, to the extent any announcements were made, they were barely audible, if at all, to the officers standing on the line, and likely inaudible to everyone else standing at the intersection (DEN 4021; DEN 15718). In at least one BWC video, a protester asks Sgt. Beall what is being said on the PA (DEN 4021). Sgt. Beall tells the protester that the officers are about to deploy gas (Beall Deposition, pp. 54-59). However, Sgt. Beall does not take this information—that protesters apparently cannot hear the announcement—to any supervisor or anyone in the chain of command to alert them to the problem so that it can be fixed. Sgt. Beall could not provide any explanation for why he did not do anything to resolve this problem (Beall Deposition, p. 59). Likewise, Lt. Williams, who was the one making the announcements during this incident, did not do anything to ensure that the announcements could be heard (Williams Deposition, pp. 107-09).



CSP video 05282020 v.63 at 8:58:24 p.m. MT

59.    On the radio at 9:02 p.m., Lt. Pine reported that they are giving a second set of announcements and that there is no need for a medic. DPD Tac 6 Dispatch Audio Files (DEN 5143 at 2020-05-28_21.02.22_Ch33; AirOne video May 28 (DEN 3840) at 9:02:13-9:02:42 MT).

60.    By around 9:04 p.m., the crowd of protesters had increased to about 200-300. Video evidence does not show any protesters acting aggressively towards the officers (*See, e.g.*, CSP video, 052820 v63.ave; DEN 4023; DEN 4025; DEN 4027; DEN 4030).



CSP 05282020 v.63 at 9:04:34 p.m. MT

61.     At 9:07 p.m., what appears to be a water bottle is thrown from the crowd at the officers (DEN 4035 at 9:07:57 p.m. MT; DEN 4038 at 9:07:57 p.m. MT; CSP video 05282020 v.63 at 9:07:17 p.m. MT).



DEN 4035 at 9:07:57 p.m. MT

62.     At 9:10:43 p.m., Commander Phelan told the officers at 14th and Sherman to deploy gas on the protesters.  On the radio, Commander Phelan told the team at 14th and Sherman, "You're taking rocks and bottles, let's deploy some chemical agent at them please. Dump some gas on 'em" (AirOne video 5/28 (DEN 3840) at 9:10:33-9:10:43 p.m. MT). Multiple videos show DPD deploying canisters of gas and PepperBalls on the protesters (*See, e.g.*, CSP video 05282020 v63 at 9:10:19 p.m. MT; CSP video 05282020 v.29; 9News Video 5-28-2020 1; DEN 4029; DEN 4030).



CSP video 050282020 v63 at 9:10:19 p.m. MT

63.    According to Lt. Williams, he and Lt. Pine made the decision to declare an unlawful assembly (Williams Deposition, pp. 99-100). They decided to declare an unlawful assembly because individuals in the crowd were throwing objects. However, this testimony is inconsistent with the radio communications and video evidence—which indicate that a decision was made to disperse the crowd before any objects were thrown (as noted above, the first object that can be seen being thrown appears to be a water bottle at 9:07 p.m., a few minutes after announcements were purportedly provided). Also, according to Lt. Williams's report, the dispersal order he read using the PA system on a Metro RDV was that the protesters were "in violation of obstructing the roadway and needed to move" (DEN 3019, Lt. Williams Statement). It appears from the video evidence that the vast majority of the protesters were peaceful.

64.    As noted above, the BWC video indicates that the protesters were chanting and noisy and that it was difficult to hear the announcements (DEN 4021). Lt. Williams did nothing to ensure that the protesters could actually hear the announcements, and according to declarations from and depositions of protesters who were present, they did not hear any announcements.

65.    These actions by the DPD and its partners were contrary to generally accepted police practices, standards, and training. The IACP states, "A warning should be issued loudly and often enough to be heard by the entire crowd … To ensure the warnings have been heard throughout the crowd, it is recommended that at least two officers go to the rear of the crowd to verify the warnings are audible" (*Crowd Management: Concepts & Issues Paper*, Fitouri 18374). Another example of insufficient announcements occurred on May 30, 2020 at the intersection of Lincoln and Colfax. Between approximately 5:30-6:00 p.m., there was a large number of protesters at Civic Center station, at the intersection of Broadway and Colfax. (*E.g.*, 9News video, 5-30-2020 7 at 40:58; AirOne video at 5:46 p.m., DEN 3842.)



AirOne video 5/30 (DEN 3842) at 5:38:20 p.m. MT

66.    At about 5:43 p.m., a BWC shows that the DPD attempted to make announcements. (DEN 5008). In Officer Carmody's BWC footage (DEN 5008) at 5:44:46 p.m. MT, an officer tells Officer Carmody that "announcements" will be made and then they were going to throw gas. Moments after that is a low-volume announcement that says, "get out of the street," and "go back to the park," "or you will be arrested," but the scene is very loud with the protesters chanting. It is likely that many or even most of them could not hear the announcement. I see no evidence that officers made any attempt to make sure the protesters could hear these announcements.

67.    At approximately 5:45-5:47 p.m., protesters were pushed south of the intersection by DPD officers using less-lethal munitions and chemical agents (*E.g.*, DEN 5008; DEN 4995; 9News video, 5-30-2020 7 at 1:00:48; Williams Deposition, p. 47). It is my opinion that this use of force was inappropriate and contrary to generally accepted police standards and practices. When officers are going to use force to disperse protesters, they should provide a warning first in all but the most extreme circumstances. In this case, the police did not provide a warning before using force against the crowd. Not only were the announcements apparently inaudible to the protesters, but protesters were not warned that chemical agents would be used. Moreover, and even more egregious, DPD was pushing protesters into a busy street (Colfax) without doing anything to ensure the safety of the protesters (or the drivers). There did not appear to be a clear or strategically defensible reason for dispersing the protesters, particularly into a live intersection. For instance, the video does not show anyone throwing anything at the officers before less-lethal munitions were used on the protesters. Protesters have a First Amendment right to express themselves in a peaceful and nonviolent manner.





AirOne video 5/30 (DEN 3842) at 5:47:29 p.m. MT (annotated)



DEN 5008 at 5:46:54 p.m. MT (annotated)

68.     According to Lt. Williams, the objective at that time was to prevent protesters from accessing a rock pile in the parking lot bordering Broadway and Colfax (Williams Deposition, p. 45). Lt. Williams ordered officers to form a skirmish line across Colfax, stretching from Lincoln to Broadway. He received this direction from Commander Phelan (Williams Deposition, pp. 50-51).



AirOne video 5/30 (DEN 3842) at 6:02:59 p.m. MT (annotated)

69.     From about 6:00 to 8:00 p.m., hundreds of protesters gathered in the park across from the Capitol. Many were crowded in the area of the intersection of Lincoln and Colfax (9 News video, 5-30-2020 7 at 1:01:38-2:14:10 min.). DPD officers (primarily from the gang unit) and Aurora police officers were in the skirmish line at the intersection of Lincoln and Colfax (Sampson Deposition, pp. 82-85; Cunningham Deposition, pp. 83-86). DPD Metro/SWAT officers were also present (*See* DPD and APD BWC video, 5/30). BWC and Colorado State Patrol video shows that during this time period, protesters stood facing the line of officers, chanting, protesting, and holding signs. Some protesters knelt or stood with their hands up. There was an occasional water bottle thrown by someone in the crowd towards the officers (DEN 4988 at 6:56:19 p.m. MT). Although there were some references in some of the officers' depositions to Molotov cocktails, I did not see any video evidence of such items being thrown during this time period and at this location.



9 News video, 5-30-2020 7 (annotated)



CSP video 05302020 v217 at 6:54:25 p.m. MT

70.    Throughout this period, BWC and CSP video shows officers deploying PepperBalls, tear gas, pepper spray, and flash bangs at protesters. On some occasions, the use of force appeared to be in response to a water bottle or other items thrown by someone in the crowd. On other occasions, there was no apparent reason for the use of force. Occasionally, protesters threw items in response to officers using force. Generally, the use of force by law enforcement personnel appeared to be indiscriminate (*See, e.g.*, COABLM 238; COABLM 294; COABLM 297; COABLM 317; COABLM 330; DEN 4976; DEN 4988; DEN 4993; DEN 5017; CSP video 05302020 v88.ave; CSP video 05302020 v211.ave; CSP video 05302020 v217.ave).



DEN 4988 at 6:56 p.m. MT

71.    Many of the Denver Police Department witnesses sought to justify not giving warnings or dispersal order based on exigent circumstances because there was not sufficient time to issue these announcements. For instance, Commander Michael O'Donnell testified in his deposition that the policy contained in the *Crowd Management Manual* "allows for a lot of flexibility" and that officers are given discretion to decide whether a dispersal order is warranted given the dynamics of each situation (O'Donnell deposition, pp. 17-23).

72.    Anytime a police agency establishes a formal written policy, it must decide how much flexibility to incorporate into the policy so that it is able to account for unforeseen circumstances. If a policy incorporates too little flexibility, it may paint officers into a corner when they encounter circumstances that the policy did not account for. If a policy incorporates too much flexibility, it is not an effective tool for regulating behavior. Commander O'Donnell's deposition testimony makes it clear that the DPD's *Crowd Management Manual* is overly flexible and allows officers too much discretion about when to provide warnings or dispersal orders when policing crowd events. This concern is exacerbated by the fact that the DPD does not provide clear training on the factors that must be assessed when deciding whether to declare an unlawful assembly (Knutson deposition, pp. 40-51).

73.    Other DPD officers, including Lt. Canino, and Lt. Williams, uniformly testified that their actions during the GFP were consistent with DPD policy, training, and instructions from the Command Post. None of the DPD leaders or officers observed any use of force by other officers that was inappropriate or inconsistent with department policy or training, and none of them took any actions that they believed were inappropriate or inconsistent with department policy or training.

74.    Based on this testimony and other evidence from the GFP, it is my opinion that, due in part to the amount of discretion and flexibility provided to officers within the DPD's *written* policies (including provisions of the *Crowd Management Manual*), the DPD's *actual* policies can be inferred from how the agency behaves in practice. The DPD's actual policies and practices are what is seen on the BWC and other video from the GFP, as well as what Denver's Rule 30(b)(6) witnesses and numerous DPD officers—from command staff to officers—testified to at their depositions and at trial. That is, the unwritten policy or practice of the DPD was to use force (such as less-lethal munitions and chemical agents) indiscriminately on crowds of protesters without giving appropriate dispersal orders or providing protestors an opportunity to comply with police orders or police direction before force was used on them, and without regard to whether the First Amendment rights of peaceful protesters were violated.

75.    Indeed, Sgt. Eric Knutson testified during deposition that the contents of the *Crowd Management Manual* are not even discussed during DPD's crowd management training for recruits, supervisors, or leaders. The *Crowd Management Manual* is distributed to the officers and they are required to indicate that they received it. However. Sgt. Knutson confirmed that there is no specific training provided to officers or supervisors on the *Crowd Management Manual* (Knutson deposition, pp. 50-56). By not providing training on the *Crowd Management Manual's* contents, the DPD rendered this document as more aspirational than operational. It is incumbent upon police organizations to train their officers how to perform the functions they are expected to perform. Not providing such training is, quite simply, a failure to train.

76.    I have seen no evidence that the Defendant officers involved in the incidents in this case (or the officers involved in the use of force incidents identified by the *Epps* plaintiffs) were disciplined for their use of force against protestors at the GFP. Based on this lack of discipline and testimony from Lt. O'Donnell, Lt. Canino, and Lt. Williams that the use of force during the GFP protests was appropriate and consistent with DPD policy, it is my opinion that the DPD has sanctioned these uses of force.

77.    DPD did not rely sufficiently on crowd management strategies during the GFP to reduce tensions and prevent conflict. Part of the reason for this is that the DPD provided the officers or their supervisors with no training on how to enact the practices described in the *Crowd Management Manual*. Instead, the DPD relied primarily on the use of crowd control tactics. The DPD also did not follow nationally accepted standards or its own written policies regarding warnings and dispersal orders before using less lethal force against crowds. The crowd control approach used by the DPD during the GFP very likely had the effect of inflaming tensions between protesters and police rather than de-escalating tensions and preventing conflict and violence.

78.    To summarize, at the time of the GFP, the DPD did not rely sufficiently on crowd management strategies to reduce tensions and prevent conflict and violence. Instead, the DPD appears to have defaulted to the use of crowd control tactics, including the use of skirmish lines, less-lethal weapons, and arrests in an effort to control the crowds. Moreover, the DPD did not follow nationally accepted standards or its own written policies regarding warnings and dispersal orders before launching chemical agents or less-lethal munitions at crowds. These approaches are deficient in relation to nationally accepted standards and practices in policing, and they are inconsistent with the DPD's *Crowd Management Manual*. Unfortunately, these approaches are consistent with the training reviewed in the previous section, which focused heavily on crowd control and did not train officers sufficiently on either crowd management or crowd control. The crowd control approach used by the DPD at the GFP very likely had the effect of inflaming tensions between protesters and police rather than de-escalating tensions and preventing conflict and violence.

### D.  Inappropriate Use of Force by Outside Police Forces

79.    In light of the size and scope of the racial justice protests that occurred in many communities throughout the United States, the DPD requested the assistance of numerous outside law enforcement agencies during the GFP. By May 30, a large number of officers from outside law enforcement agencies was assisting the DPD (OIM Report, pp. 4-5).

80.    As previously mentioned, according to the OIM, an estimated 150-200 officers worked the GFP on the first day (May 28), 100-150 on May 29, 450-500 DPD on May 30, and 450-500 on May 31 (OIM Report, pp. 2-5).

81.    According to Chief Pazen, DPD supervisors were embedded with every unit from outside agencies, and there were "rules of engagement" provided by DPD to the outside agencies (Pazen Deposition, pp. 29-30, 34). There are multiple reports of officers from these outside agencies participating in the GFP:

- COABLM 231 at 19:19:49: APD Sgt. Brukbacher takes direction from Lt. Williams

- COABLM 330 at 19:07:39: DPD Metro/SWAT Corporal hands APD Ofc. Spano a tear gas canister and tells him to throw it

- COABLM 317 at 18:01:20: APD Sgt. McClelland and Sgt. Brukbacher discuss what the objective or plan is, and Brukbacher says, "It's Denver's call."

- JSCO 14: A Jefferson County SWAT officer wrote in his report, "A Denver Police Lieutenant requested handheld gas to be deployed to disperse the crowd."

- JSCO 16: A DPD liaison directed Jefferson County SWAT where to go

- JCSO After Action Review at p. 4: Capt. Williams verified that Jefferson County use of force policies were "in line" with DPD's use of force policy

- Fitouri 12550-52: Adams County after action memo from Commander Robert Nanney stated that they were assigned DPD liaisons "to give us direction on deployment and maintaining the integrity of the DPD Use of Force directives. It was clarified that they would be directing the response of our team on site for any incident we responded to." (Fitouri 12550.)

82.     The DPD failed to conduct joint training exercises with its mutual aid partners in the months and several years leading up to the GFP. Such training is essential, and recommended by ICS and crowd management experts (IACP, Crowd Management: Concepts & Issues Paper, Fitouri 18375: "Training considerations should include the following … Joint training exercises with other agencies that will likely work together during major events…."). The DPD's failure to conduct joint training exercises with its mutual aid partners was contrary to generally accepted police standards and practices.

83.     According to the OIM, officers they interviewed "often brought up their desire to receive additional crowd control and field force operations training. … training records produced by the DPD's Training Academy … revealed that there has been a decline in the volume and frequency of crowd control and field force training in recent years" (OIM Report, p. 51).

84.     The training provided to DPD officers was inadequate, including for the reasons discussed above. Law enforcement agencies cannot request mutual aid from outside agencies and then not be held responsible and accountable for the behavior of those agencies, including their use of force.. The DPD was responsible for the behavior of these agencies, not merely because it requested mutual aid from them, but also because it (1) made the questionable decision to allow these agencies to use their own use of force policies, which was, in itself, a policy decision; (2) embedded a DPD supervisor with every unit; and (3) provided rules of engagement for the outside agencies to follow.

**E. Use of Inappropriate Crowd Control Tactics**

85.     In addition to not relying sufficiently on crowd management strategies during the GFP, the DPD also relied on a variety of inappropriate crowd control tactics. For instance, although Commander Phelan noted that in his deposition (p. 31) that his principal concern was the safety of the protesters, I could find little evidence substantiating this claim. The DPD engaged in a custom

or practice of using aggressive crowd control tactics during the GFP that unnecessarily endangered peaceful protesters and others who were not committing crimes. Moreover, these tactics very likely had the effect of inflaming tensions and escalating conflict and violence between police and protesters.

86.    Video evidence reveals numerous instances of police using chemical agents and less lethal munitions against peaceful members of the crowd during the GFP. For example, at approximately 8:30 p.m. on May 28, 2020, a group of protesters marched toward and gathered at the District 6 police station at Colfax and Washington (DEN 3850). By 8:29 p.m., the bulk of the crowd was on the south side of the Colfax and Washington intersection. The crowd appears to be impeding traffic flow, but otherwise appears mostly peaceful.





AirOne video May 28 (DEN 3840) at 8:29 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:29 p.m. MT (annotated)

87.    At about this time, Commander Phelan (radio call sign "Adam 9") explained to his team that he wanted to use "less-lethal PepperBall" or "launch some gas" to move the protesters away from the intersection (DPD Tac 6 Dispatch Audio Files, DEN 5143 @ 2020-05-28_20.28.18_Ch33, 2020-05-28_20.28.49_Ch33; AirOne video May 28 (DEN 3840) @ 8:28:18 p.m. and 8:28:52 p.m. MT). There is no discussion on the radio of a plan for providing warnings to the crowd before deploying gas. I have seen no other evidence of any announcements or dispersal orders given before the police deploy less-lethal munitions. And, police did not declare an unlawful assembly before dispersing protesters through use of force (Canino Deposition, pp. 37-38). Officers deployed gas and PepperBalls at protesters.

88.    At 8:33 p.m., DPD formed a skirmish line just north of the intersection. They began deploying large amounts of PepperBall into the intersection, and they advanced the skirmish line south to the intersection. At this time on the radio, Commander Phelan tells his team that he wants to move the protesters southbound on Washington and "just disrupt them there" (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.34.12_Ch33; AirOne video May 28 (DEN 3840) at 8:34:18 p.m. MT.)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:33:48 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:34:34 p.m. MT (annotated)

89.    At about 8:36 p.m., DPD officers on the ground advanced a skirmish line south through the intersection, deploying PepperBall along the way, as seen in Colfax & Washington HALO 05.28.2020 (DEN 3850). Most of the protesters retreated further south. Officers reported over the radio that they were getting rocks thrown at them (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.36.34_Ch33 AirOne video May 28 (DEN 3840)). At 8:36:37 p.m., Commander Phelan directed his officers to deploy gas and instructed them to don their gas masks

(AirOne video May 28 (DEN 3840) at 8:36:44-8:38:13 p.m. MT).



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:35:18 p.m. MT (annotated)



Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:36:06 p.m. MT (annotated)

90.    At 8:38 p.m., officers began deploying canisters of smoke and gas into the intersection (Colfax & Washington HALO 05.28.2020 (DEN 3850) at 8:38:52 p.m.). There is no evidence that any warnings or announcements were given prior to the deployment of gas. For example, no warnings are audible in the BWC videos from officers at this time and location (E.g., DEN 4045).

36





DEN 4045 at 8:39:09 p.m. MT

91.    In my opinion, the DPD's use of less-lethal weapons at this location and time was contrary to generally accepted police practices, standards, and training because there were no warnings given, no attempt to isolate non-peaceful from peaceful protesters, and there was an excessive amount of gas used. Officers also appeared to deploy gas into an active intersection, which is a dangerous and irresponsible tactic without sufficient justification in this case.

92.    Commander Phelan testified at his deposition that DPD's approach is to be "low profile, low visibility," to avoid "confrontation," and to "let protestors take the street" (Phelan Deposition, p. 51). I saw no evidence to back this assertion. His actions were inconsistent with this sentiment. For example, Commander Phelan stated, over the radio, that he wanted to utilize tear gas merely for the purpose of moving protesters out of the intersection. In my experience, that is not a generally accepted use of tear gas.

93.    A similar DPD response was observed on May 28, 2020 at the intersection of Lincoln and Colfax. Between approximately 9:30 and 10:00 p.m., a crowd of protesters had gathered in the area of the intersection of Lincoln and Colfax on the west side of the Capitol. DPD officers had formed an east-west line facing north on Lincoln. HALO Video 1450 Lincoln (DEN 3846).





HALO Video 1450 Lincoln (DEN 3846) at 9:46:01 p.m. (annotated)

94.    The video evidence does not show any objects being thrown at the officers. The crowd appears generally peaceful (DEN 4089; DEN 4090; DEN 4092; DEN 4091). There is live traffic on Colfax behind the protesters.

95.    On the radio, at around 9:47 p.m., Commander Phelan can be heard on the radio instructing officers, "As soon as you get there, launch" and "Actually, throw a smoke first then some chemical right after" (DEN 4092 (radio chatter audible in the BWC); DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_21.47.14_Ch33; 2020-05-28_21.47.20_Ch33). At 9:48 p.m., an officer responds on the radio saying, "We are code six with 'em and we're putting some gas in the crowd" (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_21.48.13_Ch33). At 9:48 p.m., several DPD officers in green fatigues exit a vehicle behind the line of DPD officers and deploy 7-8 canisters of what appears to be tear gas into the crowd of protesters, causing them to retreat north into the live traffic on Colfax.



HALO Video 1450 Lincoln (DEN 3846) at 9:48:19 p.m. MT (annotated)



CSP video 05282020 v88 at 9:47:46 p.m. MT

96.     As in the above referenced event, multiple DPD officers defended this practice based on officer safety concerns because they were being struck by harmful objects such as rocks and bottles. Officers have the right to defend themselves against assault by crowd members, but the appropriate response is not to punish or harm members of the whole crowd based on the violent or destructive behavior of a subset of its members, particularly in the absence of a warning or a dispersal order. The appropriate response is to target the people engaging in violent or destructive behavior, not to "launch" indiscriminate chemical agents into the crowd. My guidebook on policing protests refers to this as a "differentiated" strategy. It is meant to accomplish three key objectives: protecting the First Amendment rights of people who are behaving peacefully, ensuring that peaceful protesters are not injured or killed, and preventing the unnecessary escalation that results when police take enforcement action "against the whole crowd in response to the misbehavior of a subset of its participants."[35] Based on my review of the available evidence, it is my opinion that the DPD failed to apply a differentiated strategy to isolate non-peaceful from peaceful protestors. DPD also relied heavily on chemical agents (like tear gas) and area saturation with PepperBalls, which by their very nature affect peaceful and non-peaceful protestors alike.

97.     If crowd management efforts have failed (or if they have not been attempted) and crowd members are throwing objects at officers, the police have several reasonable alternatives they can employ. They can arrest the offenders, they can use targeted forms of force against the offenders, or they can issue an order instructing the crowd to disperse. Several officers state under deposition that they could not enter the crowd to make arrests because it was unsafe to do so. The less-lethal systems available to DPD officers during the GFP included two targeted forms of force that can be used during crowd events: PepperBalls and 40mm foam baton rounds. The video evidence and depositions both reveal numerous instances of officers targeting individuals using

---

[35] Maguire & Oakley (2020, p. 76-81).

these systems. This approach is appropriate, as long as the use of force is warranted, the rounds strike authorized parts of the body, and the rounds do not strike people who are not engaged in violent or destructive behavior. This standard is consistent with language from the DPD *Crowd Management Manual,* which states that PepperBall and 40mm operators "are responsible for every round they fire" and they must ensure that "innocent persons are not struck unintentionally" (pp. 19-21). However, video evidence reveals numerous instances of officers targeting individuals with these systems who did *not* appear to have engaged in any violent or destructive behavior. Furthermore, several officers stated under deposition that aggressive protesters were purposely hiding behind peaceful protesters who were located on the front lines of the protests (*see, e.g.*, 2021 Valentine deposition). This made it difficult for them to target the aggressive protesters with less lethal projectiles.

98.     When being assaulted by protesters throwing objects at them, if officers were unable to arrest or use targeted force against the offenders, the remaining option was to issue a dispersal order, provide clear instructions about what route people should take when exiting the area, and give the crowd sufficient time to follow police orders to disperse. That approach is consistent with nationally accepted police standards for dispersing a crowd peacefully when officers are under assault and do not have other options available for stopping the assault. Once people have been ordered to disperse, police confirm that the order is sufficiently loud for the whole crowd to hear it, and the crowd members have been given sufficient time to follow the order, police then have a reasonable justification for using more indiscriminate forms of force against the entire crowd. At that point, consistent with the British "no surprises" approach, crowd participants have been given the information they need to make an informed decision about whether to comply with police orders. My review of the video evidence in this case, as well as the depositions, indicates the officers did not follow this approach to dispersing crowds. Instead, police routinely used chemical agents and flash-bang grenades (also known as noise-flash diversionary devices, distraction grenades, or stun grenades) to disperse crowds either without any warning or order to disperse, or without sufficiently audible warnings or orders to disperse, and without providing protesters information about where the police wanted them to go.

99.     Furthermore, video evidence reveals numerous instances of police striking people in the head or other vulnerable areas with projectiles during the GFP. For example, a protester behaving peacefully was shot in the face with a 40mm round (*see* video DEN4136 and Sgt. Abeyta deposition, pp. 101-22), another was hit in the head with a tear gas canister (*see* declarations of plaintiffs Deras, Fitouri, and Parkins), and another was struck in the groin by a 40mm round (*see* video Fitouri 228). Yet another protestor, Ambrose Cruz, alleges that he was shot in the eye with PepperBall rounds (*see* Cruz First Amended Complaint ¶¶ 73- 113). The DPD *Crowd Management Manual* states that police should not deploy PepperBall or 40mm rounds to the head, eyes, throat, neck, or genitalia, or other vulnerable areas unless deadly force is warranted (pp. 19-21). This policy is consistent with medical research evidence showing that kinetic impact projectiles can cause death or serious injury when they strike vulnerable areas.[36] I have seen no evidence that the

---

[36] Haar, et al. (2017), note 17; Hiss, J., Hellman, F.N., & Kahana, T. (1997). Rubber and plastic ammunition lethal injuries: The Israeli experience. *Medicine, Science, and the Law*, 37(2), 139-144; Mahajna, A., Aboud, N., Harbaji, I., Agbaria, A., Lankovsky, Z., Michaelson, M., Fisher, D., & Krausz, M.M. (2002). Blunt and penetrating injuries caused by rubber bullets during the Israeli-Arab conflict in October, 2000: A retrospective study. *Lancet,* 359(9320), 1795-1800; Rodríguez et al. (2021), note 20.

officers who fired these rounds were disciplined for violating departmental policy and placing protesters at risk for serious injury or death. The DPD's failure to discipline reveals its actual policies and practices. Commander O'Donnell testified at his deposition that officers who violate policy are disciplined and those who do not are not disciplined.

100.     Video evidence also reveals numerous instances of police pushing crowds into active intersections or firing chemical agents or impact munitions into intersections. For example, on May 30, 2020, at approximately 5:50 p.m. in the vicinity of the intersection at Lincoln and Colfax, the BWC produced as DEN 5055 shows an individual asking a group of officers, "do you guys enjoy being tyrants?" The officer tells him to "get back" and fires PepperBalls at him. The individual was almost run over twice by cars as he was walking away and being shot in the back with PepperBalls. This same incident can be seen in the BWC video produced as DEN 5008 (*see also,* DEN 3850 and DEN 4045).





DEN 5008 at 5:50:13 p.m. MT



DEN 5008 at 5:50:14 p.m. MT



DEN 5008 at 5:50:15 p.m. MT



DEN 5008 at 5:50:17 p.m. MT

101.    Police officers are obligated to look out for the safety of the crowds they are seeking
to move or disperse as well as the safety of other people who happen to be in the area. These ill-
advised practices endanger drivers passing through the intersections as well as protesters. I have
seen no evidence that officers who were responsible for pushing people into active intersections
or firing less lethal weapons into intersections were disciplined for violating departmental policy

and placing protesters and others at risk for serious injury or death.

102.    DPD and other police agencies present at the GFP in Denver relied on indiscriminate impact munitions during the GFP, including Rubber Ball Grenades (see Mitchell deposition, pp. 83-84) and Sting-Ball Grenades (see Commander Redfearn deposition). These grenades are thrown by hand and they project rubber balls or pellets for approximately a 50-foot radius. Because the projectiles cannot be aimed, they place crowd members at risk for serious injury or death. I saw no evidence of DPD officers being trained in the use of these impact munitions. The OIM report quotes the manufacturer of one of these devices: "rubber-ball grenades can result in serious bodily injury and should only be deployed by officers who have received specialized training" (OIM report, p. 34). Moreover, due to the risk of injury, the manufacturer recommends that these grenades be used as a last resort when chemical agents and other types of impact munitions have failed to achieve their objective. Because these devices cannot be carefully aimed, and because they spread their payload indiscriminately, they run the risk of injuring and endangering not only people who are engaging in violent or destructive behavior, but also people who are behaving peacefully and lawfully. I agree with the OIM's conclusion, which states that if these devices are to be used for crowd control, "it is incumbent on the DPD to regulate their use with clear and explicit policy, which it did not do before the GFP" (OIM report, p. 35).

103.    In one egregious incident that occurred on May 31, police trapped protesters between two lines of officers and fired chemical agents and impact munitions at them from both sides (see depositions of Sergeant Abeyta, Sergeant Beall, and Commander Redfearn). Chief Stamper discussed this incident in detail in his expert report, so I will not restate the details here. I concur with his assessment that this use of kettling or encirclement tactics was "contrary to generally accepted police practices and standards" and violated the constitutional rights of protesters.

104.    Corporal Richard Eberharter testified at deposition that Metro SWAT deployed flash-bang grenades and Sting-Ball grenades[37] during the protests although they had not been provided with any training on the proper use of these devices in protests or other types of crowd events (Eberharter deposition, pp. 101, 116-117). Moreover, both Corporal Eberharter and Mr. Ryan Grothe testified that neither device is mentioned in the DPD's *Crowd Management Manual* (Eberharter deposition, pp. 140-141; Grothe deposition, pp. 17-21, 47).

105.    One theme that emerged several times from the depositions was the idea of police using crowd control formations and less lethal weapons as a form of communication with crowds. It is well known that communication has both verbal and nonverbal components, so it is possible to communicate nonverbally in both interpersonal and intergroup settings.[38] However, I have serious reservations about the disjuncture between the nonverbal messages the DPD thinks it is

---

[37] https://www.combinedsystems.com/cts-flash-bangs-sting-ball-grenades

[38] Interpersonal communication takes place between individuals. Intergroup communication takes place between representatives of different groups. There is a large body of research on intergroup communication. Some of that research focuses on the intergroup dynamics between police and members of the public. For more information about the application of intergroup communication to the police, see: Giles, H., Maguire, E. R., & Hill, S., Eds. (2021). *The Rowman and Littlefield Handbook of Policing, Communication, and Society*. Rowman & Littlefield.

sending and how those messages are likely received by protesters.

106.    Below are four instances in which DPD officers discussed the use of formations or less-lethal weapons as forms of communication with protesters.

a.    When asked if an individual who had been shot by a less lethal munition had been given orders to move back, Corporal Richard Eberharter responded, "well, with the deployment of all the CS gas, I would assume he would have understood that" (Eberharter deposition, p. 111).

b.    Sergeant Eric Knutson testified that with "with the PepperBall, we can actually lay a line to let the crowd know area denial… But area denial, letting a crowd know, just don't go past here" (Knutson deposition, pp. 47-48).

c.    Sergeant Eric Knutson testified that "we also include in the training that it may be appropriate for officers to line up and show force in order to let the crowd know, this is your time to leave and to get that point across as well" (Knutson deposition, p. 50).

d.    Commander Michael O'Donnell testified that when using the PepperBall in area denial mode [in which the officer fires the projectile into the ground] "it's a signal, a visible deterrence to push back."

107.    Nonverbal cues and signals are a crucial component of effective communication, but they are not a *replacement* for verbal communication. In these four instances, DPD officers made faulty assumptions about how crowds would likely respond to their cues and signals. A more appropriate approach would have been to tell the crowd precisely what the police wanted them to do.

108.    Some additional examples are as follows:

109.    On May 30, 2020, at 7:09 p.m., at the intersection of Lincoln and Colfax, protester Youssef Amghar was shot with PepperBalls while standing on a sidewalk with their hands up. (Amghar Declaration; DEN 5017; DEN 5047). Video does not show Amghar engage in any "physical action" that "attempts to prevent an officer's control." Nor are any warnings or dispersal orders heard on the videos. There does not appear to be any reason that warranted shooting Amghar with PepperBalls at this time and location.





110.    On May 30, 3030 at 7:17 p.m., at the intersection of Lincoln and Colfax, Elisabeth
Epps was struck in the face with a PepperBall while filming with her cell phone (BLM_00001021
at about 52:50-53:27). Officer Valentine was firing several rounds from his PepperBall gun in
Epps' direction at the time that Epps was struck in the face, as Epps was standing behind a different

47

individual that threw an object in the direction of Officer Valentine (DEN 5028; 2021 Valentine Deposition, pp. 84-86, 92, 100-101).



DEN 5028 at 7:17:00 p.m.



BLM_00001021 (Video taken by Epps) (53:58)

111.    On May 30, 2020, between 6:00-8:00 p.m., officers in the skirmish line at the
intersection of Lincoln and Colfax repeatedly shot PepperBalls at protesters who did not appear to
be engaged in any "physical action" that "attempt[ed] to prevent an officer's control" (See BWC
videos from DPD and APD officers).

112.    According to the declarations and depositions of several *Epps* plaintiffs and other
witnesses, there were numerous occasions on which police shot PepperBalls at protesters without
warning and not in response to any "physical action" by protesters that "attempt[ed] to prevent an
officer's control" Sannier Declaration, ¶¶ 8, 10, 13; Duran Declaration, ¶¶ 6-10, 14-16; Fitouri
Declaration, ¶¶ 5, 7-11; Parkins Declaration, ¶¶ 5-12; Taylor Declaration, ¶¶ 9-13; Amghar
Declaration; Deras Declaration, ¶¶ 5-6; Blades Declaration, ¶¶ 11, 17; Helmick Declaration, ¶ 18;
Sanchez Declaration, ¶¶ 31-32, 35, 39-40; Stebleton Declaration, ¶¶ 6, 11, 16; Kelly Declaration,
¶¶ 4, 7, 19, 22).

113.    In some instances, officers shot individuals who were dispersing. (E.g., DEN 5109
at 9:44:57 p.m. MT; Sanchez Declaration, ¶ 31; Helmick Declaration, ¶ 18).

114.    Officers shot credentialed members of the press. (Duran Declaration, ¶ 7.)

115.    On May 30, 2020, at approximately 6:54 p.m. at the intersection of Colfax and
Lincoln, BWC produced at DEN 4988 shows an officer deploying pepper spray on an individual
without warning. The individual was slowly approaching the officers asking, "which one of y'all
shot me?" The officer told this individual to back up, and when he did not immediately comply,
the officer deployed a significant amount of pepper spray directly into his face without warning.
(DEN 4988). There was no attempt to de-escalate. This incident is also visible in the videos
produced at DEN 4976; CSP video 05302020 v217 at 06:54 p.m. MT; Channel 9 News video 5-

49

30-2020 7 at 02:05:30-02:06:02 min.



DEN 4988 at 6:54:31 p.m.

116.    On May 30, 2020, at approximately 6:56 p.m., while a group of people were tending to the man who had just been pepper sprayed at the intersection of Colfax and Lincoln in the incident described in the preceding photograph, an individual standing on the corner threw a water bottle at the group of officers standing there. In response, the officers showered everyone on the corner with pepper spray, PepperBalls, and various other less-lethal munitions.



DEN 4988 at 6:56:22 p.m. MT (annotated)



DEN 4988 at 6:56:25 p.m. MT

117.    On May 30, 2020, at approximately 7:34 p.m. in the vicinity of the intersection of
Colfax and Broadway, Stanford Smith was pepper sprayed in the face while he was walking
peacefully in front of a line of officers with his hands raised in the air. The BWC produced at DEN
5044 shows this incident, as does the video produced by the Colorado State Patrol at 05302020
v88 at 07:32:30-07:34:16 p.m. MT.



DEN5044 at 7:34:14 p.m. (annotated)

118.    On May 30, 2020, at approximately 8:20 p.m. in the vicinity of 14th and Broadway, police officers were marching in a line and moving protesters as they moved, and deploying pepper spray on individuals without warning when they were not moving fast enough. The BWC produced at DEN 5034, for example, shows an officer telling a woman to "move out," and "you're making no point, just go," "just keep going," and "it's not worth it." When the woman did not back up fast enough, an officer pepper sprayed her without warning (DEN 5034).



DEN5034 at 8:20:38 p.m.

119.    The BWC produced at DEN 5095 shows that on May 31, 2020, at approximately 9:18 p.m. in the vicinity of the intersection at Colfax and Emerson, officers deployed multiple

flash bang or other explosive grenades (at least two) on a group of protesters without warning. (DEN 5095.) This incident can also be seen in the videos produced at DEN 5113, Fitouri 228, and DEN 3878 (HALO), and the 9News Video 5-31-20 4.



DEN 5095 at 9:18:20 p.m. MT (first flash bang or explosive)



DEN 3878 at 9:18:21 p.m. MT (first flash bang or explosive)



DEN 3878 at 9:18:36 p.m. MT (second flash bang or explosive)



Fitouri 228 (first flash bang or explosive)



9News Video 5-31-20 4 (first flash bang or explosive)



9News Video 5-31-20 4 (second flash bang or explosive)

120.    The BWC produced at DEN 5110 shows that on May 31, 2020, at approximately 9:10 p.m. in the vicinity of Colfax and Washington, an officer threw a rubber ball blast grenade without providing any warning (DEN 5110). The DPD officers on the line in front of this officer

turned around and yelled "woohoo" after he threw the grenade. This type of inappropriate behavior by officers escalates tension and conflict and should result in disciplinary action against the officers involved.



DEN 5110 at 9:09:33 p.m. MT



DEN 5110 at 9:09:35 p.m. MT



DEN 5110 at 9:09:44 p.m. MT

121.    My review of the evidence reveals a tendency among the DPD and its partners not to issue warnings or dispersal orders before using force against protestors or crowd members. DPD officers frequently justify this approach based on exigent circumstances such as protesters throwing objects at police officers. Within the DPD, there was a widespread custom or practice of firing chemical agents and kinetic impact munitions at crowds in the absence of warnings or orders to disperse. Officer Valentine testified that his failure to give a warning was consistent with DPD policy and training (7/8/22 Valentine deposition, pp. 83-84).

122.    Some of the depositions confirm that the DPD often doesn't see the need for, or the opportunity to, issue verbal warnings or dispersal orders before using force against crowd members. At the same time, I see a tendency among DPD officials to view formations and less lethal weapons as nonverbal forms of communication with protesters. There are two major problems with this approach.

123.    First, conventional best practice is for police to communicate with crowd members before, during, and after crowd events. This verbal communication is intended to help build trust, avoid misunderstandings, and de-escalate tensions. Verbal communication is one of the principal tools for avoiding conflict and violence during protests and other crowd events.[39] The most innovative and evidence-based approaches to policing protests and other types of crowd events rely heavily on dialogue between police and protesters.[40] Choosing not to communicate verbally

---

[39] Maguire and Oakley (2020), note 1.

[40] Stott, C., Scothern, M., & Gorringe, H. (2013). Advances in liaison based public order policing in England: human rights and negotiating the management of protest? *Policing: A Journal of Policy and Practice*, *7*(2), 212-226.

with crowd members is a recipe for misunderstandings and conflict.

124.    Second, there is usually a large gap between the nonverbal messages police think they are sending at protests and the way crowd members perceive those messages. For instance, police often don riot gear to protect themselves and remain safe, but protesters usually perceive officers putting on riot gear as an act of escalation.[41] Similarly, in the examples given above, police are seeking to communicate to protesters that they should step back or leave the area altogether. However, based on my experience interviewing and surveying protesters, I believe these nonverbal cues send a very different message to protesters. The use of formations, PepperBalls, and CS gas most likely communicates to protesters that police are escalating and looking for a fight. The principal mode of communication when policing protests should be verbal. Nonverbal communication can certainly play a role, but police need to think very carefully about the message they are trying to send and how it is being received by others who have a different worldview than theirs. Less lethal weapons should not be treated as a substitute for genuine dialogue.

## F. Insufficient Internal Controls for Addressing Officer Misconduct

125.    As pointed out by Chief Stamper in his expert report, the DPD appears to have "circled the wagons" and sought to shield its officers from discipline for misconduct that occurred during the GFP. I reach this conclusion for several interconnected reasons. First, my review of the video footage from the GFP identified numerous inappropriate uses of force against peaceful protesters who were not given any warning or order to disperse. Moreover, I have not found any evidence that the officers involved in these inappropriate uses of force were ever disciplined.

126.    Second, as noted earlier, several protesters were struck with impact munitions in vulnerable parts of the body – such as the head – where the projectile could have caused serious injury or death. Once again, I have not found any evidence that the officers involved in these inappropriate uses of force and violations of DPD policy were ever disciplined.

127.    Third, video footage from the GFP reveals numerous instances of officers not behaving with an appropriate professional demeanor. For instance, one officer called a protester a "fucking faggot" (see DEN 4995). Another celebrated a peaceful protester being shot in the face with a 40mm round by yelling, "Motherfucker! That's what you get! Fuck you!" (DEN 4136 @ 7:23 p.m.). Another said, "that was fun" after throwing tear gas at protesters (COABLM 402 @ 20:47:22). Yet another officer taunted a protestor about his injured eye, saying "It looks like your wife beat you" (see Cruz First Amended Complaint ¶ 103). These utterances are contrary to professional standards in policing and the DPD's own *Crowd Management Manual*, which states, "personnel must maintain a professional demeanor, despite unlawful or anti-social behavior on the part of crowd members" (p. 8). When officers behave in this manner, they diminish the perceived legitimacy of the police and promote conflict rather than de-escalating it. I have seen no evidence of any DPD officers being disciplined for these types of inappropriate and unprofessional behaviors.

128.    Fourth, some officers seem to have tried to escape accountability for their actions during the GFP. As highlighted in the OIM report, officers were often observed not displaying

---

[41] Maguire and Oakley (2020), note 1.

their badge numbers or other identifying information, thereby making it difficult to identify them in case of allegations of misconduct. Hiding badge numbers and names is a well-known strategy used by police officers during civil disturbances to promote anonymity and avoid accountability. This is contrary to nationally accepted policing practices and standards promoted by police professional bodies such as the International Association of Chiefs of Police[42] and the Police Executive Research Forum.[43] Moreover, officers were often either not wearing their BWC or had their camera deactivated (see OIM report, p. 20). Evidence from video footage and depositions revealed several incidents in which officers seemed to deactivate their BWCs immediately prior to using force against protesters, contrary to nationally accepted policing practices and standards. The net effect of officers concealing their identity and not activating their body cameras was to escape accountability for their actions during the GFP.

129.    Fifth, as articulated in detail in Chief Stamper's expert report, the DPD has not provided adequate or timely investigation of complaints against officers. Investigations into many of the complaints had still not been completed more than a year after the GFP, and the DPD appears to have issued "decline letters" in an overly casual manner, even in instances where the evidence appears to support the allegations. I agree with Chief Stamper's conclusion that the handling of these cases by Internal Affairs does not "show any serious attempt by the DPD to investigate citizen complaints of use of force during the DPD" (Stamper report, p. 51).

130.    There were several incidents during the protests in which officers seemed to deactivate their BWCs immediately prior to using force against protesters, contrary to nationally accepted policing practices and standards. The net effect of officers not wearing or activating their BWCs (and in some cases concealing their identities as well) was to avoid accountability for their actions during the GFP.

131.    For instance, Corporal Richard Eberharter testified at deposition that he and his fellow Metro/SWAT officers did not wear BWCs during the protests for officer safety reasons (Eberharter deposition, pp. 53-54). This is not a credible argument and it is inconsistent with national standards for police transparency and accountability. There are certain functions in policing, such as undercover work, that raise genuine officer safety issues associated with wearing BWCs, but responding to protests is not one of them. There are some occasions on which a SWAT team will have a credible interest in keeping its tactics private to preserve officer safety, but the most appropriate way of addressing that issue is to tag BWC videos with sensitive content to prevent them from being released.

132.    Corporal Eberharter further noted that Metro/SWAT team members are not required to wear BWCs during tactical operations, but that they are required to wear them when engaging in patrol-related functions. He testified that the decision to treat the protests as a tactical situation (rather than a patrol function) was made by somebody other than him. When asked about how the decision was made to treat their response to the protests as a tactical deployment, he responded: "that's what we are, tactical officers… if we're deployed, we deploy tactically"

---

[42] International Association of Chiefs of Police (2019). *Crowd Management Model Policy*. IACP Law Enforcement Policy Center.

[43] Police Executive Research Forum (2015). *Lessons Learned from the 2015 Civil Unrest in Baltimore* (p. 57). https://www.policeforum.org/assets/2015baltimorecivilunrest.pdf

(Eberharter deposition, pp. 56-57). This is a circular argument that lacks credibility. It suggests that Metro/SWAT officers never need to wear body cameras because they are always engaged in tactical operations. The fact that the entire team deployed without BWCs represents a serious management failure that appears engineered to ensure that officers would not be held accountable for their actions.

133.     The International Association of Chiefs of Police (IACP) *Model Policy on Body-Worn Cameras* states that "officers shall activate the BWC to record all contacts with citizens in the performance of official duties."[44] All police officers working at the GFP, including the members of Metro/SWAT, should have worn their BWCs throughout the protests. They also should have had their BWCs activated during any contacts with members of the public, especially contacts that involved arrest and/or the use of force.

134.     Sergeant Eric Knutson testified at deposition that when the DPD first obtained BWCs, the Department provided training on the technical aspects of how to use the cameras. However, there is not currently any training provided to officers on the BWC policy including issues like when officers are required to activate the camera. Furthermore, he noted that there is no specific policy or training on when officers are supposed to activate their cameras during protests. In general, officers are supposed to activate their cameras "anytime they're taking enforcement activity" (Knutson deposition, p. 70).

135.     Given the widespread lack of compliance with the DPD's *formal* BWC policy (see DPD *Operations Manual*, DEN001337-DEN001346), the DPD's *informal* policy during the protests appears to have been that officers did not have to activate their BWCs when making arrests or using force. Officer Valentine confirmed that this was his understanding (7/8/22 Valentine deposition, pp. 45, 47, 98-100). Officer Jossi noted that "there was some confusion" about when officers were supposed to activate their BWCs during the protests (7/5/22 Jossi deposition, p. 42). Neither officer was disciplined for failing to activate their BWCs during the protests.

136.     With regard to protests, Sgt. Knutson testified that if officers are standing in a skirmish line and nothing is happening, they do not need to activate their BWCs. However, if they are dealing with a violent crowd or people are approaching the line, officers would be required to activate their BWCs. Sgt. Knutson trains officers that when they are taking enforcement actions or using force against civilians, they should have their BWC on (Knutson deposition, pp. 69- 78).

137.     Sgt. Knutson's testimony about when BWCs should be worn and activated is consistent with nationally accepted police standards and practices and with the IACP's Model Policy on Body- Worn Cameras. However, many DPD officers did not follow this protocol during the GFP. Moreover, the DPD did not discipline the officers who violated this protocol, thereby sending a clear message to officers that they can disregard it with impunity. The DPD's failure to require officers to activate their BWC during protests represents a serious management failure that once again appears engineered to help officers avoid accountability for their actions during the protests.

138.     Another mechanism that police agencies rely on to improve accountability and

---

[44] https://www.theiacp.org/sites/default/files/all/b/BodyWornCamerasPolicy.pdf

control misconduct is to establish standardized reporting procedures for documenting discretionary decisions like arrests and/or use of force. For example, ensuring that officers file timely, accurate, and sufficiently detailed use of force reports is an important way for police leaders to track the use of force by officers and to hold officers accountable for their actions.

139.     Unfortunately, the DPD's use of force reporting procedures during the GFP were confusing and chaotic. By not creating and communicating clear reporting procedures for officers to follow during the protests, the DPD defeated its own ability to hold officers accountable for their actions. Without proper use of force reports, the Department lacked sufficient information to conduct thorough, professional internal affairs investigations into allegations of excessive force by officers. The absence of use of force reports and witness statements, coupled with the lack of BWC footage, served to obscure officer actions during the protests and impede any reasonable attempt to review use of force incidents.

140.     Corporal Richard Eberharter from Metro/SWAT testified at deposition that officers were not required to fill out use of force reports because they didn't have time due to "everything that was going on." He used the PepperBall gun during the first five days of the protests and did not document any instances of its use in any officer statement unless he took the person into custody. He testified that when he struck people in the lower legs with a PepperBall, or when he used the PepperBall for area denial [in which the officer aims the projectile at the ground in front of people], he was not required to file a report documenting the use of force. (Eberharter deposition, pp. 49-50).

141.     Contrast Corporal Eberharter's testimony with that of Commander Michael O'Donnell, who testified at deposition that officers completed all necessary reports following the use of force during the George Floyd protests. He noted that when officers use less lethal force, they fill out "a use of force report, which also acts as his statement or her statement." Commander O'Donnell served as lieutenant in the gang unit during the protests. He testified that each of his officers completed use of force statements for each use of force during the protests, and that he then reviewed those statements (O'Donnell deposition, pp. 34-36). He later testified that an officer who deployed less lethal force would be required to complete a use of force report, and that "any additional officers that were in close proximity would provide witness statements." He then noted it "would be a policy violation if the officer deployed less lethal and did not complete those reports." If an officer did not prepare a statement, "the officer would face discipline… he is required by policy and procedures to report that and articulate the need and rationale for utilizing less lethal. So the officer would be subject to discipline" (O'Donnell deposition, pp. 58-59). Notably, during the GFP, Commander O'Donnell was a lieutenant in the gang unit. Two officers serving in that unit – Officers Valentine and Jossi – deployed PepperBalls and pepper spray when engaging with protestors. Neither officer completed a use of force report or a witness statement relating to the incidents. To my knowledge, neither officer was disciplined for failing to submit these required reports. Thus, Commander O'Donnell's statements during deposition are clearly inaccurate.

142.     Sergeant Eric Knutson testified at deposition that officers are typically required to fill out a use of force report when they use force, but in a crowd control scenario, the report may be a "blanket" report that is filled out at the squad level. He acknowledged that these atypical use-of- force reporting procedures are not discussed in the crowd management training that the DPD

provides for recruits and for leadership. Sgt. Knutson testified that officers have to remember and report every round that they fire from the PepperBall gun. This requirement applies to both individual and blanket use-of-force reports (Knutson deposition, p 68). Every officer who used or witnessed force is required to complete a statement about what their actions were and what they saw, then these individual statements are used as a basis for completing a squad-level blanket report (Knutson deposition, p. 81).

143.    In his deposition, Commander Hans Levens quoted the DPD *Operations Manual* (section 105, subsection 9) about use of force reporting requirements. "With authorization of the chief of police or designee, the multiple use of chemical munitions in response to defensive resistance during large scale events may be documented with a single use-of-force report." One of the issues in this case is that officers delayed filing individual use of force statements because they believed there would be one overarching report written. However, this was a misunderstanding because, according to the policy quoted by Commander Levens, the only use of force that results in a blanket report being written is the use of chemical munitions. All other types of force require the standard individual-level police use-of-force reports. The blanket reporting policy does not cover 40mm munitions, noise-flash diversionary devices (flash-bangs), or Sting-Ball/Stinger grenades. He testified that nobody was disciplined for the failure to document their use of 40mm launchers or any other use of force during the protests (Levens deposition, pp. 60-62).

144.    The IACP *Model Policy on Reporting Use of Force* states that "the authority to use force carries with it the need for accountability in order to safeguard the rights of the public and to preserve the integrity of the law enforcement agency and the jurisdiction that provides this authority."[45] Timely and accurate use-of-force statements are crucial for transparency, accountability, and legitimacy.

145.    The *IACP Model Policy on Crowd Management* states that "Use-of-force reporting requirements apply equally to policing demonstrations and civil disturbances. It is very important for law enforcement agencies to document and investigate uses of force during these events, not only for managerial and accountability reasons, but also to respond effectively to potential complaints alleging excessive force following an event."[46]

146.    Commander Michael O'Donnell testified at deposition that disciplinary action can be preventative because "if an officer violates a particular policy and they're disciplined for it, other officers are going to learn from that as well." (O'Donnell deposition, p. 14). This same logic can be applied in reverse. If officers violate policy and they're not disciplined for it, they will learn that they can sidestep accountability measures and can get away with violating policy.

147.    Commander Hans Levens testified that DPD's internal affairs ("IA") division received a total of 123 complaints associated with the police response to the GFP (Levens deposition, p. 34). Most of these resulted in "decline letters" because the officers could not be identified. Part of the reason that officers could not be identified during these investigations was

---

[45] https://www.theiacp.org/sites/default/files/2020-06/Reporting%20UoF%20June%202020.pdf

[46] https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-
%2008062020.pdf

that many of them had not activated their BWCs and/or had not filed use of force reports.

148.    I also reviewed documents from the IA investigation files that were opened and closed relating to the GFP. This information reveals:

149.    IA investigations can be initiated in several ways. (Levens Deposition, pp. 16-21.) There is no apparent consistency in the manner in which certain citizen complaints are referred for investigation. For example, some state law notices of tort claims are referred by the City Attorney's Office to DPD's Internal Affairs Bureau (IAB) for investigation, but others are not. (Levens Deposition, pp. 18-21, 25.) IAB Commander Dodge decides what to investigate, and nothing circumscribes her discretion in this area (Levens Deposition, p. 30).

150.    There is no policy that describes how IAB investigators go about investigating citizen complaints (Levens Deposition, p. 31).

151.    There were 123 complaints filed by citizens or initiated internally that alleged officer misconduct at the GFP (Levens Deposition, p. 34).

152.    As of November 4, 2021 (the day before Levens' deposition), there were 12 cases still open (Levens Deposition, pp. 34-35).

153.    Levens could not say how long those have been pending but his best estimate was that, on average, complaints from the GFP took 7 months to complete (Levens Deposition, pp. 35-36).

154.    Of all the complaints from the GFP, two officers (Streeter and Archuleta) were disciplined for inappropriate use of force, one sergeant (O'Neill) was disciplined for failure to activate his BWC, and one probationary officer (McClay) was fired (Levens Deposition, pp. 39-47).

155.    Although a single officer (Sgt. Ed O'Neill) was, according to Levens, disciplined for failure to activate his BWC, there were other instances of inexplicable or apparent failure to activate BWCs during the GFP that were not investigated.

156.    For instance, one complainant, Huitziloxochitl Jaramillo (IAB case number P2020-0174), alleged that during the course of her arrest for violating the emergency curfew, the arresting officer tackled her to the ground, fracturing her wrist. She was also called "a piece of sh*t" several times. (DEN031610.) The IAB identified the arresting officer as Officer Adam Bolton. When asked during his interview whether he activated his BWC for the incident, Bolton stated, "I thought I did activate my BWC but could not find the BWC video after the notice of complaint" (DEN031642). When asked if he used force on the complainant, he said, "I don't recall…." (DEN031642). When Officer Bolton's sergeant, Sgt. Vince Lombardi, was interviewed, he stated, "I did not witness the arrest" but "Officer Bolton was extremely professional." (DEN031647). IAB credited Bolton and Lombardi's statements, even though it is incredible for Sgt. Lombardi to say both that he did not witness the arrest and that Officer Bolton was "extremely professional" during that arrest. Even Commander Levens agreed that he "has questions" about how Sgt. Lombardi could say both (Levens Deposition, pp. 50-51). The letter written by Lt. Addison on behalf of the IAB declining Ms. Jaramillo's complaint for further review credited the statements of Officer

Bolton and Sgt. Lombardi (DEN031598). It concluded, "there is no evidence found to support your allegations against the officer. Further, there is no reason to suspect that the officer violated any department policy or acted in such a manner that would be considered inconsistent with their training." (DEN031598.) Officer Bolton was not disciplined either for the alleged use of force or his failure to activate his BWC (Levens Deposition, p. 52).

157.    Levens agreed that, if Officer Bolton's BWC had been activated during the arrest, then there would be some evidence either corroborating or disproving or discrediting Ms. Jaramillo's allegations (Levens Deposition, p. 54).

158.    Officer Bolton did not complete a use of force report for his arrest of Ms. Jaramillo. This was within Denver policy because that policy requires the completion of a use of force report only if an officer uses force. And because Bolton said he did not use force, he did not have to complete a report, pursuant to policy (Levens Deposition, pp. 57-58). Levens testified that if an officer believed he had not used force to effectuate an arrest, then Denver policy did not require him to complete a use of force statement (Levens Deposition, p. 58). Bolton did not violate the use of force reporting policy, the BWC policy, or any other policy of Denver (Levens Deposition, pp. 58-59).

159.    Numerous "decline" letters were written to citizens who complained about officers' use of force and misconduct arising from the GFP (See IA files). Levens agreed that many of these letters were issued on the basis that no officer could be identified. Because no officer could be identified, no specific disciplinary action against any particular officer could be pursued (Levens Deposition, p. 54). Levens also agreed that two of the major methods for identifying officers is through a use of force report (or any other statement that documents exactly what they did) or, if they had their BWC activated, video evidence of what they did (Levens Deposition, pp. 54-55).

160.    Levens testified that, pursuant to Denver policy, individual officers working the protests were not required to complete individual use of force reports for their use of force, including the deployment of any chemical munitions or less-lethal weapons (Levens Deposition, p. 60).

161.    Denver had no policies regarding use of NFDDs or Stinger grenades or reporting or documenting the use of NFDDs or Stinger grenades (Levens Deposition, pp. 61-62). Nor is there a policy, other than that contained in the department's general use of force policy, on how to document the use of 40 mm during the protests (Levens Deposition, pp. 63-64).

162.    No one has been disciplined for the failure to appropriately document their use of force during the protests (Levens Deposition, pp. 63-64).

163.    Denver reviewed the incident of Officer Bishop pepper spraying an individual in the face at the intersection of Lincoln and Colfax on May 30, 2020 and concluded that Bishop's actions were within policy and training. Bishop was "exonerated" (Levens Deposition, pp. 67). My opinion of this incident is that the use of pepper spray was inconsistent with generally accepted police practices (see 7/29/21 Report, Paragraph 95). Further, DPD made no attempt to deescalate the situation.

164.    Many of the letters issued by the IAB in the IA files concluded that the actions of

DPD officers during the GFP were consistent with the department's training and use of force policy (See IA files). The IAB reached these conclusions by viewing HALO and/or BWC video. There were no interviews conducted for many of the IA files. Nor, apparently, did investigators visit the various locations for witness canvassing and or potential evidence gathering.

165.    For instance, IAB case number SVC2020-0030 contains a collection of numerous citizen complaints. Most of them appear to concern DPD's use of force on protestors on May 30, 2020 at Lincoln and Colfax, between approximately 5:00-8:00 p.m. (See complaints in IA file SVC2020-0030). The letters written by IAB to the complainants contain materially similar language, and all or nearly all of them conclude that, based upon IAB's review of HALO and BWC footage, "…these evidentiary facts, the deployment of crowd control munitions, including chemical munitions, were consistent with the Denver Police Department's training and use of force policy" (DEN031834-38, DEN031840-41, DEN031843-45, DEN031847, DEN031849, DEN031851-54, DEN031857-58, DEN031860-61, DEN031863, DEN031865, DEN031867, DEN031870-71, DEN031873-76, DEN031878-79).

166.    Notably, when reviewing video concerning the Basilica kettling incident which occurred on May 31, 2020, Commander Levens did not see anything that caused him concern (relating to officer conduct) except for one video where an officer shot with PepperBall a bicyclist as he was fleeing (Levens Deposition, pp. 95-99).

167.    In summary, the DPD does not appear to have taken concerns about officer misconduct during the police response to the GFP seriously. Officers were allowed to violate policy, adopt an unprofessional demeanor, conceal their identity, and not use their body cameras without consequence. Moreover, the DPD's investigation of citizen complaints illustrates that the department is not serious about holding officers accountable for misconduct during the GFP, and demonstrates a clear pattern of failing to discipline officers in a timely and appropriate manner.

### G. Summary of Opinions

168.    In both its long-term and short-term planning, the DPD was unprepared for the GFP in Denver. During her OIM interview, Lt. Kim Lovato acknowledged that in its response to the GFP, the DPD was "caught with its pants down," and that as a result, "chaos ensued" (DEN ICR 11733). According to the OIM summary, "Lieutenant Lovato felt there was a mentality throughout the department that George Floyd's death and the resulting protests were occurring far away and would not affect Denver. Because of this wrong assumption, the department was not prepared for the protests when they began" (DEN ICR 11733).

169.    My protest policing guide emphasizes the importance of using various information and intelligence sources to learn ahead of time about protests. It notes that "police should not approach protests and other public order events blindly. Detailed knowledge about the social identities of the groups or subgroups participating in the event can help provide a clearer sense of the most appropriate policing strategies… This type of information should feature prominently in police intelligence briefings [and] in the selection of strategies and tactics…"[47] The DPD's lack of

---

[47] Maguire & Oakley (2020), note 1.

preparation for the GFP signals both an intelligence failure and a leadership failure within the Department. As a result, the DPD responded to the GFP haphazardly, chose inappropriate strategies and tactics, and did not follow the provisions of its own *Crowd Management Manual*. DPD Division Chief Ron Thomas's comments to the OIM interviewers are consistent with this perspective. Chief Thomas said that as the protests went on, the command staff learned that "sometimes the mere presence of police officers agitates the protesters" (DEN ICR 11785) and that "not engaging the protesters led to better results" (DEN ICR 11786). These phenomena are well-known in the study of crowd psychology and behavior and many law enforcement agencies around the world have incorporated these principles into their policies and training for handling crowd events. The fact that the DPD command staff in charge of the Department's response to the GFP only discovered them *during* the protests is a further testament to their lack of preparation and their lack of expertise on crowd management.

170.    Police officers in the United States have an obligation to facilitate peaceful First Amendment expression and public safety during protests. They also have an obligation to behave in a lawful and transparent manner that embraces accountability and builds trust with the community. The materials I reviewed in this case reveal that the Denver Police Department did not live up to these obligations during the GFP. Instead, they behaved in a manner that likely escalated tensions and conflict with protesters rather than relying on the types of dialogue and de-escalation strategies described in the DPD's *Crowd Management Manual*. Moreover, a review of the DPD's training curricula reveals that, in choosing to engage primarily in crowd control rather than crowd management, officers were doing what they were trained to do.

171.    DPD's leaders understood this responsibility, and yet (1) DPD failed to implement sufficient training or policies; (2) DPD failed to establish credible structures and procedures for enacting the policies outlined in the *Crowd Management Manual*; (3) DPD used improper tactics and recklessly deployed potentially deadly munitions; (4) DPD supervisors failed to lead, allowing less experienced, poorly trained officers to use broad discretion, leading to reckless deployment of potentially deadly munitions; and (5) DPD failed to discipline or condemn excessive use of force, or even put policies in place to effectively identify excessive use of force. As a result, during the GFP, DPD officers relied on inappropriate strategies and tactics that were more likely to inflame tensions than to relieve them.

172.    The DPD's policies, training, strategies, and tactics led to violations of the constitutional rights of the Plaintiffs and other protesters during the GFP. It is my opinion that the DPD had a policy, practice, or custom of indiscriminately or improperly using force against protestors without providing effective dispersal orders. It was DPD policy, practice, or custom to provide its officers with less lethal weapons without appropriate (or in some cases any) training. It was DPD policy, practice, or custom to give officers almost unlimited discretion to use their less lethal weapons as they saw fit. And it was DPD policy, practice, or custom to avoid holding officers who engaged in misconduct accountable.

173.    I understand that discovery in this matter is ongoing, and certain video footage has not yet been produced. I reserve the right to supplement this report, especially as to opinions regarding events and actions surrounding any specific plaintiff, once fact discovery is complete and I have had the opportunity to review all evidence, including the complete set of video footage, relevant to this case.

174.    My rate of compensation for review is $350 per hour. I am aware that discovery is ongoing in this case. My opinions may be added to, or amended, upon review of any additional information that becomes available.


Respectfully submitted,

Edward R. Maguire, Ph.D.

Dated: March 3, 2023

# EXHIBIT A

# Edward R. Maguire

*Arizona State University * School of Criminology & Criminal Justice*
*411 North Central Avenue, Suite 600 * Phoenix, AZ 85004*
(Phone) 602-496-2016
edmaguire@asu.edu
[www.edmaguire.net](http://www.edmaguire.net)

## EDUCATION

**Ph.D.** in Criminal Justice, Rockefeller College of Public Affairs and Policy, University at Albany, SUNY (1997). Dissertation: "Context, Complexity, and Control in Large Municipal Police Organizations."

**M.A.** in Criminal Justice, University at Albany, SUNY (1992).

**B.S.** (Magna cum Laude) in Criminal Justice, University of Massachusetts at Lowell (1991).

## PROFESSIONAL EXPERIENCE

Visiting Professor, University of South Wales, United Kingdom (2022-*present*).

Professor, Arizona State University, School of Criminology and Criminal Justice (*2016 - present*). Director, Public Safety Innovation Lab (*2020-present*); Associate Director, Center for Violence Prevention and Community Safety (*2016-2021*).

Professor, American University, Department of Justice, Law and Criminology *(2008-2016; Department Chair, 2010-2012; Associate Professor, 2008-2012)*. Affiliate faculty, Center for Latin American and Latino Studies.

Associate Professor, George Mason University, Administration of Justice Department *(2000 to 2008; tenured 2002)*. Affiliate faculty, Center for Social Complexity.

Assistant Professor, University of Nebraska at Omaha, Department of Criminal Justice *(1997 to 2000; Instructor, 1996-97)*.

Social Science Analyst, United States Department of Justice, Office of Community Oriented Policing Services (COPS), Washington, DC *(1994 to 1996)*.

Associate Social Affairs Officer, United Nations Crime Prevention and Criminal Justice Branch, Vienna, Austria. Responsible for the management and analysis of data from the Fourth United Nations World Crime Survey *(April-August, 1994)*.

Research Assistant, School of Criminal Justice and the Center for Human Services Research, University at Albany, SUNY *(1991-1993)*.

# CREATIVE ACTIVITY

## BOOKS & MONOGRAPHS, AUTHORED

Stott, C., Maguire, E. R., & Radburn, M. (in progress). *Policing the crowd*. Routledge.

Maguire, E. R., & Oakley, M. (2020). *Policing protests: Lessons from the Occupy movement, Ferguson, and beyond*. Harry Frank Guggenheim Foundation.

Maguire, E. R. (2003). *Organizational structure in American police agencies: Context, complexity, and control*. State University of New York Press.

## BOOKS & MONOGRAPHS, EDITED

Giles, H., Maguire, E. R., & Hill, S. (2021). *Rowman & Littlefield handbook of policing, communication, and society*. Rowman & Littlefield.

Katz, C. M., & Maguire, E. R. (2020). *Transforming the police: Thirteen key reforms*. Waveland Press.

Brookman, F., Maguire, E. R., & Maguire, M. (2017). *The handbook of homicide*. John Wiley and Sons.

Maguire, E. R., & Duffee, D. (2015). *Criminal justice theory: Explaining the nature and behavior of criminal justice,* 2nd edition. Routledge [1st edition published in 2007].

Maguire, E. R., & Wells, W. (2009). *Implementing community policing: Lessons from twelve agencies*. Office of Community Oriented Policing Services.

## JOURNAL ARTICLES

(83) Adams, E., & Maguire, E. R. (in press). Qualitative evidence on the implementation of Cure Violence in Trinidad and Tobago. *Prevention Science*.

(82) Giles, H., Maguire, E. R., & Hill, S. (in press). The police and those policed as intergroup par excellence: Current trends and future prospects. *Group Processes & Intergroup Relations*.

(81) Maguire, E. R., Lowrey-Kinberg, B., & Johnson, D. (in press). The role of anger in mediating the effects of procedural justice and injustice. *Group Processes & Intergroup Relations*.

(80) Nuño, L., & Maguire, E. R. (2023). The nature and structure of MS-13 in Los Angeles County. *Criminal Justice Review, 48*(1), 5-20. https://doi.org/10.1177/07340168211029990

(79) Nuño, L., Hill, S., Maguire, E. R., & Giles, H. (2022). Experiencing VOICES: Police and public reactions to an intergroup communication intervention. *Police Practice and Research*. Advance online publication. https://doi.org/10.1080/15614263.2022.2147069

(78) Tom, K. E., Fine, A. D., Pickrel, E., & Maguire, E. R. (2022). Do police videos impact youths' willingness to cooperate with police? Results from a national experiment. *Journal of Experimental Criminology*. Advance online publication. https://doi.org/10.1007/s11292-022-09525-x

(77) Kapuria, M., & Maguire, E. R. (2022). Performance management and the police response to women in India. *Social Sciences, 11*, 1-17. https://doi.org/10.3390/socsci11020058

(76) Fisher, B. W., McKenna, J., Higgins, E. M., Maguire, E. R., & Homer, E. M. (2022). The alignment between community policing and the work of school resource officers. *Police Quarterly, 25*(4), 561–587. https://doi.org/10.1177/10986111211053843

(75) Maguire, E. R., & Giles, H. (2022). Public expressions of empathy and sympathy by U.S. criminal justice officials after controversial police killings of African-Americans. *Journal of Language and Social Psychology*, *41*(1), 48-75. https://doi.org/10.1177/0261927X211057238

(74) Johnson, D., Maguire, E. R., & Kuhns, J. B. (2022). Can community policing reduce perceived disorder? Results from a quasi-experiment in Trinidad and Tobago. *Policing & Society*, 32(7), 911-930. https://doi.org/10.1080/10439463.2021.1998048

(73) Adams, E. B., Morris, P. K., & Maguire, E. R. (2021). Interrupting gang violence in urban Trinidad through conflict mediation. *Caribbean Journal of Criminology, 3*(1), 69-92.

(72) Maguire, E. R., & Katz, C. M. (2021). International research collaborations in the Caribbean. *Caribbean Journal of Criminology, 3*(1), 1-9.

(71) Hill, S., Giles, H., & Maguire, E. R. (2021). VOICES: A theory-driven intervention for improving relationships between police and the public. *Policing: An International Journal, 44*(5), 786-799. https://doi.org/10.1108/PIJPSM-09-2020-0154

(70) Cordner, G., Maguire, E. R., & Shearing, C. (2021). Policing, politics, and democracy: David Bayley's enduring contributions. *International Journal of Comparative and Applied Criminal Justice, 45*(3), 239-244. https://doi.org/10.1080/01924036.2021.1916972

(69) Maguire, E. R. (2021). Protest policing and the reality of freedom: Evidence from Hong Kong, Portland, and Santiago (2019-2020). *International Journal of Comparative and Applied Criminal Justice, 45*(3), 299-313. https://doi.org/10.1080/01924036.2021.1899002

(68) Shjarback, J., & Maguire, E. R. (2021). Extending research on the 'War on Cops': The effects of Ferguson on non-fatal assaults against U.S. police officers. *Crime & Delinquency, 67*(1), 3-26. https://doi.org/10.1177/0011128719890266

(67) Adams, E. B., Morris, P. K., & Maguire, E. R. (2021). The impact of gangs on community life in Trinidad. *Race and Justice, 11*(4), 543-566. https://doi.org/10.1177/2153368718820577

(66) Maguire, E. R., Atkin-Plunk, C. A., & Wells, W. (2021). The effects of procedural justice on cooperation and compliance among inmates in a work release program. *Justice Quarterly, 38*(6), 1128-1153. https://doi.org/10.1080/07418825.2019.1634753

(65) Maguire, E. R. (2021). Effect of race on suspect injuries during encounters with police. *Injury Prevention, 27*, 456-460. https://doi.org/10.1136/injuryprev-2020-044010

(64) Maguire, E. R. (2020). Policing, state repression, and the pro-democracy movement in Hong Kong. *Policing: A Journal of Policy and Practice, 14*(4), 840-842. https://doi.org/10.1093/police/paaa077

(63) Barak, M., Leon, K. S., & Maguire, E. R. (2020). Conceptual and empirical obstacles in defining MS-13: Law-enforcement perspectives. *Criminology and Public Policy, 19*, 563-589. https://doi.org/10.1111/1745-9133.12493

(62) Snipes, J. B., Maguire, E. R., & Wang, X. (2020). A successive threat theory of police expenditures. *Crime and Delinquency, 66*(11), 1507-1532. https://doi.org/10.1177/0011128719839360

(61) Brookman, F, Pike, S., & Maguire, E. R. (2019). Dancing around Miranda: The effects of legal reform on homicide detectives in the US and the UK. *Criminal Law Bulletin, 55*(5), 725-763.

(60) Snipes, J. B., Maguire, E. R., & Tyler, D. H. (2019). The effects of procedural justice on civil disobedience: Evidence from protesters in three cities. *Journal of Crime and Justice*, 42(1), 32-44. https://doi.org/10.1080/0735648X.2018.1559128

    *Reprinted in Moule, R. K., & Fox, B., Eds. (2021). *Contemporary issues in American policing*. Routledge.

(59) Maguire, E. R., Johnson, D., Kuhns, J. B., & Apostolos, R. (2019). The effects of community policing on fear of crime and perceived safety: Findings from a pilot project in Trinidad and Tobago. *Policing and Society: An International Journal of Research and Policy, 29*(5), 491-510. https://doi.org/10.1080/10439463.2017.1294177

(58) Brookman, F., Maguire, E. R., & Maguire, M. (2019). What factors influence whether homicide cases are solved? Qualitative evidence from Great Britain and the USA. *Homicide Studies, 23*(2), 145-174. https://doi.org/10.1177/1088767918793678

(57) Maguire, E. R., Barak, M., Wells, W. H., & Katz, C. (2020). Attitudes toward the use of violence against police among Occupy Wall Street protesters. *Policing: A Journal of Policy and Practice, 14(4), 883-899*. https://doi.org/10.1093/police/pay003

(56) Maguire, E. R., Barak, M., Cross, K., & Lugo, K. (2018). Attitudes among Occupy DC participants about the use of violence against police. *Policing and Society: An International Journal of Research and Policy, 28*(5), 526-540. https://doi.org/10.1080/10439463.2016.1202247

(55) Maguire, E. R. (2018). New frontiers in research on procedural justice and legitimacy in policing. *Police Practice and Research: An International Journal, 19*(2), 107-110. https://doi.org/10.1080/15614263.2018.1418171

(54) Woo, Y., Maguire, E. R., & Gau, J. (2018). Direct and indirect effects of procedural justice on cooperation and compliance: Evidence from South Korea. *Police Practice and Research: An International Journal, 19*(2), 168-185. https://doi.org/10.1080/15614263.2018.1418147

(53) Tyler, D. H., Barak, M., Maguire, E. R., & Wells, W. H. (2018). The effects of procedural injustice on the use of violence against police by Occupy Wall Street protesters. *Police Practice and Research: An International Journal, 19*(2), 138-152. https://doi.org/10.1080/15614263.2018.1418153

(52) Campbell, B., Nix, J., & Maguire, E. R. (2018). Is the number of citizens fatally shot by police increasing in the post-Ferguson era? *Crime and Delinquency, 64*(3), 398–420. https://doi.org/10.1177/0011128716686343

(51) Johnson, D., Wilson, D. B., Maguire, E. R., & Lowrey, B. (2017). Race and perceptions of police: Experimental results on the impact of procedural (in)justice. *Justice Quarterly, 34*(7), 1184-1212. https://doi.org/10.1080/07418825.2017.1343862

(50) Pryce, D., Johnson, D., & Maguire, E. R. (2017). Procedural justice, obligation to obey, and cooperation with police in a sample of Ghanaian immigrants. *Criminal Justice and Behavior, 44*(5), 733-755. https://doi.org/10.1177/0093854816680225

(49) Maguire, E. R., Nix, J., & Campbell, B. A. (2017). A war on cops? The effects of Ferguson on the number of U.S. police officers murdered in the line of duty. *Justice Quarterly, 34*(5), 739-758. https://doi.org/10.1080/07418825.2016.1236205

(48) Matusiak, M. C., King, W. R., & Maguire, E. R. (2017). How perceptions of the institutional environment shape organizational priorities: Findings from a survey of police chiefs. *Journal of Crime and Justice, 40*(1), 5-19. https://doi.org/10.1080/0735648X.2016.1155302

  *Reprinted in Burruss, G. W., Giblin, M. J., & Schafer, J., Eds. (2018). *Contemporary research on police organizations.* Routledge.

(47) Maguire, E. R., Lowrey, B., & Johnson, D. (2017). Evaluating the relative impact of positive and negative encounters with police: A randomized experiment. *Journal of Experimental Criminology, 13*(3), 367-391. https://doi.org/10.1007/s11292-016-9276-9

(46) Maguire, E. R., Armstrong, T., & Johnson, D. (2017). The structure of citizen perceptions of crime and disorder: New evidence from a developing nation. *Journal of Quantitative Criminology, 33*(4), 675-699. https://doi.org/10.1007/s10940-016-9307-8

(45) Lowrey, B., Maguire, E. R., & Bennett, R. R. (2016). Testing the effects of procedural justice and overaccommodation in traffic stops: A randomized experiment. *Criminal Justice and Behavior, 43*(10), 1430-1449. https://doi.org/10.1177/0093854816639330

(44) Sah, S., Tannenbaum, D., Cleary, H., Feldman, Y., Glaser, J., Lerman, A., MacCoun, R., Maguire, E. R., Slovic, P., Spellman, B., Spohn, C., & Winship, C. (2016). Combating biased decision making and promoting justice and equal treatment. *Behavioral Science & Policy, 2*(2), 79-87. https://doi.org/10.1353/bsp.2016.0017

(43) Johnson, D., Maguire, E. R., Maass, S. A., & Hibdon, J. (2016). Systematic observation of disorder and other neighborhood conditions in a distressed Caribbean community. *Journal of Community Psychology, 44*(6), 729-746. https://doi.org/10.1002/jcop.21798

(42) Maguire, E. R. (2016). New directions in protest policing. *Saint Louis University Public Law Review, 35*(1), 67-108.

(41) Maguire, E. R., King, W. R., Matusiak, M. C., & Campbell, B. (2016). Testing the effects of people, processes, and technology on ballistic evidence processing productivity. *Police Quarterly, 19*(2), 199-215. https://doi.org/10.1177/1098611115618374

(40) Maguire, E. R., & Fishbein, D. H. (2016). The influence of family characteristics on problem behaviors in a sample of high-risk Caribbean adolescents. *Family Relations, 65*(1), 120-133. https://doi.org/10.1111/fare.12179

(39) Morris, P. K., & Maguire, E. R. (2015). Political culture, neighborhood structure, and homicide in urban Jamaica. *The British Journal of Criminology, 56*(5), 919-936. https://doi.org/10.1093/bjc/azv073

(38) Maguire, E. R., & Johnson, D. (2015). The structure of public opinion on crime policy: Evidence from seven Caribbean nations. *Punishment & Society, 17*(4), 502-530. https://doi.org/10.1177/1462474515604385

(37) Maguire. E. R., King, W. R., Wells, W. H., & Katz, C. M. (2015). Potential unintended consequences of the movement toward forensic laboratory independence. *Police Quarterly, 18*(3), 272-292. https://doi.org/10.1177/1098611115577679

(36) Maguire, E. R., Uchida, C. D., Hassell, K. (2015). Problem-oriented policing in Colorado Springs: A content analysis of 753 cases. *Crime and Delinquency, 61*(1), 71-95. https://doi.org/10.1177/0011128710386201

(35) Johnson, D., Maguire, E. R., & Kuhns, J. B. (2014). Public perceptions of the legitimacy of the law and legal authorities: Evidence from the Caribbean. *Law and Society Review, 48*(4), 947-978. https://doi.org/10.1111/lasr.12102

(34) Maguire, E. R., & King, W. R. (2013). Transferring criminal investigation methods from developed to developing nations. *Policing and Society: An International Journal of Research and Policy, 23*(3), 346-361. https://doi.org/10.1080/10439463.2013.818097

(33) Maguire, E. R. (2013). Exploring family risk and protective factors for adolescent problem behaviors in the Caribbean. *Maternal and Child Health Journal, 17*(8), 1488-1498. https://doi.org/10.1007/s10995-012-1156-y

(32) Cao, L., & Maguire, E. R. (2013). A test of the temperance hypothesis: Class, religiosity, and tolerance of prostitution. *Social Problems, 60*(2), 188-205. https://doi.org/10.1525/sp.2013.60.2.188

(31) Kuhns, J. B., & Maguire, E. R. (2012). Drug and alcohol use by homicide victims in Trinidad and Tobago, 2001-2007. *Forensic Science, Medicine, and Pathology, 8*(3), 243-251. https://doi.org/10.1007/s12024-011-9305-y

(30) Maguire, E. R., Wells, W., & Katz, C. M. (2011). Measuring community risk and protective factors for adolescent problem behaviors: Evidence from a developing nation. *Journal of Research in Crime and Delinquency, 48*(4), 594-620. https://doi.org/10.1177/0022427810395148

(29) Katz, C. M., Maguire, E. R., & Choate, D. (2011). A cross-national comparison of gangs in the United States and Trinidad and Tobago. *International Criminal Justice Review, 21*(3), 243-262. https://doi.org/10.1177/1057567711417179

(28) Kuhns, J.B., Wilson, D. B., Clodfelter, T., Maguire, E. R., & Ainsworth, S. (2011). A meta-analysis of alcohol toxicology study findings among homicide victims. *Addiction, 106*(1), 62-72. https://doi.org/10.1111/j.1360-0443.2010.03153.x

(27) Maguire, E.R., & Johnson, D. (2010). Measuring public perceptions of the police. *Policing: An International Journal of Police Strategies and Management, 33*(4), 703-730. https://doi.org/10.1108/13639511011085097

> *Reprinted in Emerald Gems (2015). *New perspectives in policing: Stress, public perception, and leadership.* Emerald Group Publishing.

(26) Maguire, E.R., King, W. R., Johnson, D., & Katz, C. M. (2010). Why homicide clearance rates decrease: Evidence from the Caribbean. *Policing and Society: An International Journal of Research and Policy, 20*(4), 373-400. https://doi.org/10.1080/10439463.2010.507869

(25) Henderson, H.M., Wells, W., Maguire, E. R., & Gray, J. (2010). Evaluating the measurement properties of procedural justice in a correctional setting. *Criminal Justice and Behavior, 37*(4), 384-399. https://doi.org/10.1177/0093854809360193

(24) King, W. R., & Maguire, E. R. (2009). Assessing the performance of systems designed to process criminal forensic evidence. *Forensic Science Policy & Management: An International Journal, 1*(3), 159-170. https://doi.org/10.1080/19409041003611143

(23) Kuhns, J. B., Wilson, D. B., Maguire, E. R., Ainsworth, S., & Clodfelter, T. (2009). A meta-analysis of marijuana, cocaine, and opiate toxicology study findings among homicide victims. *Addiction, 104*(7), 1122-1131. https://doi.org/10.1111/j.1360-0443.2009.02583.x

(22) Maguire, E. R. (2009). Police organizational structure and child sexual abuse case attrition. *Policing: An International Journal of Police Strategies and Management, 32*(1), 157-179. https://doi.org/10.1108/13639510910937175

(21) Maguire, E. R., & Bennett, R. R. (2008). Introduction: Special issue on criminal justice research in Trinidad and Tobago. *Caribbean Journal of Criminology and Public Safety, 13*(1&2), xii-xxxiv.

(20) Maguire, E. R., Willis, J. A., Snipes, J., & Gantley, M. (2008). Spatial concentrations of violence in Trinidad and Tobago. *Caribbean Journal of Criminology and Public Safety, 13*(1&2), 44-83.

(19) Kuhns, J. B., Maguire, E. R., & Cox, S. M. (2007). Public safety concerns of small police agencies in suburban and rural America. *Police Quarterly, 10*(4), 429-454. https://doi.org/10.1177/1098611106289405

(18) Wells, W., Horney, J., & Maguire, E. R. (2005). Patrol officer responses to citizen feedback: An experimental analysis. *Police Quarterly, 8*(2), 171-205. https://doi.org/10.1177/1098611103258956

(17) Maguire, E. R., & King, W. (2004). Trends in the policing industry. *The Annals of the American Academy of Political and Social Science, 593*(1), 15-41. https://doi.org/10.1177/0002716204262960

(16) Zhao, J., Hassell, K. D., & Maguire, E. R. (2003). Structural arrangements in large municipal police organizations: Revisiting Wilson's theory of local political culture. *Policing: An International Journal of Police Strategies and Management, 26*(2), 231-250. https://doi.org/10.1108/13639510310475741

(15) Maguire, E. R., Shin, Y., Zhao, J., & Hassell, K. D. (2003). Structural change in large police agencies during the 1990s. *Policing: An International Journal of Police Strategies and Management, 26*(2), 251-275. https://doi.org/10.1108/13639510310475750

(14) He, N., Cao, L., Wells, W., & Maguire, E. R. (2003). Forces of production and direction: Testing an expanded model of suicide and homicide. *Homicide Studies: An Interdisciplinary and International Journal, 7*(1), 36-57. https://doi.org/10.1177/1088767902239242

(13) Maguire, E. R. (2002). Multiwave establishment surveys of police organizations. *Justice Research and Policy, 4* (Fall Issue), 39-60. https://doi.org/10.3818/JRP.4.1.2002.39

(12) Katz, C., Maguire, E. R., Roncek, D. W. (2002). The creation of specialized police gang units: Testing contingency, social threat, and resource dependency explanations. *Policing: An International Journal of Police Strategies and Management, 25*(3), 472-506. https://doi.org/10.1108/13639510210437005

(11) Maguire, E. R., & Katz, C. (2002). Community policing, loose coupling, and sensemaking in American police agencies. *Justice Quarterly, 19*(3), 501-534. https://doi.org/10.1080/07418820200095331

(10) Archbold, C., & Maguire, E. R. (2002). Studying civil suits against the police: A serendipitous finding of sample selection bias. *Police Quarterly, 5*(2), 222-249. https://doi.org/10.1177/109861102129198110

(9) Maguire, E.R., & Schulte-Murray, R. (2001). Issues and patterns in the comparative international study of police strength. *International Journal of Comparative Sociology XLII* (1-2), 75-100. https://doi.org/10.1163/9789004473614_005

>    *Reprinted in Newman, G., & Howard, G. (2001). *Varieties of comparative criminology*. Brill.

(8) Maguire, E. R., & Mastrofski, S. D. (2000). Patterns of community policing in the United States. *Police Quarterly, 3*(1), 4-45. https://doi.org/10.1177/1098611100003001001

(7) Maguire, E. R., Howard, G., & Newman, G. (1998). Measuring the performance of national criminal justice systems. *International Journal of Comparative and Applied Criminal Justice, 22*(1), 31-59. https://doi.org/10.1080/01924036.1998.9678607

(6) Maguire, E. R., Snipes, J. B., Uchida, C. D., & Townsend, M. (1998). Counting cops: Estimating the number of police officers and police agencies in the United States. *Policing: An International Journal of Police Strategies and Management, 21*(1), 97-120. https://doi.org/10.1108/13639519810206628

(5) Maguire, E. R. (1997). Structural change in large municipal police organizations during the community policing era. *Justice Quarterly, 14*(3), 701-730.

>    *Reprinted in Brandl, S. G., & Barlow, D. E. (2004). *The police in America: Classic and contemporary readings*. Wadsworth.

(4) Maguire, E.R., Kuhns, J. B., Uchida, C. D., & Cox, S. (1997). Patterns of community policing in nonurban America. *Journal of Research in Crime and Delinquency, 34*(3), 368-394. https://doi.org/10.1177/0022427897034003004

(3) Snipes, J. B., & Maguire, E. R. (1995). Country music, suicide and spuriousness. *Social Forces*, 74(1): 327-329. https://doi.org/10.1093/sf/74.1.327

(2) Maguire, E.R., & Snipes, J. B. (1994). Re-assessing the link between country music and suicide. *Social Forces, 72*(4), 1239-1243. https://doi.org/10.1093/sf/72.4.1239

(1) Maguire, E. R. (1993). The professionalization of police in child sexual abuse cases. *Journal of Child Sexual Abuse,* 2(3), 107-116. https://doi.org/10.1300/J070v02n03_10

## BOOK CHAPTERS

(36) Maguire, E. R. (in press). Gang research in the Caribbean. In D. Pyrooz, J. Densley, & J. Leverso (Eds.), *The Oxford handbook of gangs and society*. Oxford University Press

(35) Maguire, E. R. (in press). Policing hate rallies. In M. Staller, B. Zaiser, & S. Koerner (Eds.), *Palgrave handbook of police conflict management*. Palgrave Macmillan.

(34) Maguire, E. R., Hill, S. L., & Giles, H. (in press). Community relations and policing: A communication accommodation theory perspective. In M. Staller, B. Zaiser, & S. Koerner (Eds.), *Palgrave handbook of police conflict management*. Palgrave Macmillan.

(33) Maguire, E. R. (in press). Policing the 2021 Capitol insurrection. In G. Cordner & M. Wright (Eds.), *Routledge handbook of policing within a crisis.* Routledge.

(32) Maguire, E. R. (2022). The meaning and measurement of legitimacy in criminal justice scholarship. In L. Cao (Ed.), *Understanding legitimacy in criminal justice: Conceptual and measurement challenges* (41-58). Springer.

(31) Maguire, E.R. (2022). Policing rival protests. In J. Schafer & R. Myers (Eds.), *Rethinking and reforming American policing: Leadership challenges and future opportunities* (pp. 289-309). Palgrave Macmillan.

(30) Giles, H., Maguire, E. R., & Hill, S. (2021). Introduction: Policing through the lens of intergroup communication. In H. Giles, E. R. Maguire, & S. Hill (Eds.). *Rowman & Littlefield handbook of policing, communication, and society* (1-16). Rowman & Littlefield.

(29) Maguire, E. R. (2021). The role of communication reform in community policing. In H. Giles, E.R. Maguire, & S. Hill (Eds.). *Rowman & Littlefield handbook of policing, communication, and society* (153-172). Rowman & Littlefield.

(28) Tyler, D. H. F., & E.R. Maguire (2021). Newsworthiness of police: Changes in print media coverage of police post-Ferguson. In H. Giles, E. R. Maguire, & S. Hill (Eds.). *Rowman & Littlefield handbook of policing, communication, and society* (245-262). Rowman & Littlefield.

(27) Giles, H., Hill, S., Maguire, E. R., & Angus, D. (2021). Conclusion: New directions in policing and intergroup communication. In H. Giles, E. R. Maguire, & S. Hill (Eds.). *Rowman & Littlefield handbook of policing, communication, and society* (371-390). Rowman & Littlefield.

(26) Maguire, E. R., & Katz, C. (2020). Introduction. In C. Katz & E. R. Maguire (Eds.), *Transforming the police: 13 key reforms* (1-8). Waveland Press.

(25) Maguire, E. R., Somers, L., & Padilla, K. (2020). Promoting officer health and wellness. In C. Katz & E. R. Maguire (Eds.), *Transforming the police: 13 key reforms* (213-230). Waveland Press.

(24) Maguire, E. R., Khade, N., & Mora, V. (2020). Improve the policing of crowds. In C. Katz & E. R. Maguire (Eds.), *Transforming the police: 13 key reforms* (235-248). Waveland Press.

(23) Brookman, F., Maguire, E. R., & Maguire M. (2017). Introduction: Homicide in global perspective. In F. Brookman, E. R. Maguire, & M. Maguire (Eds.), *The handbook of homicide* (xix-xxiv). John Wiley and Sons.

(22) Maguire, E. R. (2017). Preventing homicide. In F. Brookman, E. R. Maguire, & M. Maguire (Eds.), *The handbook of homicide* (676-692). John Wiley and Sons.

(21) Katz, C. M. and Maguire, E. R. (2015). Diagnosing gang violence in the Caribbean. In A. Harriott & C. M. Katz (Eds.), *Gangs in the Caribbean: Responses of state and society* (pp. 175-212). University of the West Indies Press.

(20) Maguire, E. R., & Gordon, J. (2015). Faith-based interventions to reduce gang violence in the Caribbean: Reflections from a professor and a priest. In A. Harriott & C. M. Katz (Eds.), *Gangs in the Caribbean: Responses of state and society* (pp. 307-336). University of the West Indies Press.

(19) Maguire, E. R. (2014). Police organizations and the iron cage of rationality. In M. D. Reisig & R. J. Kane, *Oxford handbook of police and policing* (68-100). Oxford University Press.

(18) Maguire, E. R. (2012). Criminal justice systems. In *Caribbean human development report, 2012: Human development and the shift to better citizen security* (pp. 115-139). United Nations Development Program.

(17) Maguire, E. R., & King, W. R. (2011). Federal-local coordination in homeland security. In B. Forst, J. Greene, & J. Lynch (Eds.), *Criminologists on terrorism* (pp. 322-356). Cambridge University Press.

(16) Maguire, E. R. (2010). A journey through the world of police use of force. In J. Kuhns & J. Knutsson (Eds.), *Police use of force: A global perspective* (pp. 199-211). Praeger Security International.

(15) Maguire, E. R. (2009). Taking implementation seriously: Response to Mastrofski, Weisburd, and Braga. In N. A. Frost, J. D. Freilich, & T. R. Clear (Eds.), *Contemporary issues in criminal justice policy: Papers from the American Society of Criminology Conference* (pp. 265-268). Wadsworth.

    *Reprinted in Welsh, W.N., & Harris, P. W., Eds. (2013). *Criminal justice policy & planning* (4th edition). Anderson.

(14) Wells, W., & Maguire, E. R. (2009). Introduction: Making sense of community policing. In

E. R. Maguire & W. Wells (Eds.), *Implementing community policing: Lessons from 12 agencies* (pp. xv-xxiii). Office of Community Oriented Policing Services.

(13) Wells, W., & Maguire, E. R. (2009). Internal and external communications. In E. R. Maguire & W. Wells (Eds.), *Implementing community policing: Lessons from 12 agencies* (pp. 79-96). Office of Community Oriented Policing Services.

(12) Maguire, E. R., Huneycutt, C., & Gantley, M. (2009). Newport News, Virginia.  In E. R. Maguire & W. Wells (Eds.), *Implementing community policing: Lessons from 12 agencies* (pp. 153-160). Office of Community Oriented Policing Services.

(11) Maguire, E. R., & Gantley, M. (2009). Specialist and generalist models. In E. R. Maguire & W. Wells (Eds.), *Implementing community policing: Lessons from 12 agencies* (pp. 45-56). Office of Community Oriented Policing Services.

(10) Maguire, E. R., & Gantley, M. (2009). Decentralization and geographic accountability. In E. R. Maguire & W. Wells (Eds.), *Implementing community policing: Lessons from 12 agencies* (pp. 35-44). Office of Community Oriented Policing Services.

(9) Maguire, E. R., & Wells, W. (2009). The future of community policing. In E. R. Maguire & W. Wells (Eds.), *Implementing community policing: Lessons from 12 agencies* (pp. 173-184). Office of Community Oriented Policing Services.

(8) Maguire, E. R., & King, W. R. (2007). The changing landscape of American police organizations.  In J. A. Schafer (Ed.), *Policing 2020: Exploring the Future of Crime, Communities, and Policing* (pp. 337-371). Federal Bureau of Investigation.

(7) Snipes, J. B., & Maguire, E. R. (2007). Foundations of criminal justice theory. In D. Duffee & E. R. Maguire (Eds.), *Criminal Justice Theory* (pp. 28-50). Routledge.

(6) Maguire, E. R., & Uchida, C. D. (2007). Explaining police organizations. In D. Duffee & E. R. Maguire (Eds.), *Criminal justice theory* (pp. 93-120). Routledge.

(5) Duffee, D. E., Worden, A. P., & Maguire, E. R. (2007). Directions for theory and theorizing in criminal justice. In D. Duffee & E. R. Maguire (Eds.), *Criminal justice theory* (pp. 291-320). Routledge.

(4) Maguire, E. R., & Wells, W. (2002). Community policing as communication reform. In H. Giles (Ed.), *Law Enforcement, Communication and Community* (pp. 33-66). John Benjamins Publishers.

(3) Maguire, E. R., & Uchida, C. D. (2000). Measurement and explanation in the comparative study of American police organizations. In D. Duffee (Ed.), *Criminal justice 2000, volume 4: Measurement and analysis of crime and justice* (pp. 491-557). National Institute of Justice.

(2) Eck, J., & Maguire, E. R. (2000). Have changes in policing reduced violent crime? An

assessment of the evidence. In A. Blumstein & J. Wallman (Eds.), *The crime drop in America* (pp. 207-265). Cambridge University Press.

(1) Maguire, E. R. (2000). La función policial orientada a la resolución de problemas ["Problem-oriented policing"]. In *Seguridad pública y policía en el comienzo del siglo XXI* [Public Security and the Police in the 21st Century] (pp. 99-113). Publicaciones de la Fundación Policia Española, Colección Estudios de Seguridad (Madrid, Spain).

## ENCYCLOPEDIA ENTRIES

Maguire, E. R. (2006). Crime control strategies: More police. In J. R. Greene (Ed.), *Encyclopedia of police science*, 3rd edition (pp. 315-318). Routledge.

Maguire, E. R. (2006). Authority within police organizations. In J. R. Greene (Ed.), *Encyclopedia of police science*, 3rd edition (pp. 84-86). Routledge.

Maguire, E. R., & Hassell, K. (2001). Prevention: Police role. In J. Dressler (Ed.), *Encyclopedia of crime and justice*, 2nd Edition (pp. 1155-1161). Macmillan Reference USA.

Maguire, E. R., & Archbold, C. (2001). Police: Organization and management. In J. Dressler (Ed.), *Encyclopedia of crime and justice*, 2nd Edition (pp. 1083-1091). Macmillan Reference USA.

## OTHER PUBLICATIONS

King, W. R., Wells, W., Katz, C., Maguire, E. R., & Frank, J. (2014). Research in brief: Using NIBIN ballistic imaging hits for the strategic targeting of violent criminal networks. *The Police Chief*, 81(May), 14.

Maguire, E. R., & Kuhns, J. B. (2011). Implementing community policing. *Security Studies* (the official scientific police research journal for Qatar's Ministry of the Interior), 4, 178-190.

Maguire, E. R. (2010). The effects of community policing on crime, disorder, and fear. *Security Studies* (the official scientific police research journal for Qatar's Ministry of the Interior).

Maguire, E. R. (2004). Police departments as learning laboratories. *Ideas in American Policing* lecture series. National Policing Institute. Online copy available at:
https://www.policinginstitute.org/publication/police-departments-as-learning-laboratories

Maguire, E. R. (2004). Measuring the performance of law enforcement agencies: Part two. *CALEA Update*, Volume 84. Commission on Accreditation for Law Enforcement Agencies.
        *Reprinted in *Law Enforcement Executive Forum* (January 2005).

Maguire, E. R. (2003). Measuring the performance of law enforcement agencies: Part one. Pp.

1-30 in *CALEA Update*, Volume 83 (September). Commission on Accreditation for Law Enforcement Agencies.
        *Reprinted in *Law Enforcement Executive Forum* (January 2005).

## BOOK / SOFTWARE REVIEWS

Maguire, E. R. (2001). Software review of "MicroFACT 1.1, A microcomputer factor analysis program for dichotomous and ordered polytomous data and mainframe sized problems." *Structural Equation Modeling, 8*(1), 150-156.

Maguire, E. R. (1997).  Book review of "Planning community policing: Goal specific cases and exercises," by Victor G. Strecher (Waveland Press, 1997).  *Journal of Contemporary Criminal Justice*, *14*(1), 94-95.

Maguire, E. R. (1997).  Book review of "Policing space: Territoriality and the Los Angeles Police Department," by Steve Herbert (University of Minnesota Press, 1997).  *Policing: An International Journal of Police Strategies and Management*, *16*(3), 590-591.

Maguire, E. R. (1993).  Book review of "The police in Los Angeles: reform and professionalization," by Gerald Woods (Garland, 1993). *The Criminologist, 18*(4), 15.

## UNPUBLISHED REPORTS

Maguire, E. R. (2022, May 6). *An intergroup perspective on Seattle's CHOP/CHAZ occupation*. Report submitted to the Seattle Office of the Inspector General (25 pages).

Maguire, E. R. (2022, January 19). *Independent review of the Phoenix Police Department's capacity for policing crowd events*. Report submitted to the Phoenix Police Department (42 pages).

Stott, C., & Maguire, E. R. (2021, August 26). *Improving police preparedness for crowd events in Columbus: A rapid assessment*. Report submitted to the Columbus Police Department (7 pages).

Maguire, E. R. (2020, November 19). *Public order policing in Latin America and the Caribbean: Recommendations for preserving order and preventing violence.* Report submitted to the Inter-American Development Bank (59 pages).

Maguire, E. R., & Oakley. M. (2020, April 20). *The violent crime reduction research guide*. Report submitted to the Bureau of Justice Assistance (89 pages).

Stott, C., Beale, M., Pearson, G., Rees, J., Havelund, J., Brechbühl, A., Maguire, E. R., &

Oakley, M. (2019). *International norms governing police identification and the wearing of masks during protest: Two rapid evidence reviews*. Report submitted to the Hong Kong Independent Police Complaints Council (95 pages).

Clancy, A., Brookman, F., & Maguire, E. R. (2019, October). *Gang-related homicide and police corruption in Trinidad and Tobago: A rapid evidence assessment*. Report submitted to Her Majesty's Inspectorate of Constabulary and Fire and Rescue Services (UK, 78 pages).

Maguire, E. R., Oakley, M., & Corsaro, N. (2018). *Cure Violence in Trinidad and Tobago: Final report*. Report submitted to the Inter-American Development Bank (106 pages).

Maguire, E. R., Corsaro, N., & Oakley, M. (2016, July 29). *Cure Violence in Trinidad and Tobago: Midterm evaluation*. Report submitted to the Inter-American Development Bank (77 pages).

Kuhns, J. B., Maguire, E. R., Leach, N. R., & Stephens, D. W. (2015). *Health, safety, and wellness program case studies in law enforcement*. Report submitted to the Office of Community Oriented Policing Services (60 pages).

Kuhns, J.B., Dolliver, D., Bent, E., & Maguire, E. R. (2015). *Understanding and reducing firearms assaults against law enforcement officers in the United States*. Report submitted to the Office of Community Oriented Policing Services (63 pages).

Maguire, E.R. (2014). *A Review of global and regional crime trends likely to impact the Dutch Caribbean. Report submitted to the Recherche Samenwerkings Team* (Dutch police task force) (31 pages). http://www.rst-politie.net/file/Onderzoeksrapport_maguire.pdf

King, W.R., W. Wells, C. Katz, E.R. Maguire, and J. Frank (2013). *Opening the black box of NIBIN: A process and outcome evaluation of the use of NIBIN and its effects on criminal investigations*. Report submitted to the National Institute of Justice (116 pages). https://www.ncjrs.gov/pdffiles1/nij/grants/243875.pdf

Maguire, E. R., & Gantley, M. (2010). *Wave 3 assessment for Project Lantern*. Report submitted to the International Justice Mission.

Maguire, E. R., Gantley, M., & Snipes, J. B. (2009). *Wave 2 assessment for Project Lantern*. Report submitted to the International Justice Mission.

Maguire, E. R., & Snipes, J. B. (2007). *Baseline assessment for Project Lantern*. Report submitted to the International Justice Mission.

Maguire, E. R., Stiftar, R., Simmons, K., Ibar, M. C., Alsbaugh, B., & Bryant, S. (2004, May). *Measuring the perceived service quality of the police*. Report submitted to the Orangetown Police Department [a pseudonym] (84 pages).

Maguire, E. R., & Gantley, M. (2004, May). *National survey of accredited and non-accredited public safety communications centers*. Report to CALEA (53 pages).

Maguire, E. R., & Gantley, M. (2004, May). *National survey of accredited and non-accredited law enforcement agencies*. Report to CALEA (107 pages).

Uchida, C.D., E.R. Maguire, S.E. Solomon, and M. Gantley (2003).  *Safe Kids, Safe Schools: Evaluating the Use of Iris Recognition Technology in New Egypt, NJ*.  Final report submitted to the National Institute of Justice (146 pages).
http://www.ncjrs.org/pdffiles1/nij/grants/208127.pdf

Maguire, E.R., S.E. Solomon, and C.D. Uchida (2003).  *National Evaluation of School-Based Partnerships: Reducing Disputes in Spartanburg, South Carolina*.  Report submitted to the Office of Community Oriented Policing Services (March, 83 pages).

Maguire, E.R., J. Schnobrich-Davis, S.E. Solomon, and C.D. Uchida (2003).  National Evaluation of School-Based Partnerships: Reducing Bullying, Threats, and Intimidation in Westwood, Massachusetts.  Report submitted to the Office of Community Oriented Policing Services (March, 77 pages).

Maguire, E.R. (2003).  *A White Paper on Police Agency Performance Measures*.  Report prepared for the Commission on Accreditation for Law Enforcement Agencies (January, 47 pages).

Maguire, E.R. (2002).  Causal Factors Influencing Police Organizations.  Report prepared for the National Research Council, Committee to Review Research on Police Policy and Practice (July; 96 pages).

Maguire, E.R., K.D. Hassell, and C.D. Uchida (2001).  Problem Oriented Policing in Colorado Springs.  Report submitted to the Colorado Springs Police Department (October; 50 pages).

Hassell, K.D., E.R. Maguire, and C.D. Uchida (2001).  The Colorado Springs Juvenile Offender Unit: A Process and Impact Evaluation.  Report Submitted to the Colorado Springs Police Department (October; 73 pages).

Gallagher, C., E.R. Maguire, S.D. Mastrofski, and M.D. Reisig (2001).  The Public Perception of the Police Image, Final Report submitted to the International Association of Chiefs of Police (September; 142 pages).

Koper, C.S., E.R. Maguire, and G.E. Moore (2001).  A National Study of Police Hiring and Retention Issues in Police Agencies.  Report submitted to the National Institute of Justice (94 pages).

Uchida, C.D., S.E. Solomon, and E.R. Maguire (2000).  Neighborhood-Based Policing, "Austin Style": An Assessment.  Report submitted to the Austin Police Department  (September; 51 pages).

Uchida, C.D., S.E. Solomon, and E.R. Maguire (2000).  Evaluating Fort Lauderdale's

Community Policing Demonstration Center.  Report submitted to the Fort Lauderdale Police Department  (May).

Maguire, E.R. and S.D. Mastrofski (1998).  The Utility of Existing COPS Office Data for Learning about Community Policing and Organizational Change.  Report prepared for the Office of Community Oriented Policing Services (81 pages).

Maguire, E.R. and K. Schechinger (1998).  A Process Evaluation of the Lincoln Police Department's Problem-Solving Partnerships Grant.  Report prepared for the Lincoln (NE) Police Department and the Office of Community Oriented Policing Services (28 pages).

# PROFESSIONAL ACTIVITIES

### GRANTS AND CONTRACTS

*Note: I have served as Principal or Co-Principal Investigator on dozens of externally funded projects totaling more than $9 million. Listed below are projects with a total amount of $25,000 or greater.*

2022-2023. Co-Principal Investigator on a study funded by the Arnold Foundation [subcontract from the University of Maryland] entitled "Street Outreach Worker Programs for Reducing Violence" (~$42,000).

2014-2018. Principal Investigator on a study funded by the Inter-American Development Bank entitled: "Evaluation of the CureViolence Program in Trinidad and Tobago" (~$380,000).

2014-2017. Principal Investigator (in partnership with American University's Center for Latin American and Latino Studies) on a study funded by the National Institute of Justice entitled: "Assessing the Transnational Criminal Capacity of MS-13 in the U.S. and El Salvador" (~$671,000).

2014-2015. Subcontractor on a study of police officer health, wellness, and safety funded by the Bureau of Justice Assistance (primary contract awarded to the Major City Chiefs Association) (~$28,000).

2014-2015. Principal Investigator on a study funded by the Inter-American Development Bank to evaluate a crime reduction project in Montevideo, Uruguay ($70,000).

2012-2015. Principal Investigator on a study funded by the Office of Community Oriented Policing Services entitled "Policing Protest: The Role of Community Policing in the Occupy Movement" (~$400,000).

2011-2013. Subcontractor on a study of police processing of ballistic evidence funded by the

National Institute of Justice (Principal Investigator was William King at Sam Houston State University) (~$57,000).

2008-2010. Co-Principal Investigator on a violence prevention project funded by the Ministry of Education in Trinidad and Tobago (~$152,000)

2008-2010. Principal Investigator on a project funded by the Ministry of National Security of Trinidad and Tobago entitled "Implementing Strategic Crime Control in Trinidad and Tobago" (~$1.3 million).

2006-2010. Principal Investigator on a study of sexual trafficking in minors funded by the International Justice Mission entitled "Assessment of Project Lantern" (~$528,000).

2005-2008. Co-Principal Investigator and Project Director on a research and technical assistance project funded by the Ministry of National Security of Trinidad and Tobago entitled "Improving Crime Control Capacity in the Trinidad and Tobago Police Service" (~$4.6 million).

1999-2004. Principal Investigator on a study funded by the Office of Community Oriented Policing Services entitled "How Police Organizations Implement Community Policing" ($192,885).

1998-2000. Principal Investigator on a study funded by the Office of Community Oriented Policing Services and the National Institute of Justice entitled "Measuring Community Policing at the Precinct and Agency Levels" ($199,491).

1998-2000. Project Director and Co-Principal Investigator (with Jihong Zhao) on a study funded by the National Institute of Justice entitled "The Structure of Large Municipal Police Organizations during the Community Policing Era" ($177,159).

INVITED PRESENTATIONS *(international presentations denoted with an asterisk)*

Inter-American Development Bank, "Final Results from the Evaluation of Cure Violence in Trinidad and Tobago." Washington, DC (January 24, 2019).

*Inter-American Development Bank, Citizen Security Week: "Final Results from the Evaluation of Cure Violence in Trinidad and Tobago." Santiago, Chile (November 28, 2018).

International Association of Crime Analysts Annual Conference, "Research Evidence on Violence Reduction Programs, Practices, and Strategies." Newport Beach, CA (September 21, 2018).

University of Arizona, Symposium on Constitutional Issues in Higher Education, "Plenary: New Directions in Protest Policing." Tucson, AZ (June 21, 2018).

*Stockholm Criminology Symposium, "Can Problem Oriented Policing Reduce Fear of Crime

and Perceived Physical and Social Disorder? Results from a Quasi-Experiment in Trinidad & Tobago." Stockholm, Sweden (June 13, 2018).

University at Albany, State University of New York, School of Criminal Justice, Undergraduate Commencement Address. Albany, NY (May 19, 2018).

*United States Agency for International Development, Conference on the Cure Violence Public Health Model in Latin America and the Caribbean, "Preliminary Results from the Evaluation of Cure Violence in Trinidad and Tobago." Ciudad Juarez, Mexico (April 20, 2018).

Bureau of Justice Assistance, National Public Safety Partnership Meeting on Enhancing Crime Analysis Capacity, "Research Evidence on Violence Reduction Programs, Practices, and Strategies." Charlotte, NC (April 16, 2018).

*Unidos por la Justicia, Forum on Promising Practices in Community Policing, "International Research Evidence on Police Effectiveness." San Pedro Sula, Honduras (March 23, 2018).

*Inter-American Development Bank, Citizen Security Week: "Preliminary Results from the Evaluation of Cure Violence in Trinidad and Tobago." Medellin, Colombia (December 1, 2017).

Office of Juvenile Justice and Delinquency Prevention, webinar on Law Enforcement and Youth Research Gaps and Needs: "Research Evidence in CrimeSolutions.gov on Policing Youth." Washington, DC (October 12, 2017).

Inter-American Development Bank, webinar on "Restoring Paradise in the Caribbean: Combatting Violence with Numbers" (one of three panelists). Washington, DC (May 19, 2017).

*Inter-American Development Bank, Workshop on Crime and Violence in Jamaica: "Evaluating Cure Violence in Trinidad and Tobago." Kingston, Jamaica (May 2, 2017).

Sam Houston State University, College of Criminal Justice. Beto Memorial Lecture: "New Directions in Procedural Justice Research." Huntsville, TX (April 13, 2017).

John Jay College of Criminal Justice, National Network for Safe Communities. "Implementing Crime Control Reform in Developing Nations: Lessons from Trinidad and Tobago." Tarrytown, NY (March 27, 2017).

*Keele University, Workshop on Evidence Based Practice in the Policing of Crowds. Keynote address: "New Directions in Protest Policing in the USA?" Staffordshire, England (March 13, 2017).

Texas Major Cities Police Chief Leadership Series. "Protest Policing: Procedural Justice, Legitimacy, and Values" (Session 2). San Antonio, TX (May 1, 2015).

Florida International University, School of International and Public Affairs. "Protest Policing in the United States: Lessons from the Occupy Movement." Miami, FL (March 27, 2015).

American University / International Association of Chiefs of Police Town Hall Meeting on Community-Police Relations (one of 6 panelists). Washington, DC (March 25, 2015).

Texas Major Cities Police Chief Leadership Series. "Protest Policing: Procedural Justice, Legitimacy, and Values" (Session 1). San Antonio, TX (March 20, 2015).

St. Louis University School of Law. "Improving Protest Policing." St. Louis, MO (February 20, 2015).

U.S. Department of Justice / Major City Chiefs Association. "Learning about Felonious Assaults against Police Using LEOKA Data." Washington, DC (December 18, 2014).

* Recherche Samenwerkings Team (Dutch police task force). "Gangs and Organized Crime in the Caribbean." Willemstad, Curaçao (October 22, 2014).

*Government of Curaçao. "Group- and Gang-Related Crime in Curaçao." Willemstad, Curaçao (October 21, 2014).

*Symposium on the Future of Policing. "Policing Mass Events." Griffith University, Brisbane, Australia (September 8, 2014).

*Dana Saroop Seetahal Symposium: Re-engineering the Criminal Justice System, "Reflections on Gangs and Gang Violence in Trinidad and Tobago." University of the West Indies, St. Augustine, Trinidad (June 14, 2014).

Woodrow Wilson International Center for Scholars and the World Bank. "Research Evidence, Theory, and Speculation on Gang Truces." Washington, DC (October 30, 2013).

*Inter-American Development Bank. "Some Reflections on Community Policing." Montevideo, Uruguay (October 14, 2013).

*Recherche Samenwerkings Team (Dutch police task force). "Understanding and Preventing Gang Violence in the Caribbean." Aruba (June 28, 2013).

*Recherche Samenwerkings Team (Dutch police task force). "Understanding and Preventing Gang Violence in the Caribbean." Curacao (June 27, 2013).

Workshop on Gangs and Governance in the Caribbean. "Faith-Based Interventions to Reduce Gang Violence in the Caribbean." Miami, Florida (April 25, 2013).

*Recherche Samenwerkings Team (Dutch police task force). "Understanding and Preventing Gang Violence in the Caribbean." St. Maarten (April 5, 2013).

Washington Office on Latin America (panel discussion on the anniversary of the gang truce in El Salvador). "The Effects of Gang Truces." Washington, DC (March 29, 2013).

*Summit on the Economics of Policing. "Research, Policing, and Crime Reduction." Ottawa,

Canada (January 17, 2013).

*Embassy of the Federation of Saint Kitts and Nevis. "Understanding and Reducing Violence in St. Kitts and Nevis" (Presentation to Her Excellency, Ambassador Jacinth L. Henry-Martin). Washington, DC (September 28, 2012).

Police Executive Leadership Workshop. "Police Innovation and Problem-Oriented Policing." Springfield, Illinois (September 19, 2012).

*Royal St. Kitts and Nevis Police Force. "Diagnosing and Preventing Gang Violence in St. Kitts and Nevis: Problems and Prospects." Basseterre, St. Kitts (July 3, 2012).

*Caribbean Anti-Gang Conference. Breakout Session: "Gang Violence in the Caribbean: A Focused Deterrence Approach." St. Thomas, U.S. Virgin Islands (June 20, 2012).

*Caribbean Anti-Gang Conference. Keynote Address: "Diagnosing and Preventing Gang Violence in the Caribbean." St. Thomas, U.S. Virgin Islands (June 19, 2012).

Symposium on Gangs and Gang Violence in the Caribbean. "Diagnosing and Preventing Gang Violence in the Caribbean." Washington, DC (February 17, 2012).

International Association of Chiefs of Police. "Three Gaps in Research on Policing." Chicago, IL (October 23, 2011).

National Institute of Justice Research Conference. "A Review of Law Enforcement Programs in CrimeSolutions.gov." Arlington, VA (June 20, 2011).

*Homicide and Major Crime Investigation Symposium, University of Glamorgan. "Transferring Criminal Investigation Methods from Developed to Developing Nations." Cardiff, Wales (June 5, 2011).

*Qatar Ministry of Interior. "The Worldwide Spread of Community Policing." Doha, Qatar (October 5, 2010)

*Zhejiang Police College: Sino-US Gang/Youthful Misbehavior Research Collaboration Roundtable. "Recent Developments in American Police Responses to Crime." Hongzhou, China (June 10, 2008).

*Organized Crime: A Threat to the Caribbean (A symposium hosted by the Organization of American States). "Diagnosing Gangs in the Caribbean." Montego Bay, Jamaica (With Charles M. Katz; March 21, 2007).

*St. Martin de Porres Church. "Community Approaches to Reducing Gang Violence." Gonzales, East Port of Spain, Trinidad (May 12, 2006).

Virginia Commonwealth University. "Policing: Using Trust as a Tool to Reduce Crime."

Richmond, VA (April 25, 2006).

*Trinidad and Tobago Police Service. "Reducing Violent Crime in Trinidad and Tobago." Port of Spain, Trinidad (March 14, 2006).

George Mason University, on the Visit of the Honorable Martin Joseph, Minister of National Security, Trinidad and Tobago. "Reducing Violent Crime in Trinidad and Tobago." Manassas, VA (February 4, 2006)

Administration of Justice Advisory Board, George Mason University. "Reducing Violent Crime in Trinidad and Tobago." Fairfax, Virginia (December 16, 2005). [The Chairman of this Advisory Board was Edwin Meese III, former Attorney General of the United States].

*Association of Caribbean Commissioners of Police. "Police Reform Intervention Strategies." Hastings, Barbados (December 7, 2005).

*Trinidad and Tobago Ministry of National Security. "Improving the Capacity of the Inter-Agency Task-Force to Reduce Violent Crime." Port of Spain, Trinidad (June 3, 2005).

*Edmonton Police Service. "Organizational Structure and Performance Measurement in Policing." Edmonton, Canada (March, 2005).

Police Executive Research Forum. "Performance Measures for Consent Decrees." Washington, DC (February 11, 2005).

*U.S. State Department. "Preventing Crime: Research Evidence on Effective Crime Policy." American Embassy, Curitiba and Sao Paulo, Brazil (5 talks given during lecture tour from September 15-17, 2004).

*4th IACP South American Executive Policing Conference. "Data Analysis as a Management Tool." Porto Alegre, Brazil (September 14, 2004).

Commission on Accreditation for Law Enforcement Agencies. "Findings from Four National CALEA Surveys." Fairfax, VA (May 18, 2004; with Megan Gantley).

*First Nations Chiefs of Police Association. "How to Measure Your Agency's Performance." Calgary, Alberta, Canada (May 14, 2004).

*U.S. State Department. "Preventing and Responding to Urban Violence." American Embassy, Rio De Janeiro and Brasilia, Brazil (3 talks given during lecture tour from March 24-26, 2004).

Police Foundation. "Police Organizations as Learning Laboratories." *Ideas in American Policing* lecture series. Washington, DC (February 17, 2004).

Commission on Accreditation for Law Enforcement Agencies. "Measuring the Performance of Law Enforcement Agencies." Talk repeated four times: Orlando, FL (March, 2003); Detroit, MI (July, 2003); Colorado Springs, CO (November 2003); and Pasadena, CA (March, 2004).

Coalition of Justice Associations. "The Public Image of the Police." Alexandria, VA (March 12,

2003).

Commission on Accreditation for Law Enforcement Agencies, Performance Measurement Committee. "A White Paper on Police Agency Performance." Alexandria, VA (September, 2002).

Southern Illinois University at Carbondale, Third annual Elmer and Carol Johnson Criminal Justice Career Fair. Guest Panelist (April, 2002).

National Research Council, Committee to Review Research on Police Policy and Practice. "Multiwave Establishment Surveys of Police Organizations." Washington, DC (April 11, 2002).

*International Association of Chiefs of Police, Image and Ethics Committee. "The Public Image of the Police." Toronto, Canada (May, 2001).

Southern Illinois University at Carbondale, First annual Elmer and Carol Johnson Criminal Justice Career Fair. Guest Panelist (April, 2000).

*Complutense University of Madrid, El Escorial, Spain. "La Función Policial Orientada a la Resolución de Problemas" with simultaneous translation into Spanish (June, 1999).

Police Executive Research Forum, 1998 Annual Meeting. "Research Evidence on the Spread of Community Policing" (April, 1998). San Antonio, TX.


## PAPERS/POSTERS PRESENTED AT PROFESSIONAL MEETINGS (PAST 10 YEARS ONLY)

*Key:*    *ASC = American Society of Criminology annual conference*
          *ACJS=Academy of Criminal Justice Sciences annual conference*
          NIJ= *National Institute of Justice annual research conference*

Maguire, E.R. "Findings from a Study of MS-13 in the U.S. and El Salvador." Paper presented at ASC: San Francisco, CA (November 15, 2019).

Adams, E., Morris, P., and E.R. Maguire. "Institutionalization of Gangs in Trinidad." Paper presented at ASC: Atlanta, GA (November 16, 2018).

Johnson, D., E.R. Maguire, and J. Kuhns. "Evaluating the Effects of Community Policing on Perceived Disorder in a Developing Nation." Paper presented at ASC: Philadelphia, PA (November 15, 2017).

Maguire, E.R., B. Lowrey, and D. Johnson. "The Effects of Procedural Justice on Perceptions of Police Bias: Evidence from Two Randomized Experiments." Paper presented at ASC: New Orleans, LA (November 17, 2016).

Campbell, B.A., J. Nix, and E.R. Maguire. "Civilians Killed by Police Pre- and Post-Ferguson: A Time Series Analysis." Paper presented at ASC: New Orleans, LA (November 16, 2016).

Kuhns, J.B., E.R. Maguire, D. Dolliver, E. Bent, and J. Cambareri. "Understanding Firearms Assaults against Law Enforcement Officers in the United States." Paper presented at ACJS: Denver, CO (April 1, 2016).

Maguire, E.R., D. Johnson, and B.V. Lowrey. "Evaluating the Relative Impact of Positive and Negative Encounters with Police." Paper presented at ACJS: Denver, CO (March 31, 2016).

Bennett, R.R. and E.R. Maguire. "Constructing a Conceptual Model of Police Accountability." Paper presented at the European Society of Criminology: Porto, Portugal (September 3, 2015).

Lowrey, B., E.R. Maguire, and R.R. Bennett. "Optimal Levels of Procedural Justice in Traffic Stops." Paper presented at ACJS: Orlando, FL (March 4, 2015).

Maguire, E.R., J. Hibdon, D. Johnson, and J. Kuhns. "Community Policing and Crime Reduction: A New View from Trinidad and Tobago." Paper presented at ASC: San Francisco, CA (November 21, 2014).

Maguire, E.R., M. Vriniotis, and A. Harriott. "Correlates of Bullying Victimization among Adolescents in the English-Speaking Caribbean." Paper presented at ASC: San Francisco, CA (November 20, 2014).

Maguire, E.R. "The Role of Community Policing in the Occupy Movement." Paper presented at ASC: Atlanta, GA (November 21, 2013).

Johnson, D. and E.R. Maguire. "Explaining Support for Punitive, Rehabilitative, and Preventive Criminal Justice Policies in the Caribbean." Paper presented at ASC: Atlanta, GA (November 20, 2013).

Maguire, E.R. "Support for Punitive and Progressive Crime Policies in the Caribbean." Paper presented at ACJS: Dallas, TX (March 21, 2013).

Maguire, E.R. "The Antecedents of Informal Social Control in the Caribbean." Paper presented at ASC: Chicago, IL (November 14, 2012).

Maguire, E.R. "Perceptions of Police Among Occupy DC Participants." Paper presented at the International Conference on Justice, Security and Human Rights at John Jay College: New York, NY (June 9, 2012).

Maguire, E.R. "The Structure of Adolescent Attitudes toward Police."  Paper presented at ASC: Washington, DC (November 17, 2011).

Maguire, E.R. "A Review of Law Enforcement Programs in CrimeSolutions.gov." Paper presented at NIJ: Arlington, VA (June 20, 2011).

Maguire, E.R. "The Effects of School Commitment on Adolescent Problem Behavior in Trinidad and Tobago." Paper presented at ACJS: Toronto, Canada (March 4, 2011).

King, W.R. and E.R. Maguire. "Predictors of Homicide Investigation Success in a Developing Nation: A Multi-Method Study." Paper presented at ASC: San Francisco, CA (November 17, 2010).

## SERVICE & PARTICIPATION

Guest Editor
- *Group Processes and Intergroup Relations*, guest co-editor for special issue on policing (2022)
- *Caribbean Journal of Criminology*, guest co-editor for special issue on international research collaborations (2022)
- *International Journal of Comparative and Applied Criminal Justice*, guest editor for special issue on the contributions of David Bayley (2021)
- *Police Practice and Research,* guest editor for special issue on procedural justice and legitimacy (2018*)*
- *Caribbean Journal of Criminology & Public Safety,* guest co-editor, volume 13 (2008)

Editorial Positions
- *Police Practice and Research* (Editorial Board member, 2020-present)
- *Police Quarterly* (Editorial Board member, 2017 - present)
- *Justice Quarterly* (Associate Editor, 1999-2002 term)
- *Sicurezza e scienze sociali* (International Scientific Board member)
- *Encyclopedia of Police Science* (Editorial Board member)
- *Transnational Crime and Global Security* (Advisory Board member)

Manuscript / Grant Proposal Reviewer (Agencies/Nonprofits)
- National Institute of Justice (1998-2015)
- Office of Community Oriented Policing Services (2002-2015)
- National Science Foundation (2004-2017)
- Department of Homeland Security (2006)
- Israel Science Foundation (2012-2020)
- Social Sciences and Humanities Research Council, Canada (2014-2018)
- British Academy / Leverhulme Trust, United Kingdom (2014-2020)
- Campbell Collaboration (2018)
- Economic and Social Research Council, United Kingdom (2018)
- Poland National Science Centre (2021)

Ph.D. Dissertation Committees

*Chair, Ph.D. Dissertation Committee*
- Belén Lowrey, American University; Justice, Law & Criminology (2017).
- Kenneth Sebastian Leon, American University; Justice, Law & Criminology (2017).

- David Tyler, Arizona State University; Criminology & Criminal Justice (2020).
- Michael Seales, University of the West Indies – St. Augustine, Trinidad and Tobago (in progress)

*Member / Reader, Ph.D. Dissertation Committee*
- Charles Katz, University of Nebraska at Omaha; Criminal Justice (1998).
- Jeffrey Spears, University of Nebraska at Omaha; Criminal Justice (1999).
- William Wells, University of Nebraska at Omaha; Criminal Justice (1999).
- Paula Kautt, University of Nebraska at Omaha; Criminal Justice (2000).
- David Muhlhausen, University of Maryland, Baltimore County; Policy Studies (2004).
- Joshua Chanin, American University; Public Administration (2011).
- Rebecca Welch, American University; Justice, Law & Society (2012).
- Jane Palmer, American University; Justice, Law & Society (2012).
- Francisco DaCunha, American University; Education (2013).
- Hyon Namgung, Univ. of Missouri-St. Louis; Criminology & Criminal Justice (2013).
- Allison Brooks, American University; Justice, Law & Society (2014).
- Gokhan Aksu, American University; Justice, Law & Society (2014).
- Daniel Pryce, George Mason University; Criminology, Law & Society (2014).
- Keith Williams, American University; Justice, Law & Criminology (2015).
- Joel Hunt, American University; Justice, Law & Criminology (2016).
- Kris Lugo, American University; Justice, Law & Criminology (2016).
- Erin Kearns, American University; Justice, Law & Criminology (2016).
- Erik Alda, American University; Justice, Law & Criminology (2017).
- Jessica Huff, Arizona State University; Criminology & Criminal Justice (2020).
- Jessica Rosenthal, Arizona State University; Criminology & Criminal Justice (in progress).
- Akeela Marin, University of Trinidad and Tobago; Institute for Criminology & Public Safety (in progress).

*External Examiner, Ph.D. Dissertation (Commonwealth nations)*
- Stephen Darroch, Griffith University; Criminology & Criminal Justice (2009).
- Oluwagbenga Akinlabi, Griffith University; Criminology & Criminal Justice (2016).
- Laura Bedford, University of Queensland; Institute for Social Science Research (2017).
- Kevin Peters, University of the West Indies – St. Augustine, Trinidad and Tobago (2022).
- Tarik Weekes, University of the West Indies – Mona, Jamaica (in progress).
- Abhishek Awadh, University of Madras, India (in progress).

Master's Thesis Committees

*Chair, Master's Thesis Committee*
- Kimberly Hassell, University of Nebraska at Omaha, Criminal Justice, 1999.
- Audrey Puckett, Arizona State University, Criminology & Criminal Justice (2020).
- Brandee Augustine, Arizona State University, Criminology & Criminal Justice (2021).
- April Dunlap, Arizona State University, Criminology & Criminal Justice (in progress).

*Member / Reader, Master's Thesis Committee*
- Abiud Hernandez, Arizona State University, Criminology & Criminal Justice (2021).
- Andrew Hughes, Arizona State University, Criminology & Criminal Justice (2021).

*External Examiner, Master's Thesis (Commonwealth nations)*
- Akeila Greene, University of the West Indies – St. Augustine, Trinidad (2018)


**MEMBERSHIP IN PROFESSIONAL ASSOCIATIONS**
Academy of Criminal Justice Sciences (ACJS)
American Society of Criminology (ASC)
   *Member of Program Committee (2002, 2005, 2006, 2008, 2011)
International Association of Chiefs of Police (IACP, membership lapsed)


**COURSES TAUGHT** (B=Bachelor's, M=Master's, D=Doctoral)
Community Policing (B)
Criminal Justice Program Evaluation (B)
Criminal Justice Planning and Program Evaluation (M)
Critical Issues in Justice (B)
Honors Seminar in Police Legitimacy (B)
Prevention and Deterrence of Crime (B)
Police Administration and Management (B)
Survey of Criminal Justice (B)
Terrorism and Local Policing (B)
Strategic Crime Control (B)
Research Methods (B,M,D)
Crime Policy (M)
Criminal Justice Planning and Change (M)
Police and Society (M)
Statistics I & II (M)
Advanced Research in Policing (D)
Justice Organization and Administration (D)
Proseminar in Justice (D)


**HONORS & AWARDS**

Western Society of Criminology, Fellow's Award for outstanding contributions to the field of criminology (2022).

Distinguished Alumni Award, School of Criminal Justice, University at Albany (2018).

Chair, Research Advisory Board, Police Executive Research Forum (2018-present).

Inaugural Member, Research Advisory Board, Police Executive Research Forum (2015-present).

Special Advisory Member, Government of Uruguay's Scientific Advisory Committee on marijuana legalization (2014-2015).

Standing Review Panel, National Institute of Justice (2012-2014).

National Advisory Group, International Association of Chiefs of Police homicide investigation project (2012-2013).

Advisory Board, Houston Police Department Eyewitness Identification Experiment (2012-2014).

Emerald Literati Club's "2011 Highly Commended Award" for a paper published in Policing: An International Journal of Police Strategies and Management.

Advisory Board, Center for Violence Prevention and Community Safety, Arizona State University (2010-2016).

Research Advisory Board, Police Foundation (2004-2006).

Emerald Literati Club's "2003 Highly Commended Award" for a paper published in Policing: An International Journal of Police Strategies and Management.

Board of Mentors, Wadsworth Publishers (2001).

Member, National Community Oriented Policing Resource Board, an advisory committee to the U.S. Justice Department's Office of Community Oriented Policing Services (1998).

University at Albany "President's Distinguished Doctoral Dissertation Award" (1998).

U.S. Department of Justice, Office of Community Oriented Policing Services, Cash Award for Outstanding Performance, $1,500 (1995).

Graduate Fellowship, School of Criminal Justice, University at Albany (1991-92).

First prize, Alpha Phi Sigma (Criminal Justice Honor Society) National Student Paper Competition.  Award presented at the annual ACJS meeting in Nashville, Tennessee (1991).

# EXHIBIT B

|    | A | B |
|----|---|---|
| 1 | **Materials Provided for Review** | |
| 2 | | |
| 3 | **Bates Number (if applicable)** | **File Name/Description** |
| 4 | BLM_00000001 - BLM_00000061 | photos |
| 5 | BLM_00000062 - BLM_00000131 | Videos |
| 6 | BLM_00000132 - BLM_00000166 | photos |
| 7 | BLM_00000266 | photo |
| 8 | BLM_00000974 - BLM_00001004 | photos |
| 9 | BLM_00001005 - BLM_00001069 | photos, videos |
| 10 | BLM_00001072 - BLM_00001077 | photos |
| 11 | BLM_00001106 - BLM_00001538 | photos |
| 12 | BLM_00001539 - BLM_00001643 | Videos & photos |
| 13 | BLM_00001644 - BLM_00001657 | photos |
| 14 | BLM_00001674 - BLM_00001767 | Denver Office of the Independent Monitor Report |
| 15 | BPD2 - BPD43 | Documents |
| 16 | COABLM 231-232 | Aurora PD BWC footage |
| 17 | COABLM 237 | Aurora PD BWC footage |
| 18 | COABLM 247 | Aurora PD BWC footage |
| 19 | COABLM 253 | Aurora PD BWC footage |
| 20 | COABLM 256 | Aurora PD BWC footage |
| 21 | COABLM 267 | Aurora PD BWC footage |
| 22 | COABLM 275-276 | Aurora PD BWC footage |
| 23 | COABLM 281-282 | Aurora PD BWC footage |
| 24 | COABLM 28-230 | Aurora PD General Offense Reports |
| 25 | COABLM 290 | Aurora PD BWC footage |
| 26 | COABLM 294 | Aurora PD BWC footage |
| 27 | COABLM 297 | Aurora PD BWC footage |
| 28 | COABLM 299-301 | Aurora PD BWC footage |
| 29 | COABLM 305 | Aurora PD BWC footage |
| 30 | COABLM 310 | Aurora PD BWC footage |
| 31 | COABLM 325 | Aurora PD BWC footage |
| 32 | COABLM 329 | Aurora PD BWC footage |
| 33 | COABLM 340 | Aurora PD BWC footage |
| 34 | COABLM 345-556 | Aurora PD BWC footage |
| 35 | CSP1 - CSP12 | BLM Protest 5.29.20 Operations Plan Capitol - Redacted |
| 36 | DEN000001 - DEN000017 | CAD Report 05.28.20 |
| 37 | DEN000018 - DEN000035 | CAD Report 05.29.20 |
| 38 | DEN000036 - DEN000058 | CAD Report 05.30.20 |
| 39 | DEN000059 - DEN000067 | CAD Report 05.31.20 |
| 40 | DEN000068 - DEN000111 | DPD Crowd Management_Redacted |
| 41 | DEN000117 | STG.ICP.2.3.CHEM.INTRO |
| 42 | DEN000149 | STG.ICP.2.3.CHEM.2 |

| | A | B |
|---|---|---|
| 43 | DEN000172 | STG.ICP.2.3.CHEM.3 |
| 44 | DEN000192 | STG.ICP.2.3.CHEM.4 |
| 45 | DEN000206 | STG.ICP.2.3.CHEM.5 |
| 46 | DEN000231 - DEN000234 | Videos - Chemical Agents |
| 47 | DEN000235 - DEN000316 | Crowd Mgmt for Supervisors - Sgt. School_Redacted |
| 48 | DEN000317 - DEN000335 | OC Course |
| 49 | DEN000336 - DEN000413 | 40mm Operator Course_Version 11.19 |
| 50 | DEN000414 - DEN000415 | DPD 40mm Operator Course Outlin |
| 51 | DEN000416 - DEN000417 | DPD 40mm Operator Practical Qualification_Version 11.19 |
| 52 | DEN000418 - DEN000421 | DPD 40mm Operator Written Exam_Version 11.19 |
| 53 | DEN000422 - DEN000425 | DPD 40mm Operator Written Exam_Version 11.19 |
| 54 | DEN000426 | 40mm Direct Impact Round |
| 55 | DEN000426 | 40mm Direct Impact Round |
| 56 | DEN000427 | 40mm eXact iMpact Sponge Round 6325 |
| 57 | DEN000428 | 40mm_250_Shot_Training_Kit_6530 |
| 58 | DEN000429 | Penn Arms 40mm multi pump |
| 59 | DEN000430 | Penn Arms 40mm single |
| 60 | DEN000431.0001 | 1 - Contempt of Cop.mp4 |
| 61 | DEN000431.0002 | 4 - Long Distance walk with gun and takes Hostage.mp4 |
| 62 | DEN000431.0003 | 4 - Safety Priorities LAPD Shoots Hostage Deescalation.mp4 |
| 63 | DEN000431.0004 | 4b - Guy Jogging with Knife.mp4 |
| 64 | DEN000431.0005 | 5 - Single Officer Suicide with Knife.mp4 |
| 65 | DEN000431.0006 | 7 - Haase SAGE 16-17382_FC297-1.mp4 |
| 66 | DEN000431.0007 | 10 - Breach gas robot taser tackle.wmv |
| 67 | DEN000431.0008 | 10 - FCPS and CSUPD.mp4 |
| 68 | DEN000431.0009 | 11 - Officer or Citizen Carry.mp4 |
| 69 | DEN000431.0010 | 12 - Suicidal man in car death blamed on Chief.mp4 |
| 70 | DEN000431.0011 | 15 - Robbery Suspect.wmv |
| 71 | DEN000431.0012 | 17 - Contact Team FCPD N College shooting.mp4 |
| 72 | DEN000431.0013 | 17 - Police Use Pepper Balls To Arrest Suspect.mp4 |
| 73 | DEN000431.0014 | 18 - Pitts stab in neck.mp4 |
| 74 | DEN000431.0015 | 18 - Yellow Shirt with Knife press Taser.mp4 |
| 75 | DEN000431.0016 | 19 - Americas Best Video OIS.mp4 |
| 76 | DEN000431.0017 | Inmate in hall.MPG |
| 77 | DEN000431.0018 | LA.MPG |
| 78 | DEN000431.0019 | LAPD B Bag.mpg |
| 79 | DEN000431.0020 | MIAMI.MPG |

| | A | B |
|---|---|---|
| 80 | DEN000431.0021 | Phil PA knife.MPG |
| 81 | DEN000431.0022 | Show Boat Car Thief.AVI |
| 82 | DEN000432 | 8 hour schedule - redacted_Redacted |
| 83 | DEN000433 - DEN000579 | DPD Crowd Control Field Force Trng redacted |
| 84 | DEN000580 - DEN000581 | Practice- Handout_Redacted |
| 85 | DEN000582.0001 | Hong Kong protestors |
| 86 | DEN000582.0002 | Mass arrest video |
| 87 | DEN000583 | DPD Crowd Control - Online Refresher Training_Redacted.mp4 |
| 88 | DEN000584 - DEN000671 | Pepperball Operator Course_Version 4.20 |
| 89 | DEN000672 - DEN000673 | PepperBall Operator Practical Qualification_Version 4.20 |
| 90 | DEN000674 | PepperBall Operator Written Exam_Version 4.20 |
| 91 | DEN000675 - DEN000677 | PepperBall Operator Written Exam_Version 4.20 |
| 92 | DEN000678 - DEN000681 | PepperBall Operator Written Exam_Version 4.20 |
| 93 | DEN000682 - DEN000690 | FTC-manual-9-1-17 |
| 94 | DEN000691 | spec_FTC |
| 95 | DEN000692 | spec_PepperBall-Accessories-13_cu_HPA |
| 96 | DEN000693 | spec_PepperBall-Accessories-SCUBA |
| 97 | DEN000694 | spec_PepperBall-Projectile-Round-Live-X |
| 98 | DEN000695 | spec-round-inert-19141 |
| 99 | DEN000696 - DEN000822 | DPD Crowd Control 5 Hr Recruit Field Force Trng 3Hr Plan Instr Redacted |
| 100 | DEN000696.0001 | Air Fill Procedure |
| 101 | DEN000696.0002 | Baltimore.mp4 |
| 102 | DEN000696.0003 | Border Security.mpg |
| 103 | DEN000696.0004 | Denver PD 2.mp4 |
| 104 | DEN000696.0005 | Denver PD.mp4 |
| 105 | DEN000696.0006 | Drunk Groin.mp4 |
| 106 | DEN000696.0007 | Field Searches.mpg |
| 107 | DEN000696.0008 | Final Warning Riots.wmv |
| 108 | DEN000696.0009 | Keene State Riot 1.mp4 |
| 109 | DEN000696.0010 | Murrieta 1a.wmv |
| 110 | DEN000696.0011 | PB Effects.wmv |
| 111 | DEN000696.0012 | SDPD Car_WMV V9.wmv |
| 112 | DEN000823 - DEN000948 | DPD Crowd Control 5 Hr Recruit Field Force Trng 3 Hr PPT_Redacted |
| 113 | DEN000949 | Hong Kong protestors.mp4 |
| 114 | DEN000950 - DEN001754 | 05-20 Book - Operations Manual |
| 115 | DEN001755 - DEN001798 | Crowd Management Manual - Redacted v.2 |
| 116 | DEN001909 - DEN001911 | Crowd Mgmt for Supervisors - Sgt. School_Redacted |

|   | A | B |
|---|---|---|
| 117 | DEN001912 - DEN001915 | Training Bulletin 8.16.18 1st Amend |
| 118 | DEN001916 - DEN001918 | AAR 05.28.2020 |
| 119 | DEN001919 - DEN001922 | AAR_05.29.2020_Redacted |
| 120 | DEN001923 - DEN001926 | AAR_05.31.2020_Redacted |
| 121 | DEN001927 - DEN001929 | AAR_5.30.2020 |
| 122 | DEN001930 - DEN001933 | AAR_06.01.2020 |
| 123 | DEN001934 - DEN001936 | AAR_06.02.2020 |
| 124 | DEN001937 - DEN001939 | AAR_05.28.2020_Chemical Agents (Sich) |
| 125 | DEN001940 - DEN001941 | AAR_05.29.2020_Chemical Agents (Sich) |
| 126 | DEN001942 - DEN001943 | AAR_05.30.2020_Chemical Agents (Sich) |
| 127 | DEN001944 - DEN001945 | AAR_05.31.2020_Chemical Agents (Sich) |
| 128 | DEN001946 - DEN001957 | OPS PLAN_05.28.2020_Justice for George Floyd_Redacted |
| 129 | DEN001958 - DEN001969 | OPS PLAN_05.29.2020_Justice for George Floyd (Wyckoff)_Redacted |
| 130 | DEN001970 - DEN001982 | OPS PLAN_05.30.2020_Justice for George Floyd_Redacted |
| 131 | DEN001983 - DEN001995 | OPS PLAN_05.31.2020_Justice for George Floyd_Redacted |
| 132 | DEN001996 - DEN002011 | OPS PLAN_06.01.2020 - March in Honor of George Floyd_Redacted |
| 133 | DEN002012 - DEN002027 | OPS PLAN_06.02.2020 - 06.05.2020 - George Floyd Protest_Redacted |
| 134 | DEN002028 - DEN002063 | 20-0330514 CAD 5.28 |
| 135 | DEN002064 - DEN002077 | 20-0336556 CAD 5.31 |
| 136 | DEN002078 - DEN002092 | 20-340681 CAD  06.02.2020_Redacted |
| 137 | DEN002093 - DEN002105 | CAD_06.01.2020 (20-0338873)_Redacted |
| 138 | DEN002177 - DEN002184 | U2020-0364_Redacted |
| 139 | DEN002185 - DEN002200 | U2020-0365 |
| 140 | DEN002201 - DEN002204 | U2020-0368 |
| 141 | DEN002205 - DEN002230 | U2020-0369_Redacted |
| 142 | DEN002231 - DEN002238 | U2020-0370 |
| 143 | DEN002239 - DEN002246 | U2020-0372 |
| 144 | DEN002247 - DEN002265 | U2020-0374_Redacted |
| 145 | DEN002266 - DEN002275 | U2020-0375 |
| 146 | DEN002276 - DEN002329 | U2020-0378 |
| 147 | DEN002330 - DEN002339 | U2020-0385 |
| 148 | DEN002340 - DEN002348 | U2020-0387 |
| 149 | DEN002349 - DEN002362 | U2020-0388_Redacted |
| 150 | DEN002363 - DEN002376 | U2020-0394 |
| 151 | DEN002377 - DEN002442 | U2020-0400_Redacted |
| 152 | DEN002443 - DEN002461 | U2020-0410_Redacted |
| 153 | DEN002462 - DEN002762 | Telestaff 5.28-6.2 |
| 154 | DEN002763 - DEN002776 | Chemical Agent Timeline |
| 155 | DEN002777 - DEN003839 | OFFICER STATEMENTS |

| | A | B |
|---|---|---|
| 156 | DEN003840 | AirOne Video - 5-28-2020 |
| 157 | DEN003841 | AirOne Video - 5-29-2020 |
| 158 | DEN003842 | AirOne Video - 5-30-2020 |
| 159 | DEN003843 | AirOne Video - 5-31-2020 |
| 160 | DEN003844 - DEN003885 | HALO Videos |
| 161 | DEN003886 - DEN003892 | Denver PD BWC footage |
| 162 | DEN003912 - DEN003918 | AirOne Video - 6-1-2020 |
| 163 | DEN003919 - DEN003924 | AirOne Video - 6-2-2020 |
| 164 | DEN003925 - DEN004018 | Office of Independent Monitor Report |
| 165 | DEN004021 - DEN004045 | Denver PD BWC footage |
| 166 | DEN004047 | Denver PD BWC footage |
| 167 | DEN004049 - DEN004052 | Denver PD BWC footage |
| 168 | DEN004059 | Denver PD BWC footage |
| 169 | DEN004071 - DEN004072 | Denver PD BWC footage |
| 170 | DEN004075 | Denver PD BWC footage |
| 171 | DEN004078 | Denver PD BWC footage |
| 172 | DEN004086 - DEN004092 | Denver PD BWC footage |
| 173 | DEN004154 - DEN004241 | Denver PD BWC footage |
| 174 | DEN004243 | Decline Letter |
| 175 | DEN004244 | EDOS_Response_Letter_Protests_IAB |
| 176 | DEN004245 | Grothe Email |
| 177 | DEN004249 | Klukas Email |
| 178 | DEN004253 | OIM Complaint 1 |
| 179 | DEN004254 | Denver PD video - METRO SWAT pepper ball |
| 180 | DEN004255 - DEN004258 | DFD 20-52470 |
| 181 | DEN004259 - DEN004262 | DFD 20-52500 |
| 182 | DEN004263 - DEN004266 | DFD 20-52514 |
| 183 | DEN004267 - DEN004270 | DFD 20-52800 |
| 184 | DEN004271 - DEN004275 | DFD 20-52860 |
| 185 | DEN004276 - DEN004279 | DFD 20-52903 |
| 186 | DEN004280 | DFD Protest Incidents |
| 187 | DEN004281 | Email Chain Kniech Chief Commander |
| 188 | DEN004284 | Decline  Letter for Record Only |
| 189 | DEN004285 | Tent fire |
| 190 | DEN004286 | Video |
| 191 | DEN004370 | Aboellail - OIM Intake Form |
| 192 | DEN004373 | Allred's Notification of IAB Complaint |
| 193 | DEN004374 | Beidscheid - OIM Intake Form |
| 194 | DEN004379 | Case Disposition Notice |
| 195 | DEN004380 | Decline Letter |
| 196 | DEN004380 | Decline Letter |
| 197 | DEN004381 | EDOS_Response_Letter_Protests_IAB |
| 198 | DEN004382 | Email from Beidscheid - Badge number and Location |

| | A | B |
|---|---|---|
| 199 | DEN004384 | Email from Beidscheid 06-19-2020 |
| 200 | DEN004385 | Email response from Biedscheid 06-19-2020 |
| 201 | DEN004389 | Email to Aboellail - requesting contact phone number |
| 202 | DEN004390 | Email to Beidscheid asking for more info 06-18-2020 |
| 203 | DEN004393 | Ofc Schultz Garrity Advisement |
| 204 | DEN004395 | Pic of Officers  1 |
| 205 | DEN004396 | Pic of Officers - IDed by Officers - Close up |
| 206 | DEN004397 | Pic of Officers - IDed by Officers |
| 207 | DEN004398 | Pics of Officers |
| 208 | DEN004399 - DEN004402 | Denver PD videos |
| 209 | DEN004403 - DEN004575 | P2020-0125_Redacted |
| 210 | DEN004688 - DEN004690 | AAR 05.28.2020 |
| 211 | DEN004691 - DEN004694 | AAR_05.29.2020_Redacted |
| 212 | DEN004695 - DEN004698 | AAR_05.31.2020_Redacted |
| 213 | DEN004699 - DEN004702 | AAR_06.01.2020 |
| 214 | DEN004716 | Jacquelyn Parkins Decline Letter |
| 215 | DEN004724 | EDOS_Response_Letter_Protests_IAB |
| 216 | DEN004725 | Givens' Decline Letter |
| 217 | DEN004726 | Photo CONFIDENTIAL 20200724_191024 |
| 218 | DEN004728 | Photo CONFIDENTIAL 20200724_191052 |
| 219 | DEN004729 - DEN004730 | Denver PD videos |
| 220 | DEN004731 | Case Disposition Notificaion |
| 221 | DEN004732 | Decline Letter |
| 222 | DEN004733 | Garrity and Statement - Barnes |
| 223 | DEN004736 | Mediation Form |
| 224 | DEN004738 | Ofc Notice of Complaint |
| 225 | DEN004740 | Scalise-Barnes Mediation close letter |
| 226 | DEN004741 - DEN004743 | Denver PD videos |
| 227 | DEN004744 | P2020-0131_Redacted |
| 228 | DEN004793 | Rock |
| 229 | DEN004906 - DEN004909 | Denver PD audio files |
| 230 | DEN004943 | Hickman -Resolution Decline Letter |
| 231 | DEN004960 | Complaint from Harms |
| 232 | DEN004962 | Abby Harms -Decline Status Letter |
| 233 | DEN004963 | EDOS_Response_Letter_Protests_IAB |
| 234 | DEN004964 | Denver PD audio file |
| 235 | DEN004965 | Decline Letter - Kylie Kline |
| 236 | DEN004975 - DEN005125 | Denver PD BWC footage |
| 237 | | DPD radio communications excerpts, 5/28 & 5/31 |
| 238 | DEN005187 | Rich Branden Decline Letter |
| 239 | DEN005190 | ATC Bjelland via email in regards to complaint |

| | A | B |
|---|---|---|
| 240 | DEN005191 | ATC Bjelland via email-2 |
| 241 | DEN005192 - DEN0005913 | Citizen Decline Letter |
| 242 | DEN005194 | Complaint via the OIM |
| 243 | DEN005197 | EDOS Letter |
| 244 | DEN005198 | Flyer from location at 1416 Penn St |
| 245 | DEN005199 - DEN005204 | HALO Videos |
| 246 | DEN005205 | 575A AVL |
| 247 | DEN005206 | 2020 Protest Glass-Body Repair Vehicle Costs DPD |
| 248 | DEN005215 | AVL Data Explanation |
| 249 | DEN005216 | AVL575A |
| 250 | DEN005220 | CAD 20-330514_Redacted |
| 251 | DEN005255 - DEN0005256 | Citizen decline with a debrief |
| 252 | DEN005257 | DPD Complaint & follow-up email Jade Keena |
| 253 | DEN005261 | EDOS_Response_Letter_Protests_IAB |
| 254 | DEN005262 | Email with Jade Keena  Re FW DPD Complaint |
| 255 | DEN005266 | Fleet ID two Silver Yukons |
| 256 | DEN005271 | FW Fleet |
| 257 | DEN005274 | Garage Email Damage T9312 |
| 258 | DEN005276 | Log 575A Montanez_Redacted |
| 259 | DEN005280 | Notice of Complaint |
| 260 | DEN005281 | Ofc Montanez Notice of Complaint |
| 261 | DEN005282 | Ofc Montanez Statement |
| 262 | DEN005286 | OIM DPD Complaint  Jade Keena |
| 263 | DEN005289 | Photo Siver Yukon |
| 264 | DEN005290 | Silver Yukon Blk wheels Red and Blue Lights Fleet |
| 265 | DEN005293 | T9312 Vehicle Damage from Protest |
| 266 | DEN005294 | Tucker Email License Plate DPD Complaint Jade Keena |
| 267 | DEN005297 - DEN005301 | HALO Videos |
| 268 | DEN005302 | Daily Detail Report_Redacted.pdf |
| 269 | DEN005306 | Citizen Complaint |
| 270 | DEN005311 | DPD 200 Investigation summary |
| 271 | DEN005312 | Journal Entry |
| 272 | DEN005313 | Officer Statement and Garrity |
| 273 | DEN005316 | Short video |
| 274 | DEN005317 | Sustained Journal Entry Letter Short |
| 275 | DEN005318 - DEN005319 | Denver PD Audio and video files |
| 276 | DEN005320 - DEN005324 | HALO Videos |
| 277 | DEN005325 | Denver PD audio file |
| 278 | DEN005326 - DEN005329 | AAR_05.31.2020_Redacted |
| 279 | DEN005335 - DEN005344 | 5_31 CAD Report |
| 280 | DEN005345 | Complaint from BaileyYntema@gmail |

|  | A | B |
|---|---|---|
| 281 | DEN005348 | Altman Statement |
| 282 | DEN005349 | DEN5349 Aurora Reports_Redacted |
| 283 | DEN005459 - DEN005467 | Officer Statements |
| 284 | DEN005468 | DEN5468 Citizen Yntema Decline Letter |
| 285 | DEN005469 - DEN005471 | Officer Statements |
| 286 | DEN005472 | Commerce City_Brighton After Action Report |
| 287 | DEN005482 | Commerce City_Brighton use of force reports |
| 288 | DEN005571 - DEN005572 | Cunningham Statement |
| 289 | DEN005573 | Curfew was made effective for the Dates and hours |
| 290 | DEN005574 | Douglas County Sheriff Report |
| 291 | DEN005579 | EDOS_Response_Letter_Protests_IAB |
| 292 | DEN005580 | Emergency Curfew |
| 293 | DEN005582 | Evidence Map - Evidencecom P2020-0173 |
| 294 | DEN005584 - DEN005586 | Officer Statements |
| 295 | DEN005587 | Jefferson County Report_Redacted |
| 296 | DEN005590 - DEN005604 | Officer Statements |
| 297 | DEN005605 | Email_RE_ _EXTERNAL_ Re_ Follow up on online report sent to PocketGov |
| 298 | DEN005607 - DEN005625 | Officer Statements |
| 299 | DEN005626 | Email_Fey photos |
| 300 | DEN005627 | Email_Re_ OIM Complaint #13066271 |
| 301 | DEN005628 | 5_29 Protest CAD |
| 302 | DEN005636 | AAR_05.29.2020_Redacted |
| 303 | DEN005640 - DEN005645 | Officer Statements |
| 304 | DEN005646 - DEN 005664 | Chemical Agent Timeline By Date- George Floyd Protest |
| 305 | DEN005665 | Citizen Fey Decline Letter |
| 306 | DEN005666 - DEN005667 | Drew statement |
| 307 | DEN005668 | EDOS_Response_Letter_Protests_IAB |
| 308 | DEN005669 | Evidence Map - Evidencecom P2020-0175 |
| 309 | DEN005671 | FW_DPD Complaint _ Geoffry Fey |
| 310 | DEN005674 - DEN005675 | Gunsauls statement |
| 311 | DEN005676 | IMG_20200529_231255716 taken by the complainant |
| 312 | DEN005677 | IMG_20200529_231259983 taken by the complainant |
| 313 | DEN005678 - DEN005689 | Officer Statements |
| 314 | DEN005690 | OIM Complaint #13066271 |
| 315 | DEN005691 | Email_RE_ [EXTERNAL] Fey phots |
| 316 | DEN005692 - DEN005697 | Officer Statements |
| 317 | DEN005698 - DEN005701 | HALO Videos |
| 318 | DEN005702 - DEN005704 | Denver PD audio files |
| 319 | DEN005705 | Denver PD BWC footage |
| 320 | DEN005710 | Decline Letter |

|  | A | B |
|---|---|---|
| 321 | DEN005715 | 5_30 After Action Report |
| 322 | DEN005718 | 5_30 CAD report_Redacted |
| 323 | DEN005730 | A City and County of Denver curfew |
| 324 | DEN005731 - DEN005734 | Officer Statements |
| 325 | DEN005735 - DEN 005753 | Chemical Agent Timeline By Date- George Floyd Protest |
| 326 | DEN005754 | Citizen Helmick Decline Letter |
| 327 | DEN005755 | Commerce City_Brighton After Action Report |
| 328 | DEN005765 | Commerce City_Brighton use of force reports |
| 329 | DEN005854 - DEN005855 | DEN5854 Cunningham statement |
| 330 | DEN005856 | Douglas County Sheriff Report |
| 331 | DEN005861 | EDOS_Response_Letter_Protests_IAB |
| 332 | DEN005862 | Emergency Curfew |
| 333 | DEN005864 | Evidence Map - Evidencecom |
| 334 | DEN005867 | Email_FW_ Denver Police Internal Affairs Complaint #P2020-0177 |
| 335 | DEN005869 | Email_FW_ DPD Complaint _ Robert Helmick (Complainant Struck with Pepper Balls) |
| 336 | DEN005872 - DEN005879 | Officer Statements |
| 337 | DEN005880 | Still of party wearing helmet, possibly the complainant.pdf |
| 338 | DEN005881 - DEN005884 | Officer Statements |
| 339 | DEN005885 - DEN005889 | HALO Videos |
| 340 | DEN005900 | Denver PD audio file - TAC6 radio |
| 341 | DEN005901 | Denver PD BWC footage |
| 342 | DEN005902 | EDOS_Response_Letter_Protests_IAB |
| 343 | DEN005903 | Wilson e-mail complaint instuctions |
| 344 | DEN005904 | Wilson-Decline letter |
| 345 | DEN005904 | Wilson-Decline letter |
| 346 | DEN005905 | Wilson-Follow-up email |
| 347 | DEN005906 | Wilson-OIM Intake |
| 348 | DEN005909 | 5_31 Arrest log_Redacted |
| 349 | DEN005915 | 5_31 CAD Report |
| 350 | DEN005925 | A City and County of Denver curfew |
| 351 | DEN005926 | AAR_05.31.2020_Redacted |
| 352 | DEN005930 | Allred statement |
| 353 | DEN005931 | Aurora Reports_Redactions_Redacted |
| 354 | DEN006041 | Bishop statement |
| 355 | DEN006042 - DEN 006060 | Chemical Agent Timeline By Date- George Floyd Protest |
| 356 | DEN006061 | Christian statement |
| 357 | DEN006062 - DEN006063 | Citizen Jebsen Decline Letter |
| 358 | DEN006064 | Commerce City_Brighton After Action Report |
| 359 | DEN006074 | Commerce City_Brighton use of force reports |
| 360 | DEN006163 - DEN006164 | Cordova statement |

|  | A | B |
|---|---|---|
| 361 | DEN006165 | EDOS_Response_Letter_Protests_IAB |
| 362 | DEN006166 | Emergency Curfew |
| 363 | DEN006168 | Evidence Map - Evidencecom P2020-0181 |
| 364 | DEN006170 - DEN006176 | Officer Statements |
| 365 | DEN006177 | Jefferson County Report_Redacted |
| 366 | DEN006180 - DEN006190 | Officer Statements |
| 367 | DEN006191 | OIM Complaint #13062558 |
| 368 | DEN006192 - DEN006195 | Officer Statements |
| 369 | DEN006196 | RE_ DPD Complaint _ Jens Jebsen_Redacted |
| 370 | DEN006199 - DEN006209 | Officer Statements |
| 371 | DEN006210 | Still of Aurora PD black armored vehicle on colfax |
| 372 | DEN006211 | Still of Black MRAP vehicle on colfax |
| 373 | DEN006212 | Still of small black armored police vehicle on colfax |
| 374 | DEN006213 - DEN006214 | Vento statement_Redacted |
| 375 | DEN006215 - DEN006219 | HALO Videos |
| 376 | DEN006220 - DEN006223 | Denver PD audio files |
| 377 | DEN006224 | Decline Letter Humphries |
| 378 | DEN006227 | Decline Letter |
| 379 | DEN006234 DEN006235 | Denver PD audio files |
| 380 | DEN006236 | Decline Letter Gardner |
| 381 | DEN006237 | EDOS_Response_Letter_Protests_IAB |
| 382 | DEN006238 | Email sent to complainant |
| 383 | DEN006239 | Decline Letter Berry |
| 384 | DEN006240 | EDOS_Response_Letter_Protests_IAB |
| 385 | DEN006241 | Email sent to complainant |
| 386 | DEN006242 - DEN006245 | Denver PD audio files |
| 387 | DEN006246 | 05-31-2020 mass  Arrest Log_Complainant no. 101_Redacted |
| 388 | DEN006258 | Email sent to complainant |
| 389 | DEN006259 | Decline Letter |
| 390 | DEN006264 | P2020-0197_Redacted |
| 391 | DEN006264 - DEN006342 | P2020-0197_Redacted |
| 392 | DEN006267 - DEN006268 | Decline letter P2020-0197 |
| 393 | DEN006343 - DEN006346 | HALO Videos |
| 394 | DEN006347 | Denver PD BWC footage |
| 395 | DEN006348 - DEN006350 | Denver PD audio files |
| 396 | DEN006351 - DEN006353 | P2020-0198_Redacted |
| 397 | DEN006354 - DEN006362 | P2020-0200_Redactions |
| 398 | DEN006363 - DEN006366 | HALO Videos |
| 399 | DEN006378 - DEN006379 | Decline letter_P2020-0205 |
| 400 | DEN006383 - DEN006385 | Decline letter_P2020-0206 |
| 401 | DEN006386 - DEN006387 | Denver PD audio files |

| | A | B |
|---|---|---|
| 402 | DEN006388 - DEN006390 | Decline letter_P2020-0216 |
| 403 | DEN006391 | Denver PD audio file |
| 404 | DEN006392 - DEN006400 | P2020-0258_Redacted |
| 405 | DEN006401 - DEN006403 | Denver PD BWC footage |
| 406 | DEN006404 | Denver PD audio file |
| 407 | DEN006501 - DEN006503 | Commander Phelan Correspondence re Outside Agencies |
| 408 | DEN006534 - DEN006537 | DPD emails |
| 409 | DEN006549 - DEN006550 | DPD emails |
| 410 | DEN006553 - DEN006556 | DPD emails |
| 411 | DEN006561 - DEN006562 | DPD emails |
| 412 | DEN006616 - DEN006618 | DPD emails |
| 413 | DEN006738 - DEN006741 | DPD emails |
| 414 | DEN006745 - DEN006748 | DPD emails |
| 415 | DEN006768 - DEN006771 | DPD emails |
| 416 | DEN006785 - DEN006788 | DPD emails |
| 417 | DEN006802 - DEN006804 | DPD emails |
| 418 | DEN006818 - DEN006821 | DPD emails |
| 419 | DEN006836 - DEN006839 | DPD emails |
| 420 | DEN006840 - DEN006842 | DPD emails |
| 421 | DEN006869 - DEN006872 | DPD emails |
| 422 | DEN006890 - DEN006892 | DPD emails |
| 423 | DEN006894 - DEN006896 | DPD emails |
| 424 | DEN006897 - DEN006898 | DPD emails |
| 425 | DEN006899 - DEN006902 | DPD emails |
| 426 | DEN006903 - DEN006905 | DPD emails |
| 427 | DEN006906 - DEN006909 | DPD emails |
| 428 | DEN006910 - DEN006913 | DPD emails |
| 429 | DEN006914 - DEN006917 | DPD emails |
| 430 | DEN007004 - DEN007005 | robinson email re TRO |
| 431 | DEN007047 - DEN007045 | Robinson to media re concerns |
| 432 | DEN007220 - DEN007223 | DPD emails |
| 433 | DEN008076 - DEN008077 | Decline letter P2020-0158 |
| 434 | DEN008177 - DEN008183 | Acker - McDermott Statements |
| 435 | DEN009873 | Robinson email to Pazen LL force memo |
| 436 | DEN009874 | Robinson memo LL force |
| 437 | DEN009881 - DEN009883 | Dodge email re complaints |
| 438 | DEN009884 - DEN010188 | DPD Officers' training histories |
| 439 | DEN010264 - DEN010271 | Decline letters SVC2020-0028 |
| 440 | DEN010422 - DEN010431 | Decline letters SVC2020-0029 |
| 441 | DEN010573 - DEN010577 | Decline letter SVC2020-0031 |
| 442 | DEN010846 - DEN010847 | Decline letters SVC2020-0032 |
| 443 | DEN010974 - DEN010975 | Decline letter IC2020-0055 |
| 444 | DEN011000 - DEN011003 | Decline letter P2020-0133 |

| | A | B |
|---|---|---|
| 445 | DEN011022 - DEN011024 | Decline letter P2020-0144 |
| 446 | DEN011033 - DEN011037 | Decline letter P2020-0151 |
| 447 | DEN011076 | Decline letter_Hall |
| 448 | DEN011157 - DEN011160 | Decline letter SVC2020-0163 |
| 449 | DEN011182 - DEN011184 | Decline letter_SVC2020-0167 |
| 450 | DEN011380 - DEN011384 | Sanchez email protect troops |
| 451 | DEN011855 - DEN011920 | DPD Officers' training histories |
| 452 | DEN011921 - DEN011931, DEN011934 | List of Videos - 2016 thru present |
| 453 | DEN011935 - DEN012009 | DPD Officers' training histories |
| 454 | DEN012010 - DEN012064 | IC2020-0051 Archuleta |
| 455 | DEN012069 - DEN012169 | IC2020-0074-Streeter_Redacted |
| 456 | DEN012174 - DEN012179 | Past complaint protest_P2015-0288_pp1-6 |
| 457 | DEN012447 - DEN012451, DEN012681 - DEN012686 | Past complaint protest_P2015-0318_excerpts |
| 458 | DEN012699 - DEN012706 | Past complaint protest_P2015-0339_excerpts |
| 459 | DEN012771-012773, 012811-012814 | Past complaint protest_P2015-0408_excerpts |
| 460 | DEN012831, 012854, 012867-012872, 012855-012859 | Past complaint protest_P2016-0361_excerpts |
| 461 | DEN013035-013037, 013053-013054 | Text msgs re curfew enforcement on protestors |
| 462 | DEN013089 - DEN014761 | Officer Statements_redacted |
| 463 | Fitouri 000002-000007 | Plaintiff's videos |
| 464 | Fitouri 000101-000105 | Plaintiff's videos |
| 465 | Fitouri 000114-000123 | Plaintiff's videos |
| 466 | Fitouri 000193-000229 | Plaintiff's videos |
| 467 | Fitouri 000241-000248 | Plaintiff's videos |
| 468 | Fitouri 000256 | curfew announcement video using LRAD |
| 469 | Fitouri 010938-010940 | Plaintiff's videos |
| 470 | Fitouri 010966-010968 | Plaintiff's videos |
| 471 | Fitouri 011072 | Plaintiff's video |
| 472 | Fitouri 011078 | Plaintiff's video |
| 473 | Fitouri 011148-011151 | Plaintiff's videos |
| 474 | Fitouri 011175-011176 | Plaintiff's videos |
| 475 | Fitorui 011237 | Plaintiff's video |
| 476 | Fitouri 011239 | Plaintiff's video |
| 477 | Fitouri 011241-011243 | Plaintiff's videos |
| 478 | Fitouri 011302-011303 | Emergency Curfew Order |
| 479 | Fitouri 011304-011305 | Emergency Declaration |
| 480 | Fitouri 012178-012189 | Video from CO Education Association |
| 481 | Fitouri 012550-012552 | DPD AAR from Adams County |
| 482 | Fitouri 012554-012555 | Unified Command AAR |
| 483 | Fitouri 016836 | Plaintiff's video |
| 484 | Fitouri 017058 | Plaintiff's video |
| 485 | Fitouri 017197 | Plaintiff's video |

| | A | B |
|---|---|---|
| 486 | Fitouri 017242 | Plaintiff's video |
| 487 | Fitouri 017273 | Plaintiff's audio file |
| 488 | Fitouri 017643-017650 | Plaintiff's audio files |
| 489 | Fitouri 017707-017712 | Plaintiff's videos |
| 490 | Fitouri 017715-017717 | Plaintiff's videos |
| 491 | Fitouri 017721 | Plaintiff's video |
| 492 | Fitouri 017726 | Plaintiff's videos |
| 493 | Fitouri 017744-0177749 | Plaintiff's videos |
| 494 | Fitouri 017753 | Plaintiff's video |
| 495 | Fitouri 017755-017763 | Plaintiff's videos |
| 496 | Fitouri 017765 | Plaintiff's video |
| 497 | Fitouri 017768 | Plaintiff's video |
| 498 | Fitouri 017867-017908 | Plaintiff's videos |
| 499 | Fitouri 017928 | Plaintiff's video |
| 500 | Fitouri 017930 | Plaintiff's video |
| 501 | Fitouri 017939 | CCPD BWC footage |
| 502 | Fitouri 017941 | CCPD BWC footage |
| 503 | Fitouri 017948 | CCPD BWC footage |
| 504 | Fitouri 018079 | CCPD BWC footage |
| 505 | JCSO13 - JCSO47 | JCSO 20-10539 w Supps - clean |
| 506 | various file names | All video from Colorado State Patrol (5-28-2020 thru 6-2-2020) |
| 507 | N/A | Tak, Sergeant Anthony 021921 Condensed |
| 508 | N/A | Deposition Transcript of Aurora Police Sgt. Patrick Shaker |
| 509 | N/A | Deposition Transcript of Aurora Police Capt. Stephen Redfearn |
| 510 | N/A | Deposition Transcript of DPD Sergeant Rick Beall |
| 511 | N/A | Deposition Transcript of DPD Officer Adam Bolton |
| 512 | N/A | Deposition Transcript of Matthew Canino (METRO SWAT DENVER) |
| 513 | N/A | 2020-06-25 (1) Complaint |
| 514 | N/A | 2020-07-01 Fitouri Plaintiff Complaint |
| 515 | N/A | 2020-07-23 Fitouri Plaintiff First Amended Complaint |
| 516 | N/A | (91-3) Exhibit 2 - Declaration of Claire Sannier |
| 517 | N/A | (91-4) Exhibit 3 - Declaration of Sara Fitouri |
| 518 | N/A | (91-5) Exhibit 4 - Declaration of Jacquelyn Parkins |
| 519 | N/A | (91-6) Exhibit 5 - Declaration of Johnathen D. Duran |
| 520 | N/A | (91-7) Exhibit 6 - Declaration of Kelsey Taylor |

| | A | B |
|---|---|---|
| 521 | N/A | (91-8) Exhibit 7 - Declaration of Youssef Amghar, with photos |
| 522 | N/A | (91-9) Exhibit 8 - Declaration of Joe Deras |
| 523 | N/A | (91-100) Exhibit 88 - Declaration of Shavonne Blades |
| 524 | N/A | (91-101) Exhibit 89 - Declaration of Robert Helmick |
| 525 | N/A | (91-102) Exhibit 90 - Declaration of Tejas Cousik |
| 526 | N/A | (91-103) Exhibit 91 - Declaration of Emma Smedberg |
| 527 | N/A | (91-104) Exhibit 92 - Declaration of Abby Zinman |
| 528 | N/A | (91-105) Exhibit 93 - Declaration of Brianne Sanchez, with photos |
| 529 | N/A | (91-106) Exhibit 94 - Declaration of Bennett Stebleton |
| 530 | N/A | (91-107) Exhibit 95 - Declaration of Jesse Newman |
| 531 | N/A | (91-108) Exhibit 96 - Declaration of Hayley Banyai-Becker |
| 532 | N/A | (91-110) Exhibit 98 - Declaration of Madeleine Kelly |
| 533 | N/A | (91-115) Exhibit 107 - Declaration of Ruby Tedeschi |
| 534 | N/A | SECURED Jefferson County Regional SWAT After Action Review |
| 535 | N/A | 2021-03-30 BLM Plaintiffs' First Set of Interrogatories to City and County of Denver (NOS. 1-3) |
| 536 | N/A | 2021-04-20 - BLM 5280 Plaintiffs' Second Set of Interrogatories to City and County of Denver (Nos 4-15) |
| 537 | N/A | 2021-04-28 - Defs' Response to BLM 5280 Pltfs' First Set of Roggs (Nos. 1-3) FINAL |
| 538 | N/A | 2021-05-20 Defs' Response to BLM Pltfs' Second Set of Roggs (Nos. 4-15) FINAL |
| 539 | N/A | 2020-09-21 (46) Joint Scheduling Order |
| 540 | N/A | Olsen v Owners Insurance Company |
| 541 | N/A | Fox v Gates Corp |
| 542 | N/A | Case - Cisneros v Town of Center |
| 543 | N/A | Case - Connick v Thompson |
| 544 | N/A | Case - Grynberg v Total SA |
| 545 | N/A | Case - Hilt v SFC Inc |
| 546 | N/A | Case - In re The City of New York |
| 547 | N/A | Case - Trujillo v Campbell |
| 548 | N/A | Case - Watson v City of Kansas City Kansas |
| 549 | N/A | 2020-09-22 Defs' First Combined Discovery Requests to Pltfs |

| | A | B |
|---|---|---|
| 550 | N/A | 2020-10-22 Fitouri Response to City's INT1_Amghar.Verification |
| 551 | N/A | 2020-10-22 Fitouri Response to City's INT1_Deras.Verification |
| 552 | N/A | 2020-10-22 Fitouri Response to City's INT1_Taylor.Verification |
| 553 | N/A | 2020-10-23 Fitouri Response to City's INT1_De La vaca Duran.Verification |
| 554 | N/A | 2020-10-26 Fitouri Response to City's INT1_Amghar.FINAL |
| 555 | N/A | 2020-10-26 Fitouri Ps Responses to City's 1st Int. |
| 556 | N/A | 2020-10-26 Fitouri Response to City's INT1_De La vaca Duran.FINAL |
| 557 | N/A | 2020-10-26 Fitouri Response to City's INT1_Deras.FINAL |
| 558 | N/A | 2020-10-26 Fitouri Response to City's INT1_Fitouri.FINAL |
| 559 | N/A | 2020-10-26 Fitouri Response to City's INT1_Sannier.FINAL |
| 560 | N/A | 2020-10-26 Fitouri Response to City's INT1_Fitouri.Verification |
| 561 | N/A | 2020-10-26 Fitouri Response to City's INT1_Parkins.FINAL |
| 562 | N/A | 2020-10-26 Fitouri Response to City's INT1_Taylor.FINAL |
| 563 | N/A | 2020-10-26 Fitouri Response to City's INT1_Sannier.Verification |
| 564 | N/A | 2020-10-28 Fitouri Response to City's INT1_Parkins.Verification |
| 565 | N/A | 2020-10-30 Fitouri Response to City's INT1_Fitouri.FINAL.v2 |
| 566 | N/A | 2020-10-30 Fitouri Response to City's INT1_Taylor.Amd.FINAL |
| 567 | N/A | 2020-10-30 Fitouri Response to City's INT1_Taylor.Amd.Verification |
| 568 | N/A | 2020-11-05 BLM 5280 Plaintffs' Objs. and Resp. to Defs' Discovery Requests |
| 569 | N/A | 2020-11-22 Fitouri Amended Response to City's INT 1-3.Sannier.FINAL |
| 570 | N/A | 2021-04-05 BLM 5280 Plaintff Epps's First Supplemental Response to Defendants' First Set of Discovery Requests |
| 571 | N/A | 2021-04-05 BLM 5280 Plaintiff Lyman's First Supplemental Response to Defendants' First Set of Discovery Requests |
| 572 | N/A | 2021-04-09 BLM 5280 Plaintiffs' Supp Objs & Resp to Defs' Rog 4, RFP 2 |
| 573 | N/A | 2021-04-09 - Defs' Second Combined Discovery Requests to Pltfs |

| | A | B |
|---|---|---|
| 574 | N/A | 2014AnnualReport_OIM_re BWC SWAT |
| 575 | N/A | 2014AnnualReportPolicyHighlight_OIM_re BWC SWAT |
| 576 | N/A | 2015AnnualReport_OIM_BWC |
| 577 | N/A | 2017SemiannualReport_OIM_see fn56 |
| 578 | N/A | Deposition Transcript of Patrick Phelan |
| 579 | N/A | Deposition Transcript of Sgt. David Abeyta |
| 580 | N/A | Deposition Transcript of John Sampson |
| 581 | N/A | Deposition Transcript of Tana Cunningham |
| 582 | N/A | Deposition Transcript of Nicholas Mitchell |
| 583 | N/A | Deposition Transcript of DPD Officer Keith Valentine |
| 584 | N/A | Deposition Transcript of Lt. J.D. Williams |
| 585 | N/A | Deposition Transcript of Lt. Thomas Pine |
| 586 | N/A | Deposition Transcript of Lt. Vincent Porter |
| 587 | N/A | Deposition Transcript of Chief Paul Pazen |
| 588 | N/A | List of relevant videos and notes |
| 589 | 4569683_07E48613175E4C5D94A80F37102C409D_200528_4569683_Police_Accountability_Protests_Turn_Violent_In_D_4000.mp4 | |
| 590 | 4570369_327C29C2F6C44F8C88A6A46A82A6577F_200529_4570369_Chaos_At_The_Capitol__People_Protesting_Death_Of_4000.mp4 | |
| 591 | 4570373_BBC25FD2B9B3416CA77C29149900AAE3_200529_4570373_George_Floyd_Death__Peaceful_Protest_In_Denver_T_4000.mp4 | |
| 592 | 4570514_CB3787BE398E4E62BC9BDE5EBFFD262A_200529_4570514_Denver_Mayor__Violence_During_George_Floyd_Prote_4000.mp4 | |
| 593 | 4570857_45917ACF8CC34C539720CA3AAFDE96DA_200529_4570857_A_Few_Agitators_Within_The_Group_Of_Protesters_L_4000.mp4 | |
| 594 | 5-28-2020 1.mp4 | 9 News video |
| 595 | 5-28-2020 2.mp4 | 9 News video |
| 596 | 5-28-2020 4.mp4 | 9 News video |
| 597 | 5-30-2020 2.mp4 | 9 News video |
| 598 | 5-30-2020 4.mp4 | 9 News video |
| 599 | 5-30-2020 7.mp4 | 9 News video |
| 600 | 5-31-2020 4.mp4 | 9 News video |
| 601 | Live coverage 5-30-2020.mp4 | 9 News video |
| 602 | Stamper DENVER Xpert Report 7.29.21_FINAL w sig.pdf | Norman Stamper report |