## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:22-cv-01338-SKC-SBP

JAZMINE BJELLAND, *et al.*,

        Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

        Defendants.

---

### ORDER RE: MOTION FOR SUMMARY JUDGMENT (DKT. 98)

---

In the spring of 2020, a group of demonstrators gathered in Denver to protest the murder of George Floyd and acts of violence perpetrated by police officers against Black Americans and people of color. Plaintiffs Jazmine Bjelland, Derek Buranen, Gareth Doskey, Lauren Folkerts, Jack Girard, Joseph Gallegos, Robert Greer, Zuri Hoskin, Huitziloxochitl ("Lala") Jaramillo, Debra Gehri Gilles a/k/a Virya Kelsang, Kevin Kreeger, Sebastian McCants, Sean Christian McDonnell a/k/a Christian McDonnell, and Douglas Munn, attended various days of the protests. They have filed this lawsuit based on their respective interactions with officers from the Denver Police Department (DPD)—including Officer Adam Bolton, who is sued in his individual capacity—and those officers' use of "less-lethal" weapons and crowd control tactics during various days of the protests.

1

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States. Plaintiffs' claims fall into two categories. First are those claims seeking damages from the City and County of Denver pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Plaintiffs contend Denver's alleged policies regarding crowd control tactics violated their First and Fourth Amendment rights. The second category of claims allege Officer Bolton violated Plaintiffs Jaramillo and McDonnell's First and Fourth Amendment rights when Bolton allegedly used excessive force against them.

Following a period of discovery, Defendants moved for summary judgment in their favor on all of Plaintiffs' claims. Dkt. 98. The Court has carefully reviewed the Motion and related briefing, the evidence, the relevant law, and the entire case file. The Court has also considered the undisputed material facts in the light most favorable to the non-moving party. *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). No hearing is necessary. For the following reasons, Defendants' Motion is DENIED IN PART and GRANTED IN PART.

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).

Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury, or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 248-49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

Defendants seek summary judgment on Plaintiffs' claims in their entirety. They assert Plaintiffs cannot succeed on their First Amendment claims and that their Fourth Amendment claims fail because they cannot establish a seizure. Dkt. 98 at pp.17-23. They further contend Plaintiffs cannot meet the requirements of municipal

liability under *Monell*. Finally, Officer Bolton argues he is entitled to qualified immunity as to Ms. Jaramillo's and Mr. McDonnell's claims against him.

The Court first examines Defendants' arguments regarding the merits of the First and Fourth Amendment claims, then turns to their arguments regarding the *Monell* elements, and concludes with Officer Bolton's request for qualified immunity.

## A.    First Amendment Retaliation

"[A]ny form of official retaliation for exercising one's freedom of speech . . . constitutes an infringement of that freedom." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotation omitted). To prevail on a claim of First Amendment retaliation, Plaintiffs must establish: "(1) [they were] engaged in constitutionally protected activity; (2) the defendant's actions caused [them] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to [their] exercise of constitutionally protected conduct." *Id*. Defendants contend they are entitled to summary judgment on Plaintiffs' First Amendment claims because Plaintiffs cannot establish the first or third elements of retaliation.[1]

_____

[1] As they did in *Cousik v. City & Cnty. of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 896755, at *2 n.6 (D. Colo. Mar. 1, 2024), Defendants argue there is no First Amendment claim based on the use of force itself. They cite no case law for such a proposition and this construction seems to inappropriately narrow Plaintiffs' claims. Further, this argument overlooks other cases from this district—with similar factual scenarios—that recognized claims for both impermissible content-based restriction and First Amendment retaliation. *Dayton v. City & Cnty. of Denver, Colorado*, 649 F. Supp. 3d 1124, 1135-37 (D. Colo. 2023); *Minter v. City of Aurora, Colorado*, No. 20-CV-02172-RMR-NYW, 2022 WL 900158, at *5-8 (D. Colo. Mar. 28, 2022). However,

1.    **Protected Conduct**

Defendants generally contend that summary judgment is appropriate because "[m]any of Plaintiffs' incidents" did not constitute protected speech. Since the Complaint alleges each Plaintiffs' discreet actions taken over the course of their time at the protests, Defendants have cherry-picked certain of those discreet actions to argue that those discreet acts are not constitutionally protected. But this is too narrow a reading of Plaintiffs First Amendment claims. As the Court understands it, Plaintiffs have simply alleged their discreet conduct taken during the protests—*i.e.*, the factual background—but their claims rest on the amalgamation of their conduct all taken as persons who were exercising their freedom of assembly and protest. Furthermore, Plaintiffs have presented evidence that they all attended the protests to show support for the cause, whether they were actively speaking or not. *See e.g.*, Dkt. 105-42 at pp.4-20. *See also United States v. Cooper*, 279 F. Supp. 253, 255 (D. Colo. 1968) ("There is no question but that nonverbal expression may be considered a form of speech and may in certain instances be protected by the First Amendment." (citing *Brown v. State of Louisiana*, 383 U.S. 131, 142 (1966) (sit-in); *Carlson v. People of State of California*, 310 U.S. 106, 112 (1940) (involving picketing)).

---

Plaintiffs do not respond to this characterization of their claim and instead rely on First Amendment retaliation case law only. Consequently, as District Judge Nina Y. Wang did in *Cousik*, the Court construes Plaintiffs' First Amendment claim as one asserting solely impermissible retaliation. To the extent Plaintiffs intended to assert any other claims under the First Amendment, the Court considers those claims waived or abandoned based on Plaintiffs' failure to argue to the contrary. *Id*.

The Court will not parse every action of each Plaintiff on the days they attended the protests to determine whether and which of those discreet acts constitutes protected speech or assembly. Notably, Defendants have cited no authority suggesting the Court is required to parse each Plaintiffs' particular conduct in this fashion over the course of their time protesting.[2]

The Court has reviewed the summary judgment record and concludes there are sufficient disputed issues of material fact from which a reasonable jury could find Plaintiffs were each engaged in protected First Amendment conduct at the times they were affected by DPD's less-lethal weapons and crowd control tactics during the protests.

## 2.     **Substantially Motivated**

Defendants contend Plaintiffs cannot present evidence "demonstrating each use of force at issue was substantially motivated by each Plaintiffs' First Amendment

---

[2] In a single sentence, Defendants "argue" that any conduct occurring during Denver's curfew—the validity of which is not at issue in this matter—is not protected by the First Amendment. Dkt. 98 at p.19. This is an undeveloped argument and the Court does not address it except to note Defendants' cited case law does not support its position. The Court in *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 413-14 (S.D.N.Y. 2021) addressed whether a city curfew impinged on protesters' First Amendment rights. The Court concluded it was a permissible time, place, and manner restriction; it created no "curfew exception" to First Amendment protections such that an officer is free to retaliate against a peaceful protester after curfew. *Id*.; *see also Dayton v. City & Cnty. of Denver, Colorado*, 649 F. Supp. 3d 1124, 1134 (D. Colo. 2023) ("A curfew alone does not erase an individual's rights to freedom of speech and to be free from use of excessive force.").

activity and the officer using force had the required subjective intent." Dkt. 98 at p.20.[3] Plaintiffs contend the officers' "requisite motive is supported by a wide swath of evidence, including the fact that officers used unwarned force against Plaintiffs while they were engaged in peaceful protest activity." Dkt. 105 at p.24.

"Whether a defendant acted with a retaliatory animus is typically a fact question left to the jury." *Cousik*, 2024 WL 896755, at *4 (citing *Hedquist v. Beamer*, 763 F. App'x 705, 712 (10th Cir. 2019)). But the Court may nevertheless enter summary judgment when there is "no evidence from which a reasonable jury could find that the protected activity was a motivating factor in the adverse action." *Id*.

Here, the Court has reviewed the voluminous records and notes there is ample evidence from which a reasonable jury could find that each Plaintiff was hit with a projectile or subjected to tear gas or other chemical agents while peacefully protesting. *See, e.g.*, Dkt. 105-42 at pp.4-21 (Plaintiff's responses to interrogatories). It is not the Court's role to weigh this evidence. Instead, a reasonable jury weighing the evidence could find the Plaintiffs were peacefully protesting when they were

---

[3] Defendants suggest Plaintiffs must present specific evidence regarding the intent of each individual officer who deployed force against the specific Plaintiff. Dkt. 98 at p.20. Apart from a general reference to the Tenth Circuit's decision in *Worrell v. Henry*, however, Defendants have not cited any on-point legal authority. Like Judge Wang in *Cousik*, this Court was also unable to find authority requiring "such officer-specific proof where a plaintiff does not seek to impose individual liability on any particular officer." *Cousik*, 2024 WL 896755, at *5. Moreover, the Tenth Circuit "recently observed that 'while unusual, municipal liability may exist without individual liability.'" *Id*. (quoting *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023)). Thus, the Court will not grant summary judgment on these grounds.

subjected to DPD's less-lethal weapons and tactics, and that Plaintiffs' exercise of their First Amendment rights was the substantial or motivating cause of the officers' conduct. *Cousik*, 2024 WL 896755, at *4 ("Courts around the country have agreed that the use of force against non-violent protestors can support the inference that officers meant to intimidate protestors and deter antipolice messaging.") (cleaned up); *see also Epps v. City & Cnty. of Denver*, 588 F. Supp. 3d 1164, 1176 (D. Colo. 2022) (denying summary judgment where the plaintiffs "present[ed] evidence that they did not engage in destructive activity, and that many officers used force in situations that support an inference of retaliatory motive, such as tear gassing kneeling protestors chanting 'Hands Up Don't Shoot' or shooting a plaintiff through her 'Black Lives Matter' sign").

Defendants' final contention, that the DPD officers used force not because of any protest activity but because there were individuals engaged in violence among the protesters, is not supported by any citation to the record. Dkt. 98 at p.21. And even if it were, this argument is more appropriately directed to the jury. *Cousik*, 2024 WL 896755, at *4; *Epps*, 588 F. Supp. 3d at 1176 ("Defendants' contention that officer actions were motivated by a legitimate need to respond to violent protestors may be true, but that is for a jury to decide."). The Court denies Defendants' request for summary judgment on these grounds.

**B.      Fourth Amendment Claims**

Defendants' primary argument with respect to Plaintiffs' Fourth Amendment claims is that Plaintiffs were not seized because the "chemical agents or exploded pepper balls [] did not physically touch [them] and did not cause them to submit to any officer's authority." Dkt. 98 at pg.23. Defendants also contend they are entitled to summary judgment because Plaintiffs cannot show any officer intentionally applied force to seize them. These arguments are not persuasive.

First, to the extent Defendants contend the use of chemical agents or exploded pepper balls alone cannot constitute "physical" force, they cite no authority for the proposition. From the Court's research, while these chemical agents are colloquially referred to as "tear gas," ortho-chlorobenzylidenemalononitrile (CS) and oleoresin capsicum (OC) "are not actually gases but solids at room temperature" and have low solubility in water allowing them to be used as aerosols or microparticulates. *Tear Gas and Pepper Spray Toxicity*, R. David Tidwell; Brandon K. Wills, National Library of Medicine (May 14, 2023), https://www.ncbi.nlm.nih.gov/books/NBK544263 (last visited August 13, 2024). Upon immediate contact with an individual's sensory receptors, these chemical agents can cause burning pain, irritation, inflammation of the eyes, respiratory tract, and skin and may result in coughing, shortness of breath, chest pain, headache, dizziness, or syncope. *Id*.

The science alone suggests these chemical agents result in physical contact with an individual such that a claim for excessive force based on an officer's

deployment of chemical agents and pepper balls would not be out of the realm of a legally viable claim. To be sure, Courts regularly recognize that an officer's deployment of chemical agents constitutes a use of force albeit in the context of incarcerated persons raising Eighth Amendment claims. *See DeSpain v. Uphoff*, 264 F.3d 965, 980 (10th Cir. 2001). The Court can discern no logical reason why the use of chemical agents might constitute a use of physical force under the law when used on incarcerated persons, but not when used on peaceful protestors in the context alleged here. *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011) (pepper spray is "'intermediate force' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests"). Thus, whether any "physical" force was deployed in this case is at best a disputed issue of material fact.

The Court is also not persuaded by Defendants argument that Plaintiffs must submit to an officer's authority to be seized.[4] The argument overlooks the "distinction between seizures by *control* and seizures by *force*." *Torres v. Madrid*, 592 U.S. 306,

---

[4] Because of the confused drafting, it is not clear whether this is in fact Defendants' argument, but the Court addresses the issue nonetheless.

The parties' respective briefing in this matter has made resolving this Motion, at times, a herculean task. Both parties make arguments that are difficult to follow, are often unsupported by case law or citations to the record, or combine concepts that are independent of one another. In addition, the parties repeatedly argue past one another and fail to address the substance of the important questions presented in this case. The Court has in many instances given the briefing a far more liberal construction beyond anything required—a grace typically afforded to only pro se litigants, not those who are, as here, represented by counsel.

322 (2021) (emphasis in original). "A seizure by control requires either the voluntary submission to a show of authority or the termination of freedom of movement." *Cousik v. City & Cnty. of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 896755, at *7 (D. Colo. Mar. 1, 2024). Those seizures require that "a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Torres*, 592 U.S. at 322 (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)).

A seizure by force, however, does not require control. Instead, it "requires the use of force with intent to restrain," as opposed to force applied by accident or for some other purpose. *Shields v. Wiegand*, No. CV 20-2999, 2023 WL 8005296, at *5 (E.D. Pa. Nov. 17, 2023) (citing *Torres*, 592 U.S. at 317). While some seizures by force may be fleeting in nature, "brief seizures are seizures all the same." *Torres*, 592 U.S. at 318. Consequently, a plaintiff need not have submitted to an officer's authority or had their movement altogether terminated to be seized. *See Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 264 (S.D. Ohio 2021), *modified sub nom. Alsaada v. City of Columbus, Ohio*, No. 2:20-cv-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021) ("[W]hat is required is that a person's freedom of movement had been terminated, not that the person's movement itself had been terminated."); *Jennings v. City of Miami*, No. 07-23008-CIV, 2009 WL 413110, at *8 (S.D. Fla. Jan. 27, 2009) (Even when a "citizen is able to walk or hobble away" a seizure still occurs where there was an intentional application of physical force.).

The Court is persuaded that "even absent an arrest, the use of chemical spray and less-lethal projectiles can [] amount to a cognizable restraint under the Fourth Amendment where the clear effect of officers' use of pepper spray was to control plaintiffs' movement." *Alsaada*, 536 F. Supp. 3d at 264 (quoting *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258, at *9 (D. Or. Sept. 8, 2003)) (cleaned up); *see also Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231, 1241 (W.D. Wash. 2009) ("[H]is freedom of movement was terminated in both instances after he was sprayed with pepper spray."). Here, there is evidence that nearly all the Plaintiffs came into physical contact with chemical agents that effectively restrained their freedom of movement and constituted more than a minimal intrusion on their bodily integrity. To be sure, many of the Plaintiffs were disoriented, momentarily blinded, and unable to breathe, while at least one was incapacitated completely. *See e.g.*, Dkt. 105-42 at pp.4-21. Thus, the Court is satisfied there is sufficient evidence for a reasonable jury to conclude Plaintiffs were seized within the meaning of the Fourth Amendment.

Defendants also contend Plaintiffs cannot show any officer *intentionally* applied force to seize them. But this imposes a subjective standard on an otherwise objective inquiry. Courts "rarely probe the subjective motivations of police officers in the Fourth Amendment context," *Torres*, 592 U.S. at 317, and therefore, the question is whether "the challenged conduct *objectively* manifests an intent to restrain." *Id.* (emphasis in original). But Defendants do not argue this legal standard. They instead

argue an incorrect subjective standard on this claim. And because Defendants have not addressed the appropriate legal standard, the Court concludes they have failed to meet their burden. Consequently, their request for summary judgment on this basis is denied.

## C.   Municipal Liability

It is long-standing precedent that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676 (citing *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978)); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (A governmental entity "can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue.") (citing *Monell*, 436 U.S. at 694-95, 698). "[M]unicipal liability under § 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) (internal quotation marks and citations omitted); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) ("[T]he Supreme Court require[s] a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.").

To establish municipal liability under *Monell*, a plaintiff must show (1) a municipal employee committed a constitutional violation and (2) a municipal policy or custom was the moving force behind the violation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). An official policy or custom under *Monell* may take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up).

Defendants contend they are entitled to summary judgment on Plaintiffs' municipal liability claims because Plaintiffs cannot establish a custom, practice, or failure to train. And they contend Plaintiffs' evidence fails to establish ratification.[5] Defendants also challenge Plaintiffs' ability to establish causation because Plaintiffs

---

[5] In a single sentence, Defendants contend Plaintiffs' theory regarding body worn cameras (BWC)—that DPD inappropriately gives officers the discretion whether to turn their cameras on—must fail. Dkt. 98 at p.29. The Court does not address such woefully underdeveloped arguments. *See Center for Biological Diversity v. Pizarchik*, 858 F. Supp. 2d 1221, 1230 n. 11 (D. Colo. 2012) (court does not consider "cursory, unsupported, or otherwise inadequately briefed arguments") (citation and internal quotation marks omitted).

do not identify any specific Denver officer who injured them.[6] The Court agrees in part.

### 1.      Custom, Practice, Failure to Train

Denver contends it is entitled to summary judgment because Plaintiffs may not establish a custom or practice based solely on the events of the George Floyd protests because they were an isolated incident. But the Court concludes there is sufficient evidence for a jury to find in Plaintiffs' favor on their *Monell* claims. To prove the existence of a policy, custom, or practice, Plaintiffs have presented expert witness reports identifying numerous policies and customs of the Denver Police Department. Dkts. 105-7, 105-8. There is evidence that these policies and customs date back many years. Dkts. 105-45, 105-46, 105-47, 105-48. A reasonable jury presented with these policies and expert witness testimony at trial, could find these policies or customs were the moving force behind one or more of the alleged constitutional violations in this case.

Concerning Plaintiff's failure to train theory, "[i]n the absence of an explicit policy or an entrenched custom, the inadequacy of police training may serve as a basis of § 1983 liability . . . where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002). Deliberate indifference is established only

---

[6] In their arguments, the parties do not distinguish between Plaintiffs' First and Fourth Amendment claims, and therefore, the Court takes their lead.

when a city has actual or constructive notice that its actions or omissions are substantially likely to result in constitutional violations, and it deliberately chooses to disregard that risk of harm. *Canton*, 489 U.S. at 388; *Olsen,* 312 F.3d at 1318. "In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003).

As the Court understands their argument, Defendants contend that because these protests were "unprecedented," Plaintiffs cannot establish the prior notice necessary for deliberate indifference. But absent a pattern of conduct, notice may nevertheless be found if the violation of federal rights is a "highly predictable or plainly obvious consequence of a municipality's action or inaction such as when a municipality fails to train an employee in specific skills needed to handle recurring situations." *Id*.[7]

In this case, both expert witness reports support a conclusion that the need for officer training and policies in crowd control and crowd management is obvious for a police department, such that a pattern of conduct is not necessary to establish deliberate indifference. *See* Dkt. 105-7 at ¶¶164-65. Even if a protest of this magnitude was unprecedented in Denver, they are not unprecedented nationwide. It

---

[7] For example, in *Canton*, the Supreme Court noted that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons[, and they have] armed [] officers with firearms, in part to allow them to accomplish this task." *Canton*, 489 U.S. at 390 n.10. In such a situation, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Id*.

strains credulity to suggest that a protest, regardless of the size, would need to first occur locally before a police force was on notice of the need to train its officers in crowd control and crowd management.

The expert reports also suggest that Denver's training was deficient in ways highly relevant to the events of the George Floyd protests. For example, Mr. Maguire attests that Denver's training is outdated and does not reflect current standards for crowd management or the use of less-lethal weapons. Dkt. 105-8 at ¶¶22-28. Consequently, Plaintiffs will be permitted to pursue this theory at trial because there are disputed issues of material fact.

### 2.    Ratification

Plaintiffs argue DPD's failure to discipline officers and their praise of the officers' use of force ratified their conduct. Dkt. 105 at p.32. Defendants contend that to the extent Plaintiffs rely on a ratification theory, their claim must fail because there is no evidence that "a Denver final policymaker authorized any of the specific actions of officers related to Plaintiffs" or the basis of those actions. Dkt. 98 at p.30.

First, the "Tenth Circuit has instructed that "[f]ailing to adequately . . . punish does not count as ratification." *Cousik v. City & Cnty. of Denver*, No. 22-CV-01213-NYW-KAS, 2024 WL 896755, at *15 (D. Colo. Mar. 1, 2024) (citing *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x 774, 787 (10th Cir. 2019). Rather, "the final decisionmakers' approval must *precede* the violative action." *Huff v. City of Aurora*, No. 21-cv-02715-RMR-NRN, 2022 WL 4131438, at *12 (D. Colo. Sept. 12,

17

2022) (emphasis added). Here, from the Court's review of the record, the undisputed evidence shows that all of Plaintiffs' evidence (and argument) regarding ratification and a failure to discipline occurred after the relevant events. Plaintiffs have not cited any evidence of failures to discipline that preceded the protests. Consequently, they may not proceed on this theory of ratification and summary judgment is warranted insofar as this theory is concerned.

With respect to DPD policymakers' praise, the Court reaches the same conclusion. "To succeed on a ratification theory, the plaintiff must show that a final decisionmaker has ratified the employee's specific unconstitutional actions and the basis for those actions." *Cousik*, 2024 WL 896755, at *17. Plaintiffs cite a letter from Murphy Robinson, the Executive Director of the Department of Public Safety, to the entire DPD wherein Mr. Robinson thanked the officers for their service and offered general praise of their conduct during the protests. Dkt. 105-64. Plaintiffs claim this letter approves of the officers' conduct during the protests, and therefore, constitutes ratification. Dkt. 105 at pg. 32. On this question, however, the Court is again persuaded by District Judge Wang's analysis in *Cousik*.

In *Cousik*, the plaintiffs made a similar argument regarding ratification based on Denver's then-mayor and Chief of Police's press conference where they stated that Denver officers acted with "extreme restraint," performed in an "exemplary manner," and showed "tremendous restraint." 2024 WL 896755, at *17. There, as here, the plaintiffs' arguments regarding ratification were not supported by legal authority. *Id.*

Moreover, Judge Wang noted that the press conference comments did not clearly condone any specific conduct; rather, the generalized comments commended "the *entirety* of *all* police officers' conduct the night before." *Id*. (emphasis in original). Because the comments lacked specificity, Judge Wang concluded they were insufficient to support ratification. *Id. See also Bryson v. City of Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010) ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's *specific unconstitutional actions, as well as the basis for these actions*.") (emphasis added).

As in *Cousik*, the Court concludes Mr. Robinson's statements in his letter were too generalized and did not specifically approve of the actions at issue in this case. Because Plaintiffs have not cited the Court to any further commentary that would support ratification in this regard, they will not be permitted to proceed on this theory at trial, and summary judgment is warranted on this theory.

### 3. Causation

As mentioned, to establish causation, "a plaintiff must show that '(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.'" *Est. of Yoemans by & through Ishmael v. Campbell*, 501 F. Supp. 3d 1034, 1057 (D. Colo. 2020) (quoting *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998)). Causation is a question of fact for the jury. Denver contends Plaintiffs

cannot establish causation because—with a few exceptions—Plaintiffs cannot identify the specific officer(s) who caused their injuries.

The Court first observes that Defendants' cited cases do not support their contention that Plaintiffs must know the specific identity of the officers who injured them during the protests to prove causation under *Monell*. In the *Sanchez* case relied on by Defendants, the plaintiff was on duty as a special investigations officer with the New Mexico Department of Public Safety when an altercation broke out at a local bar. *Sanchez v. City of Albuqu*erque, No. CIV 12-1161 JB/KBM, 2014 WL 1953499, at *1 (D.N.M. Apr. 30, 2014). While he was attempting to break up the fight, an unknown individual knocked the plaintiff to the ground and he blacked out momentarily. *Id*. Although an Albuquerque police officer was standing over the plaintiff when he awoke, the plaintiff admitted he did not know whether the individual who knocked him to the ground was a City of Albuquerque employee. Because he could do little more than speculate as to the individual's identity as a city employee or non-city employee, the plaintiff was unable to sustain a *Monell* action.

*Sanchez* did not turn on the question of whether the plaintiff could specifically identify the individual who harmed him, but rather, that he could not tie the individual to the City defendant to create liability for the City under *Monell*. Here, however, Plaintiffs have evidence that the DPD, its decisionmakers, and its officers, were policing the protests at the specific locations where Plaintiffs were present and injured, and that it was DPD officers who deployed the crowd control tactics at issue.

*Compare* Dkt. 57 at ¶¶86-270 *with* Dkts. 105-7, 105-8 (discussing protest dates and locations). In addition, Plaintiffs present evidence that only Denver officers had pepperball guns and flashbangs. *Id.* (SAMF ¶1). Based on this evidence, a reasonable jury could find that Denver officers caused Plaintiffs' injuries despite not knowing the identity of any specific officer. *See Lucas*, 58 F.4th at 1144 (10th Cir. 2023) ("[W]hile unusual, municipal liability may exist without individual liability[.]").

Defendants also cite *Erickson v. City of Lakewood, Colorado*, 489 F. Supp. 3d 1192, 1207 (D. Colo. 2020). In that case, the plaintiff attempted to plead a *Monell* claim based on a ratification theory. But instead of specifically identifying the final policymaker who ratified the policy, the plaintiff's allegations of ratification referred only to the City of Lakewood generally. *Id.* at 1207. Tenth Circuit precedent requires more, and therefore, the plaintiff's *Monell* claim was dismissed. *Id.* (citing *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (affirming dismissal for failure to allege conduct was approved by official policymaker)). But this Court has already concluded Plaintiffs may not proceed on their ratification theories. And the Court does not read the holding in *Erickson* to more broadly require Plaintiffs to specifically identify their alleged assailant outside of the ratification context. Consequently, Defendants' request for summary judgment on this basis is denied.

**D.    Qualified Immunity**

Plaintiffs Lala Jaramillo and Christian McDonnell bring First and Fourth Amendment claims against Officer Adam Bolton in his individual capacity. Ms.

Jaramillo claims that Officer Bolton tackled her to the ground without provocation causing her to fracture her wrist. Dkt. 57 at ¶¶215-17. She also alleges Officer Bolton put his knee in her back, causing her respirator to choke her. *Id.* Mr. McDonnell contends Officer Bolton assaulted him and called him a "fucking faggot." *Id.* at ¶240. Defendants contend Officer Bolton is entitled to qualified immunity. Dkt. 98 at pp.31-34.

Qualified immunity shields individual defendants in Section 1983 actions unless their conduct was unreasonable based on clearly established law. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). The Court has discretion to consider these prongs in any order. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011). Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

### 1.    Ms. Jaramillo

Defendants contend Ms. Jaramillo's First Amendment retaliatory arrest claim must fail because there was probable cause for her arrest. Dkt. 98 at p.33. But Ms. Jaramillo does not assert a claim based on an alleged retaliatory arrest. Defendants' arguments and cited case law in this regard are thus inapposite.

Ms. Jaramillo's claim alleges the retaliatory use of excessive force. She alleges Bolton used an excessive amount of force against her in retaliation for her exercise of her First Amendment rights. Because Defendants have not addressed the claim she pleaded, the Court declines to address the merits of their arguments. Consequently, Officer Bolton's request for qualified immunity on this claim is denied, without prejudice.

Officer Bolton also argues he is entitled to qualified immunity on Ms. Jaramillo's Fourth Amendment claim because she did not identify him as the officer who tackled her, and even if he did tackle her, the force he used was reasonable. Dkt. 98 at 33. However, even if Ms. Jaramillo did not directly identify Officer Bolton as the individual who tackled her, she has presented sufficient extrinsic evidence to create a disputed issue of material fact as to whether it was him. *See* Dkts. 105-29, 105-30. Further, Plaintiffs have provided evidence that Ms. Jaramillo was charged only with a misdemeanor violation, that she did not resist arrest, and that Officer Bolton did not feel he was in danger while arresting her. Dkt. 105 (RSUF at ¶¶78-81). These material facts create disputed issues for the jury's resolution.

The law is clearly established that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008). Thus, a reasonable officer would be on notice that tackling a peaceful and nonresistant individual, even one violating a curfew, with such force as to fracture their arm violates the law. *Id*.; *see also Epps*, 588 F. Supp.

at 1177. Ms. Jaramillo's evidence is that she posed no threat and was not resisting, but Officer Bolton nevertheless tackled and choked her and fractured her arm.[8] Should a jury find she was peacefully protesting and not resisting, for example, then it was clearly established Officer Bolton's use of force was unlawful and he would not be entitled to qualified immunity. Thus, the Court cannot grant qualified immunity based on these disputed material facts because they are intertwined with the qualified immunity question regarding the Fourth Amendment claim. *See Scherbarth v. Woods*, No. 1:16-CV-02391-SKC, 2020 WL 1538755, at *7 (D. Colo. Mar. 31, 2020) ("Because the historical facts surrounding each discrete use of force are so intertwined with the question of law on qualified immunity, a jury must resolve the factual disputes before the legal question may be determined.").

### 2.    Mr. McDonnell

Apart from making generalized and conclusory statements that Officer Bolton's interaction with Mr. McDonnell does not rise to the level of a constitutional violation, Defendants have not made any arguments specific to his First Amendment claim. However, having reviewed the video evidence from Officer Bolton's BWC and the aerial news footage, the Court concludes the video raises disputed issues of

---

[8] While Ms. Jaramillo testified that others around her started to run when a police cruiser arrived, it is not clear if she ran prior to be being tackled. *See* Dkt. 105-69. At best, this creates a disputed question of fact for the jury as to whether Officer Bolton's actions were reasonable under the circumstances.

material fact which warrant submitting Mr. McDonnell's First Amendment claim to the jury.

In the BWC footage, Officer Bolton encounters protesters who are not vocalizing their disagreement with the DPD's tactics, and he does not approach or push those protestors. Instead, Officer Bolton confronts and pushes Mr. McDonnell who *was* vocalizing his incredulity over the actions of the DPD. *See* Dkt. 105, Exs. 40 (9 News aerial footage), 41 (Officer Bolton BWC). A reasonable jury could conclude Officer Bolton specifically targeted Mr. McDonnell because of, and in order to chill, his speech.

With respect to Mr. McDonnell's Fourth Amendment claim, Officer Bolton contends the force he used did not constitute a seizure because he was simply trying to "guide" Mr. McDonnell out of the area. Dkt. 98 at p.32. Officer Bolton further contends that even if his conduct could constitute a seizure, the force was reasonable under the circumstances because he could not allow Mr. McDonnell to remain within or behind the line of officers. *Id*.

While a jury certainly could accept Officer Bolton's version of events and his stated motivations, a reasonable jury could also reach a different conclusion based on the BWC footage and aerial news footage. As discussed above, the footage could be interpreted as Officer Bolton applying force—albeit brief—to Mr. McDonnell to impede his movement rather than "guide" him away. Furthermore, Officer Bolton's justification that Mr. McDonnell presented a security risk is undercut by the BWC

footage showing Bolton bypass other individuals who remained behind the police line. Thus again, the Court cannot grant qualified immunity based on these disputed material facts because they are intertwined with the qualified immunity question.

### 3.   Clearly Established Law

In a single, albeit lengthy, sentence, Defendants argue Plaintiffs cannot show a violation of any clearly established law. Dkt. 98 at p.34. The argument is again underdeveloped, but more importantly, it is fundamentally flawed because it assumes the constitutionality of Officer Bolton's actions. The Court has already found a jury could conclude otherwise based on the disputed material facts presented.

The Court finds Officer Bolton is not entitled to qualified immunity based on the summary judgment records currently before the Court.[9]

*      *      *

For the reasons shared above, Defendants' Motion for Summary Judgment is DENIED IN PART and GRANTED IN PART. It is GRANTED insofar as Plaintiffs will not be permitted to pursue a theory of ratification to support their *Monell* claims, and it is DENIED as to the remaining issues and claims.

IT IS FURTHER ORDERED a Final Pretrial Conference is set for November 18, 2024, at 10:00 a.m. in Courtroom C201 before U.S. District Judge S. Kato Crews.

---

[9] To the extent issues of qualified immunity are intertwined with disputed issues of material fact, those issues may be addressed at trial by presenting the jury with special interrogatories to resolve the factual disputes that bear on the issue of qualified immunity.

No later than November 12, 2024, the parties shall file the proposed final pretrial order.  A WORD version of the proposed final pretrial order should also be emailed to crews_chambers@cod.uscourts.gov.  Parties shall refer to this Court's Standing Order for Civil Cases when preparing the proposed final pretrial order.  Parties should be prepared to set a trial date within one to two months out from this conference.   Lead counsel who will try the case must be in attendance.

    DATED: September 12, 2024.


                                    BY THE COURT:

                                    S. Kato Crews
                                    United States District Judge